1  ELIZABETH STAGGS WILSON, Bar No. 183160
   estaggs-wilson@littler.com
2  MICHELLE RAPOPORT, Bar No. 247459
   mrapoport@littler.com
3  BROOKE DEARDURFF, Bar No. 292433
   bdeardurff@littler.com
4  LITTLER MENDELSON, P.C.
   633 West 5th Street
5  63rd Floor
   Los Angeles, CA  90071
6  Telephone:  213.443.4300
   Facsimile:   213.443.4299
7
   Attorneys for Defendants
8  THE GEO GROUP, INC. and GEO
   CORRECTIONS AND DETENTION, LLC
9

10               UNITED STATES DISTRICT COURT

11               CENTRAL DISTRICT OF CALIFORNIA

12  EMANUEL SANTIAGO, an            Case No.  5:16-CV-02263 – DOC - KK
    individual,
13                                  **COMPENDIUM OF EVIDENCE IN
              Plaintiff,            SUPPORT OF DEFENDANTS'
14                                  NOTICE OF MOTION AND
         v.                         MOTION FOR SUMMARY
15                                  JUDGMENT, OR IN THE
    THE GEO GROUP, INC., a Florida  ALTERNATIVE MOTION FOR
16  Corporation dba GEO CALIFORNIA, SUMMARY ADJUDICATION**
    INC.; GEO Corrections and Detention,
17  LLC; DOES 1 - 10, individuals, and
    DOES, 11 - 20, business entities   **Date:        December 18, 2017
18  inclusive,                         Time:         8:30 a.m.
                                       Courtroom:    9D – 9th Floor**
19            Defendants.

20
                                    Trial Date: January 23, 2018
21

22

23

24

25

26

27

28

LITTLER MENDELSON, P.C.
633 West 5th Street
63rd Floor
Los Angeles, CA  90071
213.443.4300

EVIDENCE ISO DEFS' MOTION
FOR SUMMARY JUDGMT                    1.

Defendants THE GEO GROUP, INC. and GEO Corrections and Detention, LLC ("GEO") hereby submits the following Documentary Evidence in Support of its Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment:

**1. Declaration of James Janecka**

A. Business Records Pertaining To GEO's Investigation Into August 5, 2015 Incident……………………………………………………...**Exhibit A**

B. Plaintiff's Termination Notice…………………………...………..**Exhibit B**

C. Email Between GEO Human Resources Specialist Aida Aldape and Director of Human Resources Sandra S. Gyenes……..……...**Exhibit C**

D. GEO's Family and Medical Leave Act Policy……….……...**Exhibit D**

E. Request For Termination of Officer Marquez……….………**Exhibit E**

F. GEO's Equal Employment Opportunity Policy………….…...**Exhibit F**

G. Collective Bargaining Agreements Between GEO and United Government Security Officers of America International Union, Local 880……………………………………………………...……….**Exhibit G**

H. Union's Grievance and Request for Arbitration With Regard to Plaintiff's Termination…………………………………………………….**Exhibit H**

///

///

///

LITTLER MENDELSON, P.C.
633 West 5th Street
63rd Floor
Los Angeles, CA 90071
213.443.4300

EVIDENCE ISO DEFS' MOTION FOR SUMMARY JUDGMT

2.

1  **2. Declaration of Michelle Rapoport**

2      I.      Plaintiff's Responses to Defendants' Special Interrogatories..…..**Exhibit I**

3

4      J.      Email Regarding Withdrawal of Union Grievance………. ..…..**Exhibit J**

5

6      K.     November 6, 2017 Meet And Confer Correspondence……....**Exhibit K**

7

8
9  Dated:   November 20, 2017

10

11                                    */s/ Michelle Rapoport*
ELIZABETH STAGGS WILSON
12  MICHELLE RAPOPORT
BROOKE DEARDURFF
13  LITTLER MENDELSON, P.C.

14  Attorneys for Defendants
THE GEO GROUP, INC. and GEO
15  Corrections and Detention, LLC

16
Firmwide:151316734.1 059218.1286
17

18

19

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON, P.C.
633 West 5th Street
63rd Floor
Los Angeles, CA 90071
213.443.4300

EVIDENCE ISO DEFS' MOTION
FOR SUMMARY JUDGMT

3.

1  ELIZABETH STAGGS WILSON, Bar No. 183160
   estaggs-wilson@littler.com
2  MICHELLE RAPOPORT, Bar No. 247459
   mrapoport@littler.com
3  BROOKE DEARDURFF, Bar No. 292433
   bdeardurff@littler.com
4  LITTLER MENDELSON, P.C.
   633 West 5th Street
5  63rd Floor
   Los Angeles, CA 90071
6  Telephone: 213.443.4300
   Facsimile: 213.443.4299
7
   Attorneys for Defendants
8  THE GEO GROUP, INC. and GEO
   CORRECTIONS AND DETENTION, LLC
9

10                 UNITED STATES DISTRICT COURT

11                CENTRAL DISTRICT OF CALIFORNIA

12 | EMANUEL SANTIAGO, an          | Case No. 5:16-CV-02263 – DOC – KK
   | individual,                   |
13 |                               |
   |              Plaintiff,       | **DECLARATION OF JAMES
14 |                               | JANECKA IN SUPPORT OF
   |        v.                     | DEFENDANTS' NOTICE OF
15 |                               | MOTION AND MOTION FOR
   | THE GEO GROUP, INC., a Florida| SUMMARY JUDGMENT, OR IN
16 | Corporation (dba GEO CALIFORNIA,| THE ALTERNATIVE MOTION FOR
   | INC).; GEO Corrections and Detention,| SUMMARY ADJUDICATION
17 | LLC; DOES 1 - 10, individuals, and |
   | DOES, 11 - 20, business entities | *[Filed concurrently with Notice of
18 | inclusive,                    | Motion and Motion; Memorandum of
   |                               | Points and Authorities; Statement of
19 |              Defendants.      | Uncontroverted Facts & Conclusions of
   |                               | Law; Compendium of Evidence;
20 |                               | [Proposed] Judgment Granting
   |                               | Defendants' Motion; Declaration of
21 |                               | Michelle Rapoport;*
22 |                               |
   |                               | **Date:        December 18, 2017
23 |                               | Time:        8:30 a.m.
   |                               | Courtroom:   9D – 9th Floor**
24 |                               |
25 |                               | Trial Date: January 23, 2018
26 |                               |
27
28
   DECLARATION OF JAMES
   JANECKA

LITTLER MENDELSON, P.C.
633 West 5th Street
63rd Floor
Los Angeles, CA 90071
213.443.4300

**Page 4**

1   I, JAMES JANECKA, declare and state as follows:

2       1.   I am over eighteen years of age and am competent to make this
3   declaration. I have personal knowledge of the following, or knowledge based
4   upon records which are within my custody and control. If called and sworn as
5   a witness, I can and would competently testify the facts in this declaration. I
6   understand that this declaration will be used to support Defendants The GEO
7   Group, Inc. and GEO Corrections and Detentions LLC ("GEO's") Motion for
8   Summary Judgment, or in the Alternative, Partial Summary Judgment.

9       2.   I have been employed by The GEO Group, Inc./GEO Corrections
10   and Detentions LLC for over twenty years. GEO operates corrections and
11   detentions facilities, including the Adelanto Detention Facility, in Adelanto California
12   where Plaintiff worked. I have worked as the Warden and Facility Administrator
13   of the Adelanto Detention Facility ("Adelanto"), which is operated by GEO
14   since September 2014. Adelanto houses detainees awaiting proceedings to
15   determine their immigration status. The Facility holds an active license as a Private
16   Patrol Operator Branch with the State of California.

17       3.   In my capacity as Warden and Facility Administrator, I manage
18   GEO's operations in Adelanto. Ensuring the security of detainees, employees
19   and the public is our primary objective and an essential job function of all
20   Detention Officers. Incidents that potentially compromise the security of any of
21   our constituents are considered to be very serious, and are dealt with
22   accordingly.

23       4.   In my position as Warden and Facility Administrator, I have access
24   to employee files and records pertaining to the employment of Detention
25   Officers and other employees.

26   ///

27   ///

28   ///

DECLARATION OF JAMES JANECKA        2.

LITTLER MENDELSON, P.C
633 West 5th Street
63rd Floor
Los Angeles, CA 90071
213.443.4300

5. GEO Corrections and Detentions LLC hired Plaintiff on March 18, 2013 as a Detention Officer. GEO Group, Inc. did not employ Plaintiff.

6. At all times relevant to this lawsuit, Plaintiff was assigned to the Restricted Housing Unit (also referred to as the Segregation Unit), where detainees are placed because they cannot reside with detainees in the general population for various reasons. The Restricted Housing Unit has two tiers, or levels, on which detainees are housed.

7. On August 5, 2015, Plaintiff escorted a detainee from his cell to the shower. Once the detainee was in the shower, Plaintiff did not secure the shower door. He left the detainee with the shower door unlocked, and left to attend to other duties. With Plaintiff away performing other functions, the unattended detainee exited the shower, walked towards the exit from the Restricted Housing Unit, and pushed a button seeking access through a locked door leading out of the unit. Officer Elizabeth Marquez, hired on July 9, 2012, was stationed in Central Control and tasked with ensuring only authorized personnel gain access through locked doors. When the detainee pushed the button, Officer Marquez unlocked the door remotely from Central Control for him, and the detainee passed through the door. The detainee continued on, gaining access through four doors monitored by Officer Marquez, until he was apprehended and returned to the Restricted Housing Unit.

8. Plaintiff submitted a report in connection with the incident. In the report, he describes the incident, stating, "On 8.5.15, shortly before the 1630 count, I placed D/T Irias into a lower tier shower." Plaintiff then goes on in some detail about the activities he engaged in after placing the detainee in the shower, including "counting" detainees, and delivering dinner trays to detainees, first on the lower tier, and then on the upper tier, as the detainee remained in the lower tier shower. Plaintiff concludes his report by stating, "I had not secured the shower door when placing D/T Irias in it due to administrative segregation now being an open dayroom and I believe he exited segregation while I was

DECLARATION OF JAMES
JANECKA                                    3.

LITTLER MENDELSON, P.C.
633 West 5th Street
63rd Floor
Los Angeles, CA 90071
213.443.4300

Page 6

1   feeding the top tier with the porters."⁸ Plaintiff's failure to secure the shower

2   door contributed to the detainee's attempted escape, and jeopardized security at

3   Adelanto.

4       Attached hereto as **Exhibit A** are business records pertaining to GEO's

5   investigation into the August 5, 2015 incident. The records include Plaintiff's

6   statement regarding the incident.   The records were created in the ordinary

7   course of business, and were either made at or near the time indicated in the

8   records by persons with knowledge of the acts or events described in the

9   records.

10      9.     GEO made the decision to terminate both Plaintiff and Officer

11  Marquez for their respective roles in the escape attempt. Plaintiff was placed on

12  administrative leave immediately after the incident and ultimately terminated.

13  Attached hereto as **Exhibit B** is a true and correct copy of Plaintiff's termination

14  notice, which was created in the ordinary course of business, at or near the time

15  indicated in the records by persons with knowledge of the acts or events

16  described in the records.  The notice states, in relevant part:

17      On 8-5-2015, Officer E. Santiago was assigned as the 2nd Watch West

18  Administrative Segregation Housing Unit Officer.   He was given specific

19  direction from Lt. Duran [a supervisor] to ensure two officers are present when

20  escorting Detainee Irias ...from in cell in Administrative Segregation to the

21  shower.   At approximately 1623 hours Officer Santiago conducted a single

22  officer escort of detainee Irias to the shower area, where he failed to lock and

23  secure the shower door.   Officer Santiago then proceeded to retrieve two

24  detainee porters to facilitate distribution of meal trays.   Formal count

25  commenced at 1630 and was conducted by Officer Santiago and Officer

26  Patterson.  Once count was completed Officer Patterson departed the unit to

27  facilitate a lunch break for another officer.   Officer Santiago failed to get

28  supervisory authorization to outcount detainee Irias in the shower area and

DECLARATION OF JAMES
JANECKA                         4.

LITTLER MENDELSON, P.C
633 West 5th Street
63rd Floor
Los Angeles, CA 90071
213.443.4300

1   further authorization to bring out two detained porters prior to the facility formal

2   count clearing.   While supervising detainee porters as they handed out meal

3   trays on the far upper tier, detainee Irias completed his shower and pushed open

4   the unsecure shower door at 1653 hours.   Detainee Irias departed the

5   Segregation housing unit unsupervised and unrestrained at approximately 1653

6   hours.

7        10.   Officer Marquez was pregnant when the August 5, 2015 incident

8   occurred.  She began her maternity leave pursuant to the Family Medical Leave Act

9   immediately following the incident, on August 6, 2015.   GEO did not pay her

10  compensation during her leave. Like Plaintiff, she performed no work for GEO at any

11  time following the August 5, 2015 incident.   Following her FMLA leave, Officer

12  Marquez extended her protected leave for her pregnancy related condition.  In all,

13  Officer Marquez was on a leave of absence from August 5, 2015 until April 5, 2016.

14  The Human Resources Specialist, Aida Aldape, communicated with Director of

15  Human Resources, Sandra S. Gyenes regarding the request to terminate Officer

16  Marquez on September 1, 2015. Attached hereto as **Exhibit C** is a true and correct

17  email correspondence. Attached hereto as **Exhibit D** is a true and correct copy of

18  GEO's Family and Medical Leave Act Policy.

19       11.   Shortly after she began her leave, GEO notified her that GEO was

20  investigating the August 5, 2015 incident and would take appropriate action upon her

21  return from leave. When she attempted to return, I placed a request for her

22  termination. The termination request states,

23       Ms. Marquez had been on FMLA/PFL from 8/6/2015 through 4/5/2016.  Prior

24  to going on FMLA/PFL Ms. Marquez accessed 4 doors from Central Control to allow

25  a detainee house[d] in Administrative Segregation to exit Segregation.  The day that

26  she was going to be placed on Administrative Leave without pay (8/6/2015), Ms.

27  Marquez did not return back to work but instead indicated that she was going to be off

28  on FMLA.  The letter was mailed to her notifying her that she was under investigation

DECLARATION OF JAMES
JANECKA                           5.

LITTLER MENDELSON, P.C.
633 West 5th Street
63rd Floor
Los Angeles, CA 90071
213 443 4300

due to the incident on August 5, 2015 and due to being out on FMLA the matter being investigated prior to her FMLA will remain open, but will need to conclude upon her [return].... [W]e are recommending termination of the following employee for inability to perform job. Attached hereto as **Exhibit E** is a true and correct copy of the request for termination of Officer Marquez. The records were created in the ordinary course of business, and the records were either made at or near the time indicated in the records by persons with knowledge of the acts or events described in the records.

12. GEO terminated Officer Marquez's employment upon completion of her protected leave of absence.

13. In November 2013, a detainee scaled a fence in Adelanto's recreation yard, while supervised by a female Detention Officer. The female Officer was placed on administrative leave without pay, and following an investigation, GEO terminated the Officer for inattention to duty. There have been no other incidents at Adelanto in which a detainee attempted to escape.

14. In compliance with federal and state law, GEO provides employees with various types of protected leaves of absence. Among them is the Family Medical Leave Act, which entitles eligible employees to take 12 weeks off every calendar year for a qualifying condition. Qualifying conditions are defined by statute and include, but are not limited to, the birth of a child, or due to the employee's own serious health condition.

15. Plaintiff took a leave of absence under the FMLA during his employment between August 2014 and January 2015 under GEO's FMLA policy to recover from non-work related injuries.

///

///

///

///

DECLARATION OF JAMES JANECKA

6.

LITTLER MENDELSON, P.C
633 West 5th Street
63rd Floor
Los Angeles, CA 90071
213.443.4300

16.     GEO provides employees, in compliance with state and federal legal requirements, other types of leave apart from the FMLA, including Pregnancy Disability Leave, which entitles employees to time off due to a disability caused by pregnancy or childbirth.  GEO also provides leaves of absence under the Americans with Disabilities Act, and its state equivalents, where required and appropriate for employees who need accommodations. GEO's policy covers any qualifying condition, again, as require by law.    GEO administers its leave of absence equally to eligible employees with a qualifying condition, regardless of the qualifying reason for the leave.  GEO typically does not terminate employees during a legally protected leave of absence, regardless of the qualifying reason for the leave of absence.

17.     GEO would have waited until the conclusion of Officer Marquez's leave of absence to terminate her employment had she taken the leave for any protected reason other than childbirth and related medical conditions.  Similarly, had Plaintiff requested and qualified for a protected leave of absence immediately after the August 5, 2015 incident, GEO likely would have waited to terminate his employment until his return from leave.

18.     GEO's policy is "to provide equal employment opportunity to all qualified individuals without regard to race, religion, color, sex, sexual orientation, age, national origin, disability, veteran status, marital status, gender discrimination, military status, medical condition or any other category protected by law...." GEO's policy contains a complaint procedure, which encourages employees to report incidents that are believed to violate the policy.   The policy further prohibits retaliation against any employee who files a charge of discrimination, cooperates with a governmental investigation of a charge, or exercises any right protected by federal or state law requiring equal opportunity.  Attached hereto as **Exhibit F** is a true and correct copy of GEO's Equal Employment Opportunity, which was created and is maintained by GEO in the ordinary course of business.

///

DECLARATION OF JAMES JANECKA

7.

LITTLER MENDELSON, P.C
633 West 5th Street
63rd Floor
Los Angeles, CA 90071
213 443 4300

19.     GEO's Adelanto Facility is unionized, and Detention Officers are represented by the United Government Security Officers of America International Union, Local 880 ("the Union").    Plaintiff's employment was governed by two Collective Bargaining Agreements ("CBA"); the first was in effect from February 25, 2011 until the second CBA went into effect beginning July 3, 2015.    Attached hereto as **Exhibit G** is a true and correct copy of the collective bargaining agreements between GEO and the Union, effective during Plaintiff's employment.    The records were created in the ordinary course of business, at or near the time indicated in the records by persons with knowledge of the acts or events described in the records.

20.     The Union filed grievances challenging both Plaintiff's and Officer Marquez's termination. Attached hereto as **Exhibit H** is a true and correct copy of the Union's grievance and request for arbitration with regard to Plaintiff's termination. The records were created in the ordinary course of business, and the records were either made at or near the time indicated in the records by persons with knowledge of the acts or events described in the records.

21.     The arbitration hearings of both Officer Marquez and Plaintiff were scheduled for June, 2017.    However, the arbitration hearing regarding Plaintiff's grievance was continued to December 2017.  Marquez's arbitration proceeded on June 14, 2016. On September 1, 2017, the arbitrator issued an award in favor of GEO, holding Officer Marquez's termination was supported by just cause.


I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed this 20th day of November, 2017, at Adelanto, California.


James Janecka

DECLARATION OF JAMES JANECKA                          8.

LITTLER MENDELSON, P.C
633 West 5th Street
63rd Floor
Los Angeles, CA 90071
213 443 4300

# EXHIBIT A

# MEMORANDUM



**Corrections**

Date:   August 18, 2015

To:   Cheryl Nelson, Director Regional Operations

From:   James Janecka, Warden

The GEO Group, Inc.
GEO Corrections
Adelanto Detention Facility East
10400 Rancho Rd.
Adelanto  California 92301
www.geogroup.com

**RE:   TERMINATION REQUEST**

Based on the information on the attached memorandum, we are recommending termination of the following employee for inability to perform job.

| Employee Name: | *EMANUEL SANTIAGO* |
|---|---|
| **Employee ID Number:** | *176828* |
| **Job Title:** | *DETENTION OFFICER* |
| **Date of Hire:** | *03/18/2013* |
| **Recommended Termination Code:** | *109-INABILITY TO PERFORM JOB* |

Supporting Documents:
- Disciplinary Action Form
- Memorandum from E. Santiago, Detention Officer, dated August 5, 2015
- Memorandum from E. Marquez, Detention Officer, dated August 5, 2015
- Memorandum from J. Mora, Detention Officer, dated August 5, 2015
- Memorandum from A. Soliz, Sergeant, dated August 5, 2015
- Memorandum from J. Hutchinson, Sergeant, dated August 5, 2015
- Memorandum from R. De Soto, Detention Officer, dated August 5, 2015
- Memorandum from R. Anderson, Lieutenant, dated August 6, 2015
- Memorandum from Z. Darmandzhyan, Detention Officer, dated August 6, 2015
- Memorandum from R. Duran, Lieutenant, dated August 6, 2015
- 1940 Beds, Staffing Plan, dated June 16, 2015
- Log Book, dated August 5, 2015
- Post Order Signature Sheet, July/August 2015
- Supervisor Shift Log, dated August 5, 2015

GEO000127



- Policy and Procedure, Segregation/Special Management Unit Officer, 10.3.7-ADF
- Policy and Procedure, Special Management Unit Operations, 10.2.11-ADF
- 40 Hour Certification Housing Unit Training

_____          _____
Facility Administrator Signature          Date   8/18/15

**Page 14**

GEO000128

# DISCIPLINARY ACTION FORM


The GEO Group, Inc.

Employee's Name:  Emanuel Santiago _____  Employee No.:  176828 ___  DOH:  3/18/2013 ___

Job Title:  Detention Officer _____  Dept. Name:  Security ___  Log No.:  _____

Supervisor's Name:  Lt. R. Anderson _____  Facility Name:  ADF West ___  Facility No.:  196 ___

**INFRACTION:** Inattention to Duty _____  Date of Violation: 8/5/2015 ___

**SUMMARY OF INFRACTION:** The specific facts regarding the current infraction, including details and description of issue or rule(s) violated.

On 8/5/2015 Officer E. Santiago failed to use proper security procedures, which afforded a detainee to freely move in the Administrative Segregation housing unit and ultimately attempt to escape by breaching four facility security doors before being apprehended and returned to Segregation.

**SUMMARY OF FINDINGS:** Document below your findings. Include the Who, What, When, and Where of the investigation.    Does this incident involve OPR?   ☐ Yes  ☒ No   If Yes, OPR No.: ___  (DO NOT attach OPR Report.)

On 8-5-2015 Officer E. Santiago was assigned as the 2nd Watch West Administrative Segregation Housing Unit Officer. He was given specific direction from Lt. Duran to ensure two officers are present when escorting Detainee Irias  Redacted  from in cell in Administrative Segregation to the shower. At approximately 1623 hours Officer Santiago conducted a single officer escort of detainee Irias to the shower area, where he failed to lock and secure the shower door. Officer Santiago then proceeded to retrieve two detainee porters to facilitate distribution of meal trays. Formal count commenced at 1630 and was conducted by Officer Santiago and Officer Patterson. Once count was completed Officer Patterson departed the unit to facilitate a lunch break for another officer. Officer Santiago failed to get supervisory authorization to out count detainee Irias in the shower area and further authorization to bring out two detainee porters prior to the facility formal count clearing. While supervising detainee porters as they handed out meal trays on the far upper tier, detainee Irias completed his shower and pushed open the unsecure shower door at 1653 hours. Detainee Irias departed the Segregation housing unit unsupervised and unrestrained at approximately 1653 hours.

**SUPPORTING DOCUMENTATION:**    Additional Pages Attached?  ☒ Yes  ☐ No    If Yes, Number of Pages: 58

**DISCIPLINARY HISTORY:** List prior Counseling(s) or other Disciplinary Action(s) below. Document ALL history starting with the most recent violation looking back 12 months.

Date: _____  Violation: _____

    Action: _____

Date: _____  Violation: _____

    Action: _____

Date: _____  Violation: _____

    Action: _____

| DISCIPLINARY ACTION: | ☐ Counseling | ☐ Written Reprimand | ☐ Final Reprimand | ☒ Dismissal |
|---|---|---|---|---|

GEO000129

# DISCIPLINARY ACTION FORM

**GEO**
The GEO Group, Inc.

| REASON: | ☐ Behavior | ☐ Absenteeism/Tardiness | ☒ Performance | ☐ Policy |
|---------|-----------|------------------------|---------------|----------|
| | | *# of Points:* 0 | | |

**EXPECTED IMPROVEMENT AND STANDARD FOR THE FUTURE:** List Specific goals. Failure to show immediate and sustained improvement will result in disciplinary action up to and including discharge.

Officers are expected to move and secure detainees in a secure segregation housing unit with all required security precautions. Any deviation from policy, procedure and/or supervisory directives must be preauthorized by a supervisor. This requires staff to remain fully attentive and alert during work hours. Failure to do so may jeopardize the safety and security of the facility, as well as the lives of staff, detainees, and visitors.

I acknowledge this action and understand the expectations and requirements as discussed with me and outlined above. I also understand the Disciplinary Action Appeal Process. My signature does not imply agreement or disagreement.

EMPLOYEE Signature: _____ Date: _____

Printed Name: _____

A witness is only <u>required</u> when the employee refuses to sign this form. A witness should be from Human Resources or a member of management and *not* a co-worker of the employee.

☐ Employee refused to sign and has received a copy of completed form.

WITNESS Signature: _____ Date: _____

Printed Name: _____

SUPERVISOR Signature: _____ Date: 8·13·15
Printed Name: T. R. Anderson

DEPARTMENT HEAD Signature: _____ Date: 8-13-15
Printed Name: Ana L. Seibert-Love

FACILITY ADMINISTRATOR Signature: _____ Date: 8/17/15
Printed Name: J. Janecka

HUMAN RESOURCE Signature: _____ Date Distributed: _____
Printed Name: _____ Date Entered into HR System: _____

<u>DISTRIBUTION:</u> ☐ Copy to Employee ☐ Copy to Supervisor ☐ Original to Personnel File

FINAL REPRIMAND, DISCIPLINARY DEMOTION, OR DISMISSAL ONLY (REGION / DIVISION):

GEO000130

# DISCIPLINARY ACTION FORM

**GEO**
The GEO Group, Inc.

| | | Signature: | | |
|---|---|---|---|---|
| **HR DIRECTOR** | ☐ Concur | Signature: | | |
| | Mitigate ☐ | Printed Name: | | Date: |
| **DIRECTOR OF OPERATIONS** | ☐ Concur | Signature: | | |
| | Mitigate ☐ | Printed Name: | | Date: |
| **VICE PRESIDENT** | ☐ Concur | Signature: | | |
| | Mitigate ☐ | Printed Name: | | Date: |

**DISMISSAL ONLY:**

| | | | | |
|---|---|---|---|---|
| **CORPORATE LEGAL** | ☐ Concur | Signature: | | |
| | Mitigate ☐ | Printed Name: | | Date: |
| **CORPORATE HUMAN RESOURCES** | ☐ Concur | Signature: | | |
| | Mitigate ☐ | Printed Name: | | Date: |

GEO000131



Corrections & Detention ®

# MEMORANDUM

Date: 8-5-15

To: Lt. Anderson

cc:

From: D/O Santiago, E/ ~~~~~

Adelanto Detention Facility
10250 Rancho Road (West)
10400 Rancho Road (East)
Adelanto, CA 92301

RE:
_____

On 8-5-15, shortly before the 1630 count, I placed D/t Irias Redacted into a lower tier shower. Moments before placing him in the shower, the dinner trays were delivered by kitchen staff and were awaiting distribution. Once I signed for the dinner trays, kitchen staff exited and I proceeded to inspect the dinner cart as required. By this time the 1630 count had commenced and D/t Irias had not finished showering, so we counted him in the shower as to not delay count or cause other issues. Upon completion of our count, we needed to begin our staff lunch breaks in segregation immediately to prevent the possibility of a meal penalty, as we are to relieve eachother on 2ND Watch, one at a time, because we do not have a segregation control officer, nor do the utilities assist with lunches in segregation. Also, between the time he was placed in the shower and the time count was commenced, the 2nd segregation officer had returned from outside recreation with 8 detainees who were secured in their cells, as he had completed the detainee's hour of recreation on the lower tier. In order to complete our staff lunches, the 2nd officer on the administrative segregation side proceeded to disciplinary segregation side to relieve the 2 officers working disciplinary segregation, one officer at a time, leaving me to complete the

**Page 18**

GEO000132



Corrections & Detention ®

# MEMORANDUM

Adelanto Detention Facility
10250 Rancho Road (West)
10400 Rancho Road (East)
Adelanto, CA 92301

Date: 8-5-15

To: Lt. Anderson

cc:

From: D/o Santiago, E/

RE:

distribution of dinner trays. The 2 segregation porters were utilized to complete the distribution of dinner trays and I began distribution with them on the lower tier. We started on the left side nearest the segregation control and worked our way to the left. At the time we started D/T Irias was still in the shower and not his cell (A-116) so we skipped him and were to go back and feed him. When finished distributing to the bottom tier D/T Irias still had not finished in the shower so we continued to the top tier to distribute trays, this time from the right to the left. Once we finished distributing dinner trays to the top tier I began securing the food ports and then continued down back to the bottom tier where I seen D/T Irias being escorted by multiple staff back into segregation and into his cell. I had not secured the shower door when placing D/T Irias in it due to administrative segregation now being an open dayroom and I believe he exited segregation while I was feeding the top tier with the porters. —End Report

GEO000133

# MEMORANDUM



*Corrections*

The GEO Group, Inc.
GEO Corrections
Adelanto Detention Facility-East
10400 Rancho Road
P. O. Box 6005
Adelanto, California 92301
www.geogroup.com

Date: 8|5|15

To: Lt. Anderson
cc:

From: E. Marquez

RE: Detainee Jimmy Irias

On Wednesday August 8th 2015 at approximately 1655 hours while in Central Control at the time of incident I was on the phone verifying Count with intake, and three Control officer. Locating an available utility on the radio. I Do not Recall seeing any detainee at the camera call-up while Accessing multiple doors.

GEO000134

# MEMORANDUM



The GEO Group, Inc,
GEO Corrections
Adelanto Detention Facility
10400 Rancho Road
P. O. Box 6005
Adelanto, California 92301
www.geogroup.com

Date: 8/05/15

To: LT. ANDERSON

From: D/O J.MORA

**RE:**

AT APPROXIMATELY 1640 I DETENTION OFFICER J.MORA WAS WALKING DOWN THE WEST FACILITIES MAIN CORRIDOR WHEN I OBSERVED DETAINEE (ARIAS, JIMMY    Redacted    W1-A-116-1L) WALK OUT OF DOOR 1X101A, AS HE WALKED TOWARDS DOOR #707. I THEN ADVISED SEARGENTS SOLIS AND HUTCH OF THE SITUATION VIA VERBAL. HE THEN CONTINUED TO GET THROUGH DOOR 707 AND WALKED TO DOOR 322B I THEN FOLLOWED HIM. SEARGENT SOLIS VERBALLY ASKED DETAINEE ARIAS THAT HE WOULD BE ESCORTED BACK TO SEGREGATION AS DETAINEE ARIAS BEGAN TO COMPLY. I THEN ASSISTED WITH ECORTING DETAINEE ARIAS BACK TO SEGREGATION WHERE HE WAS PLACED IN HIS CELL. NOTHING FURTHER TO REPORT AT THIS TIME.

GEO000135



Corrections & Detention ®

Adelanto Detention Facility
10250 Rancho Road (West)
10400 Rancho Road (East)
Adelanto, CA  92301

# MEMORANDUM

Date:  08/05/2015

To: Lt. R. Anderson

cc:

From:  Sgt. A. Soliz

RE: SECURITY BREACH: DETAINEE- IRIAS, JIMMY  Redacted

On Wednesday August 5, 2015 at approximately 1640 hours I, Sgt. A. Soliz, was completing paper work in the west watch office during the formal 1630 hours count when Officer J. Mora notified me of an unattended detainee in the main corridor. Sgt. Hutchinson and I immediately entered the main corridor to assess the situation. Upon exiting the office we observed and recognized detainee Irias, Jimmy Redact opening the 707 door. Sgt. Hutchinson gave Irias the verbal command to stop but Irias stated, "I 'm getting out of here you guys opened the door for me." and proceeded through the doorway. Officer J. Mora, Officer DeSoto, Officer Darmandzhyan, Sgt. Hutchinson, and I continued to follow Irias. Sgt. Hutchinson ordered via radio for central control officers not access the intake door that Irias was standing by. I then immediately ordered central control officers not to access any doors in the facility except door 707 to allow us to proceed to where Irias was standing. Officer DeSoto began to jog towards Irias in an attempt to restrain him. However, due to previous experiences with Irias being violent towards staff and his mental condition, I ordered Officer DeSoto to stand down and approach Irias with us as a group. I also observed that Irias was not at the exiting door of the corridor and decided to use the knowledge of our facility layout to prevent escalating the situation. Sgt. Hutchinson and I used our judgment to approach the situation in a way that would de-escalate the situation and minimize possibility of staff injury. We approached Irias with urgency and caution while giving clear and concise verbal commands such as "Jimmy I need you to put your Hands behind your back." And "Jimmy I need you to cuff up." Once we reached Irias we spaced out around him to prevent any further movement from him. Irias then responded, "I don't want no cuffs. I'll fucking walk back!" We agreed to let Irias walk back to Segregation Housing without mechanical restraints due to the fact that he was housed in Segregation A Unit(which does not require detainees to be placed in restraints for movement) and also due to the fact that Irias was being compliant to return to his housing. While being escorted Irias began to state, "Its y'all fault you opened up the door! Now you're gonna charge me with another bullshit charge!" Upon reaching the Segregation Unit main corridor doors, Sgt. Hutchinson and I made contact with Lt. Duran as she was exiting the unit. We advised her of the situation and she stated," No way! I just left there and he was in the shower. Take him back to his cell." Sgt. Hutchinson and I both agreed that we should follow command since formal count had not yet cleared and we continued to escort Irias back to his housing where we returned him to his cell and was secured. Lt. Anderson was notified immediately of the situation.

GEO000136



Corrections & Detention ®

# MEMORANDUM

Date:  08/05/2015

Adelanto Detention Facility
10250 Rancho Road (West)
10400 Rancho Road (East)
Adelanto, CA  92301

To:  Lt. R. Anderson

cc:  CAPT. McCusker

From:  Sgt. J Hutchinson

RE:  SECURITY BREACH: DETAINEE- IRIAS, JIMMY      Redacted

On Wednesday August 5, 2015 at approximately 1640 hours, I was notified by Officer J. Mora that there was an unescorted Detainee in the main corridor. Sgt. Soliz and I immediately entered the main corridor to assess the situation. Upon exiting the office we observed and recognized Detainee Irias, Jimmy Redac opening the 707 door. I gave Irias the verbal command to stop several times, Irias stated, " I 'm getting out of here you guys opened the door for me." and proceeded through the doorway. Officer J. Mora, Officer DeSoto, Officer Darmandzhyan, Sgt. Soliz, and I continued to follow Irias. I ordered via radio for Central Control Officers not to access the intake door that Irias was standing by. Sgt. Soliz then immediately ordered Central Control Officers not to access any doors in the facility except door 707 to allow us to proceed to where Irias was standing. Officer DeSoto began to jog towards Irias in an attempt to restrain him. However, due to previous experiences with Irias being violent towards staff and his mental condition, Sergeant Soliz ordered Officer Desoto to stand down, I then pulled out my chemical agent verbally telling Detainee "Jimmy I need you to put your hands behind your back", he replyed "No you guys opened the door for me". I repeated it again and told him if he does not comply chemical agent will be used. Irias then said "Fuck I'll walk back. At this time we had surrounded Detainee Irias, whereby we escorted him down to Segregation without hand restraints with no issues and full compliance. As we are escorting him he said "Now you guys are going to charge me with some bulllshit." Next we entered the Segregation Corridor from the Main Corridor and  LT. Duran was there I said "What happened," she replyed "What do you mean, I just saw him in the shower." I said "LT he went threw four doors." LT. Duran then said "Take him back to his cell," which myself and Sergeant Soliz and the other three Officers did with no issues and full compliance. After securing Irias in his cell myself and Sergeant Soliz Immediately went to our Watch Commander LT. Anderson and informed of the situation, whereby he told us to check the cameras. I used my judgment to approach the situation due to previous incident with Detainee Irias in a way that would deescalate the situation and minimize possibility of staff injury.

GEO000137



**Corrections & Detention ®**

# MEMORANDUM

Date: 8/5/15

To: LT. ANDERSON
cc: SGT. HUTCHENSON.

From: P/O DESOTO

RE: 8/5/15   DISCREPANCIES.

Adelanto Detention Facility
10250 Rancho Road (West)
10400 Rancho Road (East)
Adelanto, CA 92301

ON AUGUST 5, 2015 AT APPROXIMATY 1645pm I P/O DESOTO WAS WALKING BACK FROM DROPPING OFF PAPERWORK AT CENTRAL CONTROL, WHEN I HEARD STAFF MEMBERS. MORA, DARMANDZHY, SGT. HUTCHENSON, SGT. SOUZ CALL TO A DETAINEE THAT WALKED OUT OF SEGREGATION I P/O DESOTO WITNESSED DETAINEE ARIAS. J. WALK INTO INTAKE CORRIDOR THROUGH DOOR 707. THE FOLLOWING STAFF AND MYSELF FOLLOWED THE DETAINEE AND MADE CONTACT WITH DETAINEE ARIAS. AT INTAKE ENTRANCE. I TOLD DETAINEE ARIAS TO PUT HIS HANDS BEHIND HIS BACK, HE REFUSED SGT. HUTCHENSON ASKED THE DETAINEE TO COMPLY; DETAINEE ARIAS CHOSE TO WALK BACK TO SEGREGATION. DETAINEE WAS THEN SECURED IN SEGREGATION NO INJURIES AT THE TIME, NO FURTHER DISCREPANCIES

GEO000138



**Corrections & Detention ®**

# MEMORANDUM

Adelanto Detention Facility
10250 Rancho Road (West)
10400 Rancho Road (East)
Adelanto, CA 92301

Date: 08/06/2015

To: Captain L. McCusker
cc:

From: Lt. R. Anderson

RE: **EVENTS OF 08/05/2015**

On 08/15/2015 at approximately 1700 I was notified of a Detainee having been observed unescorted within the facility and the on duty Shift Sergeants had confronted the Detainee and escorted him back to his assigned housing in Protective Custody/Administrative Segregation (W1-A) without incident. In concert with this I was managing an upcoming concern with the eminent arrival of a disabled Detainee while ensuring the 1630 face to photo facility count was completed successfully. The count was cleared at approximately 1730 at which time I turned my focus and priority on the Segregation detainee found unescorted and began my fact finding efforts to determine the actions leading to the Detainee being allowed out of Segregation without escort.

At approximately 1830 I received a phone call from Warden Janecka in regard to arrival of the disabled Detainee. During this conversation I informed Warden Janecka we had discovered Segregation Detainee outside Segregation unsupervised. Warden Janecka advised me to contact the ADO (D.W. J. Gustin) and to advise him of the situation. Multiple attempts were made to contact the ADO without success. Soon after, Chief Johnson contacted me by phone stating he had received information from the Warden regarding the above incident. I relayed the information acquired at the time of his call and continued my investigation.

It was determined the breach in security had resulted from the assigned Segregation Officers leaving the detainee unattended in an unsecured shower. The investigation also determined West Central Control Officers had accessed doors without properly identifying the person exiting.

The primary staff errors were determined to be the misunderstanding by Segregation Officers that they could relieve themselves for breaks and lunches. This is a result of mixed messages given to Segregation Officers during the recent Staffing and procedural changes. The afore mentioned errors and misunderstandings were a result of my not ensuring Staff were advised of the most recent procedural information, as I too had received mixed direction with regard to segregation procedures. Not having concluded the scenario should be classified as an attempted escape in a timely manner, I exceeded the timeline guidelines for reporting it as such.

Following this, a disciplinary packet was written on Detainee Irias, J. Redacted for attempted escape, Disciplinary Action Forms (DAF) were written on one Central Control Officer, one Segregation Officer and two Shift Sergeants.

GEO000139

# MEMORANDUM

**GEO** Corrections

The GEO Group, Inc.
GEO Corrections
Adelanto Detention Facility
10400 Rancho Road
P. O. Box 6005
Adelanto, California 92301
www.geogroup.com

Date:  08/6/2015

To:   LT. Anderson

From:   Z. Darmandzhyan

## RE:  DETAINEE IRIAS, JIMMY

On 08/05/15 at approximately 1655 hours I, Z. Darmandzhyan, observed detainee Irias, Jimmy
    Redacted    walk out from segregation and into the main corridor unaccompanied by any
staff members. I asked the detainee "what are you doing?" in which detainee Irias responded "I
have bail, I'm going". At this moment, Officer Mora notified the management staff who were in
the watch office. Myself, management, and other officers walked towards detainee Isias.
Detainee Isias opened the door leading into the medical/intake corridor and went into the
hallway. I and the responding staff entered the medical/intake corridor and approached detainee
Isias. Detainee Isias stated to us, "The doors are guiding me". Upon arriving to the area where
detainee Isias was standing, Detainee Isias was given a verbal command to submit to mechanical
restraints. Detainee Isias responded "Why so I can get another bullshit charge?" Detainee stated
that he will walk back to segregation. Detainee Isias was escorted back to segregation without
any further incident.

GEO000140



Corrections & Detention ®

# MEMORANDUM

Adelanto Detention Facility
10250 Rancho Road (West)
10400 Rancho Road (East)
Adelanto, CA  92301

Date: 08-06-2015

To: Chief J. Johnson
cc:

From:  Lt. Duran

RE: CONVERSATION WITH OFFICER  E. SANTIAGO

On Wednesday 08-05-2015 at approximately 1600 I entered Administrative segregation to drop off paperwork while I was in segregation detainee Irias Jimmy  Redacted  asked to speak to me. While speaking with detainee Irias he seemed somewhat agitated and ended the conversation stating never mind and then asking if he could take a shower. I advised detainee Irias yes he would get a shower. Seeing that Irias seemed agitated I notified officer Santiago that Irias was on edge and that I didn't trust his behavior so to take all security measures and be cautious when accessing the doors. I stated to officer Santiago that when Irias is taken out to the shower make sure both officers' were present while escorting detainee Irias to the shower I then departed administrative segregation.

GEO000141

6/16/2015   6:11 PM

| | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| 1 | The GEO Group, Inc. | | | | | | |
| 2 | Adelanto California | | | | | | |
| 3 | 1940 Beds for ICE - Adelanto Processing Center East & West & Expand West | | | | | | |
| 4 | STAFFING PLAN * | | | | | | |
| 109 | **Programs** | | | | | | |
| 110 | | | | | | | |
| 111 | | NonShift | Shift 1 | Shift 2 | Shift 3 | Relief | FTE |
| 112 | | | | | | | |
| 113 | Records Supervisor | 1.00 | | | | 1.00 | 1.00 |
| 114 | Chaplain | 1.00 | | | | 1.00 | 1.00 |
| 115 | Classification Officer - Delete 1.0 | 5.00 | | | | 1.00 | 5.00 |
| 116 | Programs Clerk | 1.00 | | | | 1.00 | 1.00 |
| 117 | Library Technician | 2.00 | | | | 1.00 | 2.00 |
| 118 | Detainee Records Clerk | 4.00 | | | | 1.00 | 4.00 |
| 119 | Recreation Specialist | 2.00 | | | | 1.00 | 2.00 |
| 120 | | | | | | | |
| 121 | Sub Total | 16.00 | 0.00 | 0.00 | 0.00 | | 16.00 |
| 122 | | | | | | | |
| 123 | #REF! | | | | | | |
| 124 | **Security Supervisors** | | | | | | |
| 125 | | | | | | | |
| 126 | | NonShift | Shift 1 | Shift 2 | Shift 3 | Relief | FTE |
| 127 | AFA Security - Added 1 | 2.00 | | | | 1.00 | 2.00 |
| 128 | Chief of Security | 1.00 | | | | 1.00 | 1.00 |
| 129 | Captain - NEW | 2.00 | | | | 1.00 | 2.00 |
| 130 | Shift Supervisor / Lieutenant | | 2.00 | 2.00 | 2.00 | 1.67 | 10.00 |
| 131 | Admin / Segregation Lieutenant - NEW | 1.00 | | | | 1.00 | 1.00 |
| 132 | Intake Lieutenant | 2.00 | | | | 1.00 | 2.00 |
| 133 | Armory / Lockshop Sergeant | 1.00 | | | | 1.00 | 1.00 |
| 134 | Assist. Shift Super. / Sgt | | 2.00 | 2.00 | 2.00 | 1.67 | 10.00 |
| 135 | Booking Clerk | 2.00 | | | | 1.00 | 2.00 |
| 136 | Security Clerk | 2.00 | | | | 1.00 | 2.00 |
| 137 | | | | | | | |
| 138 | | | | | | | |
| 139 | | | | | | | |
| 140 | Sub-Total | 13.00 | 4.00 | 4.00 | 4.00 | | 33.00 |
| 141 | | | | | | | |
| 142 | #REF! | | | | | | |
| 143 | **Detention Officers (CBA)** | | | | | | |
| 144 | | | | | | | |
| 145 | | NonShift | Shift 1 | Shift 2 | Shift 3 | Relief | FTE |
| 146 | Medical Transportation Officer | 6.00 | | | | 1.60 | 9.60 |
| 147 | Bailiff - Deleted 1.0 | 5.00 | | | | 1.20 | 6.00 |
| 148 | Court Hall / Holding Cell Off - NEW | 2.00 | | | | 1.20 | 2.40 |
| 149 | Med Holding Observation Cell Officers - NEW | | 2.00 | 2.00 | 2.00 | 1.20 | 7.20 |
| 150 | Central Control Room Officer | | 4.00 | 4.00 | 4.00 | 1.60 | 19.20 |
| 151 | Visitation Officer - Added 1 | | 5.00 | | | 1.60 | 8.00 |
| 152 | (East) Housing A Control        $\mu \vee$ | | 1.00 | 1.00 | 1.00 | 1.60 | 4.80 |
| 153 | (East) Housing A - Added 1.0 per shift $\mu \vee$ | | 4.00 | 4.00 | 4.00 | 1.60 | 19.20 |
| 154 | (East) Housing B Control - Delete 3rd shift $\mu \vee$ | | 1.00 | 1.00 | | 1.60 | 3.20 |
| 155 | (East) Housing B        $\mu \vee$ | | 3.00 | 3.00 | 3.00 | 1.60 | 14.40 |
| 156 | (West) Housing C Control $\mu \vee$ | | 1.00 | 1.00 | 1.00 | 1.60 | 4.80 |
| 157 | (West) Housing C        $\mu \vee$ | | 4.00 | 4.00 | 4.00 | 1.60 | 19.20 |
| 158 | (West) Housing D Control $\mu \vee$ | | 1.00 | 1.00 | 1.00 | 1.60 | 4.80 |
| 159 | (West) Housing D        $\mu \vee$ | | 4.00 | 4.00 | 4.00 | 1.60 | 19.20 |
| 160 | (NEW WEST EXP) Housing E Control - NEW $\mu \vee$ Page 3 of 4 | | 1.00 | 1.00 | 1.00 | 1.60 | 4.80 |

**Page 28**

GEO000142

6/16/2015    6:11 PM

| | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| 1 | The GEO Group, Inc. | | | | | | |
| 2 | Adelanto California | | | | | | |
| 3 | 1940 Beds for ICE - Adelanto Processing Center East & West & Expand West | | | | | | |
| 4 | STAFFING PLAN * | | | | | | |
| 161 | (NEW WEST EXP) Housing E - NEW HV4 | | 4.00 | 4.00 | 4.00 | 1.60 | 19.20 |
| 162 | (NEW WEST EXP) Housing F Control - NEW HV5 | | 1.00 | 1.00 | 1.00 | 1.60 | 4.80 |
| 163 | (NEW WEST EXP) Housing F - NEW HV5 | | 4.00 | 4.00 | 4.00 | 1.60 | 19.20 |
| 164 | Recreation Yard - Added 1.0 shift 1; 1.0 shift 2 | | 4.00 | 4.00 | | 1.60 | 12.80 |
| 165 | Intake / Release | | 5.00 | 5.00 | 4.00 | 1.60 | 22.40 |
| 166 | Utility / Escort - Added 1.0 per shift Utility I | | 6.00 | 5.00 | 4.00 | 1.60 | 24.00 |
| 167 | Perimeter Patrol | | 2.00 | 2.00 | 2.00 | 1.60 | 9.60 |
| 168 | Medical - Deleted shifts 1-2-3 | 1.00 | | | | 1.60 | 1.60 |
| 169 | Segregation Control - NEW | | 1.00 | 1.00 | 1.00 | 1.60 | 4.80 |
| 170 | Segregation/Protective Custody | | 4.00 | 3.00 | 2.00 | 1.60 | 14.40 |
| 171 | Lobby | | 2.00 | 2.00 | | 1.60 | 6.40 |
| 172 | Food Service (East & West) - NEW | | 2.00 | 2.00 | | 1.60 | 6.40 |
| 173 | Law Library (East & West) - NEW | | 2.00 | | | 1.60 | 3.20 |
| 174 | Property Officer - Deleted 1.0 | 3.00 | | | | 1.60 | 4.80 |
| 175 | Laundry - Deleted 1.0 | 1.00 | | | | 1.60 | 1.60 |
| 176 | | | | | | | |
| 177 | | | | | | | |
| 178 | | | | | | | |
| 179 | Sub-Total | 18.00 | 68.00 | 59.00 | 47.00 | | 302.00 |
| 180 | | | | | | | |
| 181 | #REF! | | | | | | |
| 182 | SUMMARY * | | | | | | |
| 183 | | | | | | | |
| 184 | | NonShift | Shift 1 | Shift 2 | Shift 3 | Relief | FTE |
| 185 | | | | | | | |
| 186 | Executive Office | 10.00 | 0.00 | 0.00 | 0.00 | | 10.00 |
| 187 | Business / Support | 23.00 | 0.00 | 0.00 | 0.00 | | 23.00 |
| 188 | Maintenance | 8.00 | 0.00 | 0.00 | 0.00 | | 8.00 |
| 189 | Health Care | 35.00 | 11.00 | 9.00 | 8.00 | | 67.00 |
| 190 | Programs | 16.00 | 0.00 | 0.00 | 0.00 | | 16.00 |
| 191 | Food Service | 2.00 | 9.00 | 7.00 | 0.00 | | 27.00 |
| 192 | Security Supervisors | 13.00 | 4.00 | 4.00 | 4.00 | | 33.00 |
| 193 | Detention Officers (CBA) | 18.00 | 68.00 | 59.00 | 47.00 | | 302.00 |
| 194 | | | | | | | |
| 195 | TOTAL STAFF | 125.00 | 92.00 | 79.00 | 59.00 | | 486.00 |

Page 4 of 4

GEO000143

**Page 29**

104

WIA

2nd Watch 8-5-15

| 1431 | Santiago & Patterson on post relieving Avila |
| | & Sanchez. Equipment inventory: Radio #812 #. |
| | Cuff #27, #, key ring #173 with 10 keys #257 |
| | with 1 key. |
| 1455 | Security check completed, to include fire/safety inspection |
| | with no discrepancies noted. |
| 1430-LC | Security check completed, to include fire/safety inspection, |
| | with no discrepancies noted. |
| 1510 | Lower tier out to recreation. (-8) |
| 1519 | -1 out to Attorney visit. (111-16) | -1/ |
| 1520 | Security check complete, to include fire/safety inspection, |
| | with no discrepancies noted. Top tier out to dayroom. |
| 1545 | Security check completed, to include fire/safety |
| | inspection with no discrepancies noted |
| 1555 | Lt R Drum Post check - all secured |
| 1608 | +1 back from Attorney visit. (111-16) | +1/ |
| 1610 | Security check completed, to include fire/safety inspection, |
| | with no discrepancies noted |
| 1615 | Top tier dayroom complete. |
| 1620 | Received dinner trays from kitchen. Cart was |
| | inspected. No contraband found |
| 1633 | Security check completed, to include fire/safety |
| | inspection with no discrepancies. |
| 1700 | Security check completed, to include fire/safety |
| | inspection with no discrepancies. |
| 1650-LC | Porters completed distributing dinner trays. |
| 1655-LC | D/T Irias was escorted back to his cell after |
| | found in an outside corridor. |
| 1725 | Security check completed, to include fire/safety |
| | inspection, with no discrepancies noted |
| 1730 | Count clear. |

GEO000144

| Time | Entry | |
|---|---|---|
| | End watch o.o.o | |
| 1431 | Santiago & Patterson on post relieving Avila | 1800 |
| | & Sanchez. Equipment inventory: Radio # 812 #. | 1810 |
| | Cuff #27 #, Key ring #173 with 10 keys. #257 | 1840 |
| | with 1 key. | |
| 1455 | Security check completed, to include fire/safety inspection, | 1400 |
| | with no discrepancies noted. | 1430 |
| 1430-cc | Security check completed, to include fire/safety inspection, | 1950 |
| | with no discrepancies noted. | 1955 |
| 1510 | Lower tier out to recreation. (-8) | 2000 |
| 1519 | -1 out to Attorney visit. (111-16) | -1/ 2020 |
| 1520 | Security check complete, to include fire/safety inspection, | 2030 |
| | with no discrepancies noted. Top tier out to dayroom. | 2030 |
| 1545 | Security check completed, to include fire/safety | 2040 |
| | inspection, with no discrepancies noted. | 2050 |
| 1555 | Lt R Drum Post check - all sec red | 2100 |
| 1608 | +1 back from Attorney visit. (111-16) | +1/ 2110 |
| 1610 | Security check completed, to include fire/safety inspection, | 2120 |
| | with no discrepancies noted. | 2140 |
| 1615 | Top tier dayroom complete. | 2140 |
| 1620 | Received dinner trays from kitchen. Cart was | 2220 |
| | inspected. No contraband found. | |
| 1633 | Security check completed, to include fire/safety | |
| | inspection, with no discrepancies. | |
| 1700 | Security check completed, to include fire/safety | |
| | inspection, with no discrepancies. | |
| 1650-cc | Porters completed distributing dinner trays | |
| 1655-cc | Det Iriss was escorted back to his cell after | 1600 |
| | found in an outside corridor. | |
| 1725 | Security check completed, to include fire/safety | |
| | inspection, with no discrepancies noted | |
| | Count clears. | |
| | Security check completed, to include fire/safety | |
| | inspection, with no discrepancies noted. | |
| | ... Next Page | |

W 2A
P 104
Duplicate

GEO000145

105

| | | | +/- | P | B |
|---|---|---|---|---|---|
| | 8-5-15 | 2ND WATCH | W1A | | |
| 1805 | (D) PRIOR CONSULATE INTERNET GUEVARA A#73426 | | +1 | 32 | 32 |
| 1815 | SECURITY CHECK - FIRE AND SAFETY INSPECTION | | | | |
| 1840 | Security check completed, to include fire/safety | | | | |
| | inspection, with no discrepancies noted. | | | | |
| 1905 | Security/fire/safety inspections completed. All secure. | | | | |
| 1430 | Security/fire/safety inspection, with no discrepancies. | | | | |
| 1950 | (D) 70 YARD   214, 213, 212, 211, 210, 206, 205, 204, 202 | | | | |
| 1955 | SECURITY CHECK - FIRE AND SAFETY INSPECTION FUL POST | | | | |
| 2004 | COMMISSARY ENTER | | | | |
| 2020 | Security/fire/safety inspection, with no discrepancies. | | | | |
| 2031 | LT. V. Augustin   Recall | | | | |
| 2031 | LTK. Harvey   Rounds | | | | |
| 2046 | Security/fire/safety inspection complete. All secure. | | | | |
| 2050 | PREPARE   FUL COUNT | 1 | | | |
| 2100 | COMMENCE   COUNT | B | | | |
| 2114 | SECURITY CHECK - FIRE AND SAFETY INSPECTION | | | | |
| 2137 | SECURITY CHECK - FIRE AND SAFETY INSPECTION | | | | |
| 2145 | FULL POST ENTER | P | | | |
| 2149 | COUNT CLEAR | 1B | | | |
| 2200 | SECURITY CHECK - FIRE AND SAFETY INSPECTION | | | | |
| | (D) FOUR BED MOVES DONE - GUTIERREZ - LOPEZ | | | | |
| | Redacted | CHAVEZ | | | |
| | | TIRADO | | | |
| | | MARTINEZ | | | |
| | | | 0 | 32 | 32 |
| 2303 2320 | D/O PATTERSON AND D/O PEREZ OFF POST | | | | |

GEO000146

② Sign in/out

| .54 ATE | WI-A Print Name | | Sign Name | | Time IN | Time OUT | R Purpose | | | WI-A | | | |
|---------|-----------------|--|-----------|--|---------|----------|-----------|--|--|------|--|--|--|

Redacted

| 1-5-15 | Santiago | | | | 1431 | 2210 | On post | | 8/6/15 | Souis | | | |

Redacted



# ADELANTO DETENTION FACILITY
## Supervisor Shift Log
### SHIFT: West – 2nd Watch (1400-2230)

**Day:  Wednesday**          **Date:  08-05-2015**

Officer Accountability: Standard staffing – 36 x 1.6 = 58 (Rounded up)

| Watch Lieutenant | R. Anderson | Sergeant | Soliz | Sergeant | Hutchinson |
|---|---|---|---|---|---|
| Mandatory Posts | Officer Name Redacted | Special Post Instructions | | Staff on RDO's Redacted | |
| 1: Central Control - 1 | | | | | |
| 2: Central Control - 2 | | | | | |
| 3: Housing 2 Control | | Redacted | FR | | |
| 4: Housing 2 – A Floor | | | | | |
| 5: Housing 2 – B Floor | | | | | |
| 6: Housing 2 – C Floor | | | | | |
| 7: Housing 2 – D Floor | | | | | |
| 8: Housing 3 Control | | | FR | | 15: |
| 9: Housing 3 – A Floor | | | | | |
| 10: Housing 3 – B Floor | | | | RDO Swap | Training Redacted |
| 11: Housing 3 – C Floor | | | | 1: | |
| 12: Housing 3 – D Floor | | | | 2: | 2: |
| 13: Housing 4 Control | | | FR | | 3: |
| 14: Housing 4-A Floor | | | | | |
| 15: Housing 4-B Floor | | | | | |
| 16: Housing 4-C Floor | | | | | |
| 17: Housing 4-D Floor | | | | | |
| 18: Housing 5 Control | | | | Staff on other leave | Staff Call-Off |
| 19: Housing 5-A Floor | | | | Redacted | |
| 20: Housing 5-B Floor | | | | | |
| 21: Housing 5-C Floor | | | | 3: | 3: |
| 22: Housing 5-D Floor | | | | 4: | 4: |
| 23: Front Lobby | | | | | |
| 24: Perimeter West | | | | Medical Satilite | MEDICAL RUN |
| 25: Perimeter East | | | | Redacted | |
| 26: Segregation Control | | | | | |
| 27: Segregation 2 | | | | | |
| 28: Segregation 3 | E. Soliz | | | | |
| 29: Segregation 4 | E. Santiago | | | | |
| 30::Medical escort | Redacted | | | | |
| 31: Recreation 1 | | | | | |
| 32: Recreation 2 | | | | | |
| 33: Med Observation | | | | | |
| 34: Medical Floor | | | | | |
| 35: Utility / Escort 1 | | | FR | CELL SEARCH | |
| 36: Utility / Escort 2 | | | FR | 206 | |
| 37: Utility / Escort 3 | | | | | |
| 38: Utility Relief | | | | | |
| Hospital Duty | 1: N/A | 2: N/A | Location: | | |
| Hospital Duty | 1: N/A | 2: N/A | Location: | | |
| Suicide Watch | Redacted | 2: | Location: | | |
| Camera Operators | | 2: | | | |
| Meal Relief Blocks | | | Redacted | | |
| First Responders | | | | | |

1/2

GEO000148

# ADELANTO DETENTION FACILITY
## Supervisor Shift Log
### SHIFT: West – 2nd Watch (1400-2230)

**EVENT LOG:**

| | |
|---|---|
| Briefing Topics | 1400 hrs. Briefing begins. |
| Watch Incidents | 1640 hrs. Unattended detainee discovered in the main hallway, D/T gained access, and entered door 707. Watch supervisors Hutchinson and Soliz, Officers Mora and Desoto regain custody and return D/T to Administrative Segregation. 310 hrs. Calculated Use of Force, D/T Arais, Jimmy. Moved to 1-B-105-1L |
| Overtime Usage | The following staff received OT due to a cell extraction: J. Harris 1.75 Hrs. C. Rodriguez 1.75 Hrs. A. Ferretiz 1.75 Hrs E. Santiago 1.75 Hrs. R. Ornelas 1.75 Hrs. Total= 8.75 Hrs. |
| PT Usage | None. |
| SIR's Usage | None. |
| Meal Penalties | None. |
| Missed Punch | None. |
| Disciplinary Issues | None. |
| Housing Moves | None. |
| Count | 1630- 1730          2100 – 2148 |
| Meal | 1710 - 1830 |
| Kronos Review | Reviewed and corrected |

Lt. R. Anderson _LT._____ 8.11.15         08-05-2015
Watch Commander Signature                        Date

2/2

GEO000149

| | Adelanto Detention Facility | NUMBER:<br>10.3.7 – ADF |
|---|---|---|
| GEO<br>*Corrections & Detention ·* | POLICY and PROCEDURE MANUAL<br><br>CHAPTER: Post Orders<br><br>TITLE: Segregation/Special Management Unit Officer<br><br>RELATED ACA STANDARDS: 4-ALDF-2A-04 | SUPERSEDES:<br>09/15/2014<br><br>EFFECTIVE:<br>02/16/2015 |

**All Officers will read and sign the appropriate post orders upon assuming a new post. Failure to do so could lead to disciplinary action taken up to and including termination.**

I.   AREA OF RESPONSIBILITY

   The Officer assigned to this post is responsible for all areas within his/her range of vision. This will include all areas within sight and sound, including windows, emergency fire doors, corridors, the adjacent entrances to the main corridor and observation of the exterior of the facility grounds area.

II.   SUPERVISION

   The Segregation/Special Management Unit (SEG/SMU) Officer reports directly to the Shift Supervisor.

   A.   Shift Hours as scheduled per roster.
   B.   Operational hours as scheduled per roster.
   C.   Days off as scheduled per roster.

III.   EQUIPMENT

   **The following equipment will be worn on the SEG/SMU Officer's duty belt:**

   A.   Hand Held Radio
   B.   Keys
   C.   Handcuffs
   D.   PIPE Device
   E.   Flashlight

IV.   GENERAL DUTIES

   A.   Receive orders and instructions from the Shift Supervisor.
   B.   Make written and oral reports as necessary.
   C.   Receive information from the preceding SEG/SMU Officer.
   D.   Relay all information pertinent to the operation of all other shifts and departments.
   E.   Perform other duties as assigned.
   F.   All staff is responsible for familiarization with facility policies. All policies are available at designated areas. Electronic access to local policies is also available to designated employees.
   G.   All staff assigned to the segregation unit are prohibited from entering the control pod unless in the event of an emergency.
   H.   Officer must remain vigilant in segregation performing 30 minute checks and all required counts.
   I.   All segregation security video will be reviewed daily by the Assistant Facility Administrator Security to ensure compliance.

Page 1 of 11                    Initials_____    Date_____

GEO000150

|  Corrections & Detention ▸ | Adelanto Detention Facility<br>POLICY AND PROCEDURE MANUAL<br>CHAPTER:  Post Orders<br>TITLE: Segregation/Special Management<br>Unit Officer | NUMBER:  10.3.7 – ADF |
| --- | --- | --- |

V.    **RESPONSIBILITIES**

A.    <u>Operating Procedures</u>

All detainees must be evaluated by a medical professional prior to being placed in an Special Management Unit (SMU). Segregation officer duty station will be located at the front of the segregation unit. The segregation officer will be expected to remain at this post unless making required rounds/counts or performing other required duties.

Water flow to the cells in the Segregation/Special Management Unit may be restricted through the plumbing chases at the direction of the Shift Supervisor.

Handcuff ports/food slots in doors will be kept shut unless they are actually in use and are not to be open to communicate to detainees.

Any detainee moved outside of their cell will have hands placed in restraints behind their backs (the only exception would be a medical issue in which case the Facility Administrator and Health Service Administrator would be advised prior to movement).  The restraints will be removed only when the detainee is in a secure enclosure such as a recreation area, shower, etc.

Razors will only be issued to detainees once secured in the shower. The Officer will inspect the razor upon completion and prior to movement back to the cell to ensure the blade is intact.

Staff will personally observe every detainee at least every thirty minutes on an irregular schedule and document the checks in their logbook as well as the 30 minute check form located near each occupied cell. Detainees who are violent or mentally disordered or who demonstrate unusual or bizarre behavior receive more frequent observation; suicidal detainees are under continuous observation until seen by a mental health professional.  Subsequent supervision routines are in accordance with that ordered by the mental health professional.  [4-ALDF-2A-52]

GEO000151

|  | Adelanto Detention Facility<br>POLICY AND PROCEDURE MANUAL<br><br>CHAPTER:  Post Orders<br><br>TITLE: Segregation/Special Management<br>           Unit Officer | NUMBER:  10.3.7 – ADF |
| --- | --- | --- |

**B.**     <u>Property and Contraband Control</u>

Disciplinary segregation privileges shall be defined by the imposed sanction(s) of the disciplinary official. Detainees placed in disciplinary segregation may have all personal property, to include commissary (excluding hygiene items), impounded and stored by the facility for the duration of the disciplinary sanction(s). Detainees may also be precluded from ordering commissary for the duration of the disciplinary sanction if sanctioned by the disciplinary official. A secure property storage area is provided in the disciplinary housing unit.

Control of property and contraband will include a thorough search and documented inventory of all personal property brought by a detainee to the unit.

Food service carts, laundry carts and commissary bins will be thoroughly inspected and searched by staff to prevent the introduction of contraband.

Supervisory staff may remove otherwise permissible items from the cell of a detainee in locked unit status when those items are being used by the detainee to harm himself or herself or others, create a disturbance, or otherwise disrupt the orderly operation of the unit. Such instances will be documented in memo form or using a General Incident Report (GI) placed in the unit log and the individual detainee log sheet, and a copy of the memo or GI will be forwarded to the AFA-Security and the Facility Administrator. The AFA-Security must personally approve all such instances that last longer than twenty-four hours.

A secure property storage area is provided in the Intake Property Room. All property placed in storage will be thoroughly searched and inventoried, and a copy of the inventory sheet will be provided to the detainee.

**C.**     <u>Special Management Unit Programs</u>

Detainees in locked housing shall have the same Law Library access as the general population, consistent with security. The facility will grant access upon-request-only. The level of supervision will depend on the individual's behavior and attitude.

Detainees in the SMU for protective custody will be required to use the Law Library separately or will have requested legal material delivered to them.

Religious counseling and materials will be permitted in the unit, as provided by the Chaplain or approved religious representatives and approved by the AFA-Security.

Social and legal correspondence will be permitted, subject to available postage, per normal facility procedures.

Social and legal phone calls will be permitted to detainees in all categories, but may be limited to certain hours in accordance with staff availability. Detainees in disciplinary status may be limited to legal and family emergency calls.

Social and legal visiting will be permitted for all detainees in locked status provided they are not under visiting restrictions imposed as part of disciplinary actions. Detainees in locked status may visit in the general non-contact visiting area.

GEO000152

|  | Adelanto Detention Facility<br>POLICY AND PROCEDURE MANUAL<br>CHAPTER: Post Orders<br>TITLE: Segregation/Special Management Unit Officer | NUMBER: 10.3.7 – ADF |
| --- | --- | --- |

*Upon notification by the lobby officer of a detainee visit, the segregation Officer will verify the status of the detainee. The segregation Officer will inform the requesting officer of the status to include any documented precautions or restrictions. Detainees housed in segregation for protective custody shall not use the Visitation room during normal visitation hours; protective custody detainees may be restricted to non-contact visiting area to accommodate a visit.*

Commissary will be permitted for detainees in all categories of locked status provided they are not under commissary restrictions imposed as part of the disciplinary actions.

**Administrative Segregations** detainees will be offered at least two (2) hours of recreation or exercise per day, seven (7) days a week.

**Disciplinary Segregation** Detainees will be offered at least one (1) hour of recreation or exercise per day, seven (5) days a week.

All participation or refusal to participate in recreation, showers, meals, staff interviews, visits or other major unit activities will be logged on the detainees' individual activity sheets.

D.   **Food Service Operations**

Food service operations will be under the general oversight of the Food Services Manager and will include in-cell service of meals.

Detainees in the SEG/SMU shall receive three nutritionally adequate meals per day from the menu served to the general population. For security purposes, detainees in the SEG/SMU shall use disposable utensils only.

Staff will ensure that food delivered to detainees is at the proper temperature. Modification, reduction, or termination of meals will not be used as a behavioral control measure or for punishment.

Unit staff is responsible for ensuring the sanitary conditions of all utensils and trays.

Detainees who use food or other meal-related items to disrupt operations or threaten others will be served the same food as the general population. However, Styrofoam or disposable trays may be substituted for the regular food tray.

E.   **Other Unit Programs**

The following programs and services are in operation in the locked unit:

1.   Laundry and clothing exchange procedures will be equivalent to the services offered in the general population; special demeaning clothing will not be used.
2.   Detainees in non-disciplinary status will be given the opportunity to watch television for one (1) hour a day.
3.   Sanitation in the unit will be maintained at a high level. Detainees will be responsible for cleaning their own cells. Classification may approve specially screened detainees housed in the unit for duty as porters.

Page 4 of 11          Initials_____   Date_____

GEO000153

|  | Adelanto Detention Facility<br>POLICY AND PROCEDURE MANUAL<br>CHAPTER: Post Orders<br>TITLE: Segregation/Special Management<br>Unit Officer | NUMBER: 10.3.7 – ADF |
|---|---|---|

**F.** **Other Considerations**

Special categories of detainees will require locked status and will be handled somewhat different. Detention and segregation cases may be housed in the same unit. However the privileges permitted in these two statuses are quite different and staff will ensure that detainees in disciplinary status are not able to receive prohibited items from those in non-disciplinary status.

Protective custody cases will require separation, at a minimum, from the detainees by whom they are threatened. In most cases, separation from all other detainees will be required. Records on these cases should reflect their status, any known separates, and any other special precautions that must be taken.

In many instances, careful movement through the facility and in the admission/release process will be needed. When it is necessary in the judgment of the AFA-Security; two staff members will be used to escort for such moves.

Detainees with medical and psychiatric aspects to their cases will be handled in accordance with the medical orders for those cases as long as those orders do not conflict with the facility security needs. In any case in which there appears to be such a conflict, the Shift Supervisor and, if necessary, the AFA-Security or Facility Administrator will resolve the issue with the Health Services Administrator.

A cut down tool is located in the Segregation office hall way in a RED emergency box mounted to the wall. In the event of an emergency break glass and remove cut down tool.

**G.** **Emergency Plans**

It is imperative that you be familiar with all procedures, especially emergency procedures for the post on which you work. You are specifically referred to the following emergency plans:

Facility Evacuation Plan
Bomb Plan
Riot/Disturbance Control Plan
Escape Plan
Hostage Plan
Power Outage Plan

GEO000154

|  | Adelanto Detention Facility<br>POLICY AND PROCEDURE MANUAL<br><br>CHAPTER: Post Orders<br><br>TITLE: Segregation/Special Management Unit Officer | NUMBER: 10.3.7 – ADF |
| --- | --- | --- |

**H.   Security Checks**

Inspect the following items upon assuming the SEG/SMU post and every 30 minutes thereafter, at irregular intervals, to assure that security is maintained and to assure sanitation standards are being maintained. This security check will be entered in the SEG/SMU Log as well as the 30 minute check form located near each occupied cell also the "PIPE" device will be used to log checks by pressing the "PIPE" against the metal discs mount on every cell door . Irregular 30-minute checks must begin within one-half hour from the time the last SEG/SMU check was completed. (i.e., if the SEG/SMU check was completed at 0810 hours, the next SEG/SMU check must begin before 0840 hours)

1. Determine that all detainees assigned to the SEG/SMU are present or accounted for at all times and that each detainee is safe. Detainees who are violent or mentally disordered or who demonstrate unusual or bizarre behavior shall receive more frequent observation; all detainee checks will be logged.
2. Check all doors, locks, windows, window frames and exterior walls to ensure that they are secure.
3. Check the sanitation of the SEG/SMU, direct cleaning as necessary and supervise the cleaning until it is properly completed.
4. Check for contraband in all areas of the SEG/SMU.
5. Note any equipment malfunctions and make appropriate notations in the SEG/SMU log; prepare a Maintenance Work Order to report any malfunctions. Advise the on-duty Shift Supervisor verbally on noted Maintenance Work Orders and malfunctions.
6. Ensure no detainee is housed in the same cell longer than 21 days, after 21 days the detainee must be moved to another cell. This is done for security reasons to help prevent any detainee from escaping or tampering with locks, windows etc.

**I.   <u>Forms and Reviews</u>**

1. A permanent and accurate log will be maintained in the SEG/SMU. The log will record all activities concerning the SEG/SMU detainees, e.g., meals served, recreation, visitors, etc.

   <u>The SEG/SMU log will record the detainee's name, A-number, housing location, date admitted, reasons for admission, and the authorizing official. All releases from the unit will be similarly recorded.</u>

   If anyone visits the SEG/SMU the name, title and purpose of the visit will be recorded in the SEG/SMU log. In addition, *Staff members entering the Special Management Unit, and who are not assigned to work in the Special Management Unit, will sign the Visitor's Logbook documenting the date, time and reason for their visit.*

   Unusual activity or behavior of individual detainees will be recorded in the log, with a follow-up General Incident Report sent through the Facility Administrator to the detainee's file.

2. The SMU/Segregation Activity Sheet shall be prepared immediately upon the detainee's placement in the unit. The form will be completely filled out at the end of each shift or as the activity takes place.

   The special housing Officer for each shift will record whether the detainee ate, showered and exercised, notating 'Y' for Yes and 'N' for No, for meals and showers and actual time.

   The record will also be used to notate additional information, e.g., if the detainee has a medical condition, has exhibited suicidal/assaultive behavior, etc.

Page 6 of 11          Initials_____   Date_____

GEO000155

|  | Adelanto Detention Facility<br>POLICY AND PROCEDURE MANUAL<br>CHAPTER: Post Orders<br>TITLE: Segregation/Special Management Unit Officer | NUMBER: 10.3.7 – ADF |
|---|---|---|

The facility medical staff will be required to sign each individual record when he/she visits the detainee in segregation.

A new record must be created when the current one is completed. The completed Special Housing Activity Sheets will be retained in the SMU until the detainee is released from SMU.

A record must be created when a detainee is moved from one classification to another, i.e. administrative segregation to disciplinary segregation.

Upon release from the SMU, the releasing Officer will ensure that the entire housing unit record relating to the detainee is attached to the Administrative Segregation Order and forwarded to the Records department for inclusion in the detainee's detention file.

J.  **High Security Cell Access**

High security cells will be specially marked with a notice to designate that a two-officer rule is in operation for the occupant. That cell will only be opened with two officers present. Two officers will remain in the SMU area during the out of cell time for that detainee. High security designations will be made in selected cases. Criteria for such a designation is:

1.  Demonstrated violent behavior toward staff;
2.  Demonstrated violent behavior toward other detainees;
3.  Demonstrated or reported serious escape history or risk; and
4.  Other case-by-case circumstances which warrant the high security designation.

Staff may make a recommendation for such action through their supervisor. The Facility Administrator or designee will make the final decision.

K.  **Counts**

Ensure that the detainees are accounted for in a proper manner. During all counts, all detainee activity stops. All detainees are to report directly to their assigned beds. The count is to be started when all detainees are sitting on their assigned beds with the exception of face to photo counts where each detainee will stand next to their bunk. Two Officers will be present during all counts; one taking the count and the other Officer will cover the count. Then the counting Officer will cover the count and the other Officer will make a second count. Both Officers will compare numbers by showing each Officer what they counted during that count. Make sure you see living, breathing flesh when you count, do not assume that there is a detainee under the blankets or sheets. The detainees are to remain on their assigned beds as you finish counting and while giving your count to the Master Control Center. All detainees will remain near their beds until the facility count is clear.

The counts Schedule is as follows: 0200, 0630, 1100, 1630 Face to Photo, 2100 and 2300 hours.

Page 7 of 11                    Initials_____    Date_____

GEO000156

|  | Adelanto Detention Facility<br>POLICY AND PROCEDURE MANUAL<br>CHAPTER: Post Orders<br>TITLE: Segregation/Special Management<br>Unit Officer | NUMBER: 10.3.7 – ADF |
|---|---|---|

**L.**     <u>Detainee Movement</u>

1. Control detainee movement and access into the SEG/SMU by control of doors. Only one door is to be opened at a time with the request of an officer or staff member. The SEG/SMU officer will control all movement into and out of the unit.

2. Be familiar with all regulations concerning the movement and conduct of detainees. Know what to do in emergencies. When in doubt, call the Shift Supervisor.

3. Handcuff all detainees from behind, prior to exiting their cells, and ensure they remain handcuffed unless other directives are provided. Ensure that detainees who use the Law Library are handcuffed in the front. Handcuffs shall not be required for detainees who are out of their cell for cleaning purposes and supervised. Detainees must remain handcuffed unless the Doctor, Medical Provider or the EOIR Judge requests that the handcuffs be removed; a notification to the Shift Supervisor will be made prior to removal of handcuffs. Detainees being escorted to Intake to retrieve legal items must have the approval of the Shift Supervisor or higher authority. Handcuffs will be removed by the Visitation Officer once the detainee has been secured within the visitation area.

4. Movement of detainees out of the SEG/SMU will be called in to Master Control to ensure that the hallway is cleared of detainees prior to the movement.

5. Ensure that the following escort procedures are followed.

     a.   Always escort with the detainee(s) walking in front, never behind.
     b.   Detainee(s) being escorted will be kept in clear sight.
     c.   Detainee(s) being escorted are not to stray or stop until destination is reached.
     d.   The escort officer shall walk on the strong-arm side of the detainee(s).

6. All detainee movement into and out of the unit will be recorded in the unit logbook.

7. Whenever detainee porters are used they must remain in the area where they are housed and must be under direct supervision at all times. Except for emergencies no detainees will be allowed out of their cell between 11:00pm-6:00am. In the event a cell door needs to be open after normal hour activities, the Shift Supervisor will be present.

**M.**     <u>Sanitation</u>

Cells will be cleaned and inspected daily and as detainees are transferred or released. This will include cleaning the toilet/sink areas, mopping the floor and wiping down flat surfaces, inspecting windows, vents, doors locks, etc for evidence of tampering. Shower facilities will remain in a sanitary condition at all times. Direct and supervise cleaning as needed.

**N.**     <u>Control of Chemicals</u>

Responsible for ensuring that all cleaning materials are secured when not in use. Cleaning materials will be dispensed according to caustic control directives. The SEG/SMU Officer will ensure that cleaning materials are returned to the Chemical Supply area, and the proper forms are filled out. The SEG/SMU Officer will ensure that all cleaning materials are returned and the proper forms are filled out.

     Initials_____    Date_____

GEO000157

|  | Adelanto Detention Facility<br>POLICY AND PROCEDURE MANUAL<br><br>CHAPTER:  Post Orders<br><br>TITLE: Segregation/Special Management<br>          Unit Officer | NUMBER:  10.3.7 – ADF |
|---|---|---|

O.   **Emergency Evacuation Procedures**

     1.   Notification to Master Control Center and Shift Supervisor.
     2.   Notification to all detainees and/or staff to prepare to evacuate.  In case of an electrical power outage, a key to the SEG/SMU doors is located in the Master Control Center.
     3.   Detainees are evacuated one at a time, beginning with the one in most danger first.
     4.   SMU and segregation detainees will exit the building, if safe to do so, via directives within the facility emergency evacuation plan.
     5.   All cells and areas are visually/physically checked by the SEG/SMU Officer to make sure that no one is left in the unit.
     6.   A count is taken as soon as possible to ensure that all detainees and staff are accounted for.

P.   Responsible for maintaining the post log.

Q.   Responsible for maintaining detainee accountability for all detainees assigned to work. Ensure that detainees report for work as scheduled and that the Detainee Account Clerk receives all required documentation on a daily basis.

R.   Responsible for maintaining incentive pay sheet on a daily basis, and ensure that they are correct so detainees are given credit for hours worked.

S.   Special Management Detainee:

As it pertains to this section and policy, special management detainees are male detainees that are considered as "transgender" and have recognizable anatomical gender ambiguities.  Special management detainees are further defined as:  any male detainee that presents himself as a female and has undergone a physical transformation from male to female, whether or not the transformation is complete, will be treated as a special management detainee.  Any male detainee that has undergone any surgical procedures to reassign his gender is considered a special management detainee.  Any male detainee that has begun any type of hormonal treatment resulting in female like anatomical changes is considered a special management detainee.  Any male detainee that has undergone any of the above processes or procedures and still possesses male genitalia is considered a special management detainee.

     1.   All detainees that have been identified as special management according to the criteria provided in this policy will be housed as prescribed above and must be supervised, observed and monitored by **female staff only.**
     2.   All special management detainees will be kept separate from general population detainees regardless of gender when moved within the facility and must be escorted at all times by **female staff members.**
     3.   When transportation of special management detainees-as identified by the criteria of this policy-outside of the facility is necessary, each special management detainee will be treated as a separatee with at least one **female staff member** assigned to the transportation team.
     4.   Unit housing records will identify the detainee as Protective Custody/Special Management.

GEO000158

|  | Adelanto Detention Facility | NUMBER:  10.3.7 – ADF |
| --- | --- | --- |
| | POLICY AND PROCEDURE MANUAL | |
| | CHAPTER:  Post Orders | |
| | TITLE: Segregation/Special Management Unit Officer | |

Direct supervision of detainees in the housing units/posts is required. Officers will not leave their post without proper relief.

It is a violation of this policy to harass or otherwise verbally provoke a detainee or detainees into an assault on staff in order to justify the use of force against those detainees. Non-force forms of intentional cruel punishment, such as public humiliation, are also prohibited.

The information included in this specific Post Order may not include every situation the staff may face during the shift. The times listed are approximate and may be changed due to unforeseen circumstances. The goal of this Post Order is to provide guidance and instruction to the staff manning this post. In the event of an emergency or unscheduled events, which delays a specific operation, staff is to exercise initiative and good judgment in the performance of his or her duties.

Staff is required to be at the institution in the proper uniform in time to draw keys and equipment for the post, check in with the Shift Supervisor, receive pertinent information, and begin the assigned duties at the designated starting time.

GEO000159

|  | Adelanto Detention Facility<br>POLICY AND PROCEDURE MANUAL<br>CHAPTER:  Post Orders<br>TITLE: Segregation/Special Management<br>Unit Officer | NUMBER:  10.3.7 – ADF |
|---|---|---|

THIS POST ORDER WILL BE REVIEWED AT LEAST ANNUALLY AND UPDATED AS NEEDED.

Gray highlighted areas are the changes made to the current revision.

QUESTIONS/SUGGESTIONS REGARDING THIS POST ORDER SHALL BE ADDRESSED TO THE AFA-SECURITY.

APPROVED:  _____
                          Facility Administrator

EFFECTIVE: February 16, 2015

Reviewed: June, 2012
Reviewed & Revised: September, 2012
Reviewed & Revised: October, 2012
Reviewed & Revised: March, 2013
Reviewed & Revised: May 2013
Reviewed: Sept. 2013
Reviewed & Revised: June 25, 2014
Reviewed: September 5, 2014
Reviewed & Revised: February 2015

GEO000160

|  | Adelanto Detention Facility<br><br>POLICY and PROCEDURE MANUAL<br><br>CHAPTER:  Special Management Detainees<br><br>TITLE:  Special Management Unit Operations<br><br>RELATED ACA STANDARDS:  4-ALDF-2A-45, 2A-48, 2A-51–2A-54, 2A-56–2A-64 | **NUMBER:**<br>10.2.11-ADF<br><br>**SUPERSEDES:**<br>11/24/2015<br><br>**EFFECTIVE:**<br>02/16/2015 |
| --- | --- | --- |

I.     PURPOSE

To describe the operational standards for housing detainees in administrative and disciplinary housing status while confined in the facility.

II.    POLICY

It is the policy of the facility to maintain safe, secure housing for detainees who require protection or whose behavior indicates they require more physical controls than are available in typical housing units in the facility.

III.   DEFINITIONS

A.  **Administrative Segregation** – A form of separation from the general population used when the continued presence of the detainee in the general population would pose a threat to life, property, self, other detainees, or staff or to the security or orderly running of the facility.

B.  **Disciplinary Hearing** – Non-judicial administrative procedure to determine whether substantial evidence supports finding a detainee guilty of a rule violation.

C.  **Disciplinary Segregation** – Confinement in a cell removed from the general population after a serious violation of facility rules.

D.  **Institutional Disciplinary Panel (IDP)** – Review board responsible for conducting disciplinary hearings and imposing sanctions for cases of detainee misconduct referred for disposition following the hearing. The IDP is usually comprised of a Hearing Officer and representatives of different departments in the facility.

E.  **Administration Close Custody (ACC)** – Administrative segregation for the detainee's own safety. The facts associated with the need for this status must be fully documented.

F.  **Segregation** – Confinement in a cell isolated from the general population; for administrative disciplinary or protective reasons.

G.  **Special Management Unit (SMU)** – A housing unit for detainees in administrative or disciplinary segregation.

IV.   PROCEDURES

The facility will operate a locked or secure housing unit that will constitute its prime resource for detainees who are unmanageable, present a threat to themselves or others, or who for other reasons require protection or removal from the general population.

A.  <u>Conditions of Confinement</u>

Segregation housing units provide living conditions that approximate those of the general detainee population. All exceptions are clearly documented.  Segregation cells/rooms permit the detainees assigned to them to converse with and be observed by staff members.  Cells/rooms used for segregation encompass at least 70 square feet of floor area of which 35 square feet is unencumbered.  [4-ALDF-2A-51]

Conditions of confinement in the locked unit will reflect the least restrictive amount of control necessary to adequately supervise and safeguard detainees and staff.  Whenever an emergency arises that requires variance from approved conditions on a temporary basis, such as deprivation of otherwise approved items, an immediate report will be made to the Facility Administrator.  [4-ALDF-2A-58]

Page 1 of 16

GEO000161



| | Adelanto Detention Facility | |
|---|---|---|
| | POLICY AND PROCEDURE MANUAL | NUMBER: 10.2.11-ADF |
| | CHAPTER:  Special Management Detainees | |
| | TITLE:  Special Management Unit Operations | |

A detainee will not be held in the unit without clothing, a mattress, blankets, and a pillow, except when prescribed for medical or psychiatric reasons.  If a detainee is so seriously disturbed that he or she is likely to destroy clothing or bedding or create a disturbance that would be serious detrimental to others, medical staff will be notified immediately and a regimen of treatment and control will be instituted with the concurrence of the medical department.

B.  **Medical Assessment**

When a detainee is transferred to segregation, health care personnel are informed immediately and provide assessment and review as indicated by the protocols established by the Health Services Administrator. Unless medical attention is needed more frequently, each detainee in segregation receives a daily visit from a health care provider.  The presence of a health care provider in segregation is announced and recorded. The health authority determines the frequency of physician visits to segregation. [4-ALDF-2A-45]

A psychiatric or psychological assessment, including a personal interview with the detainee by a qualified mental health professional shall be conducted every 30 days that a detainee continues confinement. This mental health assessment will be submitted to the Facility Administrator in a written report (utilizing Detention/Segregation Mental Health 30-Day Review Form OPR-624) for each individual detainee.

C.  **Operating Procedures**

All GEO staff members, contractors, ICE personal and other visitors entering the Special Management Unit and who are assigned to work in the Special Management Unit, will sign the Visitor's Logbook documenting the date, time and reason for their visit.  This includes detention officers relieving the assigned staff member for breaks or lunch/dinner.

Any detainee movement out of a cell will be in restraints.  The restraints will be removed only when the detainee is in a secure enclosure, such as a recreation area, shower, etc.
High security cells will be specially marked with a notice to designate that a two-officer rule is in operation for the occupant.  That cell will only be opened with two officers present.  Two officers will remain in the SMU area during the out of cell time for that detainee.  High security designations will be made in selected cases. Staff may make a recommendation for such action through their supervisor.  The Facility Administrator or the Facility Administrator's designee will make the final decision.

Staff will personally observe every detainee at least every thirty minutes on an irregular schedule and document the checks in their logbook as well as completing the seg 30 minute check form.  Detainees who are violent or mentally disordered or who demonstrate unusual or bizarre behavior receive more frequent observation.  Suicidal detainees are under continuous observation until seen by a mental health professional. Subsequent supervision routines are in accordance with that ordered by the mental health professional. [4-ALDF-2A-52]

D.  **Placement in Administrative Segregation**

Administrative Segregation status is a non-punitive status in which restricted conditions of confinement are required only to ensure the safety of detainees or others, the protection of property, or the security or good order of the facility.  For matters of safety and security, staff may have to take immediate action to control a detainee, including placement in Administrative Segregation.  Examples include detainees who require Administrator Close Custody, who cannot be placed in the general population because they are en route to another facility ("holdovers"), who are awaiting a disciplinary hearing, or who require separation for medical reasons.

GEO000162



| Adelanto Detention Facility | |
|---|---|
| POLICY AND PROCEDURE MANUAL | NUMBER: 10.2.11-ADF |
| CHAPTER: Special Management Detainees | |
| TITLE: Special Management Unit Operations | |

1. Prior to the detainee's placement in administrative segregation, the Facility Administrator or designee and the Classification Officer will review the case to determine whether administrative segregation is warranted.

2. A detainee may be placed in administrative segregation when the detainee's continued presence in the general population poses a threat to life, property, self, staff, or other detainees; for the secure or orderly operation of the facility; for medical reasons or other circumstances as set forth below.   Examples include, but are not limited to the following:

a. A detainee is awaiting an investigation or a hearing for a violation of facility rules.   Pre-disciplinary hearing detention should be ordered only as necessary to prevent further rules violation(s) or to protect the security and orderly operation of the facility.  It is not to be used as a punitive measure.  Time served in pre-hearing detention may be deducted from any time ordered by the Institutional Disciplinary Panel (IDP).

b. A detainee is a threat to the security of the facility.  The Facility Administrator may determine that a detainee's criminal record, past behavior at other institutions, behavior while in Immigration and Customs Enforcement (I.C.E.) detention, or other evidence is sufficient to warrant placing the detainee in administrative segregation. Copies of records supporting this action will be attached to the Administrative Segregation Order.

c. A detainee requires protection.  A detainee is admitted to Administration Close Custody status when there is documentation that protective custody is warranted and no reasonable alternatives are available. [4-ALDF-2A-46]   Administration Close Custody (ACC) may be initiated at the detainee's request or ordered to protect the detainee from harm.  Examples include:

    1) Victims of detainee assaults;
    2) Detainee informants/witnesses - detainees who provide information to the institution staff or any law enforcement agency concerning improper activities by others;
    3) Sexual predators;
    4) Detainees who have been pressured by other detainees to participate in sexual activity;
    5) Detainees who request PC;
    6) Detainees who refuse to enter the general population because of alleged intimidation from other detainees;
    7) Detainees who refuse to return to the general population, but who will not provide the reason for refusal;
    8) Detainees who appear to be in danger of bodily harm; or
    9) Detainees who seek protection, claiming to be former law enforcement officers or to have held sensitive law enforcement position, whether or not there is official information to verify the claim.

d. The IDP may order a detainee into administrative segregation following disciplinary segregation after determining that releasing the detainee into the general population would pose a threat to the security and orderly operation of the facility.   A detainee transferred from disciplinary segregation to administrative segregation shall enjoy the same privileges as all others in administrative segregation.

e. A medical professional ordering a detainee removed from the general population shall complete and sign the Administrative Segregation Order, unless the detainee will stay in the medical department's isolation/segregation ward.

f. A detainee is scheduled for release, removal, or transfer within 24 hours.  Such segregation may be ordered for security reasons or for the orderly operation of the facility.

Page 3 of 17

GEO000163



| | Adelanto Detention Facility | |
|---|---|---|
| | POLICY AND PROCEDURE MANUAL | NUMBER: 10.2.11-ADF |
| | CHAPTER: Special Management Detainees | |
| | TITLE: Special Management Unit Operations | |

### E. Administrative Segregation Order

A written order shall be completed and approved by a Shift Supervisor before a detainee is placed in administrative segregation, except when exigent circumstances make this impracticable. In such cases, an order shall be prepared as soon as possible. A copy of the order shall be given to the detainee within 24 hours, unless delivery would jeopardize the safety, security, or orderly operation of the facility.

1. The Facility Administrator or the Facility Administrator's designee shall complete the Administrative Segregation Order detailing the reasons for placing a detainee in administrative segregation, before actual placement.

2. In an emergency, the detainee's placement in administrative segregation may precede the paperwork, which the Facility Administrator will prepare as soon as possible.

3. All memoranda, medical reports, and other relevant documents shall be attached to the segregation order.

4. A copy of the completed Administrative Segregation Order will be given to the detainee within 24 hours of placement in administrative segregation, unless delivery would jeopardize the safe, secure, or orderly operation of the facility.

5. The order will remain on file with the Special Management Unit (SMU) until the detainee is returned to the general population.

6. When the detainee is released from the SMU, the releasing officer will indicate date and time of release on the Administrative Segregation Order, then forward the completed order to the Classification Officer for insertion into the detainee's detention file.

7. If the segregation is ordered for ACC purposes, the order shall state whether the detainee requested the segregation; also, whether the detainee requests a hearing concerning the segregation.

8. No Administrative Segregation Order is required for a detainee awaiting removal, release, or transfer within 24 hours.

### F. Review of Detainee Status in Administrative Segregation

1. The SMU review committee, chaired by the Programs Coordinator shall conduct a review within 72 hours of the detainee's placement in administrative segregation to determine whether segregation is still warranted. The review shall include an interview with the detainee. A written record shall be made of the decision and the justification. The Administrative Segregation Review Form will be used for the review. If the detainee has been segregated for the detainee's protection, but not at the detainee's request, the signature of the Facility Administrator or Assistant Facility Administrator is required on the Administrative Segregation Review Form to authorize continued detention.

2. The SMU review committee shall conduct the same type of review after the detainee has spent seven days in administrative segregation, and every week thereafter for the first two months and at least every 30 days thereafter. The review shall include an interview with the detainee. A written record shall be made of the decision and the justification. [4-ALDF-2A-48, 2A-49]. A reviewing authority who concludes a detainee should be removed from Administrative Segregation, submits that recommendation to the Facility Administrator, or designee for approval.

Page 4 of 17

GEO000164



| | Adelanto Detention Facility | |
|---|---|---|
| | POLICY AND PROCEDURE MANUAL | NUMBER: 10.2.11-ADF |
| | CHAPTER:  Special Management Detainees | |
| | TITLE:  Special Management Unit Operations | |

3.  A copy of the decision and justification for each review shall be given to the detainee, unless, in exceptional circumstances, this provision would jeopardize security.  The detainee shall be given an opportunity to appeal a review decision to a higher authority within the facility.

4.  When a detainee has been held in Administrative Segregation for more than 30 days, the Facility Administrator notifies the Field Office Director, who notifies the ICE/DRO Deputy Assistant Director, Detention Management Division.
Immigration and Customs Enforcement Assistant Director, Detention and Deportation shall be notified when any detainee has been in administrative detention for more than 60 days.  This notification shall be made through the on-site COTR.  The Region shall then consider whether transfer of the detainee to a facility where he/she may be placed in the general population would be appropriate.

5.  If a detainee has been in administrative segregation for more than 30 days and objects to this status, the Facility Administrator shall review the case to determine whether that status should continue. This review shall take into account the views of the detainee.  A written record shall be made of the decision and the justification.  A similar review shall take place every 30 days.

6.  After seven consecutive days in administrative segregation, the detainee may exercise the right to appeal to the Facility Administrator the conclusions and recommendations of any review conducted. The detainee may use any standard form of written communication, e.g., detainee request, to file the appeal.

G.  <u>Conditions of Administrative Segregation (Basic Living Standards)</u>

1.  Detainees in administrative segregation shall receive the same general privileges as detainees in the general population, consistent with available resources and security considerations.

2.  The quarters used for segregation shall be well ventilated, adequately lit, appropriately heated and maintained in a sanitary condition at all times.  All cells must be equipped with beds.

3.  The number of detainees confined to each cell or room in administrative segregation should not exceed the capacity for which it was designed.  The Facility Administrator may approve excess occupancy, on a temporary basis, if the Facility Administrator finds that the other basic living standards can still be maintained.

    Segregation housing units provide living conditions that approximate those of the general inmate population.  All exceptions are clearly documented.  Segregation cells permit the detainees assigned to them to converse with and be observed by staff members.  Cells used for segregation encompass at least 70 square feet of floor area of which 35 square feet is unencumbered.

4.  Clothing and bedding shall be issued to detainees in segregation.  Detainees in segregation will be provided the same opportunity for the exchange of clothing, bedding and linen and for laundry as detainees in the general population.

    A detainee in segregation may wear normal institutional clothing and shall be furnished a mattress and bedding.  A detainee may not be segregated without clothing, mattress, blankets and pillow, except:

GEO000165



| | Adelanto Detention Facility | |
|---|---|---|
| | POLICY AND PROCEDURE MANUAL | NUMBER: 10.2.11-ADF |
| | CHAPTER:  Special Management Detainees | |
| | TITLE:  Special Management Unit Operations | |

    a.  When prescribed by a medical professional for medical or psychiatric reasons.  If a detainee is so seriously disturbed that he/she is likely to destroy clothing or bedding, or to create a disturbance putting self or others at risk, the medical department shall be consulted immediately to determine whether a regimen of treatment and control may be instituted.

    b.  When the Shift Supervisor determines the detainee poses a threat to self or property.

Exceptions shall occur only when necessary for security purposes, as determined by the Facility Administrator.  Any exception, and the reasons, shall be recorded in the housing unit log.

5.  Detainees in segregation shall receive three nutritionally adequate meals per day, from the menu served to the general population. For security purposes, detainees in the SMU shall use disposable utensils only.  Under no circumstances shall food be used as punishment.

6.  Segregated detainees shall have the opportunity to maintain a normal level of personal hygiene. Staff shall provide toilet tissue, a wash basin, tooth brush, shaving utensils, etc., as needed, and may issue retrievable kits of toilet articles.

Each segregated detainee shall have the opportunity to shower and shave at least daily, unless these procedures would present an undue security hazard.  This security hazard will be documented and signed by the Facility Administrator or the Facility Administrator's designee, indicating his/her review and approval.  Denial of showers will be temporary and situational, and will continue only as long as justified by the security threat.

7.  Detainees in segregation will be provided, where practicable, barbering services.  Exceptions to this procedure may be permitted only when found necessary by the Facility Administrator.

8.  Detainees in segregation will receive a minimum of two hours of exercise per day outside their cells, Seven days per week, unless security or safety considerations dictate otherwise.

These provisions shall be carried out, absent compelling security or safety reasons documented by the Facility Administrator.  A detainee's recreation privileges may be withheld temporarily after a severely disruptive incident.  Staff shall document by memorandum and logbook(s) notation every instance when a detainee is denied recreation.  The memorandum shall be placed in the detainee's detention file as well as forwarding a copy of the action to the Facility Administrator.

The case of a detainee denied recreation privileges will be reviewed at least once each week, as part of the reviews required for all detainees in the unit. The reviewer will document whether the detainee continues to pose a threat to self, others, or facility security and, if so, why.

Denial of recreation privileges for more than 15 days requires the concurrence of the Facility Administrator and H.S.A. The Facility Administrator will notify ICE when a detainee is denied recreation privileges for more than 15 days.

When space and resources are available, detainees in administrative segregation will be able to participate in TV viewing, board games, socializing and work details (e.g., a housekeeper in the SMU); and provided opportunities to spend time outside their cells, over and above recreation periods.

9.  The Facility Administrator will issue guidelines concerning the property that detainees may retain in administrative segregation.

Page 6 of 17

GEO000166

|  Corrections & Detention · | Adelanto Detention Facility<br><br>POLICY AND PROCEDURE MANUAL<br><br>CHAPTER:  Special Management Detainees<br><br>TITLE:  Special Management Unit Operations | NUMBER: 10.2.11-ADF |
|---|---|---|

10. A reasonable amount of non-legal reading material will be available to detainees in segregation.  The detainee will also be permitted religious material, unless the religious item would pose a threat to security

11. Detainees in segregation will be permitted to retain a reasonable amount of personal legal material, unless this would create a security threat.  If personal legal material is placed in storage, the detainee shall be able to access the material promptly, upon request.

Detainees will be permitted to retain all personal legal material upon admittance to segregation, provided such material does not create a safety, security and/or sanitation hazard.  Detainees with a large amount of personal legal material may be required to place a portion of the material in their personal property, with access permitted during designated hours.  Requests to access such legal material should be met as soon as possible, but in no case longer than twenty-four (24) hours after receipt of the initial detainee request to retrieve documents, unless documented security concerns preclude action within this time-frame.

12. In addition to the direct supervision afforded by the unit officer, the Shift Supervisor shall see each segregated detainee daily, including weekends and holidays.

Unless medical attention is needed more frequently, each detainee in segregation receives a daily visit from a health care provider.  The presence of a health care provider in the Special Management Unit is announced and recorded.  The Health Services Administrator determines the frequency of physician visits to segregation units.  The medical visit shall be notated on the SMU Activity Sheet.  The medical professional will question each detainee to identify medical problems or requests.  Any action taken will be documented in a separate logbook.

13. The facility shall follow the "Visitation" standard in setting visitation rules for detainees in segregation.  Ordinarily, a detainee retains visitation privileges while in segregation.

14. Detainees in ACC will not use the visitation room during normal visitation hours.  In addition, violent and disruptive detainees may be limited to non-contact visitation.  In extreme cases, visitation may be disallowed for a particular detainee where the visit would present an unreasonable security risk.  Under no circumstances are detainees to participate in general visitation while in restraints.  If the detainee's behavior warrants restraints, the visit will not be granted.

General visitation may be restricted or disallowed when a detainee, while in a segregation status, is charged with, or has been found to have committed, a prohibited act having to do with visiting guidelines or has otherwise acted in a way that would reasonably indicate that he or she would be a threat to the orderliness or security of the visiting room.   Any restriction of visitation will be documented.

Detainees in segregation may not be denied legal visitation, but reasonable security precautions will be taken where necessary.  Legal service providers and assistants will be notified of any security concerns prior to the meeting.

15. Detainees in segregation shall have the same correspondence privileges as detainees in the general population.

16. The facility shall follow the "Telephone Access" standard that provides guidelines for detainees in segregation.  Detainees in administrative segregation will be permitted telephone access similar to

GEO000167



| | Adelanto Detention Facility | |
|---|---|---|
| | POLICY AND PROCEDURE MANUAL | NUMBER: 10.2.11-ADF |
| | CHAPTER:  Special Management Detainees | |
| | TITLE:  Special Management Unit Operations | |

that provided to detainees in the general population, but in a manner consistent with the special security and safety requirements of detainees in these units.

17. Members of the clergy may visit detainees in segregation, unless the shift supervisor determines the visit presents a security risk or will interfere with the orderly operating of the facility.

Violent and uncooperative detainees may be temporarily denied access to religious services until such time as their behavior and attitude warrants.

18. Detainees housed in segregation shall have the same law library access as the general population, consistent with security, although the facility may establish a policy of upon-request-only access. The level of supervision will depend on the individual's behavior and attitude.

Leisure reading materials will be available as requested from the Library.  [4-ALDF-2A-63]

Detainees in locked housing shall have the same law library access as the general population, consistent with security, the facility will grant access upon-request-only.  The level of supervision will depend on the individual's behavior and attitude.  [4-ALDF-2A-62]

Any denial of access to the law library will supported by compelling security concerns, for the shortest period required for security, fully documented in the SMU housing logbook as well as notification to ICE every time law library access is denied.

Detainees in the SMU for protective custody will be required to use the law library separately or will have requested legal material delivered to them.

19. Detainees in segregation shall have the same correspondence privileges as detainees in the general population (see the "Correspondence and Other Mail" standard).

H.  <u>Placement in Disciplinary Segregation</u>

To provide detainees in the general population a safe and orderly living environment, facility authorities shall discipline anyone whose behavior does not comply with facility rules and regulations.  This may involve temporary confinement apart from the general population, in the Special Management Unit (SMU).  A detainee may be placed in Disciplinary Segregation only after a finding by the Institution Disciplinary Panel (IDP) or equivalent that the detainee is guilty of a high level prohibited act or rule violation.  [4-ALDF-2A-47]

The disciplinary committee may order placement in disciplinary segregation only when alternative dispositions would inadequately regulate the detainee's behavior.

A maximum sanction of 60 days in disciplinary segregation shall apply to violations associated with a single incident.  After the first 30 days, the Facility Administrator shall send a written justification to the Assistant District Director for Detention and Deportation (ADD/DDP).  Considering the grounds for the Facility Administrator's disciplinary action, the ADD/DDP may decide to transfer the detainee to a facility where security is such that he/she could be placed in the general population.

GEO000168



| | Adelanto Detention Facility | |
|---|---|---|
| | POLICY AND PROCEDURE MANUAL | NUMBER: 10.2.11-ADF |
| | CHAPTER:  Special Management Detainees | |
| | TITLE:  Special Management Unit Operations | |

I.    Disciplinary Segregation Order

A written order shall be completed and signed by the Disciplinary Hearing Officer before a detainee is placed in disciplinary segregation.  A copy of the order shall be given to the detainee within 24 hours, unless delivery would jeopardize safety, security, or the orderly operation of the facility.

1.   The Disciplinary Hearing Officer shall prepare the Disciplinary Segregation Order, detailing the reasons for placing a detainee in disciplinary segregation, before actual placement.  All relevant documentation must be attached to the order.

2.   A copy of the completed Disciplinary Segregation Order will be given to the detainee within 24 hours of placement in disciplinary segregation, unless delivery would jeopardize the safe, secure, or orderly operation of the facility.

3.   The order will be maintained on file with the Special Management Unit (SMU) until the detainee is released from the SMU.

4.   When the detainee is released from the SMU, the releasing officer will indicate date and time of release on the Disciplinary Segregation Order, then forward the completed order to Segregation Supervisor overseeing SMU.

J.    Review of Detainee Status in Disciplinary Segregation

1.   The SMU review committee shall review the status of a detainee in disciplinary segregation within seventy-two hours of admission, every seven days for the first two months, and every thirty days thereafter to determine whether the detainee:

a.   abides by all rules and regulations; and,

b.   is provided showers, meals, recreation, and other basic living standards, weekly review(s) will include an interview with the detainee.  The SDEO shall document his/her findings after every review, by completing a Disciplinary Segregation Review Form (I-887).

2.   The SMU review committee may recommend the detainee's early release from the SMU upon finding that time in disciplinary segregation is no longer necessary to regulate the detainee's behavior.

3.   An early-release recommendation must have the Facility Administrator's approval before the detainee can be returned to the general population.

4.   The committee may shorten, but not extend, the original sanction.

5.   All review documents shall be placed in the detainee's detention file.

6.   Provided institutional security is not compromised, the detainee shall receive at each formal review, a written copy of the reviewing officer's decision and the basis for this finding.

GEO000169



| | Adelanto Detention Facility | |
|---|---|---|
| | POLICY AND PROCEDURE MANUAL | NUMBER: 10.2.11-ADF |
| | CHAPTER:  Special Management Detainees | |
| | TITLE:  Special Management Unit Operations | |

**K.**  **Conditions of Disciplinary Segregation (Basic Living Standards)**

Disciplinary segregation privileges shall be defined by the imposed sanction(s) of the disciplinary official. Detainees placed in disciplinary segregation may have all personal property, to include commissary (excluding hygiene items), impounded and stored by the facility for the duration of the disciplinary sanction. Detainees shall retain all facility issued property and hygiene items as defined on page seven (7) of the Detainee Handbook. Detainees shall not be denied the ability to retain in their possession: personal mail received after the imposed disciplinary sanctions, legal mail, legal materials, religious items deemed necessary by a religious authority and medical devices and/or equipment deemed necessary by a medical provider, unless such items pose a safety and/or security concern.

1.  The conditions of confinement will depend on the amount of supervision required to control the individual and safeguard other detainees and staff.

2.  Detainees housed in disciplinary segregation generally have fewer privileges than those housed in administrative segregation.  These detainees are subject to more stringent personal property control, restricted reading material, commissary privileges, etc.

3.  The Facility Administrator shall maintain the same living levels of decency and humane treatment for each detainee in disciplinary segregation, regardless of the purpose for which the detainee has been segregated.  When different treatment is required for security concerns presented by an individual detainee, staff shall prepare written documentation justifying this action.  The Facility Administrator shall sign this document, indicating his/her approval.

4.  Detainees in disciplinary segregation will be provided the same opportunity for the exchange of clothing, bedding, and linen, and for laundry as detainees in the general population.  If, for security purposes, the Facility Administrator authorizes an exception, the exception, and its justification, shall be documented in the SMU log.

5.  A detainee may be deprived of clothing, mattress, blanket, pillow, etc., for medical or psychiatric reasons only, as determined by the medical officer.

    If a detainee is so seriously disturbed that he/she is likely to destroy clothing or bedding or create a disturbance risking harm to self or others, the medical department shall be notified immediately and a regimen of treatment and control shall be instituted by the Health Services Administrator.

6.  As a rule, detainees in disciplinary segregation will have significantly fewer items of personal property than other detainees.  With the exception of items of personal hygiene, detainees in disciplinary segregation may lose the privilege of making commissary purchases.

7.  Access to legal and non-legal reading material shall be as follows:

    a.  The officer providing library services provide segregated detainee's leisure library access upon-request only.  This request shall be made using the Detainee Request Form.

    b.  When developing the schedule for law library-access, the Facility Administrator will set aside blocks of time for the detainees in disciplinary segregation.  These detainees will be afforded legal access comparable to, but not the same as, that of the general population.  Security constraints may impose limits on law-library access.

Page 10 of 17

GEO000170



| | Adelanto Detention Facility | |
|---|---|---|
| | POLICY AND PROCEDURE MANUAL | NUMBER: 10.2.11-ADF |
| | CHAPTER:  Special Management Detainees | |
| | TITLE:  Special Management Unit Operations | |

- Violent and/or uncooperative detainees may be temporarily denied access to the law library, until such time as their behavior and attitude warrants resumed access.

- On a case-by-case basis, legal material may be brought to individuals in disciplinary segregation. Denial of access to the law library must be justified by compelling security concerns, be fully documented in the SMU logbook, and last no longer than necessary for security purposes.

- Any denial of access to the law library will supported by compelling security concerns, for the shortest period required for security, fully documented in the SMU housing logbook as well as notification to ICE every time law library access is denied.

8. In accordance with the "Telephone Access" standard, detainees in disciplinary segregation shall be restricted to telephone calls for the following purposes:  [4-ALDF-2A-65]

   a. calls relating to the detainee's immigration case or other legal matters, including consultation calls;
   b. calls to consular/embassy officials; and
   c. family emergencies, as determined by the Facility Administrator.

9. Segregated detainees shall be allowed visits by members of the clergy, upon request, unless the supervisor determines the visit presents a security risk or will interfere with the orderly operation of the facility.

   a. The clergy member shall be told the detainees present state of behavior.
   b. The clergy member must agree to meet the segregated detainee.
   c. Violent and uncooperative detainees may be temporarily denied access to religious services until such time as their behavior and attitude warrants.

10. Detainees in segregation will receive a minimum of one hour of exercise per day outside their cells, five days per week, unless security or safety considerations dictate otherwise.

These provisions shall be carried out, absent compelling security or safety reasons documented by the Facility Administrator.  A detainee's recreation privileges may be withheld temporarily after a severely disruptive incident.   Staff shall document by memorandum and logbook(s) notation every instance when a detainee is denied recreation.  The memorandum shall be placed in the detainee's detention file as well as forwarding a copy of the action to the Facility Administrator.

The case of a detainee denied recreation privileges will be reviewed at least once each week, as part of the reviews required for all detainees in the unit. The reviewer will document whether the detainee continues to pose a threat to self, others, or facility security and, if so, why.

Denial of recreation privileges for more than 15 days requires the concurrence of the Facility Administrator and H.S.A. The Facility Administrator will notify ICE when a detainee is denied recreation privileges for more than 15 days.

GEO000171



| | Adelanto Detention Facility | |
|---|---|---|
| | POLICY AND PROCEDURE MANUAL | NUMBER: 10.2.11-ADF |
| | CHAPTER: Special Management Detainees | |
| | TITLE: Special Management Unit Operations | |

L. **Forms and Reviews**

1. A permanent log will be maintained in the SMU. The log will record all activities concerning the SMU detainees, e.g., meals served, recreation, visitors, etc.

   **The SMU log will record the detainee's name, A-number, housing location, date admitted, type of infraction or reason for admission, tentative release date (for detainees in disciplinary segregation), special medical or psychiatric problems or needs and the authorizing official. All releases from the unit will be similarly recorded.**

   All persons visiting the unit will sign a separate log, giving time and date of visit. Unusual activity or behavior of individual detainees will be recorded in the log, with a follow-up memorandum sent through the Facility Administrator to the detainee's file.

2. The SMU/Segregation Activity Sheet shall be prepared immediately upon the detainee's placement in the SMU. The form will be filled out at the end of each shift or as the activity takes place.

   The special housing officer for each shift will record whether the detainee ate, showered, exercised and took any medication. The record will also be used to notate additional information, e.g., if the detainee has a medical condition, has exhibited suicidal/assaultive behavior, etc.

   The facility medical staff will be required to sign each individual record when he/she visits the detainee in segregation.

   A new record must be created for each week the detainee is in segregation or when the reason for placement changes such as Administrative Segregation to Disciplinary. The completed Special Housing Activity Sheets will be retained in the SMU until the detainee is released from SMU.

   Upon release from the SMU, the releasing officer will ensure that the entire housing unit record relating to the detainee is attached to the Segregation Order and forwarded to the Classification Officer for inclusion in the detainee's detention file.

M. **Staffing**

1. The Assistant Facility Administrator of Security will select officers for assignment to the SMU on a rotational basis for their experience, judgment, and ability to manage detainees professionally. Supervision of these staff and unit operations will be a priority for management personnel, as indicated by the specified frequency of supervisory visits to the unit. Staff assigned to work in the special management unit is selected based on criteria that include: completion of probationary period, experience and suitability for this population. Staff is closely supervised with documented quarterly reviews conducted by the shift supervisor. There are provisions for rotation to other duties.

2. All staff assigned to SEG/SMU will receive training that includes information regarding the type of detainees housed in the unit; a course in dealing with detainees typically retained in segregated status; information on the rules governing SMU operation; special instructive discussions relative to safety and security precautions unique to the SMU area; and a basic course covering Adelanto Detention Facility policies governing discipline and the use of segregation.

GEO000172

|  | Adelanto Detention Facility | NUMBER: 10.2.11-ADF |
|---|---|---|
| | POLICY AND PROCEDURE MANUAL | |
| | CHAPTER:  Special Management Detainees | |
| | TITLE:  Special Management Unit Operations | |

**N.   High Security Cell Access**

High security cells will be specially marked with a notice to designate that a two-officer rule is in operation for the occupant.  That cell will only be opened with two officers present.  Two officers will remain in the SMU area during the out of cell time for that detainee.  High security designations will be made in selected cases.  Criteria for such a designation is:

1.   Demonstrated violent behavior toward staff;
2.   Demonstrated violent behavior toward other detainees;
3.   Demonstrated or reported serious escape history or risk; and
4.   Other case-by-case circumstances which warrant the high security designation.

Staff may make a recommendation for such action through their supervisor.  The Facility Administrator or the Facility Administrators designee will make the final decision.

**O.   Property and Contraband Control**

Control of property and contraband will include a thorough search and inventory of all personal property brought by a detainee to the unit.

Disciplinary segregation privileges shall be defined by the imposed sanction(s) of the disciplinary official. Detainees placed in disciplinary segregation may have all personal property, to include commissary (excluding hygiene items), impounded and stored by the facility for the duration of the disciplinary sanction(s). Detainees may also be precluded from ordering commissary for the duration of the disciplinary sanction if sanctioned by the disciplinary official. A secure property storage area is provided in the disciplinary housing unit. All property placed in storage will be thoroughly searched and inventoried, and a copy of the inventory sheet will be provided to the detainee.

Food service carts, laundry carts, tool carts and commissary bins will be thoroughly inspected and searched by staff to prevent the introduction of contraband. All tools must be inventoried upon entering and exiting SMU.

Supervisory staff may remove otherwise permissible items from the cell of a detainee in locked unit status when those items are being used by the detainee to harm himself or herself or others, create a disturbance, or otherwise disrupt the orderly operation of the unit.  Such instances will be documented in memo form or using a General Incident Report (GI), placed in the unit log and the individual detainee log sheet, and a copy of the memo or GI will be forwarded to the Captain and the Facility Administrator.  The Captain must personally approve all such instances that last longer than twenty-four hours.

Page 13 of 17

GEO000173



| | Adelanto Detention Facility | |
|---|---|---|
| | POLICY AND PROCEDURE MANUAL | NUMBER: 10.2.11-ADF |
| | CHAPTER:  Special Management Detainees | |
| | TITLE:  Special Management Unit Operations | |

P.  **Special Management Unit Programs**

The programs and activities named below will be available to detainees in the locked housing unit providing documented security or safety considerations do not prevent delivery of such programs for limited periods.

Isolated recreation and exercise will be provided to all detainees in the locked housing unit no fewer than five times each week for one hour.  Where cover is not provided to mitigate inclement weather, detainees are provided weather-appropriate equipment and attire.  Detainees may be denied access to recreation on a determination, documenting in writing, that the individual involved presents a serious danger to themselves or others or to institutional security.  [4-ALDF-2A-64]

Showers will be offered daily.  Detainees will be permitted to shave at this time. Detainees receive laundry, barbering, and hair care services, and are issued and exchange clothing, bedding, and linen on the same basis as detainees in the general population.  Exceptions are permitted only when determined to be necessary.  Any exception is recorded in the unit log and justified in writing.  [4-ALDF-2A-57]

Crisis counseling and other social services will be provided to detainees on an in-cell basis.  Detainees requiring private counseling may be moved in restraints to a room where the counseling staff member will remain under the observation of a second staff member, who may be outside the room.  The detainee will remain in restraints.

Detainees in locked housing are provided prescribed medication, clothing that is not degrading and access to basic personal items for use in their cells unless there is imminent danger that a detainee or any other detainee(s) will destroy an item or induce self-injury.  [4-ALDF-2A-56]

Religious counseling and materials will be permitted in the unit, as provided by approved religious representatives and approved by the Assistant Facility Administrator of Security.  The Assistant Facility Administrator of Security in conjunction with the Programs Coordinator will determine which religious volunteers, if any, will be permitted to visit the unit and under whose supervision.

Detainees in locked housing can write and receive letters on the same basis as detainees in the general population.  [4-ALDF-2A-60]

Social and legal visiting will be permitted for all detainees in locked status provided they are not under visiting restrictions imposed as part of disciplinary actions.  Detainees in locked status may visit in the general non-contact visiting area.  [4-ALDF-2A-61]

All participation or refusal to participate in recreation, showers, meals, staff interviews, visits or other major unit activities will be logged in the detainees' individual activity sheet.

GEO000174

|  **Corrections & Detention -** | Adelanto Detention Facility<br><br>POLICY AND PROCEDURE MANUAL<br>CHAPTER:  Special Management Detainees<br>TITLE:  Special Management Unit Operations | NUMBER: 10.2.11-ADF |
| --- | --- | --- |

Q.  **Food Service Operations**

Food service operations will be under the general oversight of the Food Services Administrator and will include in-cell service of meals that are the same as those served to the general population.

No detainee will be used to serve food in the unit.

Staff will ensure that food delivered to detainees is at the proper temperature.  Modification, reduction, or termination of meals will not be used as a behavioral control measure or for punishment.

Unit staff is responsible for ensuring the sanitary conditions of all utensils and trays.

Detainees who use food or other meal-related items to disrupt operations or threaten others will be served the same food as the general population.  However, Styrofoam or disposable trays may be substituted for the regular food tray.  [4-ALDF-2A-59]

R.  **Other Unit Programs**

The following programs and services are in operation in the locked unit:

1. Detainees may participate in such educational programs as can be provided within the confines of the unit, consistent with the security needs of the unit
2. In-cell programs such as leisure reading, self-study courses, and other activities will be made available to detainees in non-disciplinary status; detainees in disciplinary status may be limited in the number of reading items permitted in their possession at any one time.
3. Sanitation in the unit will be maintained at a high level.  Detainees will be responsible for cleaning their own cells.  The Assistant Facility Administrator of Security, on unit staff's recommendation, may approve specially screened detainees housed in the unit for duty as orderlies.

S. **Tours**

Staff mobility and supervisory visibility in locked units are important factors in ensuring smooth operations.

Detainees in segregation receive daily visits from the Chief of Security (Captain) members of the program staff on request, and a qualified health care daily unless medical attention is needed more frequently. Detainees requiring medication will be provided that medication as prescribed [4-ALDF-2A-53]

The Food Services Administrator will observe the service of meals once a week in locked units.  The Chaplain, classification, or social work staff and other program staff will visit all detainees in locked units as often as necessary to meet the needs of those cases, but in any event no fewer than once a week.

The Shift Supervisor will visit the locked units twice each shift.
A designated medical staff member will visit the unit at least daily and will be available as needed for other required care.  Detainees requiring medication will be provided that medication as prescribed.

The Facility Administrator and Department Heads will visit detainees confined to the segregation unit weekly.

GEO000175

|  | Adelanto Detention Facility<br><br>POLICY AND PROCEDURE MANUAL<br>CHAPTER:  Special Management Detainees<br>TITLE:  Special Management Unit Operations | NUMBER: 10.2.11-ADF |
|---|---|---|

**T.** **Other Considerations**

Protective custody cases will require separation, at a minimum, from the detainees by whom they are threatened.  In most cases, separation from all other detainees will be required.  Records on these cases should reflect their status, any known separates, and any other special precautions that must be taken.

In many instances, careful movement through the facility and in the admission/release process will be needed.  When it is necessary in the judgment of the Assistant Facility Administrator of Security; two staff members will be used to escort protective custody cases for such moves.

Detainees with medical and psychiatric aspects to their cases will be handled in accordance with the medical orders for those cases as long as those orders do not conflict with the facility's security needs.  In any case in which there appears to be such a conflict, the Shift Supervisor and, if necessary, the Assistant Facility Administrator or Facility Administrator, will resolve the issue with the Health Services Administrator.

**U.** **Case Reviews**

The SMU review committee will review each locked unit detainee's case within seventy-two hours of admission, every seven days for the first two months, and at least every thirty days thereafter.  [4-ALDF-2A-48]

GEO000176

|  | Adelanto Detention Facility<br><br>POLICY AND PROCEDURE MANUAL<br><br>CHAPTER:  Special Management Detainees<br><br>TITLE:  Special Management Unit Operations | NUMBER: 10.2.11-ADF |
| --- | --- | --- |

THIS POLICY WILL BE REVIEWED AT LEAST ANNUALLY AND UPDATED AS NEEDED.

Gray highlighted areas are the changes made to the current revision.

QUESTIONS/SUGGESTIONS REGARDING THIS POLICY SHALL BE ADDRESSED TO THE ASSISTANT FACILITY ADMINISTRATOR OF SECURITY.

APPROVED:  _____
                      Facility Administrator

EFFECTIVE:  February 16, 2015

Reviewed & Revised: October 2011
Reviewed & Revised: November 2011
Reviewed & Revised: February 2012
Reviewed & Revised: June 2012
Reviewed: July 2013
Reviewed: November 2014
Reviewed & Revised: February 2015

Page 17 of 17

GEO000177

# GEO
# 40 Hour
# Certification
# For
# Special Housing Unit
# (SHU)



**The GEO Group, Inc.**

**Officer-in Training:** E. Santiago

**Primary Trainer:** G R·DURAN

**Secondary Trainer:** _____

**SHU Training – Date Started:** 4/2/15   **Date Completed:** 7/2/15

Approved:_____ Date:_____

Rev 1 2/6/2012                    Page 1 of 10

GEO000178

# Glossary

**Professional Demeanor:**  Behavior that demonstrates the employee's attitude toward, understanding and acceptance of the rules, ethical standards, and values promulgated by the GEO GROUP, Inc. policy.

**Signature:**  Throughout this manual, where a signature is required, the signing individual must sign their full first name-middle initial-last name.  Using initials and last name only, is not sufficient documentation for this (or any) training document.

GEO000179

## GEO
## SPECIAL HOUSING UNIT
## CERTIFICATION

Once all Certification objectives have been successfully completed, the Warden, or designee must review the Certification Manual, Training Officer's reports and sign authorizing the Officer to work posts without direct and immediate supervision.

On posts manned by the Officer-in-Training who are not designated SHU Certified Officers, the Certified Officer providing training and completing the Certification Manual must remain with the Officer-in-Training. Ratios are listed as R=1:1 which means one Certified Officer to one Officer-in-Training, unless otherwise noted.

**I have read and understand that the Officer-in-Training must be under direct and immediate supervision of a Certified SHU Officer while on any post.**

Security Chief: _____    _____

Unit Commander: _____    _____

SHU Supervisors: _Lt R Duran ReginaDuran_    _6/2/15_

_____    _____

_____    _____

_____    _____
Signature                   Date

GEO000180

GEO
SHU Officer-In-Training
Certification

Officer-In-Training  Name: _E Santiago_

DATE: _4/2/15_

1.0     4 HOUR      Shift Supervisor's Office

           NOTE: May exceed 1:1 ratio.  Shift Supervisor will review post orders with Officers-in-Training.

          **Supervisor Initials and Date**                    **OBJECTIVES**

1.1   _RD 4/2/15_    Receive briefing from Shift Supervisor.

1.2   _RD 4/2/15_    Review Polices and Post Orders pertaining to SHU Training objectives.

1.3   _RD 4/2/15_    Review the Count / Locator book.

1.4   _RD 4/2/15_    Review procedure for writing reports.

Supervisor (signature): _Lt R Duran_          Print name: _LT R. DURAN_
                      _Regina Duran_
Demonstrated professional demeanor at all times ☒yes ☐no        Remedial Training Required ☐

| Date | Supervisor Name Print | Time | Supervisor Signature |
|------|----------------------|------|---------------------|
| 4/2/15 | LT R. DURAN | 1400 to 1800 | Lt R Duran |

GEO000181

Officer-In-Training Name: _E. Santiago_

DATE: _8/3/15_

2.0     8 HOURS     SHU CONTROL ROOM (R=1:1)

_8_: ACTUAL TIME ON POST

|      | Trainer Initials and Date SHU Control Room | OBJECTIVES |
|------|----------|------------|
| 2.1  | RD  4/3/15 | Read and sign post orders. |
| 2.2  | RD  4/3/15 | Demonstrate proper key control. |
| 2.3  | RD  4/3/15 | Identify all persons before allowing entry or exit. |
| 2.4  | RD  4/3/15 | Demonstrate accountability of security equipment, cameras and inventories. |
| 2.5  | RD  4/3/15 | Review Emergency procedures and notification process. |
| 2.6  | RD  4/3/15 | Demonstrate proper radio and telephone communications. |
| 2.7  | RD  4/3/15 | Demonstrate recording offender counts. |
| 2.8  | RD  4/3/15 | Demonstrate legible and accurate logbook entries (Trainer must countersign entry). |
| 2.9  | RD  4/3/15 | Demonstrate keeping area clean and safe. |
| 2.10 | RD  4/3/15 | Demonstrate knowledge and ability to operate alarm system and security panels in control center. |
| 2.11 | RD  4/3/15 | Demonstrate professional telephone etiquette. |

Trainer (signature): _Lt R Duran_          Print name: _LT R·DURAN_
_Regina Duran_

Demonstrated professional demeanor at all times ☑yes ☐no          Remedial Training Required ☐

| Date | Trainer Name Print | Time | Trainer Signature |
|------|----------|------|------------|
| 4/3/15 | LT R·DURAN | 1400 to 2230 | Lt R Duran |

GEO000182

Officer-In-Training Name: _E. Santiago_

DATE: _6/4/15_

3.0     4 HOURS     SHU MEDICAL PROCESSES (R= 1:1)

NOTE: It is MANDATORY that medical personnel must give an orientation of the operation. The nurse may do orientation with a maximum of five Officers-in-Training.

|  | Trainer Initials and Date | OBJECTIVES |
|---|---|---|
| 3.1 | _RD 4/4/15_ | Read and sign post orders. |
| 3.2 | _RD 6/4/15_ | Supervise / observe offender sick call. |
| 3.3 | _RD 6/4/15_ | Control offender movement. |
| 3.4 | _RD 6/4/15_ | Demonstrate legible and accurate logbook entries (Trainer must countersign entry). |
| 3.5 | _RD 6/4/15_ | Demonstrate effective searches of offenders at entry/exit of medical exams / contact. |
| 3.6 | _RD 4/4/15_ | Supervise offender pill call. |
| 3.7 | _RD 6/4/15_ | Demonstrate offender accountability. |

Trainer (signature): _LT R. DURAN_          Print name: _Lt R Duran_

Demonstrated professional demeanor at all times ☒yes ☐no          Remedial Training Required ☐

| Date | Trainer Name Print | Time | Trainer Signature |
|---|---|---|---|
| 4/4/15 | Lt R Duran | 1400 to 1800 | Lt R Duran |

GEO000183

**Page 69**

Officer-In-Training Name: _E Santiago_

DATE: _4/18/15_

4.0 **8 HOURS**
Escort/Utility Officer (R = 1:1)

_____8_____ : ACTUAL TIME ON POST

| | Trainer Initials and Date | | OBJECTIVES |
|---|---|---|---|
| | **DAY** | **EVENING** | |
| 4.1 | _____ | _4/18/15 RD_ | Read and sign post orders. |
| 4.2 | _____ | _4/18/15 RD_ | Demonstrate proper control of offender movement. |
| 4.3 | _____ | _4/18/15 RD_ | Demonstrate appropriate supervision of offenders. |
| 4.4 | _____ | _4/18/15 RD_ | Demonstrate proper control of contraband. |
| 4.5 | _____ | _4/18/15 RD_ | Demonstrate proper use of security equipment. |
| 4.6 | _____ | _4/8/15 RD_ | Observe offender activity. |
| 4.7 | _____ | _4/18/15 RD_ | Monitor and supervise offender movement. |
| 4.8 | _____ | _4/18/15 RD_ | Demonstrate legible and accurate logbook entries (Trainer must countersign entry). |

Trainer (signature): _LT R . DURAN_          Print name: _LT R Duran_

Demonstrated professional demeanor at all times ☑yes ☐no          Remedial Training Required ☐

| Date | Trainer Name Print | Time | | Trainer Signature |
|---|---|---|---|---|
| 4/18/15 | LT R. DURAN | 1400 to 2230 | | Lt R Duran |
| | | to | | |

GEO000184

Officer-In-Training   Name: E Santiago

DAY/EVENING/NIGHT   DATE: 6/4/15

5.0   16 HOURS   SHU HOUSING OFFICER (R =1:1)

_____ 10 : ACTUAL HOURS ON POST

| | Trainer Initials and Date | | | OBJECTIVES |
|---|---|---|---|---|
| | DAY | EVENING | NIGHT | |
| 5.1 | | | 6/4/15 | Read and sign post orders. |
| 5.2 | | 7/2/15 | | Demonstrate proficient contraband control. |
| 5.3 | | 7/2/15 | | Demonstrate proper key control. |
| 5.4 | 4/4/15 | 7/2/15 | | Demonstrate proper inventory and inspection of all equipment. |
| 5.5 | | 7/2/15 | | Demonstrate legible and accurate logbook entries (Trainer must countersign entry). |
| 5.6 | 6/4/15 | | 6/4/15 | Conduct proper 30 minute checks and make proper entry on 30 minute check form. ( BOP Facility) Demonstrate how to complete a 292 form. |
| 5.7 | | 7/2/15 | | Demonstrate proper management of inmate exercising, feeding, showering, and movement. |
| 5.8 | 4/4/15 | | | Enforce all cellblock rules and regulations. |
| 5.9 | | 7/2/15 | | Demonstrate observation skills/listening skills. |
| 5.10 | | | 6/4/15 | Perform proper sanitation/safety/security inspection. |
| 5.11 | | 7/2/15 | | Conduct a formal count and complete count sheet. (The Trainer will countersign the Trainee's signature and together will be considered as one of the two counting officers). |
| 5.12 | 4/4/15 | | | Report any problems/discrepancies to Supervisor. |
| 5.13 | 4/4/15 | | | Conduct search of offenders and personal property, to include inventory. |
| 5.14 | | | 6/4/15 | Demonstrate proper control of chemicals, equipment, and supervision of offender workers. |
| 5.15 | 4/4/15 | | | Demonstrate proper procedures for making offender phone calls. |
| 5.16 | 6/4/15 | | | Ensure proper safety equipment for offender workers is provided and used. |
| 5.17 | | 7/2/15 | | Demonstrate proper use of all applicable restraints (cuff from the rear) and devices. |
| 5.18 | 4/4/15 | | | Demonstrate manual operation of cells. |

Trainer (signature): LT R Duran   Print name: LT R DURAN

Demonstrated professional demeanor at all times ☑yes ☐no   Remedial Training Required ☐

| Date | Trainer Name Print | Time | Trainer Signature |
|---|---|---|---|
| 4/4/15 | LT R Duran | 2200 to 1000 | LT R Duran |
| 7/2/15 | LT R Duran | 2200 to 0600 | LT R Duran |

Rev 1 2/6/2012   Page 8 of 10

GEO000185

**Page 71**

# GEO
## Officer-In-Training

## SPECIAL HOUSING UNIT CERTIFICATION
### (SHU)

NOTES / COMMENTS:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Rev 1 2/6/2012                          Page 10 of 10

GEO000186

# GEO
## Officer-In-Training

### SPECIAL HOUSING UNIT CERTIFICATION
### (SHU)

- When the Officer-in-Training successfully completes a sub-objective, the Training Officer who observed and supervised the successful completion will place his/her initials and the date next to that sub-objective.
- The Trainer who supervises the last sub-objective will sign the page noting successful completion of all training objectives on that page.
- Once all objectives have been completed, the primary trainer must review and must sign this manual certifying that all objectives and sub-objectives have been satisfactorily completed.
- The Officer-in-Training must sign/date this manual verifying that they demonstrated sub-tasks requirements with satisfactory completion. Officer-in-Training acknowledges that sub-tasks requirements were completed in accordance with prescribed procedures. OIT Initial _____
- This manual, along with all reports from Trainer's who supervised the Officer-in-Training, must be forwarded to the Unit Commander.
- The Unit Commander must sign to verify all required training objectives are met and that all documentation is complete.
- The Unit Commander will forward this manual to the Warden/ Designee of the facility, who must sign to verify that all required training objectives and documentation are complete.

  **In the absence of the Warden, the approved designee will sign this manual. This completed document shall be filed in the employees training file.**

Officer-in-Training: *E. Santiago*

EID #: _____   Employing Institution: *GEO Group Adelanto*

This SHU Certification Training Manual and attached performance documentation were reviewed and approved as noted below.

Primary Trainer: *Lt R Doran*   Date : *7/3/15*

Unit Commander _____   Date: _____

Security Chief: _____   Date: _____

Warden
/ Designee: _____   Date: _____

GEO000187



| | Adelanto Detention Facility | **NUMBER:** 10.3.7 – ADF |
|---|---|---|
| | POLICY and PROCEDURE MANUAL | **SUPERSEDES:** 09/15/2014 |
| | **CHAPTER:** Post Orders | |
| | **TITLE:** Segregation/Special Management Unit Officer | **EFFECTIVE:** 02/16/2015 |
| | **RELATED ACA STANDARDS:** 4-ALDF-2A-04 | |

**All Officers will read and sign the appropriate post orders upon assuming a new post. Failure to do so could lead to disciplinary action taken up to and including termination.**

I.  AREA OF RESPONSIBILITY

The Officer assigned to this post is responsible for all areas within his/her range of vision. This will include all areas within sight and sound, including windows, emergency fire doors, corridors, the adjacent entrances to the main corridor and observation of the exterior of the facility grounds area.

II.  SUPERVISION

The Segregation/Special Management Unit (SEG/SMU) Officer reports directly to the Shift Supervisor.

A.  Shift Hours as scheduled per roster.
B.  Operational hours as scheduled per roster.
C.  Days off as scheduled per roster.

III.  EQUIPMENT

The following equipment will be worn on the SEG/SMU Officer's duty belt:

A.  Hand Held Radio
B.  Keys
C.  Handcuffs
D.  PIPE Device
E.  Flashlight

IV.  GENERAL DUTIES

A.  Receive orders and instructions from the Shift Supervisor.
B.  Make written and oral reports as necessary.
C.  Receive information from the preceding SEG/SMU Officer.
D.  Relay all information pertinent to the operation of all other shifts and departments.
E.  Perform other duties as assigned.
F.  All staff is responsible for familiarization with facility policies. All policies are available at designated areas. Electronic access to local policies is also available to designated employees.
G.  All staff assigned to the segregation unit are prohibited from entering the control pod unless in the event of an emergency.
H.  Officer must remain vigilant in segregation performing 30 minute checks and all required counts.
I.  All segregation security video will be reviewed daily by the Assistant Facility Administrator Security to ensure compliance.

Page 1 of 11          Initials_____   Date_____

GEO000188

|  | Adelanto Detention Facility<br>POLICY AND PROCEDURE MANUAL<br>CHAPTER: Post Orders<br>TITLE: Segregation/Special Management Unit Officer | NUMBER: 10.3.7 – ADF |
|---|---|---|

## V.     RESPONSIBILITIES

### A.   Operating Procedures

All detainees must be evaluated by a medical professional prior to being placed in an Special Management Unit (SMU). Segregation officer duty station will be located at the front of the segregation unit. The segregation officer will be expected to remain at this post unless making required rounds/counts or performing other required duties.

Water flow to the cells in the Segregation/Special Management Unit may be restricted through the plumbing chases at the direction of the Shift Supervisor.

Handcuff ports/food slots in doors will be kept shut unless they are actually in use and are not to be open to communicate to detainees.

Any detainee moved outside of their cell will have hands placed in restraints behind their backs (the only exception would be a medical issue in which case the Facility Administrator and Health Service Administrator would be advised prior to movement). The restraints will be removed only when the detainee is in a secure enclosure such as a recreation area, shower, etc.

Razors will only be issued to detainees once secured in the shower. The Officer will inspect the razor upon completion and prior to movement back to the cell to ensure the blade is intact.

Staff will personally observe every detainee at least every thirty minutes on an irregular schedule and document the checks in their logbook as well as the 30 minute check form located near each occupied cell. Detainees who are violent or mentally disordered or who demonstrate unusual or bizarre behavior receive more frequent observation; suicidal detainees are under continuous observation until seen by a mental health professional. Subsequent supervision routines are in accordance with that ordered by the mental health professional. [4-ALDF-2A-52]

GEO000189



| | Adelanto Detention Facility POLICY AND PROCEDURE MANUAL CHAPTER: Post Orders TITLE: Segregation/Special Management Unit Officer | NUMBER: 10.3.7 – ADF |
| --- | --- | --- |

**B.**    Property and Contraband Control

Disciplinary segregation privileges shall be defined by the imposed sanction(s) of the disciplinary official. Detainees placed in disciplinary segregation may have all personal property, to include commissary (excluding hygiene items), impounded and stored by the facility for the duration of the disciplinary sanction(s). Detainees may also be precluded from ordering commissary for the duration of the disciplinary sanction if sanctioned by the disciplinary official. A secure property storage area is provided in the disciplinary housing unit.

Control of property and contraband will include a thorough search and documented inventory of all personal property brought by a detainee to the unit.

Food service carts, laundry carts and commissary bins will be thoroughly inspected and searched by staff to prevent the introduction of contraband.

Supervisory staff may remove otherwise permissible items from the cell of a detainee in locked unit status when those items are being used by the detainee to harm himself or herself or others, create a disturbance, or otherwise disrupt the orderly operation of the unit. Such instances will be documented in memo form or using a General Incident Report (GI) placed in the unit log and the individual detainee log sheet, and a copy of the memo or GI will be forwarded to the AFA-Security and the Facility Administrator. The AFA-Security must personally approve all such instances that last longer than twenty-four hours.

A secure property storage area is provided in the Intake Property Room. All property placed in storage will be thoroughly searched and inventoried, and a copy of the inventory sheet will be provided to the detainee.

**C.**    Special Management Unit Programs

Detainees in locked housing shall have the same Law Library access as the general population, consistent with security. The facility will grant access upon-request-only. The level of supervision will depend on the individual's behavior and attitude.

Detainees in the SMU for protective custody will be required to use the Law Library separately or will have requested legal material delivered to them.

Religious counseling and materials will be permitted in the unit, as provided by the Chaplain or approved religious representatives and approved by the AFA-Security.

Social and legal correspondence will be permitted, subject to available postage, per normal facility procedures.

Social and legal phone calls will be permitted to detainees in all categories, but may be limited to certain hours in accordance with staff availability. Detainees in disciplinary status may be limited to legal and family emergency calls.

Social and legal visiting will be permitted for all detainees in locked status provided they are not under visiting restrictions imposed as part of disciplinary actions. Detainees in locked status may visit in the general non-contact visiting area.

Page 3 of 11          Initials_____   Date_____

GEO000190



| | Adelanto Detention Facility | |
|---|---|---|
| | POLICY AND PROCEDURE MANUAL | NUMBER: 10.3.7 – ADF |
| | CHAPTER: Post Orders | |
| | TITLE: Segregation/Special Management Unit Officer | |

*Upon notification by the lobby officer of a detainee visit, the segregation Officer will verify the status of the detainee. The segregation Officer will inform the requesting officer of the status to include any documented precautions or restrictions. Detainees housed in segregation for protective custody shall not use the Visitation room during normal visitation hours; protective custody detainees may be restricted to non-contact visiting area to accommodate a visit.*

Commissary will be permitted for detainees in all categories of locked status provided they are not under commissary restrictions imposed as part of the disciplinary actions.

**Administrative Segregations** detainees will be offered at least two (2) hours of recreation or exercise per day, seven (7) days a week.

**Disciplinary Segregation** Detainees will be offered at least one (1) hour of recreation or exercise per day, seven (5) days a week.

All participation or refusal to participate in recreation, showers, meals, staff interviews, visits or other major unit activities will be logged on the detainees' individual activity sheets.

D. <u>Food Service Operations</u>

Food service operations will be under the general oversight of the Food Services Manager and will include in-cell service of meals.

Detainees in the SEG/SMU shall receive three nutritionally adequate meals per day from the menu served to the general population. For security purposes, detainees in the SEG/SMU shall use disposable utensils only.

Staff will ensure that food delivered to detainees is at the proper temperature. Modification, reduction, or termination of meals will not be used as a behavioral control measure or for punishment.

Unit staff is responsible for ensuring the sanitary conditions of all utensils and trays.

Detainees who use food or other meal-related items to disrupt operations or threaten others will be served the same food as the general population. However, Styrofoam or disposable trays may be substituted for the regular food tray.

E. <u>Other Unit Programs</u>

The following programs and services are in operation in the locked unit:

1. Laundry and clothing exchange procedures will be equivalent to the services offered in the general population; special demeaning clothing will not be used.
2. Detainees in non-disciplinary status will be given the opportunity to watch television for one (1) hour a day.
3. Sanitation in the unit will be maintained at a high level. Detainees will be responsible for cleaning their own cells. Classification may approve specially screened detainees housed in the unit for duty as porters.

Page 4 of 11                    Initials_____    Date_____

GEO000191

|  | Adelanto Detention Facility<br>POLICY AND PROCEDURE MANUAL<br>CHAPTER: Post Orders<br>TITLE: Segregation/Special Management<br>Unit Officer | NUMBER: 10.3.7 – ADF |
|---|---|---|

F.   **Other Considerations**

Special categories of detainees will require locked status and will be handled somewhat different. Detention and segregation cases may be housed in the same unit. However the privileges permitted in these two statuses are quite different and staff will ensure that detainees in disciplinary status are not able to receive prohibited items from those in non-disciplinary status.

Protective custody cases will require separation, at a minimum, from the detainees by whom they are threatened. In most cases, separation from all other detainees will be required. Records on these cases should reflect their status, any known separates, and any other special precautions that must be taken.

In many instances, careful movement through the facility and in the admission/release process will be needed. When it is necessary in the judgment of the AFA-Security; two staff members will be used to escort for such moves.

Detainees with medical and psychiatric aspects to their cases will be handled in accordance with the medical orders for those cases as long as those orders do not conflict with the facility security needs. In any case in which there appears to be such a conflict, the Shift Supervisor and, if necessary, the AFA-Security or Facility Administrator will resolve the issue with the Health Services Administrator.

A cut down tool is located in the Segregation office hall way in a RED emergency box mounted to the wall. In the event of an emergency break glass and remove cut down tool.

G.   **Emergency Plans**

It is imperative that you be familiar with all procedures, especially emergency procedures for the post on which you work. You are specifically referred to the following emergency plans:

Facility Evacuation Plan
Bomb Plan
Riot/Disturbance Control Plan
Escape Plan
Hostage Plan
Power Outage Plan

Page 5 of 11          Initials_____   Date_____

GEO000192

|  | Adelanto Detention Facility<br>POLICY AND PROCEDURE MANUAL<br>CHAPTER: Post Orders<br>TITLE: Segregation/Special Management Unit Officer | NUMBER: 10.3.7 – ADF |
|---|---|---|

**H.    Security Checks**

Inspect the following items upon assuming the SEG/SMU post and every 30 minutes thereafter, at irregular intervals, to assure that security is maintained and to assure sanitation standards are being maintained. This security check will be entered in the SEG/SMU Log as well as the 30 minute check form located near each occupied cell also the "PIPE" device will be used to log checks by pressing the "PIPE" against the metal discs mount on every cell door . Irregular 30-minute checks must begin within one-half hour from the time the last SEG/SMU check was completed. (i.e., if the last SEG/SMU check was completed at 0810 hours, the next SEG/SMU check must begin before 0840 hours)

1.  Determine that all detainees assigned to the SEG/SMU are present or accounted for at all times and that each detainee is safe. Detainees who are violent or mentally disordered or who demonstrate unusual or bizarre behavior shall receive more frequent observation; all detainee checks will be logged.
2.  Check all doors, locks, windows, window frames and exterior walls to ensure that they are secure.
3.  Check the sanitation of the SEG/SMU, direct cleaning as necessary and supervise the cleaning until it is properly completed.
4.  Check for contraband in all areas of the SEG/SMU.
5.  Note any equipment malfunctions and make appropriate notations in the SEG/SMU log; prepare a Maintenance Work Order to report any malfunctions. Advise the on-duty Shift Supervisor verbally on noted Maintenance Work Orders and malfunctions.
6.  Ensure no detainee is housed in the same cell longer than 21 days, after 21 days the detainee must be moved to another cell. This is done for security reasons to help prevent any detainee from escaping or tampering with locks, windows etc.

**I.    Forms and Reviews**

1.  A permanent and accurate log will be maintained in the SEG/SMU. The log will record all activities concerning the SEG/SMU detainees, e.g., meals served, recreation, visitors, etc.

    **The SEG/SMU log will record the detainee's name, A-number, housing location, date admitted, reasons for admission, and the authorizing official. All releases from the unit will be similarly recorded.**

    If anyone visits the SEG/SMU the name, title and purpose of the visit will be recorded in the SEG/SMU log. In addition, *Staff members entering the Special Management Unit, and who are not assigned to work in the Special Management Unit, will sign the Visitor's Logbook documenting the date, time and reason for their visit.*

    Unusual activity or behavior of individual detainees will be recorded in the log, with a follow-up General Incident Report sent through the Facility Administrator to the detainee's file.

2.  The SMU/Segregation Activity Sheet shall be prepared immediately upon the detainee's placement in the unit. The form will be completely filled out at the end of each shift or as the activity takes place.

    The special housing Officer for each shift will record whether the detainee ate, showered and exercised, notating 'Y' for Yes and 'N' for No, for meals and showers and actual time.

    The record will also be used to notate additional information, e.g., if the detainee has a medical condition, has exhibited suicidal/assaultive behavior, etc.

Page 6 of 11          Initials_____    Date_____

GEO000193

|   Corrections & Detention + | Adelanto Detention Facility POLICY AND PROCEDURE MANUAL CHAPTER: Post Orders TITLE: Segregation/Special Management Unit Officer | NUMBER: 10.3.7 – ADF |
|---|---|---|

The facility medical staff will be required to sign each individual record when he/she visits the detainee in segregation.

A new record must be created when the current one is completed.  The completed Special Housing Activity Sheets will be retained in the SMU until the detainee is released from SMU.

A record must be created when a detainee is moved from one classification to another, i.e. administrative segregation to disciplinary segregation.

Upon release from the SMU, the releasing Officer will ensure that the entire housing unit record relating to the detainee is attached to the Administrative Segregation Order and forwarded to the Records department for inclusion in the detainee's detention file.

J.  **High Security Cell Access**

High security cells will be specially marked with a notice to designate that a two-officer rule is in operation for the occupant.  That cell will only be opened with two officers present.  Two officers will remain in the SMU area during the out of cell time for that detainee.  High security designations will be made in selected cases.  Criteria for such a designation is:

1.  Demonstrated violent behavior toward staff;
2.  Demonstrated violent behavior toward other detainees;
3.  Demonstrated or reported serious escape history or risk; and
4.  Other case-by-case circumstances which warrant the high security designation.

Staff may make a recommendation for such action through their supervisor.  The Facility Administrator or designee will make the final decision.

K.  **Counts**

Ensure that the detainees are accounted for in a proper manner.  During all counts, all detainee activity stops.  All detainees are to report directly to their assigned beds.  The count is to be started when all detainees are sitting on their assigned beds with the exception of face to photo counts where each detainee will stand next to their bunk.  Two Officers will be present during all counts; one taking the count and the other Officer will cover the count.  Then the counting Officer will cover the count and the other Officer will make a second count.  Both Officers will compare numbers by showing each Officer what they counted during that count.  Make sure you see living, breathing flesh when you count, do not assume that there is a detainee under the blankets or sheets.  The detainees are to remain on their assigned beds as you finish counting and while giving your count to the Master Control Center.  All detainees will remain near their beds until the facility count is clear.

The counts Schedule is as follows: 0200, 0630, 1100, 1630 Face to Photo, 2100 and 2300 hours.

GEO000194

|  | Adelanto Detention Facility<br>POLICY AND PROCEDURE MANUAL<br><br>CHAPTER:  Post Orders<br><br>TITLE: Segregation/Special Management<br>Unit Officer | NUMBER:  10.3.7 – ADF |
|---|---|---|

**L.**    **Detainee Movement**

1.  Control detainee movement and access into the SEG/SMU by control of doors.  Only one door is to be opened at a time with the request of an officer or staff member. The SEG/SMU officer will control all movement into and out of the unit.

2.  Be familiar with all regulations concerning the movement and conduct of detainees.  Know what to do in emergencies.  When in doubt, call the Shift Supervisor.

3.  Handcuff all detainees from behind, prior to exiting their cells, and ensure they remain handcuffed unless other directives are provided.  Ensure that detainees who use the Law Library are handcuffed in the front.  Handcuffs shall not be required for detainees who are out of their cell for cleaning purposes and supervised.  Detainees must remain handcuffed unless the Doctor, Medical Provider or the EOIR Judge requests that the handcuffs be removed; a notification to the Shift Supervisor will be made prior to removal of handcuffs.  Detainees being escorted to Intake to retrieve legal items must have the approval of the Shift Supervisor or higher authority.  Handcuffs will be removed by the Visitation Officer once the detainee has been secured within the visitation area.

4.  Movement of detainees out of the SEG/SMU will be called in to Master Control to ensure that the hallway is cleared of detainees prior to the movement.

5.  Ensure that the following escort procedures are followed.

      a.    Always escort with the detainee(s) walking in front, never behind.
      b.    Detainee(s) being escorted will be kept in clear sight.
      c.    Detainee(s) being escorted are not to stray or stop until destination is reached.
      d.    The escort officer shall walk on the strong-arm side of the detainee(s).

6.  All detainee movement into and out of the unit will be recorded in the unit logbook.

7.  Whenever detainee porters are used they must remain in the area where they are housed and must be under direct supervision at all times. Except for emergencies no detainees will be allowed out of their cell between 11:00pm-6:00am. In the event a cell door needs to be open after normal hour activities, the Shift Supervisor will be present.

**M.**    **Sanitation**

Cells will be cleaned and inspected daily and as detainees are transferred or released.  This will include cleaning the toilet/sink areas, mopping the floor and wiping down flat surfaces, inspecting windows, vents, doors locks, etc for evidence of tampering.  Shower facilities will remain in a sanitary condition at all times.  Direct and supervise cleaning as needed.

**N.**    **Control of Chemicals**

Responsible for ensuring that all cleaning materials are secured when not in use.  Cleaning materials will be dispensed according to caustic control directives.  The SEG/SMU Officer will ensure that cleaning materials are returned to the Chemical Supply area, and the proper forms are filled out.  The SEG/SMU Officer will ensure that all cleaning materials are returned and the proper forms are filled out.

Initials_____     Date_____

GEO000195

|  | Adelanto Detention Facility<br>POLICY AND PROCEDURE MANUAL<br>CHAPTER:  Post Orders<br>TITLE: Segregation/Special Management<br>Unit Officer | NUMBER:  10.3.7 – ADF |
|---|---|---|

O.   **Emergency Evacuation Procedures**

1. Notification to Master Control Center and Shift Supervisor.
2. Notification to all detainees and/or staff to prepare to evacuate.  In case of an electrical power outage, a key to the SEG/SMU doors is located in the Master Control Center.
3. Detainees are evacuated one at a time, beginning with the one in most danger first.
4. SMU and segregation detainees will exit the building, if safe to do so, via directives within the facility emergency evacuation plan.
5. All cells and areas are visually/physically checked by the SEG/SMU Officer to make sure that no one is left in the unit.
6. A count is taken as soon as possible to ensure that all detainees and staff are accounted for.

P.   Responsible for maintaining the post log.

Q.   Responsible for maintaining detainee accountability for all detainees assigned to work. Ensure that detainees report for work as scheduled and that the Detainee Account Clerk receives all required documentation on a daily basis.

R.   Responsible for maintaining incentive pay sheet on a daily basis, and ensure that they are correct so detainees are given credit for hours worked.

S.   Special Management Detainee:

As it pertains to this section and policy, special management detainees are male detainees that are considered as "transgender" and have recognizable anatomical gender ambiguities.  Special management detainees are further defined as:  any male detainee that presents himself as a female and has undergone a physical transformation from male to female, whether or not the transformation is complete, will be treated as a special management detainee.  Any male detainee that has undergone any surgical procedures to reassign his gender is considered a special management detainee.  Any male detainee that has begun any type of hormonal treatment resulting in female like anatomical changes is considered a special management detainee.  Any male detainee that has undergone any of the above processes or procedures and still possesses male genitalia is considered a special management detainee.

1. All detainees that have been identified as special management according to the criteria provided in this policy will be housed as prescribed above and must be supervised, observed and monitored by **female staff only.**
2. All special management detainees will be kept separate from general population detainees regardless of gender when moved within the facility and must be escorted at all times by **female staff members.**
3. When transportation of special management detainees-as identified by the criteria of this policy-outside of the facility is necessary, each special management detainee will be treated as a separatee with at least one **female staff member** assigned to the transportation team.
4. Unit housing records will identify the detainee as Protective Custody/Special Management.

Initials_____   Date_____

GEO000196

|  | Adelanto Detention Facility<br>POLICY AND PROCEDURE MANUAL<br>CHAPTER: Post Orders<br>TITLE: Segregation/Special Management Unit Officer | NUMBER: 10.3.7 – ADF |
|---|---|---|

Direct supervision of detainees in the housing units/posts is required. Officers will not leave their post without proper relief.

It is a violation of this policy to harass or otherwise verbally provoke a detainee or detainees into an assault on staff in order to justify the use of force against those detainees. Non-force forms of intentional cruel punishment, such as public humiliation, are also prohibited.

The information included in this specific Post Order may not include every situation the staff may face during the shift. The times listed are approximate and may be changed due to unforeseen circumstances. The goal of this Post Order is to provide guidance and instruction to the staff manning this post. In the event of an emergency or unscheduled events, which delays a specific operation, staff is to exercise initiative and good judgment in the performance of his or her duties.

Staff is required to be at the institution in the proper uniform in time to draw keys and equipment for the post, check in with the Shift Supervisor, receive pertinent information, and begin the assigned duties at the designated starting time.

|  | Adelanto Detention Facility<br>POLICY AND PROCEDURE MANUAL<br>CHAPTER:  Post Orders<br>TITLE: Segregation/Special Management<br>Unit Officer | NUMBER:  10.3.7 – ADF |
|---|---|---|

THIS POST ORDER WILL BE REVIEWED AT LEAST ANNUALLY AND UPDATED AS NEEDED.

Gray highlighted areas are the changes made to the current revision.

QUESTIONS/SUGGESTIONS REGARDING THIS POST ORDER SHALL BE ADDRESSED TO THE AFA-SECURITY.

APPROVED: _____
                              Facility Administrator

EFFECTIVE: February 16, 2015

Reviewed: June, 2012
Reviewed & Revised: September, 2012
Reviewed & Revised: October, 2012
Reviewed & Revised: March, 2013
Reviewed & Revised: May 2013
Reviewed: Sept. 2013
Reviewed & Revised: June 25, 2014
Reviewed: September 5, 2014
Reviewed & Revised: February 2015

GEO000198

|  | Adelanto Detention Facility<br><br>POLICY and PROCEDURE MANUAL<br><br>CHAPTER:  Special Management Detainees<br><br>TITLE:  Special Management Unit Operations<br><br>RELATED ACA STANDARDS:  4-ALDF-2A-45, 2A-48, 2A-51–2A-54, 2A-56–2A-64 | <u>NUMBER:</u><br>10.2.11-ADF<br><br><u>SUPERSEDES:</u><br>11/24/2015<br><br><u>EFFECTIVE:</u><br>02/16/2015 |
| --- | --- | --- |

I.      PURPOSE

To describe the operational standards for housing detainees in administrative and disciplinary housing status while confined in the facility.

II.     POLICY

It is the policy of the facility to maintain safe, secure housing for detainees who require protection or whose behavior indicates they require more physical controls than are available in typical housing units in the facility.

III.    DEFINITIONS

    A.  **Administrative Segregation** – A form of separation from the general population used when the continued presence of the detainee in the general population would pose a threat to life, property, self, other detainees, or staff or to the security or orderly running of the facility.

    B.  **Disciplinary Hearing** – Non-judicial administrative procedure to determine whether substantial evidence supports finding a detainee guilty of a rule violation.

    C.  **Disciplinary Segregation** – Confinement in a cell removed from the general population after a serious violation of facility rules.

    D.  **Institutional Disciplinary Panel (IDP)** – Review board responsible for conducting disciplinary hearings and imposing sanctions for cases of detainee misconduct referred for disposition following the hearing. The IDP is usually comprised of a Hearing Officer and representatives of different departments in the facility.

    E.  **Administration Close Custody (ACC)** – Administrative segregation for the detainee's own safety. The facts associated with the need for this status must be fully documented.

    F.  **Segregation** – Confinement in a cell isolated from the general population; for administrative disciplinary or protective reasons.

    G.  **Special Management Unit (SMU)** – A housing unit for detainees in administrative or disciplinary segregation.

IV.     PROCEDURES

The facility will operate a locked or secure housing unit that will constitute its prime resource for detainees who are unmanageable, present a threat to themselves or others, or who for other reasons require protection or removal from the general population.

    A.  <u>Conditions of Confinement</u>

Segregation housing units provide living conditions that approximate those of the general detainee population. All exceptions are clearly documented.  Segregation cells/rooms permit the detainees assigned to them to converse with and be observed by staff members.  Cells/rooms used for segregation encompass at least 70 square feet of floor area of which 35 square feet is unencumbered.  [4-ALDF-2A-51]

Conditions of confinement in the locked unit will reflect the least restrictive amount of control necessary to adequately supervise and safeguard detainees and staff.  Whenever an emergency arises that requires variance from approved conditions on a temporary basis, such as deprivation of otherwise approved items, an immediate report will be made to the Facility Administrator.  [4-ALDF-2A-58]

GEO000199

|  | Adelanto Detention Facility

POLICY AND PROCEDURE MANUAL

CHAPTER:  Special Management Detainees

TITLE:  Special Management Unit Operations | NUMBER: 10.2.11-ADF |

A detainee will not be held in the unit without clothing, a mattress, blankets, and a pillow, except when prescribed for medical or psychiatric reasons.  If a detainee is so seriously disturbed that he or she is likely to destroy clothing or bedding or create a disturbance that would be serious detrimental to others, medical staff will be notified immediately and a regimen of treatment and control will be instituted with the concurrence of the medical department.

B.  <u>Medical Assessment</u>

When a detainee is transferred to segregation, health care personnel are informed immediately and provide assessment and review as indicated by the protocols established by the Health Services Administrator. Unless medical attention is needed more frequently, each detainee in segregation receives a daily visit from a health care provider.  The presence of a health care provider in segregation is announced and recorded.  The health authority determines the frequency of physician visits to segregation. [4-ALDF-2A-45]

A psychiatric or psychological assessment, including a personal interview with the detainee by a qualified mental health professional shall be conducted every 30 days that a detainee continues confinement. This mental health assessment will be submitted to the Facility Administrator in a written report (utilizing Detention/Segregation Mental Health 30-Day Review Form OPR-624) for each individual detainee.

C.  <u>Operating Procedures</u>

All GEO staff members, contractors, ICE personal and other visitors entering the Special Management Unit and who are assigned to work in the Special Management Unit, will sign the Visitor's Logbook documenting the date, time and reason for their visit. This includes detention officers relieving the assigned staff member for breaks or lunch/dinner.

Any detainee movement out of a cell will be in restraints.   The restraints will be removed only when the detainee is in a secure enclosure, such as a recreation area, shower, etc.
High security cells will be specially marked with a notice to designate that a two-officer rule is in operation for the occupant.   That cell will only be opened with two officers present.  Two officers will remain in the SMU area during the out of cell time for that detainee.  High security designations will be made in selected cases. Staff may make a recommendation for such action through their supervisor.  The Facility Administrator or the Facility Administrator's designee will make the final decision.

Staff will personally observe every detainee at least every thirty minutes on an irregular schedule and document the checks in their logbook as well as completing the seg 30 minute check form.  Detainees who are violent or mentally disordered or who demonstrate unusual or bizarre behavior receive more frequent observation.  Suicidal detainees are under continuous observation until seen by a mental health professional. Subsequent supervision routines are in accordance with that ordered by the mental health professional. [4-ALDF-2A-52]

D.  <u>Placement in Administrative Segregation</u>

Administrative Segregation status is a non-punitive status in which restricted conditions of confinement are required only to ensure the safety of detainees or others, the protection of property, or the security or good order of the facility.  For matters of safety and security, staff may have to take immediate action to control a detainee, including placement in Administrative Segregation.  Examples include detainees who require Administrator Close Custody, who cannot be placed in the general population because they are en route to another facility ("holdovers"), who are awaiting a disciplinary hearing, or who require separation for medical reasons.

GEO000200



| | Adelanto Detention Facility | |
|---|---|---|
| | POLICY AND PROCEDURE MANUAL | NUMBER: 10.2.11-ADF |
| | CHAPTER:  Special Management Detainees | |
| | TITLE:  Special Management Unit Operations | |

1.  Prior to the detainee's placement in administrative segregation, the Facility Administrator or designee and the Classification Officer will review the case to determine whether administrative segregation is warranted.

2.  A detainee may be placed in administrative segregation when the detainee's continued presence in the general population poses a threat to life, property, self, staff, or other detainees; for the secure or orderly operation of the facility; for medical reasons or other circumstances as set forth below.  Examples include, but are not limited to the following:

a.  A detainee is awaiting an investigation or a hearing for a violation of facility rules.  Pre-disciplinary hearing detention should be ordered only as necessary to prevent further rules violation(s) or to protect the security and orderly operation of the facility.  It is not to be used as a punitive measure.  Time served in pre-hearing detention may be deducted from any time ordered by the Institutional Disciplinary Panel (IDP).

b.  A detainee is a threat to the security of the facility.  The Facility Administrator may determine that a detainee's criminal record, past behavior at other institutions, behavior while in Immigration and Customs Enforcement (I.C.E.) detention, or other evidence is sufficient to warrant placing the detainee in administrative segregation. Copies of records supporting this action will be attached to the Administrative Segregation Order.

c.  A detainee requires protection.  A detainee is admitted to Administration Close Custody status when there is documentation that protective custody is warranted and no reasonable alternatives are available.  [4-ALDF-2A-46]   Administration Close Custody (ACC) may be initiated at the detainee's request or ordered to protect the detainee from harm.  Examples include:

1)  Victims of detainee assaults;
2)  Detainee informants/witnesses - detainees who provide information to the institution staff or any law enforcement agency concerning improper activities by others;
3)  Sexual predators;
4)  Detainees who have been pressured by other detainees to participate in sexual activity;
5)  Detainees who request PC;
6)  Detainees who refuse to enter the general population because of alleged intimidation from other detainees;
7)  Detainees who refuse to return to the general population, but who will not provide the reason for refusal;
8)  Detainees who appear to be in danger of bodily harm; or
9)  Detainees who seek protection, claiming to be former law enforcement officers or to have held sensitive law enforcement position, whether or not there is official information to verify the claim.

d.  The IDP may order a detainee into administrative segregation following disciplinary segregation after determining that releasing the detainee into the general population would pose a threat to the security and orderly operation of the facility.  A detainee transferred from disciplinary segregation to administrative segregation shall enjoy the same privileges as all others in administrative segregation.

e.  A medical professional ordering a detainee removed from the general population shall complete and sign the Administrative Segregation Order, unless the detainee will stay in the medical department's isolation/segregation ward.

f.  A detainee is scheduled for release, removal, or transfer within 24 hours.  Such segregation may be ordered for security reasons or for the orderly operation of the facility.

GEO000201



| | Adelanto Detention Facility | |
|---|---|---|
| | POLICY AND PROCEDURE MANUAL | NUMBER: 10.2.11-ADF |
| | CHAPTER:  Special Management Detainees | |
| | TITLE:  Special Management Unit Operations | |

E.   **Administrative Segregation Order**

A written order shall be completed and approved by a Shift Supervisor before a detainee is placed in administrative segregation, except when exigent circumstances make this impracticable.  In such cases, an order shall be prepared as soon as possible.  A copy of the order shall be given to the detainee within 24 hours, unless delivery would jeopardize the safety, security, or orderly operation of the facility.

1.   The Facility Administrator or the Facility Administrator's designee shall complete the Administrative Segregation Order detailing the reasons for placing a detainee in administrative segregation, before actual placement.

2.   In an emergency, the detainee's placement in administrative segregation may precede the paperwork, which the Facility Administrator will prepare as soon as possible.

3.   All memoranda, medical reports, and other relevant documents shall be attached to the segregation order.

4.   A copy of the completed Administrative Segregation Order will be given to the detainee within 24 hours of placement in administrative segregation, unless delivery would jeopardize the safe, secure, or orderly operation of the facility.

5.   The order will remain on file with the Special Management Unit (SMU) until the detainee is returned to the general population.

6.   When the detainee is released from the SMU, the releasing officer will indicate date and time of release on the Administrative Segregation Order, then forward the completed order to the Classification Officer for insertion into the detainee's detention file.

7.   If the segregation is ordered for ACC purposes, the order shall state whether the detainee requested the segregation; also, whether the detainee requests a hearing concerning the segregation.

8.   No Administrative Segregation Order is required for a detainee awaiting removal, release, or transfer within 24 hours.

F.   **Review of Detainee Status in Administrative Segregation**

1.   The SMU review committee, chaired by the Programs Coordinator shall conduct a review within 72 hours of the detainee's placement in administrative segregation to determine whether segregation is still warranted.  The review shall include an interview with the detainee.  A written record shall be made of the decision and the justification.  The Administrative Segregation Review Form will be used for the review.  If the detainee has been segregated for the detainee's protection, but not at the detainee's request, the signature of the Facility Administrator or Assistant Facility Administrator is required on the Administrative Segregation Review Form to authorize continued detention.

2.   The SMU review committee shall conduct the same type of review after the detainee has spent seven days in administrative segregation, and every week thereafter for the first two months and at least every 30 days thereafter.  The review shall include an interview with the detainee.  A written record shall be made of the decision and the justification.  [4-ALDF-2A-48, 2A-49].  A reviewing authority who concludes a detainee should be removed from Administrative Segregation, submits that recommendation to the Facility Administrator, or designee for approval.

GEO000202



| | Adelanto Detention Facility | |
|---|---|---|
| | POLICY AND PROCEDURE MANUAL | NUMBER: 10.2.11-ADF |
| | CHAPTER:  Special Management Detainees | |
| | TITLE:  Special Management Unit Operations | |

3.  A copy of the decision and justification for each review shall be given to the detainee, unless, in exceptional circumstances, this provision would jeopardize security.  The detainee shall be given an opportunity to appeal a review decision to a higher authority within the facility.

4.  When a detainee has been held in Administrative Segregation for more than 30 days, the Facility Administrator notifies the Field Office Director, who notifies the ICE/DRO Deputy Assistant Director, Detention Management Division.
Immigration and Customs Enforcement Assistant Director, Detention and Deportation shall be notified when any detainee has been in administrative detention for more than 60 days.  This notification shall be made through the on-site COTR.  The Region shall then consider whether transfer of the detainee to a facility where he/she may be placed in the general population would be appropriate.

5.  If a detainee has been in administrative segregation for more than 30 days and objects to this status, the Facility Administrator shall review the case to determine whether that status should continue.  This review shall take into account the views of the detainee.  A written record shall be made of the decision and the justification.  A similar review shall take place every 30 days.

6.  After seven consecutive days in administrative segregation, the detainee may exercise the right to appeal to the Facility Administrator the conclusions and recommendations of any review conducted.  The detainee may use any standard form of written communication, e.g., detainee request, to file the appeal.

G.  Conditions of Administrative Segregation (Basic Living Standards)

1.  Detainees in administrative segregation shall receive the same general privileges as detainees in the general population, consistent with available resources and security considerations.

2.  The quarters used for segregation shall be well ventilated, adequately lit, appropriately heated and maintained in a sanitary condition at all times.  All cells must be equipped with beds.

3.  The number of detainees confined to each cell or room in administrative segregation should not exceed the capacity for which it was designed.  The Facility Administrator may approve excess occupancy, on a temporary basis, if the Facility Administrator finds that the other basic living standards can still be maintained.

Segregation housing units provide living conditions that approximate those of the general inmate population.  All exceptions are clearly documented.  Segregation cells permit the detainees assigned to them to converse with and be observed by staff members.  Cells used for segregation encompass at least 70 square feet of floor area of which 35 square feet is unencumbered.

4.  Clothing and bedding shall be issued to detainees in segregation.  Detainees in segregation will be provided the same opportunity for the exchange of clothing, bedding and linen and for laundry as detainees in the general population.

A detainee in segregation may wear normal institutional clothing and shall be furnished a mattress and bedding.  A detainee may not be segregated without clothing, mattress, blankets and pillow, except:

Page 5 of 17



| | Adelanto Detention Facility | |
|---|---|---|
| | POLICY AND PROCEDURE MANUAL | NUMBER: 10.2.11-ADF |
| *Corrections & Detention* ∗ | CHAPTER: Special Management Detainees | |
| | TITLE: Special Management Unit Operations | |

    a.  When prescribed by a medical professional for medical or psychiatric reasons.  If a detainee is so seriously disturbed that he/she is likely to destroy clothing or bedding, or to create a disturbance putting self or others at risk, the medical department shall be consulted immediately to determine whether a regimen of treatment and control may be instituted.

    b.  When the Shift Supervisor determines the detainee poses a threat to self or property.

Exceptions shall occur only when necessary for security purposes, as determined by the Facility Administrator.  Any exception, and the reasons, shall be recorded in the housing unit log.

5.  Detainees in segregation shall receive three nutritionally adequate meals per day, from the menu served to the general population.  For security purposes, detainees in the SMU shall use disposable utensils only.  Under no circumstances shall food be used as punishment.

6.  Segregated detainees shall have the opportunity to maintain a normal level of personal hygiene.  Staff shall provide toilet tissue, a wash basin, tooth brush, shaving utensils, etc., as needed, and may issue retrievable kits of toilet articles.

Each segregated detainee shall have the opportunity to shower and shave at least daily, unless these procedures would present an undue security hazard.  This security hazard will be documented and signed by the Facility Administrator or the Facility Administrator's designee, indicating his/her review and approval.  Denial of showers will be temporary and situational, and will continue only as long as justified by the security threat.

7.  Detainees in segregation will be provided, where practicable, barbering services.  Exceptions to this procedure may be permitted only when found necessary by the Facility Administrator.

8.  Detainees in segregation will receive a minimum of two hours of exercise per day outside their cells, Seven days per week, unless security or safety considerations dictate otherwise.

These provisions shall be carried out, absent compelling security or safety reasons documented by the Facility Administrator.  A detainee's recreation privileges may be withheld temporarily after a severely disruptive incident.  Staff shall document by memorandum and logbook(s) notation every instance when a detainee is denied recreation.  The memorandum shall be placed in the detainee's detention file as well as forwarding a copy of the action to the Facility Administrator.

The case of a detainee denied recreation privileges will be reviewed at least once each week, as part of the reviews required for all detainees in the unit. The reviewer will document whether the detainee continues to pose a threat to self, others, or facility security and, if so, why.

Denial of recreation privileges for more than 15 days requires the concurrence of the Facility Administrator and H.S.A. The Facility Administrator will notify ICE when a detainee is denied recreation privileges for more than 15 days.

When space and resources are available, detainees in administrative segregation will be able to participate in TV viewing, board games, socializing and work details (e.g., a housekeeper in the SMU); and provided opportunities to spend time outside their cells, over and above recreation periods.

9.  The Facility Administrator will issue guidelines concerning the property that detainees may retain in administrative segregation.

GEO000204



| | Adelanto Detention Facility | |
|---|---|---|
| | POLICY AND PROCEDURE MANUAL | NUMBER: 10.2.11-ADF |
| | CHAPTER:  Special Management Detainees | |
| | TITLE:  Special Management Unit Operations | |

10. A reasonable amount of non-legal reading material will be available to detainees in segregation. The detainee will also be permitted religious material, unless the religious item would pose a threat to security

11. Detainees in segregation will be permitted to retain a reasonable amount of personal legal material, unless this would create a security threat. If personal legal material is placed in storage, the detainee shall be able to access the material promptly, upon request.

    Detainees will be permitted to retain all personal legal material upon admittance to segregation, provided such material does not create a safety, security and/or sanitation hazard. Detainees with a large amount of personal legal material may be required to place a portion of the material in their personal property, with access permitted during designated hours. Requests to access such legal material should be met as soon as possible, but in no case longer than twenty-four (24) hours after receipt of the initial detainee request to retrieve documents, unless documented security concerns preclude action within this time-frame.

12. In addition to the direct supervision afforded by the unit officer, the Shift Supervisor shall see each segregated detainee daily, including weekends and holidays.

    Unless medical attention is needed more frequently, each detainee in segregation receives a daily visit from a health care provider. The presence of a health care provider in the Special Management Unit is announced and recorded.  The Health Services Administrator determines the frequency of physician visits to segregation units.  The medical visit shall be notated on the SMU Activity Sheet. The medical professional will question each detainee to identify medical problems or requests.  Any action taken will be documented in a separate logbook.

13. The facility shall follow the "Visitation" standard in setting visitation rules for detainees in segregation. Ordinarily, a detainee retains visitation privileges while in segregation.

14. Detainees in ACC will not use the visitation room during normal visitation hours.  In addition, violent and disruptive detainees may be limited to non-contact visitation.  In extreme cases, visitation may be disallowed for a particular detainee where the visit would present an unreasonable security risk. Under no circumstances are detainees to participate in general visitation while in restraints.  If the detainee's behavior warrants restraints, the visit will not be granted.

    General visitation may be restricted or disallowed when a detainee, while in a segregation status, is charged with, or has been found to have committed, a prohibited act having to do with visiting guidelines or has otherwise acted in a way that would reasonably indicate that he or she would be a threat to the orderliness or security of the visiting room.  Any restriction of visitation will be documented.

    Detainees in segregation may not be denied legal visitation, but reasonable security precautions will be taken where necessary.  Legal service providers and assistants will be notified of any security concerns prior to the meeting.

15. Detainees in segregation shall have the same correspondence privileges as detainees in the general population.

16. The facility shall follow the "Telephone Access" standard that provides guidelines for detainees in segregation.  Detainees in administrative segregation will be permitted telephone access similar to

GEO000205

|  | Adelanto Detention Facility<br><br>POLICY AND PROCEDURE MANUAL<br><br>CHAPTER:  Special Management Detainees<br><br>TITLE:  Special Management Unit Operations | NUMBER: 10.2.11-ADF |
|---|---|---|

that provided to detainees in the general population, but in a manner consistent with the special security and safety requirements of detainees in these units.

17. Members of the clergy may visit detainees in segregation, unless the shift supervisor determines the visit presents a security risk or will interfere with the orderly operating of the facility.

Violent and uncooperative detainees may be temporarily denied access to religious services until such time as their behavior and attitude warrants.

18. Detainees housed in segregation shall have the same law library access as the general population, consistent with security, although the facility may establish a policy of upon-request-only access. The level of supervision will depend on the individual's behavior and attitude.

Leisure reading materials will be available as requested from the Library.  [4-ALDF-2A-63]

Detainees in locked housing shall have the same law library access as the general population, consistent with security, the facility will grant access upon-request-only.  The level of supervision will depend on the individual's behavior and attitude.  [4-ALDF-2A-62]

Any denial of access to the law library will supported by compelling security concerns, for the shortest period required for security, fully documented in the SMU housing logbook as well as notification to ICE every time law library access is denied.

Detainees in the SMU for protective custody will be required to use the law library separately or will have requested legal material delivered to them.

19. Detainees in segregation shall have the same correspondence privileges as detainees in the general population (see the "Correspondence and Other Mail" standard).

H.  Placement in Disciplinary Segregation

To provide detainees in the general population a safe and orderly living environment, facility authorities shall discipline anyone whose behavior does not comply with facility rules and regulations.  This may involve temporary confinement apart from the general population, in the Special Management Unit (SMU).  A detainee may be placed in Disciplinary Segregation only after a finding by the Institution Disciplinary Panel (IDP) or equivalent that the detainee is guilty of a high level prohibited act or rule violation.  [4-ALDF-2A-47]

The disciplinary committee may order placement in disciplinary segregation only when alternative dispositions would inadequately regulate the detainee's behavior.

A maximum sanction of 60 days in disciplinary segregation shall apply to violations associated with a single incident.  After the first 30 days, the Facility Administrator shall send a written justification to the Assistant District Director for Detention and Deportation (ADD/DDP).  Considering the grounds for the Facility Administrator's disciplinary action, the ADD/DDP may decide to transfer the detainee to a facility where security is such that he/she could be placed in the general population.

GEO000206

|  | Adelanto Detention Facility<br><br>POLICY AND PROCEDURE MANUAL<br>CHAPTER:  Special Management Detainees<br>TITLE:  Special Management Unit Operations | NUMBER: 10.2.11-ADF |
| --- | --- | --- |

I.   **Disciplinary Segregation Order**

A written order shall be completed and signed by the Disciplinary Hearing Officer before a detainee is placed in disciplinary segregation.  A copy of the order shall be given to the detainee within 24 hours, unless delivery would jeopardize safety, security, or the orderly operation of the facility.

1.   The Disciplinary Hearing Officer shall prepare the Disciplinary Segregation Order, detailing the reasons for placing a detainee in disciplinary segregation, before actual placement.  All relevant documentation must be attached to the order.

2.   A copy of the completed Disciplinary Segregation Order will be given to the detainee within 24 hours of placement in disciplinary segregation, unless delivery would jeopardize the safe, secure, or orderly operation of the facility.

3.   The order will be maintained on file with the Special Management Unit (SMU) until the detainee is released from the SMU.

4.   When the detainee is released from the SMU, the releasing officer will indicate date and time of release on the Disciplinary Segregation Order, then forward the completed order to Segregation Supervisor overseeing SMU.

J.   **Review of Detainee Status in Disciplinary Segregation**

1.   The SMU review committee shall review the status of a detainee in disciplinary segregation within seventy-two hours of admission, every seven days for the first two months, and every thirty days thereafter to determine whether the detainee:

a.   abides by all rules and regulations; and,

b.   is provided showers, meals, recreation, and other basic living standards, weekly review(s) will include an interview with the detainee.  The SDEO shall document his/her findings after every review, by completing a Disciplinary Segregation Review Form (I-887).

2.   The SMU review committee may recommend the detainee's early release from the SMU upon finding that time in disciplinary segregation is no longer necessary to regulate the detainee's behavior.

3.   An early-release recommendation must have the Facility Administrator's approval before the detainee can be returned to the general population.

4.   The committee may shorten, but not extend, the original sanction.

5.   All review documents shall be placed in the detainee's detention file.

6.   Provided institutional security is not compromised, the detainee shall receive at each formal review, a written copy of the reviewing officer's decision and the basis for this finding.

GEO000207

|  | Adelanto Detention Facility<br><br>POLICY AND PROCEDURE MANUAL<br><br>CHAPTER: Special Management Detainees<br><br>TITLE: Special Management Unit Operations | NUMBER: 10.2.11-ADF |
|---|---|---|

**K.  Conditions of Disciplinary Segregation (Basic Living Standards)**

Disciplinary segregation privileges shall be defined by the imposed sanction(s) of the disciplinary official. Detainees placed in disciplinary segregation may have all personal property to include commissary (excluding hygiene items), impounded and stored by the facility for the duration of the disciplinary sanction. Detainees shall retain all facility issued property and hygiene items as defined on page seven (7) of the Detainee Handbook. Detainees shall not be denied the ability to retain in their possession, personal mail received after the imposed disciplinary sanctions, legal mail, legal materials, regions items deemed necessary by a religious authority and medical devices and/or equipment deemed necessary by a medical provider, unless such items pose a safety and/or security concern.

1.  The conditions of confinement will depend on the amount of supervision required to control the individual and safeguard other detainees and staff.

2.  Detainees housed in disciplinary segregation generally have fewer privileges than those housed in administrative segregation.  These detainees are subject to more stringent personal property control, restricted reading material, commissary privileges, etc.

3.  The Facility Administrator shall maintain the same living levels of decency and humane treatment for each detainee in disciplinary segregation, regardless of the purpose for which the detainee has been segregated.  When different treatment is required for security concerns presented by an individual detainee, staff shall prepare written documentation justifying this action.  The Facility Administrator shall sign this document, indicating his/her approval.

4.  Detainees in disciplinary segregation will be provided the same opportunity for the exchange of clothing, bedding, and linen, and for laundry as detainees in the general population.  If, for security purposes, the Facility Administrator authorizes an exception, the exception, and its justification, shall be documented in the SMU log.

5.  A detainee may be deprived of clothing, mattress, blanket, pillow, etc., for medical or psychiatric reasons only, as determined by the medical officer.

    If a detainee is so seriously disturbed that he/she is likely to destroy clothing or bedding or create a disturbance risking harm to self or others, the medical department shall be notified immediately and a regimen of treatment and control shall be instituted by the Health Services Administrator.

6.  As a rule, detainees in disciplinary segregation will have significantly fewer items of personal property than other detainees.  With the exception of items of personal hygiene, detainees in disciplinary segregation may lose the privilege of making commissary purchases.

7.  Access to legal and non-legal reading material shall be as follows:

    a.  The officer providing library services provide segregated detainee's leisure library access upon request only.  This request shall be made using the Detainee Request Form.

    b.  When developing the schedule for law library access, the Facility Administrator will set aside blocks of time for the detainees in disciplinary segregation.  These detainees will be afforded legal access comparable to, but not the same as, that of the general population.  Security constraints may impose limits on law library access.

GEO000208



| | Adelanto Detention Facility | |
|---|---|---|
| | POLICY AND PROCEDURE MANUAL | NUMBER: 10.2.11-ADF |
| | CHAPTER:  Special Management Detainees | |
| | TITLE:  Special Management Unit Operations | |

- Violent and/or uncooperative detainees may be temporarily denied access to the law library, until such time as their behavior and attitude warrants resumed access.

- On a case-by-case basis, legal material may be brought to individuals in disciplinary segregation. Denial of access to the law library must be justified by compelling security concerns, be fully documented in the SMU logbook, and last no longer than necessary for security purposes.

- Any denial of access to the law library will supported by compelling security concerns, for the shortest period required for security, fully documented in the SMU housing logbook as well as notification to ICE every time law library access is denied.

8.  In accordance with the "Telephone Access" standard, detainees in disciplinary segregation shall be restricted to telephone calls for the following purposes:  [4-ALDF-2A-65]

   a.  calls relating to the detainee's immigration case or other legal matters, including consultation calls;
   b.  calls to consular/embassy officials; and
   c.  family emergencies, as determined by the Facility Administrator.

9.  Segregated detainees shall be allowed visits by members of the clergy, upon request, unless the supervisor determines the visit presents a security risk or will interfere with the orderly operation of the facility.

   a.  The clergy member shall be told the detainees present state of behavior.
   b.  The clergy member must agree to meet the segregated detainee.
   c.  Violent and uncooperative detainees may be temporarily denied access to religious services until such time as their behavior and attitude warrants.

10. Detainees in segregation will receive a minimum of one hour of exercise per day outside their cells, five days per week, unless security or safety considerations dictate otherwise.

   These provisions shall be carried out, absent compelling security or safety reasons documented by the Facility Administrator.  A detainee's recreation privileges may be withheld temporarily after a severely disruptive incident.  Staff shall document by memorandum and logbook(s) notation every instance when a detainee is denied recreation.  The memorandum shall be placed in the detainee's detention file as well as forwarding a copy of the action to the Facility Administrator.

   The case of a detainee denied recreation privileges will be reviewed at least once each week, as part of the reviews required for all detainees in the unit. The reviewer will document whether the detainee continues to pose a threat to self, others, or facility security and, if so, why.

   Denial of recreation privileges for more than 15 days requires the concurrence of the Facility Administrator and H.S.A. The Facility Administrator will notify ICE when a detainee is denied recreation privileges for more than 15 days.

GEO000209



| | Adelanto Detention Facility | |
|---|---|---|
| | POLICY AND PROCEDURE MANUAL | NUMBER: 10.2.11-ADF |
| | CHAPTER:  Special Management Detainees | |
| | TITLE:  Special Management Unit Operations | |

L.  **Forms and Reviews**

1.  A permanent log will be maintained in the SMU.  The log will record all activities concerning the SMU detainees, e.g., meals served, recreation, visitors, etc.

    **The SMU log will record the detainee's name, A-number, housing location, date admitted, type of infraction or reason for admission, tentative release date (for detainees in disciplinary segregation), special medical or psychiatric problems or needs and the authorizing official. All releases from the unit will be similarly recorded.**

    All persons visiting the unit will sign a separate log, giving time and date of visit.  Unusual activity or behavior of individual detainees will be recorded in the log, with a follow-up memorandum sent through the Facility Administrator to the detainee's file.

2.  The SMU/Segregation Activity Sheet shall be prepared immediately upon the detainee's placement in the SMU.  The form will be filled out at the end of each shift or as the activity takes place.

    The special housing officer for each shift will record whether the detainee ate, showered, exercised and took any medication.  The record will also be used to notate additional information, e.g., if the detainee has a medical condition, has exhibited suicidal/assaultive behavior, etc.

    The facility medical staff will be required to sign each individual record when he/she visits the detainee in segregation.

    A new record must be created for each week the detainee is in segregation or when the reason for placement changes such as Administrative Segregation to Disciplinary.  The completed Special Housing Activity Sheets will be retained in the SMU until the detainee is released from SMU.

    Upon release from the SMU, the releasing officer will ensure that the entire housing unit record relating to the detainee is attached to the Segregation Order and forwarded to the Classification Officer for inclusion in the detainee's detention file.

M.  **Staffing**

1.  The Assistant Facility Administrator of Security will select officers for assignment to the SMU on a rotational basis for their experience, judgment, and ability to manage detainees professionally.  Supervision of these staff and unit operations will be a priority for management personnel, as indicated by the specified frequency of supervisory visits to the unit.  Staff assigned to work in the special management unit is selected based on criteria that include:  completion of probationary period, experience and suitability for this population.  Staff is closely supervised with documented quarterly reviews conducted by the shift supervisor.  There are provisions for rotation to other duties.

2.  All staff assigned to SEG/SMU will receive training that includes information regarding the type of detainees housed in the unit; a course in dealing with detainees typically retained in segregated status; information on the rules governing SMU operation; special instructive discussions relative to safety and security precautions unique to the SMU area; and a basic course covering Adelanto Detention Facility policies governing discipline and the use of segregation.

GEO000210

|  | Adelanto Detention Facility<br><br>POLICY AND PROCEDURE MANUAL<br><br>CHAPTER:  Special Management Detainees<br><br>TITLE:  Special Management Unit Operations | NUMBER: 10.2.11-ADF |
| --- | --- | --- |

**N.  High Security Cell Access**

High security cells will be specially marked with a notice to designate that a two-officer rule is in operation for the occupant.  That cell will only be opened with two officers present.  Two officers will remain in the SMU area during the out of cell time for that detainee.  High security designations will be made in selected cases.  Criteria for such a designation is:

1. Demonstrated violent behavior toward staff;
2. Demonstrated violent behavior toward other detainees;
3. Demonstrated or reported serious escape history or risk; and
4. Other case-by-case circumstances which warrant the high security designation.

Staff may make a recommendation for such action through their supervisor.  The Facility Administrator or the Facility Administrators designee will make the final decision.

**O.  Property and Contraband Control**

Control of property and contraband will include a thorough search and inventory of all personal property brought by a detainee to the unit.

Disciplinary segregation privileges shall be defined by the imposed sanction(s) of the disciplinary official. Detainees placed in disciplinary segregation may have all personal property, to include commissary (excluding hygiene items), impounded and stored by the facility for the duration of the disciplinary sanction(s).  Detainees may also be precluded from ordering commissary for the duration of the disciplinary sanction if sanctioned by the disciplinary official. A secure property storage area is provided in the disciplinary housing unit. All property placed in storage will be thoroughly searched and inventoried, and a copy of the inventory sheet will be provided to the detainee.

Food service carts, laundry carts, tool carts and commissary bins will be thoroughly inspected and searched by staff to prevent the introduction of contraband.  All tools must be inventoried upon entering and exiting SMU.

Supervisory staff may remove otherwise permissible items from the cell of a detainee in locked unit status when those items are being used by the detainee to harm himself or herself or others, create a disturbance, or otherwise disrupt the orderly operation of the unit.  Such instances will be documented in memo form or using a General Incident Report (GI), placed in the unit log and the individual detainee log sheet, and a copy of the memo or GI will be forwarded to the Captain and the Facility Administrator.  The Captain must personally approve all such instances that last longer than twenty-four hours.

GEO000211



| | Adelanto Detention Facility | NUMBER: 10.2.11-ADF |
|---|---|---|
| | POLICY AND PROCEDURE MANUAL | |
| | CHAPTER: Special Management Detainees | |
| | TITLE: Special Management Unit Operations | |

P. **Special Management Unit Programs**

The programs and activities named below will be available to detainees in the locked housing unit providing documented security or safety considerations do not prevent delivery of such programs for limited periods.

Isolated recreation and exercise will be provided to all detainees in the locked housing unit no fewer than five times each week for one hour. Where cover is not provided to mitigate inclement weather, detainees are provided weather-appropriate equipment and attire. Detainees may be denied access to recreation on a determination, documenting in writing, that the individual involved presents a serious danger to themselves or others or to institutional security. [4-ALDF-2A-64]

Showers will be offered daily. Detainees will be permitted to shave at this time. Detainees receive laundry, barbering, and hair care services, and are issued and exchange clothing, bedding, and linen on the same basis as detainees in the general population. Exceptions are permitted only when determined to be necessary. Any exception is recorded in the unit log and justified in writing. [4-ALDF-2A-57]

Crisis counseling and other social services will be provided to detainees on an in-cell basis. Detainees requiring private counseling may be moved in restraints to a room where the counseling staff member will remain under the observation of a second staff member, who may be outside the room. The detainee will remain in restraints.

Detainees in locked housing are provided prescribed medication, clothing that is not degrading and access to basic personal items for use in their cells unless there is imminent danger that a detainee or any other detainee(s) will destroy an item or induce self-injury. [4-ALDF-2A-56]

Religious counseling and materials will be permitted in the unit, as provided by approved religious representatives and approved by the Assistant Facility Administrator of Security. The Assistant Facility Administrator of Security in conjunction with the Programs Coordinator will determine which religious volunteers, if any, will be permitted to visit the unit and under whose supervision.

Detainees in locked housing can write and receive letters on the same basis as detainees in the general population. [4-ALDF-2A-60]

Social and legal visiting will be permitted for all detainees in locked status provided they are not under visiting restrictions imposed as part of disciplinary actions. Detainees in locked status may visit in the general non-contact visiting area. [4-ALDF-2A-61]

All participation or refusal to participate in recreation, showers, meals, staff interviews, visits or other major unit activities will be logged in the detainees' individual activity sheet.

GEO000212



| | Adelanto Detention Facility | |
|---|---|---|
| | POLICY AND PROCEDURE MANUAL | NUMBER: 10.2.11-ADF |
| | CHAPTER:  Special Management Detainees | |
| | TITLE:  Special Management Unit Operations | |

**Q.   Food Service Operations**

Food service operations will be under the general oversight of the Food Services Administrator and will include in-cell service of meals that are the same as those served to the general population.

No detainee will be used to serve food in the unit.

Staff will ensure that food delivered to detainees is at the proper temperature.  Modification, reduction, or termination of meals will not be used as a behavioral control measure or for punishment.

Unit staff is responsible for ensuring the sanitary conditions of all utensils and trays.

Detainees who use food or other meal-related items to disrupt operations or threaten others will be served the same food as the general population.  However, Styrofoam or disposable trays may be substituted for the regular food tray.  [4-ALDF-2A-59]

**R.   Other Unit Programs**

The following programs and services are in operation in the locked unit:

1.  Detainees may participate in such educational programs as can be provided within the confines of the unit, consistent with the security needs of the unit
2.  In-cell programs such as leisure reading, self-study courses, and other activities will be made available to detainees in non-disciplinary status; detainees in disciplinary status may be limited in the number of reading items permitted in their possession at any one time.
3.  Sanitation in the unit will be maintained at a high level.  Detainees will be responsible for cleaning their own cells.  The Assistant Facility Administrator of Security, on unit staff's recommendation, may approve specially screened detainees housed in the unit for duty as orderlies.

**S.   Tours**

Staff mobility and supervisory visibility in locked units are important factors in ensuring smooth operations.

Detainees in segregation receive daily visits from the Chief of Security (Captain) members of the program staff on request, and a qualified health care daily unless medical attention is needed more frequently. Detainees requiring medication will be provided that medication as prescribed [4-ALDF-2A-53]

The Food Services Administrator will observe the service of meals once a week in locked units.  The Chaplain, classification, or social work staff and other program staff will visit all detainees in locked units as often as necessary to meet the needs of those cases, but in any event no fewer than once a week.

The Shift Supervisor will visit the locked units twice each shift.
A designated medical staff member will visit the unit at least daily and will be available as needed for other required care.  Detainees requiring medication will be provided that medication as prescribed.

The Facility Administrator and Department Heads will visit detainees confined to the segregation unit weekly.

GEO000213

|  Corrections & Detention | Adelanto Detention Facility<br><br>POLICY AND PROCEDURE MANUAL<br><br>CHAPTER:  Special Management Detainees<br><br>TITLE:  Special Management Unit Operations | NUMBER: 10.2.11-ADF |
| --- | --- | --- |

T.   <u>Other Considerations</u>

Protective custody cases will require separation, at a minimum, from the detainees by whom they are threatened.  In most cases, separation from all other detainees will be required.  Records on these cases should reflect their status, any known separates, and any other special precautions that must be taken.

In many instances, careful movement through the facility and in the admission/release process will be needed.  When it is necessary in the judgment of the Assistant Facility Administrator of Security; two staff members will be used to escort protective custody cases for such moves.

Detainees with medical and psychiatric aspects to their cases will be handled in accordance with the medical orders for those cases as long as those orders do not conflict with the facility's security needs.  In any case in which there appears to be such a conflict, the Shift Supervisor and, if necessary, the Assistant Facility Administrator or Facility Administrator, will resolve the issue with the Health Services Administrator.

U.   <u>Case Reviews</u>

The SMU review committee will review each locked unit detainee's case within seventy-two hours of admission, every seven days for the first two months, and at least every thirty days thereafter.  [4-ALDF-2A-48]

GEO000214

|  Corrections & Detention · | Adelanto Detention Facility<br><br>POLICY AND PROCEDURE MANUAL<br>CHAPTER:  Special Management Detainees<br>TITLE:  Special Management Unit Operations | NUMBER: 10.2.11-ADF |
| --- | --- | --- |

<u>THIS POLICY WILL BE REVIEWED AT LEAST ANNUALLY AND UPDATED AS NEEDED.</u>

Gray highlighted areas are the changes made to the current revision.

QUESTIONS/SUGGESTIONS REGARDING THIS POLICY SHALL BE ADDRESSED TO THE ASSISTANT FACILITY ADMINISTRATOR OF SECURITY.

APPROVED: _____
          Facility Administrator

EFFECTIVE: <u>February 16, 2015</u>

Reviewed & Revised: October 2011
Reviewed & Revised: November 2011
Reviewed & Revised: February 2012
Reviewed & Revised: June 2012
Reviewed: July 2013
Reviewed: November 2014
Reviewed & Revised: February 2015

GEO000215

# EXHIBIT B

# DISCIPLINARY ACTION FORM



**The GEO Group, Inc.**

Employee's Name: __Emanuel Santiago__          Employee No.: __176828__          DOH: __3/18/2013__

Job Title: __Detention Officer__          Dept. Name: __Security__          Log No.: _____

Supervisor's Name: __Lt. R. Anderson__          Facility Name: __ADF West__          Facility No.: __196__

**INFRACTION:** __Inattention to Duty__          Date of Violation: __8/5/2015__

**SUMMARY OF INFRACTION:** The specific facts regarding the current infraction, including details and description of issue or rule(s) violated.

On 8/5/2015 Officer E. Santiago failed to use proper security procedures, which afforded a detainee to freely move in the Administrative Segregation housing unit and ultimately attempt to escape by breaching four facility security doors before being apprehended and returned to Segregation.

**SUMMARY OF FINDINGS:** Document below your findings. Include the Who, What, When, and Where of the investigation.          Does this incident involve OPR? ☐ Yes ☒ No          If Yes, OPR No.: _____

*(DO NOT attach OPR Report.)*

On 8-5-2015 Officer E. Santiago was assigned as the 2nd Watch West Administrative Segregation Housing Unit Officer. He was given specific direction from Lt. Duran to ensure two officers are present when escorting Detainee Irias A # 73945866 from in cell in Administrative Segregation to the shower. At approximately 1623 hours Officer Santiago conducted a single officer escort of detainee Irias to the shower area, where he failed to lock and secure the shower door. Officer Santiago then proceeded to retrieve two detainee porters to facilitate distribution of meal trays. Formal count commenced at 1630 and was conducted by Officer Santiago and Officer Patterson. Once count was completed Officer Patterson departed the unit to facilitate a lunch break for another officer. Officer Santiago failed to get supervisory authorization to out count detainee Irias in the shower area and further authorization to bring out two detainee porters prior to the facility formal count clearing. While supervising detainee porters as they handed out meal trays on the far upper tier, detainee Irias completed his shower and pushed open the unsecure shower door at 1653 hours. Detainee Irias departed the Segregation housing unit unsupervised and unrestrained at approximately 1653 hours.

**SUPPORTING DOCUMENTATION:**          Additional Pages Attached? ☒ Yes ☐ No          If Yes, Number of Pages: __58__

**DISCIPLINARY HISTORY:** List prior Counseling(s) or other Disciplinary Action(s) below. Document ALL history starting with the most recent violation looking back 12 months.

Date: _____     Violation: _____
          Action: _____

Date: _____     Violation: _____
          Action: _____

Date: _____     Violation: _____
          Action: _____

**DISCIPLINARY ACTION:**     ☐ Counseling     ☐ Written Reprimand     ☐ Final Reprimand     ☒ Dismissal

SANTIAGO 014

HR-893

## ,ARY ACTION FORM

**GEO**
The GEO Group, Inc.

| | | | |
|---|---|---|---|
| ☐ Behavior | ☐ Absenteeism/Tardiness | ☒ Performance | ☐ Policy |

# of Points: 0

**EXPECTED IMPROVEMENT AND STANDARD FOR THE FUTURE:** List Specific goals. Failure to show immediate and sustained improvement will result in disciplinary action up to and including discharge.

Officers are expected to move and secure detainees in a secure segregation housing unit with all required security precautions. Any deviation from policy, procedure and/or supervisory directives must be preauthorized by a supervisor. This requires staff to remain fully attentive and alert during work hours. Failure to do so may jeopardize the safety and security of the facility, as well as the lives of staff, detainees, and visitors.

I acknowledge this action and understand the expectations and requirements as discussed with me and outlined above. I also understand the Disciplinary Action Appeal Process. My signature does not imply agreement or disagreement.

**EMPLOYEE** Signature: _____   Date: _____

Printed Name: _____

A witness is only _required_ when the employee refuses to sign this form. A witness should be from Human Resources or a member of management and _not_ a co-worker of the employee.

☐ Employee refused to sign and has received a copy of completed form.

**WITNESS** Signature: _Aida Aleglaye_   Date: 9/16/15

Printed Name: _Aida Aida JL_

**SUPERVISOR** Signature: _____   Date: 8·13·15

Printed Name: _I R Andersal_

**DEPARTMENT HEAD** Signature: _____   Date: 8-13-15

Printed Name: _Aw P. Seibert-Love_

**FACILITY ADMINISTRATOR** Signature: _____   Date: 8/17/15

Printed Name: _J Jauecka_

**HUMAN RESOURCE** Signature: _____   Date Distributed: _____

Printed Name: _____   Date Entered into HR System: _____

**DISTRIBUTION:**   ☐ Copy to Employee   ☐ Copy to Supervisor   ☐ Original to Personnel File

FINAL REPRIMAND, DISCIPLINARY DEMOTION, OR DISMISSAL ONLY (REGION / DIVISION):

# DISCIPLINARY ACTION FORM



| | | | | |
|---|---|---|---|---|
| **HR DIRECTOR** | ☑ Concur<br>Mitigate ☐ | Signature:<br>Printed Name: | S. Cisnes | Date: 5/21/15 |
| **DIRECTOR OF OPERATIONS** | ☑ Concur<br>Mitigate ☐ | Signature:<br>Printed Name: | C. NELSON | Date: 8/26/15 |
| **VICE PRESIDENT** | ☑ Concur<br>Mitigate ☐ | Signature:<br>Printed Name: | Mr J H. Black | Date: 8/20/11 |

**DISMISSAL ONLY:**

| | | | | |
|---|---|---|---|---|
| **CORPORATE LEGAL** | ☑ Concur<br>Mitigate ☐ | Signature:<br>Printed Name: | Alex Inclung | Date: 8/31/15 |
| **CORPORATE HUMAN RESOURCES** | ☑ Concur<br>Mitigate ☐ | Signature:<br>Printed Name: | FOR C. Ryan | Date: 9/1/15 |

SANTIAGO 016

HR-893

3/14/11 NP

# EXHIBIT C

**From:** Aida Aldape
**Sent:** Wednesday, September 2, 2015 10:23 AM
**To:** Sandra Gyenes
**Cc:** Jocelyn Siguenza
**Subject:** Re: Request for Corporate Review - Elizabeth Marquez Termination (Adelanto)

Okay, I will notify Ms. Marquez....Thank you.

**Aida Aldape**
HR Specialist
**The GEO Group, Inc.**
Adelanto Detention Facility - East
10400 Rancho Rd.
Adelanto, California 92301

Tel: 760 561-6100 Ext. 1115 • Fax: 760 561-6194
aaldape@geogroup.com
www.geogroup.com <http://www.geogroup.com/>

This email and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to which they are addressed. If you are not the intended recipient or the person responsible for delivering the email to the intended recipient, be advised that your have received this email in error and that any use, dissemination, forwarding, printing or copying of this email is strictly prohibited. If you have received this email in error, please immediately notify by replying to this email.

On Wed, Sep 2, 2015 at 10:22 AM, Sandra Gyenes <sgyenes@geogroup.com> wrote:
That should have been noted when you submitted the recommendation for termination.  Obviously you will not be able to terminate her while she is on leave.  However a letter should be sent to her informing her that the matter being investigated prior to her LOA will remain ope during her LOA, but will need to be closed out upon her return.

**Sandra S. Gyenes**
Director of Human Resources, WESTERN REGION

**The GEO Group, Inc.** ®
6100 Center Drive, Suite 825
Los Angeles, California 90045

Tel: 310 348 3000 • Dir: 310 348 3008
Mobile: 310 291 0562

sgyenes@geogroup.com
www.geogroup.com

1

GEO000625

On Wed, Sep 2, 2015 at 10:13 AM, Aida Aldape <aaldape@geogroup.com> wrote:

Yes, two employees were involved in the incident (Ms. Marquez and Mr. Santiago).  On her last day worked was the date of the incident and she requested to be on leave prior to obtaining approval to place her on leave.  The recommendation was to request a termination on both individuals and not just one, since they were both on duty and involved in the incident.

**Aida Aldape**
HR Specialist
**The GEO Group, Inc.**
Adelanto Detention Facility - East
10400 Rancho Rd.
Adelanto, California 92301

Tel: 760 561-6100 Ext. 1115 • Fax: 760 561-6194
aaldape@geogroup.com
www.geogroup.com <http://www.geogroup.com/>

This email and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to which they are addressed. If you are not the intended recipient or the person responsible for delivering the email to the intended recipient, be advised that your have received this email in error and that any use, dissemination, forwarding, printing or copying of this email is strictly prohibited. If you have received this email in error, please immediately notify by replying to this email.

On Wed, Sep 2, 2015 at 10:02 AM, Sandra Gyenes <sgyenes@geogroup.com> wrote:
I don't completely understand.  You submitted a recommendation for termination due to performance while processing a maternity leave?

**Sandra S. Gyenes**
Director of Human Resources, WESTERN REGION

**The GEO Group, Inc.** ®
6100 Center Drive, Suite 825
Los Angeles, California 90045

Tel: 310 348 3000 • Dir: 310 348 3008
Mobile: 310 291 0562

sgyenes@geogroup.com
www.geogroup.com

On Wed, Sep 2, 2015 at 9:15 AM, Aida Aldape <aaldape@geogroup.com> wrote:

Good Morning Sandra,

2

**Page 108**

GEO000626

On Ms. Marquez requested FMLA (maternity) prior to obtaining approval to place her on Administrative Leave.  Should we continue with the termination process although she is on FMLA?

Please advise.

**Aida Aldape**
HR Specialist
**The GEO Group, Inc.**
Adelanto Detention Facility - East
10400 Rancho Rd.
Adelanto, California 92301

Tel: 760 561-6100 Ext. 1115 • Fax: 760 561-6194
aaldape@geogroup.com
www.geogroup.com <http://www.geogroup.com/>

This email and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to which they are addressed. If you are not the intended recipient or the person responsible for delivering the email to the intended recipient, be advised that your have received this email in error and that any use, dissemination, forwarding, printing or copying of this email is strictly prohibited. If you have received this email in error, please immediately notify us by replying to this email.

On Tue, Sep 1, 2015 at 3:52 PM, Sandra Gyenes <sgyenes@geogroup.com> wrote:

Hi Aida,

We have corporate approval on the termination of Elizabeth Marquez.  See attached.

Please process the termination at your earliest convenience!

Let me know if you have any questions!

Thanks,
Sandy

**Sandra S. Gyenes**
Director of Human Resources, WESTERN REGION

**The GEO Group, Inc. ®**
6100 Center Drive, Suite 825
Los Angeles, California 90045

Tel: 310 348 3000 • Dir: 310 348 3008
Mobile: 310 291 0562

sgyenes@geogroup.com
www.geogroup.com

3

GEO000627

---------- Forwarded message ----------
From: **Maria Barsallo** <mbarsallo@geogroup.com>
Date: Tue, Sep 1, 2015 at 11:30 AM
Subject: Re: Request for Corporate Review - Elizabeth Marquez Termination (Adelanto)
To: Sandra Gyenes <sgyenes@geogroup.com>

Corporate Legal and HR have completed the review and concur with the recommendation of termination based on code **I09 – Inability to Perform Job.**

Attached is the Disciplinary Action Form with the approval signatures.  Please obtain the employee's signature (or witness), make sure the termination is processed through Infinium, distribute a copy of the Disciplinary Action Form to the employee and supervisor, and file the document in the employee's personnel file.

Regards,

On Fri, Aug 28, 2015 at 4:13 PM, Sandra Gyenes <sgyenes@geogroup.com> wrote:

Hi Mary,

Officer Marquez is currently on administrative leave w/o pay pending approval of his termination due to *I09 - Inability to Perform Job.*

Please review and let me know if you require any additional information.

Best Regards,
Sandy

**Sandra S. Gyenes**
Director of Human Resources, WESTERN REGION

**The GEO Group, Inc. ®**
6100 Center Drive, Suite 825
Los Angeles, California 90045

Tel: 310 348 3000 • Dir: 310 348 3008
Mobile: 310 291 0562

sgyenes@geogroup.com
www.geogroup.com

4

GEO000628

# EXHIBIT D

|  | CORPORATE POLICY & PROCEDURE MANUAL  CHAPTER: Human Resources  TITLE: Unpaid Leave of Absence | NUMBER: 3.4.2  SUPERSEDES: 4/1/13  EFFECTIVE: 5/2/13 |
|---|---|---|

## POLICY

It is the policy of The GEO Group, Inc. (GEO) that unpaid leaves of absence may be granted to employees for Family and Medical Leave Act leave, Military Service leave, Personal leave, and State Domestic Violence leave.

## GUIDELINES

### 1. FAMILY AND MEDICAL LEAVE ACT (FMLA)

**General Provisions:**

Under the Family and Medical Leave Act (FMLA) employees who have been employed for at least 12 months (need not be consecutive months) and worked 1,250 hours during the preceding 12 month period are eligible for family and medical leave.

**Reasons for Leave:**

Eligible employees may be granted a total of twelve (12) weeks of family and medical leave during a twelve (12) month period or a total of twenty-six (26) weeks to care for a covered service member with a serious injury or illness during a twelve (12) month period.

Leave may be granted to eligible employees for the following reasons:

- For incapacity due to pregnancy, prenatal medical care or child birth;

- To care for the employee's child after birth, or placement for adoption or foster care;

- To care for the employee's spouse, son or daughter or parent who has a serious health condition;

- For a serious health condition that makes the employee unable to perform the essential functions of their job;

|  | **CORPORATE POLICY & PROCEDURE MANUAL** | **NUMBER:** |
|---|---|---|
| | | **3.4.2** |

- For a qualifying exigency arising out of the fact that the employee's spouse, son, daughter or parent is on active duty or call to active duty status in support of a contingency operation as a service member of the National Guard or Reserves; or

- Because the employee is the spouse, son, daughter, parent or the next of kin of a covered service member with a serious injury or illness.

The entitlement to leave for the birth or placement of a child for adoption or foster care will expire twelve (12) months from the date of the birth or placement. Additionally, if both spouses employed by GEO, they are permitted to take only a combined total of twelve (12) weeks of leave for the birth or placement of the child or to care for a sick parent.

Employees in California taking leave under the California's Pregnancy Disability Leave (PDL) are entitled to maintain coverage under a group health plan for the entire duration of leave under PDL, which could be as long as four months over a 12-month period.

**<u>Definitions</u>:**

A. **Serious Health Conditions:** FMLA's definition of a serious health condition covers a variety of physical and mental conditions. A serious health condition means an illness, injury, impairment or physical or mental condition that involves either:

- Inpatient care (overnight stay) in a hospital, hospice, or residential medical-care facility, including any period of incapacity (inability to work, attend school or perform other regular daily activities) or subsequent treatment in connection with such inpatient care; or

- Continuing treatment by a health care provider, which includes:

   1) A period of incapacity lasting more than three (3) consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also includes:

      - Treatment two or more times by or under the supervision of a health care provider (in person visits, the first within seven (7) days and both within thirty (30) days of the first day of in capacity); or

      - One treatment by a health care provider (in person visit within seven (7) days of the first day of incapacity) with a continuing regiment of treatment (prescription medication, physical therapy etc).



| CORPORATE POLICY & PROCEDURE MANUAL | NUMBER: 3.4.2 |
|---|---|

2) Any period of incapacity related to pregnancy of for prenatal care. A visit to the health care provider is not necessary for each absence;

3) Any period of incapacity (or treatment) for a chronic serious health condition (asthma, diabetes, epilepsy, etc) which continues over an extended period of time, requires periodic visits (at least twice a year) to a health care provider, and may involve occasional episodes of incapacity. A visit to a health care provider is not necessary for each absence;

4) A period of incapacity that is permanent or long term due to a condition for which treatment may not be effective (Alzheimer's, stroke, terminal diseases, etc.); or

5) Any absences to receive multiple treatments for restorative surgery for a condition that would likely result in a period of incapacity of more than three (3) days if not treated (chemotherapy, physical therapy etc).

Typically, common ailments requiring only brief treatment such as the common cold, flu, ear aches, upset stomach, headaches, etc., are not considered serious health conditions covered by FMLA.

An employee may also take leave "to care for" a spouse, child or parent with a serious health condition. The phrase "to care for" includes both physical and psychological care, and the arrangement of third-party care for the family member (i.e. nursing home or home care nurse).

An employee who is eligible for FMLA leave and sustains a work related injury that qualifies as a serious health condition should be placed on FMLA leave. The employee may not be forced to return to work in a "light duty" position before the employee's FMLA entitlement has expired. If the employee accepts the "light duty" position in lieu of FMLA leave, the employee retains their right to FMLA leave.

The Corporate Human Resources Department should be contacted prior to declining an employee's request for FMLA leave.

**B. Spouse, Child or Parent:** A spouse is a husband or wife as defined or recognized under state law for purposes of marriage in the state where the employee resides, including common law marriage in states where it is recognized. A parent is a biological parent or an individual who stands or stood in the place of a parent to the employee. Persons who stand in place of a parent include those with day-to-day responsibility to care for and financially support a child.

A child is a biological, adopted or foster child, a stepchild, a legal ward, or a child of a person standing in the place of a parent, who is either under age 18, or age 18 or older

|  | CORPORATE POLICY & PROCEDURE MANUAL | NUMBER: 3.4.2 |
|---|---|---|

and "incapable of self-care because of a mental or physical disability".

**C. Next of Kin:**  Next of kin of a covered service member means the nearest blood relative other than the covered service member's spouse, parent, son or daughter, in the following order of priority: blood relatives who have been granted legal custody of the covered service member by court decree or statutory provisions; brothers and sisters; grandparents; aunts and uncles, and first cousins.

**Military Family Leave Entitlements:**

Eligible employees with a spouse, son, daughter, or parent on active duty or call to active duty status in the National Guard or Reserves in support of a contingency operation may use leave entitlement to address certain qualifying exigencies.

Qualifying exigencies may include:

- Short-notice deployment (short-notice deployment is limited in time and duration to a period of seven calendar days beginning on the date a covered military member is notified of an impending call or order to active duty in support of a contingency operation);

- Military events and related activities;

- Childcare and school activities;

- Financial and legal arrangements;

- Counseling;

- Rest and recuperation (eligible employees may take up to five days of leave for each instance of rest and recuperation; or

- Post-deployment activities and additional activities.

GEO may require the employee to provide a copy of the covered military member's active duty orders or other military issued documentation that indicates the covered military member is on active duty or call to active duty status in support of a contingency operation, and the dates of a covered military member's active duty service.

**Special Leave:**



| | CORPORATE POLICY & PROCEDURE MANUAL | NUMBER: |
|---|---|---|
| The GEO Group, Inc. | | 3.4.2 |

FMLA also includes a special leave entitlement that permits eligible employees to take up to 26 weeks of leave to care for a covered service member during **a single 12-month period**. A covered service member is a current member of the Armed Forces, including a member of the National Guard or Reserves, who has a serous injury or illness incurred in the line of duty on active duty that may render the service member medically unfit to perform their duties for which the service member is undergoing medical treatment, recuperation or therapy; or is in outpatient status; or is on the temporary disability retired list.

The "single 12-month period" in which an eligible employee may use up to 26 work weeks of leave begins on the first day the eligible employee takes FMLA leave to care for a covered service member and ends 12 months after that date.  No more than 26 work weeks of leave may be taken within any single 12-month period.

### Duration of FMLA:

An eligible employee is entitled to a combined total of 26 work weeks of leave for any FMLA-qualifying reason during the single 12 month period.  For example, an eligible employee may take 16 weeks of FMLA leave to care for a covered service member and 10 weeks of FMLA leave to care for a different family member with a serious health condition. However, the employee may not take more than 12 weeks of FMLA leave to care for the family member during the single 12-month period.  In the case of leave that qualifies as both leave to care for a covered service member and leave to care for a family member with a serious health condition during the single 12-month period, the facility HR Representative must designate such leave as service member leave first.  Leave that qualifies as both cannot be designated and counted as both types of leave.

The FMLA provides that a husband and wife employed by the same employer are limited to a combined total of 26 work weeks of leave during the relevant 12-month period if the leave taken is to care for a covered service member.

*Note:  All applicable leave of absences run concurrent with FMLA leave, if the leave qualifies as FMLA leave.*

### 2.  MILITARY SERVICE LEAVE

In compliance with the Uniformed Services Employment and Reemployment Rights Act (USERRA), a military leave of absence will be granted to employees who are absent from work because of service in the U.S. Armed Forces, the various reserve units, or the National Guard.



| CORPORATE POLICY & PROCEDURE MANUAL | NUMBER: |
|---|---|
| | 3.4.2 |

**Reasons for Leave:**

"Service" means the performance of duty on a voluntary or involuntary basis and includes active duty, active duty for training, inactive duty training, full-time National Guard duty, or an absence to be examined for such service or training. In general, an employee may serve a total of five years on active duty without losing reemployment rights. However, extensions for training, involuntary active duty and completion of initial period of obligated service beyond five years may be granted.

## 3. PERSONAL LEAVE

An employee with a minimum of ninety (90) days of service may apply for a Personal Leave. Leaves of absence for personal reasons should be requested by the employee in writing and will require prior approval by the appropriate management personnel.

Personal leaves of absences will normally be limited to thirty (30) days or less.

## 4. STATE DOMESTIC VIOLENCE LEAVE

Seven (7) states currently have legislation dealing with domestic violence leave (CA, CO, FL, HI, IL, ME and NC). Following is an example of how it is administered in Florida. For details on other states see your HR representative.

The law permits employees to take up to three working days of leave within a 12-month period, if the employee or a family or household member is the victim of domestic violence, and if the leave is sought for specific reasons related to the domestic violence as follows:

- To seek an injunction for protection against domestic violence, repeat violence, dating violence, or sexual violence;

- To obtain medical care or mental health counseling for the employee or a family or household member to address physical or psychological injuries resulting from the domestic violence;

- To obtain services from a victim-services organization;

- To make the employee's home secure from the domestic violence perpetrator or to seek new housing to escape the perpetrator; or

- To seek legal assistance to address issues arising from the domestic violence and to attend and prepare for court-related proceedings arising from the domestic violence.

|  The GEO Group, Inc. | CORPORATE POLICY & PROCEDURE MANUAL | NUMBER: 3.4.2 |
|---|---|---|

Leave under this law is considered <u>unpaid</u> to the extent it is not covered by paid leave. Pay for leave under this law must be reviewed with Corporate Human Resources on a case by case basis.

**Definitions:**

A. **Domestic violence:** Any assault, aggravated assault, battery, aggravated battery, sexual assault, sexual battery, stalking, aggravated stalking, kidnapping, false imprisonment, or any criminal offense resulting in physical injury or death of one family or household member by another family or household member.

B. **Family or household member:** Spouses, former spouses, persons related by blood or marriage, persons who are presently residing together as if a family or who have resided together in the past as if a family, and persons who are parents of a child in common regardless of whether they have been married. With the exception of persons who have a child in common, the family or household members must be currently residing or have in the past resided together in the same single dwelling unit.

**Eligibility:**

To be eligible for leave under this law, the employee must be employed for at least three (3) months.

APPROVED: _____
Corporate Policy Director

4/1/13
EFFECTIVE: _____

**POLICY OWNER:** Christopher Ryan, Director, Employee and Labor Relations

# EXHIBIT E

154299

# MEMORANDUM



**The GEO Group, Inc.
GEO Corrections
Adelanto Detention Facility East
10400 Rancho Rd.
Adelanto, California 92301
www.geogroup.com**

Date:     April 8, 2016

To:       James Black, Vice President, Western Region

From:     James Janecka, Warden

RE:       **TERMINATION REQUEST**

Ms. Marquez had been on FMLA/PFL from 8/6/2015 through 4/5/2016. Prior to going on FMLA/PFL Ms. Marquez accessed 4 doors from Central Control to allow a detainee house in Administrative Segregation to exit Segregation. The day that she was going to be placed on Administrative Leave without pay (8/6/2015), Ms. Marquez did not return back to work but instead indicated that she was going to be off on FMLA. A letter was mailed to her notifying her that she was under investigation due to the incident of August 5, 2015 and due to being out on FMLA the matter being investigated prior to her FMLA will remain open, but will need to close out upon her.

Based on the information on the attached memorandum, we are recommending termination of the following employee for inability to perform job.

| Employee Name: | *ELIZABETH MARQUEZ* |
|---|---|
| **Employee ID Number:** | Redacted |
| **Job Title:** | *DETENTION OFFICER* |
| **Date of Hire:** | *07/09/2012* |
| **Recommended Termination Code:** | *I09-INABILITY TO PERFORM JOB* |

Supporting Documents:
- Disciplinary Action Form
- Memorandum from E. Marquez, Detention Officer, dated August 5, 2015
- Memorandum from E. Santiago, Detention Officer, dated August 5, 2015
- Memorandum from J. Mora, Detention Officer, dated August 5, 2015
- Memorandum from A. Soliz, Sergeant, dated August 5, 2015
- Memorandum from J. Hutchinson, Sergeant, dated August 5, 2015
- Memorandum from R. De Soto, Detention Officer, dated August 5, 2015
- Memorandum from R. Anderson, Lieutenant, dated August 6, 2015

**Page 120**

GEO000332



- Memorandum from Z. Darmandzhyan, Detention Officer, dated August 6, 2015
- Supervisor Shift Log, dated June 15, 2015, July 20, 2015, August 3, 4 and 5th, 2015
- Policy and Procedure, Master Control Center Operations, 10.2.27-ADF
- Policy and Procedure, Master Control Center Officer, 10.3.11-ADF
- Post Order Signature Sheet, June 2015, July 2015 and August 2015
- Letter dated September 2, 2015.
- Tracking receipt September 2, 2015.

_____   _____
Facility Administrator Signature              Date    4/8/16

*Page 2 of 2*

GEO000333

# EXHIBIT F

|  The GEO Group, Inc. | CORPORATE POLICY & PROCEDURE MANUAL<br><br>CHAPTER:  Human Resources<br><br>TITLE:  Equal Employment Opportunity | **NUMBER:**<br>3.1.13<br>**SUPERSEDES:**<br>04/01/13<br>**EFFECTIVE:**<br>05/15/14 |
| --- | --- | --- |

## POLICY

It is the Policy of The GEO Group, Inc. (GEO) to provide equal employment opportunity to all qualified individuals without regard to race, religion, color, sex sexual orientation, age, national origin, disability, veteran status, marital status, gender discrimination, military status, medical condition or any other category protected by law.  This policy covers all aspect of the application for employment, the employment relationship including working conditions, personnel actions, promotion and transfer, layoff and recall, compensation, access to training and employee benefits.

It is the responsibility of all employees of GEO to support the spirit and principle of this Policy and treat each other with dignity and respect and alert GEO management, Corporate Human Resources or Legal Department of any violation of this Policy.  GEO Management will ensure that all personnel actions are administered according to this Policy.

## PROCEDURE

A.  Employee Complaint

In the event an employee believes in good faith that he/she has been discriminated against or is being retaliated against, that employee should promptly report the incident, in an effort to remedy the problem at the earliest opportunity.

B.  Retaliation Prohibited

Federal law prohibits retaliation against any applicant or employee who files a charge of discrimination, cooperates with the government's investigation of a charge, opposed any act or practice made unlawful by any federal, state or local law requiring equal opportunity; or exercised any other right protected by federal state or local law requiring equal opportunity.  In addition, GEO engages in interactive processes to ensure that qualified individuals with disabilities under the Americans with Disabilities act are afforded a reasonable accommodation for their disability.  Any form of retaliation must be reported immediately.

C.  Notice to Subcontractors and Vendors

Written notification of Company policies regarding non-discrimination, Equal Employment Opportunity and Affirmative Action will be sent to all subcontractors, vendors and suppliers

CONFIDENTIAL AND PROPRIETARY INFORMATION OF THE GEO GROUP

GEO000064



| | CORPORATE POLICY MANUAL | NUMBER: |
|---|---|---|
| The GEO Group, Inc. | | 3.1.13 |

requesting appropriate action on their part.   This will be coordinated from Corporate Headquarters with each facility.

D.  EEOC or any related Federal or State Agency Charge or Complaint

All facility locations must immediately notify Corporate Human Resources or Legal upon receipt of a formal, written charge or complaint of discrimination from attorneys, the EEOC or any related federal or state agency, including demand letters from attorneys.  If written, a copy of the charge or complaint must be forwarded to the Corporate Human Resources or Legal upon receipt.

E.  Investigation

1.  Managers and Supervisors must treat all allegations of harassment as potential litigation. Reporting of such allegations should be immediate and be done in a confidential manner. An accurate reporting of allegations or violation of this policy or harassment must be given to the corporate Human Resources or Legal Department.

2.  Employees are expected to cooperate with Company officials who are assigned to investigate a harassment complaint.  Refusal to cooperate in an official investigation could subject an employee to disciplinary action, up to and including termination of employment.

3.  Complaints will be investigated in a timely manner and will be kept confidential to the extent practicable recognizing that during an investigation the alleged harasser and witnesses would need to be contacted.

4.  Depending upon the severity of a harassment complaint, it may be appropriate to suspend or otherwise transfer the accused away from the Complainant. The accused may not be suspended or transferred without the express approval of the Corporate Human Resources or Legal Departments.

5.  Appropriate corrective disciplinary action, up to and including termination of any employee, regardless of the level of his/her position, will result if allegation of harassment are substantiated.

APPROVED: _____
              Corporate Policy Director

CONFIDENTIAL AND PROPRIETARY INFORMATION OF THE GEO GROUP

GEO000065

# EXHIBIT G

# G-1

# ADELANTO DETENTION FACILITY
# COLLECTIVE BARGAINING AGREEMENT

## Between

## GEO Corrections Holdings, Inc.
## (GEO)

## And

## United Government Security Officers of America International Union, and its Local #880

**Effective Dates:  July 3, 2015 – July 2, 2018**

1

GEO000334

# Table of Contents

| Subject | Page |
|---|---|
| Preamble | 3 |
| Witnesseth | 3 |
| Article – 1  Recognition and Purpose | 3 |
| Article – 2  Union Security | 4 |
| Article – 3  Non-Discrimination | 4 |
| Article – 4  Hours of Work and Overtime | 5 |
| Article – 5  Reporting Pay | 8 |
| Article – 6  Leaves of Absence | 8 |
| Article – 7  No Strike/No Lockout | 8 |
| Article – 8  Company Regulations | 9 |
| Article – 9  Union Representatives and Access To The Facility | 9 |
| Article – 10  Dues Check Off | 10 |
| Article – 11  Union Seniority | 12 |
| Article – 12  Grievance Procedure and Arbitration | 14 |
| Article – 13  Uniforms | 17 |
| Article – 14  Just Cause | 17 |
| Article – 15  Savings Clause | 19 |
| Article – 16  Management Rights | 20 |
| Article – 17  Excused/Unexcused Absences and Tardiness | 21 |
| Article – 18  Jury Duty | 23 |
| Article – 19  Bereavement Pay | 23 |
| Article – 20  Holidays | 24 |
| Article – 21  Vacation | 24 |
| Article – 22  401(k) Plan | 26 |
| Article – 23  Wages | 26 |
| Article – 24  Health and Wellness Benefits | 27 |
| Article – 25  Waiver of Bargaining Rights and Amendments to Agreement | 28 |
| Article – 26  Drug and Alcohol Testing | 29 |
| Article – 27  Miscellaneous Provisions | 29 |
| Article – 28  Duration | 30 |
| Signature Page | 31 |

GEO000335

## PREAMBLE

THIS AGREEMENT is entered into this third day of July 2015 by and between GEO Corrections Holdings, Inc., (GEO), hereinafter referred to as the "Company," and the United Government Security Officers of America International Union, and its Local #880, hereinafter referred to as the "Union."

GEO manages the Adelanto Detention Facility in Adelanto, CA under the terms of an intergovernmental service agreement (IGSA) with the city of Adelanto, CA, who contracts with Immigration and Customs Enforcement (ICE), hereinafter referred to as the "Client". As the management agent for the Contract Agency, the terms of this document are governed by Company's contract and standards established by the Clients.

## WITNESSETH

WHEREAS, the parties have entered into collective bargaining negotiations, which negotiations have resulted in complete agreement between the parties, **NOW THEREFORE**, it is agreed by and between the Company and the Union as follows:

## ARTICLE 1
## RECOGNITION AND PURPOSE

1.1   The Company recognizes the International Union, United Government Security Officers of America International Union, (UGSOA), and its Local 880 as the exclusive collective bargaining representative for all full-time (those regularly scheduled 40 hours per week or those permanently assigned to 12 hour shifts) and part-time (those regularly scheduled fewer than 40 hours per week) Detention Officers, Transportation Officers and Classification Officers employed by the Company at the  Adelanto Detention Facility as listed in the NLRB Certification in Case Number 31-RC-118510 for the purpose of collective bargaining in accordance with the National Labor Relations Act (NLRA), Fair Labor Standards Act and Service Contract Act, as amended, and excludes all managers, supervisors and confidential employees and other employees as defined by the NLRA. These exclusions include but are not limited to the Facility Administrator, Assistant Facility Administrators, Majors, Captains, Lieutenants, other professional employees, Maintenance Staff and Clerical Staff.

1.2   For the purpose of this Agreement, the term "Officer" or "Officers" designates only such Officers as are covered by this Agreement.

1.3   It is the purpose of this Agreement to promote and expand harmonious relationships between the Company and Officers represented by the Union to provide, where not inconsistent with Client rules and regulations, applicable state and federal laws and regulations required by any agency having jurisdiction over the Operations and Management Contract(s) or Personnel Rules, for the salary structure, fringe benefits, and employment conditions of the Officers covered by this Agreement. It is recognized that a harmonious relationship can best be achieved by open dialogue, timely resolution of

3

GEO000336

differences, and negotiating in good faith; both parties agree that they share the responsibility to provide uninterrupted service to the Client(s).

## ARTICLE 2
## UNION SECURITY

2.1   All Officers hereafter employed by the Company in the classification covered by this Agreement shall become members of the Union and remain in good standing not later than the thirty-first (31st) day following the beginning of their employment, or the date of the signing of this Agreement, whichever is later.

2.2   An Officer who is not a member of the Union at the time this Agreement becomes effective shall become a member in good standing of the Union within ten (10) days after the thirty-first (31st) day following the effective date of this Agreement, and for the duration of this Agreement.

2.3   Officers meet the requirement of being members in good standing of the Union, within the meaning of this Article, by tendering the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership in the Union or, in the alternative, by tendering to the Union financial core fees and dues, as defined by U.S. Supreme Court in NLRB v. General Motors Corporation, 373 U.S. 734 (1963) and Beck v. Communication Workers of America, 487 U.S. 735 (1988).

2.4   In the event the Union requests the discharge of an Officer for failure to comply with the provisions of this Article, it shall serve written notice on the Company requesting that the employee be discharged effective no sooner than two (2) weeks of the date of that notice. The notice shall also contain the reasons for discharge. In the event the Union subsequently determines that the employee has remedied the default prior to the discharge date, the Union will notify the Company and the Officer, and the Company will not be required to discharge that Officer. The Union and the Officer will hold the Company harmless in regard to any request from the Union to discharge an Officer. Should the Union request that an Officer be reinstated and that Officer has lost wages as a result of the initial Union request, the Company will not be responsible for payment of any claims for lost wages.

2.5   This Article shall be subject to all applicable state and federal laws.

2.6   The Union agrees to indemnify and hold the Company harmless against any claim, suits, judgments, or liabilities of any sort whatsoever arising out of the Company' s compliance with the provisions of this Union Security Article.

## ARTICLE 3
## NON-DISCRIMINATION

3.1   The Company has the right to promulgate policies, reporting requirements and procedures regarding equal employment opportunity, discrimination and harassment.

4

GEO000337

These policies, reporting requirements and procedures will, at a minimum, meet those required by laws and regulations of the United States, the laws and regulations of the State of California, as well as any requirements imposed by this agreement.

3.2     Neither the Company nor the Union shall discriminate against any Officer by reason of the following status: age, sex "except where age or sex is a bona fide occupational qualification", race or ethnic origin, color, national origin, religion, disability, disabled veteran status, political affiliation, marital status, sexual orientation, genetic information or any other factor protected by law or membership or non-membership in a union.

3.3     The use of any male pronoun in this Agreement is a generic reference.

# ARTICLE 4
# HOURS OF WORK AND OVERTIME

4.1     For payroll purposes the normal workweek shall commence at 12:01 AM on Monday and ends at 11:59 PM. on Sunday. The normal workday shall commence at the start of an Officer's shift and extend for a period of twenty-four (24) hours. The foregoing is descriptive only; nothing herein shall be construed as guaranteeing any specified number of hours of work or pay per week. It is understood that the description of a "normal work week" does not describe a pay period or the number of annual pay periods. The Company, at its sole discretion, will determine the number of annual pay periods based on its payroll system.

4.2     Officers will be notified in a timely manner of their shift assignments.  At a minimum, Officers will be given two weeks advanced notice that their permanent shift will change. The Company will not arbitrarily change permanent shifts without operational need or in response to Client requirements.  Documentation shall be provided to the Union upon request.

4.3     Each Officer will be given a thirty (30) minute unpaid off-duty meal period. The Officer will not be required to perform any duties, whether active or inactive, while eating. Should the Officer be required to perform any duties, whether active or inactive, the affected Officer will be paid for the meal period at the appropriate rate. The meal period shall commence after the start of the second (2) hour (i.e. 2 hours after the start of shift) and before the start of the sixth (6) hour (i.e. 5:59 hours after the start of shift).  Officers shall be allowed to leave the facility during their meal period after notification to their supervisor.

4.4     Each Officer will be given two (2) ten (10) minute paid rest periods per shift. The Company will provide rest periods as close to practical to the center of each four (4) hour portion of a shift.

4.5     Officers required to attend a pre-shift briefing will be paid for the time so spent.

4.6     Overtime shall be paid as follows:

5

GEO000338

1. One and one-half (1 ½) times the Officer's regular rate of pay shall be paid for all hours worked in excess of eight (8) hours up to and including twelve (12) hours within any given workday (or for all hours in excess of forty (40) hours worked in a single workweek) and for the first eight (8) hours worked on the seventh (7th) day of work.

2. Double (2x) the Officer's regular rate of pay shall be paid for all hours worked in excess of twelve (12) hours in any workday and for all hours worked in excess of eight (8) hours on the seventh (7th) day of work in any workweek.

3. To ensure that Officers are paid for all hours actually worked (either regular or overtime hours) the Company will determine the method of collecting and processing time. Officers will be responsible for accurately applying the rules of any such time keeping process implemented by the Company. Any changes in the time keeping process will be provided to the Union no less than forty-eight (48) hours prior to implementation. The method of time keeping will not be subject to the grievance and arbitration process as set forth in Article 12.

4.7 No overtime work shall be required or permitted, except by direction of the proper supervisory personnel of the Company, or except in cases of emergency where prior authorization cannot be obtained. Officers will be notified as soon as is reasonably possible of the need to work overtime. Officers will be notified of mandatory overtime in a timely manner, preferably two hours in advance, unless an emergency occurs, including "no call, no show."

4.8 The payment of overtime for any hour excludes that hour from consideration for overtime payment on any other basis. There shall be no pyramiding or duplication of premium or overtime pay. In the event more than one premium seems to be due under this Agreement, only the higher premium shall apply.

4.9 In the event of "no call, no-shows", Officers may be held over to the next shift until a replacement is found and the Officer has been properly relieved.

4.10 In the event overtime cannot be filled from volunteers, the Company has the right to mandate that Officers work overtime. Voluntary and mandatory overtime applies to all members of the Officer workforce, regardless of the Officer's post or assignment (Court/Baliff, Transportation and Intake Officers are exempt from mandatory overtime under normal circumstances). In an effort to fairly and equitably manage both voluntary and mandatory overtime opportunities, the following process will be adopted.

A. Officers wishing to volunteer for overtime assignments shall notify their shift supervisor. Officers shall indicate if they are volunteering for Day Off, Hold Over and/or Early Call assignments. The supervisor shall consult the Volunteer Overtime List and assign overtime in seniority order.

6

GEO000339

**Page 131**

B.  In the event there are insufficient Officers on the Voluntary Overtime List and the assignment of mandatory overtime is necessary, Officers may be mandated in reverse seniority order.  Mandatory overtime may be 4 or 8 hour assignments at the Company's discretion.  Officers working on their "Friday" shall not be mandated unless facility needs require otherwise.

*It is understood that the provisions of Article 4.10.A and 4.10.B are agreed to on a trial basis for the first 120 days after ratification.  If these provisions are not modified at the completion of the trial period (to include any extension of the trial period), they shall remain in effect for the remainder of the agreement.*

C.  Officers may volunteer to work the mandatory overtime assignments of other Officers.

D.  Supervisors have the discretion to consider mitigating circumstances should an Officer request not to be mandated to work overtime.

E.  Should the situation arise where Officers may be sent home early, the most senior Officer will be asked first, followed by the next senior Officer working down the list of those Officers working overtime assignments.  Should no one volunteer, the least senior Officer working Day Off or Hold Over overtime shall be selected.

F.  Failure to work mandated overtime will result in appropriate discipline, up to and including discharge.

4.11  Scheduled shift swaps are authorized and Officers wishing to swap shifts must complete a Shift Swap Mutual Agreement form no later than 24 hours before the shifts to be swapped.  Shift swaps shall not be approved if they result in additional overtime.

4.12  Supervisory and exempt employees shall not perform the duties of Officers covered by this agreement except under the following conditions:

A.  When such work is necessary for instruction and/or training purposes without relieving the Officer from duties.

B.  For up to 60 minutes for comfort/or emergency relief of Officers when other qualified Officers are not readily available.

C.  Any work necessary during an emergency such as; fire, explosion, flood, earthquake, weather conditions (i.e., snow, ice, high winds, etc.), water line ruptures or power failures. Additionally, any emergency situation in which the facility Emergency Plans are initiated, in all cases, except training exercises.

*Note: The above language precludes the Company from using supervisors or exempts employees to do bargaining unit work in the normal course of business.*

7

## ARTICLE 5
## REPORTING PAY

5.1   An Officer who reports for work at his regular starting time or has been called in to work and has not been advised either orally or in writing not to report shall receive a minimum of four (4) hours work or four (4) hours pay at the appropriate hourly rate.

5.2   The provisions of Section 5.1 above shall not apply if the Company is unable to advise the Officer not to report or provide the work because of acts of God, fire, snowstorm, flood, power failure, or other conditions or causes beyond the control of the Company.

## ARTICLE 6
## LEAVES OF ABSENCE

6.1   In addition to any leaves provided by this agreement, or company policy, the Company provides leaves of absences in accordance with all applicable federal and/or state laws (i.e., FMLA, Military leaves, etc.) The protocols for such leaves can be found in the Employee Handbook and by contacting the facility Human Resources Department.

6.2   **Union Leave:** Up to three (3) Union representatives will be granted leaves of absence, without pay, for the purpose of attending quarterly Union meetings, annual training and every five years the International Union Convention, provided such request is made to the Facility Administrator, or their designee, with a minimum twenty one (21) days of notice.

## ARTICLE 7
## NO STRIKE/NO LOCKOUT

7.1   The parties recognize the sensitive nature of the services provided by the Company to the Client and, therefore, agree that all operations of the Company shall, during the term of this Agreement, continue without interruption.

7.2   Under the term of this Agreement, the Union, its members and employees within the bargaining unit represented by the Union, individually and collectively, will not advocate, encourage, condone, or take part in any strike, sympathy strike, walkout, picketing, stay-in, slowdown, concerted refusal to work, or other curtailment or restricting of the Company's operations or interference with operations in or about the Company's premises, or equipment. The Company and its representatives agree not to engage in a lockout during the term of this Agreement.

7.3   The parties recognize the right of the Company to take such disciplinary action as the Company in its sole discretion determines appropriate, including discharge, against all participants. It is understood and agreed by the parties that an employee does have the right to file a grievance solely on the issue of whether he did, in fact, violate any provisions of this Article. Separate grievances may not be joined in arbitration.

8

GEO000341

7.4    Any claim, action or suit for damages and/or injunctive relief resulting from the Union's violation of this Article shall not be subject to the grievance and arbitration provisions of this Agreement.

## ARTICLE 8
## COMPANY REGULATIONS

8.1    Any rules, regulations or directives which are now in effect, or which may be later imposed upon the Company by its Client, or any other Governmental Agency having jurisdiction will apply with equal force and effect to the Officers hereunder. Officers are also required to adhere to Company Rules and Regulations.

8.2    The Company reserves the right, from time to time, to amend, add to or delete from its Company Rules and Regulations and practices unless such amendment, addition or deletion would violate a specific provision of this Agreement.

8.3    All work rules that could result in discipline are contained in the Employee Handbook, this Collective Bargaining Agreement, Post Orders or other published means. The Company will provide written copies or reasonable access to all the published items described in this Article.

8.4    The Union will be notified in a timely manner (if practical, within 2 weeks) prior to the implementation of any changes to Company policies, rules and regulations.

## ARTICLE 9
## UNION REPRESENTATIVES AND ACCESS TO FACILITY

9.1    Representatives of the Union shall have reasonable access to the facility to ascertain whether the Agreement is being properly observed, provided that they do not interfere with the duties of any Officer or the operation of the facility. Access to the facility may not be granted during count times, meal periods, shift changes, or other times when there is a major inmate or staff movement, or during an emergency situation. Access to the facility after normal business hours (7:30 am - 4:00 pm) or outside of the Union Representative's working hours will require approval from the Facility Administrator or their designee. Representatives of the International Union shall contact the Facility Administrator or his designee, then present themselves at the facility and inform the Facility Administrator or their designee, of the circumstances of the visit. To the extent practicable the Union will provide the Facility Administrator with a one (1) week advanced notice before any visit by a representative of the International Union. The Company and the Union representative shall conduct themselves in such a manner as to carry out the intent and spirit of this Article. The Company shall not unreasonably withhold such access.

9.2    Union representatives may contact Stewards during working hours by telephone for the purpose of conducting Union business, provided that permission to do so has first been received from the Facility Administrator, or his designee.

9

GEO000342

9.3   The Union may designate one (1) Officer as a Chief Steward, one (1) Officer per shift as a Shift Steward (East and West) and one (1) Officer per shift as an alternate Shift Steward (East and West) to act as Union representatives, in addition to the elected Union Officers. Shift Stewards and Alternates shall in each case be an Officer with seniority and who regularly works the shift to which they are assigned.

9.4   The Union shall inform the Company in writing of the names of the Local Union representatives who are accredited to represent it, which information shall be kept up to date at all times. Only persons so designated will be accepted by the Company as representatives of the Union.

9.5   It is mutually understood that access to the facility is governed by client rules, and is subject to applicable client restrictions, and these rules and restrictions must be followed. Any representative of the International Union requesting access to the facility must obtain proper clearance from the Client.

9.6   No Union representative may leave an assigned duty post or work assignment to engage in representation of Officers during a pre-disciplinary investigatory interview or disciplinary proceeding without first notifying and receiving authorization from the Shift Supervisor. The Company shall not unreasonably withhold such authorization.

9.7   Union business shall occur during non-duty times, except where noted in this Article.

9.8   The Union recognizes that representation of Officers is not meant to circumvent the normal relationship between supervisor and Officer. The right to Union representation shall not apply to conversations between an Officer and the supervisor for the purpose of giving instructions concerning work performance, providing training or non-disciplinary discussion or communications regarding work habits or techniques.

9.9   The Company will permit a union representative the opportunity to address all newly hired Officers during Pre-Service Classroom Training for the purpose of a union orientation. Union orientation will be limited to one (1) hour.

9.10  The Company shall provide two (2) lockable Bulletin Boards (1 for East and 1 for West) for use by the Union. Bulletin Board postings will be limited to:

    A.    Notices of Recreational-Social Events
    B.    Notice of Union Elections
    C.    Notice of Results of Union Elections
    D.    Notice of Union Meetings
    E.    Notices of Other "Official" Union Business

## ARTICLE 10
## DUES CHECK OFF

10.1  Subject to the limitations of any state or federal law, the Company agrees to deduct from

the first paycheck earned each calendar month by a member of the Union covered by this Agreement, the Union membership dues and initiation fees uniformly levied by the Union in accordance with said Union's constitution and by-laws, of each member of the Union who has in effect at that time a proper authorization card executed by the Officer, authorizing the Company to make such deductions. A minimum of fifteen (15) workdays prior to the first deduction, the Union will advise the Company of the exact dollar amount due from each Officer.

10.2   All sums collected in accordance with such signed authorization cards shall be remitted by the Company to the UGSOA International Office no later than the fifteenth (15th) of the month subsequent to the month in which such sums were deducted by the Company.

10.3   The check-off authorization card to be executed and furnished to the Company by the Union and the Officers shall be the official Union authorization for check-off of dues. The Company shall accept no other form, unless the substitute is mutually agreed upon by the parties.

10.4   The Union accepts full responsibility for the authenticity of each check-off card submitted by it to the Company, and any authorizations, which are incomplete or in error shall be disregarded by the Company, and shall be returned to the Union for correction. The Union agrees that upon receipt of proper proof, it will refund to the Officer any deduction erroneously or illegally withheld from an Officer's earnings by the Company, which has been transmitted to the Union by the Company.

10.5   No deduction of Union dues will be made from the wages of any Officer who has executed a check-off form and has been transferred to a job not covered by this agreement or who is not in a pay status.

10.6   Anytime there is a change in the deduction authorization the Company will have minimum of fifteen (15) work days to put the change into effect.

10.7   An Officer who has executed a check-off form and who resigns or is otherwise discharged from the employ of the Company shall be deemed to have automatically revoked his assignment, and if the Officer is recalled or re-employed, further deduction of Union dues will be made only upon execution and receipt of a new check-off form.

10.8   Collection of back dues owed at the time of starting deductions of any Officer, and collection of dues missed because the Officer's earnings were not sufficient to cover payment for a particular pay period, will be the responsibility of the Union, and will not be the subject of payroll deductions.

10.9   Deduction of membership dues shall be made, provided there is a balance in the paycheck sufficient to cover the amount after all other deductions authorized by the Officer or required by law have been satisfied. In the event of termination of employment, the obligation of the Company to collect dues shall not extend beyond the pay period in which the Officer's last day of work occurs.

11

GEO000344

10.10 The Union agrees to indemnify the Company and hold it harmless against any and all claims, suits or other forms of liability which may be made against it by any party for amounts deducted from wages as herein provided.

10.11 Solicitation of Union membership or collection or checking of dues will not be conducted during working time. The Company agrees not to discriminate in any way against any Officer for Union activity, but such activity shall not be carried out during working hours except as specifically allowed by the provisions of this Agreement.

# ARTICLE 11
# UNION SENIORITY

11.1   For the first three (3) months worked following successful completion of facility pre-service training and orientation, an Officer shall be regarded as probationary and shall have no seniority. Pre-Service and Probationary Officers may be disciplined or discharged without recourse to the grievance procedure. Officers discharged during their pre-service or probation shall not have any rights under this Agreement. However, Pre-Service and Probationary Officers shall be represented by the Union concerning wages, hours and working conditions, but the Company reserves the right to decide questions relating to promotions, transfers, layoffs or discharge. The Company may extend the probationary period in increments of 30-day blocks for up to a total of 90 additional days. The Union will be notified of the need to extend an Officer's probationary period.

11.2   Officers who have lost seniority as set forth in Section 11.8 of this Article, and Officers who terminate or leave the bargaining unit prior to completion of the probationary period shall be required, upon rehire or reentry into the bargaining unit, to serve the probationary period again.

11.3   After completion of the probationary period an Officer's seniority under this Agreement shall revert to the Officer's date of hire at the Adelanto Detention Facility.  Officers who transfer from another UGSOA represented GEO facility shall retain their union seniority, provided there is no break in service.  Seniority of Officers who start work on the same date shall be determined by the last four digits of the Officer's social security number. The lower number will be the most senior.

11.4   Officers employed as of the date of ratification shall have their seniority based upon their date of hire (as an Officer) at the facility. Officers who enter the bargaining unit after that date shall have their seniority based upon Article 11.3.

11.5   The purpose of seniority is to establish Officers' rights and privileges based on the length of service in the bargaining unit. Seniority under this Agreement will have no influence on promotions or advancement within the Company, except as contained in this Agreement.

11.6   Part-time Officers will have seniority only among other part-time Officers. In the event

GEO000345

of a layoff, part-time Officers will be laid off before full-time Officers. Part-time Officers who go full-time will be entered on the full-time seniority list based upon their seniority determined under section 11.4.

11.7   The Company agrees to prepare an updated site seniority list of Officers covered by this Agreement quarterly. A copy of which will be furnished to the Union.

11.8   Officers will lose their seniority, and shall be discharged for any of the following:

> A. Being laid off for more than 12-months;
> B. Absent due to illness or injury for more than twelve (12) months, or length of employment, whichever is less. Absences taken pursuant to the applicable federal and/or state laws are exempt under this provision;
> C. Discharged for Just Cause
> D. Failure to obtain and/or maintain a security clearance;
> E. Failure to return from layoff upon recall as provided below;
> F.  If the Officer voluntarily resigns or retires; or
> G. If the Officer is convicted of a felony.

11.9   Layoff and recalls from layoff will be made on the basis of seniority, in accordance with Section 11.6. Positions requiring "special training and/or skills" will be exempt from the seniority process.

11.10  Laid-off Officers shall have recall rights for a period of twelve (12) months or their length of employment whichever is less, and shall retain their accumulated seniority as of the date of layoff.

11.11  In case of re-employment, Officers who have been laid off shall be notified to return to work, at their last known address, in reverse order of lay-off. The notice will be by certified mail return receipt. In the event that a former Officer, so notified, fails to report for work within five (5) business days after receipt of such notice, their seniority shall be terminated.

11.12  It will be the responsibility of the laid-off Officer to keep the Company notified of any change of address, and current phone number.

11.13  An Officer who is activated, drafted or who volunteers for military service in the Armed Forces of the United States, shall accumulate full seniority during the term of such service, provided they are honorably discharged and apply for reemployment as an Officer within ninety (90) days after such discharge, provided the Officer still meets all eligibility requirements. The above is limited to a six (6) year period; however, in time of war there is no limit.

11.14  An Officer who is transferred from or promotes out of the bargaining unit shall cease to accumulate seniority. If the Officer returns to the bargaining unit within twelve (12) months shall retain the seniority he had at the time he transferred out of the bargaining

13

GEO000346

unit.

11.15  All position vacancies will be posted for a period of seven (7) calendar days setting out the position and qualifications.  When all factors are considered equal, seniority shall be used to determine the selection for these positions.  Part-time Officers will be considered for full-time Officer positions before selecting an external candidate.  In the interest of maintaining continuing operations, the employer may temporarily assign an Officer to a vacant or new position or shift until the job is filled according to this Article.

# ARTICLE 12
## GRIEVANCE PROCEDURE AND ARBITRATION

12.1  The parties agree that all problems should be resolved, whenever possible, before the filing of a grievance but within the time limits for filing grievances stated elsewhere in this Article, and encourage open communications between the Company and Officers so that resorting to the formal grievance procedure will not normally be necessary. The parties further encourage the informal resolution of grievances whenever possible. A grievance is defined as an alleged violation of a specific term or provision of this Agreement. The purpose of this Article is to promote a prompt and efficient procedure for the investigation and resolution of grievances. This grievance procedure is not intended for complaints of harassment or discrimination as referenced in the Employment Handbook and Corporate Policy.

12.2  **GENERAL PROVISIONS:**

The number of days outlined in Article 12.3 in the processing and presentation of grievances shall establish the maximum time allowed for the presentation and processing of a grievance.

While it is the intent of the Company to respond to grievances on a timely basis, if the Company fails to respond to a grievance within the time period allotted for a specific step, the grievance may be treated by the Union as if it were denied at that step and the Union may proceed to the next step. The Parties, by mutual written agreement, may agree to extend any of the time limitations.

The Parties agree that if the Union fails to move the grievance to the next step in the process within the time period allotted for a specific step, the grievance shall be treated by the Company as resolved, and no further action shall be taken.

12.3  An Officer who believes that any provision of this Agreement has not been properly applied or interpreted may present his grievance to be settled by the following procedures. During each step of the grievance procedure the Parties have the right to perform a reasonable investigation into the complaint.

INFORMAL STEP

14

**Page 139**

The Parties shall make their best efforts to resolve any dispute on an informal basis. Both the Company and the Union agree that the Union representative will first discuss the matter with the supervisor and attempt to resolve the dispute within ten (10) business days after the actions giving rise to the dispute occurred, and became known or should have become known to the Union.

STEP 1

If the matter is not resolved informally, a Union representative, not later than ten (10) business days after the informal discussion with the supervisor, shall set forth the facts in writing, specifying the language of this Agreement allegedly violated. This shall be signed by the aggrieved Officer (if available and willing to sign the grievance) and/or the Union representative and shall be submitted to the Chief of Security. The Chief of Security shall have ten (10) business days to meet with the Union representative and return a decision in writing, delivering copies to the Union representative and grievant.

STEP 2

If the grievance is not settled in Step 1, the grievance may be appealed in writing to the Facility Administrator or designee, not later than ten (10) business days from the Step 1 grievance response. The Facility Administrator, or designee, shall have ten (10) business days to meet with the Union and return a decision in writing, delivering copies to the Union and grievant.

STEP 3

If the grievance is not settled in Step 2, the grievance may be appealed in writing to the Western Region Vice President, or designee, not later than ten (10) business days from the Step 2 grievance response. Arrangements will be made for the Western Region VP, or designee, and the Local Union to discuss and attempt to resolve the grievance. The discussion will be held no later than fifteen (15) business days and a decision, in writing, will be delivered to the Local Union and grievant.

12.4    Any grievance involving the termination of an Officer's employment shall be automatically advanced to Step 3 of the grievance and arbitration process.

12.5    Prior to the grievance being process for Arbitration, it will be reviewed by the International Union President, or designee and the Company's  Vice President of Employee and Labor Relations, within fifteen (15) business days of the denial by the Company's Western Region Vice President, or their designee. A meeting or telephonic review between the above referenced parties may be held by mutual agreement.

12.6    Grievances processed in accordance with the requirements of Section 12.3 that remain unresolved may be processed to arbitration by the Union, giving the Company's Vice President of Employee and Labor Relations written notice of its desire to proceed to arbitration not later than fifteen (15) business days after the Step 3 grievance response.

GEO000348

Grievances that proceed to arbitration shall be processed in accordance with the following procedures and limitations:

A.  Selection of an Arbitrator – Within fifteen (15) business days the Party requesting arbitration will request the Federal Mediation Conciliation Service (FMCS) to supply a list of seven (7) arbitrators. If the two Parties cannot agree on an arbitrator during the review of the original list, a second list of prospective arbitrators may be requested from the FMCS. If the Parties still cannot agree on an arbitrator then the strike method will be used on the second list. The Party requesting arbitration will strike the list first.

B.  Decision of the Arbitrator – The arbitrator shall commence the hearing at the earliest possible agreed to date. It is understood and agreed between the Parties that the arbitrator shall have no power to add to, subtract from, or modify any of the terms of this Agreement. The decision or award of the arbitrator shall be final and binding upon the Company, the Union and the grievant, provided any party may appeal to an appropriate court of law a decision that was rendered by the arbitrator acting outside of or beyond the arbitrator's jurisdiction, pursuant to applicable law.

C.  Arbitration Expense – The arbitrator's fees and expenses, including the cost of any hearing room, shall be shared equally between the Company and the Union. Each Party to the arbitration will be responsible for its own expenses and compensation incurred bringing any of its witnesses or other participants to the arbitration. Any other expenses, including transcript costs, shall be borne by the party incurring such expenses.

12.7   Officers have the right to be present during each step of the grievance process. It is understood between the parties that the Union will act as the representative in question.

12.8   The Union shall have the power to determine whether or not a grievance filed by a member of the Union should be submitted at each step of the grievance process.

12.9   Each dispute shall constitute a separate proceeding unless the question involved is common to more than one dispute, in which case the proceeding may be consolidated, but only with mutual consent of the parties.

12.10   No claim for back wages under this Agreement shall exceed the amount of earnings the Officer would have otherwise earned by working for the Company, less any and all compensation the Officer received from any other source, including unemployment compensation. Under no circumstances will interest charges be included in any award for back pay. In no event may the arbitrator enter a monetary award for any item other than lost wages.

12.11   Nothing contained herein shall prohibit the Company's ability to file and process its own

16

GEO000349

grievance under the procedure outlined above.

12.12  In the event the parties settle any grievance prior to a final and binding determination by an arbitrator, such settlement shall be on a non-precedent setting basis unless the parties affirmatively state otherwise in writing signed by both parties. Evidence of any such non-precedent setting settlements shall not be admissible in any proceedings under this Article, including but not limited to, arbitration hearings.

12.13  In no case shall a local Company representative respond at more than one step of the grievance process as outlined above.

## ARTICLE 13
## UNIFORMS

13.1  Seasonal uniforms and equipment shall be supplied where required by the Company, and replaced as necessary. Uniforms or equipment worn or used by the Officers who are on duty shall be prescribed by the Company, and no deviation from the Company's requirements shall be practiced except when allowed by the Company.

13.2  Uniforms, equipment, and other Company issued items remain the property of the Company and must be returned upon separation if requested by the Company.

13.3  The Company shall supply each Officer with 5 uniform shirts and pants at the time of hire.  In addition, the Company shall supply each Officer with a duty belt and an "all weather" jacket.  Furthermore, the Company shall reimburse Officers up to seventy-five dollars ($75) per calendar year for boots (receipt required).

## ARTICLE 14
## JUST CAUSE

14.1  Except where otherwise provided in this Agreement, where appropriate, the Company will adhere to concepts of Progressive Discipline, which it defines as the corrective process of applying penalties short of dismissal where conduct is of a less serious nature. The nature of discipline should be appropriate to the conduct and need not begin with the least serious disciplinary action. Acceptance of the principle of progressive discipline does not limit the Company's authority to immediately dismiss for serious offenses that cannot be condoned.

14.2  No Officer shall be disciplined or discharged without Just Cause. The Company shall provide the Officer and the Union with a copy of all disciplinary action forms. Any Officer not granted a required security clearance by the Client shall be terminated with no recourse to either the grievance or arbitration procedures set forth in Article 12 of this Agreement.

14.3  The following violations are representative only of the reasons that constitute Just Cause

17

GEO000350

for immediate dismissal. The list of violations below is not an all-inclusive list:

- Proven dishonesty,
- The use, sale, possession or introduction into the facility of contraband,
- Any type of theft,
- Aiding or abetting an escape,
- Insubordination,
- Fighting,
- Being under the influence of illegal drugs or alcohol,
- Leaving a duty post without being properly relieved,
- Inattention to post (sleeping, etc.),
- Sexual and other forms of harassment, in conjunction with the Company's general orders and regulations,
- Unnecessary and/or Excessive Use of Force,
- Failure to respond to an emergency,
- Failure to obey lawful orders,
- Failure to fully and truthfully participate in any facility investigation or attempt to obstruct a facility investigation,
- Refusal to allow a search of themselves and/or their property,
- Falsification of Company or Client records,
- Unauthorized possession of Company, Client or other's property.

14.4    Other disciplinary action will consist of:

Counseling – A discussion between an Officer and his supervisor regarding their violation of a behavioral or performance standard, policy or procedure along with guidance or instructions from the supervisor for correcting the problem. All counseling events will be documented.

Written Reprimand – When counseling was given for a violation and that violation is repeated, or for a more serious offense.

Final Reprimand – The "last chance" for the officer to make immediate and sustained improvement in performance and behavior.

Dismissal – The result of a serious breach of a rule, standard, practice, policy, procedure or as a result of repeated disciplinary violations.

Informal coaching which is defined as instantaneous, verbal correction to minor job performance or behavioral issues are not considered disciplinary actions. As such, these coaching sessions should not be documented on a disciplinary action form. Informal coaching sessions may occur between each of the disciplinary actions listed above (i.e. Counseling, Written Reprimand and Final Reprimand).

To decide on the appropriate action the Company may consider: the seriousness of the Officer's conduct, employment record within the prior year, ability to correct the conduct,

18

actions taken for similar conduct by other Officers, how the conduct affects detainees, the client, the public and other relevant circumstances. At any step in the above process Officers may (at the discretion of the Company) be placed on a Performance Improvement Plan (PIP) as a last attempt to assist the Officer to be successful.

The Officer should be informed of the incident that gave rise to the potential disciplinary action as soon as practical.

14.5    Any Officer who is under investigation by any law enforcement agency; including those for, or charged with, a felony or misdemeanor will be placed on administrative leave without pay pending the outcome of the investigation. If an Officer enters a plea of guilty or nolo contendere to the criminal charges stemming from the arrest, the Officer will be terminated with no recourse to either the grievance or arbitration procedures set forth in Article 12 of this Agreement. If the Officer is found not guilty or the charges are dropped, the Officer will be reinstated with no back pay, but with no loss of seniority.

14.6    Disciplinary actions, excluding statutory claims that have been upheld, will remain in an Officer's personnel file, but cannot be used against the Officer after the expiration of 12 months from the date of the last violation.

14.7    An Officer interviewed concerning a matter that may result in disciplinary action may request a Union representative be present during such interview. Nothing herein shall be construed to compel an Officer to have Union representation present. If an Officer requests Union representation, the Officer will not be required to respond to questions until the representative is present. Once the Union representative is present, questioning may begin and the Officer may confer with the Union representative regarding his responses. Although the Officer may consult with the Union representative related to the issue at hand, the Company requires all interview responses come from the Officer.

14.8    Officers are entitled to meet with the Facility Administrator or his designee to review their personnel file. This review will be scheduled at a mutually convenient time in accordance with the needs of the business or applicable state laws. Information contained in an Officer's personnel file shall be considered confidential. Officers may not request removal of items from the file, but can if they wish add rebuttal statements or additional information related to items contained within the file. Officers may request copies of file documents that bear their signature.

# ARTICLE 15
# SAVINGS CLAUSE

15.1    Should any part of this Agreement, or any portion therein contained be rendered or declared illegal, invalid, or unenforceable by a court of competent jurisdiction, inclusive of appeals, if any, or by the decision of any authorized governmental agency, such invalidation of such part of this Agreement shall not invalidate the remaining portions

GEO000352

thereof. In the event of such occurrence, the parties agree to meet as soon as practical, and if possible, to negotiate substitute provisions for such parts or portions rendered or declared illegal or invalid. The remaining parts and provisions of the Agreement shall remain in full force and effect.

# ARTICLE 16
# MANAGEMENT RIGHTS

16.1   Subject to the express provisions of this Agreement, management's rights include those listed in this Article as well as any rights that are usual and customary.

16.2   The management of the Company' s operations and direction of the working forces, including, but not limited to: establish new jobs; abolish or change existing jobs; assign and change work duties and responsibilities; employ; promote; demote; train; transfer; layoff; recall; discipline, suspend or discharge for Just Cause; determine the number of employees necessary for any operation; determine the number of hours to be worked; schedule hours of work, including starting and quitting times and meal and break times; increase and decrease the work force; establish, change, and maintain performance standards and methods; deploy the workforce within the facility in the manner it considers the most effective and efficient to meet the operational needs; determine the qualifications, efficiency and ability of employees; maintain the efficiency of operations and employees; determine services to be offered; determine the source of supply for all services, goods, or materials; institute technological changes or improvements in operations; use temporary employees from third party providers, as long as it does not result in layoff or reduction of hours of bargaining unit members; transfer operations; decide the number and location of facilities; close a facility or a portion thereof; acquire, sell to or merge with other companies; require the taking of physical, mental, drug, or alcohol tests; require Officers to consent to credit checks; require Officer's complete cooperation in investigation of potential theft or fraud; and make and revise such reasonable rules and regulations in connection with the Company's operations and the conduct and duties of its employees in respect of such operations as are deemed advisable, will be vested exclusively in the company, subject only to such limitations as are specifically set forth in this Agreement.

16.3   The Company need not necessarily exercise rights reserved to it, or if the Company does exercise its reserved rights in any particular way, such will not be deemed a waiver of its right to exercise them in other ways not in conflict with the express provisions of this Agreement. The Company maintains and retains all management rights and the enumeration of management's rights herein shall not be deemed to exclude any other management rights.

16.4   The Company shall not implement any changes to subjects identified as mandatory subjects of collective bargaining pursuant to the guidance of the National Labor Relations Act and its decisions without first bargaining with the Union regarding such matters.

GEO000353

# ARTICLE 17
## EXCUSED/UNEXCUSED ABSENCES and TARDINESS

17.1    The procedure stated herein establishes a "no fault" point system to monitor the attendance of the Officers covered by this Agreement.

17.2    Prompt attendance on the job is an important part of the performance record each Officer builds from the day they are hired. The success of an Officer depends in large measure on how well be performs the job each day. The Company is entitled to a reasonable degree of regularity in the attendance by all Officers, and disciplinary action is proper for failure to adhere to a reasonable attendance standard. The Company will focus particular attention on clear patterns of abuse, such as an unscheduled leave or "calling-out" in conjunction with days off, holidays, or vacations.

17.3    The Company recognizes there may be a reasonable absence due to bona fide sickness or emergency situation, often beyond the control of the Officer, therefore this procedure allows for a number of "occurrences" before discipline is administered. For example, an "occurrence" is a single day of absence or two or more consecutive days of absence.

17.4    Designed to work as a "no fault" procedure with a point system of attendance monitoring, this procedure will be consistently administered. The Officer's immediate supervisor is responsible to coach, guide and/or discipline, as appropriate, Officers who are excessively absent or tardy. Within the procedures and limitations of this Agreement, the Company reserves the right to impose discipline where there is a clear pattern of misuse or intentional abuse.

17.5    A rolling 6-month period is the applicable period of time within which occurrences are counted under the procedure. An Officer's record of points for absenteeism and tardiness occurrences will be tallied, tracked, trended and reported continuously through the Company's information systems. Each individual point will be verified for validity before each disciplinary action is issued.

The following accumulative total points received during the rolling 6-month period are considered thresholds in terms of when disciplinary action may be taken:

> 3 points ---------- Coaching
> 6 points ---------- Counseling
> 8 points ---------- Written Reprimand
> 10 points -------- Final Written Reprimand
> 12 points -------- Dismissal

17.6    Absences for the following reasons will not add points to an Officers record:

A. Use of scheduled vacation time or other scheduled leave time for doctor office appointments or medical procedures, as well as scheduled Long Term Illness time, which has been approved in advance by a supervisor. Note; however, that supervisors will

21

GEO000354

question an Officer's time off when there is an apparent pattern of absences, i.e., going to the doctor every Monday or Friday or at the beginning or end of the Officer's scheduled work week.

B. Other authorized and approved leaves, including paid or unpaid Personal Leave, Jury Duty, Bereavement Leave, Military Leave, Family Medical Leave, Union Leave and any other form of leave required by law.

17.7   Absences for the following will add points to an Officer's record:

Unexcused Absence:  6 points:  An Officer will have an unexcused absence when the Officer fails to call in an absence and show up for a scheduled shift (No Call No Show).

Unscheduled Absence:  2 points:  An Officer who is absent from work and fails to notify their supervisor as soon as possible, less than two (2) hours before their scheduled reporting time is considered to have an unscheduled absence. Officers shall be responsible for providing their expected date of return to work during such notification. Each time an Officer is absent as an unscheduled absence the Officer will receive two (2) points for the unscheduled absence "occurrence". Multiple continuous days of absence for the same reason shall be considered one "occurrence".

Tardiness:  An Officer who will be late to work must notify a supervisor as soon as possible. Officers shall be responsible for providing their expected arrival time during such notification. Late arrivals that were approved in advance by a supervisor, such as for a scheduled doctor office appointment, dental appointment or other scheduled and pre-approved reason will not add points to an Officer's record.

Late Arrival:  1 point:  The following reasons will add points to an Officer's record:  An Officer is considered a late arrival if the Officer arrives at work and clocks in more than seven (7) minutes after the Officer's scheduled reporting time. For example, given the rounding in the timekeeping system, if an Officer is required to begin a shift at 6:45 AM, they would be allowed to clock in no earlier than 6:38 AM and could clock in up to 6:52 AM and either punch would be rounded to 6:45 AM. Those Officers clocking in more than seven (7) minutes after their scheduled time will receive one (1) point.

Exclusions:  Late arrivals and absences that were the result of factors outside of the Officer's control will be handled by the Facility Administrator on a case by case basis. Examples of events outside of the Officer's control include, but are not limited to: medical emergencies, car accidents, unplanned highway closures, sudden severe weather and earthquakes. Examples of events that will not be considered outside of the Officer's control include, but not limited to:  heavy traffic, lack of transportation and weather such as heavy snowfall.

22

GEO000355

In all cases, the Company will follow the requirements of the Family and Medical Leave Act and the Americans with Disabilities Act, as well as any other applicable law.

Early Arrival: 1 point: An Officer is considered an early arrival if the Officer arrives at work and clocks in more than seven (7) minutes before their scheduled reporting time.

17.8 As an incentive for Perfect Attendance Officers have the opportunity to earn two Perfect Attendance Days per year. If an Officer has Perfect Attendance for a six (6) month period between January 1st and June 30th or between July 1st and December 31st, they will receive one personal paid holiday for each period. The holiday must be taken within the six (6) month period following the award. Officers must inform their Supervisor at least two (2) weeks in advance of taking any earned personal holiday.

Perfect Attendance is defined as a six (6) month period with no missed time for sickness or time unpaid. For the purpose of qualifying for this benefit, scheduled vacation days, holidays, jury duty, required military training or bereavement leave will be considered days worked. The following disqualifies an Officer from Perfect Attendance Days; rehired within the award period; out on leave during the period (except Military Leave); worked part-time during the period; or received pay for unscheduled vacation days.

## ARTICLE 18
## JURY DUTY

18.1 Officers are required to provide a copy of the Notice of Jury Service upon receipt. They are required to inform their Supervisor as soon as possible after learning the specific date of service required. Upon presenting documentation of jury service performed, the Company shall reimburse the Officer for each regularly scheduled hour missed at their regular pay rate, to a maximum of ten (10) days in any 12-month period. Transportation fees provided to Officers for serving as a juror shall not be considered as jury duty pay. Officers are expected to return to work if excused from jury duty in time to perform at least four (4) hours of a scheduled work shift.

18.2 Jury duty shall not be considered as time worked for the purpose of computing overtime.

## ARTICLE 19
## BEREAVEMENT LEAVE

19.1 Upon the death of a full-time Officer's immediate family member, the Officer will be granted up to three (3) days leave with pay, not including the Officers regular days off, in order for the Officer to make arrangements for and to attend the funeral.

19.2 For the purposes of this Article immediate family member is defined as an Officers spouse, child, parents, siblings, grandparents and grandchildren, including immediate family members by step or in-law relation.

23

GEO000356

**Page 148**

19.3   Bereavement Leave shall not be considered as time worked for the purposes of computing overtime.

19.4   Upon the death of a qualifying person under Section 19.2, the Facility Administrator or their designee will consider, on a case-by-case basis, requests to extend Bereavement Leave through the use of available vacation time and/or sick leave.

## ARTICLE 20
## HOLIDAYS

20.1   The Company will provide full-time Officers the following ten (10) paid holidays regardless of the day on which the holiday falls:

| | |
|---|---|
| New Year's Day | Labor Day |
| Martin Luther King's Day | Presidents' Day |
| Veterans Day | Memorial Day |
| Thanksgiving Day | Independence Day |
| Christmas Day | Personal Holiday |

20.2   Officers may opt to take their Personal Holiday on any day they are scheduled to work. Whatever day an Officer elects to take as his Personal Holiday, the Officer must notify the shift supervisor a minimum of two (2) weeks in advance of the chosen day.  Should more than one Officer elect the same day off, the Company retains the right to approve the number of Officers that will be allowed to take the day off.  Selection will be made on a first come, first served basis.

20.3   Provided individual Officers have worked any hours during the week the holiday falls, they will receive eight (8) hours of Holiday Pay at their regular straight-time hourly rate. In addition, Officers who work on the actual day a holiday falls will be paid their straight time rate for all hours so worked. Appropriate overtime rules apply to the actual number of hours worked on a holiday or during a week in which a holiday falls. The eight (8) hours of Holiday Pay are not included as hours worked for the purpose of calculating overtime.

20.4   Officers will receive Holiday Pay even if they are on approved paid time off (vacation, jury duty, bereavement leave, etc.)

20.5   Part-time Officers will receive holiday pay based on a prorated basis at the rate of 20% of wages worked the week of the holiday, regardless of the day on which the holiday falls.

## ARTICLE 21
## VACATION

21.1   During the term of this Agreement, the Company shall grant paid vacation to all full-time

GEO000357

Officers based on years of service with the Company. Years of Service is determined by the Officer's anniversary date with the Company.

| Years of Service | Pay Period Accrual | Annual Accrual |
|---|---|---|
| More than one (1) year but less than 5 years | 3.077 hours | 80 hours |
| More than five (5) years but less than 10 years | 4.616 hours | 120 hours |
| More than ten (10) years but less than 15 years | 6.154 hours | 160 hours |
| More than fifteen (15) years | 7.692 hours | 200 hours |

21.2   During the term of this Agreement, the Company will pay a percentage of worked wages in lieu of vacation for part-time Officers as follows:

| Years of Service | % of Worked Wages |
|---|---|
| More than one (1) year but less than 5 years | 6.15% |
| More than five (5) years but less than 10 years | 8.08% |
| More than ten (10) years | 10.00% |

21.3   Up to twenty four (24) hours of unused vacation, not taken within the annual twelve month vacation period, shall be rolled over into the next year's allotment of vacation. Any unused vacation time in excess of twenty four (24) hours shall be paid out.

21.4   Any unused vacation time that has been earned and vested shall be paid at the time of separation from employment with GEO.

21.5   Officers covered under this agreement are also governed by the Service Contract Act (SCA).  The SCA provides for sick leave benefits (pay) through Health and Welfare benefit income (see Article 23 Wages).  In accordance with California Sick Leave, Officers, at their sole discretion, may also use available paid vacation time to cover scheduled and unscheduled absences due to illness or injury.

21.6   If a designated holiday named in this Agreement falls during an Officer's vacation period, such Officer shall be entitled to receive pay for such holiday [eight (8) hours at the Officer's straight time hourly rate in addition to their vacation pay].

21.7   Vacation preferences will be determined as follows:

A. During the month of November a vacation calendar for the following year will be posted in the Officers' break rooms.

B. The vacation calendar will be accompanied by a current union seniority list with a signature line.

C. Officers will select hours of vacation in the order of their seniority. Officers have the option to select their vacation, in part or in full.  Officers may also elect not to select any

GEO000358

vacation at that time. Officers will sign their name to the seniority list and the next senior Officer will be allowed to make their selection.

D. The Company may allow the maximum amount of Officers off for vacation per shift provided it does not interfere with the efficient operations of the facility. With that in mind, the Company will at a minimum award time off for vacation to two (2) Officers per shift at the East building and three (3) Officers per shift at the West building.

E. Subsequent vacation requests will be handled on a first come, first served basis.

F. Every effort will be made to accommodate additional vacation requests per shift at each building.

21.8    Vacation time shall not be considered as time worked for the purpose of computing overtime.

21.9    Except as provided in sections 21.3 and 21.4, Officers entitled to vacation will not be given pay in lieu thereof.

## ARTICLE 22
## 401(k) PLAN

22.1    All Officers are eligible to participate in the Company 401(k) and profit sharing savings plan as may be amended from time to time by the Company to ensure that the benefits are the same for all GEO Group Officers.

22.2    The Company will match 50% of the Officers salary deferrals up to the first 5% of salary deferred (maximum matching contribution is 2.5% of deferred salary).

22.3    The Company's matching contribution will be applied each pay period.

## ARTICLE 23
## WAGES

23.1    Listed below are the hourly rates and the Health and Welfare hourly rate for covered Officers by this Agreement.

A. The rates listed below (Article 23.1 A.) will become effective date of ratification.

| Seniority | Hourly Rate |
|---|---|
| From Date of Hire to End of 6-Month Probation | $16.22 |
| End of 6-Month Probation to 1 year | $17.03 |
| 1 year but less than 6 years | $17.62 |
| 6 years or more | $18.19 |

26

GEO000359

| Health & Welfare | $3.81 |
|---|---|

B. The rates listed below (Article 23.1 B.) will become effective if and when this Article is incorporated by the Client into the Operations and Management Contract (Years 2 and 3 Hourly Rates shall be effective on the anniversary of the effective date of this CBA).

| Seniority | Year 1 Hourly Rate | Year 2 Hourly Rate | Year 3 Hourly Rate |
|---|---|---|---|
| From Date of Hire to End of 6-Month Probation | $16.54 | $16.87 | $17.21 |
| End of 6-Month Probation to 1 year | $17.37 | $17.72 | $18.07 |
| 1 year but less than 6 years | $17.97 | $18.33 | $18.70 |
| 6 years or more | $18.55 | $18.92 | $19.30 |
| Health & Welfare | $4.02 | | |

C. Should Article 23.1 B not be incorporated into the Operations and Management Contract, the parties agree to reopen negotiations. In addition, GEO agrees to provide the UGSOA with written notice verifying that the hourly rates were rejected.

D. Should the Department of Labor increase the Health and Welfare Hourly Rate during the term of this Agreement the Company and the Union agree to reopen negotiations regarding the Health and Welfare Hourly Rate provided for in this Article.

D. Any revised Health and Welfare Hourly Rate will only become effective on the Client Contract Date (i.e. May 27) once each year of the Agreement as incorporated by the Client into the Operations and Management Contract.

23.2    Officers shall receive the Health & Welfare hourly rate (based on 2080 hours per year) as a part of their wages. Officers may elect to voluntarily participate in the Company's benefit plans, the cost of which will be explained in detail to each Officer. Should Officers elect not to participate in the Company's benefit plans the amount of the Health & Welfare hourly rate will continue to be paid directly to the Officer in the form of wages and be reflected on their paychecks. Should an Officer choose to participate in the Company's benefit plans on a limited basis (for example taking dental or vision insurance only) any cost of the plans will be subtracted from the Health & Welfare hourly rate, with the remaining funds continuing to be paid in the form of wages.

## ARTICLE 24
## HEALTH AND WELLNESS BENEFITS

24.1    Effective the first day of the month coincident with or following 30-days of employment, full-time Officers may elect to enroll in:

27

GEO000360

A. The Company's Group Health Insurance Plans, plan with optional family coverage.
B. Flexible Spending Accounts

The company has established and pays the administrative costs related to pre-taxed Medical and Dependent Care Flexible Spending Accounts (FSA). Officers have the opportunity, through pre-taxed payroll deductions, to participate in these FSA programs up to the limits established by law. For additional information Officers should contact their Human Resources Office. For decisions related to income tax considerations, Officers should consult with the IRS or a personal financial advisor.

24.2   Effective the first day of the month coincident with or following 90-days of employment full-time Officers may elect to participate in Company's dental, vision, group life insurance, disability, legal and voluntary benefit plans. Specific information related to these plans is available from the facility Human Resources Department. The terms and conditions of said plans are not subject to the grievance and arbitration procedures established herein.

24.3   The Company reserves the exclusive right to make or modify Health and Wellness benefits at any time during the life of this Agreement. The Company also reserves the exclusive right to modify the choice of service providers.

24.4   The Company shall discuss with the Union any changes or modifications to the Health and Wellness benefits prior to open enrollment. The Union will have the option to offer the Union's benefit plan.

24.5   Health and Wellness Benefits shall not be subject to the grievance procedures set forth in this Agreement.

24.6   Employee Assistance Program

To assist Officers in both work related and non-work related issues, the Company provides an Employee Assistance Program. Program participation may be voluntary or in some instances required by the Company. The provisions of the Employee Assistance Program are not subject to the grievance and arbitration process. Specific information related to the EAP may be found in the facility Human Resource Office and/or GEO Corporate Human Resources. The EAP is available for Officers and their families. All information, whether voluntary or required by management, is strictly confidential.

## ARTICLE 25
## WAIVER OF BARGAINING RIGHTS AND AMENDMENTS TO AGREEMENT

25.1   During the negotiations resulting in this Agreement, the Company and the Union each had the unlimited right and opportunity to make demands and proposals with respect to all proper subjects of collective bargaining; all such subjects were discussed and

GEO000361

negotiated upon; and the agreements contained herein were arrived at after the free exercise of such rights and opportunity.

25.2    This Agreement supersedes any previous agreements, rules, regulations or customs governing the Company, its employees and the Union.

25.3    Any changes in this Agreement, whether by addition, waiver, deletion, amendments or modifications, must be reduced to writing and executed by both the Company and the Union. The Company and the Union shall meet to negotiate these changes prior to their implementation.

## ARTICLE 26
## DRUG AND ALCOHOL TESTING

26.1    The Union collectively and its members individually recognize the sensitive nature of the Company's business. As such, each recognizes that maintaining a drug and alcohol free work place is essential to the safety and security of all Officers, the general public, the inmates and the institution.

26.2    The Union collectively and the members individually agree that the Company has the right to implement policies and procedures related to drug and alcohol testing and that these policies may include provisions for both cause and prevention testing.

26.3    Drug testing includes provisions for testing for Cause and Prevention. Procedures are found in the Adelanto Detention Facility Policy 3.2.6 and GEO Policy #3.2.6 Personnel: Drug Free Workplace.

26.4    When the Company has a "reasonable suspicion" to believe that an Officer is in violation of Company Rules of Conduct related to the use of alcohol or drugs, the Facility Administrator or his designee may require the Officer to submit to an alcohol and/or drug test. Procedures are established in the Adelanto Facility Policy 3.2.6 and GEO Policy #3 .2.6. Personnel: Drug Free Workplace.

26.5    An Officer may refuse to submit to a drug screening or alcohol test. However the Officer shall be warned that such refusal constitutes grounds for immediate dismissal and then be allowed an opportunity to submit to the testing as though the Officer had originally complied with the order.

26.6    The Union collectively and the members individually agree that drug testing policies or regulations of the Company, Client or other regulating authority are subject to review and change. Changes made by the Company, Client or other regulating agencies will be binding on the parties to this Agreement. Changes will be communicated to the Union prior to implementation.

## ARTICLE 27
## MISCELLANEOUS PROVISIONS

29

GEO000362

27.1   The Union recognizes that it is the responsibility of Officers to familiarize themselves and learn all policies and rules established by the Company or its Client, and faithfully report all violations thereof. The Union agrees that Officers shall discharge all duties as assigned to them impartially and without regard to any Union or non-union affiliation of any Officer of the Company or Client, and that failure to do so may be cause for discipline.

27.2   It is understood that no provisions of this Agreement will apply to any temporary supplementary correctional force transferred to work at the facility to maintain contractual obligations to the Client or during emergency situations. Unless the Client exercises its contractual option to assume operation of the facility or Officers are engaged in an adverse job action against the Company, such supplementary force will not result in job loss or in the loss of normal hours to permanent Officers coming under this agreement while the supplementary force is being utilized.

27.3   The Union recognizes the principle of management responsibility and that the Company must furnish satisfactory service in accordance with the demands and directives of the Company's Client(s) and the requirements of the particular job.

27.4   Officers will be paid at the appropriate rate for all required Company Training.

27.5   Union membership insignia shall be authorized to be worn on Company uniforms provided that if the Client objects then such insignia shall be removed when the Company so requests.

27.6   The Company agrees to permit one (1) full time bargaining unit member selected by the Union as the Union Safety Representative to participate in the facility sponsored safety committee. An alternate may be utilized when the primary Union Safety Representative is not available due to illness or vacation or when circumstances require the assistance of an alternate.

27.7   The Company and the Union agree to meet quarterly (more often if necessary) for Labor/Management meetings to share information, discuss issues and improve communications.   This meeting will be no more than two people from each party represented and will not be to discuss grievances.

27.8   This Agreement shall be binding upon the parties hereto, their successors and assigns and no provisions, terms or obligations herein contained shall be affected, modified, altered or changed in any respect whatsoever by the consolidation, merger, sale transfer or assignment of either party hereto or affected, modified, altered or changed in any respect whatsoever by any change of any kind in the legal status, owner or management of either party hereto.

## ARTICLE 28
## DURATION

Except as otherwise provided herein, this Agreement becomes effective on July 3, 2015, and

30

GEO000363

shall continue in force and effect until midnight July 2, 2018, and from year to year thereafter, unless either party receives written notice from the other party, not less than sixty (60) days, nor more than ninety (90) days, immediately prior to the expiration date, of its intention to amend, modify or terminate this Agreement, provided that if the Company shall cease to operate at this site, this Agreement shall automatically terminate and the rights and obligations of both the Union and the Company hereunder, shall automatically cease except with reference to those Officers covered herein shall remain in the employment of the Company for the purpose of performing work arising from the termination provisions of the Company's agreement with the Client, and as to such Officers, this Agreement shall continue in effect until termination of employment of such Officers.

## SIGNATURE PAGE

IN WITNESS WHEREOF, the parties have caused their Representatives to sign this Agreement on July 28, 2015, as full acknowledgement of their intentions to be bound by the Agreement.

Michael Burke                              Date
DHS VP UGSOA

Christopher D. Ryan
VP Employee & Labor Relations

31

GEO000364

# EXHIBIT G

# G-2

# DESERT VIEW MEDIUM COMMUNITY CORRECTIONAL FACILITY AND ADELANTO DETENTION FACILITIES (ADELANTO EAST AND WEST)

## COLLECTIVE BARGAINING AGREEMENT

### Between

## THE GEO GROUP, INC.
## (GEO)

### And

## INTERNATIONAL UNION, SECURITY, POLICE and FIRE PROFESSIONALS OF AMERICA (SPFPA) And its Amalgamated LOCAL 151 (SPFPA)

**Effective:**

**February 25, 2011 - February 24, 2014**

## Table of Contents

| Subject | Page |
|---|---|
| Preamble | 3 |
| Article – 1  Recognition And Purpose | 3 |
| Article – 2  Union Security | 4 |
| Article – 3  Non-Discrimination | 5 |
| Article – 4  Hours Of Work And Overtime | 5 |
| Article – 5  Call-In And Reporting Pay | 9 |
| Article – 6  Leaves Of Absence | 10 |
| Article – 7  No Strike/No Lockout | 10 |
| Article – 8  Company Regulations | 11 |
| Article – 9  Access To The Facility | 12 |
| Article – 10  Check Off/Administrative Fees | 12 |
| Article – 11  Seniority | 14 |
| Article – 12  Grievance And Arbitration | 16 |
| Article – 13  Uniforms | 20 |
| Article – 14  Just Cause | 21 |
| Article – 15  Savings Clause | 22 |
| Article – 16  Management Rights | 23 |
| Article – 17A  Sick Leave/Tardiness (DVMCCF Only) | 24 |
| Article – 17B  Excused/Unexcused Absences (Adelanto East and West Only) | 26 |
| Article – 18  Jury Duty And Witness Pay | 29 |
| Article – 19  Bereavement Pay | 29 |
| Article – 20  Holidays | 30 |
| Article – 21  Vacation | 31 |
| Article – 22  401k Plan | 33 |
| Article – 23  Wages | 33 |
| Article – 24A Company Health Insurance and Benefits (DVMCCF Only) | 34 |
| Article – 24B  Union Health Insurance (Adelanto East and West Only) | 35 |
| Article – 25  Waiver Of Bargaining Rights And Amendments | 37 |
| Article – 26  Outside Employment | 37 |
| Article – 27  Drug Testing | 38 |
| Article – 28  Miscellaneous Provisions | 38 |
| Article – 29  Duration | 41 |
| Signature Page | 42 |
| Appendix – A:  Union Check Off Card | 43 |
| Appendix – B:  Wage Schedule (Desert View MCCF Only) | 44 |
| Appendix – C:  Wage Schedule (Adelanto East and West Only) | 45 |

## PREAMBLE

THIS AGREEMENT is entered into this 3rd day March 2011, by and between The GEO Group, Inc. (GEO), hereinafter referred to as the "Company," and the International Union, Security, Police and Fire Professionals of America (S.P.F.P.A.), and its amalgamated Local # 151 (S.P.F.P.A.), hereinafter referred to as the "Union."

The GEO Group, Inc. manages the Desert View Modified Community Correctional Facility in Adelanto, California under the terms of an operations and management agreement with the California Department of Corrections (CDC), hereinafter referred to as the "Client". As the management agent for the CDC, the terms of this document are governed by the California Penal Code and the California Code of Regulations, Title-15, Administration of Correctional Facilities and the Department Operations Manual. The Adelanto Detention Facilities (Adelanto East and West) are operated under terms and conditions of an operations and management agreement with the City of Adelanto. Operation of these facilities may be governed by regulations of the Department of Homeland Security, Immigration and Customs Enforcement (ICE) or the United States Marshals Service (USMS). As such, all appropriate regulations of these agencies shall be in force.

## WITNESSETH

WHEREAS, the parties have entered into collective bargaining negotiations, which negotiations have resulted in complete agreement between the parties. NOW THEREFORE, it is agreed by and between the Company and the Union as follows:

## ARTICLE 1
## RECOGNITION AND PURPOSE

1.1     The Company and the Union agree to include, by accretion, the new facilities which comprise the Adelanto Detention Facility (Adelanto East and West). It is also agreed that within this Section detention services at certain facilities in San Bernardino County, California and surrounding areas includes Adelanto, California and the Adelanto Detention Facility (Adelanto East and West), therefore, the Company recognizes the International Union, Security, Police and Fire Professionals of America (S.P.F.P.A.) and its amalgamated Local # 151 as the exclusive collective bargaining representative for all full-time and part-time Correctional Officers employed by the Company at the Desert View Modified Community Correctional Facility in Adelanto, California, as defined in the NLRB certification 31-RC-8022 and all full-time and part-time Detention Officers employed at the Adelanto Detention Facilities (Adelanto East and West) and excludes corporals, sergeants, lieutenants, administrators, assistant facility administrators, captains, professional employees and supervisors as defined in the Act.

1.2    For the purpose of this Agreement, the term "Officer" or "Officers" designates only such Officers as are covered by this Agreement.

1.3    It is the intent and purpose of the parties to this Agreement to establish and maintain a relationship built upon mutual trust and respect.  It is recognized that such a relationship can best be achieved by open dialogue, timely resolution of differences, and negotiating in good faith.

## ARTICLE 2
## UNION SECURITY

2.1    All Officers hereafter employed by the Company in the classification covered by this Agreement shall become members of the Union and remain in good standing not later than the thirty-first (31st) day following the beginning of their employment, or the date of the signing of this Agreement, whichever is later, as a condition of continued employment.

2.2    An Officer who is not a member of the Union at the time this Agreement becomes effective shall become a member in good standing of the Union within ten (10) days after the thirty-first (31st) day following the effective date of this Agreement, and for the duration of this Agreement.  Also as a condition of employment, an Officer shall remain a member of the Union to the extent of paying an initiation fee and the membership dues uniformly required as a condition of acquiring or retaining membership in the Union, for the duration of this Agreement.

2.3    Officers meet the requirement of being members in good standing of the Union, within the meaning of this Article, by tendering the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership in the Union or, in the alternative, by tendering to the Union financial core fees and dues, as defined by the U. S. Supreme Court in NLRB v. General Motors Corporation, 373 U.S. 734 (1963) and Beck v. Communications Workers of America, 487 U.S. 735 (1988).

2.4    In the event the Union requests the discharge of an Officer for failure to comply with the provisions of this Article, it shall serve written notice on the Company requesting that the employee be discharged effective no sooner than two (2) weeks of the date of that notice.  The notice shall also contain the reasons for discharge.  In the event the Union subsequently determines that the employee has remedied the default prior to the discharge date, the Union will notify the Company and the Officer, and the Company will not be required to discharge that Officer.

2.5    This Article shall be subject to all applicable state and federal laws.

2.6     The Union agrees to indemnify and save the Company harmless against any claim, suits, judgments, or liabilities of any sort whatsoever arising out of the Company's compliance with the provisions of this Union Security Article.

## ARTICLE 3
## NON-DISCRIMINATION

3.1     The Company has the right to promulgate policies, reporting requirements and procedures regarding equal employment opportunity, discrimination and harassment.  These policies, reporting requirements and procedures will, at a minimum, meet those required by California and/or Federal Laws and Regulations.

3.2     Neither the Company nor the Union shall discriminate against any Officer by reason of the following status: age, sex "except where age or sex is a bona fide occupational qualification", race or ethnic origin, color, national origin, religion, disability, disabled or Vietnam era veteran, political affiliation, marital status, or membership or non-membership in a union, or any other prohibited basis, and in a manner consistent with all applicable laws, regulations and orders.

3.3     The use of any male pronoun in this Agreement is a generic reference.

## ARTICLE 4
## HOURS OF WORK AND OVERTIME

4.1     For payroll purposes the normal workweek shall commence at 0000 hours on Monday and end 2359 on Sunday.  The normal workday shall commence at the start of an Officer's shift and extend for a period of twenty-four (24) hours.  The foregoing is descriptive only; nothing herein shall be construed as guaranteeing any specified number of hours of work or pay per week.  It is understood that the description of a "normal work week" does not describe a pay period or the number of annual pay periods.  The Company, at its sole discretion, will determine the number of annual pay periods based on its payroll system.  The Company will not change an Officer's days off or schedule for the sole purpose of avoiding sixth or seventh day overtime.

4.2     Each Officer will be given a thirty (30) minute unpaid off-duty meal period approximately midway between the start and end of his shift.  The Officer will not be required to perform any duties, whether active or inactive, while eating.  Should the officer be required to perform any duties, whether active or inactive, the affected Officer will be paid for the meal period at the appropriate rate. Officers may also leave the facility for their meal period if they wish after contacting their supervisor.

4.3     Each Officer will be given two (2) ten (10) minute paid rest periods to be taken midway between each one-half (½) of his or her shift

5

**Page 162**

4.4    Officers required to attend a pre-shift briefing will be paid for the time so spent.

4.5    Overtime shall be paid as follows:

    1. One and one-half (1 ½) times the Officer's regular rate of pay shall be paid for all hours worked in excess of eight (8) hours up to and including twelve (12) hours within any given workday (or for all hours in excess of forty (40) hours worked in a single workweek) and for the first eight (8) hours worked on the seventh (7th) day of work.

    2. Double (2x) the Officer's regular rate of pay shall be paid for all hours worked in excess of twelve (12) hours in any workday and for all hours worked in excess of eight (8) hours on the seventh (7th) day of work in any workweek.

    3. To ensure that Officers are paid for all hours actually worked (either regular or overtime hours) the Company will determine the method of collecting and processing time. Officers will be responsible for accurately applying the rules of any such time keeping process implemented by the Company. Any changes in the time keeping process will be provided to the Union within a reasonable time prior to the implementation. The method of time keeping will not be subject to the grievance and arbitration process as set forth in Article-12.

4.6    No overtime work shall be required or permitted, except by direction of the proper supervisory personnel of the Company, or except in cases of emergency where prior authorization cannot be obtained. Officers will be notified as soon as is reasonably possible of the need to work overtime. Officers will be notified of mandatory overtime in a timely manner, preferably two hours in advance, unless an emergency occurs, including "no call, no show."

4.7    The payment of overtime for any hour excludes that hour from consideration for overtime payment on any other basis. There shall be no pyramiding or duplication of premium or overtime pay. In the event more than one premium seems to be due under this Agreement, only the higher premium shall apply.

4.8    In the event of "no-shows", Officers may be held over to the next shift until a replacement is found and the Officer has been properly relieved. Sub-section 4.9, d. of this article will be followed unless a Specialized Skill is necessary to meet operational needs.

4.9    In the event overtime cannot be filled from volunteers, the Company has the right to mandate that Officers work overtime. Mandatory overtime applies to all full-time members of the Officer work force. Part-time Officers may be mandated to work overtime in the event of emergency or other operational need. In an effort to fairly and equitably manage both volunteer and mandatory overtime opportunities, the following process will be adopted.

a.   The Company will prepare and maintain a seniority roster for each shift. This roster will be posted in the Shift Supervisor's Office. The Roster will be arranged in reverse order (least to most seniority).

b.   Officers will have access to and may review the seniority list to review where they fall on the list in relation to other Officers, determine if they may fall into a mandatory category so they can make any necessary outside arrangements, and with the Supervisor, have an opportunity to correct any errors.

c.   At the beginning of each shift overtime will be first offered on a volunteer basis to the Officers on a hold over or early in basis. If there are more volunteers than overtime opportunities, the volunteer with the most seniority will be provided the overtime opportunity. A volunteer call-in list will be available in the Shift Supervisors Office. Those Officers wishing to volunteer on a call in basis may do so by placing their name on the volunteer list. If volunteers are not available on a hold over or early in basis the Shift Supervisor will consult the volunteer call in list.

d.   In the event there are an insufficient number of volunteers and mandatory overtime becomes necessary, overtime mandation will be determined by seniority, beginning with the least senior Officer being mandated first and continuing through the next least senior Officer each day. When an Officer (s) has been mandated to "Hold Over" overtime, if the Company calls in another Officer (s) to relieve the held over Officer(s), the Officer who has been mandated the most will be relieved without regard to seniority. In the event that Officer(s) have been mandated an equal number of times the most senior Officer will be relieved first. An Officer who has volunteered to stay over will be relieved last if a relief is called in.

e.   Should it become necessary to call Officers at home for mandated overtime, the same process of least senior Officer being mandated first and continuing through the next least senior Officer each day. If the supervisor is unable to contact the least senior Officer, they will note the attempt and reason in a written log book and then attempt to contact the next Officer on the list. This log will be made available to shift stewards for the purpose of periodic review and resolution of errors. It is every Officer's responsibility to keep the Company informed of any changes in their address and phone number. The Company is not responsible for Officer's who do not keep them informed of their current contact number (s). Officers may supply a maximum of two contact phone numbers. One phone will be listed as the primary number. Another number (cell phone or other) may also be provided. Supervisors will make their initial call on the primary number provided by the Officer. Officers must provide an accurate primary contact phone number and inform supervisors should this

number change.  A failure to provide changes to primary or secondary phone numbers will result in appropriate discipline.

f.     It is the Company's intention to use "Hold Over" overtime whenever possible in order to balance overtime opportunities between shifts.  The Union recognizes that there may be posts that require specialized skills and in regard to those posts there may be times when strictly following the above overtime equalization process may not be possible.  "Early In" overtime will only be available for specialized posts that require certain Officers' training and skills or in emergency cases.  It is the Company's intention to use "Hold Over" whenever possible to fill vacant posts.

g.     It is the Company's intention to avoid assigning either volunteer or mandatory overtime in error.  Should a volunteer be passed over for an overtime assignment they will be given the next available volunteer overtime assignment.  Should an Officer be mandated to work overtime out of turn, they will be not be considered for mandatory overtime the next time their name comes up to be mandated.  Its only intent is to assist Officers when errors are made.

h.     Supervisors will not receive bargaining unit overtime opportunities unless there are no volunteers, or the mandatory list of officers has been exhausted and/or in emergency situations, including "no call, no show."

*The parties have also acknowledged that by mutual agreement this procedure may be modified from time to time to accommodate our changing environment. Such changes will be reduced to writing and signed by the Company's Corporate office and Union's Regional Vice President.*

4.10   Failure to work mandated overtime will result in appropriate discipline, up to and including discharge.

4.11   Schedule shift swaps are authorized and Officers wishing to swap shifts must complete the Shift Swap Mutual Agreement Form five (5) days prior to the shifts that are to be swapped and are subject to the following conditions:

a.  Each Officer is responsible for reporting to duty on the date or date (s) agreed upon.

b.  The date (s) agreed upon are considered the Officer (s) regular working days.

c.  The agreement only applies to the shift to be worked, not a specific post.

d.  In instances where the swap covers two separate shifts both Shift Supervisors' approval will be required.

    e.  Officers are not authorized to work more than 16 hours in a workday and must have an 8 hour rest period between shifts.

    f.  Approval is at the discretion of the Facility Captain, based upon the needs of the facility.

    g.  Officers shall understand that any failure to cover the date (s) within this mutual agreement may lead to appropriate discipline.

4.12    Part-time Officers not already scheduled to work will be called in, if necessary, by seniority (most senior to least senior).  A part-time seniority list will be maintained in the Shift Supervisor's office.  Part-time Officers will be able to view the Part-time seniority list to see where they fall.  Should a Part-time Officer be called to work and he does not answer the call, the Supervisor will note the lack of response and move to the next most senior Officer on the seniority list.

## ARTICLE 5
## CALL-IN AND REPORTING PAY

5.1    Officers are required to report for work at their scheduled starting times.  Because a failure to report on time can cause delays in filling the requirements for shift coverage, this may cause supervisors to attempt to find replacements and places a hardship on other Officers.  Failing to report to work on time will result in progressive discipline as outlined in Article-14.

5.2    Officers are required to call the on-site Shift Supervisor, a minimum of two (2) hours prior to the start of the scheduled shift, if they are unable to work their scheduled shift.  The failure to call a minimum of 2-hours prior to the start of the shift constitutes a violation and will result in progressive discipline as outlined in Article-14.  Officers who fail to report for duty at least two (2) consecutively scheduled workdays without notifying the Shift Supervisor or higher authority (unless they were prevented from doing so due to circumstances beyond their control) will be considered as having abandoned their position and their employment will be terminated without recourse to the grievance and arbitration procedures set forth in Article-12.

5.3    An Officer who reports for work at his or her regular starting time or has been called in to work and has not been advised either orally or in writing not to report shall receive a minimum of four (4) hours work or four (4) hours pay at the appropriate hourly rate.

5.4    The provisions of Section 5.3 above shall not apply if the Company is unable to advise the Officer not to report or provide the work because of acts of God, fire, snowstorm, flood, power failure, or other conditions or causes beyond the control of the Company.

# ARTICLE 6
## LEAVES OF ABSENCE

6.1   Other than those leaves included in this Article, the Employee Handbook is recognized as the source for specific information for FMLA, Military Leave, Maternity Leave, Jury Duty, etc.

6.2   The Company may grant a temporary leave of absence without pay to Officers for a period of up to thirty (30) calendar days for personal reasons. All leave requests shall be submitted in writing to the Facility Administrator. Upon approval by the Facility Administrator, the Officer will receive a signed copy of the request for their records.  The Facility Administrator is the sole approving authority when considering leave requests.

6.3   Officers on leave shall report their availability for reassignment or return to work to the Facility Administrator or his designated representative, at least forty-eight (48) hours before the expiration of their leave.  Failure to properly notify the Facility Administrator may result in administrative discipline up to and including termination of employment.

6.4   Union Leave: Upon two weeks advance notice, up to three elected delegates of the local will be granted an unpaid leave of absence to attend the General Convention of the International once every five years.  Additionally, upon two weeks advance notice up to three representatives of the local will be granted unpaid leave of absence to attend the Regional Conference held approximately every two and one-half years and to attend any negotiations regarding the Collective Bargaining Agreement.

# ARTICLE 7
## NO STRIKE/NO LOCKOUT

7.1   The parties recognize the sensitive nature of the services provided by the Company to the Client and, therefore, agree that all operations of the Company shall, during the term of this Agreement, continue without interruption.

7.2   Under the term of this Agreement, the Union, its members and employees within the bargaining unit represented by the Union, individually and collectively, will not advocate, encourage, condone, or take part in any strike, sympathy strike, walkout, picketing, stay-in, slowdown, concerted refusal to work, or other curtailment or restricting of the Company's operations or interference with operations in or about the Company's premises, or equipment. The Company and its representatives agree not to engage in a lockout during the term of this Agreement.

7.3   The parties recognize the right of the Company to take such disciplinary action as the Company in its sole discretion determines appropriate, including discharge, against any employee or employees who participate in violation of this Article,

10

whether such action is taken against all of the participants or against only certain participants, and the parties agree that the degree of the disciplinary action taken by the Company will not be considered a grievance or subject to review through the grievance procedure.  It is understood and agreed by the parties that an employee does have the right to file a grievance solely on the issue of whether he did, in fact, violate any provisions of this Article.  Separate grievances may not be joined in arbitration.

### ARTICLE 8
### COMPANY REGULATIONS

8.1    Any rules, regulations or directives (including, but not limited to the California Penal Code, Title 15 of the Code of Regulations and the Department Operations Manual or the Department of Homeland Security Immigration and Customs Enforcement or United States Marshals Service) which are now in effect, or which may be later imposed upon the Company by its Client, or any other Governmental Agency having jurisdiction will apply with equal force and effect to the Officers hereunder.  Officers are also required to adhere to Company Rules and Regulations.

8.2    The Company reserves the right, from time to time, to amend, add to or delete from its Company Rules and Regulations and practices unless such amendment, addition or deletion would violate a specific provision of this Agreement.  Copies of Rules and Regulations so imposed will be made available to the Union upon request.

8.3    The Union shall receive copies of all rules before Officers are disciplined for a violation pursuant to Article-14 of this Agreement.

8.4    Typically all work rules that could result in discipline are contained in the Employee Handbook, the Collective Bargaining Agreement, Post Orders, through internal memoranda or other means, i.e., posted notices, shift briefing information, etc.  Should there be any work rules contained in facility policy, the Company will provide any Officer reasonable access, during non work hours, to all facility policies for which they could be disciplined or that contain information related to their jobs or the Company, except those polices that are considered privileged, confidential or sensitive by the Company, its client or the appropriate American Correctional Association standards.  Officers will not be disciplined for information contained in policies from which they are restricted.

8.5    The Union will be notified at least two weeks prior to, or sooner, of any Company proposed Facility policy, rules or regulation changes.  The Company and the Union agree that occasions may arise where the Company may not be able to give two weeks notice, however the Company will give notice as soon as they become aware of the proposed change (s).

## ARTICLE 9
## ACCESS TO FACILITY

9.1     Duly authorized representatives of the Union shall have reasonable access to the facility to ascertain whether the Agreement is being properly observed, provided that no interview shall be held during rush hours or interrupt operations or disrupt or interfere with the duties of any Officer.  Rush Hours include, but are not limited to, count times, meal periods, major turnouts, shift changes, or other times when there is major inmate or staff movement or during an emergency situation.

9.2     Access to the facility after normal business hours (8:00 AM – 4:30 PM) will require prior approval from the Facility Administrator or his designee.

9.3     It is mutually understood that access to the facility is governed by client rules, and is subject to applicable client restrictions, and these rules and restrictions must be followed.   Any representative of the International Union (or other union representative) requesting access to the facility must obtain proper clearance from the California Department of Corrections.

9.4     The representative of the Union shall contact the Facility Administrator, or his or her designee, then present themselves at the facility and inform the Facility Administrator, or his or her designee, of the circumstances of the visit. To the extent practicable the Union will provide the Facility Administrator with a one (1) week advanced notice before any visit by a representative of the International Union.  The Company and the Union representative shall conduct themselves in such a manner as to carry out the intent and spirit of this Article.

9.5     The Local Union President, or his or her designee, will be allowed to meet with a group of new Officer trainees during the week of orientation.  This shall be for approximately thirty (30) minutes to discuss being a Union member, hand out the Collective Bargaining Agreement, Dues Check-Off Authorization cards and membership application.   Such access cannot be guaranteed on any specific advanced schedule.   The Company will attempt to provide the Union representative with as much advance notice as possible.

## ARTICLE 10
## CHECK OFF/ADMINISTRATIVE FEES

10.1    Subject to the limitations of any state or federal law, the Company agrees to deduct from the first paycheck earned each calendar month by a member of the Union covered by this Agreement, the Union membership dues and initiation fees uniformly levied by the Union in accordance with said Union's constitution and by-laws, of each member of the Union who has in effect at that time proper authorization card executed by the Officer, authorizing the Company to make such deductions.  A minimum of fifteen (15) days prior to the first deduction, the Union will advise the Company of the exact dollar amount due from each Officer.

10.2    All sums collected in accordance with such signed authorization cards shall be remitted by the Company to the Secretary-Treasurer of the Union no later than the fifteenth (15th) of the month subsequent to the month in which such sums were deducted by the Company.

10.3    The check-off authorization card to be executed and furnished to the Company by the Union and the Officers shall be the official Union authorization for check-off of dues, a copy of which shall be attached and made a part of this Agreement as Appendix-A. The Company shall accept no other form, unless the substitute is mutually agreed upon by the parties.

10.4    The Union accepts full responsibility for the authenticity of each check-off card submitted by it to the Company, and any authorizations, which are incomplete or in error shall be disregarded by the Company, and shall be returned to the Union for correction. The Union agrees that upon receipt of proper proof, it will refund to the Officer any deduction erroneously or illegally withheld from an Officer's earnings by the Company, which has been transmitted to the Union by the Company.

10.5    No deduction of Union dues will be made from the wages of any Officer who has executed a check-off form and has been transferred to a job not covered by this agreement or who is not in a pay status.

10.6    Anytime there is a change in the deduction authorization the Company will have a minimum of fifteen (15) workdays to put the change into effect.

10.7    An Officer who has executed a check-off form and who resigns or is otherwise discharged from the employ of the Company shall be deemed to have automatically revoked his or her assignment, and if the Officer is recalled or re-employed, further deduction of Union dues will be made only upon execution and receipt of a new check-off form.

10.8    The Union may assess appropriate "Administrative Fees" upon those Officers who elect not to become members of the Union, but who receive benefit from the negotiation of this Agreement.

10.9    Collection of back dues and/or administrative fees owed at the time of starting deductions of any Officer, and collection of dues missed because of the Officer's earnings were not sufficient to cover payment for a particular pay period, will be the responsibility of the Union, and will not be the subject of payroll deductions.

10.10    Deduction of membership dues and/or administrative fees shall be made, provided there is a balance in the paycheck sufficient to cover the amount after all other deductions authorized by the Officer or required by law have been satisfied. In the event of termination of employment, the obligation of the Company to collect

13

**Page 170**

dues shall not extend beyond the pay period in which the Officer's last day of work occurs.

10.11   The Union agrees to indemnify the Company and hold it harmless against any and all claims, suits or other forms of liability which may be made against it by any party for amounts deducted from wages as herein provided.

## ARTICLE 11
## SENIORITY

11.1   For the first six (6) months worked following successful completion of facility orientation, an Officer shall be regarded as probationary and shall have no seniority or seniority rights whatsoever, and may be disciplined or discharged without recourse to the grievance procedure.  Officers discharged during their probation do not have any rights under this Agreement.  The Company, in consultation with the Union, may extend the probationary period in increments of 30-day blocks for up to a total of 90 additional days for training, retraining, work improvement, and additional evaluation.  The first 30-day extension will be at the Company's discretion.  Subsequent 30-day periods will require agreement by the Union.  The Company shall provide details of any extension of the probationary period in writing.  A copy will be provided to both the officer and the Union.

11.2   Seniority for full-time Officers under this Agreement shall begin on the Officer's date of hire. Seniority of Officers who start work on the same date shall be determined by the lowest of the last four digits of their social security number (SSN), the lower number will be the most senior.  Seniority is defined as the length of continuous service with the Desert View Modified Community Correctional Facility and/or the length of continuous service with the Adelanto Detention Facility (Adelanto East and West) Part-time Officers will have seniority only among other part-time Officers.  In the event of a layoff, Part-time Officers will be laid off before Full-time Officers.  Part-time Officers who go full time will be entered on the Full-time Seniority list in the lowest position regardless of the length of Part-time service.

11.3   Seniority under this Agreement will have no influence on promotions or advancement within the Company.  The benefits of seniority are limited to those specifically mentioned in this Agreement.

11.4   The Company agrees to prepare an updated site seniority list of Officers covered by this Agreement, a copy of which will be furnished to the Union monthly.

11.5   Officers will lose their seniority, and shall be discharged for any of the following:

a.      Is laid off for more than 12-months;

14
**Page 171**

b.    Absent due to illness or injury for more than six (6) months, or length of employment, whichever is less.  Absences taken pursuant to the FMLA, CFRA, FEHA, and/or ADA are exempt under this provision;

c.    Discharged;

d.    Gives a false reason for a leave of absence and/or engages in other employment during such leave;

e.    Fails to meet qualification/re-qualification requirements in accordance with the client and/or other Governmental Agencies regulations having jurisdiction;

f.    Fails to obtain and/or maintain a security clearance;

g.    Fails to return from layoff upon recall as provided below;

h.    If the Officer voluntarily resigns or retires; or

i.    If the Officer is convicted of a felony, thereby being unable to be licensed.

11.6   Layoff and recalls there from shall be affected and considered on the basis of seniority.  Positions requiring "special training and/or skills" will be exempt from the seniority process.

11.7   Laid-off Officers shall have callback rights for a period of twelve (12) months or length of employment whichever is less, and shall retain their accumulated seniority as of the date of layoff.

11.8   In case of re-employment, Officers who have been laid off shall be notified to return to work, at their last known address, in reverse order of lay-off.  The notice will be by certified mail return receipt.  In the event a former Officer so notified fails to report for work within five (5) days after receipt of such notice, his seniority shall be terminated.

11.9   It will be the responsibility of the laid-off Officer to keep the Company notified of any change of address, and current phone number.

11.10  Part-time Officers desiring to go full-time will be given consideration before new Officers are hired.

11.11  An Officer promoted from a bargaining unit position will, should they return to a bargaining unit position, have lost their seniority and will be entered on the seniority list in the lowest position.  In cases where an Officer serves in a position not covered by the bargaining unit in a temporary or acting capacity and returns to the bargaining unit he will return with his seniority intact.  Notice of such temporary assignments will be provided to the Union in advance.

**ARTICLE 12**
**GRIEVANCE PROCEDURE AND ARBITRATION**

12.1    The parties agree that all problems should be resolved, whenever possible, before the filing of a grievance but within the time limits for filing grievances stated elsewhere in this Article, and encourage open communications between the Company and Officers so that resorting to the formal grievance procedure will not normally be necessary.  The parties further encourage the informal resolution of grievances whenever possible.  A grievance is defined as a violation of a specific term or provision of this Agreement.  At each step in the grievance process, participants are encouraged to pursue appropriate modes of conflict resolution. The purpose of this Article is to promote a prompt and efficient procedure for the investigation and resolution of grievances.  This grievance procedure is not intended for complaints of harassment or discrimination as referenced in the Employment Handbook and DVMCCF Policy #1.C.12.

12.2    It is the intent of the parties to first provide a reasonable opportunity for resolution of a dispute through the grievance procedure and arbitration process.  Except as noted below, if prior to seeking resolution of a dispute by filing a grievance hereunder, or while the grievance proceeding is in process, an Officer seeks resolution of the matter in any other forum, whether administrative or judicial, the Company shall have no obligation to entertain or proceed further with the matter pursuant to this grievance procedure.

12.3    An Officer who believes that any provision of this Agreement has not been properly applied or interpreted may present his or her grievance to be settled by the following procedures.  During each step of the grievance procedure the Company has the right to perform a reasonable investigation into the complaint. The investigation may include but is not limited to: conducting interviews, having officers prepare written statements, review records, etc.

In order to advise a grievant, representatives of the local Union may request copies of the information used by the Company to reach its conclusions for any response to a grievance that was filed by bargaining unit members through the Local.  Disclosure of any confidential information relative to individual Officers will require written authorization from the subject Officer(s).  Officers will hold the Company harmless for any information it provides to the Union with the Officer's appropriate authorization.    Information that is not relevant to the grievance in question, is considered privileged and/or confidential by the Company or the Officer in question or that is protected by State or Federal law will not be made available.

a.        Step 1: The aggrieved Officer may present the complaint informally to his or her supervisor.  If resolution is achieved at this informal level, the

16
**Page 173**

matter does not need to be reduced to writing and will be considered closed.

b.      Step 2:  An Officer who believes he or she has an unresolved grievance shall reduce the grievance to writing and present it to the Facility Human Resource Representative within five (5) workdays after the occurrence of the facts giving rise to the grievance.   Human Resources will log the grievance, provide a tracking number and deliver the grievance to the facility Captain within two (2) workdays for response.

The Captain will have five (5) workdays, not to include scheduled days off, after receipt from Human Resources to respond to either an original or amended grievance.   If requested by the aggrieved Officer, a Union Steward may be present at such presentation.

An official grievance will provide (at a minimum) the following information:

1.      The specific terms of the Agreement alleged to have been violated;
2.      A specific description of the grounds of the grievance including names, dates, places and times;
3.      The proposed remedy being sought by the grievant;
4.      The name, mailing address, and signature of the grievant;
5.      Date of submission.

Failure to provide all information on the grievance form (items 1 through 5 above) will be grounds for the return of the grievance to the grievant.  If the grievance is not amended and returned within five (5) workdays, the grievance will be deemed withdrawn.

c.      Step 3:  If the grievance is not resolved in Step 2, the local Union President or his or her designee will request a meeting to discuss the grievance with the Facility Administrator or his or her designee within seven (7) workdays of the denial by the Captain.   The Facility Administrator or his or her designee shall respond in writing within ten (10) workdays of the presentation of the grievance stating his final answer.

d.      If the grievance is not resolved in Step 3, the local Union President or the President's designee, within ten (10) workdays of the denial by the Facility Administrator or his or her designee, may submit the written grievance to arbitration.

e.      Officers have the right, if they so request, to have a Union representative present during each step of the grievance process.   It is understood between the parties that the local Union President, Vice President, Shift Steward or alternate may act as the representative in question.

    f.    As referenced in this Article, workdays do not include Saturday, Sunday, Holidays or scheduled off days.  Scheduled days off apply to both the Officer and the Company Representative.

12.4    Only those grievances which have been processed in strict accordance with the requirements of the above paragraphs and which remain unsettled shall be processed to arbitration in accordance with the procedures and limitations described herein.

12.5    The Union shall have the power to determine whether or not a grievance filed by a member of the Union should be submitted for arbitration.  The time limits set forth in each step of the grievance procedure may be extended by mutual agreement in writing and such extended time limits shall then be considered as applicable to the grievance involved for the purpose of this section.

12.6    The Arbitrator shall be selected from a panel of seven (7) proposed arbitrators, submitted by the Federal Mediation and Conciliation Services.  The party requesting arbitration shall be responsible for contacting the FMCS to obtain the list.  If the two parties cannot agree on an arbitrator during the review of the original list, a second list of prospective arbitrators may be requested from the FMCS.  If the parties still cannot agree on an arbitrator then the strike method will be used on the second list.

12.7    Each dispute shall constitute a separate proceeding unless the question involved is common to more than one dispute, in which case the proceeding may be consolidated, but only with mutual consent of the parties. No grievance filed after the termination of this Agreement shall be arbitrable.

12.8    The arbitrator shall be governed at all times wholly by the terms of this Agreement.  With respect to Article-14 of the Agreement, the arbitrator shall neither add to, subtract from, modify or alter the terms or provisions of this Agreement.  Arbitration shall be confined solely to the application and/or interpretation of this Agreement and the precise issue(s) submitted for arbitration. The arbitrator shall refrain from issuing any statements of opinion or conclusions not essential to the determination of the issues submitted and is prohibited from using any standard not specifically specified in this Agreement, including but not limited to notions of industrial standards.

12.9    No claim for back wages under this Agreement shall exceed the amount of earnings the Officer would have otherwise earned by working for the Company, less any and all compensation the Officer received from any other source, including unemployment compensation.  Under no circumstances will interest charges be included in any award for back pay.  In the event an Officer is awarded back pay as a result of an arbitrator's ruling, deducted from the award will be any amounts received by the Officer for unemployment compensation and interim

earnings, as well as any amounts which could have been earned through reasonable efforts by the employee to mitigate. In no event may the arbitrator enter a monetary award for any item other than lost wages. The Arbitrator shall not have the power to award punitive or exemplary damages, attorney's fees, or any other form of non wage damages.

12.10   Issues of arbitrability shall be separated from the substantive issue(s) and, whenever possible, determined by means of a hearing conducted by conference call. The arbitrator shall have ten (10) work days from the hearing to render a decision on arbitrability. If the issue is judged to be arbitrable, the arbitrator shall then proceed to hear the substantive issue(s) in accordance with Section 12.3d. at a mutually agreeable time.

12.11   Should either of the parties fail to attend the hearing as agreed, the Arbitrator shall be empowered to proceed with the hearing in the absence of either party, and shall be empowered to render a final decision, and award on the basis of only the evidence presented.

12.12   All fees and expenses of arbitration shall be borne equally by the parties. Each party shall bear the cost of preparing and presenting its own case. The party desiring a transcript of the arbitration proceedings shall provide written notice to the other party of its intention to have a transcript of the arbitration made at least one week prior to the date of the arbitration. The party desiring such transcript shall be responsible for scheduling a stenotype reporter to record the proceedings. The requesting party is responsible for the cost of the stenotype reporter and the transcript of the proceedings.

12.13   The decision or award of the arbitrator shall be final and binding upon the Company, the Union and the grievant, provided any party may appeal to an appropriate court of law a decision that was rendered by the arbitrator acting outside of or beyond the arbitrator's jurisdiction, pursuant to applicable law.

12.14   Nothing in this article shall be constructed to circumvent the right of any Officer to take a grievance up with the Company and have same resolved without the intervention of the Union provided the settlement is not inconsistent with any of the provisions of the Agreement, and further provided the Union has been given the opportunity to have a representative present at the time of settlement.

12.15   Any Officer or Union policy grievance not appealed or processed strictly within the time limits and in the manner set forth in each step of the grievance procedure shall be considered settled on the basis of the last answer by the Company. Any grievance step not answered by the Company within the time limits and in the manner set forth in each step of the above procedure may be appealed directly to the next step of the grievance process by the Union at any time within ten (10) work days of the Company's default.

19

**Page 176**

12.16   No grievance shall be filed or processed if it concerns a matter occurring more than five (5) work days before the Company or the affected Officer(s) knew or should have reasonably known that the events would result in the filing of an official grievance.

12.17   It is the specific intention of the parties that the grievance and arbitration procedures set forth herein are the exclusive and sole mechanism for the resolution of any grievances, disputes, disagreements or claims made under or related to this Agreement.

12.18   Nothing contained herein shall prohibit the Company's ability to file and process its own grievance under the procedure outlined above.

12.19   In the event the parties settle any grievance prior to a final and binding determination by an arbitrator, such settlement shall be on a non precedent setting basis unless the parties affirmatively state otherwise in writing signed by both parties.  Evidence of any such non precedent setting settlements shall not be admissible in any proceedings under this Article, including but not limited to, arbitration hearings.

12.20   The Company will provide copies of all disciplinary notices to the affected Officer.

**ARTICLE 13**
**UNIFORMS**

13.1   Uniforms and equipment shall be supplied where required by the Company, and replaced as necessary.  Uniforms or equipment worn or used by the Officers who are on duty shall be prescribed by the Company, and no deviation from the Company's requirements shall be practiced except with the consent of the Company.

13.2   Uniforms, equipment, and other Company issued items remain the property of the Company and must be returned upon separation, or instead the Officer must pay eighty percent (80%) replacement cost for uniform items and pay one hundred percent (100%) of replacement cost of unreturned equipment.

13.3   The following lists those Uniform items provided by the Company which (except where noted) are required to be returned by the Officer at the end of his service:

   a.   Company ID Card and/or insignia
   b.   5-Shirts
   c.   5-Pairs Pants
   d.   1-Belt
   e.   1-Cap (this item need not be returned at the end of service)
   f.   1-Badge

g.     1-Removable Lined All-Weather Jacket
h.    1-Whistle and Chain
i.     1-Name Tag
j.     1-Utility Belt with Radio Holster

## ARTICLE 14
## JUST CAUSE

14.1    Except where otherwise provided in this Agreement, where appropriate, the Company will adhere to concepts of Progressive Discipline, which it defines as the corrective process of applying penalties short of dismissal or long-term suspension where conduct is of a less serious nature.  The nature of discipline should be appropriate to the conduct and need not begin with the least serious disciplinary action.  Acceptance of the principle of progressive discipline does not limit the Company's authority to dismiss for serious offenses that cannot be condoned.  Officers may be suspended without pay during a disciplinary investigation.  Should the officer be reinstated he will receive pay for all lost regularly scheduled time at their regular hourly rate.

14.2    No Officer shall be disciplined or discharged without just cause.  The Company shall notify the Union in writing, that the services of an Officer are no longer desirable, and that he has been disciplined or discharged.  Any Officer not granted a required security clearance or fails to maintain licenses required for the position shall be discharged without recourse to grievance or arbitration procedures.

14.3    The following are representative of the reasons that constitute Just Cause for immediate dismissal:

- Dishonesty,
- The illegal use, sale or possession of narcotics, drugs or alcohol,
- Any type of theft,
- Insubordination,
- Workplace Violence
- Being under the influence of drugs and/or alcohol,
- Leaving a duty post without being properly relieved,
- Inattention to post (sleeping, reading non work related materials, TV, radio, etc.),
- Sexual and other forms of harassment, in conjunction with the Company's general orders and regulations.

14.4    Other disciplinary action will consist of:

- Verbal Counseling, and so noted in the personnel file

- Written Reprimand, and so noted in the personnel file.

21

**Page 178**

- Work Improvement Plan: A plan specifically tailored to improve identified weaknesses in an Officer may be imposed for a period of one (1) to twelve (12) months. During this time, Officers will receive regular feedback from appropriate supervisors. At the end of the designated period, the Officer's suitability for employment will be re-evaluated.

- Suspension: A temporary layoff without pay for serious misconduct or repeated offenses.

- Dismissal: The result of a serious breach of a rule, standard, practice, policy, procedure or as a result of repeated disciplinary problems.

*To decide on the appropriate action the Company may consider: the seriousness of the Officer's conduct, employment record, ability to correct the conduct, actions taken for similar conduct by other Officers, how the conduct affects prisoners, the client and the public and other circumstances.*

14.5    Any Officer arrested for a felony or serious misdemeanor will be placed on leave without pay pending resolution of any criminal prosecution stemming from the arrest.  If the criminal prosecution has not been resolved within 12 months of the arrest; the Officer enters a plea of guilty or nolo contendere to the criminal charges stemming from the arrest; or the Officer is found guilty of the charges stemming from the arrest, then the Officer will be terminated with no recourse to either the grievance or arbitration procedures set forth in Article 12 of this agreement.  If the Officer is found not guilty or the charges are dropped, the Officer will be reinstated with no back pay (unless the charges were initiated by the Company), but with no loss of seniority.   The Company retains the prerogative to review the circumstances surrounding the arrest and based on its findings will take appropriate disciplinary action, if warranted.

14.6    Disciplinary actions, excluding statutory claims that have been upheld, will remain in an Officer's personnel file, but cannot be used against the Officer after the expiration of 12 months from the date of the last violation.

## ARTICLE 15
## SAVINGS CLAUSE

15.1    SHOULD ANY PART OF THIS AGREEMENT, OR ANY PORTION THEREIN CONTAINED BE RENDERED OR DECLARED ILLEGAL, INVALID, OR UNENFORCEABLE BY A COURT OF COMPETENT JURISDICTION, INCLUSIVE OF APPEALS, IF ANY, OR BY THE DECISION OF ANY AUTHORIZED GOVERNMENTAL AGENCY, SUCH INVALIDATION OF SUCH PART OF THIS AGREEMENT SHALL NOT INVALIDATE THE REMAINING PORTIONS THEREOF. IN THE EVENT OF SUCH OCCURRENCE, THE PARTIES AGREE TO MEET IMMEDIATELY, AND IF POSSIBLE, TO NEGOTIATE SUBSTITUTE

PROVISIONS FOR SUCH PARTS OR PORTIONS RENDERED OR DECLARED ILLEGAL OR INVALID. THE REMAINING PARTS AND PROVISIONS OF THE AGREEMENT SHALL REMAIN IN FULL FORCE AND EFFECT.

## ARTICLE 16
## MANAGEMENT RIGHTS

16.1   Subject to the express provisions of this Agreement, management's rights include those listed in this article as well as any rights that are usual and customary.

16.2   The management of the Company's operations and direction of the working forces, including, but not limited to: establish new jobs; abolish or change existing jobs; assign and change work duties and responsibilities; employ; promote; demote; train; transfer; lay off; recall; discipline, suspend or discharge; determine the number of employees necessary for any operation; determine the number of hours to be worked; schedule hours of work, including starting and quitting times and meal and break times; increase and decrease the work force; establish, change, and maintain performance standards and methods; deploy the workforce within the facility in the manner it considers the most effective and efficient to meet the operational needs; determine the qualifications, efficiency and ability of employees; maintain the efficiency of operations and employees; determine services to be offered; determine the source of supply for all services, goods, or materials; institute technological changes or improvements in operations; use temporary employees from third party providers, as long as it does not result in layoff or reduction of hours of bargaining members; transfer operations; decide the number and location of facilities; close a facility or a portion thereof; acquire, sell to or merge with other companies; require the taking of physical, mental, drug, or alcohol tests; require Officers to consent to credit checks; require officers complete cooperation in investigation of potential theft or fraud; and make and revise such reasonable rules and regulations in connection with the Company's operations and the conduct and duties of its employees in respect of such operations as are deemed advisable, will be vested exclusively in the company, subject only to such limitations as are specifically set forth in this Agreement. The Company need not necessarily exercise rights reserved to it, or if the Company does exercise its reserved rights in any particular way, such will not be deemed a waiver of its right to exercise them in other ways not in conflict with the express provisions of this Agreement. The Company maintains and retains all management rights and the enumeration of management's rights herein shall not be deemed to exclude any other management rights.

**ARTICLE 17A**
**(OFFICERS WORKING AT THE DESERT VIEW MEDIUM COMMUNITY**
**CORRECTIONAL FACILITY-ONLY)**
**SICK LEAVE/TARDINESS**

17A.1 The provisions of this article do not apply to the conditions required by State or Federal regulations i.e., FMLA, ADA, California Family Rights Act, California Fair Employment and Housing Act or other governing statutes.

17A.2 <u>Sick Leave</u>

    a.    During the term of this Agreement, full-time and probationary Officers shall, after 90 days of service, accrue four (4) hours of Sick Leave for each month of service not to exceed forty-eight (48) hours per anniversary year of employment. Sick leave is to be used to cover absences necessitated by personal illness or family emergency, and visits to a doctor or dentist in instances where it is impossible to schedule such visits during off duty hours.

    b.    Sick Pay shall be paid at the Officer's straight-time hourly pay rate, eight (8) hours per day and will not be considered as hours worked for the purpose of computing overtime.

    c.    Officers may accumulate and carry over Sick Leave up to 240 hours (30 workdays) from one anniversary year to the next. Officers are not paid for unused Sick Leave when they resign or are discharged.

    d.    As an incentive for non-use of Sick Leave, Officers who have satisfactorily completed their probationary period, can earn one personal leave-day with pay for perfect attendance from January 1st through June 30th and another day from July 1 through December 31st. Personal Leave days must be taken in the 180-day period after it was earned. Entitlement shall begin after completing the first, full six (6) month period described above. The Officer may use an earned personal leave-day anytime during the 6 month period after the date it was earned. The Officer must notify his or her supervisor of his or her intent to take an earned personal leave-day at least 5 days in advance. The use of said earned day shall not affect future accumulation.

    e.    If more than one Officer requests to take a personal leave day and the Company is not able to grant all requests, the Officer with the most seniority will be given preference. It is understood that, based on security concerns, the Company may not be able to grant an Officer's request for personal leave time; however, the Company will make every effort to approve personal leave if possible.

f.      Proof of illness in the form of a doctor's medical certificate shall be required if any Officer is absent for three (3) consecutive workdays or if the illness occurs during an Officer's annual leave.  For absences of less than three (3) days, a doctor's certificate may be required if the Company has reasonable grounds to believe that the officer has been, or is, abusing his Sick Leave privileges as outlined in section (i.) below.   Any misrepresentation will result in discipline as outlined in Article-14.

g.      Unless an emergency occurs which prevents the giving of notice of the utilization of Sick Leave, the facts and circumstances of which may require verification, the Officer shall personally notify the shift supervisor of his or her illness at least two (2) hours before the scheduled beginning of work.  If possible, Officers shall give earlier notice.

h.      Any Officer whose established attendance record or circumstances of any absence are questionable may be required by the Company to produce evidence of illness.

i.      Being ill before or after days off, paydays, company holidays or functions, scheduled vacation days, calendar holidays or other events, will cause Officers to come to the attention of their supervisors who will discuss the issue with them, set expectations for future performance and begin the progressive disciplinary process as outlined in Article-14.   Should an Officer provide to the Company a valid doctor's excuse or documented excuse for an appointment, scheduled appointment or family medical emergency which would otherwise qualify for the use of sick leave, such absences will not be indicative of forming a pattern of abusing sick leave.

j.      Sick leave shall not be allowed in advance of being earned.  In the event an Officer has not earned sick leave or exhausts all sick leave benefits, absences will be recorded as unpaid time and said absences shall be considered unexcused.

k.      The use of Sick Leave shall not be accepted for personal days off or to compensate Officers who miss work for any reason other than those listed in 17.2, a. of this Article.

l.      All absences from work, other than those allowed in this Agreement (sick leave, vacation, jury duty, etc.) will be considered unexcused absences. Unexcused absences will result in disciplinary action, up to and including discharge.

17A.3  <u>Tardiness</u>

    a.    Tardiness is defined as failing to report for duty at the scheduled reporting time within the parameters established by the time keeping system.

    b.    Tardiness will be monitored by supervisors who will take the following actions for violations:

        1.    <u>First Tardy</u>: Supervisors will issue a verbal counseling (noted in personnel file).

        2.    <u>Second Tardy</u>: (within 120-days of the first tardy) Supervisors will issue a Written Counseling and place the Officer on a 120-day <u>Work Improvement Plan</u>.

        3.    <u>Third Tardy</u>: (first tardy after 120-day the Work Improvement Plan began) Supervisors will issue a Written Reprimand.

        4.    <u>Fourth Tardy</u>: (second tardy after the 120-day Work Improvement Plan began). Supervisors will suspend the Officer without pay for five (5) scheduled workdays.

        5.    <u>Fifth Tardy</u>: (third tardy after the 120-day Work Improvement Plan began). Supervisors will suspend the Officer without pay. The Facility Administrator will recommend termination of the Officer through the appropriate corporate review process.

    c.    If at any time after a Work Improvement Plan has been implemented an Officer is tardy free for a period of 120 consecutive days the officer will be returned to the beginning of the process outlined in Section-b.

    d.    The 120-day period represents calendar days and not scheduled workdays.

    e.    The Company reserves the right to discharge Officers who, in its opinion, demonstrate a pattern of abusing this process.

**ARTICLE 17B**
**(OFFICERS WORKING AT ADELANTO DETENTION FACILITY**
**ADELANTO EAST AND WEST ONLY)**
**EXCUSED/UNEXCUSED ABSENCES and TARDINESS**

17B.1  The Company and the Union agree that prompt and consistent attendance is an important part of the performance record each Officer builds from the day they are hired. The success of an Officer depends in large measure on how well he performs the job *each day*. Attendance in a detention environment is essential to providing for the safety and security of the facility and providing the services

required of the Company and the Client.  Officers are expected to work their scheduled shifts and if unable to do so, to follow certain guidelines that will assist their fellow Officers and facility Management to meet contractual post assignment obligations.

17B.2   The processes below allow for a number of occurrences of tardiness and/or unexcused absences before any discipline is administered, because it is recognized that a reasonable amount of absence due to a bona fide sickness or emergency situation is often beyond the control of the employee.  On the other hand, the parties agree that the facility is entitled to a reasonable degree of regularity in the attendance of Officers, and that disciplinary action is proper for failure to adhere to a reasonable attendance standard.  Therefore, procedures contained in this Article will be consistently applied to all Officers.

17B.3   All absences from work, other than those allowed in this Agreement will be considered unexcused absences.  Unexcused absences will result in progressive disciplinary action that could lead to discharge.  Officers will not be required to forfeit Vacation Time to compensate the Company for an unexcused absence.

17B.4   Excused Absences are those absences that have been approved in advance by the Officer's Supervisor.  Examples of an Excused Absence are vacation time, jury duty, bereavement leave, etc.  The provisions of this article do not apply to the conditions required by State or Federal regulations i.e., FMLA, Military Leave, or other governing statutes.

17B.5   An Unexcused Absence is defined as any absence from work that has not been pre-approved by the Officer's Supervisor.  An example of an unexcused absence is calling off a scheduled shift.   A rolling twelve (12) month period is the applicable period of time within which occurrences are counted under this section.  Each separate time an employee is absent is counted as one "occurrence" and the Officer will receive one (1) point for each occurrence.   Consecutive days of absence for the same reason will count as only one "occurrence" except as provided in Section 17.5, e below.  Each time an Officer is tardy will count as one-half (1/2) an occurrence and the Officer will receive one-half (1/2) of a point.

   a.   All absences from work, other than those allowed in this Agreement (vacation, bereavement leave, jury duty, etc.) will be considered unexcused absences.  Any Officer whose established attendance record or circumstances of any absence are questionable may be required by the Company to produce evidence of illness.

   b.   Unless an emergency occurs which prevents the giving of notice that the Officer is unable to work his scheduled shift, the facts and circumstances of which may require verification, the Officer shall personally notify the Shift Supervisor at least two (2) hours before the scheduled beginning of his shift.  If possible, Officers shall give earlier notice.

    c.  If any Officer is absent for three (3) consecutive workdays or if the illness occurs during an Officer's annual leave, proof of illness in the form of a doctor's medical certificate shall be required.  For absences of less than three (3) days, a doctor's certificate may be required if the Company has reasonable grounds to believe that the Officer has been, or is, abusing this process.  Any misrepresentation will result in discipline as outlined in Article-14.

    d.  Patterns of unexcused absences, such as calling in before or after: days off, paydays, company holidays or functions, scheduled vacation days, calendar holidays or other events, will cause Officers to come to the attention of their supervisors who will discuss the issue with them, set expectations for future performance and begin the progressive disciplinary process as outlined in Article-14.

    e.  As noted in Article 5, Section 5.3 above, any Officer who is absent for a period of two (2) consecutive days without notifying their Supervisor or higher authority will be considered as having abandoned their position and their employment will be terminated.

17B.6  Tardiness is defined as failing to report for duty at the scheduled reporting time within the parameters established by the time keeping system.

17B.7  Unexcused Absences and Tardiness will be monitored by the Officer's Supervisor in conjunction with the facility Human Resources or Payroll personnel.

17B.8  The following <u>accumulative total points received during any rolling 12-month period</u> will result in disciplinary action as described below:

> 2 Points...........................................................First Warning -Verbal
> 4 Points................................................... Second Warning - Written
> 6 Points...................................................................Final Reprimand
> 8 Points.............................................................................Dismissal

For example, if an employee receives two (2) Points, the employee will be issued a Verbal Counseling.  When the employee receives two (2) additional Points, for an accumulated total of four (4) Points, the employee will receive a Written Reprimand.  (Each two (2) additional points during any rolling 12-month period will result in the next disciplinary step.)

17B.9  The Company reserves the right to discharge Officers who, in its opinion, demonstrate a continuing pattern of abusing this process.

17B.10 As an incentive for Perfect Attendance Officers have the opportunity to earn two Perfect Attendance Days per year.  If an Officer has Perfect Attendance for a six (6) month period between January 1st and June 30th or between July 1st and

December 31st, they will receive one personal paid holiday for each period. The holiday must be taken within the six (6) month period following the award. Officers must inform their Supervisor at least two weeks in advance of taking any earned paid personal holiday. Perfect Attendance is defined as having no Unexcused Absences or Tardiness.

## ARTICLE 18
## JURY DUTY AND WITNESS PAY

18.1    Officers are required to provide a copy of the Notice of Jury Service upon receipt. They are required to inform their Supervisor as soon as possible after learning the specific date of service required. Upon presenting documentation of jury service performed the Company shall reimburse the Officer for each regularly scheduled hour missed. The Officer will receive his straight-time hourly pay rate, up to eight (8) hours per scheduled workday missed to a maximum of ten (10) days in any 12-month period. Transportation fees provided to Officers for serving as a juror shall not be considered as jury duty pay. Officers are expected to return to work if excused from jury duty in time to perform at least four (4) hours of a work shift.

18.2    If an Officer, while serving as an Officer for the Company, is called as a witness for the Company, the Client or for the prosecution for a crime involving a work related incident, the Officer (unless he is the defendant in the case at question) will be compensated for all time so served at the appropriate rate.

18.3    Jury duty shall not be considered as time worked for the purpose of computing overtime.

18.4    Witness pay, as defined in Section 18.2, will be considered as time worked for the purpose of computing overtime.

## ARTICLE 19
## BEREAVEMENT PAY

19.1    Upon the death of a:

- Parent,
- Spouse,
- Spouse's parent,
- Child,
- Step parent,
- Step-child,
- Child's spouse,
- Grandchild,
- Grandparent,
- Brother or sister, or

- Other person, as designated by appropriate statute,

of a full-time non-probationary Officer, the Officer will be granted up to three (3) days leave with pay, not including the Officer's regular days off, in order for the Officer to make arrangements for and to attend the funeral. The Officer is required to provide a newspaper clipping, death certificate, funeral program or other form of validation.

19.2    Bereavement Pay shall not be considered as time worked for the purposes of computing overtime.

19.3    Upon a death qualifying under Section 19.1, the Facility Administrator, or his or her designee, will consider, on a case-by-case basis, requests to extend Bereavement Leave through the use of available vacation time or approved GEO Leave.

**ARTICLE 20**
**HOLIDAYS**

20.1    The Company will provide full-time Officers the following ten (10) paid holidays regardless of the day on which the holiday falls:

| | |
|---|---|
| New Year's Day | Labor Day |
| Martin Luther King's Day | Veteran's Day |
| President's Day | Thanksgiving Day |
| Memorial Day | Christmas Day |
| Fourth of July | Officer's Personal Day* |

*Officers are required to notify their shift supervisor 2 weeks prior to their choice of day they intend to take their personal holiday.

20.2    Officers may opt to take their personal holiday on any day they are scheduled to work (e.g., the actual day of their birthday, the actual birthday of their spouse or another family member, the actual day of their anniversary, or another day of personal significance to the particular officer). Whatever day an Officer elects to take as his or her personal holiday, the Officer must still notify the shift supervisor 2 weeks in advance of the chosen day. Should more than one Officer select the same day off, the administration retains the right to approve the number of Officers that will be allowed to take the day off. Selection will be made on a first come, first served basis.

20.3    Officers scheduled to work and those not scheduled but who work a listed holiday will be paid at their regular hourly rate for all hours worked on the holiday, plus eight (8) hours of Holiday Pay at their regular straight-time hourly rate. Appropriate overtime rules apply to the actual number of hours worked on a

holiday or during a week in which a holiday falls.  The eight (8) hours of Holiday Pay are not included as hours worked for the purpose of calculating overtime.

20.4    Officers in an active payroll status who are not scheduled to work and who do not work on a listed holiday will be paid eight (8) hours of Holiday Pay at their regular straight-time hourly rate.

20.5    An Officer scheduled to work a holiday, and who does not work, will forfeit Holiday Pay, and may otherwise be subject to disciplinary action consistent with sick leave or absences as noted in applicable Article 17.

20.6    Hours paid under section 20.3 above will not be considered as hours worked for the purpose of computing overtime.

### ARTICLE 21
### VACATION

21.1    During the term of this Agreement, the Company will provide paid vacation for full-time, Officers as follows:

| Years Service | Pay Period Accrual | Annual Accrual |
|---|---|---|
| 1.  Less than 5 years | 3.077 Hours | 80 Hours |
| 2.  Greater than 5 but less than 10 years | 4.616 Hours | 120 Hours |
| 3.  Greater than 10 years | 6.154 Hours | 160 Hours |

21.2    Officers accrue vacation time every pay period beginning upon their date of hire (also referred to as their anniversary date).

21.3    Officers are encouraged to take vacation time within the twelve (12) month period following each anniversary year of employment.  Officers may accrue vacation up to a maximum of one hundred twenty (120) hours in excess of their annual vacation benefit.  Officers working at Adelanto East and West will not be allowed to accrue or carry over vacation time from one anniversary year to the next and must be paid for any unused vacation time at the end of each anniversary year.

21.4    Unused vacation that has been earned and vested shall be paid at the time of separation from employment with GEO in accordance with the provisions of state law.

21.5    If a designated holiday named in this Agreement falls during an Officer's vacation period, such Officer shall be entitled to receive pay for such holiday [eight (8) hours at the Officer's straight time hourly rate in addition to their vacation pay].

21.6    Vacation preferences will be determined as follows:

31

**Page 188**

a. Officers will select their preference for vacation based on seniority within their shift during an open selection period from January 1st through January 15th each year. Officers should be prepared to submit their request on January 1st. Generally accrued vacation time should be taken in 8-hour segments, however Officers may use accrued vacation time in as little as 1-hour segments if they so chose. Officers may take accrued vacation in weekly blocks up to and including the number of weekly blocks accrued in one year. Upon seven (7) days advanced written notice to the payroll clerk Officers may choose to receive vacation pay prior to the start of their approved vacation time.

b. Employees filing their vacation requests during the January 1st through January 15th will be schedule by seniority. If more vacation requests than are allotted are received for any period of time seniority selection will continue until all vacation is scheduled.

c. The Company will attempt to meet work requirements in accordance with the vacation schedule. Failing in this, the Company will designate those employees whose services cannot be spared on a reverse seniority basis.

d. Officers who are entitled to more than two weeks of vacation will be allowed a second round selection period from January 15th to January 31st.

e. An Officer who elects not to make a selection during the open selection period or who has not earned vacation time by the end of the first open selection period may choose their vacation time from the remaining available dates on a first come first served basis.

f. If an Officer changes shifts on an involuntary basis he will be allowed to retain his preferred vacation time. In these cases should the Officer's days off change the Company will make every attempt to adjust his vacation days with his new days off. Should an Officer change shifts on a voluntary basis he will be required to select his vacation from the remaining available dates.

g. The Company shall approve the time an Officer takes his vacation. Once vacation time has been approved, it is not the intent of the Company to deny vacation except in cases of emergency.

h. Approval of vacation time requires a minimum of two weeks prior notice from the Officer.

21.7 Vacation time shall not be considered as time worked for the purpose of computing overtime.

21.8 Except as provided in sections 21.3 and 21.4, Officers entitled to vacation will not be given pay in lieu thereof.

32

**Page 189**

## ARTICLE 22
## 401(k) PLAN

22.1   The Company shall provide a 401(k) Plan for all eligible Officers under the terms and conditions specified in the plan booklet. The provisions of said plan shall be no less than those in effect as of the date of this Agreement. Officers may elect to participate in said Plan on a voluntary basis. The terms and conditions of the Plan are not subject to the grievance or arbitration process.

22.2   On an annual basis, the Company agrees to match 50% of an Officer's contribution up to a maximum 5% of his annualized pay into the 401K plan. Officers are eligible for the Company match upon enrollment in the plan and with the first pay period after enrollment papers have been processed. This does not limit an Officer's contribution to the 401K. Officers may elect to contribute any percentage of their base pay to the Plan up to any specified legal limitations. However, the 50% Company match is limited to the first 5% of Officers contributions.

22.3   Should the plan benefits be increased over the life of the Agreement the Company will provide any increased contributions to the Officers covered by this Agreement.

## ARTICLE 23
## WAGES

23.1   Officers working at the Desert View Medium Community Correctional Facility shall receive the minimum hourly rates of pay on the dates indicated, as outlined in Appendix-B.

23.2   Officers working at the Adelanto Detention Facility (Adelanto East and West) shall receive the minimum hourly rates of pay on the dates indicated, as outlined in Appendix-C

23.3   The wage rates outlined in Appendix-B of the Agreement will be effective February 25, 2011.

## ARTICLE 24A
## FOR OFFICERS WORKING AT THE DESERT VIEW COMMUNITY CORRECTIONAL FACILITY
## HEALTH AND BENEFIT PLANS

24A.1  For the duration of this Agreement the Company shall, at a minimum, provide and maintain all health and benefit plans as those in place on the effective date of this Agreement.

24A.2  The Company reserves the exclusive right to make or modify health benefits provided by its health benefit plan at any time during the life of this Agreement. The Company also reserves the exclusive right to modify the choice of service provider for health care.

24A.3  Health Insurance and Company Benefits shall not be subject to the grievance procedures set forth in this Agreement.

24A.4  Health Insurance, including dental and vision plans, is provided on a cost shared basis between the Company and the Officers.  Officers should consult with Human Resources to determine the choice of plans, plan coverage and the associated costs.  These plans also make available spouse and/or dependent coverage.

24A.5  In addition to Health Insurance, Company Benefits Also Include

   a.  Basic Life Insurance and AD&D Insurance – The Company will provide basic life and AD&D insurance up to 1X the Officer's Wages to a maximum of $30,000.00 at no cost to the Officer.  Officers may purchase additional life insurance up to a maximum of $250,000.00.  Officers may also purchase Spouse and Dependent life insurance (see Human Resources for qualifications and limitations.

   b.  Short-term disability up to 60% of pay to a maximum weekly benefit of $1,000.00.  The cost of short term disability is split 50%/50% between the Company and the Officer

   c.  Flexible Spending Accounts: The Company has established and pays the administrative costs related to pre-taxed Medical and Dependent Care Flexible Spending Accounts (FSA).  Officers have the opportunity, through pre-taxed payroll deductions, to participate in these FSA programs up to the limits established by law.  For additional information Officers should contact their Human Resources Office.  For decisions related to income tax considerations, Officers should consult with the IRS or a personal financial advisor.

34

d. Employee Assistance Program: To assist Officers in both work related and non-work related issues, the Company provides an Employee Assistance Program. Program participation may be voluntary or in some instances required by the Company. The provisions of the Employee Assistance Program are not subject to the grievance and arbitration process. Specific information related to the EAP may be found in the facility Human Resource Office and/or GEO Corporate Human Resources. The EAP is available for officers and their families. All information, whether voluntary or required by management, is strictly confidential.

e. Participation in the Company's 401K Retirement Plan (see Article 22 for details).

## ARTICLE 24B
## FOR OFFICERS WORKING AT THE ADELANTO DETENTION FACILITY
## (ADELANTO EAST AND WEST)
## HEALTH INSURANCE AND COMPANY BENEFITS

24B.1 After the Adelanto Detention Facility (Adelanto East and West) has been opened and operational for a minimum of 90 days, Officers will be given the opportunity to vote to accept the Union's Health Insurance and Benefits Plans or to remain under the Company's Health and Benefits Plans. Should Officers choose to participate in the Union's Health Insurance and Benefits Plans, all Officers at Adelanto East and West will no longer be eligible to participate in the Company Health and Benefits and will be transitioned to the Union's Plans at the first open enrollment date following the vote (currently expected to be November 1, 2011). This vote has no effect on Officers working at the Desert View Medium Correctional Facility.

24B.2 Should Officers at the Adelanto Detention Facility (Adelanto East and West) vote to participate in the Union's Health Insurance and Benefits Plans the following will be in effect:

a. The Company agrees to recognize the following Health and Welfare benefit rate, unless the prevailing Department of Labor Wage Determination lists a higher rate, then that rate will be in force.

**Effective February 18, 2011**          **$3.50 per hour**

b. The Company agrees to reopen negotiations for Health and Welfare benefits and hourly contribution increases annually provided that the Union makes a request to reopen negotiations at least sixty (60) days prior to the beginning of each contract year.

c. Effective November 1, 2011, the appropriate hourly Health and Welfare monies will be forwarded to the Union's Third Party Administrator no less

than five (5) working days after each payday. It is the Union's responsibility to notify the Company of the name of the Union's Third Party Administrator and any changes relative to it and provide a file with the names of the Officers and the deduction amounts prior to each payday. Health and Welfare monies are only to be used for medical, dental, life, vision, disability, supplemental insurance and any related Officer benefit. All bargaining unit Officers will be enrolled into the Union's Health and Welfare plan.

d. The Company's responsibility under this article is the withholding and forwarding to the Union or its designated Third Party Administrator Health and Welfare monies plus any additional funds deducted as authorized by the Officer, and prescribed under Section f. below. The Company must be provided with necessary documentation from said Officer, confirming Officers withholding election. The Union will be responsible for the administration of its health plan benefits and any other supplemental benefits provided to the Officers through the Union. The Company will assist with distributing enrollment materials to new hires and submitting completed forms to the Third Party Administrator.

e. Subject to the conditions and particulars listed above, any additional or required Officer contributions for health insurance coverage and/or any other supplemental benefit offered by or through the Union will, at the Officer's option, be deducted by means of a payroll deduction. The Company must be provided with the necessary documentation to confirm such Officer election.

f. As a condition of the Company being responsible for withholding and forwarding all such monies for any Officer covered under this agreement and eligible for such contribution, all such Officers must complete an authorization form, which authorizes the Company to deduct any and all contributions made for said Officers. The Union or its Third Party Administrator will provide a file of such deductions prior to each payday. Such authorization shall specify amounts to be deducted from the Officer's paycheck. For any and all error(s) relative to such contributions, said errors meaning errors made by the Officer in completing any forms, the responsibility for said error shall be the Officer's. For any and all periods when the Officer was ineligible (ineligible Officers are those who are not on active status), the Union shall have the right to recover such contributions from the Officer.

g. To enable the Union benefit consultant to go to market in an attempt to improve member's health benefits, the Company agrees to provide the necessary data for the benefit consultant to obtain quotes. This will include a census of all bargaining unit Officers, prior and current plan designs/rates, and their claims experience for the prior 12 months. The Company also agrees to supply the Third Party Administrator with a list of new hires each month. Also to be included are Officers that have terminated employment, Officers on

leave, and any changes of status including changing from part-time to full-time, full-time to part-time and/or promotions into management.  The list is to have name, status change date (hire, term, leave, promotion/demotion, full-time or part-time status, date of birth, and social security number or Officer ID Number).

## ARTICLE 25
## WAIVER OF BARGAINING RIGHTS AND AMENDMENTS TO AGREEMENT

25.1    During the negotiations resulting in this Agreement, the Company and the Union each had the unlimited right and opportunity to make demands and proposals with respect to all proper subjects of collective bargaining; all such subjects were discussed and negotiated upon; and the agreements contained herein were arrived at after the free exercise of such rights and opportunity.

25.2    This Agreement supersedes any previous agreements, rules, regulations or customs governing the Company, its employees and the Union.  The parties agree that they will not be bound by any past understandings or practices adopted by them or by other companies in the Company's industry unless those understandings or practices are agreed to in writing or incorporated in writing in the terms of this Agreement.  Arbitration decisions and grievance procedure settlements rendered or reached concerning any other companies in the Company's industry shall not be considered as precedent under this Agreement and cannot be introduced as evidence or received into the record of any grievance proceeding or arbitration conducted under this Agreement.

25.3    Any changes in this Agreement, whether by addition, waiver, deletion, amendments or modifications, must be reduced to writing and executed by both the Company and the Union.

## ARTICLE 26
## OUTSIDE EMPLOYMENT

26.1    All Officers employed at the facility must obtain written approval from the Facility Administrator prior to becoming committed to Secondary Employment.  Such approval will not be unreasonably withheld nor will it be arbitrary or capricious.  Secondary Employment must not interfere with required duties or expectations, directly or indirectly create a conflict of interest or a situation that would be prohibited by State or Federal Law.  Officers who are approved for Secondary Employment must advise their secondary employer that they (the Officer) are expected to respond without delay to emergency situations that occur at the Facility.

26.2    Any Officer who violates any provision of this Article may be subject to discipline.

## ARTICLE 27
## DRUG AND ALCOHOL TESTING

27.1   The Union collectively and its members individually recognize the sensitive nature of the company's business.  As such, each recognizes that maintaining a drug and alcohol free work place is essential to the safety and security of all Officers, the general public, the inmates and the institution.

27.2   The Union collectively and the members individually agree that the Company has the right to implement policies and procedures related to drug and alcohol testing and that these policies may include provisions for both cause and prevention testing.

27.3   Drug testing includes provisions for testing for Cause and Prevention.  Procedures are found in GEO Policy #3.2.6 Personnel, Drug Free Workplace.

27.4   When the Company has a "reasonable" suspicion to believe that an Officer is in violation of Company Rules of Conduct related to the use of alcohol or drugs, the Facility Administrator or his designee may require the Officer to submit to an alcohol and/or drug test.   Procedures are established in GEO Policy #3.2.6. Personnel: Drug Free Workplace.

27.5   An Officer may refuse to submit to a drug screening or alcohol test.  However the Officer shall be warned that such refusal constitutes grounds for immediate dismissal and then be allowed an opportunity to submit to the testing as though the Officer had originally complied with the order.

27.6   The Union collectively and the members individually agree that Company, Client or other regulating authority drug testing policies or regulations are subject to review and change.  Changes made by the Client or other regulating agencies will be binding on the parties to this Agreement.

27.7   Changes made by the Company will be negotiated with the Union prior to implementation.

## ARTICLE 28
## MISCELLANEOUS PROVISIONS

28.1   The Union recognizes that it is the responsibility of Officers to familiarize themselves and learn all policies and rules established by the Company or its client, and faithfully report all violations thereof.  The Union agrees that Officers shall discharge all duties as assigned to them impartially and without regard to any Union or non-union affiliation of any Officer of the Company or client, and that failure to do so may be cause for discipline.

28.2    It is understood that no provisions of this Agreement will apply to any temporary supplementary correctional force transferred to work at the facility to maintain contractual obligations to the client or during emergency situations.  Unless the Client exercises their contractual option to assume operation of the facility or Officers are engaged in an adverse job action against the Company, such supplementary force will not result in job loss, or in the loss of normal hours to permanent Officers coming under this agreement while the supplementary force is being utilized.

28.3    The Union recognizes the principle of management responsibility, and that the Company must furnish satisfactory service in accordance with the demands and directives of the Company's client and the requirements of the particular job.

28.4    The Company shall provide a Bulletin Board for use by the Union with the understanding the Union shall not post nor distribute any letters, handbills, or notices etc., elsewhere on the site.  Bulletin Board postings shall not contain any partisan political literature, offensive or derogatory language, signs or symbols related to the Company, the Client, visitors, other staff or any other individual or organization.  Violation by the Union may result in the loss of privilege.  Bulletin Board postings will be limited to:

   a.    Notices of Recreational-Social Events
   b.    Notice of Union Elections
   c.    Notice of Results of Union Elections
   d.    Notice of Union Meetings
   e.    Notices of Other "Official" Union Business

28.5    Officers are entitled to meet with the Facility Administrator or his designee to review their personnel file.  This review will be scheduled at a mutually convenient time in accordance with the needs of the business or applicable state laws.  Information contained in an Officer's personnel file shall be considered confidential.  Officers may not request removal of items from the file, but can if they wish add rebuttal statements or additional information related to items contained within the file.  Officers may request copies of file documents that bear their signature.

28.6    The Union may designate one Officer for each shift to act as its Shift Steward. Each shift may have one (1) alternate, who shall function as the Shift Steward only when the regular Shift Steward is absent or unavailable.  The local Union will keep the Company currently advised in writing of the identity of the Shift Stewards and their alternates, as well as the identity of the local Union officials. Only Officers named by the local Union as currently holding any of the above positions will be recognized by the Company as representing the Union.

28.7    The Company and the Union agree that only those Officers in non-probationary, non-disciplinary and active employment status may act as representatives under

the terms of this Agreement. Exemptions are the Local Union President and Officers of the International Organization.

28.8  An Officer interviewed concerning his discipline may request a Union representative be present during such interview. Nothing herein shall be construed to compel an Officer to have Union representation present. If an Officer requests Union representation, the Officer will not be required to respond to questions until the representative is present. Once the Union representative is present, questioning may begin and the Officer may confer with the Union representative regarding his responses. Although the Officer may consult with the Union representative related to the issue at hand, the Company requires all interview responses come from the Officer.

28.9  The Union recognizes that representation of Officers is not meant to circumvent the normal relationship between supervisor and Officer as it pertains to discussions and counseling. The right to Union representation shall not apply to conversations between an Officer and the supervisor for the purpose of giving instructions concerning work performance, providing training or retraining or non-disciplinary correction of work habits or techniques.

28.10  No Shift Steward, alternate Shift Steward, or any other local Union officer may leave an assigned duty post or work assignment to engage in representation of Officers during a pre-disciplinary investigatory interview or disciplinary proceeding without first notifying and receiving authorization from the Shift Supervisor. The Company shall not unreasonably withhold such authorization.

28.11  No Shift Steward, alternate Shift Steward or other Union officer will be allowed to leave an assigned post without proper relief.

28.12  No Shift Steward, alternate Shift Steward or other Union officer shall cause an Officer to leave their assigned post without first notifying the Shift Supervisor and receiving proper authorization.

28.13  Officers will be paid at the appropriate rate for all required Company training.

28.14  Whereas the parties to this Agreement realize that it is always best to resolve issues as they arise and in the spirit of cooperation and mutual respect, meetings between the Union and the Company are encouraged. These meetings may be held at least once per month if requested by either party and at a time and place of mutual agreement. The purpose of the meetings is to discuss issues of mutual concern. The Union and the Company may be represented by no more than two representatives each. The parties will exchange a written proposed agenda for the meetings within five (5) working days before the scheduled meeting. The attendees of the Labor/Management meetings shall have no power to change, alter, modify or amend this Agreement. It is understood that these meetings are not intended to supplant the grievance and arbitration procedures as set forth in

this Agreement.  These meetings may be discontinued at any time during the life of this Agreement with written notice by either party to the other.

**ARTICLE 29**
**DURATION**

Except as otherwise provided herein, this Agreement becomes effective on February 25, 2011 and shall continue in force and effect until midnight February 24, 2014 and from year to year thereafter, unless either party receives written notice from the other party, not less than sixty (60) days, nor more than ninety (90) days, immediately prior to the expiration date, of its intention to amend, modify or terminate this Agreement, provided that if the Company shall cease to operate at this site, this Agreement shall automatically terminate and the rights and obligations of both the Union and the Company hereunder, shall automatically cease except with reference to those Officers covered herein shall remain in the employment of the Company for the purpose of performing work arising from the termination provisions of the Company's agreement with the Client, and as to such Officers, this Agreement shall continue in effect until termination of employment of such Officers.

41

Mar 30 11 '14'p     O L williams Const                    760-951-0991          p.1

IN WITNESS WHEREOF, the parties hereto have hereunto set their respective hand and seals, and caused this instrument to be clearly executed.

FOR THE COMPANY:                    FOR THE UNION:
The GEO Group, Inc. (GEO)           International Union, Security, Police and
                                    Fire Professionals of America (SPFPA)

BY: _____         BY: _____

TITLE: _____         TITLE: _VP Region 3_____

DATE: _3-20-2011_____          DATE: _3-20-2011_____

                                    And it's Amalgamated Local #151
                                    (SPFPA)

                                    BY: _____

                                    TITLE: _RESIDENT LOCAL 151_

                                    DATE: _MARCH 28, 2011_____


                                    BY: _____

                                    TITLE: _____

                                    DATE: _____


                                    BY: _____

                                    TITLE: _____

                                    DATE: _____


                                    BY: _____

                                    TITLE: _____

                                    DATE: _____

42

APPENDIX-A

INSERT UNION CHECK-OFF AUTHORIZATION CARD

# APPENDIX-B

## WAGES

### FOR OFFICERS WORKING AT THE DESERT VIEW MEDIUM COMMUNITY CORRECTIONAL FACILITY

The following <u>minimum</u> rates of pay shall be applicable to Officers during the term of this Agreement:

1.  After the effective date of this Agreement all Officers will receive the following hourly rates on the dates noted on the chart below:

| Wages | February 25, 2011 | February 25, 2012 | February 25, 2013 |
|---|---|---|---|
| From Date of Hire to End of 6-Month Probation | $15.59 | $15.90 | $16.22 |
| End of 6-Month Probation to 1 year | $16.37 | $16.70 | $17.03 |
| 1 year but less than 6 years | $16.94 | $17.28 | $17.62 |
| 6 years or more | $17.48 | $17.83 | $18.19 |

Note: The table reflects a 5% increase in wages in Year-1, a 2% increase in wages for Year-2 and an additional 2% increase in wages in Year-3. Year one wage increases become effective, and are retroactive to, February 25th 2011

2.  The Company's contract with its client allows for a Cost of Living Adjustment (COLA) for wages. Should the client provide a COLA for wages in any given year of the contract, any increase provided by the Client to the Company will be passed along to the officers, less the amount of the increase noted in the table above. This increase will be effective beginning the first pay period following the approval of the COLA adjustment. Example: Year-2 the Company provides a 2% wage increase. Should the Client provide a 4.0% increase in the form of a COLA for wages, the officers would receive an additional increase of 2% in their then current wage rates. When such a COLA increase is included in the contract with the client, the Company will so advise the Union within thirty (30) calendar days.

44

**Page 201**

## APPENDIX-C

### WAGES

### FOR OFFICERS WORKING AT THE ADELANTO DETENTION FACILITY

### (ADELANTO EAST AND WEST)

The following <u>minimum</u> rates of pay shall be applicable to Officers during the term of this Agreement:

1. After the effective date of this Agreement all Officers will receive the following hourly rates on the dates noted on the chart below:

| Wages | February 25, 2011 | February 25, 2012 | February 25, 2013 |
|---|---|---|---|
| From Date of Hire to End of 6-Month Probation | $15.59 | $15.90 | $16.22 |
| End of 6-Month Probation to 1 year | $16.37 | $16.70 | $17.03 |
| 1 year but less than 6 years | $16.94 | $17.28 | $17.62 |
| 6 years or more | $17.48 | $17.83 | $18.19 |

2. Full-time Officers working at the Adelanto Detention Facility (Adelanto East and West) will also receive $3.50 per hour for Health and Welfare Benefits. The Health and Welfare Benefit rate will be paid equally each pay period as follows: $3.50 x 2080 hours divided by 26 pay periods. This amount will be remitted to the Union should the Officers vote to participate in the Union's Health Insurance Plans as noted in Article 24B.

3. Should the appropriate DOL Wage Determination increase the Health and Welfare Benefits hourly rate, the Company agrees to reopen negotiations with the Union and implement an agreed-upon amount.

45

**Page 202**

# EXHIBIT H

## UGOSA  LOCAL 880

*A HURTADO -PRESIDENT*
*J HARRIS -VICE PRESIDENT*
*S NOWICKI-SECRETARY*
*M MCCORMICK-TREASURER*

DICIPLINARY APPEAL
August 18, 2015

UGOSA is currently representing officer E. Santiago in the matter of the termination of his employment on August 15,2015.
The following is an appeal of this decision
Officer Santiago has been employed with GEO for two years and has (0) attendance points (0) write-ups  and no documented events of verbal counseling.
Reason for appeal:
To the charges of inattention to duty,  failure to follow the direct order of a supervisor,  and failure to secure his area

1. GEO Staffing plan -  Ice contractual requirements and GEO policy says that Administrative Segregation is a two man post, Officer Santiago was left alone on a two man post so that GEO could avoid a meal penalty.  The Lieutenant on duty (Anderson) ordered the second officer (Patterson)  off post to cover a lunch break for another officer elsewhere.  (this info was in the disciplinary report attached)  There was no inattention to duty,  per the shift supervisor Santiago was performing the workload of two officers.  (on the SMU log two officers signed in for all three shifts.)   Copy Attached

2. As to the charge of not securing his area  (shower door)
On July 1,2015 Assistant Warden Love upon activation of this open movement Administrative Segregation unit announced verbally to staff that due to open movement showers could remain unsecured unless a detainee was issued a razor.   Attached is a memo from a senior segregation officer Shelton.

3. As to the charge of not following a direct order from lieutenant Duran ( that this particular detainee was a two man escort)  We are asking for the documentation to support this

GEO000226

**Page 204**

- A notification (written form) which is required to the facility administrator (refer to attached post orders) this is GEO policy for any modification or restriction to a detainee's program
- A log book entry that states it is a requirement
- A copy of the SMU log that states he was a two man escort (this should be listed under pertinent information
- Notification posted on the outside of the cell- currently there is a cautionary sign posted

- According to our research during the course of our investigation we found no evidence of these items and we do not believe they exist, therefore there is NOTHING to support any of these charges and therefore all charges should be dismissed.

SUPPORTIVE DOCUMENTS ATTATCHED

In conclusion,

This event would have never occurred had management provided the correct amount of staff to man the post. If the control pod had been properly staffed as required by the ICE contract this situation could have been avoided completely.

Lieutenant Anderson ordered it, lieutenant Duran was on duty and aware of the practice of collapsing a required post on a daily basis. Assistant Warden Love who is in charge of security was aware of the practice. After the event on 8/5/15 this action was stopped immediately. Within 3 days all segregation officers were provided with documented OJT training. In short officer Santiago followed the direct order of a supervisor. It was the supervisors choice not to man the post properly or the control pod. The supervisors were able to continue on and correct their mistakes. Officer Santiago made no mistake and he was terminated.

GEO000227

## _RESOLUTION SOUGHT_:

We are asking that officer Santiago be restored to full active duty status immediately and receive back pay for the time he was off,  that he be given the same training that every other officer received after this incident,  and that all evidence of this issue be removed from his employee file.

If we do not hear from you within 15 business days of today's date then it will be assumed by both parties that the informal process is over and we will directly proceed with this matter to arbitration where it can be resolved by a third party.

A HURTADO -President 880

GEO000228

**Page 206**

Warden,
On our hurrey to file our appeal for Santiago there were maybe spelling and grammar errors

I have revised a copy with the corrections for you with the exception of 1 change

On the first copy you had 10 days

After reviewing the CBA it states you have 15 Business days to respond here is the revised. Copy   thanks Nanck

GEO000229

## Employee Disciplinary Appeal Form



**Employee To Complete:**

| Name: |  |
|---|---|
| *E. SANTIAGO* | |
| Employee ID Number: | Date: *8 / 1 2015* |

**Reason for Appeal:** *(Be specific as to all details related to the situation) (Attach additional sheet if needed; include name and date)*

*SEE ATTATCHED*
*DOCCUMENTS.*

**Resolution Sought:** *(Be specific as to what you would like to see done) (Attach additional sheet if needed; include name and date)*

| Appeal Received By: | Date: / / |
|---|---|

**First Level Decision:**

| Signature of Authority: | Date: / / |
|---|---|

**Second Level Decision:**

| Signature of Authority: | Date: / / |
|---|---|

**Final Decision:**

| Signature of Authority: | Date: / / |
|---|---|

*Additional documentation may be attached to this form*

Rev 01/11 NP                                                                                          HR-841

GEO000230

Date: Aug. 18,2015

Disciplinary Appeal

UGOSA Local 880, is currently representing officer E. Santago in the matter of his termination of employment on Aug.15,2015.  The following is an appeal of this decision:

Officer Santago has been employed with GEO for two years has (0) attendance points (0) write ups and no documents of verbal counseling.

Reason for the appeal:  To the charges of inattention to duty and failure to follow a direct order of a supervisor and failure to secure the shower door.
1. staffing plan (GEO) Ice contractual requirement say (GEO) policy, Administrative Segregation is a two man post,officer Santago was left alone on a two man post, so that GEO could avoid a meal penalty. the LT. on duty (Anderson) ordered the second officer D/O Patterson off post to cover a lunch break for another officer elsewhere, there was No inattention to duty. per the shift supervisor D/O Santago was performing the workload of two officers.
2. As to the charge of not securing his area ( shower door).
On July 1st. AW Love upon activation of this open movement Administrative Segregation unit announced verbally to staff that due to open movement the shower can remains unsecured unless the detainee is issued a razor. attached is a memo form a senior seg. officer.
3.As to the charge of not following a direct order from Lt. Duran, that for this particular detainee he was a two man escort). We are asking you to provide us with the documentation that supports this.
1. A notification (written form) which is required by GEO policy
2. A log book entry that required this
3. A copy of the SMU housing unit record that states that this detainee is a two man escort to the shower. (all detainee info should be on the SMU log).
4. Nothing was posted on the outside the detainee cell stating that this detainee was a two man escort, we are aware that currently today it is posted on the outside of the cell. According to our research during the course of our investigation we found none of those items and we do not believe they exist and therefore there is nothing to support any of these charges. In conclusion this event would have never occurred had management/supervisors provided the correct amount of staff to man the post. If the control pod had been manned as required by ICE contract this situation could have been avoided completly.

SUPPORTING DOCCUMENTS ATTATCHED:

Friday, September 18, 2015 AOL: Artie24

GEO000231

Date: Aug. 18,2015

Disciplinary Appeal

This is a violation of GEO policy:

Lt. Anderson ordered it, Lt. Duran was on duty and aware of the practice of collapsing a required post. AW Love who is responsible for security was aware and approved of this practice daily. After the event on 8/5/2015, this practice was stopped immediately, within (3) days all officers were provided with OJT training. In short officer Santago followed the direct order of a supervisor,it was the supervisor's choice to not man the post properly or the H/U control pod for segregation. Supervisors were able to continue and correct their mistakes after this event. Officer Santago made no mistakes and he was terminated.

Resolution Sought:
We are asking that officer Santago be resorted to full active status immediately and receive back pay for the time he was off, that he be provided with the same training that all other offers were provided and that all evidence of this issue be removed from this employee file, if we do not hear from you in (10) business days. it will be assumed by both parties that the informal process is over and we will directly process with matter to Arbitration where it can be resolved by a 3rd. party settlement.

A. Hurtado: Union President of Local 880

*A. Hurtado* 8/18/15

Friday, September 18, 2015 AOL: Artie24

GEO000232

**Page 210**

1   ELIZABETH STAGGS WILSON, Bar No. 183160
    estaggs-wilson@littler.com
2   MICHELLE RAPOPORT, Bar No. 247459
    mrapoport@littler.com
3   BROOKE DEARDURFF, Bar No. 292433
    bdeardurff@littler.com
4   LITTLER MENDELSON, P.C.
    633 West 5th Street
5   63rd Floor
    Los Angeles, CA  90071
6   Telephone:  213.443.4300
    Facsimile:   213.443.4299
7
    Attorneys for Defendants
8   THE GEO GROUP, INC. and GEO
    CORRECTIONS AND DETENTION, LLC
9

10              UNITED STATES DISTRICT COURT

11            CENTRAL DISTRICT OF CALIFORNIA

12  EMANUEL SANTIAGO, an              Case No.  5:16-CV-02263 – DOC – KK
    individual,
13                                    **DECLARATION OF MICHELLE**
              Plaintiff,              **RAPOPORT IN SUPPORT OF**
14                                    **DEFENDANTS' NOTICE OF**
         v.                           **MOTION AND MOTION FOR**
15                                    **SUMMARY JUDGMENT, OR IN**
    THE GEO GROUP, INC., a Florida    **THE ALTERNATIVE MOTION FOR**
16  Corporation dba GEO CALIFORNIA,   **SUMMARY ADJUDICATION**
    INC.; GEO Corrections and Detention,
17  LLC; DOES 1 - 10, individuals, and
    DOES, 11 - 20, business entities
18  inclusive,
                                      **Date:          December 18, 2017**
19            Defendants.             **Time:          8:30 a.m.**
                                      **Courtroom:     9D – 9th Floor**
20

21                                    Trial Date: January 23, 2018

22

23

24

25

26

27

28

DECLARATION OF MICHELLE
RAPOPORT
**Page 211**

1    I, MICHELLE RAPOPORT, declare and state as follows:

2    1.    I am an attorney at law, licensed to practice in the State of

3    California and before this Court.  I am a shareholder with Littler Mendelson,

4    P.C., counsel of record for Defendants THE GEO GROUP, INC. and GEO

5    Corrections and Detention, LLC ("Defendants") in this case and make this

6    declaration in support of Defendants' Motion For Summary Judgment, Or In The

7    Alternative Motion For Summary Adjudication ("Motion").    All of the

8    information set forth herein is based on my personal and first-hand knowledge

9    except where indicated, and if called and sworn as a witness, I could and would

10   testify competently thereto.

11   2.    On January 27, 2017, my office served a first set of Special

12   Interrogatories and Request for Production on Plaintiff. Plaintiff served responses to

13   these interrogatories and requests on April 24, 2017. Attached hereto as **Exhibit "I"** is

14   a true and correct copy of Plaintiff's Responses to Defendant's Special Interrogatories,

15   verified by Plaintiff.

16   3.    In Plaintiff's response to Defendant's Special Interrogatories, he claims

17   he "was terminated because of his gender, while another employee, Officer Marquez,

18   who was pregnant at the time, was not treated similarly." However, Plaintiff concedes,

19   "Officer Marquez was terminated related to the August 2015 incident with detainee

20   Irias.  Geo terminated her at a different time than Officer Santiago because at the time

21   that this happened Officer Marquez was pregnant and she went out on maternity leave

22   the following day.  When she returned after having her baby in May, she was

23   terminated…" (*See* Plaintiff's responses to Defendant's Special Interrogatories Nos. 1

24   & 2.)

25   4.    Plaintiff, who is represented by a labor union, filed a grievance

26   challenging his termination, arguing his termination was not supported by "good

27   cause."  However, Plaintiff abandoned his grievance, and has elected to only proceed

28   with his more limited civil claim, alleging gender discrimination.  Attached hereto as

LITTLER MENDELSON, P.C.
633 West 5th Street
63rd Floor
Los Angeles, CA  90071
213.443.4300

DECLARATION OF MICHELLE RAPOPORT

2.

**Page 212**

1  **Exhibit J** is a true and correct copy of Plaintiff's counsel's email to me, dated October

2  4, 2017, stating that Plaintiff has abandoned his grievance.

3       5.     Pursuant to Local Rule 7-3, I began to meet and confer with opposing

4  counsel some months ago.     In May, 2017, Plaintiff's counsel and I discussed

5  Plaintiff's claims in depth.  I explained to Plaintiff's counsel why I believed Plaintiff's

6  claims were subject to summary judgment, or partial summary judgment.  On October

7  26, 2017, during an in person meeting, my associate Brooke Deardurff met and

8  conferred with Plaintiff's counsel regarding the anticipated motion for summary

9  judgment. Further, I sent a meet and confer letter to Mr. Mostafavi on November 6,

10  2017 expressing GEO's intention to file the instant Motion. I further conferred with

11  Mr. Mostafavi telephonically on November 14, 2017 to once again discuss the

12  Motion. Attached hereto as **Exhibit "K"** is a true and correct copy of the meet and

13  confer correspondence sent to Plaintiff on November 6, 2017.

14

15       I declare under penalty of perjury under the laws of the United States of

16  America and the State of California that the foregoing is true and correct.

17       Executed this 20th day of November, 2017, at Los Angeles, California.

18

19

20                 */s/ Michelle Rapoport*

                Michelle Rapoport

21  Firmwide:151201168.2 059218.1286

22

23

24

25

26

27

28

LITTLER MENDELSON, P.C.
633 West 5th Street
63rd Floor
Los Angeles, CA  90071
213.443.4300

DECLARATION OF MICHELLE RAPOPORT

3.

# EXHIBIT I

AMIR MOSTAFAVI, ESQ. (SBN: 282372)
**MOSTAFAVI LAW GROUP, APC**
11835 W Olympic Blvd., STE 1055
Los Angeles, California 90064
Telephone: (310) 473-1111
Facsimile: (310) 473-2222
amir@mostafavilaw.com

Attorneys for Plaintiffs EMANUEL SANTIAGO

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

EMANUEL SANTIAGO, an individual

        Plaintiff,

vs.

THE GEO GROUP, INC. a Florida Corporation dba GEO CALIFORNIA, INC.; GEO Corrections and Detention, LLC; DOES 1-10, individuals, and DOES 11-20, business entities inclusive,

        Defendants.

Case No. 5:16-CV-02263 – DOC- KK

**RESPONSES OF PLAINTIFF EMANUEL SANTIAGO TO DEFENDANTS THE GEO GROUP, INC. AND GEO CORRECTIONS AND DETENTION, LLC'S INTERROGATORIES SET ONE TO PLAINTIFF EMANUEL SANTIAGO**

Trial Date: January 23, 2018

**PROPOUNDING PARTY:**     DEFENDANT, THE GEO GROUP, INC., ET AL.

**RESPONDING PARTY:**     PLAINTIFF, EMANUEL SANTIAGO

**SET NUMBER:**     ONE (1)

    Plaintiff EMANUEL SANTIAGO ("EMANUEL SANTIAGO", "SANTIAGO" or "Plaintiff") hereby responds to Defendant THE GEO GROUP, INC. et al.'s Special Interrogatories, Set No. One, pursuant to Rule 33 of the Federal Rules of Civil Procedure, as follows:

### PRELIMINARY STATEMENT

    Plaintiff has not completed its investigation of the facts relating to this case, has not fully completed its discovery in this action, and has not completed its preparation for trial.

    All the responses contained herein are based only upon such information and documents, which are presently available to and specifically known to Defendant and disclose only those contentions, which presently occur to Plaintiff. It is anticipated that further discovery, independent investigation, legal research and analysis will supply additional facts, and meaning to the known

1

facts, as well as establish entirely new factual conclusions and legal contentions, all of which may lead to substantial additions, changes and variations to the contentions set forth herein. The following responses are given without prejudice to Plaintiff's right to produce evidence of any subsequently discovered fact or facts revealed by further investigation.  Plaintiff accordingly reserves the right to change any and all answers herein as additional facts are ascertained, analysis is made, legal research is completed and contentions are made.  The answers contained herein are made in a good faith effort to supply as much factual information as is presently known but in no way be to the prejudice of this responding party in relation to further discovery, research or analysis.

## GENERAL OBJECTION

To the extent that these special interrogatories seek information privileged against disclosure by the attorney-client privilege and/or protected by the attorney work-product doctrine, Plaintiff objects to these form interrogatories.

## RESPONSES TO SPECIAL INTERROGATORIES

Subject to the Preliminary Statement and General Objection set forth above, and incorporated into each of the specific responses herein, Plaintiff responds to the first set of special interrogatories as follows:

**INTERROGATORY NO. 1:**

State all facts that RELATE TO, concern, or support the first cause of action in the COMPLAINT for "Failure To Prevent Discrimination In Violation Of Government Code § 12940."

**RESPONSES TO INTERROGATORY NO. 1:**

Objection. Responding Party objects to this Interrogatory on the grounds that it is vague and ambiguous as to the term/phrase "YOU." This interrogatory is also overly broad and nonsensical due to the breadth of the specially-defined term "YOU," which propounding party defines as including not only Plaintiff, but also her agents, attorneys and other PERSONS acting on Plaintiff's behalf.  Further, due to the breadth of this term, any interrogatory containing the specially-defined term "YOU" necessarily seeks attorney work-product which is expressly and statutorily not discoverable.   Without waiving the following objections, Responding Party responds as follows: plaintiff was terminated because of his gender while another employee, Officer Marquez, who was pregnant at the time, was not treated similarly. Defendant Geo failed to train and ensure the supervisor of plaintiff and Officer Marquez do not treat them based on their gender, when it comes to their work and conditions thereat. Since Marquez was pregnant, she was not disciplined and or terminated at the time plaintiff was pretextually terminated.

**INTERROGATORY NO. 2:**

State all facts that RELATE TO, concern, or support the second cause of action in the COMPLAINT for "Discrimination Based On Gender In Violation Of Government Code § 12940."

**RESPONSES TO INTERROGATORY NO. 2:**

Objection.  Responding Party objects to this Interrogatory on the grounds that it is vague and ambiguous as to the term/phrase "your", "reprimand", and "discipline" and "received."  This interrogatory is also overly broad and nonsensical due to the breadth of the specially-defined term "YOUR," which propounding party defines as including not only Plaintiff, but also her agents, attorneys and other PERSONS acting on Plaintiff's behalf.  Further, due to the breadth of this term, any interrogatory containing the specially-defined term "YOUR" necessarily seeks attorney work-product which is expressly and statutorily not discoverable. Without waiving the following objections, Responding Party responds as follows:  On the day of the incident in August 2015, Officer Marquez was heading the Central Control post.  Marquez started working at GEO around the time as Santiago had. Officer Marquez's duties were very difficult because she had to regulate the entire the facility on one switch board.  Central was supposed to have three officers in the control center—one for each board, and one for the radio, telephone, and opening doors. Marquez was by herself on the boards, and radios, during count in August 2015 on the day of the incident with detainee Irias. Officer Marquez was terminated related to the August 2015 incident with detainee Irias.  Geo terminated her at a different time than Officer Santiago because at the time that this happened Officer Marquez was pregnant, and she went out on maternity leave the following day . When she returned after having her baby in May, she was terminated later in May 2015.

**INTERROGATORY NO. 3**

State all facts that RELATE TO, concern, or support the third cause of action in the COMPLAINT for "Wrongful Termination In Violation Of Public Policy Code §§ 12940 (A) Et Seq."

**RESPONSES TO INTERROGATORY NO. 3:**

Objection.  Responding Party objects to this Interrogatory on the grounds that it is vague and ambiguous as to the term/phrase "you" and "your."  Objection. Responding Party objects to this Interrogatory on the grounds that it is vague and ambiguous as to the term/phrase "YOU" and "YOUR." This interrogatory is also overly broad and nonsensical due to the breadth of the specially-defined term "YOU," and "YOUR" which propounding party defines as including not only Plaintiff, but also her agents, attorneys and other PERSONS acting on Plaintiff's behalf. Further, due to the breadth of this term, any interrogatory containing the specially-defined terms "YOU" and "YOUR" necessarily seeks attorney work-product which is expressly and statutorily not discoverable.  Not waiving the objection, Responding Party's answer is limited only to

3

Plaintiff's contacts with employers as follows: On August 6th, 2015, the day following the incident, officer Marquez did not report to work. She was pregnant and decided to begin her family leave. That same day Plaintiff was called to human resources and informed in writing that he was being placed on unpaid administrative leave pending an investigation, effective immediately. Plaintiff was terminated shortly after.

**INTERROGATORY NO. 4:**

State all facts that RELATE TO, concern, or support the fourth cause of action in the COMPLAINT for "Unfair Business Practices In Violation Of California Business And Professions Code §§ 17200, *Et Seq.*"

**RESPONSES TO INTERROGATORY NO. 4:**

Objection. Responding Party objects to this Interrogatory on the grounds that it is vague and ambiguous as to the term/phrase "YOU," This interrogatory is also overly broad and nonsensical due to the breadth of the specially-defined term "YOU," which propounding party defines as including not only Plaintiff, but also her agents, attorneys and other PERSONS acting on Plaintiff's behalf. Further, due to the breadth of this term, any interrogatory containing the specially-defined term "YOU" necessarily seeks attorney work-product which is expressly and statutorily not discoverable. Responding Party specifically reserves the right to supplement this response once the investigation, research and analysis, and trial preparation are completed. Without waiving the following objections, Responding Party responds as follows: Defendant's policy or practice discriminating against employees based on gender in violation of Government Code §12940, Defendant's policy or practice in failing to prevent discrimination against employees based on gender in violation of Government Code §12940 (K), Defendant's policy or practice in retaliating against employees based on gender in violation of Labor Code §1102.5, Defendant's failure to provide rest and meal periods, Defendant's failure to pay state overtime compensation under California Labor Code §§ 510 and 1194, Defendant's failure to provide accurate wage statements under Labor Code §226, Defendant's failure to pay wages timely upon termination under Labor Code §203, and Defendant's failure to pay wages on regularly established paydays under Labor Code §§204, 210, and 2698-2699.5.

**INTERROGATORY NO. 5:**

State all facts that RELATE TO, concern, or support the fifth cause of action in the COMPLAINT for "Retaliation In Violation Of Labor Code § 1102.5."

**RESPONSES TO INTERROGATORY NO. 5:**

Defendants, made, adopted, and enforced a rule, regulation, and policy requiring Plaintiff to comply with Defendant's procedures, yet due to their under-staffing the facility, and forcing

Defendant to be the only officer in a two officer post. Upon learning Plaintiff was the only officer on duty in a two officer post, while the second officer was required to be elsewhere by the Defendant, when their policies resulted in a detainee's near escape from the facility, Defendants retaliated against Plaintiff by terminating his employment, while not terminating or disciplining the other employee officer who had left her post, or the other employee from Control Center who allowed detainee Irias to exit through four security points. Furthermore, when plaintiff made disclosures for what happened regarding the attempted scape by Orias, Defendants retaliated against him by engaging in the adverse employment actions described herein, which adversely and materially affected Plaintiff's employment.

**INTERROGATORY NO. 6:**

State all facts that RELATE TO, concern, or support the sixth cause of action in the COMPLAINT for "Failure To Provide Meal And Rest Periods."

**RESPONSES TO INTERROGATORY NO. 6:**

Objection. This request is nonsensical as phrased.  Responding Party further objections to this Interrogatory on the grounds that it is vague and ambiguous as to the term/phrase "you." This interrogatory is also overly broad and nonsensical due to the breadth of the specially-defined term "YOU" which propounding party defines as including not only Plaintiff, but also her agents, attorneys and other PERSONS acting on Plaintiff's behalf.  Further, due to the breadth of this term, any interrogatory containing the specially-defined terms "YOU" and "YOUR" necessarily seeks attorney work-product which is expressly and statutorily not discoverable.   Without waiving the following objections, Responding Party responds as follows: Plaintiff was hired by Defendant as a Detention Officer at Facility Number 196, the Adelanto Detention Facility, located at 10250 Rancho Road, Adelanto, California 92301 and was a non-exempt employee under applicable IWC orders. Upon being hired, Plaintiff worked as the second shift from 2:00 pm until 10:30 pm from Monday through Friday for the first six months. Later Plaintiff was moved to the third shift working from 10:00 pm until 6:30 am from Sunday through Thursday and continued working the third shift from about November 2013 until August 2015. During his employment period, plaintiff did not take any statutory rest or mail breaks nor were compensated for it. Plaintiff did not get meal break for the first three months of his employment with the defendant and received no rest breaks.

**INTERROGATORY NO. 7:**

State all facts that RELATE TO, concern, or support the seventh cause of action in the COMPLAINT for "Failure To Pay State Overtime Compensation Under California Labor Code §§ 510, 1194."

**RESPONSES TO INTERROGATORY NO. 7:**

1  Objection. This interrogatory is also overly broad and nonsensical due to the breadth of the

2  specially-defined term "YOU" which propounding party defines as including not only Plaintiff, but

3  also her agents, attorneys and other PERSONS acting on Plaintiff's behalf. Further, due to the

4  breadth of this term, any interrogatory containing the specially-defined terms "YOU" and "YOUR"

5  necessarily seeks attorney work-product which is expressly and statutorily not discoverable. The

6  Responding Party responds, that upon being hired, Plaintiff worked as the second shift from 2:00

7  pm until 10:30 pm from Monday through Friday for the first six months. Later Plaintiff was moved

8  to the third shift working from 10:00 pm until 6:30 am from Sunday through Thursday and

9  continued working the third shift from about November 2013 until August 2015. Although, plaintiff

   worked in excess of 8 hours per day, he was not paid overtime.

10 **INTERROGATORY NO. 8:**

11      State all facts that RELATE TO, concern, or support the eighth cause of action in the

   COMPLAINT for "Failure To Provide Accurate Wage Statements Under Labor Code § 226."

12 **RESPONSES TO INTERROGATORY NO. 8:**

13      Objection. This request is vague and ambiguous, overly broad and unreasonably

14 burdensome. It is neither relevant nor reasonably calculated to lead to the discovery of admissible

15 evidence. The wage statements plaintiff received were not correctly reflect his hours worked and or

16 the correct overtime hours and/or the payment for compensation in lieu of taking statutory breaks.

17 **INTERROGATORY NO. 9:**

18      State all facts that RELATE TO, concern, or support the ninth cause of action in the

   COMPLAINT for "Failure To Pay Wages Timely Upon Termination Under Labor Code § 203."

19 **RESPONSES TO INTERROGATORY NO. 9:**

20      Objection. This request is vague and ambiguous, overly broad and unreasonably

21 burdensome. It is neither relevant nor reasonably calculated to lead to the discovery of admissible

22 evidence. Not waiving the objection, Responding Party's answer is as follows: plaintiff was paid all

23 wages including overtime he was owed at the time of termination.

   **INTERROGATORY NO. 10:**

24      State all facts that RELATE TO, concern, or support the tenth cause of action in the

25 COMPLAINT for "Failure To Pay Wages On Regularly Established Paydays--Labor Code §§

26 204.210 And 2698-2699.5."

27 **RESPONSES TO INTERROGATORY NO. 10:**

28      Objection. This request is vague and ambiguous, overly broad and unreasonably

   burdensome. Not waiving the objection, Responding Party's answer is as follows: plaintiff did not

   receive all wages owed to him at the regularly established paydays. Although, he received a

1  payment on these intervals, the payment did not include for a correct amount because of defendant's
2  failure to pay for denied breaks and overtime.

3  **INTERROGATORY NO. 11:**

4       IDENTIFY all of the witnesses that support the claims in YOUR COMPLAINT against
   DEFENDANT.

5  **RESPONSES TO INTERROGATORY NO. 11:**

6       Objection.  This interrogatory is also overly broad and nonsensical due to the breadth of the
7  specially-defined term "YOU" which propounding party defines as including not only Plaintiff, but
8  also her agents, attorneys and other PERSONS acting on Plaintiff's behalf.  Further, due to the
9  breadth of this term, any interrogatory containing the specially-defined terms "YOU" and "YOUR"
10 necessarily seeks attorney work-product which is expressly and statutorily not discoverable. Also,
11 this interrogatory seeks information that may be protected from disclosure by the attorney-client
12 privilege and/or work product doctrine, including pursuant to *Coito v. Superior Court* (2012) 54
13 Cal.4th 480, 501-502 and/or *Nacht & Lewis Architects, Inc. v. Superior Court* (1996) 47
14 Cal.App.4th 214.  Furthermore, this interrogatory seeks information that may be protected from
15 disclosure by Plaintiff's Constitutional right to privacy, which has not been waived by virtue of the
   filing of this lawsuit. Additionally, the discovery request is unduly intrusive.

16 **INTERROGATORY NO. 12:**

17       State the total hours of income, employment benefits, or earning capacity you have lost to
18 date as a result of any adverse employment action taken by DEFENDANTS, and how the amount
   was calculated.

19 **RESPONSES TO INTERROGATORY NO. 12:**

20       Objection.  This interrogatory is nonsensical as phrased. This interrogatory is also vague and
21 ambiguous as the allegation purportedly quoted has been taken out of context and, without its
22 context, it makes no sense, is ambiguous, and/or its meaning has been altered by propounding party.
23 Plaintiff seeks to recover economical damages for his past and future loss of earnings, in addition to
24 non-economical damages for his emotional distress he had suffered as the direct consequence of
25 defendant's discriminatory and retaliatory conducts. The emotional distress damages will be
   ascertained by the expert opinions of to be designated economical and psychological experts.

26 **INTERROGATORY NO. 13:**

27       IDENTIFY all witnesses that support YOUR contention that YOU experienced any
28 emotional distress as a result of DEFENDANTS' conduct.

   **RESPONSES TO INTERROGATORY NO. 13:**

Objection:  To the extent that this request seeks to ascertain the results of research and investigation conducted by responding party's counsel of record, the request seeks to discover information which is protected from disclosure by the attorney work product privilege.  Furthermore, to date the parties have not been required to disclose any expert witness information in this case.  Therefore, any experts retained by responding party as consultants are not required to be disclosed and their identities and opinions are also entitled to work product protection.  *Williamson vs. Superior Court* 21 Cal.3d 829, 834.

**INTERROGATORY NO. 14:**

IDENTIFY by stating the names, business addresses and telephone numbers of all health care providers (including but not limited to physicians, psychologists, counselors, therapists, clinics, hospitals and any other health care processionals, institutions and providers) with whom YOU consulted or sought consultation, from whom YOU were treated or sought treatment, by whom YOU were examined or evaluated, from whom YOU sought examination or evaluation or from whom YOU otherwise received or sought medical, psychological, counseling or therapy services, examination, evaluation, treatment, assistance or advice for the mental and emotional distress YOU allegedly suffered as alleged in YOUR COMPLAINT.

**RESPONSES TO INTERROGATORY NO. 14:**

Objection. This discovery request has, in substance, been previously propounded. (See Interrogatory/Request No. 13.) Continuous discovery into the same matter constitutes oppression, and Plaintiff further objects on that ground. (*Professional Career Colleges v. Superior Court* (1989) 207 Cal.App.3d 490, 493 494.

Objection. To the extent that this request seeks to ascertain the results of research and investigation conducted by responding party's counsel of record, the request seeks to discover information which is protected from disclosure by the attorney work product privilege.  Furthermore, to date the parties have not been required to disclose any expert witness information in this case.  Therefore, any experts retained by responding party, as consultants are not required to be disclosed and their identities and opinions are also entitled to work product protection.  *Williamson vs. Superior Court* 21 Cal.3d 829, 834.  However, without waiving said objections, and limited only to information not obtained from expert consultants or from the research and investigation conducted by responding party's counsel of record: Unknown

**INTERROGATORY NO. 15:**

IDENTIFY by name, address (including street address city and zip code), telephone number and personal contact, each potential employer with whom YOU been in contact for employment at any time from September 16, 2015, to the present.

8

**Page 222**

**RESPONSES TO INTERROGATORY NO. 15:**

Objection. This request is unreasonably burdensome. This request is overly broad, burdensome and harassing as it fails to limit itself to any relevant time period or in scope to any issue in this case.

**INTERROGATORY NO. 16:**

IDENTIFY by name, address (including street address, city and zip code), telephone number and personal contact, every employer who has made an offer of employment to YOU from September 16, 2015, to the present.

**RESPONSES TO INTERROGATORY NO. 16:**

Objection. This request is unreasonably burdensome. This request is overly broad, burdensome and harassing as it fails to limit itself to any relevant time period or in scope to any issue in this case. The request also implicate right of privacy of non-parties.

**INTERROGATORY NO. 17:**

For all offers of employment received by YOU from September 16, 2015 to the present, if any, indicate what job and salary was offered to YOU.

**RESPONSES TO INTERROGATORY NO. 17:**

Plaintiff objects to this Request on the grounds: (1) that the terms "received" "offers," and "offered" are vague and ambiguous; (2) this request is compound.

**INTERROGATORY NO. 18:**

IDENTIFY by name, address (including street address, city and zip code), telephone number, each and every employer for whom YOU have worked for any period of time from September 16, 2015, through the present.

**RESPONSES TO INTERROGATORY NO. 18:**

Plaintiff objects to this Request on the grounds: (1) that the terms "worked" and "time" are vague and ambiguous.

DATED: April 24, 2017                    MOSTAFAVI LAW GROUP, APC

By: _____

Amir Mostafavi, Esq.
Attorneys for Plaintiff
EMANUEL SANTIAGO

9

*Emanuel Santiago* **VERIFICATION**

I, _____, declare:

I am the named plaintiff in this action. I have read the foregoing **RESPONSES TO DEFENDANT'S DISCOVERY REQUEST FOR:**

☐ **FORM INTERROGATORIES:**                    SET _____

☑ **SPECIAL INTERROGATORIES:**               SET __1__

☐ **REQUEST FOR ADMISSIONS:**               SET _____

☑ **REQUEST FOR PRODUCTION OF DOCUMENTS:**   SET __1__

I know the contents thereof. I have obtained and reviewed documents and records and based on such review, the facts stated herein are true and correct.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Los Angeles, California on this *24* day of *April*, 2017

Clients Name: *Emanuel Santiago*

**PROOF OF SERVICE**
**Cal. Civ. Pro. Code §§ 1011 -1013a**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I, the undersigned, declare: I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 11835 W Olympic Boulevard, Suite 1055, Los Angeles, California, 90064. I am readily familiar with the business practice of processing of documents for service for Mostafavi Law Group, APC.

On April 24, 2017, I served a true and correct copy of the foregoing document(s) described as:

RESPONSES OF PLAINTIFF EMANUEL SANTIAGO TO DEFENDANTS THE GEO GROUP, INC. AND GEO CORRECTIONS AND DETENTION, LLC'S INTERROGATORIES SET ONE TO PLAINTIFF EMANUEL SANTIAGO

On all the following interested parties as indicated below:

> Elizabeth Staggs Wilson, Esq.
> Michelle Rapoport, Esq.
> Littler Mendelson, P.C.
> 633 West 5th Street, 63rd Floor
> Los Angeles, CA 90071

by causing service by the method indicated below:

X  <u>U.S. Mail</u> – By placing a copy of said document(s) in a sealed envelope with postage thereon fully prepaid, and depositing said envelope with the U.S. Postal Service, following this office's business practices.
<u>Overnight Delivery</u> - By placing a copy of said document(s) in a sealed prepaid overnight envelope or package, and depositing said envelope or package today in a box or other facility regularly maintained by the express service carrier, following this office's business practices.
<u>Personal Service</u> – By personally delivering said document(s) in an envelope or package clearly labeled to identify the attorney/party located at the office(s) of the addressee(s) stated above.
<u>Facsimile</u> – By placing a true copy thereof into a facsimile machine to the fax number stated above, as agreed upon, in writing, by parties or attorneys of the record.
<u>Electronic Service</u> – By electronically sending a copy of said document(s) to the attorney or party as stated above and as agreed upon, in writing, by the parties, or their attorneys of the record.

I declare under the penalty of perjury under laws of the State of California that the foregoing is true and correct. Executed on April 24, 2017, at Los Angeles, California.

_Amir Mostafavi_ (signature)

_____

Amir Mostafavi

10

PLAINTIFF EMANUEL SANTIAGO'S RESPONSES TO DEFENDANTS' INTERROGATORIES SET ONE

# EXHIBIT J

## Rapoport, Michelle

| | |
|---|---|
| **From:** | Amir Mostafavi, Esq. <amir@mostafavilaw.com> |
| **Sent:** | Wednesday, October 04, 2017 7:00 AM |
| **To:** | Rapoport, Michelle |
| **Cc:** | Loan Dao |
| **Subject:** | Union Arbitration |

Michelle,

We were confirmed that the Union withdrawn the demand for arbitration for Mr. Santiago and will not proceed to a hearing.



*Amir Mostafavi*
*Mostafavi Law Group, APC*
*Practice Limited in Employment Law*
11835 W Olympic Blvd., Suite 1055 | Los Angeles, CA 90064
P: 310-473-1111 | F: 310-473-2222
www.mostafavilaw.com

# EXHIBIT K



**Littler Mendelson, PC**
633 West 5th Street
63rd Floor
Los Angeles, CA  90071

Michelle Rapoport
213.443.4222 direct
213.443.4300 main
213.947.4396 fax
mrapoport@littler.com

November 6, 2017

**VIA EMAIL (AMIR@MOSTAFAVILAW.COM)**

Amir Mostafavi
Mostafavi Law Group, APC
11835 West Olympic Blvd., Suite 1055
Los Angeles, CA, 90064

Re:     *Emanuel Santiago v. The GEO Group et al.*

Dear Mr. Mostafavi:

As we have discussed in the past, defendants The GEO Group and Geo Corrections and Detention, LLC ("Defendants") intend to file a motion for summary judgment in accordance with Rule 56 of the Federal Rules of Civil Procedure (the "Motion") regarding the claims of your client, Plaintiff Emanuel Santiago ("Plaintiff").   The purpose of this letter is to once again engage Plaintiff in a meet and confer conference in compliance with Local Rule 7-3 concerning the Motion.

The Motion will address and seek summary adjudication of all of Plaintiff's ten causes of action against him and in Defendants' favor.  Defendants believe that all of the claims lack merit based on undisputed material facts concerning them.  In particular, Plaintiff cannot establish his claim of gender discrimination or any of his other claims arising from gender-based allegations. Plaintiff also cannot establish any of his claims based on alleged Labor Code violations, as they lack merit and are preempted by the Labor Management Relations Act, or are otherwise precluded from being adjudicated in this action.

If you are amenable to voluntarily and promptly dismissing any of Plaintiff's claims, please let me know.  Alternatively, if you would like to further discuss the dismissal of Plaintiff's claims or the Motion, please let me know as well.  Thank you for your prompt attention to this matter.

Sincerely,

Michelle Rapoport

Firmwide:150788777.2

littler.com

**Page 229**