# EXHIBIT 26

Santiago's Disciplinary Action Form

# DISCIPLINARY ACTION FORM



The GEO Group, Inc.

Employee's Name:   Emanuel Santiago

Job Title: Detention Officer                    Employee No.: 176828          DOH: 3/18/2013

Supervisor's Name:   Lt. R. Anderson          Dept. Name: Security

Facility Name: ADF West          Facility No.: 196          Log No.:

## INFRACTION:  Inattention to Duty

Date of Violation:  8/5/2015

## SUMMARY OF INFRACTION:  The specific facts regarding the current infraction, including details and description of issue or rule(s) violated.

On 8/5/2015 Officer E. Santiago failed to use proper security procedures, which afforded a detainee to freely move in the Administrative Segregation housing unit and ultimately attempt to escape by breaching four facility security doors before being apprehended and returned to Segregation.

## SUMMARY OF FINDINGS:  Document below your findings. Include the Who, What, When, and Where of the investigation.

Does this incident involve OPR?   ☐ Yes  ☒ No    If Yes, OPR No
(DO NOT attach OPR Report)

On 8-5-2015 Officer E. Santiago was assigned as the 2nd Watch West Administrative Segregation Housing Unit Officer. He was given specific direction from Lt. Duran to ensure two officers are present when escorting Detainee Irias A # 73945866 from m cell in Administrative Segregation to the shower. At approximately 1623 hours Officer Santiago conducted a single officer escort of detainee Irias to the shower area, where he failed to lock and secure the shower door. Officer Santiago then proceeded to retrieve two detainee porters to facilitate distribution of meal trays. Formal count commenced at 1630 and was conducted by Officer Santiago and Officer Patterson. Once count was completed Officer Patterson departed the unit to facilitate a lunch break for another officer, Officer Santiago failed to get supervisory authorization to out count detainee Irias in the shower area and further authorization to bring out two detainee porters prior to the facility formal count clearing. While supervising detainee porters as they handed out meal trays on the far upper tier, detainee Irias completed his shower and pushed open the unsecure shower door at 1653 hours. Detainee Irias departed the Segregation housing unit unsupervised and unrestrained at approximately 1653 hours.

## SUPPORTING DOCUMENTATION:

Additional Pages Attached?   ☒ Yes  ☐ No    If Yes, Number of Pages:  58

## DISCIPLINARY HISTORY:  List prior Counseling(s) or other Disciplinary Action(s) below. Document ALL history starting with the most recent violation looking back 12 months.

Date: _____   Violation: _____

Action: _____

Date: _____   Violation: _____

Action: _____

Date: _____   Violation: _____

Action: _____

| DISCIPLINARY ACTION: | ☐ Counseling | ☐ Written Reprimand | ☐ Final Reprimand | ☒ Dismissal |
|---|---|---|---|---|

Rev 3 14/11 NP                    Page 1 of 3                    HR - 893

GEO000233 (INITIAL PRODUCTION 10/03/17)

# DISCIPLINARY ACTION FORM

**GEO**
The GEO Group, Inc.

---

REASON:  ☐ Behavior    ☐ Absenteeism/Tardiness    ☒ Performance    ☐ Policy

# of Points: 0

---

## EXPECTED IMPROVEMENT AND STANDARD FOR THE FUTURE: List Specific goals. Failure to show immediate and sustained improvement will result in disciplinary action up to and including discharge.

Officers are expected to move and secure detainees in a secure segregation housing unit with all required security precautions. Any deviation from policy, procedure and/or supervisory directives must be preauthorized by a supervisor. This requires staff to remain fully attentive and alert during work hours. Failure to do so may jeopardize the safety and security of the facility, as well as the lives of staff, detainees, and visitors.

---

I acknowledge this action and understand the expectations and requirements as discussed with me and outlined above. I also understand the Disciplinary Action Appeal Process. My signature does not imply agreement or disagreement.

EMPLOYEE Signature:

Printed Name:                                                                                Date:

---

A witness is only _required_ when the employee refuses to sign this form. A witness should be from Human Resources or a member of management and not a co-worker of the employee.

☒ Employee refuses to sign and has received a copy of completed form

WITNESS Signature: _Aida Aldape_    Date: 9/16/15

Printed Name: _Aida Aldape_

---

SUPERVISOR Signature:    Date: 8-13-15

Printed Name: _T. R. Anderson_

DEPARTMENT HEAD Signature:    Date: 8-13-15

Printed Name: _Ann L. Seibert Love_

FACILITY ADMINISTRATOR Signature:    Date: 8/7/15

Printed Name: _J. Jarecka_

---

HUMAN RESOURCE Signature:    Date Distributed:

Printed Name:    Date Entered into HR System:

**DISTRIBUTION:**    ☐ Copy to Employee    ☐ Copy to Supervisor    ☐ Original to Personnel File

---

FINAL REPRIMAND, DISCIPLINARY DEMOTION, OR DISMISSAL ONLY (REGION / DIVISION):

---

GEO000234 (INITIAL PRODUCTION 10/03/17)

# DISCIPLINARY ACTION FORM

**GEO**
The GEO Group, Inc.

| | | | |
|---|---|---|---|
| HR DIRECTOR | ☑ Concur ☐ Mitigate | Signature: _____ Printed Name: S. Cisnes | Date: 8/26/15 |
| DIRECTOR OF OPERATIONS | ☑ Concur ☐ Mitigate | Signature: _____ Printed Name: C. NELSON | Date: 8/26/15 |
| VICE PRESIDENT | ☑ Concur ☐ Mitigate | Signature: _____ Printed Name: Mr. J.H. Black | Date: 8/27/15 |

**DISMISSAL ONLY:**

| | | | |
|---|---|---|---|
| CORPORATE LEGAL | ☑ Concur ☐ Mitigate | Signature: _____ Printed Name: Alex Lwelms | Date: 8/31/15 |
| CORPORATE HUMAN RESOURCES | ☑ Concur ☐ Mitigate | Signature: Maria a Buenata Printed Name: FOR C. Ryan | Date: 9/1/15 |

GEO000235 (INITIAL PRODUCTION 10/03/17)

# EXHIBIT 27

Disciplinary Action Form for Marquez

**DISCIPLINARY ACTION FORM**

The GEO Group, Inc.

Employee's Name:   Elizabeth Marquez                    Employee No.: Redacted       DOH: 7/9/2012

Job Title: Detention Officer                 Dept. Name: Security              Log No.:

Supervisor's Name:  Lt. R. Anderson          Facility Name: ADF West           Facility No.: 196

**INFRACTION:** Inattention to Duty                                    Date of Violation: 8/5/2015

**SUMMARY OF INFRACTION:** The specific facts regarding the current infraction, including details and description of issue or rule(s) violated.

Officer Marquez accessed 4 doors from Central Control to allow a detainee housed in Administrative Segregation to exit Segregation.

**SUMMARY OF FINDINGS:** Document below your findings.     Does this incident     ☐ Yes  ☒ No    If Yes,
Include the Who, What, When, and Where of the investigation.     involve OPR?                    OPR No.:
                                                                              (DO NOT attach OPR Report.)

On 8-5-2015 Officer E. Marquez was assigned to 2nd Watch West Central Control. At approximately 1640 hours radio communication was sent to central to cease all door access due to the discovery of an unattended detainee walking through interior facility security door 707. The detainee was positively identified by responding staff as a detainee Irias  Redacted   housing assignment Administrative Segregation. A review of video surveillance and staff interviews revealed detainee Irias passed through four (4) interior facility security doors, in an attempt to escape. All four security doors were controlled by Central Control Officer Marquez.

**SUPPORTING DOCUMENTATION:**        Additional Pages Attached?   ☒ Yes   ☐ No     If Yes, Number of Pages:  29

**DISCIPLINARY HISTORY:** List prior Counseling(s) or other Disciplinary Action(s) below. Document ALL history starting with the most recent violation looking back 12 months.

Date: _____   Violation: _____
        Action: _____

Date: _____   Violation: _____
        Action: _____

Date: _____   Violation: _____
        Action: _____

| DISCIPLINARY ACTION: | ☐ Counseling | ☐ Written Reprimand | ☐ Final Reprimand | ☒ Dismissal |
|---|---|---|---|---|

| REASON: | ☐ Behavior | ☐ Absenteeism/Tardiness | ☒ Performance | ☐ Policy |
|---|---|---|---|---|
|  |  | # of Points: 0 |  |  |

Rev 3/14/11 NP                          Page 1 of 3                              HR- 893

GEO000328 (INITIAL PRODUCTION 10/03/17)

DISCIPLINARY ACTION FORM



## EXPECTED IMPROVEMENT AND STANDARD FOR THE FUTURE: List Specific goals. Failure to show immediate and sustained improvement will result in disciplinary action up to and including discharge.

Central Control Officers must make positive identification through either voice recognition and/or visual assessment prior to granting access to any facility security door. This requires staff to remain fully attentive and alert during work hours. Failure to do so may jeopardize the safety and security of the facility, as well as the lives of staff, detainees, and visitors.

I acknowledge this action and understand the expectations and requirements as discussed with me and outlined above. I also understand the Disciplinary Action Appeal Process. My signature does not imply agreement or disagreement.

EMPLOYEE Signature: _____ Date: _____

Printed Name: _____

A witness is only **required** when the employee refuses to sign this form. A witness should be from Human Resources or a member of management and *not* a co-worker of the employee.

☐ Employee refused to sign and has received a copy of completed form.

WITNESS Signature: _____ Date: _____

Printed Name: _____

SUPERVISOR Signature: _____ Date: 4/11/16
Printed Name: Joshua Johnson

DEPARTMENT HEAD Signature: _____ Date: 4/8/16
Printed Name: Pat Love

FACILITY ADMINISTRATOR Signature: _____ Date: 04/08/2016
Printed Name: James Janecka

HUMAN RESOURCE Signature: _____ Date Distributed: _____
Printed Name: Aida Aldape

Date Entered into HR System: _____

DISTRIBUTION: ☐ Copy to Employee   ☐ Copy to Supervisor   ☐ Original to Personnel File

FINAL REPRIMAND, DISCIPLINARY DEMOTION, OR DISMISSAL ONLY (REGION / DIVISION):

HR DIRECTOR   ☒ Concur  ☐ Mitigate   Signature: _____ Printed Name: Sunny Lewis   Date: 4/13/16

DIRECTOR OF OPERATIONS   ☒ Concur  ☐ Mitigate   Signature: _____ Printed Name: C. NELSON   Date: 4/13/16

VICE PRESIDENT   ☒ Concur  ☐ Mitigate   Signature: _____ Printed Name: J.H. BLACK   VICE PRESIDENT   Date: 4/14/16

DISMISSAL ONLY:

CORPORATE LEGAL   ☒ Concur  ☐ Mitigate   Signature: _____ Printed Name: Alex Landino   Date: 4/19/16

CORPORATE HUMAN RESOURCES   ☒ Concur  ☐ Mitigate   Signature: _____ Printed Name: Sharon P. Kelley   Date: 4/20/16

GEO000329 (INITIAL PRODUCTION 10/03/17)



The GEO Group, Inc.
Adelanto Detention Facility
10400 Rancho Road
Adelanto, California 92301

TEL: 760 561 6100
Fax: 760 561 6194
www.geogroup.com

September 2, 2015

Elizabeth Marquez
Redacted

This letter is to notify you that you are under an investigation due to the incident of August 5, 2015.  Due to you being out on Family Medical Leave of Absence (FMLA) the matter being investigated prior to you FMLA will remain open, but will need to be closed out upon your return.

Also, as a reminder, during this leave period, if you are currently enrolled in any benefits plan, it is your responsibility to send bi-weekly payments to our Benefits Department as indicated on the FMLA paperwork that was given to you.

Please note that you are not to be on the grounds of the Adelanto Detention Facility for any reason unless instructed to be present through the notification by the Warden or his/her representative.

If you have any questions, please contact the undersigned at 760-561-6100 Ext. 1115.

Sincerely,

Aida Aldape
Human Resources Specialist

**GEO**
*Corrections*

**The GEO Group, Inc.**
**GEO Corrections**
Adelanto Detention Facility
10400 Rancho Road
Adelanto, California 92301

TEL: 760 561 6100
Fax: 760 561 6194
www.geogroup.com

April 29, 2016

Re:  TERMINATION

Dear Ms. Marquez,

Your employment at GEO will be terminated as of May 02, 2016, due to inability to perform job.

Enclosed you will find two copies of the Disciplinary Action Form and an ICE Contractor Employee Separation Clearance Checklist. One copy is for your record; please review, sign and date the second copies and return them to me.

Additionally, enclosed you will find a Separation Benefits Summary and your final paycheck.

Contact the Human Resources Department to schedule return of all GEO property and to retrieve any personal items you may have left at the facility.

Sincerely,

Jocelyn Siguenza
Human Resources Assistant

154-299

# MEMORANDUM

APR 15 2016
THE GEO GROUP, INC.
HUMAN RESOURCES

**GEO** Corrections

The GEO Group, Inc.
GEO Corrections
Adelanto Detention Facility East
10400 Rancho Rd.
Adelanto, California 92301
www.geogroup.com

Date:     April 8, 2016

To:       James Black, Vice President, Western Region

From:     James Janecka, Warden

RE:       **TERMINATION REQUEST**

Ms. Marquez had been on FMLA/PFL from 8/6/2015 through 4/5/2016. Prior to going on FMLA/PFL Ms. Marquez accessed 4 doors from Central Control to allow a detainee house in Administrative Segregation to exit Segregation. The day that she was going to be placed on Administrative Leave without pay (8/6/2015), Ms. Marquez did not return back to work but instead indicated that she was going to be off on FMLA. A letter was mailed to her notifying her that she was under investigation due to the incident of August 5, 2015 and due to being out on FMLA the matter being investigated prior to her FMLA will remain open, but will need to close out upon her.

Based on the information on the attached memorandum, we are recommending termination of the following employee for inability to perform job.

| Employee Name: | *ELIZABETH MARQUEZ* |
|---|---|
| Employee ID Number: | Redacted |
| Job Title: | *DETENTION OFFICER* |
| Date of Hire: | *07/09/2012* |
| Recommended Termination Code: | *109-INABILITY TO PERFORM JOB* |

Supporting Documents:
- Disciplinary Action Form
- Memorandum from E. Marquez, Detention Officer, dated August 5, 2015
- Memorandum from E. Santiago, Detention Officer, dated August 5, 2015
- Memorandum from J. Mora, Detention Officer, dated August 5, 2015
- Memorandum from A. Soliz, Sergeant, dated August 5, 2015
- Memorandum from J. Hutchinson, Sergeant, dated August 5, 2015
- Memorandum from R. De Soto, Detention Officer, dated August 5, 2015
- Memorandum from R. Anderson, Lieutenant, dated August 6, 2015



- ○ Memorandum from Z. Darmandzhyan, Detention Officer, dated August 6, 2015
- ○ Supervisor Shift Log, dated June 15, 2015, July 20, 2015, August 3, 4 and 5th, 2015
- Policy and Procedure, Master Control Center Operations, 10.2.27-ADF
- Policy and Procedure, Master Control Center Officer, 10.3.11-ADF
- Post Order Signature Sheet, June 2015, July 2015 and August 2015
- Letter dated September 2, 2015.
- Tracking receipt September 2, 2015.

_____                    _4/.8/16___
Facility Administrator Signature            Date

*Page 2 of 2*

GEO000333 (INITIAL PRODUCTION 10/03/17)

# EXHIBIT 28

Marquez's FMLA Leave



September 2, 2015

The GEO Group, Inc.
Adelanto Detention Facility
10400 Rancho Road
Adelanto, California 92301

TEL: 760 561 6100
Fax: 760 561 6194
www.geogroup.com

Elizabeth Marquez
9438 Poplar Ave.
Fontana, CA  92335

This letter is to notify you that you are under an investigation due to the incident of August 5, 2015.  Due to you being out on Family Medical Leave of Absence (FMLA) the matter being investigated prior to you FMLA will remain open, but will need to be closed out upon your return.

Also, as a reminder, during this leave period, if you are currently enrolled in any benefits plan, it is your responsibility to send bi-weekly payments to our Benefits Department as indicated on the FMLA paperwork that was given to you.

Please note that you are not to be on the grounds of the Adelanto Detention Facility for any reason unless instructed to be present through the notification by the Warden or his/her representative.

If you have any questions, please contact the undersigned at 760-561-6100 Ext. 1115.

Sincerely,

Aida Aldape
Human Resources Specialist

SANTIAGO 180



Ship    Track    Manage My Account    Customs Tools    Office/Print Services    Login



**804330648124**

Ship date                                                  Actual delivery
Wed 9/02/2015                                              Thu 9/03/2015 8:22 am

PORTLAND, CA US                                           FONTANA, CA US

**Delivered**
Signed for by: SALDANO

Stay connected wherever you are. Track while you travel. ▸

### Travel History

| Date/Time | Activity | Location |
|---|---|---|
| 9/03/2015 - Thursday | | |
| 8:22 am | Delivered | Fontana CA |

### Shipment Facts

| | | | |
|---|---|---|---|
| Tracking number | 804330648124 | Service | FedEx First Overnight |
| Signature services | Direct signature required | Special handling section | Deliver Weekday, Residential Delivery, Direct Signature Required |



Additional Information      Customer Support                Follow FedEx

Federal Express Canada Ltd. All rights reserved © FedEx 1995-2016

FedEx Express US Airbill

1 From Please print and press hard.
Date 9-1-2015
Sender's FedEx Account Number
Sender's Name Rick McClay
Company GEO GROUP INC., THE
Address 10400 RANCHO RD
City ADELANTO
State CA ZIP 92301-2237
Phone 760 561-6100

2 Your Internal Billing Reference
9438

3 To
Recipient's Name Elizabeth Mancha
Company
Address 9438 Poplar Ave
Phone 909.379.4700
City Fontana
State CA ZIP 92335

FedEx Tracking Number 8043 3064 8124

4 Express Package Service
SLA1

5 Packaging
FedEx Envelope*   FedEx Pak*   FedEx Box   FedEx Tube

6 Special Handling and Delivery Signature Options

7 Payment Bill to

Total Packages   Total Weight   Total Declared Value

30-59-4059-3
X-115
0215
3059-4059-3

011534 67959

611



**Corrections & Detention ®**

# MEMORANDUM

**Adelanto Detention Facility**
10250 Rancho Road (West)
10400 Rancho Road (East)
Adelanto, CA 92301

Date: 08/05/15

To: LT. R. ANDERSON

cc:

From: SGT. A. SOLIZ

RE: ATTEMPTED ESCAPE: DETAINEE - IRIAS, JIMMY #5866

ON WEDNESDAY AUGUST 5, 2015 AT APPROXIMATELY 1640 HRS,
I, SGT. A. SOLIZ, WAS ADVISED BY OFFICER J. MORA OF AN UNATTENDED
DETAINEE IN THE MAIN CORRIDOR. SGT. HUTCHINSON AND MYSELF
EXITED THE WATCH OFFICE AND GAVE VERBAL COMMANDS TO
DETAINEE IRIAS TO STAND STILL. IRIAS IGNORED COMMANDS AND
ENTERED DOOR 707. OFFICER MORA, DESOTO, SGT. HUTCHINSON, AND I
FOLLOWED IRIAS THROUGH THE DOOR AND CONTINUED VERBAL
COMMANDS. IRIAS COMPLIED AND AGREED TO RETURN TO SEGREGATION.
IRIAS WAS SECURED IN HIS HOUSING UNIT.

SANTIAGO 183



# MEMORANDUM

**Adelanto Detention Facility**
10250 Rancho Road (West)
10400 Rancho Road (East)
Adelanto, CA 92301

Date:  8-5-15

To: LT. Anderson

cc: CAPT. McCusker

From:  SGT. Hutchinson

## RE: DETAINEE IRIAS A#73945866

On August 5, 2015 at approximately 1640 hours, I was notified by Officer Mora and Officer Darmandzhyan that Detainee Irias, Jimmy A# 5866 came out of Segregation by himself unescorted. Myself and Sergeant Solis went to talk to Detainee Irias, whereby he then open the 707 door and walked threw, the door closed and myself and three other Officers reopened the door and approached Detainee Irias, whereby he was given several verbal commands then escorted back to the Administration Segregation side where he came from.

SANTIAGO 184

# EXHIBIT 29

Santiago's Administrative Leave

**PERSONNEL ACTION FORM (PAF)**
RATE CHANGES. TRANSFERS OR TERMINATIONS

**GEO**
The GEO Group, Inc.

Prepared By:

| Date Initiated | Effective Date | Employee's Last Name | First | Middle | Employee Identification Number | Date of Hire |
|---|---|---|---|---|---|---|
| 08/06/2015 | 08/06/15 | **Santiago** | **Emanuel** | | **176828** | **03/18/13** |

| | PRESENT | PROPOSED |
|---|---|---|

| TRANSFER ACTION | TRANSFER Reason Code: | |
|---|---|---|
| | **Employer** | Employer |
| | **USC - GEO CORRECTIONS & DETENTIONS** | |
| | Facility Name | Facility Name |
| | **196 - ADELANTO PROCESSING CENTER** | |
| | Department Name | Department Name |
| | **12 - SECURITY OPERATIONS** | |

| This section must be completed for all Transfer or Salary Actions. | Position Title | Position Code | Position Title | Position Code |
|---|---|---|---|---|
| | **Detention Officer** | **19677A** | | |
| | Employee Status | Standard Hours/Week | Employee Status | Standard Hours/Week |
| | **HFTR** | **40** | | |
| | Supervisor ID | Supervisor Name | | |

| SALARY ACTION | SALARY Reason Code: | | | |
|---|---|---|---|---|
| | If currently NON-EXEMPT, enter hourly rate: | If current EXEMPT, enter salaried rate: | New Hourly or Annual Salary | Enter Proposed Percentage Increase |
| | | | | |
| | Shift Differential: | | Shift Differential: | |
| | Status Code/Rate Test: | | Next Review Date: | |
| | FLSA Minimum Wage Test: | | FLSA Minimum Wage Test: | |

| LEAVE NOTIFICATION | Leave Notification Code: | **L7 - ADMINISTRATIVE LEAVE** |
|---|---|---|
| | Enter Leave Date: **08/06/15** | Enter Return Date: |

| TERMINATION ACTION | Termination Action Code: | |
|---|---|---|
| | Voluntary or Involuntary: | Enter Last Day Worked: |
| | Was Full Time Work Available: | Did Employee Refuse Work: |
| | Unused Vacation Hours: | Number of Days Notice: |
| | Is employee eligible for rehire: | |

| REMARKS / AUTHORIZATIONS REQUIRED | |
|---|---|

| Facility's HR Representative | Facility's Asst. Warden, Finance & Administration/Department Head |
|---|---|
| Print Name:   Alda Aldape | Print Name:   Gregory Hillers |
| Signature: _Aldahdap_   Date 8/13/15 | Signature: _Greg Hillers_   Date 8-13-15 |
| Facility Administrator/Warden or Asst. Warden, Finance & Administration | Regional/Corporate Representative |
| Print Name:   James Janecka | Print Name: |
| Signature: _GJule_   Date 8/6/15 | Signature:   Date |

**Human Resources Use Only**

| Revised: 5/1/2014 | Date Entered in HRIS | Corp. Compensation (if needed): | HR-812 |
|---|---|---|---|

H & W ____
KROMOD - notify Shelby   Equinium ✓ ____ census ____



**The GEO Group, Inc.**
Adelanto Detention Facility
10400 Rancho Road
Adelanto, California 92301

TEL: 760 561 6100
Fax: 760 561 6194
www.geogroup.com

August 6, 2015

Effective August 6, 2015, you are being placed on administrative leave without pay pending investigation.

Also, during this leave period, if you are currently enrolled in any benefits plan, it is your responsibility to send bi-weekly payments to the Human Resources Dept. to continue your benefits. The attached Benefits while on Administrative Leave form indicates your cost if you choose to keep your benefits at the current level. Your failure to make the required payments may result in your benefits being cancelled.

You are not to be on the grounds of the Adelanto Detention Facility for any reason unless instructed to be present through the notification by the Warden or his/her representative.

If you have any questions, please contact the undersigned at 760-561-6100 Ext. 1115.

Sincerely,

James Janecka
Warden

_____        8·6·15
Emanuel Santiago/Signature              Date

_____        8|4|2015
Witness                                 Date

GEO000004 (INITIAL PRODUCTION 10/03/17)

**GEO**

Form must be completed by a Human Resource Staff member to be processed.

The GEO Group, Inc.

## EMPLOYEE DATA FORM - NEW HIRES, REHIRE, OR PERSONAL CHANGES

Prepared By:

| Date Initiated | Employer | | | Employee's Last Name | | First | Middle |
|---|---|---|---|---|---|---|---|
| 02/21/13 | | | | Santiago | | Emanuel | |
| Effective Date | Facility Name | | | Employee Identification Number | | | |
| | | New Hire | Rehire | Employee's Personal Email Address | | | |

| Personal Information | Address (First Line) Street No. & Name, include apartment no. if applicable | | | City | | State | Zip Code |
|---|---|---|---|---|---|---|---|
| | 9630 Toban Dr. Font | | | Fontana | | CA | 92335 |
| | Primary Phone # (incl. area code) | Secondary Phone | Birthdate | US Citizen | Marital Status | Veteran | Ethnic ID | Sex |
| | 760-887-6716 | | | | | | | |

| Facility Information | Department | | Check Sequence Number | | Standard Work Week |
|---|---|---|---|---|---|
| | | | | | |
| | Position Title | | Position Code | Next Review Date | Employee Status |
| | | | | | |

| Salary Information | Enter Pay Rate (Hourly or Salaried Amount) | Shift Differential | Compensation Verfication | FLSA Minimum Wage Test: | Status Code/Rate Test: |
|---|---|---|---|---|---|
| | | | | | |

| Emergency Information | Contact Name | | | Primary Phone Number (incl. area code) | |
|---|---|---|---|---|---|
| | Address | City | State | Zip Code | Relationship to Contact: |
| | | | | | |

| Military Status | Military Branch | Discharge Date | Military Occupation |
|---|---|---|---|
| | | | |

| Education Information | High School | Year Graduated | Major | Minor | Degree |
|---|---|---|---|---|---|
| | College | Year Graduated | Major | Minor | Degree |
| | Licenses & Certifications: | | | | |

| Remarks | |
|---|---|
| | |

| Authorizations Required | Facility's HR Representative | Business Manager/Department Head | Employee's Name & Signature |
|---|---|---|---|
| | Type Name:   Aida Aldape | Type Name:   Dean Macur | Type Name: |
| | Signature:                    Date: | Signature:                    Date: | Signature:                    Date: |
| | Facility Administrator/Warden or Business Unit Head | Regional/Corporate Representative | |
| | Type Name:   Matt Holm | Type Name:   Jeffrey Wrigley | |
| | Signature:                    Date: | Signature:                    Date: | |

HR-602

Revised   6/15/11

Human Resources Use Only
Date Entered in HRIS

GEO000005 (INITIAL PRODUCTION 10/03/17)

# Emergency Contact Information

**GEO**
The GEO Group, Inc.

| Employee Name: | *Santiago* | *Emanuel* | |
| | Last | First | MI |

| Contact Name: | *Felix* | *Susana* | *G* |
| | Last | First | MI |

Contact Address: *9630 Tokay Dr*

City: *Fontana*　　　　State: *CA*　　Zip: *92335*

Contact Telephone Number: *562-274-5693*　　Alternative Contact Telephone Number: - -

Relationship: *Fiance*

*Emanuel Santiago*
Employee Signature

*3-18-13*
Date

Aida Aldape
Employer Representative *(Print) First, MI, Last*

*3/18/13*
Employer Representative Signature　　Date



The GEO Group, Inc.

March 1, 2013

Adelanto Detention Facility
10400 Rancho Road
Adelanto, A 92301

Emanuel Santiago
9630 Tokay Dr.
Fontana, CA  92335

TEL  760-561-6100
Fax: 760-561-6194
www.geogroup.com

Dear Emanuel:

This letter will confirm to you our conditional offer of employment.  You are being offered the position of Part-Time Detention Officer, located at the Adelanto Detention Facility located in Adelanto, CA. The salary for your position is $16.22 per hour.

As a part-time employee, your work days may include weekends and holidays and hours of work may be eight (8) to thirty-two (32) hours per week.  You may also be required to work on days that you are not scheduled to work depending on facility needs.

Your effective date of employment is March 18, 2013.  This offer is contingent upon the successful completion of a background investigation by ICE and all related employment forms, including a health screening.

To confirm these conditions, please review this offer letter, sign and return the original to me. Please retain one copy for your records.  This letter is not intended, nor should it be construed, as a contract of employment.  Rather it is intended to set forth the previously agreed upon conditions of your employment with the Company.

Emanuel, we anticipate your favorable decision to join our team and look forward to a mutually rewarding relationship.

Very truly yours,

Aida Aldape
Human Resources Specialist

I have read and agree with this Letter of Employment.

3 - 4 - 13
_____
Date

_____
Emanuel Santiago/Signature

GEO000007 (INITIAL PRODUCTION 10/03/17)

# EXHIBIT 30

Emails between Aldape and Gyenes

**From:** Aida Aldape
**Sent:** Wednesday, September 2, 2015 10:23 AM
**To:** Sandra Gyenes
**Cc:** Jocelyn Siguenza
**Subject:** Re: Request for Corporate Review - Elizabeth Marquez Termination (Adelanto)

Okay, I will notify Ms. Marquez....Thank you.

**Aida Aldape**
HR Specialist
**The GEO Group, Inc.**
Adelanto Detention Facility - East
10400 Rancho Rd.
Adelanto, California 92301

Tel: 760 561-6100 Ext. 1115 • Fax: 760 561-6194
aaldape@geogroup.com
www.geogroup.com <http://www.geogroup.com/>

This email and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to which they are addressed. If you are not the intended recipient or the person responsible for delivering the email to the intended recipient, be advised that your have received this email in error and that any use, dissemination, forwarding, printing or copying of this email is strictly prohibited. If you have received this email in error, please immediately notify by replying to this email.

On Wed, Sep 2, 2015 at 10:22 AM, Sandra Gyenes <sgyenes@geogroup.com> wrote:
That should have been noted when you submitted the recommendation for termination.  Obviously you will not be able to terminate her while she is on leave.  However a letter should be sent to her informing her that the matter being investigated prior to her LOA will remain ope during her LOA, but will need to be closed out upon her return.

**Sandra S. Gyenes**
Director of Human Resources, WESTERN REGION

**The GEO Group, Inc. ®**
6100 Center Drive, Suite 825
Los Angeles, California 90045

Tel: 310 348 3000 • Dir: 310 348 3008
Mobile: 310 291 0562

sgyenes@geogroup.com
www.geogroup.com

1

On Wed, Sep 2, 2015 at 10:13 AM, Aida Aldape <aaldape@geogroup.com> wrote:

Yes, two employees were involved in the incident (Ms. Marquez and Mr. Santiago).  On her last day worked was the date of the incident and she requested to be on leave prior to obtaining approval to place her on leave.  The recommendation was to request a termination on both individuals and not just one, since they were both on duty and involved in the incident.

**Aida Aldape**
HR Specialist
**The GEO Group, Inc.**
Adelanto Detention Facility - East
10400 Rancho Rd.
Adelanto, California 92301

Tel: 760 561-6100 Ext. 1115 • Fax: 760 561-6194
aaldape@geogroup.com
www.geogroup.com <http://www.geogroup.com/>

This email and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to which they are addressed. If you are not the intended recipient or the person responsible for delivering the email to the intended recipient, be advised that your have received this email in error and that any use, dissemination, forwarding, printing or copying of this email is strictly prohibited. If you have received this email in error, please immediately notify by replying to this email.

On Wed, Sep 2, 2015 at 10:02 AM, Sandra Gyenes <sgyenes@geogroup.com> wrote:
I don't completely understand.  You submitted a recommendation for termination due to performance while processing a maternity leave?

**Sandra S. Gyenes**
Director of Human Resources, WESTERN REGION

**The GEO Group, Inc. ®**
6100 Center Drive, Suite 825
Los Angeles, California 90045

Tel: 310 348 3000 • Dir: 310 348 3008
Mobile: 310 291 0562

sgyenes@geogroup.com
www.geogroup.com

On Wed, Sep 2, 2015 at 9:15 AM, Aida Aldape <aaldape@geogroup.com> wrote:

Good Morning Sandra,

GEO000626

On Ms. Marquez requested FMLA (maternity) prior to obtaining approval to place her on Administrative Leave.  Should we continue with the termination process although she is on FMLA?

Please advise.

**Aida Aldape**
HR Specialist
**The GEO Group, Inc.**
Adelanto Detention Facility - East
10400 Rancho Rd.
Adelanto, California 92301

Tel: 760 561-6100 Ext. 1115 • Fax: 760 561-6194
aaldape@geogroup.com
www.geogroup.com <http://www.geogroup.com/>

This email and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to which they are addressed. If you are not the intended recipient or the person responsible for delivering the email to the intended recipient, be advised that your have received this email in error and that any use, dissemination, forwarding, printing or copying of this email is strictly prohibited. If you have received this email in error, please immediately notify by replying to this email.

On Tue, Sep 1, 2015 at 3:52 PM, Sandra Gyenes <sgyenes@geogroup.com> wrote:

Hi Aida,

We have corporate approval on the termination of Elizabeth Marquez.  See attached.

Please process the termination at your earliest convenience!

Let me know if you have any questions!

Thanks,
Sandy

**Sandra S. Gyenes**
Director of Human Resources, WESTERN REGION

**The GEO Group, Inc. ®**
6100 Center Drive, Suite 825
Los Angeles, California 90045

Tel: 310 348 3000 • Dir: 310 348 3008
Mobile: 310 291 0562

sgyenes@geogroup.com
www.geogroup.com

3

---------- Forwarded message ----------
From: **Maria Barsallo** <mbarsallo@geogroup.com>
Date: Tue, Sep 1, 2015 at 11:30 AM
Subject: Re: Request for Corporate Review - Elizabeth Marquez Termination (Adelanto)
To: Sandra Gyenes <sgyenes@geogroup.com>

Corporate Legal and HR have completed the review and concur with the recommendation of termination based on code **I09 – Inability to Perform Job.**

Attached is the Disciplinary Action Form with the approval signatures.  Please obtain the employee's signature (or witness), make sure the termination is processed through Infinium, distribute a copy of the Disciplinary Action Form to the employee and supervisor, and file the document in the employee's personnel file.

Regards,

On Fri, Aug 28, 2015 at 4:13 PM, Sandra Gyenes <sgyenes@geogroup.com> wrote:

Hi Mary,

Officer Marquez is currently on administrative leave w/o pay pending approval of his termination due to *I09 - Inability to Perform Job.*

Please review and let me know if you require any additional information.

Best Regards,
Sandy

**Sandra S. Gyenes**
Director of Human Resources, WESTERN REGION

**The GEO Group, Inc. ®**
6100 Center Drive, Suite 825
Los Angeles, California 90045

Tel: 310 348 3000 • Dir: 310 348 3008
Mobile: 310 291 0562

sgyenes@geogroup.com
www.geogroup.com

4

GEO000628

# EXHIBIT 31

Termination Request for Marquez

# MEMORANDUM

**GEO**
*Corrections*

Date:     April 8, 2016

To:      James Black, Vice President, Western Region

From:    James Janecka, Warden

The GEO Group, Inc.
GEO Corrections
Adelanto Detention Facility East
10400 Rancho Rd.
Adelanto, California 92301
www.geogroup.com

### RE:      TERMINATION REQUEST

Ms. Marquez had been on FMLA/PFL from 8/6/2015 through 4/5/2016. Prior to going on FMLA/PFL Ms. Marquez accessed 4 doors from Central Control to allow a detainee house in Administrative Segregation to exit Segregation. The day that she was going to be placed on Administrative Leave without pay (8/6/2015), Ms. Marquez did not return back to work but instead indicated that she was going to be off on FMLA. A letter was mailed to her notifying her that she was under investigation due to the incident of August 5, 2015 and due to being out on FMLA the matter being investigated prior to her FMLA will remain open, but will need to close out upon her.

Based on the information on the attached memorandum, we are recommending termination of the following employee for inability to perform job.

| Employee Name: | *ELIZABETH MARQUEZ* |
| --- | --- |
| Employee ID Number: | *173049* |
| Job Title: | *DETENTION OFFICER* |
| Date of Hire: | *07/09/2012* |
| Recommended Termination Code: | *I09-INABILITY TO PERFORM JOB* |

Supporting Documents:
- Disciplinary Action Form
- Memorandum from E. Marquez, Detention Officer, dated August 5, 2015
- Memorandum from E. Santiago, Detention Officer, dated August 5, 2015
- Memorandum from J. Mora, Detention Officer, dated August 5, 2015
- Memorandum from A. Soliz, Sergeant, dated August 5, 2015
- Memorandum from J. Hutchinson, Sergeant, dated August 5, 2015
- Memorandum from R. De Soto, Detention Officer, dated August 5, 2015
- Memorandum from R. Anderson, Lieutenant, dated August 6, 2015



- Memorandum from Z. Darmandzhyan, Detention Officer, dated August 6, 2015
- Supervisor Shift Log, dated June 15, 2015, July 20, 2015, August 3, 4 and 5th, 2015
- Policy and Procedure, Master Control Center Operations, 10.2.27-ADF
- Policy and Procedure, Master Control Center Officer, 10.3.11-ADF
- Post Order Signature Sheet, June 2015, July 2015 and August 2015
- Letter dated September 2, 2015.
- Tracking receipt September 2, 2015.

_____    _____
Facility Administrator Signature         Date

*Page 2 of 2*

SANTIAGO 145

# DISCIPLINARY ACTION FORM



The GEO Group, Inc.

Employee's Name: __Elizabeth Marquez__                Employee No.: __173049__        DOH: __7/9/2012__

Job Title: __Detention Officer__        Dept. Name: __Security__                Log No.: _____

Supervisor's Name: __Lt. R. Anderson__        Facility Name: __ADF West__        Facility No.: __196__

**INFRACTION:** __Inattention to Duty__                            Date of Violation: __8/5/2015__

**SUMMARY OF INFRACTION:** The specific facts regarding the current infraction, including details and description of issue or rule(s) violated.

Officer Marquez accessed 4 doors from Central Control to allow a detainee housed in Administrative Segregation to exit Segregation.

**SUMMARY OF FINDINGS:** Document below your findings. Include the Who, What, When, and Where of the investigation.

Does this incident involve OPR?  ☐ Yes  ☒ No    If Yes, OPR No.: _____
(DO NOT attach OPR Report.)

On 8-5-2015 Officer E. Marquez was assigned to 2nd Watch West Central Control. At approximately 1640 hours radio communication was sent to central to cease all door access due to the discovery of an unattended detainee walking through interior facility security door 707. The detainee was positively identified by responding staff as a detainee Irias A# 73945866, housing assignment Administrative Segregation. A review of video surveillance and staff interviews revealed detainee Irias passed through four (4) interior facility security doors, in an attempt to escape. All four security doors were controlled by Central Control Officer Marquez.

**SUPPORTING DOCUMENTATION:**        Additional Pages Attached?  ☒ Yes  ☐ No    If Yes, Number of Pages: __29__

**DISCIPLINARY HISTORY:** List prior Counseling(s) or other Disciplinary Action(s) below. Document ALL history starting with the most recent violation looking back 12 months.

Date: _____        Violation: _____

    Action: _____

Date: _____        Violation: _____

    Action: _____

Date: _____        Violation: _____

    Action: _____

| DISCIPLINARY ACTION: | ☐ Counseling | ☐ Written Reprimand | ☐ Final Reprimand | ☒ Dismissal |
|---|---|---|---|---|

| REASON: | ☐ Behavior | ☐ Absenteeism/Tardiness | ☒ Performance | ☐ Policy |
|---|---|---|---|---|
| | | # of Points: 0 | | |

SANTIAGO 146

DISCIPLINARY ACTION FORM


The GEO Group, Inc.

**EXPECTED IMPROVEMENT AND STANDARD FOR THE FUTURE:** List Specific goals. Failure to show immediate and sustained improvement will result in disciplinary action up to and including discharge.

Central Control Officers must make positive identification through either voice recognition and/or visual assessment prior to granting access to any facility security door. This requires staff to remain fully attentive and alert during work hours. Failure to do so may jeopardize the safety and security of the facility, as well as the lives of staff, detainees, and visitors.

I acknowledge this action and understand the expectations and requirements as discussed with me and outlined above. I also understand the Disciplinary Action Appeal Process. My signature does not imply agreement or disagreement.

EMPLOYEE Signature: _____   Date: _____

Printed Name: _____

A witness is only <u>required</u> when the employee refuses to sign this form. A witness should be from Human Resources or a member of management and *not* a co-worker of the employee.

☐ Employee refused to sign and has received a copy of completed form.

WITNESS Signature: _____   Date: _____

Printed Name: _____

SUPERVISOR Signature: _____   Date: 4/11/16

Printed Name: Joshua Johnson

DEPARTMENT HEAD Signature: _____   Date: 4/8/16

Printed Name: Pat Love

FACILITY ADMINISTRATOR Signature: _____   Date: 04/08/2016

Printed Name: James Janecka

HUMAN RESOURCE Signature: _____   Date Distributed: _____
Date Entered into HR System: _____

Printed Name: Aida Aldape

**DISTRIBUTION:**   ☐ Copy to Employee   ☐ Copy to Supervisor   ☐ Original to Personnel File

FINAL REPRIMAND, DISCIPLINARY DEMOTION, OR DISMISSAL ONLY (REGION / DIVISION):

HR DIRECTOR   ☑ Concur   ☐ Mitigate   Signature: _____   Printed Name: Sunny Lewis   Date: 4/13/16

DIRECTOR OF OPERATIONS   ☑ Concur   ☐ Mitigate   Signature: _____   Printed Name: C. NELSON   Date: 4/13/16

VICE PRESIDENT   ☑ Concur   ☐ Mitigate   Signature: _____   Printed Name: J.H. BLACK   VICE PRESIDENT   Date: 4/14/16

DISMISSAL ONLY:

CORPORATE LEGAL   ☑ Concur   ☐ Mitigate   Signature: _____   Printed Name: Alex Landon   Date: 4/19/16

CORPORATE HUMAN RESOURCES   ☑ Concur   ☐ Mitigate   Signature: _____   Printed Name: Sharon P. Kelley   Date: 4/20/16

SANTIAGO 147

# MEMORANDUM



Date: 8|5|15

To: LT. Anderson
cc:

From: E. Marquez

The GEO Group, Inc.
GEO Corrections
Adelanto Detention Facility-East
10400 Rancho Road
P. O. Box 6005
Adelanto, California 92301
www.geogroup.com

RE: Detainee Jimmy Irias

On Wednesday August 8th 2015 at approximately 1655 hours while in Central Control at the time of incident I was on the phone Verifying Count with intake, and three Control officer, Locating an available utility on the radio. I Do not Recall seeing any detainee at the camera Call-up while Accessing multiple doors.

SANTIAGO 148

# MEMORANDUM



**Corrections & Detention ©**

Adelanto Detention Facility
10250 Rancho Road (West)
10400 Rancho Road (East)
Adelanto, CA 92301

Date: 8-5-15

To: Lt. Anderson

cc:

From: D/O Santiago, E/

**RE:**

On 8-5-15, shortly before the 1630 count, I placed D/t Irias #73945866 into a lower tier shower. Moments before placing him in the shower, the dinner trays were delivered by kitchen staff and were awaiting distribution. Once I signed for the dinner trays, kitchen staff exited and I proceeded to inspect the dinner cart as required. By this time the 1630 count had commenced and D/t Irias had not finished showering, so we counted him in the shower as to not delay count or cause other issues. Upon completion of our count, we needed to begin our staff lunch breaks in segregation immediately to prevent the possibility of a meal penalty, as we are to relieve eachother on 2nd Watch, one at a time, because we do not have a segregation control officer, nor do the utilities assist with lunches in segregation. Also, between the time he was placed in the shower and the time count was commenced, the 2nd segregation officer had returned from outside recreation with 8 detainees who were secured in their cells, as he had completed the detainee's hour of recreation on the lower tier. In order to complete our staff lunches, the 2nd officer on the administrative segregation side proceeded to disciplinary segregation side to relieve the 2 officers working disciplinary segregation, one officer at a time, leaving me to complete the

SANTIAGO 149



Adelanto Detention Facility
10250 Rancho Road (West)
10400 Rancho Road (East)
Adelanto, CA 92301

# MEMORANDUM

Date: 8-5-15

To: Lt. Anderson

cc:

From: P/o Santiago, C/

RE:

distribution of dinner trays. The 2 segregation porters were utilized to complete the distribution of dinner trays and I began distribution with them on the lower tier. We started on the left side nearest the segregation control and worked our way to the left. At the time we started D/t Irias was still in the shower and not his cell (A-116) so we skipped him and were to go back and feed him. When finished distributing to the bottom tier D/t Irias still had not finished in the shower so we continued to the top tier to distribute trays, this time from the right to the left. Once we finished distributing dinner trays to the top tier I began securing the food ports and then continued down back to the bottom tier where I seen D/t Irias being escorted by multiple staff back into segregation and into his cell. I had not secured the shower door when placing D/t Irias in it due to administrative segregation now being an open dayroom and I believe he exited segregation while I was feeding the top tier with the porters. — End Report

SANTIAGO 150

# MEMORANDUM

**GEO**
*Corrections*

The GEO Group, Inc.
GEO Corrections
Adelanto Detention Facility
10400 Rancho Road
P. O. Box 6005
Adelanto, California 92301
www.geogroup.com

Date: 8/05/15

To: LT. ANDERSON

From: D/O J.MORA

## RE:

AT APPROXIMATELY 1640 I DETENTION OFFICER J.MORA WAS WALKING DOWN THE WEST FACILITIES MAIN CORRIDOR WHEN I OBSERVED DETAINEE (ARIAS, JIMMY A#73945866- W1-A-116-1L) WALK OUT OF DOOR 1X101A, AS HE WALKED TOWARDS DOOR #707. I THEN ADVISED SEARGENTS SOLIS AND HUTCH OF THE SITUATION VIA VERBAL. HE THEN CONTINUED TO GET THROUGH DOOR 707 AND WALKED TO DOOR 322B I THEN FOLLOWED HIM. SEARGENT SOLIS VERBALLY ASKED DETAINEE ARIAS THAT HE WOULD BE ESCORTED BACK TO SEGREGATION AS DETAINEE ARIAS BEGAN TO COMPLY. I THEN ASSISTED WITH ECORTING DETAINEE ARIAS BACK TO SEGREGATION WHERE HE WAS PLACED IN HIS CELL. NOTHING FURTHER TO REPORT AT THIS TIME.

SANTIAGO 151



Corrections & Detention ®

# MEMORANDUM

Date: 08/05/15

**Adelanto Detention Facility**
10250 Rancho Road (West)
10400 Rancho Road (East)
Adelanto, CA 92301

To: LT. R. ANDERSON

cc:

From: SGT. A. SOLIZ

RE: ATTEMPTED ESCAPE: DETAINEE - IRIAS, JIMMY #5866

ON WEDNESDAY AUGUST 5, 2015 AT APPROXIMATELY 1640 HRS,
I, SGT. A. SOLIZ, WAS ADVISED BY OFFICER J. MORA OF AN UNATTENDED
DETAINEE IN THE MAIN CORRIDOR. SGT. HUTCHINSON AND MYSELF
EXITED THE WATCH OFFICE AND GAVE VERBAL COMMANDS TO
DETAINEE IRIAS TO STAND STILL. IRIAS IGNORED COMMANDS AND
ENTERED DOOR 707. OFFICER MORA, DESOTO, SGT. HUTCHINSON, AND I
FOLLOWED IRIAS THROUGH THE DOOR AND CONTINUED VERBAL
COMMANDS. IRIAS COMPLIED AND AGREED TO RETURN TO SEGREGATION.
IRIAS WAS SECURED IN HIS HOUSING UNIT.



# MEMORANDUM

**Adelanto Detention Facility**
10250 Rancho Road (West)
10400 Rancho Road (East)
Adelanto, CA 92301

Date: 08/05/2015

To: Lt. R. Anderson

cc:

From: Sgt. A. Soliz

## RE: SECURITY BREACH: DETAINEE- IRIAS, JIMMY #73945866

On Wednesday August 5, 2015 at approximately 1640 hours I, Sgt. A. Soliz, was completing paper work in the west watch office during the formal 1630 hours count when Officer J. Mora notified me of an unattended detainee in the main corridor. Sgt. Hutchinson and I immediately entered the main corridor to assess the situation. Upon exiting the office we observed and recognized detainee Irias, Jimmy #5866 opening the 707 door. Sgt. Hutchinson gave Irias the verbal command to stop but Irias stated, "I 'm getting out of here you guys opened the door for me." and proceeded through the doorway. Officer J. Mora, Officer DeSoto, Officer Darmandzhyan, Sgt. Hutchinson, and I continued to follow Irias. Sgt. Hutchinson ordered via radio for central control officers not access the intake door that Irias was standing by. I then immediately ordered central control officers not to access any doors in the facility except door 707 to allow us to proceed to where Irias was standing. Officer DeSoto began to jog towards Irias in an attempt to restrain him. However, due to previous experiences with Irias being violent towards staff and his mental condition, I ordered Officer DeSoto to stand down and approach Irias with us as a group. I also observed that Irias was not at the exiting door of the corridor and decided to use the knowledge of our facility layout to prevent escalating the situation. Sgt. Hutchinson and I used our judgment to approach the situation in a way that would de-escalate the situation and minimize possibility of staff injury. We approached Irias with urgency and caution while giving clear and concise verbal commands such as "Jimmy I need you to put your Hands behind your back." And "Jimmy I need you to cuff up." Once we reached Irias we spaced out around him to prevent any further movement from him. Irias then responded, "I don't want no cuffs. I'll fucking walk back!" We agreed to let Irias walk back to Segregation Housing without mechanical restraints due to the fact that he was housed in Segregation A Unit(which does not require detainees to be placed in restraints for movement) and also due to the fact that Irias was being compliant to return to his housing. While being escorted Irias began to state, "Its y'all fault you opened up the door! Now you're gonna charge me with another bullshit charge!" Upon reaching the Segregation Unit main corridor doors, Sgt. Hutchinson and I made contact with Lt. Duran as she was exiting the unit. We advised her of the situation and she stated," No way! I just left there and he was in the shower. Take him back to his cell." Sgt. Hutchinson and I both agreed that we should follow command since formal count had not yet cleared and we continued to escort Irias back to his housing where we returned him to his cell and was secured. Lt. Anderson was notified immediately of the situation.

SANTIAGO 153



**Corrections & Detention ®**

# MEMORANDUM

Date:  8-5-15

To: LT. Anderson

cc: CAPT. McCusker

From:  SGT. Hutchinson

Adelanto Detention Facility
10250 Rancho Road (West)
10400 Rancho Road (East)
Adelanto, CA  92301

## RE: DETAINEE IRIAS A#73945866

On August 5, 2015 at approximately 1640 hours, I was notified by Officer Mora and Officer Darmandzhyan that Detainee Irias, Jimmy A# 5866 came out of Segregation by himself unescorted. Myself and Sergeant Solis went to talk to Detainee Irias, whereby he then open the 707 door and walked threw, the door closed and myself and three other Officers reopened the door and approached Detainee Irias, whereby he was given several verbal commands then escorted back to the Administration Segregation side where he came from.

SANTIAGO 154



**Corrections & Detention ®**

# MEMORANDUM

Date: 08/05/2015

To: Lt. R. Anderson

cc: CAPT. McCusker

From: Sgt. J Hutchinson

**Adelanto Detention Facility**
10250 Rancho Road (West)
10400 Rancho Road (East)
Adelanto, CA 92301

## RE: SECURITY BREACH: DETAINEE- IRIAS, JIMMY A#73945866

On Wednesday August 5, 2015 at approximately 1640 hours, I was notified by Officer J. Mora that there was an unescorted Detainee in the main corridor. Sgt. Soliz and I immediately entered the main corridor to assess the situation. Upon exiting the office we observed and recognized Detainee Irias, Jimmy #5866 opening the 707 door. I gave Irias the verbal command to stop several times, Irias stated, " I 'm getting out of here you guys opened the door for me." and proceeded through the doorway. Officer J. Mora, Officer DeSoto, Officer Darmandzhyan, Sgt. Soliz, and I continued to follow Irias. I ordered via radio for Central Control Officers not to access the intake door that Irias was standing by. Sgt. Soliz then immediately ordered Central Control Officers not to access any doors in the facility except door 707 to allow us to proceed to where Irias was standing. Officer DeSoto began to jog towards Irias in an attempt to restrain him. However, due to previous experiences with Irias being violent towards staff and his mental condition, Sergeant Soliz ordered Officer Desoto to stand down, I then pulled out my chemical agent verbally telling Detainee "Jimmy I need you to put your hands behind your back", he replyed "No you guys opened the door for me". I repeated it again and told him if he does not comply chemical agent will be used. Irias then said "Fuck I'll walk back. At this time we had surrounded Detainee Irias, whereby we escorted him down to Segregation without hand restraints with no issues and full compliance. As we are escorting him he said "Now you guys are going to charge me with some bullshit." Next we entered the Segregation Corridor from the Main Corridor and LT. Duran was there I said "What happened," she replyed "What do you mean, I just saw him in the shower." I said "LT he went threw four doors." LT. Duran then said "Take him back to his cell," which myself and Sergeant Soliz and the other three Officers did with no issues and full compliance. After securing Irias in his cell myself and Sergeant Soliz Immediately went to our Watch Commander LT. Anderson and informed of the situation, whereby he told us to check the cameras. I used my judgment to approach the situation due to previous incident with Detainee Irias in a way that would deescalate the situation and minimize possibility of staff injury.



Corrections & Detention ®

Adelanto Detention Facility
10250 Rancho Road (West)
10400 Rancho Road (East)
Adelanto, CA 92301

# MEMORANDUM

Date: 8/5/15

To: LT. ANDERSON
cc: SGT. HUTCHENSON.

From: P/O DESOTO

RE: 8/5/15   DISCREPANCIES

ON AUGUST 5, 2015 AT APPROXIMATY 1645pm I P/O DESOTO WAS WALKING BACK FROM DROPPING OFF PAPERWORK AT CENTRAL CONTROL, WHEN I HEARD STAFF MEMBERS. MORA, DARMANDZHY, SGT. HUTCHENSON, SGT. SOLIZ CALL TO A DETAINEE THAT WALKED OUT OF SEGREGATION I P/O DESOTO WITNESSED DETAINEE ARIAS. J. WALK INTO INTAKE CORRIDOR THROUGH DOOR 707. THE FOLLOWING STAFF AND MYSELF FOLLOWED THE DETAINEE AND MADE CONTACT WITH DETAINEE ARIAS. AT INTAKE ENTRANCE. I TOLD DETAINEE ARIAS TO PUT HIS HANDS BEHIND HIS BACK, HE REFUSED SGT. HUTCHENSON ASKED THE DETAINEE TO COMPLY: DETAINEE ARIAS CHOSE TO WALK BACK TO SEGREGATION. DETAINEE WAS THEN SECURED IN SEGREGATION. NO JURIES AT THE TIME, NO FURTHER DISCREPANCIES

SANTIAGO 156



Corrections & Detention ©

# MEMORANDUM

Date:   08/06/2015

**Adelanto Detention Facility**
10250 Rancho Road (West)
10400 Rancho Road (East)
Adelanto, CA 92301

To:   Captain L. McCusker
cc:

From:  Lt. R. Anderson

RE:    **EVENTS OF 08/05/2015**

On 08/15/2015 at approximately 1700 I was notified of a Detainee having been observed unescorted within the facility and the on duty Shift Sergeants had confronted the Detainee and escorted him back to his assigned housing in Protective Custody/Administrative Segregation (W1-A) without incident. In concert with this I was managing an upcoming concern with the eminent arrival of a disabled Detainee while ensuring the 1630 face to photo facility count was completed successfully. The count was cleared at approximately 1730 at which time I turned my focus and priority on the Segregation detainee found unescorted and began my fact finding efforts to determine the actions leading to the Detainee being allowed out of Segregation without escort.

At approximately 1830 I received a phone call from Warden Janecka in regard to arrival of the disabled Detainee. During this conversation I informed Warden Janecka we had discovered Segregation Detainee outside Segregation unsupervised. Warden Janecka advised me to contact the ADO (D.W. J. Gustin) and to advise him of the situation. Multiple attempts were made to contact the ADO without success. Soon after, Chief Johnson contacted me by phone stating he had received information from the Warden regarding the above incident. I relayed the information acquired at the time of his call and continued my investigation.

It was determined the breach in security had resulted from the assigned Segregation Officers leaving the detainee unattended in an unsecured shower. The investigation also determined West Central Control Officers had accessed doors without properly identifying the person exiting.

The primary staff errors were determined to be the misunderstanding by Segregation Officers that they could relieve themselves for breaks and lunches. This is a result of mixed messages given to Segregation Officers during the recent Staffing and procedural changes. The afore mentioned errors and misunderstandings were a result of my not ensuring Staff were advised of the most recent procedural information, as I too had received mixed direction with regard to segregation procedures. Not having concluded the scenario should be classified as an attempted escape in a timely manner, I exceeded the timeline guidelines for reporting it as such.

Following this, a disciplinary packet was written on Detainee Irias, J. A# 73945866 for attempted escape, Disciplinary Action Forms (DAF) were written on one Central Control Officer, one Segregation Officer and two Shift Sergeants.

# MEMORANDUM

**GEO Corrections**

The GEO Group, Inc.
GEO Corrections
Adelanto Detention Facility
10400 Rancho Road
P. O. Box 6005
Adelanto, California 92301
www.geogroup.com

Date:  08/6/2015

To:   LT. Anderson

From:   Z. Darmandzhyan

## RE:  DETAINEE IRIAS, JIMMY

On 08/05/15 at approximately 1655 hours I, Z. Darmandzhyan, observed detainee Irias, Jimmy (A# 73945866) walk out from segregation and into the main corridor unaccompanied by any staff members. I asked the detainee "what are you doing?" in which detainee Irias responded "I have bail, I'm going". At this moment, Officer Mora notified the management staff who were in the watch office. Myself, management, and other officers walked towards detainee Isias. Detainee Isias opened the door leading into the medical/intake corridor and went into the hallway. I and the responding staff entered the medical/intake corridor and approached detainee Isias. Detainee Isias stated to us, "The doors are guiding me". Upon arriving to the area where detainee Isias was standing, Detainee Isias was given a verbal command to submit to mechanical restraints. Detainee Isias responded "Why so I can get another bullshit charge?" Detainee stated that he will walk back to segregation. Detainee Isias was escorted back to segregation without any further incident.

SANTIAGO 158

# EXHIBIT 32

Termination Request for Santiago

# MEMORANDUM



**Date:**   August 18, 2015

The GEO Group, Inc.
GEO Corrections
Adelanto Detention Facility East
10400 Rancho Rd.
Adelanto, California 92301
www.geogroup.com

**To:**     Cheryl Nelson, Director Regional Operations

**From:**   James Janecka, Warden

**RE:**     **TERMINATION REQUEST**

Based on the information on the attached memorandum, we are recommending termination of the following employee for inability to perform job.

| Employee Name: | *EMANUEL SANTIAGO* |
|---|---|
| Employee ID Number: | *176828* |
| Job Title: | *DETENTION OFFICER* |
| Date of Hire: | *03/18/2013* |
| Recommended Termination Code: | *I09-INABILITY TO PERFORM JOB* |

Supporting Documents:
- Disciplinary Action Form
- Memorandum from E. Santiago, Detention Officer, dated August 5, 2015
- Memorandum from E. Marquez, Detention Officer, dated August 5, 2015
- Memorandum from J. Mora, Detention Officer, dated August 5, 2015
- Memorandum from A. Soliz, Sergeant, dated August 5, 2015
- Memorandum from J. Hutchinson, Sergeant, dated August 5, 2015
- Memorandum from R. De Soto, Detention Officer, dated August 5, 2015
- Memorandum from R. Anderson, Lieutenant, dated August 6, 2015
- Memorandum from Z. Darmandzhyan, Detention Officer, dated August 6, 2015
- Memorandum from R. Duran, Lieutenant, dated August 6, 2015
- 1940 Beds, Staffing Plan, dated June 16, 2015
- Log Book, dated August 5, 2015
- Post Order Signature Sheet, July/August 2015
- Supervisor Shift Log, dated August 5, 2015

GEO000127 (INITIAL PRODUCTION 10/03/17)



- Policy and Procedure, Segregation/Special Management Unit Officer, 10.3.7-ADF
- Policy and Procedure, Special Management Unit Operations, 10.2.11-ADF
- 40 Hour Certification Housing Unit Training

_____          _____8/18/15_____
Facility Administrator Signature                Date

_Page 2 of 2_

GEO000128 (INITIAL PRODUCTION 10/03/17)

# DISCIPLINARY ACTION FORM


The GEO Group, Inc.

Employee's Name:   Emanuel Santiago                    Employee No.: 176828        DOH: 3/18/2013

Job Title: Detention Officer                          Dept. Name: Security        Log No.: _____

Supervisor's Name:   Lt. R. Anderson                 Facility Name:  ADF West     Facility No.: 196

**INFRACTION:**  Inattention to Duty                                Date of Violation: 8/5/2015

**SUMMARY OF INFRACTION:**  The specific facts regarding the current infraction, including details and description of issue or rule(s) violated.

On 8/5/2015 Officer E. Santiago failed to use proper security procedures, which afforded a detainee to freely move in the Administrative Segregation housing unit and ultimately attempt to escape by breaching four facility security doors before being apprehended and returned to Segregation.

**SUMMARY OF FINDINGS:**  Document below your findings. Include the Who, What, When, and Where of the investigation.

Does this incident involve OPR?   ☐ Yes  ☒ No   If Yes, OPR No.:
(DO NOT attach OPR Report.)

On 8-5-2015 Officer E. Santiago was assigned as the 2nd Watch West Administrative Segregation Housing Unit Officer. He was given specific direction from Lt. Duran to ensure two officers are present when escorting Detainee Irias **redacted** from in cell in Administrative Segregation to the shower. At approximately 1623 hours Officer Santiago conducted a single officer escort of detainee Irias to the shower area, where he failed to lock and secure the shower door. Officer Santiago then proceeded to retrieve two detainee porters to facilitate distribution of meal trays. Formal count commenced at 1630 and was conducted by Officer Santiago and Officer Patterson. Once count was completed Officer Patterson departed the unit to facilitate a lunch break for another officer. Officer Santiago failed to get supervisory authorization to out count detainee Irias in the shower area and further authorization to bring out two detainee porters prior to the facility formal count clearing. While supervising detainee porters as they handed out meal trays on the far upper tier, detainee Irias completed his shower and pushed open the unsecure shower door at 1653 hours. Detainee Irias departed the Segregation housing unit unsupervised and unrestrained at approximately 1653 hours.

**SUPPORTING DOCUMENTATION:**    Additional Pages Attached?   ☒ Yes  ☐ No    If Yes, Number of Pages:  58

**DISCIPLINARY HISTORY:**  List prior Counseling(s) or other Disciplinary Action(s) below.  Document ALL history starting with the most recent violation looking back 12 months.

Date: _____   Violation: _____

    Action: _____

Date: _____   Violation: _____

    Action: _____

Date: _____   Violation: _____

    Action: _____

| DISCIPLINARY ACTION: | ☐ Counseling | ☐ Written Reprimand | ☐ Final Reprimand | ☒ Dismissal |
|---|---|---|---|---|

GEO000129 (INITIAL PRODUCTION 10/03/17)

# DISCIPLINARY ACTION FORM



**The GEO Group, Inc.**

| REASON: | ☐ Behavior | ☐ Absenteeism/Tardiness | ☒ Performance | ☐ Policy |
|---|---|---|---|---|

# of Points: 0

## EXPECTED IMPROVEMENT AND STANDARD FOR THE FUTURE: List Specific goals. Failure to show immediate and sustained improvement will result in disciplinary action up to and including discharge.

Officers are expected to move and secure detainees in a secure segregation housing unit with all required security precautions. Any deviation from policy, procedure and/or supervisory directives must be preauthorized by a supervisor. This requires staff to remain fully attentive and alert during work hours. Failure to do so may jeopardize the safety and security of the facility, as well as the lives of staff, detainees, and visitors.

I acknowledge this action and understand the expectations and requirements as discussed with me and outlined above. I also understand the Disciplinary Action Appeal Process. My signature does not imply agreement or disagreement.

**EMPLOYEE** Signature: _____   Date: _____
Printed Name: _____

A witness is only <u>required</u> when the employee refuses to sign this form. A witness should be from Human Resources or a member of management and *not* a co-worker of the employee.

☐ Employee refused to sign and has received a copy of completed form.

**WITNESS** Signature: _____   Date: _____
Printed Name: _____

**SUPERVISOR** Signature: _____   Date: 8-13-15
Printed Name: LT. R. ANDERSON

**DEPARTMENT HEAD** Signature: _____   Date: 8-13-15
Printed Name: Asst. P. Seibert Love

**FACILITY ADMINISTRATOR** Signature: _____   Date: 8/17/15
Printed Name: J. Janecka

**HUMAN RESOURCE** Signature: _____
Printed Name: _____

Date Distributed: _____
Date Entered into HR System: _____

**DISTRIBUTION:** ☐ Copy to Employee   ☐ Copy to Supervisor   ☐ Original to Personnel File

FINAL REPRIMAND, DISCIPLINARY DEMOTION, OR DISMISSAL ONLY (REGION / DIVISION):

GEO000130 (INITIAL PRODUCTION 10/03/17)

# DISCIPLINARY ACTION FORM

**GEO**
The GEO Group, Inc.

| | | | | |
|---|---|---|---|---|
| **HR DIRECTOR** | ☐ Concur | Signature: | | |
| | Mitigate ☐ | Printed Name: | | Date: |
| **DIRECTOR OF OPERATIONS** | ☐ Concur | Signatu e: | | |
| | Mitigate ☐ | Printed Name: | | Date: |
| **VICE PRESIDENT** | ☐ Concur | Signature: | | |
| | Mitigate ☐ | Printed Name: | | Date: |

**DISMISSAL ONLY:**

| | | | | |
|---|---|---|---|---|
| **CORPORATE LEGAL** | ☐ Concur | Signature: | | |
| | Mitigate ☐ | Printed Name: | | Date: |
| **CORPORATE HUMAN RESOURCES** | ☐ Concur | Signature: | | |
| | Mitigate ☐ | Printed Name: | | Date: |

GEO000131 (INITIAL PRODUCTION 10/03/17)



**Corrections & Detention®**

Adelanto Detention Facility
10250 Rancho Road (West)
10400 Rancho Road (East)
Adelanto, CA  92301

# MEMORANDUM

Date: 8-5-15

To: Lt. Anderson

cc:

From: D/o Santiago, E/

RE:

On 8-5-15, shortly before the 1630 count, I placed D/t Irias ~~Redacted~~ into a lower tier shower. Moments before placing him in the shower, the dinner trays were delivered by kitchen staff, and were awaiting distribution. Once I signed for the dinner trays, kitchen staff exited and I proceeded to inspect the dinner cart as required. By this time the 1630 count had commenced and D/t Irias had not finished showering, so we counted him in the shower as to not delay count or cause other issues. Upon completion of our count, we needed to begin our staff lunch breaks in segregation immediately to prevent the possibility of a meal penalty, as we are to relieve eachother on 2ND Watch, one at a time, because we do not have a segregation control officer, nor do the utilities assist with lunches in segregation. Also, between the time he was placed in the shower and the time count was commenced, the 2nd segregation officer had returned from outside recreation with 8 detainees who were secured in their cells, as he had completed the detainee's hour of recreation on the lower tier. In order to complete our staff lunches, the 2nd officer on the administrative segregation side proceeded to disciplinary segregation side to relieve the 2 officers working disciplinary segregation, one officer at a time, leaving me to complete the



Corrections & Detention ®

# MEMORANDUM

Date: 8-5-15

To: Lt. Anderson

cc:

From: D/O Santiago, E/

RE:

Adelanto Detention Facility
10250 Rancho Road (West)
10400 Rancho Road (East)
Adelanto, CA 92301

distribution of dinner trays. The 2 segregation porters were utilized to complete the distribution of dinner trays and I began distribution with them on the lower tier. We started on the left side nearest the segregation control and worked our way to the left. At the time we started D/T Irias was still in the shower and not his cell (A-116) so we skipped him and were to go back and feed him. When finished distributing to the bottom tier D/T Irias still had not finished in the shower so we continued to the top tier to distribute trays, this time from the right to the left. Once we finished distributing dinner trays to the top tier I began securing the food ports and then continued down back to the bottom tier where I seen D/T Irias being escorted by multiple staff back into segregation and into his cell. I had not secured the shower door when placing D/T Irias in it due to administrative segregation now being an open dayroom and I believe he exited segregation while I was feeding the top tier with the porters. — End Report

# MEMORANDUM



Date: 8|5|15

To: LT. Anderson
cc:

From: E. Marquez

<u>RE:</u> <u>Detainee Jimmy Irias</u>

    On Wednesday August 8th 2015 at approximately
1655 hours while in Central Control at the time
of incident I was on the phone Verifying Count
with intake, and three control officer. Locating an
available utility on the radio. I Do not Recall seeing
any detainee at the camera call-up while Accessing
multiple doors.

The GEO Group, Inc.
GEO Corrections
Adelanto Detention Facility-East
10400 Rancho Road
P. O. Box 6005
Adelanto, California 92301
www.geogroup.com

GEO000134 (INITIAL PRODUCTION 10/03/17)

# MEMORANDUM

**GEO**
*Corrections*

The GEO Group, Inc.
GEO Corrections
Adelanto Detention Facility
10400 Rancho Road
P. O. Box 6005
Adelanto, California 92301
www.geogroup.com

Date: 8/05/15

To: LT. ANDERSON

From: D/O J.MORA

## RE:

AT APPROXIMATELY 1640 I DETENTION OFFICER J.MORA WAS WALKING DOWN THE WEST FACILITIES MAIN CORRIDOR WHEN I OBSERVED DETAINEE (ARIAS, JIMMY   ~~Redacted~~   W1-A-116-1L) WALK OUT OF DOOR 1X101A, AS HE WALKED TOWARDS DOOR #707. I THEN ADVISED SEARGENTS SOLIS AND HUTCH OF THE SITUATION VIA VERBAL. HE THEN CONTINUED TO GET THROUGH DOOR 707 AND WALKED TO DOOR 322B I THEN FOLLOWED HIM. SEARGENT SOLIS VERBALLY ASKED DETAINEE ARIAS THAT HE WOULD BE ESCORTED BACK TO SEGREGATION AS DETAINEE ARIAS BEGAN TO COMPLY. I THEN ASSISTED WITH ECORTING DETAINEE ARIAS BACK TO SEGREGATION WHERE HE WAS PLACED IN HIS CELL. NOTHING FURTHER TO REPORT AT THIS TIME.



**Corrections & Detention ®**

# MEMORANDUM

Date:  08/05/2015

**Adelanto Detention Facility**
10250 Rancho Road (West)
10400 Rancho Road (East)
Adelanto, CA 92301

To: Lt. R. Anderson

cc:

From:  Sgt. A. Soliz

### RE:  SECURITY BREACH: DETAINEE- IRIAS, JIMMY   <span style="color:red">Redacted</span>

On Wednesday August 5, 2015 at approximately 1640 hours I, Sgt. A. Soliz, was completing paper work in the west watch office during the formal 1630 hours count when Officer J. Mora notified me of an unattended detainee in the main corridor. Sgt. Hutchinson and I immediately entered the main corridor to assess the situation. Upon exiting the office we observed and recognized detainee Irias, Jimmy <span style="color:red">Redacted</span> opening the 707 door. Sgt. Hutchinson gave Irias the verbal command to stop but Irias stated, "I 'm getting out of here you guys opened the door for me." and proceeded through the doorway. Officer J. Mora, Officer DeSoto, Officer Darmandzhyan, Sgt. Hutchinson, and I continued to follow Irias. Sgt. Hutchinson ordered via radio for central control officers not access the intake door that Irias was standing by. I then immediately ordered central control officers not to access any doors in the facility except door 707 to allow us to proceed to where Irias was standing. Officer DeSoto began to jog towards Irias in an attempt to restrain him. However, due to previous experiences with Irias being violent towards staff and his mental condition, I ordered Officer DeSoto to stand down and approach Irias with us as a group. I also observed that Irias was not at the exiting door of the corridor and decided to use the knowledge of our facility layout to prevent escalating the situation. Sgt. Hutchinson and I used our judgment to approach the situation in a way that would de-escalate the situation and minimize possibility of staff injury. We approached Irias with urgency and caution while giving clear and concise verbal commands such as "Jimmy I need you to put your Hands behind your back." And "Jimmy I need you to cuff up." Once we reached Irias we spaced out around him to prevent any further movement from him.  Irias then responded, "I don't want no cuffs. I'll fucking walk back!" We agreed to let Irias walk back to Segregation Housing without mechanical restraints due to the fact that he was housed in Segregation A Unit(which does not require detainees to be placed in restraints for movement) and also due to the fact that Irias was being compliant to return to his housing. While being escorted Irias began to state, "Its y'all fault you opened up the door! Now you're gonna charge me with another bullshit charge!" Upon reaching the Segregation Unit main corridor doors, Sgt. Hutchinson and I made contact with Lt. Duran as she was exiting the unit. We advised her of the situation and she stated," No way! I just left there and he was in the shower. Take him back to his cell." Sgt. Hutchinson and I both agreed that we should follow command since formal count had not yet cleared and we continued to escort Irias back to his housing where we returned him to his cell and was secured. Lt. Anderson was notified immediately of the situation.



Corrections & Detention ®

# MEMORANDUM

Date:  08/05/2015

Adelanto Detention Facility
10250 Rancho Road (West)
10400 Rancho Road (East)
Adelanto, CA  92301

To: Lt. R. Anderson

cc: CAPT. McCusker

From:  Sgt. J Hutchinson

### RE:  SECURITY BREACH: DETAINEE- IRIAS, JIMMY    Redacted

On Wednesday August 5, 2015 at approximately 1640 hours, I was notified by Officer J. Mora that there was an unescorted Detainee in the main corridor. Sgt. Soliz and I immediately entered the main corridor to assess the situation. Upon exiting the office we observed and recognized Detainee Irias, Jimmy Redac opening the 707 door. I gave Irias the verbal command to stop several times, Irias stated, "I'I dm getting out of here you guys opened the door for me." and proceeded through the doorway. Officer J. Mora, Officer DeSoto, Officer Darmandzhyan, Sgt. Soliz, and I continued to follow Irias. I ordered via radio for Central Control Officers not to access the intake door that Irias was standing by. Sgt. Soliz then immediately ordered Central Control Officers not to access any doors in the facility except door 707 to allow us to proceed to where Irias was standing. Officer DeSoto began to jog towards Irias in an attempt to restrain him. However, due to previous experiences with Irias being violent towards staff and his mental condition, Sergeant Soliz ordered Officer Desoto to stand down, I then pulled out my chemical agent verbally telling Detainee "Jimmy I need you to put your hands behind your back", he replyed "No you guys opened the door for me". I repeated it again and told him if he does not comply chemical agent will be used. Irias then said "Fuck I'll walk back. At this time we had surrounded Detainee Irias, whereby we escorted him down to Segregation without hand restraints with no issues and full compliance. As we are escorting him he said "Now you guys are going to charge me with some bullshit." Next we entered the Segregation Corridor from the Main Corridor and  LT. Duran was there I said "What happened," she replyed "What do you mean, I just saw him in the shower." I said "LT he went threw four doors." LT. Duran then said "Take him back to his cell," which myself and Sergeant Soliz and the other three Officers did with no issues and full compliance. After securing Irias in his cell myself and Sergeant Soliz Immediately went to our Watch Commander LT. Anderson and informed of the situation, whereby he told us to check the cameras. I used my judgment to approach the situation due to previous incident with Detainee Irias in a way that would deescalate the situation and minimize possibility of staff injury.



Corrections & Detention ®

Adelanto Detention Facility
10250 Rancho Road (West)
10400 Rancho Road (East)
Adelanto, CA 92301

# MEMORANDUM

Date: 8/5/15

To: LT. ANDERSON
cc: SGT. HUTCHENSON.

From: P/O DESOTO

RE: 8/5/15   DISCREPANCIES.

ON AUGUST 5, 2015 AT APPROXIMATLY 1645pm I P/O
DESOTO WAS WALKING BACK FROM DROPPING OFF PAPERWORK
AT CENTRAL CONTROL, WHEN I HEARD STAFF MEMBERS,
MORA, DARMAWDZHY, SGT, HUTCHENSON, SGT. SOLIZ CALL TO A
DETAINEE THAT WALKED OUT OF SEGREGATION I P/O DESOTO
WITNESSED DETAINEE ARIAS, J. WALK INTO INTAKE CORRIDOR
THROUGH DOOR 707, THE FOLLOWING STAFF AND MYSELF FOLLOWED THE
DETAINEE AND MADE CONTACT WITH DETAINEE ARIAS, AT
INTAKE ENTRANCE. I TOLD DETAINEE ARIAS TO PUT HIS HANDS
BEHIND HIS BACK, HE REFUSED SGT. HUTCHENSON ASKED THE
DETAINEE TO COMPLY; DETAINEE ARIAS CHOSE TO WALK BACK TO
SEGREGATION. DETAINEE WAS THEN SECURED IN SEGREGATION
NO JURIES AT THE TIME, NO FURTHER DISCREPANCIES

GEO000138 (INITIAL PRODUCTION 10/03/17)



Corrections & Detention ®

# MEMORANDUM

Adelanto Detention Facility
10250 Rancho Road (West)
⁽¹⁾10400 Rancho Road (East)
Adelanto, CA  92301

Date:  08/06/2015

To:    Captain L. McCusker
cc:

From:  Lt. R. Anderson

RE:    **EVENTS OF 08/05/2015**

On 08/15/2015 at approximately 1700 I was notified of a Detainee having been observed unescorted within the facility and the on duty Shift Sergeants had confronted the Detainee and escorted him back to his assigned housing in Protective Custody/Administrative Segregation (W1-A) without incident. In concert with this I was managing an upcoming concern with the eminent arrival of a disabled Detainee while ensuring the 1630 face to photo facility was completed successfully. The count was cleared at approximately 1730 at which time I turned my focus and priority on the Segregation detainee found unescorted and began my fact finding efforts to determine the actions leading to the Detainee being allowed out of Segregation without escort.

At approximately 1830 I received a phone call from Warden Janecka in regard to arrival of the disabled Detainee. During this conversation I informed Warden Janecka we had discovered Segregation Detainee outside Segregation unsupervised. Warden Janecka advised me to contact the ADO (D.W. J. Gustin) and to advise him of the situation. Multiple attempts were made to contact the ADO without success. Soon after, Chief Johnson contacted me by phone stating he had received information from the Warden regarding the above incident. I relayed the information acquired at the time of his call and continued my investigation.

It was determined the breach in security had resulted from the assigned Segregation Officers leaving the detainee unattended in an unsecured shower. The investigation also determined West Central Control Officers had accessed doors without properly identifying the person exiting.

The primary staff errors were determined to be the misunderstanding by Segregation Officers that they could relieve themselves for breaks and lunches. This is a result of mixed messages given to Segregation Officers during the recent Staffing and procedural changes. The afore mentioned errors and misunderstandings were a result of my not ensuring Staff were advised of the most recent procedural information, as I too had received mixed direction with regard to segregation procedures. Not having concluded the scenario should be classified as an attempted escape in a timely manner, I exceeded the timeline guidelines for reporting it as such.

Following this, a disciplinary packet was written on Detainee Irias, J. Redacted for attempted escape, Disciplinary Action Forms (DAF) were written on one Central Control Officer, one Segregation Officer and two Shift Sergeants.

# MEMORANDUM

**GEO Corrections**

The GEO Group, Inc.
GEO Corrections
Adelanto Detention Facility
10400 Rancho Road
P.O. Box 6005
Adelanto, California 92301
www.geogroup.com

Date:  08/6/2015

To:  LT. Anderson

From:  Z. Darmandzhyan

## RE:  DETAINEE IRIAS, JIMMY

On 08/05/15 at approximately 1655 hours I, Z. Darmandzhyan, observed detainee Irias, Jimmy <span style="color:red">Redacted</span> walk out from segregation and into the main corridor unaccompanied by any staff members. I asked the detainee "what are you doing?" in which detainee Irias responded "I have bail, I'm going". At this moment, Officer Mora notified the management staff who were in the watch office. Myself, management, and other officers walked towards detainee Isias. Detainee Isias opened the door leading into the medical/intake corridor and went into the hallway. I and the responding staff entered the medical/intake corridor and approached detainee Isias. Detainee Isias stated to us, "The doors are guiding me". Upon arriving to the area where detainee Isias was standing, Detainee Isias was given a verbal command to submit to mechanical restraints. Detainee Isias responded "Why so I can get another bullshit charge?" Detainee stated that he will walk back to segregation. Detainee Isias was escorted back to segregation without any further incident.



Corrections & Detention ®

# MEMORANDUM

Date: 08-06-2015

**Adelanto Detention Facility**
10250 Rancho Road (West)
10400 Rancho Road (East)
Adelanto, CA 92301

To: Chief J. Johnson
cc:

From: Lt. Duran

## RE: CONVERSATION WITH OFFICER E. SANTIAGO

On Wednesday 08-05-2015 at approximately 1600 I entered Administrative segregation to drop off paperwork while I was in segregation detainee Irias Jimmy  Redacted  asked to speak to me. While speaking with detainee Irias he seemed somewhat agitated and ended the conversation stating never mind and then asking if he could take a shower. I advised detainee Irias yes he would get a shower. Seeing that Irias seemed agitated I notified officer Santiago that Irias was on edge and that I didn't trust his behavior so to take all security measures and be cautious when accessing the doors. I stated to officer Santiago that when Irias is taken out to the shower make sure both officers' were present while escorting detainee Irias to the shower I then departed administrative segregation.

# EXHIBIT 33

Master Control Policy

|  | **Adelanto Detention Facility** POLICY and PROCEDURE MANUAL CHAPTER: Security TITLE: Master Control Center Operations RELATED ACA STANDARDS: 4-ALDF-2A-01, 03 | **NUMBER:** 10.2.27 – ADF **SUPERSEDES:** 07/01/2013 **EFFECTIVE:** 11/03/2014 |
|---|---|---|

## I.   POLICY

It is the policy of the facility to maintain a secure control center that serves as the communications and movement control hub for the entire facility.

## II.   PROCEDURES

The master control center is the hub of all external and internal security and communication activity.  It will not ordinarily serve as a decision-making or command post, nor will weapons be stored there.  The Assistant Facility Administrator of Security will ensure the provisions of Policy 10.2.33 (Management of the Security Program) are carried out in this area.

Major responsibilities of the control center officer include the following:

- Maintaining all necessary count records
- Carrying out key accountability functions as described in Policy 10.2.8 (Key Control)
- Issuing emergency equipment items, radios, handcuffs, and other security equipment
- Controlling such doors and gates as are actuated from this post
- Maintaining inventories on all keys, equipment, and emergency supplies in the control center
- Maintaining a current staff roster that includes all employees' telephone numbers
- Conducting and logging periodic checks of all communications systems, surveillance systems, emergency alarm and generator systems, fire alarms, telephones, gates, radio systems, visual recording systems and closed-circuit monitoring systems
- Recording all appropriate information in the control center log
- Notifying the Shift Supervisor of any emergency or alarm signal from any of the monitoring systems or from staff
- Contacting local law enforcement authorities for assistance when so directed by the Shift Supervisor
- Maintaining, to the extent possible, continuous communications with any area of the facility experiencing a disturbance

### A.   STAFFING

The control center will be staffed twenty-four (24) hours each day in three shifts of eight (8) hours each, by two trained officers.  Supplementary staff may be assigned during peak activity periods, such as shift changes and counts.  Additional staff may be assigned during an institutional emergency.

### B.   ACCESS

Access to the Master Control Center will be limited to those staff who have official duties to conduct in this area.

Unless assigned to relief duty, off-duty staff or those assigned to other posts are considered unauthorized personnel and will not be admitted to the Master Control Center.

SANTIAGO 166



| | Adelanto Detention Facility | NUMBER: 10.2.27 – ADF |
|---|---|---|
| | POLICY AND PROCEDURE MANUAL | |
| | CHAPTER:  Security | |
| | TITLE:  Control Center Operations | |

The Master Control Center security door will remain locked except for admission or exit of authorized persons.

Detainees will not be permitted to access to the Control Center.

C.    MOVEMENT CONTROL

The control center officer controls movement through critical doors and ensures that all gates and doors are closed at all times when intended.  Television and audio communications devices used in connection with gate functions will enable positive identification of all persons passing through key traffic points.

D.    EMERGENCY RESPONSE

When an emergency occurs anywhere within the facility, the control center ordinarily will be the first post notified.  The control center officer will immediately notify the Shift Supervisor of the situation and will make further notifications as directed by the Shift Supervisor.

The officer assigned to the control center in a crisis must remain calm, gathering and relaying information in a very thorough manner.

A third control center officer will be posted during emergencies as so directed by the Shift Supervisor.

E.    LOGS AND RECORDS

The control center officer will maintain logs and records of counts, alarms (both tests and actual), visitors, key inventories, equipment inventories, equipment tests, emergency situations, and unusual incidents.

SANTIAGO 167

|  | Adelanto Detention Facility<br><br>POLICY AND PROCEDURE MANUAL<br><br>CHAPTER: Security<br><br>TITLE: Control Center Operations | NUMBER: 10.2.27 – ADF |
| --- | --- | --- |

THIS POLICY WILL BE REVIEWED AT LEAST ANNUALLY AND UPDATED AS NEEDED.

**Gray highlighted areas are the changes made to the current revision.**

QUESTIONS/SUGGESTIONS REGARDING THIS POLICY SHALL BE ADDRESSED TO THE FACILITY ADMINISTRATOR.

APPROVED: _____
                    Facility Administrator

EFFECTIVE: November 3, 2014

Reviewed & Revised: October 2011
Reviewed & Revised: June 2012
Reviewed: July 2013
Reviewed & Revised: October 2014

SANTIAGO 168

| GEO Corrections & Detention | Adelanto Detention Facility<br><br>POLICY and PROCEDURE MANUAL<br><br>CHAPTER:   Post Orders<br><br>TITLE:  Master Control Center Officer<br><br>RELATED ACA STANDARDS: 4-ALDF-2A-04 | **NUMBER:**<br>10.3.11 – ADF<br><br>**SUPERSEDES:**<br>07/01/2014<br><br>**EFFECTIVE:**<br>09/15/2014 |
| --- | --- | --- |

**All Officers will read and sign the appropriate Post Orders upon assuming a new post.  Failure to do so could lead to disciplinary action taken up to and including termination.**

I.      **AREA OF RESPONSIBILITY**

Responsible for the Master Control Center and all areas that are within visual or camera range as well as all audible communication systems.  This will include all areas within sight and sound, including windows, emergency fire doors, corridors, the adjacent entrances to the main corridor and observation of the exterior of the facility grounds area.

II.     **SUPERVISION**

The Master Control Center Officer reports directly to the Shift Supervisor.

A.      Shift Hours as scheduled per roster.
B.      Operational hours as scheduled per roster.
C.      Days off as scheduled per roster.

III.    **STAFFING**

The Master Control Center  will be staffed twenty-four (24) hours each day in three shifts of eight (8) hours each, by two trained Officers. These Officers are selected based on criteria that includes:  experience and suitability for this post.  There are provisions for rotation to other duties.

IV.     **EQUIPMENT**

Responsible for becoming familiar with all the master control center equipment; i.e. battery charger, light, power, telephone switches, radios, TV monitors, control panel, fire alarm panel and cameras.

A.      Prior to assuming control room duties, check out the following:

1.      Operating Equipment
   a.   Lamp test the fire alarm system
   b.   Review emergency generator control panel status
   c.   Verify door control panel in operation
   d.   Facility radio system operating satisfactorily
   e.   TV security monitors operating satisfactorily
   f.   Court Room Duress Alarm operating satisfactorily
   g.   Breach Alarms
   h.   Video Recording Equipment operating satisfactorily
   i.   Weather monitor operating satisfactorily
   j.   Fence Shaker System

Initials_____   Date_____

SANTIAGO 169



| | Adelanto Detention Facility<br>POLICY AND PROCEDURE MANUAL<br>CHAPTER:  Post Orders<br><br>TITLE:  Master Control Center Officer | NUMBER: 10.3.11 – ADF |
| --- | --- | --- |

    2.   Equipment Inventory:

       a.  Account for all emergency key sets and restricted keys located in the control room
       b.  Account for all radios
       c.  Video Camera Recorder (camcorder), and memory card
       d.  Daily manifest available in control
       e.  Emergency phone numbers
       f.  Hand-held metal detectors
       g.  Cell Phone(s)
       h.  Flashlights
       i.  Handcuffs
       j.  Cut-down knives
       k.  Emergency Plans manual

**B.**    Responsible for:

    1.    Issuing restricted keys to ICE staff, radios, handcuffs, hand-held metal detectors and cut-down tools to Officers upon receipt of key chit with Officers' name.*

        *Note:* If officers do not have chits, the Shift Supervisor will be notified.  Paper chits will not be allowed.

**C.**    Facility Radio

    1.  Facility Radio

       All security and some support services staff are furnished with a radio which will be securely carried on their person at all times while they are on duty.  Monitor the radio for on-going radio traffic before speaking into it.  Do not use the radio in an excessive manner and follow proper radio procedures.  Utilize telephones to minimize radio traffic, especially during emergency situations.

       a.  Monitor facility hand-held radios for transmissions and proper radio usage.  Note and report improper radio use.
       b.  Conduct a minimum of one (1) radio check per shift.
       c.  Ensure all spare batteries are fully charged, when needed.  Batteries should only be placed in the charger when they are fully discharged.

**D.**    VIDEO ELECTRONIC SURVEILLANCE

    1.    These devices will not be used to invade the personal privacy of detainees, or as a substitute for staff supervision.

    2.    These devices may be used for observing special management detainees, housing unit disturbances and emergencies as approved by the Shift Supervisor, AFA-Security or the Facility Administrator.

Initials_____     Date_____

SANTIAGO 170

|  | Adelanto Detention Facility<br>POLICY AND PROCEDURE MANUAL<br>CHAPTER:  Post Orders<br>TITLE:  Master Control Center Officer | NUMBER:  10.3.11 – ADF |
|---|---|---|

3. The Master Control Center serves as the facility communication base during an emergency, a resource used to gather and relay information in a thorough manner while delegating duties as directed.  This will be accomplished by utilizing its:

    a.    Intercom system
    b.    Phone systems
    c.    Radio system

E. DURESS ALARMS

1. A duress alarm is located at the Judge's bench in each courtroom, in the Judge's chambers and at each detainee attorney visiting room.

If a duress alarm sounds in the Control Center, it will be a continuous audible sound.  A steady red indicator light will come on indicating the location of the activated duress alarm.

3. Upon activation of the duress alarm, the Control Center will notify the Shift Supervisor and the perimeter patrol officer's of the alarms location. PPO will provide immediate armed response to the affected area. The PPO will station themselves near the facility entrance awaiting further direction by the Shift Supervisor.  At no other time will armed Officers enter the secure perimeter of the facility.

V. **GENERAL DUTIES**

A. Receive orders and instructions from the Shift Supervisor.
B. Make written and oral reports as necessary.
C. Receive information from the proceeding Master Control Center Officer.
D. Relay all information pertinent to the operation of all other shifts and departments.
E. Perform other duties as assigned.

VI. **RESPONSIBILITIES**

A. It is imperative that the Master Control Officer be familiar with all procedures, especially emergency procedures.  Master Control Officers are specifically referred to the Emergency Plans Manual:

      Fire Plan
      Facility Evacuation Plan
      Bomb Threat Action Plan
      Riot/Disturbance Control Plan
      Escape Procedures Plan
      Hostage Incident Action Plan
      Emergency Total Loss of Power Plan

Initials_____    Date_____

SANTIAGO 171



| | Adelanto Detention Facility POLICY AND PROCEDURE MANUAL CHAPTER: Post Orders TITLE: Master Control Center Officer | NUMBER: 10.3.11 – ADF |
|---|---|---|

B.     Access

The Control Center Officer is responsible for the security of the Control Room.  The Control Room is the most sensitive area in the facility.  Therefore, the Control Room door will never be opened for or accessed by detainees for any reason at any time.  Become familiar with all personnel assigned to this facility.

Access to the Control Center will be limited to those staff and contract employees who have official duties to conduct in this area.  Unless assigned to relief duty, off-duty staff or those assigned to other posts are considered unauthorized personnel and will not be admitted to the control center.  The Control Center security door will remain locked except for admission or exit of authorized persons.

C.     Entrances/Exits

Control primary access points.

All perimeter security entrances, Control Center door, housing unit doors and any door opening into a corridor are to be kept locked except when used for entry or exit of employees, detainees, visitors, or for emergencies.

1.     The Master Control Center will have control of the security doors to the receiving/loading area, all doors in the main intake receiving area, vehicle entrance and the exit gate to the sally port and all doors leading to the Master Control Center.  When opening or closing doors, the Master Control Center Officer will exercise caution to allow only authorized persons and equipment in and out without compromising the safety and security of facility. The Master Control Center Officer will open and close one door at a time for high security areas as well as primary access points.   No emergency door will be open without Shift Supervisor approval and staff standing by door.

All vehicle traffic into or out of the sallyport will be coordinated through the Perimeter Patrol Officer. Upon notification a vehicle is requesting access to the sallyport, the Master Control Center Officer will notify Perimeter Patrol. Upon completion of the vehicle search the Perimeter Patrol Officer will approve opening the sallyport gate. The only exception will be for emergency vehicles.

There must be two staff members present anytime entry or exit via the sallyport gate is required.  One staff member will call the Master Control Center intercom, radio or telephone and request for the gate to be opened.  The gate must be completely opened.  This includes but is not limited to exterior inspections, staff members going through, etc.  The staff members who requested that the entry/exit gate be opened and the Master Control Center Officer are responsible for ensuring that the gate is closed prior to departing the sallyport exit gate area.  The gate is not to remain open under any circumstances.

SANTIAGO 172



| | Adelanto Detention Facility | |
|---|---|---|
| | POLICY AND PROCEDURE MANUAL | NUMBER: 10.3.11 – ADF |
| | CHAPTER:  Post Orders | |
| | TITLE:  Master Control Center Officer | |

**Anytime the exit gate to the sallyport is called via intercom, radio or telephone to be opened, it must be opened all the way.  The gate is not to be closed unless it is called via intercom, radio or telephone to be closed. This includes but is not limited to, exterior inspections, staff members going through, etc.  Monitor the CCTV to ensure there are no obstructions when the gate is closing.**

D.      Log

The Master Control Center Officer is responsible for making entries and maintaining a Control Center logbook in accordance with the Policy and Procedure on Permanent Logs and Reports.

Ensure that log entries include but are not limited to the following:

1. Personnel on duty and their post assignments
2. Detainee population chart (detainee counts, etc.)  Must annotate the name of the Officer calling in the count and the time the Officer called in the count.
3. Detainee movement into and out of the facility
4. Watch calls conducted between 1800 and 0600 daily.
5. Shift activities (security checks, meals, recreation, religious services, shakedowns, etc.)
6. All emergencies (detailed in the Emergency logbook)
7. Relief from and assumption of control center duties
8. Inventories conducted
9. External security and safety inspections
10. Any unusual occurrences or significant events
11. Equipment losses or malfunctions
12. Deliveries (milk, bread, UPS, etc.)
13. Accounting for all keys retained within the Control Center. Discrepancies will be noted in the logbook as well as notification to the shift supervisor.

E.      Watch Calls

Conduct watch calls (Officer safety checks) every half-hour between the hours of 6:00 P.M. and 6:00 A.M.  This will be accomplished by announcing via radio "beginning watch calls".  Call each staff member by name over the radio and ask for a status.  If a staff member does not respond to the watch call within three (3) minutes, the Shift Supervisor will be notified.  The Shift Supervisor will check the staff member's status and notify the Control Center of the results.  The watch calls will be entered in the Control Center logbook as "Watch calls conducted all staff members responded".  Identify which Officers did not respond, the Shift Supervisor who conducted the safety check and the Officer's status.

F.      Counts

Responsible for preparing the Verification and Master Count Tally Sheet as well as logging the times that the counts are received in the logbook. All movement into or out of the facility will be notated as ICE in the from or to column on the Master Count Movement Form.  Count slips must be delivered to the Control Center before count is cleared and

SANTIAGO 173

| | Adelanto Detention Facility | |
|---|---|---|
| **Ge** *Corrections & Detention* | **POLICY AND PROCEDURE MANUAL** **CHAPTER:  Post Orders** **TITLE:  Master Control Center Officer** | NUMBER:  10.3.11 – ADF |

they will be attached to the Verification and Master Count Tally Sheets when count is officially cleared.  Refer to the Policy and Procedures on Detainee Count for further instructions regarding counts procedure.

The counts Schedule is as follows: 0200, 0630, 1100, 1630 Face to Photo, 2100 and 2300 Hours.

After clearing the 2300 count the shift supervisor will complete and transmit the midnight census noting the transmission on the formal count sheet.

G.     Fire

When notified of a fire, be especially alert to and observant of the fire alarm display panel.  This is a combined signal, consisting of a light and a buzzer.  This panel is activated by fire protection equipment located throughout the facility.  When notified of a fire, either signaled by the panel or through another type of communication:

1. Advise all radio units of the emergency situation, repeating the appropriate code twice.
2. Alert the Medical and Maintenance Department personnel on duty.
3. Call the Fire Department through the local emergency number 911, when the Shift Supervisor or the senior Officer present gives the order.  Provide all available fire related information and the exact location of the fire.
4. Begin notification of facility personnel on the emergency notification roster, and ICE Officers if requested to do so by the Shift Commander.
5. Maintain an accurate record of notification and times pertaining to the emergency in the Control Center Emergency logbook as well as resetting/disabling of any fire/emergency equipment.

H.     Control Center Cleanliness

Responsible for keeping the Control Center clean to include the restroom.  Also, responsible for submitting a Maintenance Work Order for any maintenance work that needs to be done in the Control Center.

Responsible for ensuring that all cleaning materials are secured in the chemical supply area when not in use and that they are returned to the chemical supply area and the proper forms are filled out.

I.     Emergency Evacuation Procedures

1. Notification to all detainees and/or staff to prepare to evacuate.  In case of an electrical power outage issue the appropriate emergency key set(s) located in the control center emergency lock boxes.  Access to the emergency key set(s) requires breaking the glass front on the emergency lock boxes.
2. Housing units are evacuated one at a time, beginning with the one in most danger first.
3. Detainees go into areas per posted evacuation plan posters, located in housing units and corridors.
4. A count is taken as soon as possible to ensure that all detainees and staff are accounted for.

SANTIAGO 174

|  | Adelanto Detention Facility POLICY AND PROCEDURE MANUAL CHAPTER:  Post Orders TITLE:  Master Control Center Officer | NUMBER:  10.3.11 – ADF |
| --- | --- | --- |

DO NOT ALTER, ERASE OR MUTILATE LOGS, post orders or other official written materials. Erasable pens are not permitted.  Pens used in the workplace will be of black indelible ink.

J.      Stay in the Control Center unless specifically authorized by the on duty Shift Supervisor.  The on-duty Shift Supervisor will designate a relief if the Control Center Officer is authorized to leave the Control Center.

K.      Lunch Relief

        The Shift Supervisor will appoint an Officer for lunch relief.

It should be noted that the routine cannot and should not be rigidly adhered to.  Other pertinent and intermittent duties will also require your attention from time to time.  Therefore the list of duties must be flexible with work of an urgent nature taking precedence over routine matters.

Initials_____     Date_____

SANTIAGO 175

|   Corrections & Detention › | Adelanto Detention Facility<br>POLICY AND PROCEDURE MANUAL<br>CHAPTER:   Post Orders<br><br>TITLE:  Master Control Center Officer | NUMBER:  10.3.11 – ADF |
| --- | --- | --- |

**THIS POST ORDER WILL BE REVIEWED AT LEAST ANNUALLY AND UPDATED AS NEEDED.**

**Gray highlighted areas are the changes made to the current revision.**

QUESTIONS/SUGGESTIONS REGARDING THIS POST ORDER SHALL BE ADDRESSED TO THE AFA-SECURITY.

APPROVED: _____
                              Facility Administrator

EFFECTIVE: <u>September 15, 2014</u>

Reviewed & Revised: June, 2012
Reviewed & Revised: October, 2012
Reviewed: March, 2013
Reviewed: Sept. 2013
Reviewed & Revised: June 25, 2014
Reviewed: September 5, 2014

SANTIAGO 176

# EXHIBIT 34

Santiago's Termination Decision

**PERSONNEL ACTION FORM (PAF)**
RATE CHANGES, TRANSFERS OR TERMINATIONS

**GEO**
The GEO Group, Inc.

Prepared By:

| Date Initiated | Effective Date | Employee's Last Name | First | Middle | Employee Identification Number | Date of Hire |
|---|---|---|---|---|---|---|
| 09/02/2015 | 09/10/15 | Santiago | Emanuel | | 176828 | 03/18/13 |

| | **PRESENT** | **PROPOSED** |
|---|---|---|

| | PRESENT | PROPOSED |
|---|---|---|
| **TRANSFER ACTION** | TRANSFER Reason Code: | |
| | Employer **USC - GEO CORRECTIONS & DETENTIONS** | Employer |
| | Facility Name **196 - ADELANTO PROCESSING CENTER** | Facility Name |
| | Department Name **12 - SECURITY OPERATIONS** | Department Name |

This section must be completed for all Transfer or Salary Actions.

| Position Title | Position Code | Position Title | Position Code |
|---|---|---|---|
| **Detention Officer** | **19677A** | | |
| Employee Status | Standard Hours/Week | Employee Status | Standard Hours/Week |
| **HFTR** | **40** | | |
| Supervisor ID | Supervisor Name | | |

| **SALARY ACTION** | SALARY Reason Code: | | |
|---|---|---|---|
| | If currently NON-EXEMPT, enter hourly rate: | If current EXEMPT, enter salaried rate: | New Hourly or Annual Salary | Enter Proposed Percentage Increase |
| | Shift Differential: | | Shift Differential: |
| | Status Code/Rate Test: | | Next Review Date: |
| | FLSA Minimum Wage Test: | | FLSA Minimum Wage Test: |

| **LEAVE NOTIFICATION** | Leave Notification Code: | |
|---|---|---|
| | Enter Leave Date: | Enter Return Date: |

| **TERMINATION ACTION** | Termination Action Code: **I09 - INABILITY TO PERFORM JOB** | |
|---|---|---|
| | Voluntary or Involuntary: **Involuntary** | Enter Last Day Worked: **8/6/2015** |
| | Was Full Time Work Available: **Yes** | Did Employee Refuse Work: **No** |
| | Unused Vacation Hours: | Number of Days Notice: |
| | Is employee eligible for rehire: **No** | |

**REMARKS / AUTHORIZATIONS REQUIRED**

| Facility's HR Representative | Facility's Asst. Warden, Finance & Administration/Department Head |
|---|---|
| Print Name: Jocelyn Siguenza | Print Name: Gregory Hillers |
| Signature: Date 9-2-15 | Signature: Date 9-3-15 |
| Facility Administrator/Warden or Asst. Warden, Finance & Administration | Regional/Corporate Representative |
| Print Name: James Janecka | Print Name: |
| Signature: Date 9/2/2015 | Signature: Date |

Human Resources Use Only

Revised: 5/1/2014

| Date Entered in HRIS | Infinium |
|---|---|
| Corp. Compensation (if needed): | |

HR-012

GEO000001 (INITIAL PRODUCTION 10/03/17)

# EXHIBIT 35

Transcript of Arbitration Hearing for Marquez

# In The Matter Of:

*Arbitration of Elizabeth Marquez Vs*

---

*June 14, 2017*

---

SANTIAGO 072

Page 1

```
 1            ARBITRATION PROCEEDINGS
 2        BEFORE LEONARD M. SHAPIRO, ARBITRATOR
 3
 4  GEO GROUP, INC.,              )
 5  and                          )
                                 ) FMCS No. 1655686
 6  UGSOA LOCAL 880,              )
 7  Re:  Elizabeth Marquez (Grievant) )
                                 )
 8  _____)
 9
10
11
12
13          TRANSCRIPT OF PROCEEDINGS
14
15
16          Wednesday, June 14, 2017
17               10:04 a.m.
18
19            9619 Mariposa Road
20            Hesperia, California
21
22  DONNA BALL, CSR NO. 11191
23
24
25
```

Page 2

```
 1  APPEARANCES OF COUNSEL:
 2
 3  FOR GEO GROUP, INC.
 4       LITTLER MENDELSON P.C.
         BY:  Frederick C. MINER, ESQ.
 5       2425 East Camelback Road
         Suite 900
 6       Phoenix, Arizona 85016
         (602) 474-3600
 7
 8  FOR UGSOA LOCAL 880:
 9       UNITED GOVERNMENT SECURITY OFFICERS OF AMERICA,
         INTERNATIONAL UNION
10       BY:  ROBERT KAPITAN, ESQ.
         2879 Cranberry Highway
11       East Wareham, Massachussetts 02538
         (774) 678-0936
12
13  THE ARBITRATOR:
14       LEONARD M. SHAPIRO
         5 Lattimore Court
15       Freehold, New Jersey 07728
         (732) 761-9847
16
17  ALSO PRESENT:
18       Sharon P. Kelley
         Mary Wise-McCormick
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2  OPENING STATEMENTS                    PAGE
 3  By Mr. Miner                            6
 4  By Mr. Kapitan                         10
 5  AFTERNOON SESSION                     112
 6
 7  WITNESS                               PAGE
 8  RONALD D. ANDERSON
 9  Direct Examination by Mr. Miner        14
10  Cross-Examination by Mr. Kapitan       61
11  Redirect Examination by Mr. Miner   98, 110
12  Recross Examination by Mr. Kapitan  105, 107, 110
13
14  WITNESS                               PAGE
15  JAMES JANECKA
16  Direct Examination by Mr. Miner       112
17  Cross-Examination by Mr. Kapitan      132
18
19
20
21
22
23
24
25
```

Page 4

```
 1          INDEX (CONTINUED)
 2  WITNESS                          PAGE
 3  SHAWNA NOWICKI
 4  Direct Examination by Mr. Kapitan    146
 5  Cross-Examination by Mr. Miner       164
 6  Redirect Examination by Mr. Kapitan  170, 172
 7
 8  WITNESS                          PAGE
 9  ELIZABETH MARQUEZ
10  Direct Examination by Mr. Kapitan    176
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

INDEX TO EXHIBITS

| | COMPANY | DESCRIPTION | PAGE |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | 1 | Termination Request and various | 51 |
| 4 | | other documents were marked for identification by the Arbitrator |
| 5 | | and were retained by Arbitrator |
| 6 | 2 | Video/DVD was marked for | 141 |
| 7 | | Identification by the Aritrator and Retained by the Arbitrator |
| 8 | | | |
| 9 | UNION | | |
| 10 | 1 | PBN (Performance-based National | 144 |
| 11 | | Detention Standards was marked for Identification and Retained by |
| 12 | | the Arbitrator |

Page 6

HESPERIA, CALIFORNIA; WEDNESDAY, JUNE 14, 2017

10:04 A.M.

-oOo-

THE ARBITRATOR: Ladies and gentlemen, we are here for a hearing with regard to the discharge -- we're here for a hearing with regard to the discharge of Ms. Marquez. And the parties have agreed on an issue, that being was there just cause for the discharge. And if not, what shall be the remedy.

I'll ask the Company attorney to start with an opening statement.

MR. MINER: Thank you, Mr. Arbitrator, and good morning.

OPENING STATEMENT

MR. MINER: The case involves an incident that occurred on August 5th of 2015. The case involves a termination, then notice of termination was provided April 29th, 2016. Subsequent to events on August 5th, the grievant took a leave of absence. Upon her return from her leave of absence in April 2016, the investigation was concluded and closed, the determination to terminate her employment was made, and she was notified of that decision.

Apart from those procedural issues, permanent facts all relate to August 2015, and August 5th in

Page 7

particular. On that day, there was an escape attempt by a high-risk inmate from the administrative segregation unit at the facility.

The inmates at the facility are provided uniforms that are color-coded according to their level of risk. This particular inmate was dressed in a red uniform indicating that he was the highest classification of risk among the detainees in the facility. He was left unsecured in a shower. And that resulted in the termination of another guard that is not before you today as a result of our exchange of correspondence last week.

And so the termination of Emanuel Santiago for his role in the escape attempt, we understand is one that will be addressed by another arbitrator at a future time.

Subsequent to being left in the unsecured shower, the detainee was able to access a secured door leaving his segregation unit. He was then able to access a secured door on the other side of a Sally port, also exiting that same unit. He was able to walk rather leisurely unaccompanied through a hall, leading to a third door through which he was able to gain access.

And, finally, he was able to walk through an additional main corridor of the facility, and in the observation of staff who were in the process of apprehending him, gained access to a fourth secured door,

Page 8

passed through it, and closed it behind him.

All of the facilities, as you will hear in our testimony today, all of the doors in the facility are secured. All of the doors are accessed through a central controlled office in the facility. This central control office is sort of the brain of the facility.

And a key function of this part of the facility is assuring that doors that are secured are accessed only by authorized individuals, only following positive identification by the officers stationed there.

The central control office is staffed by two officers, one of whom on the date of the incident was Ms. Marquez.

We don't believe there are facts in dispute with respect to what occurred, or at least we haven't been informed that there's any dispute about the facts. Ms. Marquez was responsible for all of the doors in this part of the facility. She had access to the equipment that was used to secure and unsecure those doors. She had access to the audio and video resources that she was to use to verify the identity of anyone seeking access to those doors.

Four different times this high-risk detainee requested access to a different door and four different times Ms. Marquez accessed those doors for him.

Page 9

1 Obviously, she did that without verifying his identity.
2 We cannot imagine she knowingly allowed this individual to
3 access those doors.
4         The parties labor agreement in Article 14.3
5 provides certain categorical grounds for the termination
6 of an officer in the facility, including among them
7 inattention to post.
8         Mr. Arbitrator, this is a classic egregious and
9 very risky inattention, case of inattention that occurred
10 here.  The facility obviously is set up with layer upon
11 layer of security to prevent risky, hazardous behavior
12 from occurring.
13         In this particular case, Ms. Marquez failed on
14 four different occasions by providing access to four
15 secured doors to a high-risk inmate and risk the inmate's
16 safety, risk the safety of the staff, and potentially risk
17 the public's safety.  This inmate was two doors away from
18 exiting the facility.  There is no excuse for the total
19 neglect and disregard of this basic job function than what
20 occurred here.  It created a dangerous scenario.
21 Termination was appropriate under Article 14.3.  There
22 clearly was just cause for the termination.  The grievance
23 has no merit, and we ask for it to be dismissed.
24         THE ARBITRATOR:  Thank you.
25         Mr. Kapitan?

Page 10

1         MR. KAPITAN:  Yes, I would like to make an
2 opening statement, please.
3
4         OPENING STATEMENT
5         MR. KAPITAN:  Arbitrator Shapiro, I believe the
6 basis of the relationship between the parties has been
7 expressed by Mr. Miner.  If you have any questions
8 regarding the nature of the party, please ask, and we will
9 be happy to provide more detailed information on that.
10         As a basis, we are talking about a detention
11 facility.  This happens to be one of the largest in the
12 nation, if not the largest in the nation.  The area that
13 we are talking about, the west section of the facility,
14 contains multiple housing units.  Also contains a
15 segregation unit, which had just been in operation for a
16 week, if not just a couple weeks prior to this incident in
17 August 2015.  Things were kind of new.  Procedures were
18 new, and added, the situation we had on August 5th when
19 Detainee Irias, who has been classified by the Company as
20 a high-risk individual, was knowingly and permissibly
21 allowed to go unescorted and unrestrained into the shower
22 unit.
23         You'll see evidence that the Company admitted,
24 through their own end, that they did not communicate
25 procedures in this time period when things were just

Page 11

1 starting up in the segregation unit.  They did not
2 communicate procedures well.  They did not talk to the
3 officers.  The managers, it was their responsibility for
4 the staffing issues.  And that lead to a situation where
5 the detainee was allowed to be in a shower unit by himself
6 with the door unlocked.
7         That was a result of management conduct, not the
8 officers.  They created that situation by having two
9 control officers in there.  One, Mr. Santiago, was
10 responsible for other duties.  He was involved in the
11 distribution of food trays.  The other was called away to
12 conduct a meal break for a different officer.  So that
13 left one control officer to control not only the entire
14 segregation unit with the meal trays, but also to keep
15 tabs on Mr. Irias.
16         The failure by the Company lead to the detainee
17 being unescorted and unrestrained into the facility.  From
18 there, there is no dispute.  The union will admit that he
19 accessed four doors.
20         The basis for our defense in this case with
21 Ms. Marquez is that the company bears a great deal of
22 responsibility for what happened.  And there are
23 substantial mitigating factors.  Not only did their
24 conduct lead to the detainee being unescorted and
25 unrestrained in the hallway, but they left Ms. Marquez in

Page 12

1 the control room to conduct duties that no reasonable
2 person would be able to conduct.
3         She was in the control unit because she was eight
4 months pregnant.  She could not work another post that had
5 a risk of physical conduct with a detainee, so she was
6 working in the control center.  The control center
7 requires specific training and qualifications in order to
8 work there, none of which she had.
9         She was asked not only to control all the
10 movement over the facility, which means she was required to
11 monitor over 300 doorways, but at the time Detainee Irias
12 tried to access the doors there was an emergency count
13 going on.  And we'll get into further detail on what that
14 involves.  But, essentially, it's what you would imagine.
15 Four times a day they count the number of detainees to
16 make sure they have everyone.
17         At this time period, around 1630, 4:30 in the
18 afternoon, there was a discrepancy.  So they went into
19 somewhat of a shut-down mode and conducted an emergency
20 count.  This left Ms. Marquez in the control unit to
21 monitor over 300 doors.  She was on the phone and she was
22 on the radio talking about security measures with officers
23 at the same time trying to conduct an emergency count.
24 That is not reasonable for one person to be able to do on
25 a normal day.

Page 13

1    The control officer will get an alert to access a
2 door every couple seconds.  You can imagine in a facility
3 where people are constantly moving, how many people are
4 trying to go through these doors.
5    There will be testimony that this happens every
6 couple seconds.  And, invariably, it's always someone with
7 access and who is authorized to go through those doors.
8 It becomes almost rote that someone buzzes, you let them
9 through.  In fact, they will testify that individuals
10 complain when the officers in the control room take too
11 much time to verify the identity of someone.  They expect
12 just to be buzzed through.
13    So in this situation where it is set up that an
14 individual allows access continuously and quickly to
15 individuals, never has a detainee tried to access a door.
16 Errors were made.  And the Company bears responsibility
17 for that.  It just so happens in this case that a detainee
18 tried to access a door, which never happens, but it
19 happened in this case because of the Company's error in
20 allowing him to go unrestrained and unescorted while in
21 the shower.
22    Because of the company's responsibility in this,
23 the Union believes that some discipline may be
24 appropriate, but termination certainly is not.  We ask
25 that you sustain the grievance, make the grievant whole,

Page 14

1 award reinstatement in back pay and continue jurisdiction
2 until such remedy is made effective.
3    Thank you.
4    THE ARBITRATOR: Thank you.  I assume the Company
5 will have a first witness?
6    MR. MINER: Company calls Lieutenant Anderson.
7 Would you come sit up next to the arbitrator.
8    THE ARBITRATOR: Thank you, Mr. Anderson.
9    Before you sit down, will you raise your right
10 hand, please.
11    Do you swear or affirm, that the testimony you
12 are about to give, will be the truth, the whole truth, and
13 nothing but the truth?
14    THE WITNESS: I do.
15
16    RONALD D. ANDERSON,
17 called as a witness by the Company, testified as follows:
18    THE ARBITRATOR: Your witness.
19    MR. MINER: Thank you, Mr. Arbitrator.
20
21    DIRECT EXAMINATION
22 BY MR. MINER:
23    Q   Thank you, Mr. Anderson.  Good morning.
24    A   Good morning.
25    Q   Lieutenant Anderson, where do you currently --

Page 15

1 Excuse me.  Where are you currently employed?
2    A   With the --
3    Q   Let's try that again.
4    Lieutenant Anderson, where are you currently
5 employed?
6    A   I'm currently employed with the Adelanto
7 Detention Facility, the GEO Group.
8    Q   How long have you worked there?
9    A   Since 2011.
10    Q   What is your job title?
11    A   I'm a shift supervisor.
12    Q   And how long have you been a shift supervisor?
13    A   Since April of 2014.
14    Q   Do you go by the lieutenant?
15    A   Yes.
16    Q   Thank you.
17    And who do you report to?
18    A   I report directly to Captain McCusker.
19    Q   And who does Captain McCusker report to?
20    A   Would be Chief Johnson.
21    Q   Who does Chief Johnson report to?
22    A   A.W. Vantel.
23    Q   And that's the assistant warden?
24    A   That's correct.
25    Q   And, ultimately, who does the assistant warden

Page 16

1 report to?
2    A   To Warden Janecka.
3    Q   You're familiar with Warden Janecka?
4    A   Yes, sir.
5    Q   How long has he been at the facility?
6    A   About three, four years, I think, I believe.
7    Q   And how long have you been the shift
8 supervisor?
9    A   I've been the shift supervisor since my promotion
10 in April of 2013.
11    Q   How long have you been in corrections overall?
12    A   I started my correctional career back in 2001.
13    Q   And what was your first job in corrections?
14    A   First job in corrections was a line staff with
15 the Atlantic Community Correctional Facility.
16    Q   Tell us about the Adelanto Detention Center,
17 please.  Today how many inmates are there, if you know?
18    A   We currently house, my last count on my last day
19 was I think we housed 1,500, roughly, plus or minus.
20    Q   And how many staff roughly are there at the
21 facility?
22    A   I want to say 200.
23    Q   And who is the government agency that GEO
24 contracts with to operate this facility?
25    A   That would be the Department of Homeland facility

Page 17

1 and the ICE -- ICE department or --
2 Q   The Immigration Customs --
3 A   Immigration Customs Enforcement, that's correct.
4 Q   Okay.  And so what type of detainees are we
5 talking about here?
6 A   Immigrants.  The detainees that we have obviously
7 come from all over the world.  They -- with various cases.
8 To my knowledge, everybody there is waiting to see -- you
9 know, to have their case be heard.
10 Q   Are all detainees classified and held in the same
11 way in the facility?
12 A   No.
13 Q   How does the facility classify the detainees?
14 A   Once the detainees arrive, they go through an
15 intake process.  During that intake process, they're
16 classified.  They go through a classification screening,
17 if you will.  During that classification process, there
18 are determining factors within that individual's case that
19 will determine their classification level.
20 Q   And how many levels are there?
21 A   We currently have four.
22 Q   And what are they?
23 A   We have low, we have medium low, medium high, and
24 high.
25 Q   How are the detainees -- how does the Company

Page 18

1 track the classification status of the detainees within
2 the facility?
3 A   I don't quite understand the question.
4 Q   Fair enough.  It wasn't a well stated question.
5    Does the Company provide uniforms for the
6 detainees?
7 A   Yes.
8 Q   What sort of uniforms?
9 A   The clothing that is given is color coordinated
10 for the individual detainee.  If they are a low level,
11 they are placed in a blue color.  If they are a medium low
12 to medium high, it's orange.  And a high level detainee
13 will be placed in red.
14 Q   What is a high level or red uniform indicate to
15 an officer at the facility?
16 A   That we have -- we have a high level detainee.
17 Q   Meaning what goes into the determination, if you
18 know, that an inmate is high level?
19 A   It would have their history determine -- the
20 determination is made based on their history.
21 Q   What sort of history?
22 A   Their criminal history, their background, where
23 they came from, how they got to where we are -- where they
24 currently are.
25 Q   Are you familiar with the administrative

Page 19

1 segregation unit at the facility?
2 A   Yes.
3 Q   What is that?
4 A   The administrative segregation unit at the
5 facility is a portion of the facility which houses the
6 detainees that are placed on a nondisciplinary status.
7 Q   And what is the purpose of assigning a detainee
8 to that unit?
9 A   Oh, it varies.  It varies for various reasons.
10 It could be for protective custody reasons.  It could be
11 for the placement of waiting to determine the outcome of a
12 current report or current situation.
13 Q   Okay.  Could it include a risk level detainee?
14 A   Yes.
15 Q   Such as?
16 A   Risk level being the reclassification.  It could
17 be a mental health status.
18 Q   How long has the administrative segregation unit
19 at the facility been operating?
20 A   Since we opened the west facility.
21 Q   And when was that?
22 A   The west facility opened up in 2013, I do
23 believe, if I remember correctly.  I think it was two
24 years after we opened the east facility.
25 Q   Were there any changes to administrative

Page 20

1 segregation in the summer of 2015?
2 A   There was a dividing wall that was placed in
3 between the two, the two housing units, to separate the
4 administrative side from the disciplinary side.
5 Q   Were there any changes in procedures announced
6 when the wall was installed?
7 A   None.  Other than the clear, you know, the clear
8 division between the two units.
9 Q   Okay.  How is the administrative segregation unit
10 accessed at this facility?
11 A   We have a controlled door from central control
12 that will allow access into a controlled area, a Sally
13 port, if you will, between the -- the Sally port is a spot
14 between two controlled areas, a controlled room.  Once you
15 make access from the housing corridor into the Sally port,
16 you move from the Sally port into the actual segregation
17 unit.
18 Q   Okay.  You referred to central control?
19 A   Yes, sir.
20 Q   What is the central control office?
21 A   Central control is more or less the heartbeat
22 of the institution.
23 Q   And what happens there?
24 A   We have -- we have incoming phone calls.  You
25 have staff that control the movement throughout the

Case 5:16-cv-02263-DOC-KK   Document 50-10   Filed 11/27/17   Page 82 of 159   Page ID
#:4281
Arbitration of Elizabeth Marquez Vs

June 14, 2017

Page 21

1  facility.
2    Q   And how do they control the movement throughout
3  the facility?
4    A   We have a set of doors or a set of boards that
5  are set up that will access -- that will allow the officer
6  access to electronically open doors throughout the
7  facility.
8    Q   All the doors?
9    A   Electronically open all the doors?  I want to say
10  the majority of them, yes.
11    Q   Okay.  All the secured doors?
12    A   All the secured doors, that is correct, yes.
13    Q   How does an officer in central control access a
14  particular door?
15    A   When a -- when a door is activated, when the
16  intercom is activated, an alert icon will show up on the
17  central control board.  From there, the central control
18  officer will activate that.  It will open up an intercom
19  between central and the location of activation, if you
20  will, which will also bring up in most cases, a video, a
21  video shot, live video feed of that location.
22    Q   And where is this video appearing?
23    A   It's in central control on a monitor.
24    Q   And where is the monitor stationed?
25    A   The monitors are stationed in between where the

Page 22

1  two officers are at.
2    Q   Okay.  You mentioned a board.  Can you describe
3  the layout of the board for us?
4    A   The layout of the board is approximately -- it
5  will be like looking at a 40-inch -- or a flat 40-inch
6  screen TV laying down.  If you will, if you can picture,
7  again blueprints of the facility, certain portions of the
8  facility are laid out.  If you will, we'll just use the
9  segregation, per se.
10    If somebody in segregation activates a door or
11  hits the intercom, that portion of the facility shows up
12  on the board in the layout.  On that blueprint layout
13  there are, again, icons that will allow the central
14  control officer to activate, to open up the -- the
15  intercom between the two.
16    So you're now opening up a line of communication
17  between where the button has been activated and central
18  control.
19    Q   So there's an intercom first that alerts an
20  officer that a request for access is being made?
21    A   That's correct.
22    Q   And there's an audio component to this
23  intercom?
24    A   Yes, sir.
25    Q   And then you mentioned that there is, in most

Page 23

1  cases I think you said, a video component?
2    A   Yes.
3    Q   How does that work?
4    A   Well, the video component -- once the activation
5  has been made, central control will activate that icon
6  that comes up, that digital request has been made.  Once
7  that request has been made, the icon is activated.  And
8  like in most cases, the video feed will show up on the
9  monitor.
10    Q   You said "In most cases"?
11    A   Yes, sir.
12    Q   Do all the doors have a video capability?
13    A   No.
14    Q   Okay.  Which doors have a video capability?
15    A   It will be easier to tell you which doors didn't.
16    Q   All right.
17    A   The ones that don't, unfortunately, are the doors
18  that lead out of the segregation unit.
19    Q   Okay.  Why is it that those don't have a video
20  capability, if you know?
21    A   There's -- I'm not really sure at this time.  I
22  just know that there's a video camera above the door, but
23  it doesn't actually show the door.  Where, in most cases,
24  if you hit an intercom, a camera is pointed at that door.
25    Q   Okay.  If there's no video capability after the

Page 24

1  intercom is activated, how does an officer in central
2  control identify the individual seeking access?
3    A   They ask them to positively identify themselves.
4    Q   How do they do that?
5    A   Verbally.
6    Q   And what happens next?
7    A   Generally, once the -- once the notification or
8  identification has been positively identified, the
9  individual has been positively identified, central control
10  will then access the door.
11    Q   Were you working on August 5th, 2015?
12    A   Yes, sir.
13    Q   There was an incident that day involving a
14  detainee by the name of Jimmy Irias.
15    Are you familiar with that detainee?
16    A   Yes, sir.
17    Q   Can you tell the arbitrator who Jimmy Irias is.
18    A   Detainee Irias came to us.  And from the moment
19  that he was there was a problem.  He has had multiple
20  accounts of assaults on staff, including ICE agents.
21  Therefore, he was placed as a high level or high risk
22  detainee and placed in the segregation unit.
23    Q   Are you familiar with the incident in which
24  Mr. Irias attempted to escape the unit?
25    A   Yes.

Case 5:16-cv-02263-DOC-KK   Document 50-10   Filed 11/27/17   Page 83 of 159   Page ID
#:4282
Arbitration of Elizabeth Marquez Vs

June 14, 2017

Page 25

1  Q   Where were you at the time?
2  A   I was in central control.
3  Q   Who else was in the central control office with
4  you at the time?
5  A   That would be Officer Marquez and Officer Harris.
6  Q   Who is Officer Harris?
7  A   Officer Harris was employed with us and was one
8  of the shift officers that was assigned to central that
9  day.
10  Q   What is the typical staffing of the central
11  control office?
12  A   Two.
13  Q   Two officers?
14  A   Two officers.
15  Q   In addition to a supervisor?
16  A   The only reason why I was there was to confirm
17  count paperwork.
18  Q   So there's a count going on?
19  A   Yes, sir.
20  Q   What is a count?  Can you describe that for us,
21  please?
22  A   A count will positively account for the detainees
23  that we have in our charge, that we're responsible for.
24  Q   And how is a count conducted?
25  A   A count is conducted -- there's two ways.  You

Page 26

1  can -- you can count, you know, just bodies.  You can go
2  through a unit and you can count, one, two, three, four,
3  you can count that way.  Or you can do a face-to-photo
4  count.
5      A face-to-photo count is completed with a face
6  card where you positively identify each detainee versus
7  the information that you have that they are positively --
8  you know, if they are supposed to be in cell 101 in bed 1
9  low, then that's where they are.  The detainee that sat on
10  their bed, they are positively identified by the officer,
11  and then they move through the unit.  Once they receive
12  that count, they are placed -- once they receive that
13  number, they place it on to a count slip.
14  Q   What is the facility's protocol with respect to
15  movement within the facility during the face-to-photo
16  count?
17  A   There is no detainee movement.
18  Q   How long does the face-to-photo count last?
19  A   I'd say 35 to 45 minutes.
20  Q   At the time that you were in central control on
21  August 5th, during this incident, what kind of a count was
22  occurring at that time?  What kind of a count?
23  A   This was an emergency count at this time due to a
24  discrepancy that was found.
25  Q   Okay.  What sort of a discrepancy?

Page 27

1  A   I do believe the numbers weren't -- the numbers
2  weren't matching up with the information that we should --
3  that we had.
4  Q   So this was not a scheduled count?
5  A   No.  This was a scheduled count.  It had run
6  long.  So, therefore, per policy, after 60 -- after 45
7  minutes we are to initiate an emergency count.
8  Q   I see.  So this started out as a count and became
9  an emergency count because of the duration?
10  A   Yes, sir.
11  Q   Am I correct?
12  A   Yes, sir, that is correct.
13  Q   And it lasted long because of a discrepancy that
14  was discovered?
15  A   That is correct.
16  Q   Do you recall what the discrepancy was?
17  A   I do not.
18  Q   Okay.  When did the count begin?
19  A   The count would have begun at 1630, if I remember
20  correctly.
21  Q   And what time was it when you entered central
22  control?
23  A   It would have been approximately 1640, 1645.
24  Q   And how long were you there?
25  A   I don't really recall.

Page 28

1  Q   Okay.  Do you recall roughly how long you were in
2  the office?
3  A   It would have been at least 45 minutes.
4  Q   Okay.  What were you doing in the office while
5  you were in central control?
6  A   I was confirming the paperwork.  I was putting
7  together the count packet, ensuring that all the numbers
8  were correct.
9  Q   Okay.  What was Officer Harris doing at that
10  time?
11  A   At that time Office Harris was putting together
12  the count packets.
13  Q   What is the count packet?
14  A   The count packet comprises of a master control
15  sheet, which has the facility numbers, our cross tab,
16  which is generated from a GEO track.
17  Q   Okay.
18  A   And, again, all of the counts slips, all of the
19  out-count slips.
20  Q   Helping you with documentation, I take it?
21  A   Yeah.  He was helping me organize it, making sure
22  that everything was as it should be.
23  Q   Okay.  And what was Ms. Marquez doing during this
24  time?
25  A   Officer Marquez was operating the boards, the

Case 5:16-cv-02263-DOC-KK   Document 50-10   Filed 11/27/17   Page 84 of 159   Page ID
#:4283
Arbitration of Elizabeth Marquez Vs

June 14, 2017

Page 29

1 radio, monitoring the phones.
2 Q   Okay.  When you say "Operating the boards" --
3 A   Yes, sir.
4 Q   -- what does that mean?  What was she doing?
5 A   She was activating -- activating the boards would
6 have consisted of being able to access the doors
7 throughout the facility, controlling the movements of the
8 staff that was moving through the housing units while
9 they -- while they were conducting the count.
10 Q   Okay.  During the count you testified there's no
11 detainees movement?
12 A   That is correct.
13 Q   Does that have any impact on the amount of
14 movement by staff during the count?
15 A   No.
16 Q   So there's still a -- what, how much movement by
17 staff throughout the facility?
18 A   It's minimal.  You might have, I would say, four
19 to six officers that are moving through the facility while
20 they are counting the units.
21 Q   Is that because they are conducting the count?
22 A   That is their responsibility, that is correct.
23 Q   During this period, do you recall a number of
24 telephone calls coming into the central control office?
25 A   Nothing more than normal, no.

Page 30

1 Q   Do you recall a great deal or any amount of radio
2 activity among the staff?
3 A   Again, nothing more than normal.
4 Q   How did you become aware that -- of an escape
5 attempt by Mr. Irias?
6 A   I had looked up onto the monitors and started
7 reviewing the monitors and noticed that there was a
8 detainee standing in the hallway in our main corridor.
9 Q   Where was the monitor stationed at the time?
10 A   In central control.  And it was in between both
11 officers.
12 Q   Where were you standing?
13 A   I was standing -- when I noticed it, I was
14 standing to the right of Officer Harris, and was just on
15 the outside of the wall looking into where the boards were
16 at and where the monitors were.
17 Q   And where was Ms. Marquez at that time?
18 A   She was at the left side of central control.
19 Q   Was she in a position where the monitor could
20 have been visible to her?
21 A   Yes.
22 Q   Was the monitor visible -- strike that.
23     The monitor was visible to you; correct?
24 A   Yes.
25 Q   And what did you observe when you saw an inmate

Page 31

1 in the corridor?
2 A   When I looked up and saw Detainee Irias walking
3 down the hallway of the main corridor, it was at that
4 time -- that's when I noticed there was an unauthorized
5 detainee in the hallway.  We had movement, and he was
6 unescorted.
7 Q   What did you do?
8 A   At that point in time, I had called for the two
9 shift sergeants.  I had alerted them via the radio that we
10 had an unauthorized detainee in the hallway.
11 Q   And where were you when you made that radio
12 call?
13 A   Central control.
14 Q   How far were you from where Ms. Marquez was
15 working?
16 A   You and I are further apart.  We were closer than
17 this.
18 Q   So less than eight feet?
19 A   Oh, much less than eight feet, yes.
20 Q   Was there any noise in the office at the time?
21 A   No, nothing unusual.  Nothing out of the ordinary
22 of what would normally be there.
23 Q   Was the phone ringing at the time?
24 A   Yes.  That's normal.
25 Q   How many phones?

Page 32

1 A   We have two phones in central control.
2 Q   And how many of them were ringing?
3 A   I would say at least one of them at the time.
4 Q   You called using your radio two shift sergeants,
5 I believe you testified?
6 A   Yeah.  That would be shift Sergeant Soliz and
7 Hutchinson.
8 Q   And what did you tell them?
9 A   I told them we had an unauthorized detainee in
10 the main hallway.
11 Q   Did you give them any directives?
12 A   That they were to -- they were to meet or -- that
13 they were to apprehend the individual.
14 Q   What happened next?
15 A   The shift sergeants came out of the watch office
16 and had made visual contact with the detainee Irias.
17 Q   Okay.  And?
18 A   And at that time as they started to approach, and
19 again they were walking as they were approaching Detainee
20 Irias.
21 Q   Let me stop you here.  How is it you're aware of
22 what the sergeants were doing, vis-a-vis, Mr. Irias?
23 A   I could see them on the monitor.
24 Q   You're watching the monitor?
25 A   Yes, sir.

SANTIAGO 080

Case 5:16-cv-02263-DOC-KK   Document 50-10   Filed 11/27/17   Page 85 of 159   Page ID
#:4284
Arbitration of Elizabeth Marquez Vs

June 14, 2017

Page 33

1   Q   The same monitor that is above the boards?
2   A   Yes.  It is right next to the boards, yes.
3   Q   All right.  Thank you.  Please procedure.
4   A   It was at that time, as they were approaching the
5   Detainee Irias, that again he was standing next to another
6   door that lead to another hallway that was accessed and he
7   walked through it.
8   Q   Then what happened?
9   A   The door shut behind him.  And it was at that
10  time that I had made the announcement to cease and decease
11  all operation of doors and --
12  Q   So let me stop you there.  Who did you make this
13  announcement to?
14  A   I had told Marquez and Harris to no longer access
15  any doors and that I also made the call over the radio.
16  Q   What did you say on the radio call?
17  A   That -- that they were to cease and decease all
18  movement.
19  Q   What happened next?
20  A   The responding team, which was the shift
21  sergeants and a couple of officers, and I don't remember
22  who they were, were actually at -- able to access the
23  door.  And I do believe the door number was 707.  I had
24  instructed Officers Marquez to open that door to allow the
25  responding team to come in.

Page 34

1   Q   And did she do so?
2   A   Yes, sir.
3   Q   Okay.  Did they pass through the door?
4   A   They passed through the door.  They were able to
5   escort -- make contact with Detainee Irias, who was
6   escorted back to the restricted housing unit.
7   Q   How many doors total did Mr. Irias pass through
8   after leaving the administrative segregation unit?
9   A   After leaving administrative segregation, he
10  passed through two doors.
11  Q   How many doors did he pass in order to leave the
12  unit?
13  A   Four.
14  Q   Were those all secured doors?
15  A   Yes.
16  Q   And how many had video capability?
17  A   Two.
18  Q   Did they all have audio capability?
19  A   Yes.
20  Q   And I'm referring to the audio intercom request
21  for access.
22  A   Yes, they did.
23  Q   How many doors at the time Mr. Irias was
24  apprehended, how many doors stood between Mr. Irias and
25  the outside of the facility?

Page 35

1   A   Two.
2   Q   And what were those doors?
3   A   Again, controlled doors that were at the end
4   of the hallway in which he was in.
5   Q   After Mr. Irias was apprehended, did you have any
6   discussion, conversation, with Ms. Marquez about what had
7   occurred?
8   A   Nothing more than, you know -- no, not really.
9   It was -- there was no discussion.
10  Q   Okay.  What was your directive after Mr. Irias
11  was apprehended?  What was your role at that point?
12  A   From there I had to notify my superior, which I
13  made a phone call to -- I actually received a phone call
14  from Warden Janecka.  Told him about the event.  I had
15  placed a call to Captain McCusker to alert him of the
16  event.
17  Q   How long were you in the central control office
18  after that -- after -- let me strike that.
19       After Irias was apprehended, how long did you
20  remain in the central control office?
21  A   Moments.  I mean, less than five minutes.  I had
22  made my way to the watch office almost immediately after
23  he was apprehended.
24  Q   What is the watch office?
25  A   The watch office is the location where myself,

Page 36

1   shift supervisors or shift sergents conduct the shift, if
2   you will.
3   Q   Okay.  Were you involved in an investigation of
4   the escape attempt?
5   A   Yes.
6   Q   Did you collect statements from witnesses who
7   were involved in the incident?
8   A   Yes.
9   Q   Did you collect some video with respect to
10  Mr. Irias' movement within the facility?
11  A   Yes.
12       MR. MINER:  Mr. Arbitrator, I have five short
13  video clips which are queued up to run on my laptop, which
14  has a projector available.  I think it will take less than
15  ten minutes to view the video.  Would you like me to
16  proceed or would you like a short break before we do so?
17       THE ARBITRATOR:  Well, before we do that,
18  Mr. Kapitan, do you have any objection to the video being
19  shown?
20       MR. KAPITAN:  No objection.
21       THE ARBITRATOR:  Show the video.  Thank you.
22  BY MR. MINER:
23  Q   Lieutenant, I am going to show the video clips
24  and ask you to describe what we're viewing as we go.
25       Okay?

SANTIAGO 081

Page 37

1  A  Yes, sir.
2  Q  Okay.  So let me ask you, Lieutenant, what are we
3  looking at?  What is this video footage showing us?
4  A  What you're looking at is the control housing
5  unit.  This is our restricted housing unit or segregation
6  unit, if you will.  The view down here on the bottom left
7  is the showers in which the detainees will use or access
8  to, of course, you know, bathe.
9  Q  Okay.  And so we're looking into the unit?
10  A  Into the unit, that is correct.
11  Q  What is directly below the video camera -- well,
12  all right.  Let me ask you this:  In the middle of the
13  frame from the bottom about halfway up, there's some dark
14  rectangular looking objects.
15      What are those?
16  A  Those are windows that lead into the segregation
17  control unit.
18  Q  Okay.  And below the camera, outside of range of
19  what we're looking at, what is below where the camera is
20  stationed?
21  A  Is the door that leads out to -- out of
22  segregation.
23  Q  Okay.  So the video is stationed above the door
24  looking in?
25  A  That's correct.

Page 38

1  Q  And there now appears to be an individual inside
2  a door looking out?
3  A  Yes, sir.
4  Q  Do you see that?
5  A  Yes, sir.
6  Q  The left of the frame?
7  A  Yes, sir.
8  Q  Do you know who that is?
9  A  That would be Detainee Irias.
10  Q  I'm going to hit play again.  Tell me if you want
11  me to pause the video while we go.
12      And so what is happening now, Lieutenant?
13  A  Detainee Irias has accessed that door and is now
14  standing in the segregation unit unsupervised.
15  Q  What is GEO's policy with respect to secure doors
16  of a shower facility such as this one when it's being
17  used?
18  A  Detainees in the segregation unit, the doors
19  should be locked.
20  Q  How long has that been the policy at Adelanto?
21  A  For -- so as far as I'm concerned, the moment
22  that segregation was put into activation.
23  Q  And when was that?
24  A  Back in 2013 when it was built.
25  Q  Are you aware of any changes to the policy since

Page 39

1  that time?
2  A  No, sir.
3  Q  Have you ever known of a detainee to be left in
4  an unsecured shower as Mr. Irias apparently was here?
5  A  No, sir.
6  Q  I'm going to continue the video.  And what's
7  happening?
8  A  He is now making an approach.  He's now
9  approaching the door that leads out of segregation.
10  Q  We cannot see him in this video; correct?
11  A  That is correct.
12  Q  Is this video that was visible or viewable in
13  central control in live time --
14  A  Yes.
15  Q  -- at the time that this incident was occurring?
16  A  Yes.  You could queue up that video from central.
17  Q  You could do so, but was it viewable at the time?
18  Was it being shown on a monitor when you were in central
19  control?
20  A  No, sir.
21  Q  Okay.  So how would that video have been queued
22  up from central control?
23  A  They would have had to, a central control officer
24  would have actually had to queue that camera up in order
25  to view that particular door or that particular view.

Page 40

1  Q  Okay.  So if Mr. Irias approached the door
2  leading out of administrative segregation.  What would his
3  first step have been in order to gain access to that
4  door?
5  A  He would have hit the intercom.
6  Q  And then what?
7  A  And waited for the door to open.  I mean,
8  that's -- that's -- when you hit an intercom, you
9  positively identify yourself through verbal, then you wait
10  for the door to be accessed.
11  Q  Okay.  And for the officer sitting in central
12  control, what does that officer experience?
13  A  The central control officer will hear an audible,
14  you know, they will ask, identify.  They will hear the
15  audio return, the answer.  And then once the
16  identification has been made positive, they will access
17  the door.
18  Q  And by "Access the door," how do they do so?
19  A  They have to click a series of buttons in order
20  to open that door from the boards.
21  Q  Let's go to this second video clip.  I think this
22  one is shorter.  And so before it starts, let me pause and
23  ask you to identify what we are looking at here.
24  A  We're now looking at what is known as the
25  segregation housing corridor.  You're looking at the --

SANTIAGO 082

Case 5:16-cv-02263-DOC-KK   Document 50-10   Filed 11/27/17   Page 87 of 159   Page ID
#:4286
Arbitration of Elizabeth Marquez Vs

June 14, 2017

Page 41

1 the door straight at the end leads out to the rec yard.
2 The door to the right is a mechanical room.  And then the
3 third door in is going to be the actual door that leads
4 into segregation.
5   Q   So that's the door that looks like it has a
6 window next to it?
7   A   It does have a window next to it.
8   Q   Okay.  And so this video then is looking --
9 strike that.
10     Is this video looking at the door that we just
11 saw below the video camera in the first clip?
12   A   No.
13   Q   So what door is this one?
14   A   This door is the secondary door that would lead
15 into the Sally port or the control room beyond it.
16 Beyond -- what we don't see is, what's beyond this door,
17 is that Sally port or that controlled area.
18   Q   I see.  So this door, the third door to the
19 right --
20   A   Yes, sir.
21   Q   -- is the second door to the Sally port that
22 leads into the administrative segregation?
23   A   That is correct.
24   Q   Great.  Thank you.  Can I proceed and play the
25 video?

Page 42

1   A   Yes, sir.
2   Q   And tell me if you would like me to pause.  What
3 are we observing here?
4   A   Pause.  What you had seen is Detainee Irias
5 access that door, that secured door, and made entrance
6 into the housing corridor.
7   Q   Okay.
8   A   In order to access that door, again, central had
9 to access that door in order to allow him access into that
10 hallway.
11   Q   And how would Mr. Irias have done so?
12   A   Again, there's an intercom next to that door.
13   Q   Okay.  There's no video, though, with respect to
14 the access request for door No. 2; correct?
15   A   That is correct.
16   Q   Okay.  The video that we're now looking at is the
17 very next available video that shows Mr. Irias'
18 progression?
19   A   Correct.
20   Q   Okay to proceed?
21   A   Yes, sir.
22   Q   So Mr. Irias now has exited down below the
23 visible frame of the video; correct?
24   A   That is correct.
25   Q   And where is he heading?

Page 43

1   A   He's heading towards the main corridor doors.  It
2 will be a double set of doors that lead into the main
3 corridor.
4   Q   And I'll open the third video clip.  So I'm going
5 to pause it again here so you can describe for us what
6 we're looking at.
7   A   The bottom of the -- bottom left-hand screen
8 is the window in the previous -- the previous video.
9   Q   Okay.
10   A   The door, the first door to your left, is the
11 discipline side of our segregation unit, again, with the
12 window next to that door.  The next door up is going to be
13 a mechanical room.  And then the two double doors that
14 you're looking at are the control doors leading into the
15 main corridor.  And there is a window in between those two
16 doors.
17   Q   I see.  Okay.  Okay to proceed?
18   A   Yes, sir.
19   Q   And what are we viewing now?
20   A   Here again Detainee Irias walking down towards
21 the secured doors.
22   Q   And what does he appear to be doing?
23   A   Besides having a stroll, looks like he may have
24 hit the -- he hit the intercom in order to access that
25 door.

Page 44

1   Q   What is happening here?
2   A   That door has been accessed, and he's now walking
3 through it.
4   Q   Okay.  Is this video footage that we just saw,
5 was this video viewable in live time from central control
6 during this incident?
7   A   Yes.
8   Q   Was it being viewed at the time?
9   A   No.
10   Q   Why not?
11   A   That's unclear.
12   Q   Okay.  Did you view it?
13   A   No.
14   Q   Okay.  Once the intercom is accessed, that's
15 someone such as Mr. Irias pushes the intercom and requests
16 for access --
17   A   Yes.
18   Q   -- the central officer is alerted to that
19 request; correct?
20   A   Yes.
21   Q   Receives an audio identification; correct?
22   A   Yes.
23   Q   How is the video image then made available to the
24 central control officer?
25   A   Again, the video, once the intercom is activated,

Case 5:16-cv-02263-DOC-KK   Document 50-10   Filed 11/27/17   Page 88 of 159   Page ID
#:4287
Arbitration of Elizabeth Marquez Vs

June 14, 2017

Page 45

1 the video portion of the video will pop up onto a monitor
2 giving the visual and audio identification.
3    Q   And where is the monitor located again?
4    A   It's in between the two staff members that are
5 posted in central.
6    Q   Okay. So we'll finish this video clip. And the
7 door is closing?
8    A   Yes.
9    Q   Let's proceed to the fourth clip. And I'll pause
10 here. What are we looking at, Lieutenant?
11    A   We're looking at the main corridor. The windows,
12 the first window and the door to your right is our watch
13 office where, again, we've described that earlier. That's
14 where the shift office is. The door next to it is the
15 chapel. The ensuing three windows beyond it are -- again,
16 belong to that chapel. And the hallway continues on down
17 towards segregation.
18    Q   Okay to proceed?
19    A   Yes.
20    Q   Tell me when to pause.
21    A   Pause.
22       What we have is Detainee Irias has access to that
23 door, and has come out of the segregation unit into the
24 main corridor at this time.
25    Q   Okay. What is the first time you observed some

Page 46

1 video footage of Mr. Irias?
2    A   If you play the video, it is just prior to the
3 sergeants coming out of the office.
4    Q   Okay.
5    A   It was at that time, I -- I do believe there are
6 two staff members that were entering the watch office.
7 And it was just then that I made the notification or that
8 I had seen the -- Irias in the hallway. It was right
9 about here that I had -- it was right about here that I
10 had seen him on video.
11       The call had been made for the shift sergeants
12 that we had the detainee in the hallway. And pause.
13    Q   Okay.
14    A   He was standing again at door 707, which leads
15 yet to another hallway. Again, a secured door where an
16 intercom had to be hit in order for that door to be
17 accessed.
18    Q   Okay. And did he access it?
19    A   Yes.
20    Q   And this shot, we're at 45442, he's got it
21 open?
22    A   That's correct.
23    Q   Okay to proceed?
24    A   Yes.
25    Q   There are a number of staff?

Page 47

1    A   You have two sergeants, two shift sergeants and
2 three line staff.
3    Q   And what are they doing?
4    A   They are advancing down towards the subject
5 detainee.
6       Go ahead and pause.
7    Q   Okay.
8    A   The detainee has now entered that door, has
9 passed through the door and has shut it behind him, with
10 the advancing staff -- with the staff advancing towards
11 that door. And responding staff is now waiting for that
12 door to be accessed from the central control.
13    Q   What's happening in central control at this
14 time?
15    A   There was -- there was some confusion going on.
16 It was rather quiet other than myself. I had gotten kind
17 of loud with the -- with trying to make sure that, Hey,
18 let's make sure with the direction -- let's make sure that
19 we're not opening any more doors. The announcement had
20 been made via radio that we're not accessing any more
21 doors. There is no more movement. And that I had now
22 given the direction to open that door. It was kind of --
23    Q   Let me stop you there. Who did you give that
24 direction to?
25    A   Officer Marquez.

Page 48

1    Q   What did you say to her?
2    A   I said, "Officer Marquez, open that door, open
3 707."
4    Q   Okay. Did she do so?
5    A   Yes.
6    Q   And they apparently are doing so?
7    A   Yes.
8    Q   And they are passing through that door?
9    A   Passing through that door.
10    Q   And we'll look at the last of the video clips.
11 What are we doing here?
12    A   You see Detainee Irias coming through door 707
13 into the ensuing hallway, which is known as the intake
14 hallway.
15    Q   We see that there's intake written on the wall
16 alongside the right-hand side of the viewer.
17       Is that the intake area where that door leads?
18    A   That door actually leads into the intake area,
19 that is correct.
20    Q   And what happens in the intake area?
21    A   Intake, obviously, they will -- they will bring
22 in for processing the detainees, the new arrivals. They
23 will process them out for release to the, you know, bond
24 out for release to the street, as we call it, as they have
25 been bonded out.

Case 5:16-cv-02263-DOC-KK   Document 50-10   Filed 11/27/17   Page 89 of 159   Page ID
#:4288
Arbitration of Elizabeth Marquez Vs

June 14, 2017

Page 49

1   Q   And we'll proceed with the video.
2   A   And pause.
3       Detainee Irias, as you can see right there, has
4   actually reached up and hit the intercom button to access
5   yet another door into intake.
6   Q   What was happening in central control at that
7   time?
8   A   At that time I was directing both Marquez and
9   Harris to open doors at my discretion.
10  Q   Okay.
11  A   At my directive.
12  Q   Hm-hmm.
13  A   The only directive at that point was to open door
14  707 so that the responding staff could apprehend Detainee
15  Irias.
16  Q   While you were providing these directives to
17  Officer Marquez, did she respond to you in any way?
18  A   Not other than, "Yes, sir."
19  Q   Okay to proceed with the video?
20  A   Yes, sir.
21  Q   And what is happening here?  What are we
22  viewing?
23  A   Right now we're waiting for the responding staff
24  to arrive.  They've made -- they've made entrance into the
25  707 or the intake hallway door, and they are now walking

Page 50

1   down towards Detainee Irias.
2   Q   Appears to be some discussion; is that correct?
3   A   Verbal commands were being made for him to cuff
4   up, to submit to mechanical restraints.
5   Q   Did he consent?
6   A   No, he did not.
7       As you can see, Sergeant Hutchinson had directed
8   Detainee Irias to go back to segregation.
9       MR. KAPITAN: Objection.  Regarding "Knowledge."
10  We can see what is on the video.  We don't know if he has
11  firsthand knowledge of what was said.
12      THE ARBITRATOR: Sustained.
13      MR. MINER: Those are all the video clips that I
14  plan to show, Rob.  I'll just leave this in case you want
15  to go back over any of this on cross.
16      MR. KAPITAN: I appreciate it.
17      MR. MINER: Okay.
18  Q   You testified that after the incident you were
19  involved in an investigation and collected some witness
20  statements from various individuals; correct?
21  A   Yes, sir.
22      MR. MINER: I'm going to hand you what I've
23  marked as Company Exhibit 1.
24      Mr. Arbitrator, I am going to be reviewing just
25  some of the documents in this company exhibit with

Page 51

1   Lieutenant Anderson.  And I'll be reviewing the remainder
2   of the documents during the testimony of Warden Janecka.
3   So I'm not going to be offering the admission of this
4   entire exhibit at this time.
5       THE ARBITRATOR: Well, let's take this for I.D.
6   purposes right now.
7       (Company Exhibit 1 was marked by the
8       Arbitrator for identification and was
9       retained by the Arbitrator.)
10      THE ARBITRATOR: Any objections to this?
11      MR. KAPITAN: No.  But just to the extent that
12  some of the documents do contain hearsay statements.  I
13  come across this in every termination case where we have
14  statements.
15      THE ARBITRATOR: And so do I.  As you probably
16  know what my typical response is going to be, which is
17  that I will take this not for the proof of what it says,
18  but for the fact that it was an investigation conducted
19  with regard to the termination, based upon testimony of
20  witnesses, which you have an opportunity to cross-examine.
21      MR. KAPITAN: Yes.  Except that we don't have the
22  witnesses here, but we do have a video and you need --
23      MR. MINER: I'll be glad to stipulate that we're
24  offering the statements solely to demonstrate the
25  investigation that occurred, and we are not offering them

Page 52

1   for the truth of any matter.
2       THE ARBITRATOR: I so accept.
3       MR. MINER: Thank you.
4   Q   If you would turn to page 5, please, Lieutenant
5   Anderson, with the fifth numbered page, I should say, of
6   the exhibit.
7       Do you recognize that document?
8   A   Yes.
9   Q   What is it?
10  A   This is a memo that was submitted to me on the
11  night of August 5th by Officer E. Marquez.
12  Q   Did you review it?
13  A   Yes.
14  Q   Did you request Ms. Marquez to provide this memo
15  to you?
16  A   Yes.
17  Q   Did you have any discussion with her about the
18  circumstances --
19  A   No.
20  Q   -- of these four doors being accessed?
21  A   No.
22  Q   You did not discuss that with her?
23  A   No.
24  Q   How about the sixth page and the seventh page of
25  the exhibit, do you recognize that?

Case 5:16-cv-02263-DOC-KK   Document 50-10   Filed 11/27/17   Page 90 of 159   Page ID
#:4289
Arbitration of Elizabeth Marquez Vs

June 14, 2017

Page 53

1   A   Yes.
2   Q   And what is it?
3   A   This is, again, another memorandum from Officer
4   Santiago, dated August 5th, '15. And this was, again, in
5   regards to the -- the incident that took place in
6   segregation.
7   Q   Okay. Do you know if Mr. Santiago is still
8   employed with GEO?
9   A   I do not.
10   Q   Let's look at the eighth page, please, of Company
11   One?
12   A   This is a memorandum submitted to me by Officer
13   J. Mora, who was one of the responding officers on the
14   night of August 5th.
15   Q   Did Officer Mora provide this to you at your
16   request?
17   A   Yes.
18   Q   Did you review it?
19   A   Yes.
20   Q   And the ninth page, please?
21   A   Again, this is a memorandum from Sergeant Soliz,
22   who was one of the responding staff sergeants in the
23   video, that was submitted to me at my request.
24   Q   Okay. Did you review it?
25   A   Yes.

Page 54

1   Q   And the tenth page, please?
2   A   The tenth page is another memorandum by Sergeant
3   Soliz that gives a little further detail as the
4   individual -- as the incident on the night of August 5th.
5   Q   Okay. Did you request that statement?
6   A   Yes.
7   Q   Why did you do that?
8   A   For the first memorandum, Page 9, didn't give me
9   enough information. So I asked for a more detailed
10   reports from him.
11   Q   Great. The 11th page, please?
12   A   The 11th page was from Sergeant Hutchinson, who
13   is the other responding staff sergeant. This is dated
14   August 5th to myself in regards to the Detainee Irias.
15   Q   Same question about the 12th page, please, of
16   Company 1?
17   A   12th page is another memorandum by Sergeant
18   Hutchinson. Again, this gives us further details because
19   page 11, the first memorandum, did not give enough
20   information with regard to the incident.
21   Q   Perfect. Excuse me, the 13th page, please. What
22   is this?
23   A   13th page is from Officer Desoto, who was one
24   of the responding staff members on the night of
25   August 5th. And, again, this was in reference to Detainee

Page 55

1   Irias.
2   Q   Did you request the statement?
3   A   I requested this statement.
4   Q   And did you review it after he submitted it?
5   A   Yes.
6   Q   And the 14th page, please. What is this?
7   A   14th page is a memorandum, dated August 6th.
8   This was written by myself in regards to the night of
9   August 5th.
10   Q   And I won't ask what the memorandum says because
11   it speaks for itself.
12        Did you submitted this to Captain McCusker?
13   A   Yes, this was submitted to Captain McCusker.
14   Q   And the 15th page, please?
15   A   15th page is a memorandum dated August 6th by
16   Officer Darmandzhyan, who was one of the responding
17   officers on that night.
18   Q   Did you request he provide this statement?
19   A   Yes.
20   Q   And you reviewed it?
21   A   Yes.
22   Q   Would you please turn to the 23rd page of Company
23   One.
24        What is this document?
25   A   This document that we're looking at is the Policy

Page 56

1   and Procedure stated -- numbered 10.2.27. This is a GEO
2   policy.
3   Q   And what does the policy provide for?
4   A   This particular one is for security, master
5   control center operations.
6   Q   Okay. And in particular, does it describe
7   responsibilities of that officer?
8   A   Yes.
9   Q   Including what?
10   A   Including the maintaining of all secured areas
11   throughout the facility.
12   Q   And if you would please turn to the 29th page of
13   Company One. What are we looking at here, please?
14   A   Again, this is -- these are the post orders for
15   master control center. The number is 10.3.11.
16   Q   And what does this particular post order
17   provide?
18   A   This particular post order provides more or less
19   the directive or the directions on what the expectations
20   are of the company, of the officer that is standing that
21   post.
22   Q   In particular with respect to control primary
23   access points, what is the post order?
24   A   The control primary access points, the post
25   order -- are you asking me to read this or --

Case 5:16-cv-02263-DOC-KK   Document 50-10   Filed 11/27/17   Page 91 of 159   Page ID
#:4290
Arbitration of Elizabeth Marquez Vs

June 14, 2017

Page 57

1    Q   Would you just please point out to the Arbitrator
2  what the central control officer's responsibility is with
3  respect to controlling primary access points in the
4  facility?
5        THE WITNESS: Mr. Arbitrator, the policies speaks
6  on the central control officer's duty to control all
7  secured perimeter, interior and exterior doors throughout
8  the facility, and to maintain the security of the
9  institution.
10        THE ARBITRATOR: Thank you.
11  BY MR. MINER:
12    And if you would finally turn to the 35th page of
13  Company Exhibit 1.  Tell me when you get there.
14    A   I'm there.
15    Q   What is the 35th page?
16    A   The 35th page is a post-order signature sheet
17  that is on every post that we have throughout the
18  facility.
19    Q   And there are some signatures on the document?
20    A   There are several signatures on this document.
21    Q   Is Ms. Marquez' signature on the document?
22    A   Officer Marquez is the ninth signature down on
23  this document.
24    Q   Thank you.
25        Was Officer Marquez properly assigned in central

Page 58

1  control on August 5th?
2    A   Yes.
3    Q   Was she qualified to hold that post?
4    A   Yes.
5    Q   Was she knowledgeable about the post?
6    A   Yes.
7    Q   How do you know that?
8    A   Prior experience.  Prior experience with her in
9  there.  She had proven she -- she had proven to run the
10  post several times before prior to this.
11    Q   Was there any unusual or unreasonable level of
12  activity on August the 5th while you were in the office
13  with her?
14    A   Nothing unreasonable, no.
15    Q   What is the protocol when the telephones are
16  ringing in central control and a request for access is
17  made to a secure door in the facility, what is expected of
18  an officer at central control?
19    A   To answer the phone as necessary, to, again,
20  still positively identify anybody that is accessing doors
21  that is requesting to move throughout the facility.
22    Q   In the video footage that we saw, other than the
23  last two clips in which some staff were pursuing
24  Mr. Irias, the only movement we observed was from
25  Mr. Irias; correct?

Page 59

1    A   Yes.
2    Q   During the period when this escape attempt was
3  occurring, what was the level of movement or activity in
4  the corridors at the facility?
5    A   There was none.
6    Q   Why not?
7    A   We were in count.
8        MR. KAPITAN: Objection. Foundation. He already
9  testified that he was doing the count.  He is just
10  testifying from policy now, not personal knowledge.
11        THE ARBITRATOR: Sustained.
12  BY MR. MINER:
13    Q   Well, did you observe the video of other areas of
14  the facility?
15    A   Yes.  We had access to other video -- or other
16  areas of the facility at that time.
17    Q   Did you observe any level of movement or
18  activity?
19    A   There was none.
20    Q   Is that because you believe that the policy was
21  being complied with with respect to the lack of movement
22  during the count?
23    A   Yes.
24        MR. MINER: I believe those are all my questions
25  for now of this witness, Mr. Arbitrator.  I'll pass the

Page 60

1  witness.
2        THE ARBITRATOR: Of course.
3        MR. KAPITAN: Again, I think it's appropriate now
4  to take a break, if we could.
5        THE ARBITRATOR:  That's fine.  Let's take ten
6  minutes.
7        MR. KAPITAN: Thank you.
8        MR. MINER: I'm sorry.  Could we go back on the
9  record for just a moment.
10        THE ARBITRATOR: Let's go back on the record.
11        MR. MINER: And I apologize for my oversight. I
12  do have a copy of the video on DVD, Mr. Arbitrator.
13  Mr. Kapitan already has a copy.  I provided it to him.
14  I'm glad to offer this as an exhibit should you wish to
15  view it after the hearing today.
16        THE ARBITRATOR: Do you have any objection to
17  that, Mr. Kapitan?
18        MR. KAPITAN: You having a copy?
19        THE ARBITRATOR: To me having a copy of the
20  video.
21        MR. KAPITAN: I'm assuming you want a copy.
22        THE ARBITRATOR: I do, but I'm not going to take
23  it over your objection.  You might have a good one.
24        MR. KAPITAN: No objection.
25        THE ARBITRATOR: No.  I'll take it.  Thank you.

Page 61

1       MR. MINER: I'll just mark this as Company 2.
2    (Company Exhibit 2 was marked by the
3    Arbitrator for identification and was
4    retained by the Arbitrator.)
5       THE ARBITRATOR: Then we'll take the
6    investigation package as Company No. 1.
7       MR. MINER: Thank you.
8       THE ARBITRATOR: Okay. Let's take a ten-minute
9    break. We're off the record.
10   (Recess taken from 11:20 a.m. to 11:37 a.m.)
11      THE ARBITRATOR: We'll go back on the record.
12      Mr. Kapitan, your witness.
13      MR. KAPITAN: Thank you.
14
15          RONALD D. ANDERSON,
16   resumed the stand and testified further as follows:
17
18          CROSS-EXAMINATION
19   BY MR. KAPITAN:
20      Q   Mr. Anderson --
21      A   Sir.
22      Q   --I have a few questions for you regarding the
23   testimony you just gave.
24      Okay?
25      You testified about different classifications of

Page 62

1    detainees; low, medium low, medium high, and high?
2       A   Yes, sir.
3       Q   Are there any differences with how those
4    different classifications are treated within the
5    facility?
6       A   In regards to what kind of treatment?
7       Q   For instance, do -- are low risk detainees not
8    restrained when walking around the facility, but high risk
9    are? Is there any difference with escorts?
10      A   In regards to escorts, anybody coming from
11   segregation are placed in the mechanical restraints.
12   Coming from the housing units, generally not. Whether
13   your low, medium, high, doesn't matter the classification.
14      Q   Let me stop you. I'm not asking about restraints
15   in particular. What I'm asking about, is there any
16   difference in how low risk individuals are treated versus
17   high risk or low medium -- I'm sorry, low medium or medium
18   high, is there any difference in those classifications as
19   to how they are treated?
20      A   Yes.
21      Q   In what way?
22      A   Depending on where they are coming from. Again,
23   it's -- if they are coming -- well, number one, they are
24   never mixed. The low level detainees are never allowed to
25   intermix with the medium low to medium high and the high

Page 63

1    detainees.
2       Q   You mean there's a separate admin segregation
3    unit for low risk detainees versus high -- high risk?
4       A   If we're talking about segregation, then, no.
5    Because anybody that is placed in segregation is
6    immediately reclassified to at least a minimum level of a
7    medium low.
8       Q   But they're are mixed in admin segregation, you
9    have medium low, medium high and high?
10      A   Yes. Oh, yes.
11      Q   So they are mixed there?
12      A   Yes, in segregation, that's correct.
13      Q   Any other difference other than mixing?
14      A   No.
15      Q   You testified about changes in the segregation
16   unit. So there was a segregation unit as of 2013, I
17   believe you said?
18      A   Yes.
19      Q   Okay. And the change in 2015 was that there was
20   a wall put in between admin and disciplinary
21   segregation?
22      A   That's correct.
23      Q   All right. When was that in 2015?
24      A   I don't remember when exactly. It was during
25   the -- I want to say it was during the construction when

Page 64

1    they had put in the dividing wall between the two. I
2    don't exactly remember the exact day or the exact time.
3       Q   Would you agree that it was sometime in the
4    summer of 2015?
5       A   Yes, definitely during the summer.
6       Q   And along with that wall that went up, what were
7    the other changes as to how those were differentiated
8    between disciplinary and admin?
9       A   The access points to and from segregation was
10   changed. It was -- you now had -- each side had its own
11   access point. But that was pretty much about it.
12      Q   Did staffing change?
13      A   Not really, no. Staffing didn't change. It
14   was -- it's always been the -- the current staffing plan
15   has always been in place. I don't remember there being a
16   change.
17      Q   All right. So prior to the wall going up and
18   there being a distinction between disciplinary and admin
19   segregation, their -- segregation was just staffed by a
20   certain number of officers?
21      A   Correct.
22      Q   Okay. And within segregation, how many different
23   classifications, and I'll use that loosely because I don't
24   want to confuse it with detainee classifications, but
25   officer, detention officer classifications, are there in

Page 65

1 the segregation unit? For instance, you have, what,
2 control officer and different things like that; correct?
3 A Well, you have a control officer and two line
4 staff members within the units.
5 Q Within?
6 A Each individual unit. So if you had -- the
7 disciplinary side has two staff members, and the
8 segregation or the administrative side has two officers.
9 Q As of 2015 when they were separated?
10 A That's correct.
11 Q All right. Prior to that, how many officers were
12 in the combined segregation unit?
13 A There was a total of -- and this was prior to the
14 wall going up -- is that the question?
15 Q That's the question.
16 A Prior to the wall going up, there was a total of
17 three. You had one in control and two on the floor.
18 Q All right. Then after the wall went up, how many
19 were there?
20 A You had two on each side. So there's a total of
21 five.
22 Q After the wall went up, you said there were two
23 on each side. Those are -- what is it? One is control
24 and one line?
25 A No. They're both -- there was supposed to be two

Page 66

1 line on the floor, on each side, and then you had one in
2 control.
3 Q One control officer for both sides of
4 segregation?
5 A Correct.
6 Q Were there ever two control officers working in
7 the segregation unit?
8 A Not the segregation unit, no.
9 Q And in admin segregation, you said the doors are
10 unlocked, the cell doors?
11 A I never stated that, no.
12 Q Are they or are they not?
13 A During certain times of the day, yes, they are.
14 When they have their day room, of course the doors are
15 open, and they are allowed access to their day room, in
16 and out of their cells as they see fit for their day room
17 period.
18 Q Okay. All right. You testified that Detainee
19 Irias -- is it Irias with an "I" or Irias with an "A"?
20 A It's Irias with an "A." I believe the correct
21 spelling is A-r-i-a-s.
22 Q In some of the documents it is spelled "I-r;"
23 correct?
24 A I would have to review the documents in order to
25 confirm that.

Page 67

1 Q But it's the same person?
2 A Yes, yes, absolutely.
3 Q It's Detainee Irias?
4 A Correct.
5 Q Okay. Irias was designated for the admin
6 segregation unit; right?
7 A Yes, sir.
8 Q You testified that he had a history of assault?
9 A Yes.
10 Q So why wasn't he on disciplinary segregation?
11 A That I'm not sure about. I don't have -- I don't
12 have control over where the detainees are placed. I just
13 know that that's where he was at the time.
14 Q Is it fair to say that a detainee who assaults a
15 staff member and needed to be segregated would be put in
16 disciplinary segregation?
17 A Yes, it would be fair.
18 Q And any detainee who was being segregated for,
19 like you said, protective custody or some type of
20 administrative reason, would be in the admin section?
21 A Correct.
22 Q So the fact that Detainee Irias was in
23 segregation wasn't to do with his, what you call a violent
24 background. It was --
25 A Yes, the reason for his being in segregation is

Page 68

1 unclear to me at this time.
2 Q If we can, let's get into how the control center
3 operates. Is it okay if I call it a control center? Or
4 do you call it a different --
5 A It's central control.
6 Q Central control.
7 Is there any specialized training that's required
8 for central control?
9 A Generally, 40 hours.
10 Q For the control officer?
11 A Yes.
12 Q Okay. What do you mean 40 hours? 40 hours of
13 what?
14 A 40 hours of training that the officer would be
15 shadowed with another officer that was in there during a
16 standard eight-hour shift.
17 Q Is that documented anywhere, the training?
18 A Should be, yes. To my knowledge -- I don't have
19 control of the training document, but that -- the 40
20 hours, the redirection of one staff member to another post
21 for training purposes should be documented from the
22 training department, yes.
23 Q And that training you described, the 40 hours, is
24 specific to central command?
25 A Correct.

Page 69

1  Q   Do you know if Officer Marquez ever received that
2  40-hour training?
3  A   I do believe that she did, yes.  Did I conduct
4  it, did I redirect her there, no.
5  Q   What is your belief based on?
6  A   The belief based on the amount of time that I had
7  seen her in there and her ability to work that post.
8  Q   So you're just basing it on the fact that she was
9  in there to begin with.  You have no knowledge whatsoever
10  whether she actually conducted the training?
11  A   Correct.  Prior to my supervising her, yes, that
12  is correct, I was unsure.
13  Q   Do you know why she was stationed in central
14  control in August 2015?
15  A   Other than that was her assigned post, no.
16  Q   Were you aware that she was pregnant?
17  A   Yes.
18  Q   You have no knowledge whatsoever that she was
19  assigned to central control because of her pregnancy?
20  A   Generally, if we have a female staff member that
21  is pregnant, yes, we will put them in a post that will
22  have an indirect supervision and no possible contact with
23  detainees, which would be at the control unit.  So it's
24  very common that that happens, yes.
25  Q   Do you recall how long she was in central

Page 70

1  control, posted there in August 2015, how long she had
2  been working specifically at that post prior to August
3  5th?
4  A   I'm not really sure.  I can't give you a
5  definitive answer on that one.
6  Q   You described the board?
7  A   Hm-hmm.
8  Q   You said it was a 40-inch screen essentially
9  laying flat?
10  A   Correct.
11  Q   Okay.  And it brings up a blueprint, I think was
12  the word you used, of the facility?
13  A   Hm-hmm.  Yes.
14  Q   And then if someone hits a button to access the
15  door, it brings up a specific location.
16  Is that like a pop-up window or something?
17  A   Yes.  If you will, for the discussion purposes,
18  yeah, it would be -- you have a layout or the blueprint
19  would be on the board itself.  And then there's --
20  throughout that blueprint there's icons for where the
21  doors are at.  It's one of those icons that illuminate or,
22  you know, become active and start flashing.  And it alerts
23  the central control officer that that door is being
24  requested.
25  Q   Okay.  And then what happens when you get that

Page 71

1  icon?
2  A   When you hit that icon, the board will ask you if
3  you want to -- if you want to open that door.  You then
4  have to -- you then have to hit another -- you know,
5  request back and a pop-up window, if you will, that will
6  actually open that window -- or open that door.
7  Q   You said there's an icon for a video feed?
8  A   Yes.  There's a -- it's like a little small video
9  camera.
10  Q   All right.  If you hit that, what happens?
11  A   The video feed will then show up on the screen on
12  one of the monitors that are next to the board of that
13  door that you've just asked -- or the door that you
14  requested.
15  Q   And that's the monitor you're saying that is in
16  between the two control officers?
17  A   Yes, that's correct.
18  Q   How big the video feed that pops up on the
19  monitor?
20  A   It can be, depending on the way that the monitor
21  is set up, it can either be a four square, which I think
22  is a -- I want to say a, a what, a four by four square or
23  a full standard computer monitor screen.
24  Q   How big is the monitor?
25  A   I want to say it is at least 12, 14 inches.  A

Page 72

1  standard regular computer monitor that you would get
2  straight out of the box when you buy a computer.
3  Q   And it's sitting on a desk?
4  A   Yes, it's sitting on a desk.  There's -- I want
5  to say there's four of them in central control.
6  Q   At any one point, just in the standard operation
7  of the central command or central control post, the
8  control officer who is responsible for movement, right,
9  responsible for that board --
10  A   Hm-hmm.
11  Q   -- how many doors are essentially under that
12  responsibility for the control?
13  A   It's an undetermined amount.  But I would -- if I
14  needed to, it would be hundreds, hundreds of doors
15  throughout the facility.
16  Q   Can you break that number down, not by, you know,
17  five here, five here, what is encompassed in that hundreds
18  of doors?  What does that represent?
19  A   The facility itself, the interior and the
20  exterior of the facility.
21  Q   So every portion of the building?
22  A   Yes, sir.
23  Q   Whether that is areas --
24  MR. MINER: God bless you.
25  THE ARBITRATOR: Thank you.

SANTIAGO 090

Page 73

BY MR. KAPITAN:

1  Q  -- areas related to intake; correct?
2  A  Yes, sir.
3  Q  Different facilities like medical?
4  A  Yes, sir.
5  Q  Housing?
6  A  Yes.
7  Q  Within housing, can you give us an estimate of
8  how many secured doors would be the responsibility of the
9  control officer?
10  A  Inside of a standard housing unit, you would
11  have -- you would have four doors that would be
12  responsible for the central control officer.  However,
13  central control at that point, inside of a housing unit,
14  would be controlled by the housing control pod.  Inside
15  each one of our housing units you have four control pods.
16  In the center of that, there's a control unit that
17  controls each one of those pods.
18  Q  Okay.
19  A  So central at that point has access to those.
20  However, it's the control unit themselves that has control
21  of that so that it takes the burden off of -- it
22  basically -- it's going to direct more or less -- it's
23  going to -- what is the word I'm looking for?  It's going
24  to move the responsibility.  It's going to take a portion

Page 74

1  of the facility and give it to that control unit.
2  Now central control has access over the entire
3  facility at any time.
4  Q  Back to my question, which was --
5  A  Okay.
6  Q  -- how many doors in each unit are there?
7  A  Well, if you want to include the cell doors,
8  there's -- you know, I can't give you a definitive answer
9  on that.  I mean, if you have -- four, five -- I'm going
10  to say 9 to 12 doors within each unit, within each housing
11  unit.
12  Q  How many units are there?
13  A  Right now we have four units.  Our segregation
14  unit including in that would make seven.
15  Q  And the cell doors wouldn't count for each
16  unit?
17  A  Yes, they would.
18  Q  Okay.  But that -- you didn't include that in
19  your count; correct?
20  A  No.
21  Q  How many cell doors are there?
22  A  Again, I'm not sure about how many.  I can't give
23  you a definitive answer on that.
24  Q  If you included cell doors, would it be
25  reasonable to say there's approximately 360 doors in the

Page 75

1  housing unit that are secured?
2  A  In an entire housing unit?
3  Q  Total.
4  A  Within one housing unit?
5  Q  Or together.  You tell me.  In all the housing
6  units combined?
7  A  Yeah, there's -- that number would be up in the
8  hundreds, definitely.  That would definitely be up in the
9  hundreds.
10  Q  Aside from the housing, then you have all those
11  other areas in the facility, and that's in the hundreds?
12  A  Yeah.  You still have medical, you have intake,
13  you've got the administration.  Yeah, there's --
14  Q  And you testified that the housing pod, now some
15  of that responsibility from maintaining access to those
16  doors, shifted to the housing pod --
17  A  Yes, sir.
18  Q  -- the housing pod control officers?
19  A  Yes, sir.
20  Q  That is the current status; correct?
21  A  Yes, sir.
22  Q  In August 2015, is that what the status was?
23  A  Yes.
24  Q  So you're saying on August 5th, 2015, at this
25  time, there were control officers in the housing pods that

Page 76

1  were responsible for those access doors?
2  A  Yes.
3  Q  Okay.  Including segregation unit?
4  A  Yes.
5  Q  Who in the segregation unit on August 15th, 2015,
6  was responsible then for controlling the doors that
7  Detainee Irias accessed?
8  A  That would have been central control at the time
9  of the event.
10  Q  All right.  I thought you said that that was
11  separated, that that was shifted to the control officer in
12  that area?
13  A  I did.  And at the time of the event, it was
14  the -- the control had been shifted back, essentially.
15  Q  Why?
16  A  Due to a need for the officer to give another
17  staff member a break, to relieve for a meal break.
18  Q  All right.  So control officers in the housing
19  units were also responsible for giving breaks; correct?
20  A  At that time, yes.
21  Q  So the responsibilities to monitor access in
22  secured doors for the housing was shifted to control at
23  the times when the pod control officer had to get
24  breaks?
25  A  It's not uncommon, no.

Case 5:16-cv-02263-DOC-KK  Document 50-10  Filed 11/27/17  Page 96 of 159  Page ID
#:4295
Arbitration of Elizabeth Marquez Vs

June 14, 2017

Page 77

1  Q  At the time?
2  A  Correct.
3  Q  Do you know at the time of this incident, how
4 many of those pods responsibility was shifted to Officer
5 Marquez?
6  A  No, I do not.
7  Q  Central control is staffed by two officers;
8 correct?
9  A  Yes, sir.
10  Q  Are there any times when a third officer is
11 assigned to central control?
12  A  Never assigned, no.
13  Q  What about staffed?
14  A  No.  We have never -- we have never had staff or
15 assigned a third officer in central.
16  Q  What about in situations when an account -- I'm
17 sorry.  Not an account.  When a count is taking place, is
18 extra staff provided for central control?
19  A  No, sir.
20  Q  Why not?
21  A  There's no need.  There never has been.  There
22 never has been a third officer brought into central
23 control.
24  Q  You said there's never a need.  Do you know whose
25 decision that was?

Page 78

1  A  No.
2  Q  Did you have any part in the decision?
3  A  No, sir.
4  Q  If you look at company Exhibit 1.
5  A  (The witness complies.)
6  MR. MINER:  Sorry.
7 BY MR. KAPITAN:
8  Q  If you turn to page 23.
9  The post order under "A staffing," toward the
10 bottom of the page, it says, "Supplementary staff may be
11 assigned during peak activity periods such as shift
12 changes and counts."
13  So you're saying the Company just decided that
14 supplementary staff is not needed?
15  A  Well, it does state it may be assigned during
16 peak activity periods.
17  Q  I read that.
18  A  Yes.
19  Q  What the question was, the Company decided at
20 some point that it wasn't needed, even though it may be?
21  A  I'm not really good at -- I would say that -- to
22 say that the Company made that decision, would obviously
23 be above my pay rate.  I don't have decision-making
24 possibility like that.
25  Q  In your experience, so I understand,

Page 79

1 supplementary staff has never been assigned to central
2 control during the count?
3  A  I'm not going to say that its never been done,
4 no.  There have been times that in the event that we've
5 had situations or during a count that if somebody needed
6 to be in there, if a supervisor felt the need was
7 necessary, then, yes, we could bring somebody in.  But
8 that would be at the discretion of the supervisor.
9  Q  On August 5th, 2015, when that incident occurred,
10 which was around 1630 to 1700 hours --
11  A  Yes, sir.
12  Q  -- isn't it true that a shift change is taking
13 place at that time?
14  A  No, sir.
15  Q  Admin and ICE aren't on a shift change?
16  A  I have no idea what admin and ICE were doing.
17 When administrative staff goes home is anywhere from 1500
18 to whenever they are done with their work.  I mean, we've
19 had administrative staff there on duty.  So that's not
20 unusual.
21  Q  And you don't know when a normal time is, when
22 admin staff leaves the building?
23  A  Like I said, generally, between -- anytime
24 starting at about 1500 hours to about 1730.  So the 9:00
25 to 5:00, the 8:00 to 4:00 is the standard eight-hour shift

Page 80

1 or shift work for an administrative officer or an
2 administrator.
3  Q  What about ICE?
4  A  ICE, I have no clue.  ICE is in and out of that
5 building 24/7.
6  Q  The post orders also say on the next sentence,
7 "Additional staff may be assigned during an institutional
8 emergency"?
9  A  Yes, sir.
10  Q  Isn't it true that an emergency count was taking
11 place at that time, 1430 to 1500 hours on August 5th,
12 2015?
13  A  Yes, sir.
14  Q  But no additional staff was assigned to central
15 command?
16  A  No, sir.
17  Q  The duties on central command -- I'm sorry --
18 central control, the officer in charge of movement,
19 working the board, essentially, for lack of a better
20 term --
21  A  Hm-hmm.
22  Q  -- how often, at a typical time during the day,
23 does someone try to access a security door?
24  A  That happens probably every couple of minutes.
25  Q  Would it be fair to say that it's even more

Page 81

1  frequent than that?
2      A   Sure.  Absolutely.  I mean, it happens -- central
3  control is very business.  As the name would dictate, it's
4  central control.  Your -- your central hub of the facility
5  that's controlling the facility.  So to have multiple --
6  multiple requests for doors to come up all at once is very
7  common.
8      Q   Then, you also testified that the duties also
9  included phone?
10     A   Yes.
11     Q   Who's using the phone at that time on a typical
12  day?
13     A   Could be just about anybody.  Anybody calling in
14  to central control.  At this time of the day our front
15  desk is now shut down, so the phones are routed through
16  central control.
17     Q   Okay.  So it's not something specific to even
18  someone moving through an access door.  It could be any
19  phone call?
20     A   Sure.
21     Q   Then what is expected of the central control
22  officer when they answer the phone?  Are they supposed to
23  process all calls?  Do they transfer calls?
24     A   Yes, they process, transfer all incoming calls as
25  needed, you know, depending on the phone call itself.

Page 82

1      Q   You also mentioned the radio?
2      A   Yes.
3      Q   Is it like a hand-held radio?
4      A   No.  This is a base radio that is -- that is used
5  to communicate with all other hand-held radios throughout
6  the facility.
7      Q   Okay.  With respect to that duty, what is a
8  typical radio call that a central control officer would be
9  handling?
10     A   As far as what would the traffic entail?
11     Q   Correct.  What are the typical communications
12  made over a radio?
13     A   If you were sitting in central control and I'm
14  the officer that's calling in, it would be, "Central
15  control, Lieutenant Anderson."  Central would then respond
16  back with, "Go ahead."
17         "Moving one from medical back to housing unit 2.
18  Am I clear?"  Central control would come back, check the
19  cameras, come back with, "You're clear."  Movement would
20  proceed.
21     Q   During this specific time we're talking about,
22  14 -- I'm sorry, 1630 to 1700 on August 5th, is there more
23  or less radio traffic?
24     A   Generally, during a count there's less traffic,
25  much less traffic.  Radio traffic cuts down because,

Page 83

1  again, there's no need for it.  Movement throughout the
2  facility, the calling of doors, it cuts down drastically
3  in comparison because, again, we are in counts.
4      Q   And your testimony, is that the same for
5  emergency count?
6      A   For emergency count, yes.  During emergency count
7  there's even less radio traffic.  It is -- the traffic
8  that you would be hearing during an emergency count would
9  be mine talking to my primary officers, my utilities,
10  giving them directives and directions on how to proceed,
11  what needs to be done next.
12         The other traffic that you would be getting would
13  be coming from those utilities that are now clearing the
14  facility and the spaces such as kitchen or the culinary,
15  medical, law library, court, visitation, to ensure that
16  the house is cleared, that everybody has been returned
17  during an emergency count.
18     Q   All right.  And the housing officers, control
19  officers or line officers, there's communication with them
20  during an emergency count, isn't there?
21     A   Only upon request.
22     Q   Request of?
23     A   What's your status, what's your numbers.  And
24  that would be my directive.  I would be the one calling
25  that.  Central control would be calling the units.  The

Page 84

1  secondary central control officer could contact the
2  housing unit control pod to ask them, "Hey, do you guys
3  have numbers?  Have you completed your count"?
4      Q   All right.  Isn't it true that Officer Marquez
5  was participating in the count during the incident?
6      A   She was controlling the boards.  Officer Harris
7  had the paperwork that day, if you will.
8      Q   Right.
9      A   So she had the side of central that was
10  controlling the boards.  She was answering phones and
11  directing traffic with the radio at that time.
12     Q   And your testimony is that she was not
13  participating in any way in the count?
14     A   The only way that she was participating in the
15  count, she was receiving phone calls from intake and from
16  the units, to give us those -- that information.
17     Q   Currently, what is the procedure in central
18  command for staffing during an emergency count?
19     A   Should still be two.  During an emergency count,
20  you're going to have two staff members within that --
21  within central.
22     Q   What about a normal count, still two?
23     A   Still two.
24     Q   You testified that during the incident that we're
25  talking about, you told Sergeant Soliz -- is it Soliz?

Page 85

1  A   Soliz, S-o-l-i-z.
2  Q   Soliz and Hutchinson?
3  A   Yes, sir.
4  Q   That there was a detainee in the hallway?
5  A   Yes, sir.
6  Q   That's not included in your statement; correct?
7  A   I would have to review my statement.
8  Q   It's in front of you, Company Exhibit 1.
9  A   I believe it's page 12.  I do believe it's page
10 12.
11       MR. MINER: So take a look at 14.
12       THE WITNESS: 14.
13       (Pause in proceedings.)
14       THE WITNESS: So back to your question.
15 BY MR. KAPITAN:
16 Q   I'm asking why you didn't include that in your
17 statement?
18 A   No real answer on that one.  The statement that
19 was written, I feel as though that was rather important to
20 include that in my statement.
21 Q   But you're sure it happened, that you contacted
22 Soliz?
23 A   I know it happened.  I made the radio call for
24 Sergeant Hutchinson and Sergeant Soliz to get into the
25 hallway because we had -- we had a detainees in the

Page 86

1  hallway, an unescorted detainee in the hallway.
2  Q   On pages 9 and 10, that's Sergeant Soliz'
3  statement, can you turn to that, please.
4       MR. MINER: I'm sorry, Rob, what pages?
5       MR. KAPITAN: Pages 9 and 10.
6       THE WITNESS: 9 and 10.
7       MR. MINER: Thank you.  Got you.
8       THE WITNESS: Okay.
9  BY MR. KAPITAN:
10 Q   He doesn't mention you calling on the radio
11 either?
12 A   No, he does not.
13 Q   Did you talk to him about that at all?
14 A   No, I did not.
15 Q   All right.  Can you turn to page 11 and to 12.
16 These are Sergeant Hutchinson's statements?
17 A   They state the same.
18 Q   He doesn't mention that you called on the radio
19 either?
20 A   That is correct.
21 Q   Did you talk to him about that?
22 A   No, I did not.
23 Q   You also testified that you made a radio call to
24 stop all movement?
25 A   Yes, sir.

Page 87

1  Q   All right.  That's not mentioned in any of the
2  statements?
3  A   No, it's not.
4  Q   Do you know why that is?
5  A   No, I do not.
6  Q   Why didn't you put it in yours?
7  A   Again, it was -- it wasn't -- it wasn't included
8  in the statement for -- I just didn't include that in the
9  statement.
10 Q   Right.  I'm asking why.  Is there a reason why?
11 A   I have no clarification on that, no.
12 Q   But you did ask Sergeant Soliz and Sergeant
13 Hutchinson to provide more detail in their statement, and
14 that's why they submitted additional statements?
15 A   Yes, sir.
16 Q   But you didn't think it was necessary to provide
17 details on yours?
18 A   Apparently not.
19 Q   At the time of the incident you testified that
20 you saw Detainee Irias prior to accessing door 707?
21 A   Okay.
22 Q   And that is, I believe, from the video of the
23 door that he was accessing when the Sergeants and the
24 officers were trying to take control of him?
25 A   That's correct.

Page 88

1  Q   Were you aware of him in the hallway prior to him
2  accessing the door?
3  A   Door 707?
4  Q   Correct.
5  A   Yes.  That's when I had noted -- that's when I
6  had made notice.  That's when I noticed he was in the
7  hallway.
8  Q   But you did not stop Officer Marquez from
9  allowing him access through that door?
10 A   Well, at that time when I saw him in the hallway,
11 and then door 707 had opened, yes, I had actually
12 exclaimed, "What the hell are you doing?  What's going on?
13 Why is he now going through 707?  How did that door get
14 open?"
15 Q   You didn't state any of that in your testimony
16 previously?
17 A   As far as what was stated?
18 Q   This conversation that you say you had with
19 Ms. Marquez when he was accessing door 707?
20 A   No.
21 Q   With respect to the staffing in the housing unit,
22 you said at the time in August 2015 the control officers
23 were giving meal breaks?
24 A   Yes.
25 Q   Is that what they are doing now?

Page 89

1  A   No.
2  Q   What are they doing now?
3  A   At this -- what we have now are -- we have staff
4  that are assigned specifically for that task.
5  Q   When did that change?
6  A   I don't remember a date or time to be honest with
7  you.
8  Q   Why did it change?
9  A   Again, not really sure that the need for -- to
10 cut down on meal penalties, to ensure that the breaks and
11 lunches were getting conducted, that the staff were
12 getting the breaks and the lunches that are required.
13 Q   Is it fair to say that there were issues with
14 staffing and housing in August 2015 in the segregation
15 unit, the admin segregation unit?
16 A   There was an issue.
17 Q   What do you mean by that?
18 A   There was a -- there was a -- there was an
19 obvious flaw that we had to overcome.  Just, you know, if
20 we had -- if we had a staff member that was going to be
21 giving someone a break, then, of course, then we've got
22 two staff members -- you know what I mean, there were two
23 staff members that are now -- you have one staff member
24 that's going to be giving someone a break who would then
25 be off post, who would then collapse -- would have a

Page 90

1  collapsed state control unit to come in to monitor the
2  board.
3  Q   What do you mean by "collapsed"?
4  A   He had vacated the post and turned over the
5  control to central to make entrance into the unit.
6  Q   All right.  So as of -- I'm sorry, not "as of,"
7  on August 5th, 2015, in the admin segregation unit, who
8  was posted in there?
9  A   You had -- if you look at Company 1, page 18, is
10 a copy of the staffing roster that day.  You had --
11 MR. MINER:  Can I stop?
12 MR. KAPITAN:  Yeah, that's the 3rd.
13 MR. MINER:  This is August 3rd.
14 THE WITNESS:  Excuse me.  I apologize.
15 MR. MINER:  That's okay.
16 MR. KAPITAN:  We're on page 21, I believe.
17 THE WITNESS:  That is correct.
18 MR. MINER:  Thanks, Rob.
19 MR. KAPITAN:  Hm-hmm.
20 THE WITNESS:  Thank you.
21 Line 26 shows segregation control as Officer D.
22 Moreiko.  27 shows segregation 2, B. Patterson.  28,
23 segregation 3 shows L. Perez.  29, segregation 4,
24 E. Santiago.
25 / / /

Page 91

1  BY MR. KAPITAN:
2  Q   All right.  So on August 5th, 2015, when the
3  incident occurred, these were the individuals who were
4  stationed in segregation?
5  A   Yes.
6  Q   Now this just said "Segregation."  This doesn't
7  say "Admin" or "Discipline"?
8  A   Correct.
9  Q   Are these the individuals who were stationed in
10 the combined segregation discipline and admin?
11 A   Yes.  This is all inclusive.
12 Q   Okay.
13 A   This covers both administrative and discipline.
14 Q   Who were assigned to admin segregation on this
15 date?
16 A   Would have been L. Perez and E. Santiago.
17 Q   When the incident occurred, do you know where
18 L. Perez was?
19 A   I do not.
20 Q   And Santiago?
21 A   Santiago was in the unit handing out the evening
22 meal trays.
23 Q   Why was Detainee Irias on this floor?
24 A   That's a great question.  It was -- due to the --
25 due to him being in administrative segregation, it was --

Page 92

1  it was common practice to be able to take a detainee from
2  their cell, take them down to the shower area, and leave
3  them there until they were completed with their shower.
4  Once the bathing was completed, they would then be
5  escorted back to their cell.
6  Q   You said that was practice when?
7  A   That's the practice ongoing.  Always has been.
8  Q   Always has been?
9  A   Yes.
10 Q   They leave them at the shower?
11 A   Yes.
12 Q   And it was your testimony previously that the
13 shower door would be locked?
14 A   That is correct.
15 Q   Was it a practice that it was unlocked?
16 A   Never really -- it wasn't a practice.  It was
17 obviously this day.
18 Q   Did that -- did officers leave detainees in
19 showers and leave the door unlocked, whether it was
20 practice or not, did it happen?
21 A   Yes.
22 Q   On a regular basis?
23 A   Yes.
24 Q   And the Company knew about it?
25 A   Unsure.

SANTIAGO 095

Case 5:16-cv-02263-DOC-KK   Document 50-10   Filed 11/27/17   Page 100 of 159   Page ID
#:4299
Arbitration of Elizabeth Marquez Vs

June 14, 2017

Page 93

1    Q   Did you know about it?
2    A   Did I know about it?  Yes.
3    Q   On page 14 of Company Exhibit 1, if you go down
4  to the page with the primary staffers, do you see that?
5    A   Yes.
6    Q   First sentence says, "Primary staffers were
7  determined to be the misunderstanding"?
8    A   Yes.
9    Q   You wrote that?
10   A   Yes.
11   Q   What did you mean by that?
12   A   That it was determined to be the misunderstanding
13 by the segregation officers, that they could relieve
14 themselves for breaks and lunches because there was more
15 than one person on post.  That by relieving yourself for
16 breaks or lunch, I'm not going to be leaving a post
17 unattended.
18   Q   And you said it was a misunderstanding because
19 they were doing it, but they shouldn't have been?
20   A   That's correct.
21   Q   On this day, though, the officer in admin
22 segregation with Santiago, went to relieve someone else;
23 correct?
24   A   That is my understanding, yes.
25   Q   Was he ordered to do it?

Page 94

1    A   No, not -- I did not place -- I did not give that
2  order, no.
3    Q   Do you know if anyone gave him an order to do
4  that?
5    A   I do not.
6    Q   The next sentence says, "This is a result of
7  mixed messages."
8        Do you see that sentence?
9    A   Yes.
10   Q   What did you mean by that?
11   A   Mixed messages were coming from both the
12 segregation lieutenant from ICE, from the administration
13 that this is -- this is how we're going to do things.
14   Q   Can you give a little bit more detail?  What do
15 you mean by, "This is how we're going to do things"?  What
16 type of things?
17   A   Well, this is how we're going to operate.  If you
18 have a detainee that's going to be escorted here, it's
19 because they are in the administrative segregation side,
20 it's not necessary to move them restrained as it is on the
21 disciplinary side.  If you move a detainee from the
22 disciplinary side, if they come out of their cell they are
23 to submit to mechanical restraints and then the movement
24 is taking place.  Where on the administrative side, it's
25 not always the case.

Page 95

1    Q   So the mix message in this case was Detainee
2  Irias was allowed to go into the shower unescorted and
3  restrained?
4    A   Correct.
5    Q   And that the door remained unlocked?
6    A   And that the door remained unlocked.
7    Q   Is it fair to say that the staffing errors led to
8  him being able to access that door leading out of the
9  admin segregation unit?
10   A   Yes.
11   Q   Quickly, just a few more to wrap up.
12       You said that the original count, normally it
13 takes 30 to 45 minutes?
14   A   Yes.
15   Q   And if it goes over, it went into an emergency
16 count?
17   A   Correct.
18   Q   Do you know how long this count took on
19 August 5th, 2015?
20   A   I don't recall.
21   Q   With respect to the video that we saw --
22   A   Yes, sir.
23   Q   -- we saw images -- I don't think we need to
24 replay them.  I don't need a spot detail.  But if for some
25 reason you need to explain something and we need the video

Page 96

1  up, please ask, and we can queue it up.
2    A   Okay.
3    Q   Some of the video we show going down a long
4  corridor; right?
5    A   Hm-hmm.  Yes, sir.
6    Q   And we saw Detainee Irias at the door?
7    A   Hm-hmm.
8    Q   The video that comes up on the monitor in central
9  control, is it that video feed?
10   A   Very same, yes.
11   Q   All right.  There's no separate video at the door
12 where it's someone's face?
13   A   Where it's just the door?
14   Q   Right.
15   A   No, sir.
16   Q   The door that Detainee Irias was trying to access
17 was the intake door?
18   A   Yes.
19   Q   All right.  Where does that go to?
20   A   That goes into another hallway, which leads to, I
21 think there's four offices, and then, of course, the
22 intake area.
23   Q   All right.  In the opening statement Mr. Miner
24 said that there's two doors away from the exit?
25   A   Yes, sir.

Page 97

1    Q   What two doors was --
2    A   At the end of that hallway there's two doors.
3  And there was one door that leads into, again, a Sally
4  port or a control room that would then lead to the
5  outside.
6    Q   Is that Sally port staffed by a security
7  officer?
8    A   No.
9    Q   So you're saying that there's one door in that
10  intake hallway that then leads to a Sally port that leads
11  to the outside?
12    A   Yes, sir.
13    MR. KAPITAN: If I could have just one minute.
14    THE ARBITRATOR: Sure.
15    MR. MINER: Do you mind if we take a couple of
16  minutes break for --
17    THE ARBITRATOR: Well, let's -- how much longer
18  are you going to be?
19    MR. MINER: I just need five seconds.
20    THE ARBITRATOR: Let's finish up with the
21  witness.
22    MR. MINER: Sure.
23    MR. KAPITAN: That's all I have.  Thank you very
24  much.
25    THE ARBITRATOR: Any redirect?

Page 98

1    MR. MINER: Thank you.  That does raise a few
2  follow-up questions.
3    THE ARBITRATOR: Go ahead.
4    MR. MINER: Thank you, Mr. Arbitrator.
5
6    REDIRECT EXAMINATION
7  BY MR. MINER:
8    Q   I want to start with a question that was very
9  recent.  So I'm going to take this one out of order
10  because it's fresh in my mind.
11    You were asked whether the error in terms of
12  leaving -- the error that occurred when Mr. Irias was left
13  in that an unsecured shower resulted in him being able to
14  access the door leading out of the administrative
15  segregation.
16    Do you remember that question?
17    A   Yes, sir.
18    Q   And you answered "yes," correct?
19    A   Yes.
20    Q   We've used the term "access the door" --
21    A   Hm-hmm.
22    Q   -- in a few different ways.  So I want to clarify
23  your answer.  Earlier, we -- you testified about an
24  individual accessing the door in terms of walking through
25  the door, opening the door, walking through it; correct?

Page 99

1    A   Yes, sir.
2    Q   In this case you were asked whether the unsecured
3  shower door resulted in Mr. Irias accessing the door
4  departing exiting the segregation unit.  Is that correct
5  that he passed through that door because the shower door
6  had been unsecured?
7    MR. KAPITAN: Objection.
8    THE ARBITRATOR: What is your objection?
9    MR. KAPITAN: Objection.  Leading question to try
10  to rehabilitate the witness.  And I think the testimony is
11  what it is.  If you're asking a question about what he
12  meant, I understand, but this is getting --
13    MR. MINER: That is what I'm asking.
14    MR. KAPITAN: -- "Is this what it was"?
15    THE ARBITRATOR: Okay.  I am going to allow the
16  question because I understand the two different meanings
17  of the word "access," and we should clarify.
18    So go right ahead.  I understand where you are
19  going.
20    MR. MINER: Thank you.
21    Q   What is the meaning of the term "access" in
22  response to that particular question?
23    A   The meaning to access to that particular question
24  was that that door had to be accessed from central
25  control.  In order for him to pass through that door, it

Page 100

1  would have had to have been opened or accessed through
2  central.
3    Q   Okay.  There's another meaning of access, meaning
4  approaching and grabbing onto it; correct?
5    A   Yes.
6    Q   Is that what you meant with respect to your
7  earlier response to the question?
8    A   Yeah.  That he had access to that door.  He had
9  access to that door.
10    Q   Okay.  Just to -- just a few questions.  Are the
11  detainees ever permitted to walk through hallways of the
12  facility unescorted?
13    A   No.
14    Q   You testified about a day room and periods when
15  detainees are permitted free access within their unit to
16  use the day room; correct?
17    A   Yes, sir.
18    Q   In the administrative segregation unit, how long
19  is the day room access period?
20    A   I want to say it's one hour.
21    Q   One hour.  How frequently?
22    A   One hour -- I want to say it's one hour a day.
23    Q   Does every detainee receive the same hour or is
24  it a different hour for different detainees?
25    A   It would be a different hour for different

Case 5:16-cv-02263-DOC-KK   Document 50-10   Filed 11/27/17   Page 102 of 159   Page ID
#:4301
Arbitration of Elizabeth Marquez Vs

June 14, 2017

Page 101

1 detainees.  Again, it's divided among the tiers.  You have
2 an upper tier and a lower tier.  The lower tier, you would
3 have, say, 12:00 to 1:00, the upper tier would have a
4 different hour.
5     Q   Outside the day room periods --
6     A   Hm-hmm.
7     Q   -- what is the policy with respect to where
8 detainees are supposed to be?
9     A   In their cell.
10    Q   Do you have any personal knowledge regarding
11 Mr. Irias' conduct that might have alerted you to the risk
12 he presented?
13    A   Other than his -- other than the prior assault
14 and the issues that we had with him being disruptive.
15    Q   Have you personally dealt with disruptions with
16 Mr. Irias?
17    A   Yes.
18    Q   For instance, can you give us an illustration?
19    A   He was upset over -- he was just upset over a
20 non -- it was a noncontrolling issue.  It's -- I was
21 alerted to the -- to him banging on the door down.  He was
22 upset over -- he was upset over -- at the time I don't
23 recall what it was he was upset about.  But he was just
24 beating on the door.  He was yelling and screaming.  And
25 it was my job to go in and to try to calm him down, try to

Page 102

1 get him to relax a little bit.
2     Q   Were you able to do that?
3     A   Yes.  We were able to get him to calm down.  We
4 were able to escort him over to medical so he could be
5 seen.
6     Q   Had you ever observed Mr. Irias demonstrating any
7 violent behavior?
8     A   Nothing personal, no.  Just on video, what I've
9 seen on video.
10    Q   For instance?
11    A   Him and -- he actually had assaulted an ICE staff
12 down in intake.
13    Q   When did that occur?
14    A   I don't remember the date.  It was obviously
15 prior to this.
16    Q   About how long was it before this incident?
17    A   I'd say a couple months prior probably.
18    Q   You interacted with Ms. Marquez on August 5th, I
19 take it?
20    A   Yes.
21    Q   You were aware that she was pregnant?
22    A   Yes.
23    Q   Did you observe anything unusual about her health
24 condition?
25    A   No.

Page 103

1     Q   Was she responsive when you spoke to her?
2     A   Yes.
3     Q   Did she seem lucid?
4     A   Yes.
5     Q   During the time that you were in central control
6 during this particular incident, were you aware of other
7 door access requests being made?
8     A   There were some, yes.
9     Q   How many, roughly?
10    A   I couldn't even tell you.  I didn't have
11 activity -- I didn't have a visual of the board, and I
12 wasn't really concerned with that at the time.
13    Q   Can you help us understand generally how many
14 there were in terms of your experience on other days with
15 access requests?  Were there more, less, or about the
16 same?
17    A   I'd say they were about the same.
18    Q   Were you authorized at the time -- during the
19 time of the incident to request additional staff in
20 central control should it be needed?
21    A   Yes.
22    Q   Did you see any need for additional staff in
23 central control while you were there?
24    A   No.
25    Q   Why not?

Page 104

1     A   The situation at hand was being taken care of by
2 the staff that was on the floor, the two supervisors that
3 were responding to that.
4     Q   Okay.  In terms of the level of activity from
5 phone calls, radio calls, door access requests and so
6 forth, did you observe any need for additional staffing
7 based on those needs?
8     A   No, sir.
9     Q   Did you observe any need for additional staffing
10 to assist you with the count process or the paperwork
11 relating with the count?
12    A   No, sir.
13    Q   Personally, have you ever assigned additional
14 staff into central control because of the need for
15 additional help during periods of high activity?
16    A   Yes.
17    Q   Can you recall the most recent time that that
18 occurred?
19    A   I would probably say within the last six months.
20    Q   Okay.  And what was the need that arose that
21 caused you to assign the additional staff?
22    A   We had an influx of intake.  There was a large
23 movement, central control officer was trying to get their
24 master movement sheet completed.  And due to the logging
25 that has to be handwritten, there was a lot of movement

Page 105

1 that was being inputted onto the sheet. Therefore that
2 third staff member was needed to assist with the
3 controlling of the boards and whatnot.
4       MR. MINER: That's all my questions for now.
5 Thank you.
6       THE ARBITRATOR: Recross?
7       MR. KAPITAN: Yes.
8
9           RECROSS EXAMINATION
10 BY MR. KAPITAN:
11    Q   Mr. Anderson, you were asked about your
12 experience with Detainee Irias?
13    A   Yes, sir.
14    Q   Isn't it true that this was -- this incident was
15 not the only time that Detainee Irias tried to access a
16 secured door and was let through?
17    A   That I do not know.
18    Q   You don't recall an incident that happened just
19 shortly after --
20    A   No.
21    Q   -- August?
22    A   No.
23       MR. KAPITAN: That's all. Thank you.
24       MR. MINER: Nothing further. Thank you.
25       THE ARBITRATOR: I do have a couple questions.

Page 106

1       THE WITNESS: Yes, sir.
2       THE ARBITRATOR: You talked about the -- you did
3 or counsel did, about the color of the different
4 categories, uniforms of the different categories of
5 detainees. Would you describe the other colors besides
6 high being red?
7       THE WITNESS: You have the medium low, and the
8 medium high is orange. And the low levels are a dark navy
9 blue.
10       THE ARBITRATOR: And when an officer asks for a
11 door to be opened, you said that the control officer asks
12 for a verbal I.D. What specifically is that verbal I.D.
13 that's given?
14       THE WITNESS: It would generally be the last name
15 of the officer. So if I was requesting a door to be
16 opened, if central were to ask me to identify, my response
17 would be, "Lieutenant Anderson."
18       THE ARBITRATOR: Okay. I'm curious. And
19 sometimes I really shouldn't ask a curious questions
20 because that's when I get in trouble, but I will anyway.
21 Was Mr. Irias found to be the problem with the count on
22 that day?
23       THE WITNESS: No.
24       THE ARBITRATOR: Okay. He was just hanging out
25 there. Don't want anyone to be hanging out there.

Page 107

1       Just one more. You said that when you were in
2 the control room, you saw the video of Mr. Irias in the
3 hallway; correct?
4       THE WITNESS: Yes, sir.
5       THE ARBITRATOR: Do you have any idea as to how
6 that video ended up coming up on the screen?
7       THE WITNESS: No, I do not.
8       THE ARBITRATOR: Okay. That's all the questions
9 I have for this witness.
10       Do you gentlemen have any questions based on my
11 questions.
12       MR. MINER: Nothing further.
13       MR. KAPITAN: I actually do.
14
15      FURTHER RECROSS EXAMINATION
16 BY MR. KAPITAN:
17    Q   And briefly, Mr. Anderson, you were asked
18 about -- you were asked about the verbal I.D?
19    A   Yes, sir.
20    Q   And you said the officer would give the last
21 name?
22    A   Yes, sir.
23    Q   It's not just officers that are accessing doors;
24 correct?
25    A   That is correct.

Page 108

1    Q   It would be anyone authorized to be in the
2 building?
3    A   Yes.
4    Q   ICE officers, admin, other -- are there other
5 contractors that work, like was it Keefe?
6    A   Yes, sir. We have Keefe Commissary.
7    Q   And they do food?
8    A   Yes, sir. They -- yes, sir.
9    Q   Do central control officers have a list of names
10 to check against?
11    A   They have a copy of the roster, that's correct.
12    Q   Of everyone who is authorized to be in the
13 building?
14    A   No.
15    Q   So as long as someone gives a name, then they are
16 allowed through?
17    A   Not necessary, if the name is not recognizable to
18 the central control staff.
19    Q   You mean inaudible?
20    A   Correct. I mean, if you told me -- if I'm in
21 central control and I do not recognize your last name,
22 then I'm going to question that.
23    Q   But central control officers aren't required to
24 memorize everyone's last name who is authorized to be in
25 the building?

Page 109

1     A   No, sir.
2     Q   How many people are authorized to be in that
3 building? Can you give me a count?
4     A   No, I couldn't give you a count. I mean,
5 there's -- you've got, what, 40 people that are on staff
6 and security staff on first and second watch, you probably
7 have 10 to 15 medical staff. You have -- there's the
8 courts. There's several. I mean, you've got probably I
9 would say, 50.
10     Q   Of total people that are authorized to be in the
11 building?
12     A   At any one time, sure.
13     Q   But if they are authorized, they can come in
14 whenever?
15     A   Yes.
16     Q   Okay. So wouldn't the number be closer in the
17 hundreds?
18     A   Well, sure it would. I'm saying at the time of
19 the incident. And, again, as I stated, it's kind of hard
20 to give you a hard number. Because, again, if I'm
21 authorized access to this building, I can show up at any
22 time that I care to.
23     Q   Right.
24     A   Regardless of whether I'm supposed to be there or
25 not or required to be there for a shift.

Page 110

1     Q   And that was my point is that an officer, when
2 they are given a verbal I.D., doesn't know specifically
3 whether that person is authorized to be in the building
4 unless they recognize the last name?
5     A   That's correct.
6     MR. KAPITAN: That's all I wanted to clear up.
7 Thank you.
8     MR. MINER: I guess that does create a follow-up
9 for me.
10
11       FURTHER REDIRECT EXAMINATION
12 BY MR. MINER:
13     Q   Then what does central control do? They don't
14 recognize a name, then what, they go ahead and let them
15 in?
16     A   No, sir. They would call over the radio to have
17 security staff respond to that door to make a positive
18 identification.
19     MR. MINER: Okay. Thank you.
20     MR. KAPITAN: Follow-up, please.
21     THE ARBITRATOR: Go ahead.
22
23       FURTHER RECROSS-EXAMINATION
24 BY MR. KAPITAN:
25     Q   In your experience --

Page 111

1     THE ARBITRATOR: I don't know how many re's we're
2 up to, but --
3     MR. KAPITAN: My re-re-recross.
4 BY MR. KAPITAN:
5     Q   In your experience, how often does that happen?
6     A   Very rarely. Very rarely.
7     Q   What does that mean?
8     A   I don't think I've ever seen it happen where we
9 had to have somebody respond to a door because central
10 didn't recognize the name of the person that was asking
11 for access.
12     Q   And you believe that's because the central
13 control officers always recognize every name that's
14 given?
15     A   I think that they are competent individuals, and
16 I think the people that are in there are capable of
17 recognizing the pattern of repetitiveness of people
18 that will access these doors.
19     MR. KAPITAN: I don't think that quite answered
20 the question, but I'll leave it there.
21     MR. MINER: I think it did.
22     I'm good. Thank you.
23     THE ARBITRATOR: Thank you. So the witness is
24 excused.
25     MR. MINER: Can we take a five-minute break,

Page 112

1 please, before our next witness?
2     THE ARBITRATOR: We can do that. Let's take a
3 five-minute break. We're off the record.
4     (At 12:45 p.m. a lunch recess was taken
5     until to 1:39 p.m. of the same day.)
6     THE ARBITRATOR: Back on the record.
7     MR. MINER: Thank you, Mr. Arbitrator. GEO calls
8 James Janecka.
9     THE ARBITRATOR: Sir, please, raise your right
10 hand. Do you swear or affirm the testimony you are about
11 to give will be the truth, the whole truth, and nothing
12 but the truth?
13     THE WITNESS: Yes, sir.
14
15       JAMES JANECKA,
16 called as a witness by the Company, testified as follows:
17     THE ARBITRATOR: Have a seat, please.
18     Your witness, Counsel.
19     MR. MINER: Thank you.
20
21       DIRECT EXAMINATION
22 BY MR. MINER:
23     Q   Warden, where are you currently employed?
24     A   At the Adelanto Detention Facility.
25     Q   And your position there?

Page 113

1    A   The warden.
2    Q   What are your responsibilities as warden at the
3 facility?
4    A   The overall management and operations of the
5 entire facility.
6    Q   How many staff are there at Adelanto?
7    A   Currently, we have 405.  We're authorized 431.
8    Q   And are the officers represented by a labor
9 organization?
10   A   Yes, a Local union.
11   Q   And it's the Union in this case?
12   A   That is correct.
13   Q   And how many members of the bargaining are there?
14 How many total officers?
15   A   We're authorized 307.  We're actually, with the
16 cadets that are in preservice, have 300 at the facility at
17 this time.
18   Q   And back in August of 2015, how many were there
19 at that time?
20   A   The actual on payroll, I would -- I would have to
21 say approximately 260 to 270.
22   Q   Okay.  Thank you.
23       I'm going to ask you to take a look at what we
24 marked earlier as Company Exhibit 1.
25   A   Yes, sir.

Page 114

1    Q   Are you familiar with an officer by the name of
2 Marquez?
3    A   Yes, sir.
4    Q   How is it that you are familiar with her?
5    A   I had general familiarization with Ms. Marquez as
6 an employee at the Adelanto Detainee Facility.
7    Q   Are you familiar with an incident last -- two
8 Augusts ago involving an inmate by the name of Irias?
9    A   Yes, sir.
10   Q   And how is it that you're familiar with the
11 incident?
12   A   My initial -- initially became aware of the
13 incident was on the night or the evening of the incident.
14 I actually called out to the facility.  And I don't even
15 recall why.  But I called the institution to speak to
16 Lieutenant Anderson about something.  I don't even
17 remember.
18       And he had advised me of Irias being let out of
19 segregation, and they found him accessing three doors,
20 four doors, and staff ended up having to go down, stop
21 Irias, and get him escorted back into segregation.  That's
22 my initial.  And then from that point, I became more aware
23 of the incident through review of video footage and
24 through statements that were provided to me.
25   Q   Did you review the video that we reviewed

Page 115

1 together during the hearing this morning?
2    A   Yes.
3    Q   And, also, if you take a look at Company Exhibit
4 1, following the first four pages of the document are a
5 series of documents and witness statements.
6    A   Yes.
7    Q   Are you familiar with all those documents?
8    A   Yes, sir.
9    Q   Those documents also are referenced on the first
10 and second page of Company Exhibit 1 in a series
11 of supporting documents.
12       Do you see those?
13   A   Yes, sir.
14   Q   And they were attached to this memorandum.  Are
15 you familiar with this memo?
16   A   Yes, sir.
17   Q   What is it?
18   A   It is a termination request.
19   Q   So what is the purpose of a termination request
20 at GEO?
21   A   The purpose of a termination request is at the
22 facility level, an infraction occurs by a staff member, an
23 investigation occurs into the infraction.  It's compiled
24 in the HR office, the human resources office.  Human
25 resources then provides me with the documentation for my

Page 116

1 review.
2       I look at the severity of the infraction.  If I
3 see that it warrants termination -- and I review
4 all aspects.  I look at the CBA.  And if I recall, on a
5 certain page in the CBA it specifically states inattention
6 to duty is one of the criteria that can result in
7 immediate dismissal.
8       So I looked at the totality of the events and the
9 documentation I had, along with policy and the CBA.  At
10 that point in time, I made the decision and I felt that
11 the severeness of the infraction warranted me to make a
12 request to my regional office for dismissal.  And at that
13 point, I submitted -- or my human resources manager
14 submitted the packet up to the regional office.
15   Q   Okay.  Who is James Black?
16   A   James Black is my regional vice president.
17   Q   And was the termination request submitted to
18 him?
19   A   Yes, sir.
20   Q   Whose decision was it to request the termination
21 in this case?
22   A   It was mine at the facility level to initiate the
23 request.
24   Q   You mentioned that there were some breaches or
25 violations of policy, I believe?

Page 117

1   A   Several.

2   Q   What were they?

3   A   It started with Santiago.  Mr. Santiago made a
4   critical error where he did not secure the detainee into
5   the shower.  That was the utmost most critical error.

6   Q   Let me stop you there for a moment.  Are you
7   familiar -- prior to this incident, are you familiar with
8   any officers leaving detainees in unsecured showers in the
9   administrative segregation unit?

10  A   No, sir.

11  Q   Or anywhere in the facility?

12  A   In our general population.

13  Q   Is it acceptable in the general population?

14  A   Yes, sir.

15  Q   How long has the administrative segregation unit
16  been active?

17  A   The first -- can I give you a little history --

18  Q   Please.

19  A   -- of the administrative segregation unit?

20      The facility -- the west facility was built in
21  two phases.  The first phase was completed, if I'm not
22  mistaken, in August of 2012 or '13.  I wasn't there at the
23  time.  And it had 640 beds.  The administrative
24  segregation unit was half the size it is today, or was on
25  August 5th of '15.

Page 118

1   Q   Hm-hmm.

2   A   I'm sorry.  Repeat your question again.

3   Q   That's quite all right.  You're giving me the
4   history of the administrative segregation unit, how long
5   it's been in effect.

6   A   In July 1st of 2015, phase 2 of construction of
7   the west facility was completed.  The administrative
8   segregation unit was doubled in size and the divided wall
9   that was mentioned earlier was placed up, separating the
10  administrative side from the disciplinary side.

11  Q   Okay.  At the time that administrative
12  segregation was expanded and separated from disciplinary
13  segregation, were there changes in the procedures and
14  protocols for officers working the area?

15  A   Procedures were changing within the ICE, which is
16  immigration, customs and enforcement.  We follow PBNS,
17  it's hard for me to say that slowly.  Performance Base
18  National Standard.  That's our guide for detention
19  facilities.  The new standards, one of the requirements
20  was, and currently is today, is to allow detainees in the
21  administrative segregation area to have as much similar --
22  as much similar activity in access to recreation programs
23  and day rooms as practical in accordance to like general
24  population detainees.

25  Q   And so how was that implemented in July 2015?

Page 119

1   A   It was started very slowly.  It recently -- it's
2   broadened, but it started out very slowly.  We have ICE
3   officials at the facility that I interact with routinely.
4   We discussed the ability to start letting administrative
5   detainees, administrative detention detainees, start
6   having access to what we call a day room.  And the day
7   room is an open area, and it consisted with construction.

8       There was also four large stainless steel tables
9   that were added.  A couple televisions were added.  There
10  was a microwave and a law library kiosk and a couple other
11  things that were added into the day room area.

12      It was agreed that the detainees could start
13  coming out of their cell in small groups -- out of their
14  cells in small groups to commingle and have a little free
15  time out of their cells.  And I want to say we started at
16  about an hour, hour and a half a day with the different
17  groups.

18  Q   How long did that hour to hour and a half a day
19  in the day room remain in place after July 2015?

20  A   It's there today.

21  Q   Same standard?

22  A   Same standards.  We actual -- actually, they get
23  four to six hours between the day room, and there's also
24  an open outdoor recreation yard.

25  Q   And what's the time period on the day room, the

Page 120

1   daily day room?

2   A   The specific day room out times?

3   Q   Yes.

4   A   There's a morning session.  And I want to say it
5   runs from approximately 7:00 to 10:00, roughly.  And
6   there's an afternoon session that runs sometime from like
7   1:00 to 3:30.

8   Q   Okay.  For -- in the case of individual
9   detainees, are they still receiving the hour to 90
10  minutes, or are they receiving more expanded --

11  A   They are offered the expanded time.  They are not
12  required, but they are offered.

13  Q   Okay.  And how long has that been in effect?

14  A   The expanded time, we gradually grew into it.  We
15  would perceive, with adding a few minutes here and there
16  to where we're at today, has probably been in effect for
17  nine months to a year, maybe a little longer.  I don't
18  know exactly.

19  Q   Okay.  Now, separate and apart from time that
20  inmates spend in the day room, since July of 2015, has
21  there been any change in the policy regarding escorting
22  detainees to the showers?

23  A   No, sir.

24  Q   How about the policy of leaving detainees in
25  secured showers?

Page 121

1  A   They are secured.  And there's a couple reasons.
2  Not only because of them being in administrative
3  segregation, you also have to look at -- and it was
4  mentioned earlier, that some of the detainees, they are in
5  there for protective reasons.  They can't function in
6  general population.  Several of them do have serious
7  mental illness, which causes them to be vulnerable.  And
8  with the Prison Rape Elimination Act, commonly referred to
9  as PREA, you can't just leave the shower doors open and
10 let someone prey on them.
11     Q   And to your knowledge, as long as you've been at
12 the facility, are you aware of any incident other than
13 this particular incident, other than the case involving
14 Mr. Santiago, where an officer left the detainee in an
15 unsecured shower?
16     A   In segregation is what you're asking?
17     Q   In administrative segregation.
18     A   No, sir.
19     Q   Thank you.
20     Okay.  Company Exhibit 1 doesn't address
21 Mr. Santiago's case; correct?
22     A   Correct.
23     Q   It addresses Ms. Marquez' case; correct?
24     A   Correct.
25     Q   Now, in considering the statements and the

Page 122

1  evidence in connection with the overall incident, did you
2  consider the impact of Mr. Santiago's conduct on the
3  sequence of events that resulted in Ms. Marquez'
4  failures?
5     A   Yes.
6     Q   Okay.  Can you explain that to the Arbitrator,
7  please?
8     A   Again, the critical mistake that Mr. Santiago
9  made was not securing Jimmy Irias, the detainee, into the
10 showers.  And as I looked at the totality, and I remember
11 reviewing both disciplinaries and all the investigative
12 reports in the video, there was also a statement I think
13 that I reviewed in the Santiago case where Lieutenant
14 Regina Duran, who is the segregation lieutenant, was aware
15 that Jimmy Irias had been acting up, he had been acting
16 out just prior, approximately an hour prior, to him being
17 escorted to the shower or taken to the shower.
18     Lieutenant Grand made a comment -- or basically
19 gave direction to Santiago that something to the effect
20 of, Irias was not acting right today.  He's been acting
21 out.  Make sure there's two officers to escort him if you
22 have to interact with him.  That was one.  So, yes, I did
23 look at the Santiago part.
24     Q   Okay.  And what was your determination with
25 respect to Mr. Santiago's conduct?  Did you make a

Page 123

1  determination about appropriate discipline to him?
2     A   Yes.
3     Q   What was the determination?
4     A   Decision for dismissal resulting in termination.
5     Q   And was he terminated?
6     A   Yes.
7     Q   And in this case you likewise recommended
8  termination; correct?
9     A   Yes.
10    Q   Based upon what violation?
11    A   Total inattention to duties, the severity of the
12 violations.  I looked at each door that was accessed as a
13 checkpoint.  We have different layers of security.  There
14 isn't just one door that will let you out of segregation
15 roaming into a hallway or into an area anywhere in the
16 institution.
17    Again, as mentioned earlier, there are call
18 buttons.  There is no video with the first door to let you
19 out of the administrative segregation area, but there is a
20 call button.  That was the first mistake.
21    Checkpoint 2 was the second door of what we
22 commonly refer to as a Sally port, which is a secure,
23 double door secured vestibule.  At checkpoint 2, Irias
24 pushed the call button again.  There was no verification
25 who was at the door.  He was let into the hallway of

Page 124

1  segregation.  He proceeded down to checkpoint 3.
2     MR. KAPITAN:  Arbitrator Shapiro?
3     THE ARBITRATOR:  Yes, sir.
4     MR. KAPITAN:  Can I ask a clarifying question in
5  order to determine if there's an objection?
6     THE ARBITRATOR:  Sure.
7     MR. KAPITAN:  I'm not sure what the basis of the
8  testimony is.  Is this personal knowledge or just what was
9  gathered from the investigative file?
10    THE ARBITRATOR:  Go ahead sir, answer the
11 question.
12    THE WITNESS:  I'm sorry.  It was knowledge of the
13 reviewing of the video and the evidence that was provided
14 to me, sir.
15    MR. KAPITAN:  Okay.  So you're basing your
16 testimony off of the -- essentially, the packet?
17    THE WITNESS:  The packet and the video, yes, sir.
18    MR. KAPITAN:  Okay.  I'm going to object to the
19 last answer because he testified about the fact that there
20 was no identification when he pressed the call button, and
21 that hasn't been anywhere in the testimony or the packet.
22    THE ARBITRATOR:  Sustained.
23    THE WITNESS:  Okay.
24 BY MR. MINER:
25    Q   Do you know whether Mr. Irias attempted to

Page 125

1  self-identify when he attempted to access each of those
2  doors?
3      A   I do not know.
4      Q   Do you believe that he did?
5      A   I would --
6          MR. KAPITAN: Objection.
7          THE WITNESS: I seriously doubt --
8          THE ARBITRATOR: Objection sustained.
9          MR. KAPITAN: Doesn't matter what the witness
10 believes.
11 BY MR. MINER:
12     Q   Take a look, please, at the third page of Company
13 One.
14     A   Yes, sir.
15     Q   Or actually -- let me stop you there.  So the
16 objection to the characterization of the verbal
17 self-identification has been sustained.
18         I still would like you to identify the violations
19 that you determined were warranting the termination.  You
20 mentioned that building -- two doors that were accessed.
21 So if you can continue.
22     A   And the third door was accessed yet again by
23 detainee that had no -- for a detainee that had no access
24 or should have had no access through that door.  He was
25 not escorted.  He had no authority to be in that area.  He

Page 126

1  proceeded unescorted into the main corridor, went to the
2  fourth door and again had no reason -- should have had no
3  access to that door whatsoever and was permitted through
4  the door by central control.
5      Q   Thank you.
6          Do you know who in central control was
7  responsible for accessing those doors on August 5th?
8      A   Ms. Marquez was in central control.  And it was
9  my understanding, through the investigation, that she had,
10 during that period of time, she had primary access of the
11 doors.
12         There was also Officer Harris, but it's my
13 understanding that Mr. Harris was more assisting with the
14 count that was being conducted at the time and that
15 Ms. Marquez had the primary responsibility of the facility
16 doors.
17     Q   Okay.  Thank you.  You've reviewed all of the
18 witness statements?
19     A   Yes, sir.
20     Q   In Company Exhibit 1; correct?
21     A   Yes, sir.
22     Q   Okay.  Now, if you would take a look at the third
23 page of Company Exhibit 3 [sic]?
24     A   Yes, sir.
25     Q   As well as the fourth page.  It appears to be a

Page 127

1  two-page document?
2      A   Correct.
3      Q   And identify this for us, please.
4      A   This is a disciplinary action form.
5      Q   And what is a disciplinary action form?
6      A   Once an infraction is -- or an employee has
7  violated a rule or has violated or has an infraction, a
8  rule violation, this document is the disciplinary action
9  form that comes from our personnel department and it is
10 our official form to begin the disciplinary process.
11     Q   Okay.  There are a number of signatures on page
12 4, the second page of this document.
13     A   Yes.
14     Q   Can you identify those for us?
15     A   At the -- at the middle of the page it is Chief
16 of Security Josh Johnson, Joshua Johnson, where it says,
17 "Supervisor."  Department Head, Assistant Warden, Patricia
18 Love."  Below her is facility administrator, myself,
19 James Janecka.  You go to the bottom of the section, you
20 have Sony Lewis, who is our -- in our regional HR
21 department.  Then you have our regional director,
22 Ms. Cheryl Nelson; our regional vice president, Mr. James
23 Black.  Corporate legal, Alex Lindino.  Then corporate
24 human resources is Ms. Sharon Kelley.
25     Q   Okay.  The reference to James Black, is that the

Page 128

1  same James Black to whom your memo on the first page of
2  Company 1 was addressed?
3      A   Yes, sir.
4      Q   What do these signatures indicate on the fourth
5  page of the disciplinary action plan form?
6      A   It means all these individuals below my name
7  concurred with my recommendation for termination.
8      Q   Okay.  What are the training requirements for a
9  new officer being assigned to the facility?
10     A   A new detentional officer goes through 176 hours
11 of preservice training, which covers different elements,
12 everything from human resources, to use of force, to
13 general policies and procedures.  There's 176 hours of
14 training, 40 of which are OJT, on the job orientation
15 where officers are rotated to different posts to become
16 familiar with different aspects of the institution.
17     Q   Very good.  With respect to officers assigned to
18 central control in particular, are there any additional
19 training requirements for those officers?
20     A   And I think it's referenced in either the policy
21 or the post order in here.  It states that central
22 control -- officers assigned to central control will be
23 trained officers.  It does not specify any specialized
24 training.
25         I think it also states they will be assigned

Page 129

1 according to experience and suitability.
2 Q The incident in this case occurred on August 5th;
3 correct?
4 A Yes, sir.
5 Q Ms. Marquez did not receive her notice of
6 termination, according to joint Exhibit 2, until April of
7 2016. Can you explain why there was a delay between the
8 incident and the issuance of that notice?
9 A To the best of my remembrance, Ms. Marquez was
10 pregnant at the time. Immediately following the August
11 5th incident, if I recall correctly, Ms. Marquez went out
12 on FMLA.
13 Q Do you recall when she returned from her leave?
14 A Not the specific date, no, sir. It would have
15 been in April of '16, but I don't know the specific date.
16 Q Was any notice provided to Ms. Marquez about the
17 existence of the investigation when she began her FMLA
18 leave?
19 A Yes, to my knowledge it was.
20 Q Would you please take a look at the 37th page of
21 Company 1?
22 A Of which page?
23 Q 37.
24 A Of Exhibit 1?
25 Q Yes.

Page 130

1 A I only have 35.
2 Q You're missing four pages.
3 MR. KAPITAN: Take mine.
4 MR. MINER: Thank you.
5 THE WITNESS: Yes, there was notification.
6 Appears to be made on September 2nd. She was notified
7 that you are under investigation due to an incident of
8 August 5th, 2015.
9 BY MR. MINER:
10 Q Thank you very much.
11 Did you participate in the grievance procedure
12 with respect to the termination of Ms. Marquez in this
13 case?
14 A Yes.
15 Q Did you meet with the Union to discuss
16 termination?
17 A Yes. Yes, I recall.
18 Q What did the Union argue with respect to whether
19 the termination was appropriate or not appropriate?
20 MR. KAPITAN: Objection. Relevance.
21 THE ARBITRATOR: You know --
22 MR. KAPITAN: We had the issue.
23 THE ARBITRATOR: -- I'm going to -- I'm going to
24 not only sustain the objection, but I really don't want to
25 hear anything that happened during the grievance process.

Page 131

1 MR. MINER: No problem. I was going to ask the
2 warden to address his responses to that, but I --
3 THE ARBITRATOR: I really don't want to hear --
4 MR. MINER: I'll bring that up at our post --
5 THE ARBITRATOR: Whatever happened between the
6 parties during the grievance process is none of my
7 business.
8 MR. MINER: Fair enough, Mr. Arbitrator. I have
9 no other questions at this time. Thank you.
10 THE ARBITRATOR: Cross?
11 MR. KAPITAN: Arbitrator Shapiro, I do have some
12 questions, but one of the questions elicited an area I
13 didn't anticipate going into, and I need to make a copy.
14 Can I have just two minutes to go make a copy?
15 THE ARBITRATOR: Yes, sir.
16 MR. MINER: You know where the machine is?
17 MR. KAPITAN: Yes.
18 THE ARBITRATOR: Let's go off the record for a
19 couple minutes.
20 (Recess was taken from 2:06 p.m. to 2:08 p.m.)
21 THE ARBITRATOR: Let's go back on record.
22 Mr. Kapitan?
23 MR. KAPITAN: All right. Thank you.
24 ///
25 ///

Page 132

1 JAMES JANECKA,
2 resumed the stand and testified further as follows:
3
4 CROSS-EXAMINATION
5 BY MR. KAPITAN:
6 Q Mr. Janecka --
7 A Yes.
8 Q -- I do have a few questions for you regarding
9 your testimony.
10 A Yes, sir.
11 Q You testified about the procedures in central
12 control office, generally?
13 A General, very general.
14 Q Right. After this incident, did anything change
15 with respect to how the count is conducted?
16 A Not immediately that I recall. If you're
17 referring to we take count now and for probably the last
18 year, maybe a little bit longer. It's currently conducted
19 in the supervisor's office, yes, sir.
20 Q Okay. Can you describe what that change was?
21 A As far as what?
22 Q How the count is done as opposed to what it was.
23 A It's still conducted the same way. It's just in
24 a different location.
25 Q Okay. Who does it now?

Case 5:16-cv-02263-DOC-KK   Document 50-10   Filed 11/27/17   Page 110 of 159   Page ID #:4309
Arbitration of Elizabeth Marquez Vs

June 14, 2017

Page 133

1  A  An officer still collects the -- or receives the
2  paperwork and the majority of the calls from the different
3  locations, and they document it onto the count sheets, the
4  official master count sheet.  And then a lieutenant
5  verifies at the end and verifies all the count slips.
6  Q  Where is that done?
7  A  In the shift supervisor's office.  I think it was
8  referred to earlier as the watch office.
9  Q  And you said an officer does that.  Which
10  officer?
11  A  It can be any officer.  An officer that is
12  experienced or is confident -- or competent in taking
13  count.
14  Q  And I apologize.  I didn't mean to ask which
15  officer by name does that.  Which officers by post?
16  A  There's times when I see utility officers in
17  there and there's times I see control officers that will
18  be relieved, and they come out and do the count in the
19  shift supervisor's office.
20  Q  What is the normal procedure for which officer
21  does it?  Is it the central control officer who does the
22  count or is it utility?
23  A  Normally it will be for the shift supervisor to
24  make that determination.  I don't dictate that.
25  Q  You don't know what the typical termination is?

Page 134

1  A  I see both.
2  Q  When the central control officer does it, you
3  said they are relieved?
4  A  Correct.
5  Q  So someone else comes into the central control
6  office and takes over their responsibilities?
7  A  Currently, yes.
8  Q  And you said that's been around for approximately
9  how long?
10  A  Approximately, a year, maybe a little bit longer.
11  Q  Between now and August 5th, 2015, were any
12  changes made to how the housing is staffed with control
13  officers?
14  A  No.
15  Q  At the time in August 2015, the control officers
16  in the housing units and the segregation units were doing
17  relief duties; correct?
18  A  That is correct.
19  Q  Now they are not; correct?
20  A  No, sir.
21  Q  Do you know how long that change has been in
22  effect?
23  A  Probably close to a year.  I -- working in good
24  faith with the Union on trying to get their body of
25  officers to get their ten-minute breaks and their meal

Page 135

1  breaks, I made the decision to hold over a certain amount
2  of officers, if need be, extra on the shift to provide the
3  officers with their ten-minute breaks and their lunch
4  breaks.
5  Q  Is the count still being done at 1630?
6  A  No, sir.
7  Q  What time is it being done?
8  A  It's probably 1800 hours.  That count now is
9  conducted immediately following the dinner meal.
10  Q  When did that change take effect?
11  A  That took place in February of 2016.  We were
12  having some conflicts with some visitation hours.  There
13  were some complaints from attorneys and some access to
14  detainees about having access.  And so we made the
15  decision to move that count after the evening meal instead
16  of prior to the evening meal.
17  Q  You said you reviewed Company Exhibit 1 in this
18  packet?
19  A  Yes, sir.
20  Q  To make a recommendation regarding discipline in
21  this case?
22  A  That's correct.
23  Q  And you talked about a violation committed by
24  officer Santiago?
25  A  That's correct.

Page 136

1  Q  Okay.  We're not here about that today.
2  A  Okay.
3  Q  And I'm -- I'm just clarifying.  We're not here
4  to decide that.  But I'm curious.  You said there was a
5  violation for the -- for Detainee Irias to be in the
6  shower unescorted?
7  A  Unsecured.
8  Q  Unsecured.  You mean the door?
9  A  Yes.
10  Q  Were you aware that there was any kind of memo
11  issued by Assistant Warden Love at the time regarding
12  securing those doors?
13  A  No, sir, I'm not aware of that.
14  Q  You don't recall being provided one by the
15  Union?
16  A  I don't recall at this time, no, sir.
17  Q  You heard the testimony previously from
18  Mr. Anderson about communication at this time, correct, in
19  the segregation unit?
20  A  Correct.
21  Q  Mixed signal?
22  A  Correct.
23  Q  Did you take that into account when you found a
24  violation?
25  A  As far as miscommunication -- or

Page 137

1  miscommunication?
2      Q   Correct.
3      A   About securing a detainee in the shower?
4      Q   Yes.
5      A   I looked at it, yes.  I looked and it had no --
6  in my opinion, we're speaking of the Marquez case, had
7  no -- I could see where it had nothing to do with four
8  other doors that led through the facility.
9      Q   I'm sorry.  I was specifically asking, you
10 testified about finding a violation with respect to
11 Mr. Santiago.  And so since you testified about it, I'm
12 just following up and asking if that statement by
13 Mr. Anderson, regarding the miscommunication and the mixed
14 signals, entered into your thinking regarding the
15 violation by Mr. Santiago?
16     A   I knew it wasn't any direction that I ever saw in
17 writing, and I knew that I did not give the direction and
18 there was no policy change to it.  So, yes, I considered
19 it, but I looked at, was there a policy change, was there
20 a written post order change, or was there any direction in
21 writing provided by any of the -- my office, and I had
22 nothing to substantiate that.
23     Q   Did you ask whether there was any directive or
24 what the communications were, or you just decided that you
25 didn't have any?

Page 138

1      A   I may have asked during the investigation.  I
2  don't specifically recall if I did or to whom if I did.
3      Q   You said part of the changes in the segregation
4  unit, the detainees had some free time?
5      A   Had some free time?
6      Q   Yes.
7      A   Yes, sir.
8      Q   That essentially means they are out of their
9  cell.  They are in the day room?
10     A   They could be in the day room.  And we did start
11 allowing them out to what we call the outdoor recreation.
12     Q   When they go into the outdoor area, they are
13 escorted to that area; correct?
14     A   Correct.
15     Q   Whose responsibility is it to escort the
16 segregation detainees outside?
17     A   It would be one of the detention officers, either
18 one that are assigned to the floor, or there's a utility
19 officer that may take them out to the recreational area.
20     Q   And these changes occurred approximately July
21 2015?
22     A   The changes began slowly in July of '15.
23     Q   When you were conducting the investigation into
24 Ms. Marquez' discipline, did you ask that Officer Harris
25 be interviewed?

Page 139

1      A   I'm sorry?
2      Q   Did you ask that Officer Harris be interviewed as
3  part of the investigation?
4      A   I didn't conduct the investigation.  I reviewed
5  the investigative information that was provided to me.
6      Q   Correct.  But you did not request it?
7      A   No, sir.
8      Q   All right.  Do you have the ability to request
9  that interviews be conducted as part of an investigation?
10     A   Yes, sir.
11     Q   And in this case you did not?
12     A   No, sir.
13     Q   Why didn't you request that Officer Harris be
14 interviewed?
15     A   I don't recall.
16     Q   Officer Harris was present in the control
17 center?
18     A   That's my understanding.
19     Q   Central control at that time?
20     A   That's my -- according to the records I have and
21 the testimony that I heard, yes, sir.
22     Q   There was another officer in the segregation
23 unit.  We had testimony previously from Mr. Anderson that
24 he thought it was Officer Perez.
25         Do you know if it was Perez or Patterson?

Page 140

1      A   I don't know.  I -- just what's on the rosters.
2  I think there's a Perez, Santiago, Perez and Patterson.
3      Q   Hm-hmm.
4      A   I don't know who was where at the time.
5      Q   There's -- I'm looking at a disciplinary action
6  form issued to Mr. Santiago, and it references an Officer
7  Patterson, not Perez.
8      A   Okay.  There's also a Patterson.  If you look at
9  the -- on the August 5th, sir.
10     Q   Yes.  In the shift log?
11     A   The shift roster, page 21.  The officers assigned
12 were Moreiko, Patterson, Perez, and Santiago.  Perez and
13 Patterson were both assigned that day.
14     Q   Correct.  Mr. Santiago was in the administrative
15 segregation unit.  So only one other officer would have
16 been in the administrative segregation unit; correct?
17     A   Correct.
18     Q   So it was either Patterson, Perez, or Moreiko.
19     A   Yes, sir.
20     Q   Okay.  And what I'm saying is I'm looking at a
21 Company form that says "Patterson."
22         Do you have any reason to believe that it wasn't
23 Patterson instead of Perez?
24     A   I have no reason to believe one way or the other.
25 I don't know.

Case 5:16-cv-02263-DOC-KK  Document 50-10  Filed 11/27/17  Page 112 of 159  Page ID
#:4311
Arbitration of Elizabeth Marquez Vs

June 14, 2017

Page 141

1  Q  I'm not trying to belabor the point.  I just want
2  to make sure we're clear on the record who was actually
3  assigned there.
4      MR. MINER: Can we just confirm that we're not
5  arbitrating the Santiago case today?  It sounds like we
6  are.
7      MR. KAPITAN: No, no, no, I wasn't going there.
8  My point being, Mr. Anderson's testimony was that it was
9  Perez.  I'm looking at a company document that says it was
10  Patterson.  I just want to make sure we have the right
11  one.
12      MR. MINER: You want to bring in the Santiago
13  case, well bring it on.
14      THE ARBITRATOR: Gentlemen, let's move on.
15  BY MR. KAPITAN:
16  Q  Did you request that the other officer, whether
17  it was Perez or Patterson, be interviewed?
18  A  No, I did not request it.
19  Q  Why not?
20  A  I can't recall why.  I received the investigative
21  packet in my office, and I didn't request any additional
22  information.  I felt that the video footage and the
23  information I had been provided was sufficient to
24  substantiate my request for termination.
25  Q  But Santiago did give a statement in support of

Page 142

1  discipline for Ms. Marquez?
2  A  Yes.  As part of the packet.
3  Q  Did you interview Mr. Irias?
4  A  Mr. who?
5  Q  Detainee Irias?
6  A  No, I did not.
7  Q  Why not?
8  A  I wasn't conducting the investigation, sir.
9  Q  Why didn't you request that he be interviewed?
10  A  I didn't have a reason to request.  I could see
11  his actions on video, and I have his statements from
12  staff.
13  Q  You testified about the training for central
14  control?
15  A  Testified what our policies and post orders speak
16  to as far as what training is required, yes, sir.
17  Q  Okay.  And you said the post orders just require
18  an officer to be trained?
19  A  That's correct.
20  Q  In your mind there's no distinction between any
21  specialized training for central control under the post
22  orders?
23  A  If you don't mind, can I look at the post order?
24  Q  Please.  Go ahead.
25  A  That may be in the policy, but under staffing,

Page 143

1  page -- it's page 26 of the exhibit, 1 of 8, staffing
2  number 3.  "The master control center will be staffed 24
3  hours each day in three shifts for eight hours each by a
4  trained officer.  These officers are selected on criteria
5  that includes experience and suitability for the post.
6  There are no provisions for rotation to other duties."
7  Q  Correct.
8  A  Correct.  So there is nothing that I am aware of
9  in our post orders or policies that requires specialized
10  training.
11  Q  But that word, "trained" in reference to
12  officers, you think just means the minimal training that's
13  given to every officer?
14  A  The 176 hours of required training by PDNX, yes,
15  by our contract.
16  Q  Do you have any reason to believe that it's in
17  there to refer to all officers.  In other words, why is it
18  in there if it's referring to everyone?
19  A  You have to be a trained officer to assume the
20  post, period.  That's required by our contract, any post.
21  I couldn't have someone that's in preservice training that
22  hasn't complete -- successfully completed the 176 hours
23  assume that post.
24      MR. KAPITAN: I did not premark yours.  I didn't
25  know you had -- you want it?

Page 144

1      THE COURT: Let's go with Union 1.
2      MR. KAPITAN: Yes.
3      (Union Exhibit 1 was marked by the
4      Arbitrator for identification and
5      was retained by the Arbitrator.)
6  BY MR. KAPITAN:
7  Q  Mr. Janecka, I have handed you an exhibit that's
8  marked Union Exhibit 1.  It's just one page.  Can you
9  review it and tell me when you're done.
10  A  It's PBNDS standards, yes, sir.
11  Q  Is that the standard you testified about
12  previously, the PBNDS?
13  A  Yes, sir.
14  Q  And this is just an excerpt.  This is just one
15  page out of the entire standard, because I don't think we
16  want to produce the entire thing.
17  A  Yes.
18  Q  Under B, Control Centers, it says the chief of
19  security -- and I apologize.  These are underlined in my
20  only copy.  So this is not how it normally is, but these
21  are my notes.
22      "The chief of security shall carefully screen
23  officers for the highly responsible control center post
24  assignment."
25      Do you see that?

Page 145

1  A  Yes.
2  Q  Okay.  Is any special screening conducted by GEO
3 prior to an officer being assigned to central control?
4  A  I'm not aware of the chief -- if he screened
5 anyone or not.  I'm not sure.
6  MR. KAPITAN: If I could have just one moment.  I
7 think I can wrap up.
8  THE ARBITRATOR: Sure.
9  MR. KAPITAN: Nothing further.  Thank you.
10  THE ARBITRATOR: Redirect?
11  MR. MINER: I'm sorry, Mr. Kapitan.  No, I have
12 no further questions.  Thank you.
13  THE ARBITRATOR: Thank you.
14  MR. MINER: Thank you, Warden.
15  THE WITNESS: Thank you.
16  THE ARBITRATOR: Any other witnesses, Mr. Miner?
17  MR. MINER: No, thank you, Mr. Arbitrate.  GEO
18 rests subject to rebuttal.
19  THE ARBITRATOR: Mr. Kapitan?
20  MR. KAPITAN: Hm-hmm.  You want to go right
21 ahead, or does anybody need a break?
22  Union is ready to call its first witness, if we
23 can proceed right away.
24  THE ARBITRATOR: Absolutely.
25  Could you raise your right hand, please.

Page 146

1  Do you swear or affirm that the testimony you're
2 about to give will be the truth, the whole truth, and
3 nothing but the truth?
4  THE WITNESS: I do, sir.
5
6  SHAWNA NOWICKI,
7 called as a witness by the Union, testified as follows:
8  THE ARBITRATOR: Please have a seat.
9  Mr. Kapitan, your witness.
10  MR. KAPITAN: Thank you, very much.
11
12  DIRECT EXAMINATION
13 BY MR. KAPITAN:
14  Q  Will you state your name and spell your last name
15 for the record -- well, actually spell both your names,
16 just so we're correct.
17  A  My name is Shawna Nowicki, S-h-a-w-n-a
18 N-o-w-i-c-k-i.
19  Q  Ms. Nowicki, are you currently employed?
20  A  I am.
21  Q  By whom?
22  A  By GEO.
23  Q  What position do you hold with GEO?
24  A  I am currently a court bailiff at the west
25 facility.

Page 147

1  Q  How long have you worked with GEO?
2  A  It will be six years in August.
3  Q  And during that six years, were you always a
4 bailiff or have you had different positions?
5  A  I've worked every post in the facility.
6  Q  So basically you're a security officer, and
7 you're currently assigned as a bailiff.  Is it a special
8 designation or just a different post?
9  A  I just bid on that post by seniority because I
10 wanted a change in hours.  So I am specifically assigned
11 to that post because it is a specialized post, but I have
12 only had that position for about three months.
13  Q  Prior to working as a bailiff, you said you've
14 worked where?  Everywhere you said?
15  A  Everywhere.  I've worked central control,
16 segregation, housing units, medical, every post.
17  Q  And how are you assigned to those posts?  On a
18 daily basis?  On a monthly basis?  How does that work?
19  A  Well, when I first came to the facility, I was
20 put in central at the beginning under our previous chief,
21 Chief Davis.  And then we opened the west facility.  So we
22 started out at the east, and then I moved to the west.
23  When I came to the west facility, I was at
24 central control for a while, and then I went to
25 segregation for about a year and a half.

Page 148

1  Q  With respect to central control, can you give us
2 an idea of what a typical shift would be like when you're
3 working in there?
4  A  Very busy.  Constant, constant, constant is the
5 best I can describe it.  The phones are ringing.  You have
6 radio traffic.  You have doors popping up, moving into the
7 facility.  It's a very, very busy post.
8  Q  All right.  With respect to the phones, how often
9 does the phone ring?
10  A  There's not much time where you are not on the
11 phone at some point.
12  Q  It's continuous?
13  A  Yes.
14  Q  At any point during the day, does the phone
15 traffic increase?
16  A  It does.  It increases at about 4:30 because
17 our -- in administration during the day between the hours
18 of like 7:00 and 4:00, they have a secretary that all the
19 facility calls are routed through there.  As soon as that
20 person leaves for the day, then all phone traffic goes
21 through central control.
22  Q  You also testified about radio?
23  A  Yes.
24  Q  What kind of things are communicated over the
25 radio?

Case 5:16-cv-02263-DOC-KK   Document 50-10   Filed 11/27/17   Page 114 of 159   Page ID
#:4313
Arbitration of Elizabeth Marquez Vs

June 14, 2017

Page 149

1    A   Well, if you're in a housing unit, you'll call in
2  for a supervisor or for any kind of movement in the
3  facility.  Basically, anything that you're doing that you
4  need somebody else's attention, you call on the radio.
5        When you have a bubble -- I'm sorry, not a
6  bubble, when you have a housing control officer, which is
7  what we talked about where the pods are facing the housing
8  unit, then those people handle that radio traffic because
9  in a unit you have an intercom that you can push the
10 button and you can tell the housing control officer, can
11 you call central and relay this information.  So it does
12 reduce the radio traffic when you relay it through the
13 bubble.
14       But for people on a visit, court, anywhere else,
15 they have to rely on the radio if you don't have a phone.
16    Q   How often does someone call on the radio or have
17 to communicate on the radio?
18    A   There is not a whole lot of break in radio
19 traffic, generally.  It's a lot.
20    Q   And then with respect to monitoring movement on
21 the board, how often does someone request access to a
22 door?
23    A   I would say you're looking at -- when I was a
24 central officer, it was probably at least 20 doors every
25 five seconds.  It depends on the time of the day.  You

Page 150

1  have attorney visits.  You have people being moved to
2  medical.  You have people being move to court.  You have
3  people coming from intake.  Every movement within the
4  facility is called being on the radio, so it's constant.
5    Q   Okay.  But then that's the radio, that's
6  specifically with the board where people are pressing
7  buttons to access a door, how often is that?
8    A   Every time a staff member goes to the bathroom,
9  they have to push a button some way to get to the door.
10 So it is constant for everybody.
11       For example, you come into the Sally port that
12 leads to the control center, you might go through that
13 door three times because you come in to get a radio, check
14 out your keys, you go right back out the same door that
15 you came.  In that minute you were walking around, you
16 already accessed five doors, just one person.
17    Q   We had some testimony previously about the number
18 of doors that are controlled by central control.  Do you
19 recall that testimony?
20    A   Yes.
21    Q   Okay.  Do you have any knowledge of how many
22 doors?
23    A   It's a lot of doors.  But can I ask a clarifying
24 question?  Are we talking about before or now?
25    Q   Let's handle that.  How about prior to in August

Page 151

1  of 2015?
2    A   So prior to -- well, I'd have to explain a little
3  bit about the set up of central.  You have two boards, one
4  for each control officer.  So, generally, the duties are
5  split in half.  One person would have half the facility
6  and the other person would have the other half of the
7  facility.  And then --
8    Q   All right.  Let me clarify.  This is --
9    A   Now.
10    Q   This is now?  Okay.
11    A   Well, normally.  Yes, now.
12    Q   Okay.
13    A   And then now that we have our housing control
14 unit staff, they have all the doors within the housing
15 units.
16    Q   What do you mean, "Now that we have our housing
17 control staff"?
18    A   At the time of the incident in August, we did not
19 have officers in the housing control unit on each unit
20 controlling those doors.
21    Q   Why didn't they?
22    A   Because they were out covering breaks.
23    Q   And so that's the situation now is that the
24 control officers are handling those doors within that
25 unit?

Page 152

1    A   Correct.  So they handle more radio traffic
2  because now you press the intercom in the housing unit and
3  you say, call the lieutenant, call medical, call so and
4  so, and they pick up the phone in the housing unit and
5  they relay that.  So it reduces not only radio traffic,
6  but the amount of doors that you control for entering and
7  exiting the facility, the area.
8        MR. KAPITAN:  By the way, are we speaking too
9  fast.
10       THE WITNESS: I'm sorry.
11       MR. KAPITAN: Let's slow down a little.
12       I noticed that you were speeding up a little bit.
13    Q   So that is how it currently works?
14    A   Yes.
15    Q   When did that change?
16    A   It wasn't -- to my knowledge, it wasn't too long
17 after the incident.  I don't recall the exact date, but I
18 know it wasn't too long because that was one of our
19 complaints.
20    Q   Right.  Then at the time of the incident in 2015,
21 right, how did it work within the housing units with
22 respect to control of the access doors?
23    A   In August how did it work?
24    Q   In 2015.
25    A   Okay.  So central control had control of those

Page 153

1 doors, every single door within the facility.  Now they
2 have a limited amount of control.
3    Q   Okay.
4    A   So you have an extra set of eyes and you have an
5 extra person there doing the movement in and out of those
6 particular units.  And we have five control pods plus
7 segregation.  So that's an additional six officers manning
8 doors.
9    Q   We had some testimony about counts --
10   A   Uh-huh.
11   Q   -- being conducted.  What happens during a count?
12   A   Well, during a count, all detainees that are not
13 in another area of the facility like visitation, or court,
14 or medical are to stand by their bunks or their cell and
15 they are to be counted.  Everybody stays in their
16 movement.  Once count starts there is no movement for any
17 detainee anywhere.
18       If you're -- if you're -- I'm sorry.  I'm going
19 fast.  If you're outside of the unit, you go on a sheet
20 called an out-count.
21       And I'm sorry, are we talking about what happened
22 then or what happened now?
23   Q   Okay.  If you need -- whenever you want to
24 clarify between the two, just go ahead and say it.
25   A   So before, prior to August 5th, one control --

Page 154

1 one central control officer would shut down their board
2 and hand all the doors over to the second officer, and
3 they would conduct all the paperwork and all the count in
4 the control center.
5       Now, like the Warden said, they have an officer
6 that comes in and either relieves the central control
7 officer or takes the paperwork to another area to complete
8 it.
9    Q   How long would a normal count take?
10   A   Depends on how fast the officers walked and if
11 they are doing it correctly.  But generally speaking, it
12 usually takes a half an hour to 45 minutes.
13   Q   By the way, I forgot to ask, that change from
14 having the central control officer do the count in central
15 control as opposed to going to the watch office, do you
16 know when that occurred?
17   A   Yes.  It was before Marquez was terminated, I
18 know that.  I believe it was a couple weeks after the
19 incident.  I can't be sure of the exact date, but I do
20 know that it changed fairly quickly.
21       And how we were briefed by the chief supervisor,
22 it was at the Warden's directive that that paperwork was
23 to be taken to the watch office and then to central
24 control -- I mean, then outside of the control unit.
25   Q   There was also testimony about an emergency

Page 155

1 count?
2    A   Hm-hmm.
3    Q   What is an emergency count?
4    A   Well, an emergency count is when our numbers
5 don't reconcile our paperwork.  In other words, if you're
6 supposed to have -- if you have a total of 80 detainees in
7 the unit and one is in medical and one is out counted to
8 visit, and you actually do the count and you come up with
9 76, 76 plus 2 is not 80, so there's a discrepancy
10 somewhere.
11       So emergency count is when the regular count
12 commences and it is not reconciled within the hour.
13   Q   Is that a serious event?
14   A   It is because it could mean that we have somebody
15 missing or there's been an escape.
16   Q   How long does it take to conduct an emergency
17 count?
18   A   Depending on where the problem is.
19   Q   Give me an example.
20   A   It could take half an hour, 45 minutes, even up
21 to an hour.  Because what happens in an emergency count is
22 each officer has to move back to the previous unit that
23 they counted and two officers have to count each unit and
24 it is face to photo, which is a little book we have with
25 the detainees' picture.  And they reconcile the count to

Page 156

1 the detainee and then we figure out who's missing.
2       During an emergency count, other than court,
3 there should be no discrepancy.  Everyone is returned to
4 their unit.
5       For example, if we have five detainees in kitchen
6 and we can't figure out where the disciplinary is, they
7 will return those detainees to the unit to conduct their
8 count.
9    Q   During an emergency count, does the traffic
10 change with respect to the phones?
11   A   No.
12   Q   Does the traffic change, does the amount of
13 traffic on the radio change?
14   A   Well, if you're talking about then, the answer is
15 yes.  If you're talking about now, no.  And here's the
16 reason why.  I'm sorry.  I'm trying to speak slow.
17 Because now you could push the intercom button and tell
18 the control officer within the housing unit to relay your
19 information.  Back then, there was no officer there, so
20 you'd have to communicate via radio.  There was no other
21 way to communicate.
22   Q   What about the movement on the board during an
23 emergency count?
24   A   Well, you have to understand, an emergency count
25 means all the doors in the facility have to be accessed in

Page 157

1 the housing unit again because the officers are retracing
2 their steps, and they are going back and they are
3 recounting every single unit for a second, third or fourth
4 time.
5    Q   So how does that relate to the amount of traffic
6 on the board for movement?
7    A   It does put a lot more -- for example, during a
8 regular count, you count unit one, two, you have your
9 officers moving. Once that's done, the movement stops.
10    In an emergency count, you're doing it all over
11 again. So there is more movement because you're trying to
12 go back and forth and reconcile. It's a big facility.
13    Q   With respect to the normal duties when you're
14 monitoring movement as a central control officer, you're
15 working the board, essentially. When someone tries to
16 access a door, and it's just the verbal, what is the
17 procedure?
18    A   Well, that gets a little tricky because you have
19 contractors. ICE is kind of like the boss. So when an
20 ICE officer comes to the door, and he identifies himself
21 as ICE, they get really mad if you ask them by name.
22    When I was in central, I never asked them by
23 name. If they said ICE, I let them through. If they say
24 Keefe coffee, we don't know the Keefe people that are
25 there because they change weekly. They all have to be

Page 158

1 preapproved to come into the facility, but we don't know
2 that. They come through the door, and they say, is "This
3 is Keefe," and they do walk around the facility
4 unescorted, then we access that door. It's a very quick
5 progression.
6    And at the time we're talking about, emergency
7 count, there is no detainee movement whatsoever. There's
8 never been any detainee movement during any of our
9 emergency counts ever in the six years I've been there.
10    Like if I was in visit, and they call an
11 emergency count, I better have my detainee back to his
12 unit because once emergency count starts, there is no
13 movement anywhere.
14    Q   Is there any sort of list of authorized persons
15 that when you're doing a verbal I.D. you have to check
16 against?
17    A   No, sir.
18    Q   With respect to the video, when someone tries to
19 access a door and a video pops up, what do you see?
20    A   You see a quick flash. If you have 20 doors and
21 you see a quick flash, you verify and you have a finger
22 mouse and you click that mouse to get the door open. And
23 it happens pretty fast.
24    Q   What do you actually see on the monitor?
25    A   Well, it depends on what angle you're looking at.

Page 159

1 We have you have several different angles. Sometimes
2 you'll see a long hallway. Sometimes the camera will be
3 right over the door with just, like you saw on the video,
4 with just that person there.
5    Q   Okay. In the video that we saw, we saw Detainee
6 Irias walking down the hallway. Is that what you see as a
7 central control officer?
8    A   No. Because by the time they get to the door and
9 they push the button, what you saw with him standing
10 there by the door, which I couldn't even tell he had red
11 on when he was standing at the door with the camera, all
12 you see is a person standing at the door. You don't have
13 a view of what happened before or after. It's just a
14 still shot of who's there right then.
15    Q   Some testimony previously regarding shift change.
16 So around what time does a shift change occur in the
17 afternoon?
18    A   Well, shift change for security is different from
19 courts, administration, kitchen. ICE comes in and out.
20 So in regards to shift change, as far as security goes,
21 during the 1630 count, there was no shift change. You
22 have administration, but not your mail clerks, your -- and
23 everybody comes through the center side where to turn in
24 their keys and their equipment, and then they access the
25 doors to get back out to the time clock.

Page 160

1    So there is other movement within the facility
2 even when it's count time.
3    Q   Who else is on a shift change? You mentioned
4 admin?
5    A   You have secretaries. You have the Warden and
6 the administrative staff that, generally, we clock out
7 around 5:00 o'clock or so depending on the day. You have
8 your attorneys leaving. You have your court staff. I
9 know court staff usually leaves between 4:00 and 6:00. It
10 just depends on the day.
11    Q   There's also testimony regarding practices in the
12 admin segregation unit regarding detainees being
13 unescorted? Are you familiar with what the current
14 practice is now?
15    A   I'm not entirely -- well, yes and no. Let me
16 explain what I mean by that. I have never worked the ASEG
17 unit, Administration Segregation Unit, since the wall went
18 up. But I was a segregation officer for a year and a half
19 prior to the wall going up. And in that unit, before the
20 wall went up, there was never any movement within
21 segregation where the detainees were not handcuffed. Any
22 detainee, ASEG or not.
23    If they were in the segregation unit, they were
24 always handcuffed. They were handcuffed in the shower.
25 They were handcuffed to the rec yard. They were

SANTIAGO 112

Case 5:16-cv-02263-DOC-KK   Document 50-10   Filed 11/27/17   Page 117 of 159   Page ID
#:4316
Arbitration of Elizabeth Marquez Vs

June 14, 2017

Page 161

1 handcuffed for movement within the facility.  We never
2 differentiated between administrative segregation and
3 disciplinary segregation until July.
4    Q   On August 5th, 2015, do you recall anything
5 happening with respect to Detainee Irias getting access
6 through doors?
7    A   The only thing that I recall is Sergeant
8 Hutchinson made a radio announcement.
9    Q   Did you ever hear Mr. Anderson make any radio
10 announcement?
11   A   No, sir.
12   Q   Do you have any knowledge of an incident
13 involving Detainee Irias accessing a door other than this
14 incident?
15   A   Yes, I do.
16   Q   What happened?
17   A   Six weeks after the incident with Officer
18 Marquez, we had a fairly new officer in central control --
19 and I have to give you a little bit of the setup so you
20 can understand.  I was a visitation officer at the time.
21 And the way our visitation is set up is you have -- it was
22 our desk, and then there's a bank of windows for
23 noncontact, but there's a wall.  And on the other side is
24 where Detainee Irias was.  And then there's a door with a
25 button.  They brought him in in handcuffs.  They uncuffed

Page 162

1 him and left him in there for a visit.
2        Since I was a visit officer, we always sit on the
3 other side of the wall and we just monitor that area.
4    Q   Let me stop you there.  You actually witnessed
5 this?
6    A   Yes, I did.
7    Q   Okay.  Go ahead.
8    A   So he pushed the button.  And before I could get
9 on the radio and tell central control, the door popped
10 open, he stuck his head out, and Officer Cisneros, who is
11 a court officer, was walking by and actually told him to
12 get back in, and they shut the door.
13        Then I called central on the phone, and I said,
14 "Hey, Detainee Irias is here.  We already know what
15 happened the last time.  Please make sure you don't access
16 the door without verifying."
17        So -- and then I went to the -- I went to
18 Sergeant Castaneda, and I talked to him about it, and I
19 went to Lieutenant Hurtado at the time, and we rolled back
20 the footage.  And that's exactly what happened.  And we
21 provided those details in our appeal or in our statement
22 to the Warden previous to the termination of Officer
23 Marquez.  I forget which paperwork it is, it was in, but I
24 included that in there.
25   Q   To your knowledge, was anyone disciplined for

Page 163

1 that event?
2    A   No, sir.
3    Q   One thing I forgot to ask, in one of the videos
4 when Detainee Irias was walking out of the shower and he
5 was walking towards that first door, there was a window on
6 the bottom right.
7        Do you recall that?
8    A   Yes.
9    Q   What is that window?
10   A   That window is the control bubble where the
11 officer that's supposed to control the doors in
12 segregation and the doors out of that unit is sitting.
13   Q   That's normally the control officer?
14   A   Correct.  But at the time, it wasn't.  It didn't
15 have a control officer in there.
16   Q   Who was in there?
17   A   Actually, it is the lieutenant that ASEG --
18 sorry, the administrative lieutenant's office.  So she
19 will be in there with the officer.  And that day she
20 wasn't in the office when the detainee passed by.
21        MR. KAPITAN: That's all I have.  Thank you very
22 much.
23        THE ARBITRATOR: Cross?
24        MR. MINER: Thank you.  Just a few questions,
25 please.

Page 164

1              CROSS-EXAMINATION
2 BY MR. MINER:
3    Q   You testified that you spent some time working
4 in central control?
5    A   Yes.
6    Q   When did you start with them?
7    A   Well, I returned -- actually, I trained with
8 central control and with Chief Davis previous to the
9 facility even opening.
10   Q   Okay.  Let me ask the same question again.  When
11 did you start working in central control?
12   A   August of -- no, it wasn't August.  September of
13 2000- -- when did we open the west facility?
14   Q   '15?
15   A   So it was September of 2015.
16   Q   And how long did you work there?
17   A   Pretty regular for a good four or five months.
18   Q   How many emergency counts were there during that
19 time?
20   A   Not that many.
21   Q   Less than ten?
22   A   You know, that was a long time ago.  I don't know
23 the answer to that.
24   Q   Okay.  Fair enough.
25   A   But it's not significant in my mind.

Page 165

1  Q   Sure.  All right.  Where were you working on
2  August 5th, 2015?
3  A   Visitation.
4  Q   And what were you doing at the time of the count
5  that afternoon?
6  A   I was watching detainees visit with their family.
7  Q   And what else?
8  A   That was my post.  That's it.
9  Q   And how long were you at that post?
10  A   I came in at 11:30, and I left at 8:30.
11  Q   Did you spend any time in central control that
12  day?
13  A   No.
14  Q   Did you ever have experience when you worked in
15  central control of any detainee seeking access to a
16  secured door?
17  A   Yes.
18  Q   Tell us about it.
19  A   Myself -- we have medical tanks, suicide watch
20  tank, medical tanks.  We don't have a camera.  I have
21  actually accessed a door where a detainee is in medical
22  observation.  They push the door open.  You -- they push
23  the button.  Its kind of complicated.  At the east
24  facility in the tanks they have a button where you can
25  block the detainee's access to that.

Page 166

1      At the west facility they don't have that.  So
2  they can push the button, and if you don't know that that
3  is a medical tank or you don't look, there's no camera,
4  you can access the door, and the detainee can come out
5  without your knowledge.
6  Q   Well, all right.  Let me stop you.  Did that
7  happen?
8  A   To me?
9  Q   Yes.
10  A   Yes.  I've popped a door before, yes.
11  Q   Okay.  So that's what I'm asking you about.  Tell
12  us about the incident where you popped the door for a
13  detainee.
14  A   Which time?  It doesn't happen all the time, but
15  mistakes are made and it does happen.
16  Q   Tell us about the last time it happened.
17  A   Well, the last time is pretty simple.  I had a
18  detainee push a button.  I accessed the door before I
19  verified, and I just called -- he was -- it wasn't an
20  issue because the detainee never came out.  I just called
21  the medical officer, and I said, "Can you please go secure
22  such and such door."  And they went in.  They pulled it
23  open, they shut it, and that was the end of it.  There was
24  no issues from it.
25  Q   With the phone ringing all the time, and the

Page 167

1  radio going all the time, how did you have time to call
2  medical and say, "Whoops, I just inadvertently accessed
3  the door"?
4  A   We have two officers.  So you have two phones.
5  You have access to either side of the radio.  You just do
6  it.  And if something like that happens, then you take
7  care of it, and you move back to your duties.
8  Q   Did you conduct any investigation into what
9  occurred on August the 5th?
10  A   I did.
11  Q   In what capacity?
12  A   I am the vice president of the Union.  And I went
13  down to the segregation unit after the incident, the next
14  day, because there was much confusion, like Lieutenant
15  Anderson said, about what's what, who said what.  And I
16  asked Officer Shelton for a memo because he verbally told
17  me that Assistant Warden Pat Love had been on the unit
18  that week and gave the verbal directive to the officers
19  that the showers are to remain unlocked.
20      I know, as a union rep, if you don't get them to
21  write it right away, that they don't, or they forget the
22  details.  So that day, I had him write a memo to me about
23  her verbal directive because I knew what was coming.
24  Q   Anything else?
25  A   I talked to Marquez about what happened that day.

Page 168

1  I talked to Harris about what happened that day.  I put in
2  a request to supervisors after they changed the
3  policies -- I'm sorry, not the policies -- the practices.
4  Because policies never change, just how we do things have
5  changed.
6      When they changed the practice, I requested the
7  lieutenant to put it in writing that the central control
8  officer now exits, and we never got anything back from
9  them.
10  Q   Do you recall when that was when you requested
11  statements regarding change of practice?
12      MR. KAPITAN: Objection, Arbitrator Shapiro.
13      THE WITNESS: No.
14      THE ARBITRATOR: What is the objection?
15      MR. KAPITAN: I wanted to see where this was
16  going, but I think this is getting into the realm of the
17  same thing regarding the grievance processing.  It's not
18  relevant.
19      THE ARBITRATOR: No, it's not.  I'll take it.
20  Go ahead.
21      MR. MINER: Thank you.
22  Q   Do you need me to restate that question?
23  A   Please.
24  Q   Yeah.  When was it when you were seeking out
25  these statements from supervisors about change of

Case 5:16-cv-02263-DOC-KK    Document 50-10    Filed 11/27/17    Page 119 of 159    Page ID
#:4318
Arbitration of Elizabeth Marquez Vs

June 14, 2017

1 processes?
2   A   After it happened, after the incident on
3 August 5th happened.  I am not sure of the exact date, but
4 we do have the paperwork.
5   Q   Okay.
6   A   And we did submit that paperwork to the warden
7 with our packet and our memos and all of that.
8   Q   Have you reviewed the packet that was provided to
9 the warden?
10   A   Yes.
11   Q   Okay.  You testified that when the video image
12 becomes available in central control, it appears for a
13 flash, and then you click your mouse.  I think that's what
14 you testified; is that right?
15   A   That is correct.
16   Q   So let me -- I haven't asked my question yet.
17   A   Okay.
18   Q   So how long does the image remain on the screen
19 if you don't hit that mouse?
20   A   Until you click the next door.
21   Q   Until -- what does that mean, "click the next
22 door"?
23   A   So we're going back to the screen with the icons.
24 You might have a list.  There's a little tiny box on the
25 bottom corner that has a list of all the doors that are

1 ringing with an intercom.  They come up one by one.  You
2 click on one door, you're automatically moving on to the
3 next one because you might have 500 doors lit up at one
4 time.
5   Q   Wait a minute.  I am asking about the image and
6 the mouse click.  So you click on the door?
7   A   Hm-hmm.
8   Q   The image appears.  And then if you click
9 nothing, what happens?
10   A   It would stay on there.
11   Q   It stays on there until you click it again?
12   A   Until you click the next door.  But there's -- in
13 central control, there's never an instance where there's
14 not another door behind the first one.
15   Q   Sure.  I understand.  Thank you.
16   A   Okay.
17       MR. MINER:  That's all my questions.  Thank you,
18 Mr. Arbitrator.
19       THE ARBITRATOR:  Any redirect?
20       MR. KAPITAN:  One, please.
21       THE ARBITRATOR:  Go ahead.
22
23       REDIRECT EXAMINATION
24 BY MR. KAPITAN:
25   Q   You were asked about the incident where you

1 popped a door?
2   A   Hm-hmm.
3   Q   Was a count being conducted at the time?
4   A   No.
5       MR. KAPITAN:  That's all I have.  Thank you.
6       THE ARBITRATOR:  I have one question.
7       THE WITNESS:  Yes, sir.
8       THE ARBITRATOR:  Get back to the image and how
9 long it stays there.  It will stay there until you -- it
10 will stay there, and by clicking the next door, does that
11 give access to the door you had been looking at in the
12 video?
13       THE WITNESS:  That's not how it works.
14       THE ARBITRATOR:  Okay.  So the image comes on.
15 I'm trying to understand.  The image comes on.  You want
16 to give access to that person whose image you see.  What
17 do you do?
18       THE WITNESS:  You're already in position to click
19 the mouse.
20       THE ARBITRATOR:  So you click the mouse?
21       THE WITNESS:  And that's it, it opens the door.
22 So it can be a simple movement of boom.
23       THE ARBITRATOR:  I understand.  So then what
24 relativity is there from that to clicking the next door
25 that was trying to be accessed?

1       THE WITNESS:  I can't tell you what anybody else
2 does, but there are so many doors that once you click the
3 one, you're automatically already moving your hand to go
4 to the next one because it's constant.
5       THE ARBITRATOR:  But there's no relationship
6 between the next one to opening the prior one; correct?
7       THE WITNESS:  Right.  As soon as you --
8       THE ARBITRATOR:  Okay.  I got my answer.  Okay.
9 Thank you.
10       MR. KAPITAN:  Can I follow up on that because I
11 think --
12       THE ARBITRATOR:  Sure.
13       MR. KAPITAN:  -- something needs to be clarified.
14
15       FURTHER REDIRECT EXAMINATION
16 BY MR. KAPITAN:
17   Q   I believe the question was with respect to you
18 clicking the next door, how long that image stays up, the
19 video image of the person trying to access the door?
20   A   It goes away as soon as you click the next door.
21   Q   I think that was the relevance that --
22   A   It doesn't stay there.
23   Q   You're operating the access of one door, that
24 video image is up, as soon as you click the next door, it
25 goes away?

Page 173

1    A   Correct.
2        MR. KAPITAN: Okay.
3        MR. MINER: Thank you.
4        THE ARBITRATOR: Any other questions?
5        MR. MINER: No, sir.
6        THE ARBITRATOR: Thank you.
7        THE WITNESS: Thank you.
8        THE ARBITRATOR: Next witness. Let's take ten
9    minutes.
10       (Recess taken from 3:07 p.m. to 3:17 p.m.)
11       THE ARBITRATOR: Go back on the record.
12       MR. KAPITAN: Prior to getting to the -- are we
13   all set? Prior to getting to the Union's last witness,
14   one issue I wanted to raise. I alluded to the
15   disciplinary action form for Santiago previously only in
16   reference to the fact that it identifies the officer who
17   was working with Santiago. I would like to introduce a
18   clean copy of that, not for the purpose of litigating
19   Santiago's discipline, but merely for establishing who the
20   other officer was.
21       THE ARBITRATOR: I'm not going to take it.
22       MR. KAPITAN: Okay.
23       THE ARBITRATOR: This case has nothing to do with
24   Mr. Santiago and Mr. Santiago's case, so I am not going to
25   take it. I don't believe it's relevant.

Page 174

1        MR. KAPITAN: That leads me to my problem is I
2    think -- and I frankly do not care whether that document
3    is in or not. My sole purpose was to establish that it
4    was Officer Patterson who was working and not Perez. And
5    I believe it goes to the credibility of Mr. Anderson's
6    testimony because he testified that it was Perez; whereas,
7    I have a GEO document that says it was Patterson. So one
8    way or another, I would like to establish that it was
9    Patterson. And that's why I'm asking about that document.
10   I asked about a stipulation, but we could not reach a
11   stipulation.
12       MR. MINER: The warden has already addressed
13   this, Mr. Arbitrator. He testified to this specific
14   point, which is, again, irrelevant, you know, as you've
15   already pointed out to the Marquez termination.
16       THE ARBITRATOR: I'm going to leave it at that.
17       MR. KAPITAN: Okay.
18       Then the Union would like to consult if there's a
19   different way that we can establish that it was Patterson
20   because I do believe it is a credibility issue with
21   respect to Mr. Anderson's testimony. If he gets that
22   information wrong, what else can he get wrong.
23       THE ARBITRATOR: Well, that's an argument that I
24   will allow you to make in closing. And let's leave it up
25   to the documents that are in.

Page 175

1        MR. KAPITAN: The issue that brings up with me is
2    being able to establish that it was Mr. Patterson to begin
3    with.
4        MR. MINER: Which would require litigating the
5    Santiago case.
6        MR. KAPITAN: I don't believe so.
7        MR. MINER: I think it would.
8        THE ARBITRATOR: Well, I'm just going to leave it
9    at that. I'm not going to take it. I don't want to get
10   anymore into the Santiago issue than we have. And I
11   will -- when you make your argument, I will consider your
12   argument with regard to the lieutenant's credibility.
13       MR. KAPITAN: Okay. Thank you.
14       With that, the Union calls its last witness,
15   Ms. Marquez.
16       THE ARBITRATOR: Raise your right hand, please.
17   Do you swear or affirm that the testimony you're about to
18   give, will be the truth, the whole truth and nothing but
19   the truth?
20       THE WITNESS: Yes.
21
22             ELIZABETH MARQUEZ,
23   called as a witness by the Union, testified as follows:
24       THE ARBITRATOR: Please have a seat. Your
25   witness, Counsel.

Page 176

1        MR. KAPITAN: Thank you.
2
3             DIRECT EXAMINATION
4    BY MR. KAPITAN:
5        Q   Say your name and spell your first and last name
6    for the record, please.
7        A   First and last name, Elizabeth Marquez,
8    E-l-i-z-a-b-e-t-h, M-a-r-q-u-e-z.
9        Q   Were you ever employed by GEO?
10       A   Yes, I was.
11       Q   From approximately what date to what date?
12       A   July the 9th to April -- I don't remember the
13   termination date.
14       Q   Of which years? July 9th of what year?
15       A   2012 to 2015.
16       Q   Prior to working at GEO, where did you work?
17       A   Prior to working GEO, I was a full-time student.
18   And I worked for FedEx and a convalescent home.
19       Q   Okay. Let's take each one of those. You were a
20   full-time student?
21       A   Hm-hmm.
22       Q   What were you studying?
23       A   Criminal justice.
24       Q   Do you have your degree?
25       A   Yes, I do.

Page 177

1  Q  And you said you were working for which --
2  A  For FedEx home delivery, and I was also working
3  for a retirement center, convalescent home.
4  Q  You were working two jobs at once?
5  A  Yes.
6  Q  With GEO, what position did you have?
7  A  A detention officer.
8  Q  What kind of post did you work as a detention
9  officer?
10  A  When I first started it was working the units,
11  the dorms.  And then I went out to being a utility, which
12  was pretty much breaking, doing the chow, which is dinner.
13  After that, I got into central.
14  Q  When did you start working in central control?
15  A  I was -- I would say a year prior to the
16  incident.
17  Q  So the summer of 2014?
18  A  Yes.
19  Q  Did you work in central continuously from the
20  summer of 2014 until August 2015?
21  A  No.
22  Q  You worked other --
23  A  Yes.  It was on and off.
24  Q  All right.  Prior to August 5th, 2015, how long
25  had you been working at central control, just

Page 178

1  continuously?
2  A  When I found out I was pregnant.
3  Q  All right.  When was that?
4  A  It was in -- I don't remember if it was February
5  or March of 2014 -- oh, '15.  I'm sorry.
6  Q  That was a long pregnancy.
7  A  Yeah.  I'm sorry.
8  Q  It was 2015?
9  A  Yes.
10  Q  And then you were stationed in central control?
11  A  Yes, when I brought the notice in to the
12  lieutenant.
13  Q  Were those two things related, your pregnancy and
14  being stationed in central control?
15  A  Yes.
16  Q  How were they related?
17  A  Well, I couldn't work anywhere else with the
18  detainee access -- not detainee access.  Detainee -- what
19  is the word I'm looking for?  Well, I couldn't work with
20  detainees is what the -- due to me being pregnant.
21  Q  As of August 5th, 2015, how long were you in your
22  pregnancy?
23  A  I was eight months.
24  Q  How were you feeling with your pregnancy at that
25  time?

Page 179

1  A  Well, I had complications, but I think I was
2  feeling good.  I don't remember.
3  Q  Complications at that time?
4  A  Yes.
5  Q  So within central control, what was it like
6  working in there?
7  A  It was stressful, and it was also -- it was very
8  busy.  If it's not one thing, it's another.  You're
9  constantly doing stuff in central control.
10  Q  We had testimony before about different duties
11  that are required.  One of them was working on -- with
12  calls on the radio.
13  A  Hm-hmm.
14  Q  Do you recall that?
15  A  Yes.
16  Q  How often were you handling -- and just on a
17  regular basis in central control, how often would someone
18  get on the radio to communicate?
19  A  I would say -- on a busy day or just a regular
20  day?
21  Q  Give me both.
22  A  On a busy day it's every couple seconds you have
23  someone calling in traffic, when they call in traffic to
24  central control, you have to answer it right now and you
25  still do the doors and write down the information that

Page 180

1  they are giving you because -- which is -- and on a slow
2  day, it's maybe minutes when somebody calls and they say,
3  "Hey, I'm moving so and so from medical to -- back to the
4  unit."
5  Q  All right.  Then there were questions or
6  testimony regarding using phones as well.
7  Do you recall that?
8  A  Yes.
9  Q  All right.  What type of communications would
10  come over the phone?
11  A  We have the east facility calling in.  We have
12  outside calls trying to leave messages for the detainees.
13  We have sometimes the higher ups like Warden Janecka,
14  Chief Johnson trying to get a hold of somebody else.
15  You've got all kinds of calls.
16  Q  Was the volume of calls on the telephone
17  different at certain times of the day?
18  A  Yes.
19  Q  What do you mean by that?
20  A  After the front desk, like what he mentioned,
21  when they leave at 4:00, then all the calls start coming
22  into central control.
23  Q  And what about tracking movement on the board,
24  how many times did someone try to access the door in a
25  normal day?

Case 5:16-cv-02263-DOC-KK    Document 50-10    Filed 11/27/17    Page 122 of 159    Page ID
#:4321
Arbitration of Elizabeth Marquez Vs

June 14, 2017

Page 181

1    A   It was pretty constant.  You probably get like
2  five doors.  In less than three seconds, you already have
3  reds on the little screen because they pop up red when
4  they show up.  So all the doors are constantly red, red,
5  red.  So you have to click, and go click, and go -- that's
6  pretty much all of it.
7    Q   How long is a shift working at central control?
8    A   It's eight hours.
9    Q   Do you get any breaks?
10   A   A lunch break.
11   Q   How long is that?
12   A   30 minutes, 31 minutes.
13       (Knock on the door.)
14  BY MR. KAPITAN:
15   Q   What was your -- what was your shift time?
16   A   I was working 1400 to 2230.
17   Q   When you were working in central control, what
18  was the process regarding doing counts?
19   A   Doing count, the other officer would give me all
20  the boards.  I was in charge of getting the numbers from
21  the units.  I write down all the numbers from all the
22  units, then I give to the other officer saying, "Here is
23  what I got," and then we compare it.
24       In the meantime, I'm using -- I'm doing the
25  radio, answering phone calls, opening doors and trying to

Page 182

1  get numbers from the units.
2    Q   So you had some participation in the count?
3    A   Yes.
4    Q   Do you remember ever having emergency counts?
5    A   Yes.
6    Q   All right.  In general, not specifically
7  regarding the one on August 5th, but in general, what is
8  it like in an emergency count?
9    A   In an emergency count, once they tell us it's an
10  emergency count and we can't figure out the number, we get
11  all the people from medical, visitation, pretty much all
12  the counts.  And then we have to send everybody back to
13  the units, and we do another face-to-photo count, which is
14  a book with pictures.  We compare it, see who's missing
15  and then from there -- we go from there.
16   Q   With respect to the radio traffic --
17   A   Hm-hmm.
18   Q   -- how does that compare during a count compared
19  to when it's not a count?
20   A   Doing count, a normal count, we have no radio
21  traffic.  During emergency count, we have to try to get
22  all available officers to go here, go there, and count
23  wherever we're off and try to make sure there's nobody in
24  the kitchen, nobody in medical, nobody in visitation.
25  Double check there's no detainee left behind especially.

Page 183

1    Q   All right.  During a normal count, is there any
2  change in telephone traffic?
3    A   No.
4    Q   During an emergency count, is there any change in
5  telephone traffic?
6    A   Yes.
7    Q   What happens?
8    A   You call and see to verify who they have back
9  there.  And if we can't figure out what detainees are back
10  there and compare with their A number, then that's when we
11  send everybody back.  Pretty much telephone communication.
12  But since we don't have the telephone in the units, then
13  we have to use the radio.
14   Q   There were some questions regarding how the
15  procedure works for monitoring accessing doors, security
16  doors?
17   A   Hm-hmm.
18   Q   When someone tries to access a security door that
19  does not have a video camera, what is the process?
20   A   You hit the "select" on the screen because it
21  selects, then it goes onto the intercom, then you ask them
22  to identify.  When they identify, you unlock the door.
23  Sometimes on the screen it just shows black.  It doesn't
24  show no picture.
25   Q   Right.  And I'm asking about the doors that did

Page 184

1  not have video.
2    A   Okay.
3    Q   And when you're getting a verbal I.D, what types
4  of verbal responses are acceptable?
5    A   The last name.
6       (Pause in proceedings.)
7       THE ARBITRATOR: Back on track.
8       MR. KAPITAN: Back on the record.
9    Q   All right.  We were talking about verbal I.D.'s
10  and someone giving you the last name.
11   A   Hm-hmm.
12   Q   Are you referencing that last name against any
13  list?
14   A   No.  We don't have a list.
15   Q   How do you know that that name is someone who is
16  authorized to be in the facility?
17   A   You just assume because they are at the facility
18  they have the right to be there.  Because they have to go
19  through the front lobby in order to get back there.  So if
20  front lobby lets you in, then --
21   Q   Prior to August 5th, 2015, had you ever had,
22  while you were working in central control, ever had a
23  detainee try to access the door?
24   A   No.
25   Q   When a door -- when someone pushes a button to

Page 185

1 access a door with a video feed, now what happens on the
2 board?
3    A   I see who it is.
4    Q   How do you see who it is?
5    A   When somebody hits the intercom, the camera shows
6 just a picture of a door and who's standing by the door.
7    Q   Where does that picture show up?
8    A   On the screen in central control.
9    Q   On your board or on the monitor?
10   A   On the monitor next to it.
11   Q   How many monitors are there?
12   A   Two.  One for the person over here and one for
13 the person on the other side.
14   Q   How big are those monitors?
15   A   I will say a little bigger than that screen right
16 there on the laptop.
17   Q   Well, that won't come across too well in the
18 transcript.  So if you can judge by inches maybe.
19   A   Maybe 12 inches.
20   Q   How big is the picture that comes up on that
21 screen?
22   A   As big as the screen.
23   Q   Okay.  Is there ever smaller than the screen?
24   A   They have one that has four pictures on it.
25   Q   How long does that picture stay up?

Page 186

1    A   Seconds.  It doesn't stay up long.
2    Q   How do they come off of the screen?
3    A   Once you hit the other door.
4    Q   The next door?
5    A   The next door, yes.
6    Q   Now, getting into what happened on August 5th, do
7 you recall what happened generally on around 1630 with
8 respect to the count?
9    A   Well, why was the count off?  What is your
10 question?
11   Q   Generally, do you recall what happened with the
12 emergency count?
13   A   I know that one of the units -- I want to say on
14 the three side.  I don't know if it was Bravo or Charlie.
15 One of the units was off on the numbers.  We couldn't --
16 every time we get somebody in there to count, it was
17 always off, a different number every time.  So I know I
18 was on the radio, and I was calling intake because their
19 bodies were -- they had bodies in intake.  I was calling
20 intake, and then -- and then on the radio trying to get
21 somebody else to go back in that unit to recount to see if
22 we can get matching numbers.  Because every time somebody
23 was going in there, it was something different.
24   Q   How busy was it at that time?
25   A   It was pretty busy.

Page 187

1    Q   Do you remember Detainee Irias trying to access
2 any doors?
3    A   No, I don't remember.
4    Q   At all?
5    A   At all.
6    Q   Do you remember Mr. Anderson communicating with
7 you about Detainee Irias?
8    A   No.
9    Q   When was the first time you noticed something was
10 up with Detainee Irias?
11   A   When Sergeant Hutchinson told me on the radio.
12   Q   You heard something over the radio?
13   A   Hm-hmm.
14   Q   There was testimony that you went out on FMLA
15 leave?
16   A   Hm-hmm.
17   Q   Why did you go out on FMLA leave?
18   A   Because I was already having complications prior
19 to that, and they -- I don't know because of the whole
20 incident.  I don't know if it was stress or something, and
21 it was just -- I know this is too much information, but I
22 started spotting, so the doctor didn't want me to go back
23 due to the stress of the job.
24   Q   When did the doctor tell you that?
25   A   On the -- I went in at I want to say 1:00 or 2:00

Page 188

1 in the morning that day of, which was the next day, the
2 6th.  And that's when she gave me a note to not go back.
3    Q   Are you currently working?
4    A   Yes, I am.
5    Q   Where are you working?
6    A   I am a supervisor for the Legrand Warehouse in
7 Rancho.
8    Q   How long have you worked there?
9    A   A year.
10   Q   Have you tried to work in security at all?
11   A   No.  I tried, but I can't get nothing.
12       MR. KAPITAN:  If I can have just one minute,
13 please.
14       Nothing further for the witness.  Thank you very
15 much.
16       THE ARBITRATOR:  Cross?
17       MR. MINER:  Rob, is this your final witness for
18 the day?
19       THE ARBITRATOR:  Let's go off the record.
20       (Off the record.)
21       THE ARBITRATOR:  Let's go back on.
22       MR. MINER:  No questions for the witness,
23 Mr. Arbitrator.  Thank you.
24       THE ARBITRATOR:  Thank you very much.  You're
25 excused.

SANTIAGO 119

Page 189

1   Anything, Mr. Kapitan?
2       MR. KAPITAN: If I could have just one second to
3   clarify I think we're okay.
4       THE ARBITRATOR: Sure.
5       MR. KAPITAN: Union rests.
6       THE ARBITRATOR: Gentleman --
7       MR. MINER: Mr. Arbitrator, we request the
8   opportunity to brief the case.
9       THE ARBITRATOR: I was assuming that. You too,
10  Mr. Kapitan?
11      MR. KAPITAN: Yes, please.
12      THE ARBITRATOR: Let's establish a date when we
13  can have briefs, too.
14      MR. MINER: We propose 30 days from receipt of
15  the transcript.
16      THE ARBITRATOR: Is that okay with you,
17  Mr. Kapitan?
18      MR. KAPITAN: That's fine with me.
19      THE ARBITRATOR: And I would assume to get the
20  transcript in about two weeks; is that correct?
21      THE REPORTER: Yes.
22      THE ARBITRATOR: Okay. So you have 30 days from
23  receipt of transcript.
24      We're going to do reply briefs or not?
25      MR. MINER: I don't see the need for reply

Page 190

1   briefs.
2       MR. KAPITAN: I would assume that we would submit
3   simultaneous briefs.
4       THE ARBITRATOR: Simultaneous briefs, my reply to
5   my New Jersey address, 5 Lattimore Court, Freehold,
6   New Jersey, 07728. And then I have 30 days for a decision
7   after that.
8       MR. MINER: Mr. Arbitrator, may I propose a date
9   certain for submission of briefs to you. I see that
10  Friday, July 28th is a little bit more than 30 days out
11  from the anticipated receipt of the transcript.
12      THE ARBITRATOR: Is that okay with you,
13  Mr. Kapitan?
14      MR. KAPITAN: Yeah. If I could just check the
15  date real quick just on my calendar. I was anticipating
16  30 days from the transcript, and we would just e-mail at
17  that point what would be a submission date, but if I could
18  check the actual date.
19      MR. MINER: Thank you.
20      MR. KAPITAN: And while that -- I'm turning my
21  phone on.
22      THE ARBITRATOR: Go ahead.
23      MR. KAPITAN: While that process is -- you would
24  like a hard copy mailed to your address?
25      THE ARBITRATOR: I would like a hard copy. As I

Page 191

1   said before, from the old school.
2       MR. KAPITAN: Yes.
3       THE ARBITRATOR: I want to touch it and feel it
4   and rummage through it. It's kind of hard to do on a
5   computer page by page and make my little notes and all
6   that good stuff. So, yes, I would like a hard copy.
7       MR. MINER: Would you like copies of any
8   authorities that are cited in our briefs?
9       THE ARBITRATOR: If you feel so inclined, I'd be
10  happy to have it.
11      MR. MINER: Okay. You mentioned July 28th?
12      THE ARBITRATOR: Yes.
13      MR. KAPITAN: That's fine.
14      THE ARBITRATOR: July 28th it is.
15      Anything else?
16      MR. KAPITAN: One other thing real quick, on
17  July 28th -- and I'm sorry, I always get mixed up when I'm
18  going to submit the brief, and I just want to make sure I
19  have it down. The hard copies post-marked by July 28th,
20  not received?
21      MR. MINER: That's agreeable.
22      THE ARBITRATOR: Correct.
23      MR. KAPITAN: Thank you.
24      THE ARBITRATOR: Anything else?
25      MR. MINER: Nothing from me.

Page 192

1       THE ARBITRATOR: Okay. We are adjourned.
2       MR. MINER: Thank you, Mr. Arbitrator.
3       THE ARBITRATOR: Thank you.
4       (Whereupon, at the hour of 3:41 p.m.
5       the proceedings were adjourned.)
6       -oOo-

Page 193

1  STATE OF CALIFORNIA        )
                              )  ss.
2  COUNTY OF SAN BERNARDINO   )

3              I, DONNA BALL, Certified Shorthand Reporter

4  No. 11191, in and for State of California, do hereby

5  certify;

6              That on Wednesday, June 14, 2017, I did

7  report all of the testimony and proceedings in the

8  foregoing arbitration proceedings;

9              That said proceedings were taken down in

10 stenographic writing by me and thereafter transcribed into

11 typewriting under my direction;

12             I further certify that the foregoing is a

13 full, true, and correct transcript of said proceeding.

14             I further certify that I am neither counsel

15 for nor related to any party to said action, nor in

16 anywise interested in the outcome thereof.

17             In witness whereof, I have hereunto

18 subscribed my name this 7th day of July, 2017.

19

20        _____

          DONNA BALL, CSR NO. 11191
21

22

23

24

25

SANTIAGO 121

**[**

**[sic] (1)**
126:23

**A**

**ability (3)**
69:7;119:4;139:8
**able (17)**
7:16,17,19,21,22;
12:2,24;29:6;33:22;
34:4;92:1;95:8;98:13;
102:2,3,4;175:2
**above (4)**
23:22;33:1;37:23;
78:23
**absence (2)**
6:19,20
**absolutely (3)**
67:2;81:2;145:24
**accept (1)**
52:2
**acceptable (2)**
117:13;184:4
**access (111)**
7:16,17,21,25;8:18,
20,21,24;9:3,14;12:12;
13:1,7,14,15,18;20:12,
15;21:5,6,13;22:20;
24:2,10;29:6;33:14,22;
34:21;37:7;40:3,16,18;
42:5,8,9,9,14;43:24;
44:16;45:22;46:18;
49:4;56:23,24;57:3;
58:16;59:15;64:9,11;
66:15;70:14;73:20;
74:2;75:15;76:1,21;
80:23;81:18;88:9;95:8;
96:16;98:14,20;99:17,
21,23;100:3,8,9,15,19;
103:7,15;104:5;
105:15;109:21;111:11,
18;118:22;119:6;
125:1,23,24;126:3,10;
135:13,14;149:21;
150:7;152:22;157:16;
158:4,19;159:24;
161:5;162:15;165:15,
25;166:4;167:5;
171:11,16;172:19,23;
178:18,18;180:24;
183:18;184:23;185:1;
187:1
**accessed (25)**
8:4,8,25;11:19;
20:10;33:6;38:13;
40:10;44:2,14;46:17;
47:12;52:20;76:7;
99:24;100:1;123:12;
125:20,22;150:16;
156:25;165:21;166:18;

**accessing (13)**
47:20;58:20;87:20,
23;88:2,19;98:24;99:3;
107:23;114:19;126:7;
161:13;183:15
**accordance (1)**
118:23
**according (4)**
7:5;129:1,6;139:20
**account (4)**
25:22;77:16,17;
136:23
**accounts (1)**
24:20
**across (2)**
51:13;185:17
**Act (1)**
121:8
**acting (4)**
122:15,15,20,20
**action (7)**
127:4,5,8;128:5;
140:5;173:15;193:15
**actions (1)**
142:11
**activate (3)**
21:18;22:14;23:5
**activated (6)**
21:15,16;22:17;23:7;
24:1;44:25
**activates (1)**
22:10
**activating (2)**
29:5,5
**activation (3)**
21:19;23:4;38:22
**active (2)**
70:22;117:16
**activity (10)**
30:2;58:12;59:3,18;
78:11,16;103:11;
104:4,15;118:22
**actual (5)**
20:16;41:3;113:20;
119:22;190:18
**actually (24)**
23:23;33:22;35:13;
39:24;48:18;49:4;
69:10;71:6;88:11;
102:11;107:13;113:15;
114:14;119:22;125:15;
141:2;146:15;155:8;
158:24;162:4,11;
163:17;164:7;165:21
**added (4)**
10:18;119:9,9,11
**adding (1)**
120:15
**addition (1)**
25:15
**additional (14)**
7:23;80:7,14;87:14;

103:19,22;104:6,9,13,
15,21;128:18;141:21;
153:7
**address (4)**
121:20;131:2;190:5,
24
**addressed (3)**
7:14;128:2;174:12
**addresses (1)**
121:23
**Adelanto (6)**
15:6;16:16;38:20;
112:24;113:6;114:6
**adjourned (2)**
192:1,5
**admin (21)**
63:2,8,20;64:8,18;
66:9;67:5,20;79:15,16,
22;89:15;90:7;91:7,10,
14;93:21;95:9;108:4;
160:4,12
**administration (6)**
75:13;94:12;148:17;
159:19,22;160:17
**administrative (41)**
7:2;18:25;19:4,18,
25;20:4,9;34:8,9;40:2;
41:22;65:8;67:20;
79:17,19;80:1;91:13,
25;94:19,24;98:14;
100:18;117:9,15,19,23;
118:4,7,10,11,21;
119:4,5;121:2,17;
123:19;140:14,16;
160:6;161:2;163:18
**administrator (2)**
80:2;127:18
**admission (1)**
51:3
**admit (1)**
11:18
**admitted (1)**
10:23
**advancing (3)**
47:4,10,10
**advised (1)**
114:18
**affirm (4)**
14:11;112:10;146:1;
175:17
**AFTERNOON (5)**
3:5;12:18;120:6;
159:17;165:5
**again (49)**
15:3;22:7,13;28:18;
30:3;32:19;33:5;35:3;
38:10;42:8,12;43:5,11,
20;44:25;45:3,13,15;
46:14,15;53:3,4,21;
54:18,25;56:14;58:19;
60:3;62:22;74:22;83:1,
3;87:7;89:9;97:3;
101:1;109:19,20;

118:2;122:8;123:17,
24;125:22;126:2;
157:1,11;164:10;
170:11;174:14
**against (3)**
108:10;158:16;
184:12
**agency (1)**
16:23
**agents (1)**
24:20
**ago (2)**
114:8;164:22
**agree (1)**
64:3
**agreeable (1)**
191:21
**agreed (2)**
6:7;119:12
**agreement (1)**
9:4
**ahead (14)**
47:6;82:16;98:3;
99:18;110:14,21;
124:10;142:24;145:21;
153:24;162:7;168:20;
170:21;190:22
**alert (3)**
13:1;21:16;35:15
**alerted (4)**
31:9;44:18;101:11,
21
**alerts (2)**
22:19;70:22
**Alex (1)**
127:23
**allow (8)**
20:12;21:5;22:13;
33:24;42:9;99:15;
118:20;174:24
**allowed (7)**
9:2;10:21;11:5;
62:24;66:15;95:2;
108:16
**allowing (3)**
13:20;88:9;138:11
**allows (1)**
13:14
**alluded (1)**
173:14
**almost (2)**
13:8;35:22
**along (2)**
64:6;116:9
**alongside (1)**
48:16
**always (12)**
13:6;64:14,15;92:7,
8;94:25;111:13;147:3;
160:24;162:2;186:17;
191:17
**AMERICA (1)**
2:9

**among (4)**
7:8;9:6;30:2;101:1
**amount (9)**
29:13;30:1;69:6;
72:13;135:1;152:6;
153:2;156:12;157:5
**ANDERSON (22)**
3:8;14:6,8,16,23,25;
15:4;51:1;52:5;61:15,
20;82:15;105:11;
106:17;107:17;114:16;
136:18;137:13;139:23;
161:9;167:15;187:6
**Anderson's (3)**
141:8;174:5,21
**angle (1)**
158:25
**angles (1)**
159:1
**announced (1)**
20:5
**announcement (5)**
33:10,13;47:19;
161:8,10
**answered (2)**
98:18;111:19
**anticipate (1)**
131:13
**anticipated (1)**
190:11
**anticipating (1)**
190:15
**anymore (1)**
175:10
**anywise (1)**
193:16
**Apart (3)**
6:24;31:16;120:19
**apologize (4)**
60:11;90:14;133:14;
144:19
**apparently (3)**
39:4;48:6;87:18
**appeal (1)**
162:21
**appear (1)**
43:22
**APPEARANCES (1)**
2:1
**appearing (1)**
21:22
**appears (6)**
38:1;50:2;126:25;
130:6;169:12;170:8
**appreciate (1)**
50:16
**apprehend (2)**
32:13;49:14
**apprehended (5)**
34:24;35:5,11,19,23
**apprehending (1)**
7:25
**approach (2)**

32:18;39:8
**approached (1)**
40:1
**approaching (4)**
32:19;33:4;39:9;
100:4
**appropriate (6)**
9:21;13:24;60:3;
123:1;130:19,19
**approximately (10)**
22:4;27:23;74:25;
113:21;120:5;122:16;
134:8,10;138:20;
176:11
**April (7)**
6:17,20;15:13;16:10;
129:6,15;176:12
**Arbitrate (1)**
145:17
**arbitrating (1)**
141:5
**ARBITRATION (2)**
1:1;193:8
**ARBITRATOR (154)**
1:2;2:13;5:,,,4;6:4,
12;7:14;9:8,24;10:5;
14:4,7,8,18,19;24:17;
36:12,17,21;50:12,24;
51:5,8,9,10,15;52:2;
57:1,5,10;59:11,25;
60:2,5,10,12,16,19,22,
25;61:3,4,5,8,11;72:25;
97:14,17,20,25;98:3,4;
99:8,15;105:6,25;
106:2,10,18,24;107:5,
8;110:21;111:1,23;
112:2,6,7,9,17;122:6;
124:2,3,6,10,22;125:8;
130:21,23;131:3,5,8,
10,11,15,18,21;141:14;
144:4,5;145:8,10,13,
16,19,24;146:8;
163:23;168:12,14,19;
170:18,19,21;171:6,8,
14,20,23;172:5,8,12;
173:4,6,8,11,21,23;
174:13,16,23;175:8,16,
24;184:7;188:16,19,21,
23,24;189:4,6,7,9,12,
16,19,22;190:4,8,12,
22,25;191:3,9,12,14,
22,24;192:1,2,3
**area (24)**
10:12;20:12;41:17;
48:17,18,20;76:12;
92:2;96:22;118:14,21;
119:7,11;123:15,19;
125:25;131:12;138:12,
13,19;152:7;153:13;
154:7;162:3
**areas (7)**
20:14;56:10;59:13,
16;72:23;73:2;75:11

**argue (1)**
130:18
**argument (3)**
174:23;175:11,12
**A-r-i-a-s (1)**
66:21
**Aritrator (1)**
5:6
**Arizona (1)**
2:6
**arose (1)**
104:20
**around (9)**
12:17;62:8;79:10;
134:8;150:15;158:3;
159:16;160:7;186:7
**arrivals (1)**
48:22
**arrive (2)**
17:14;49:24
**Article (2)**
9:4,21
**ASEG (3)**
160:16,22;163:17
**Aside (1)**
75:10
**aspects (2)**
116:4;128:16
**assault (2)**
67:8;101:13
**assaulted (1)**
102:11
**assaults (2)**
24:20;67:14
**assign (1)**
104:21
**assigned (27)**
25:8;57:25;69:15,19;
77:11,12,15;78:11,15;
79:1;80:7,14;89:4;
91:14;104:13;128:9,
17,22,25;138:18;
140:11,13;141:3;
145:3;147:7,10,17
**assigning (1)**
19:7
**assignment (1)**
144:24
**assist (2)**
104:10;105:2
**assistant (5)**
15:23,25;127:17;
136:11;167:17
**assisting (1)**
126:13
**assume (6)**
14:4;143:19,23;
184:17;189:19;190:2
**assuming (2)**
60:21;189:9
**assuring (1)**
8:8
**Atlantic (1)**

16:15
**attached (1)**
115:14
**attempt (5)**
7:1,13;30:5;36:4;
59:2
**attempted (3)**
24:24;124:25;125:1
**attention (1)**
149:4
**attorney (2)**
6:10;150:1
**attorneys (2)**
135:13;160:8
**audible (1)**
40:13
**audio (7)**
8:20;22:22;34:18,20;
40:15;44:21;45:2
**August (63)**
6:16,18,25,25;10:17,
18;24:11;26:21;52:11;
53:4,14;54:4,14,25;
55:7,9,15;58:1,12;
69:14;70:1,2;75:22,24;
76:5;79:9;80:11;82:22;
88:22;89:14;90:7,13;
91:2;95:19;102:18;
105:21;113:18;117:22,
25;126:7;129:2,10;
130:8;134:11,15;
140:9;147:2;150:25;
151:18;152:23;153:25;
161:4;164:12,12;
165:2;167:9;169:3;
177:20,24;178:2;
182:7;184:21;186:6
**Augusts (1)**
114:8
**authorities (1)**
191:8
**authority (1)**
125:25
**authorized (15)**
8:9;13:7;103:18;
108:1,12,24;109:2,10,
13,21;110:3;113:7,15;
158:14;184:16
**automatically (2)**
170:2;172:3
**available (7)**
36:14;42:17;44:23;
169:12;182:22
**AW (1)**
15:22
**award (1)**
14:1
**aware (15)**
30:4;32:21;38:25;
69:16;88:1;102:21;
103:6;114:12,22;
121:12;122:14;136:10,
13;143:8;145:4

**away (7)**
9:17;11:11;96:24;
145:23;167:21;172:20,
25

**B**

**back (48)**
14:1;16:12;34:6;
38:24;50:8,15;60:8,10;
61:11;71:5;74:4;76:14;
82:16,17,18,19;85:14;
92:5;112:6;113:18;
114:21;131:21;150:14;
155:22;156:19;157:2,
12;158:11;159:25;
162:12,19;167:7;
168:8;169:23;171:8;
173:11;180:3;182:12;
183:8,9,11;184:7,8,19;
186:21;187:22;188:2,
21
**background (2)**
18:22;67:24
**bailiff (4)**
146:24;147:4,7,13
**BALL (3)**
1:22;193:,3
**banging (1)**
101:21
**bank (1)**
161:22
**bargaining (1)**
113:13
**base (2)**
82:4;118:17
**based (7)**
18:20;51:19;69:5,6;
104:7;107:10;123:10
**basic (1)**
9:19
**basically (4)**
73:23;122:18;147:6;
149:3
**basing (2)**
69:8;124:15
**basis (8)**
10:6,10;11:20;92:22;
124:7;147:18,18;
179:17
**bathe (1)**
37:8
**bathing (1)**
92:4
**bathroom (1)**
150:8
**bears (2)**
11:21;13:16
**beating (1)**
101:24
**became (3)**
27:8;114:12,22
**become (3)**

30:4;70:22;128:15
**becomes (2)**
13:8;169:12
**bed (2)**
26:8,10
**beds (1)**
117:23
**began (2)**
129:17;138:22
**begin (4)**
27:18;69:9;127:10;
175:2
**beginning (1)**
147:20
**begun (2)**
27:19
**behavior (2)**
9:11;102:7
**behind (5)**
8:1;33:9;47:9;
170:14;182:25
**belabor (1)**
141:1
**belief (2)**
69:5,6
**believes (2)**
13:23;125:10
**belong (1)**
45:16
**below (7)**
37:11,18,19;41:11;
42:22;127:18;128:6
**BERNARDINO (1)**
193:2
**Besides (2)**
43:23;106:5
**best (2)**
129:9;148:5
**better (2)**
80:19;158:11
**beyond (4)**
41:15,16,16;45:15
**bid (1)**
147:9
**big (6)**
71:18,24;157:12;
185:14,20,22
**bigger (1)**
185:15
**bit (8)**
94:14;102:1;132:18;
134:10;151:3;152:12;
161:19;190:10
**Black (6)**
116:15,16;127:23,
25;128:1;183:23
**bless (1)**
72:24
**block (1)**
165:25
**blue (2)**
18:11;106:9
**blueprint (4)**

22:12;70:11,18,20
**blueprints (1)**
    22:7
**board (22)**
    21:17;22:2,3,4,12;
    70:6,19;71:2,12;72:9;
    80:19;90:2;103:11;
    149:21;150:6;154:1;
    156:22;157:6,15;
    180:23;185:2,9
**boards (13)**
    21:4;28:25;29:2,5;
    30:15;33:1,2;40:20;
    84:6,10;105:3;151:3;
    181:20
**bodies (3)**
    26:1;186:19,19
**body (1)**
    134:24
**bond (1)**
    48:23
**bonded (1)**
    48:25
**book (2)**
    155:24;182:14
**boom (1)**
    171:22
**boss (1)**
    157:19
**both (11)**
    30:10;49:8;65:25;
    66:3;91:13;94:11;
    122:11;134:1;140:13;
    146:15;179:21
**bottom (8)**
    37:6,13;43:7,7;
    78:10;127:19;163:6;
    169:25
**box (2)**
    72:2;169:24
**brain (1)**
    8:6
**Bravo (1)**
    186:14
**breaches (1)**
    116:24
**break (15)**
    11:12;36:16;60:4;
    61:9;72:16;76:17,17;
    89:21,24;97:16;
    111:25;112:3;145:21;
    149:18;181:10
**breaking (1)**
    177:12
**breaks (13)**
    76:19,24;88:23;
    89:10,12;93:14,16;
    134:25;135:1,3,4;
    151:22;181:9
**brief (2)**
    189:8;191:18
**briefed (1)**
    154:21

**briefly (1)**
    107:17
**briefs (7)**
    189:13,24;190:1,3,4,
    9;191:8
**bring (6)**
    21:20;48:21;79:7;
    131:4;141:12,13
**brings (3)**
    70:11,15;175:1
**broadened (1)**
    119:2
**brought (3)**
    77:22;161:25;178:11
**bubble (5)**
    149:5,6,13;152:4;
    163:10
**building (11)**
    72:21;79:22;80:5;
    108:2,13,25;109:3,11,
    21;110:3;125:20
**built (2)**
    38:24;117:20
**bunks (1)**
    153:14
**burden (1)**
    73:22
**business (2)**
    81:3;131:7
**busy (7)**
    148:4,7;179:8,19,22;
    186:24,25
**button (17)**
    22:17;49:4;70:14;
    123:20,24;124:20;
    149:10;150:9;156:17;
    159:9;161:25;162:8;
    165:23,24;166:2,18;
    184:25
**buttons (3)**
    40:19;123:18;150:7
**buy (1)**
    72:2
**buzzed (1)**
    13:12
**buzzes (1)**
    13:8

**C**

**cadets (1)**
    113:16
**calendar (1)**
    190:15
**California (4)**
    1:20;6:1;193:1,4
**call (35)**
    31:12;33:15,16;
    35:13,13,15;46:11;
    48:24;67:23;68:3,4;
    81:19,25;82:8;85:23;
    86:23;110:16;119:6;
    123:17,20,24;124:20;

138:11;145:22;149:1,
    4,11,16;152:3,3,3;
    158:10;167:1;179:23;
    183:8
**called (15)**
    11:11;14:17;31:8;
    32:4;86:18;112:16;
    114:14,15;146:7;
    150:4;153:20;162:13;
    166:19,20;175:23
**calling (10)**
    81:13;82:14;83:2,24,
    25;86:10;179:23;
    180:11;186:18,19
**calls (20)**
    14:6;20:24;29:24;
    81:23,23,24;84:15;
    104:5,5;112:7;133:2;
    148:19;175:14;179:12;
    180:2,12,15,16,21;
    181:25
**calm (2)**
    101:25;102:3
**came (8)**
    18:23;24:18;32:15;
    147:19,23;150:15;
    165:10;166:20
**Camelback (1)**
    2:5
**camera (14)**
    23:22,24;37:11,18,
    19;39:24;41:11;71:9;
    159:2,11;165:20;
    166:3;183:19;185:5
**cameras (1)**
    82:19
**can (69)**
    13:2;22:2,6;24:17;
    25:20;26:1,1,1,2,3,3;
    41:24;43:5;49:3;50:7,
    10;68:2;71:20,21;
    72:16;73:8;86:3,15;
    90:11;94:14;96:1;
    101:18;103:13;104:17;
    109:3,13,21;111:25;
    112:2;116:6;117:17;
    122:6;124:4;125:21;
    127:14;129:7;131:14;
    132:20;133:11;141:4;
    142:23;144:8;145:7,
    23;148:1,5;149:9,10,
    10;150:23;161:20;
    165:24;166:2,4,4,21;
    171:22;172:10;174:19,
    22;185:18;186:22;
    188:12;189:13
**capability (6)**
    23:12,14,20,25;
    34:16,18
**capable (1)**
    111:16
**capacity (1)**
    167:11

**Captain (5)**
    15:18,19;35:15;
    55:12,13
**card (1)**
    26:6
**care (4)**
    104:1;109:22;167:7;
    174:2
**career (1)**
    16:12
**carefully (1)**
    144:22
**case (33)**
    6:15,16;9:9,13;
    11:20;13:17,19;17:9,
    18;50:14;51:13;94:25;
    95:1;99:2;113:11;
    116:21;120:8;121:13,
    21,23;122:13;123:7;
    129:2;130:13;135:21;
    137:6;139:11;141:5,
    13;173:23,24;175:5;
    189:8
**cases (6)**
    17:7;21:20;23:1,8,
    10,23
**Castaneda (1)**
    162:18
**categorical (1)**
    9:5
**categories (2)**
    106:4,4
**cause (2)**
    6:8;9:22
**caused (1)**
    104:21
**causes (1)**
    121:7
**CBA (3)**
    116:4,5,9
**cease (2)**
    33:10,17
**cell (13)**
    26:8;66:10;74:7,15,
    21,24;92:2,5;94:22;
    101:9;119:13;138:9;
    153:14
**cells (3)**
    66:16;119:14,15
**center (15)**
    12:6,6;16:16;56:5,
    15;68:2,3;73:17;
    139:17;143:2;144:23;
    150:12;154:4;159:23;
    177:3
**Centers (1)**
    144:18
**central (167)**
    8:4,5,11;20:11,18,20,
    21;21:13,17,17,19,23;
    22:13,17;23:5;24:1,9;
    25:2,3,8,10;26:20;
    27:21;28:5;29:24;

30:10,18;31:13;32:1;
    35:17,20;39:13,16,18,
    22,23;40:11,13;42:8;
    44:5,18,24;45:5;47:12,
    13;49:6;57:2,6,25;
    58:16,18;68:5,6,8,24;
    69:13,19,25;70:23;
    72:5,7,7;73:13,14,20;
    74:2;76:8;77:7,11,15,
    18,22;79:1;80:14,17,
    18;81:2,4,4,14,16,21;
    82:8,13,14,15,18;
    83:25;84:1,9,17,21;
    90:5;96:8;99:24;100:2;
    103:5,20,23;104:14,23;
    106:16;108:9,18,21,23;
    110:13;111:9,12;
    126:4,6,8;128:18,21,
    22;132:11;133:21;
    134:2,5;139:19;
    142:13,21;145:3;
    147:15,20,24;148:1,21;
    149:11,24;150:18;
    151:3;152:25;154:1,6,
    14,14,23;157:14,22;
    159:7;161:18;162:9,
    13;164:4,8,11;165:11,
    15;168:7;169:12;
    170:13;177:13,14,19,
    25;178:10,14;179:5,9,
    17,24;180:22;181:7,
    17;184:22;185:8
**certain (8)**
    9:5;22:7;64:20;
    66:13;116:5;135:1;
    180:17;190:9
**certainly (1)**
    13:24
**Certified (1)**
    193:3
**certify (3)**
    193:5,12,14
**change (34)**
    63:19;64:12,13,16;
    79:12,15;89:5,8;
    120:21;132:14,20;
    134:21;135:10;137:18,
    19,20;147:10;152:15;
    154:13;156:10,12,13;
    157:25;159:15,16,18,
    20,21;160:3;168:4,11,
    25;183:2,4
**changed (5)**
    64:10;154:20;168:2,
    5,6
**changes (11)**
    19:25;20:5;38:25;
    63:15;64:7;78:12;
    118:13;134:12;138:3,
    20,22
**changing (1)**
    118:15
**chapel (2)**

45:15,16
**characterization (1)**
125:16
**charge (3)**
25:23;80:18;181:20
**Charlie (1)**
186:14
**check (7)**
82:18;108:10;
150:13;158:15;182:25;
190:14,18
**checkpoint (4)**
123:13,21,23;124:1
**Cheryl (1)**
127:22
**Chief (11)**
15:20,21;127:15;
144:18,22;145:4;
147:20,21;154:21;
164:8;180:14
**chow (1)**
177:12
**circumstances (1)**
52:18
**Cisneros (1)**
162:10
**cited (1)**
191:8
**clarification (1)**
87:11
**clarified (1)**
172:13
**clarify (5)**
98:22;99:17;151:8;
153:24;189:3
**clarifying (3)**
124:4;136:3;150:23
**classic (1)**
9:8
**classification (6)**
7:7;17:16,17,19;
18:1;62:13
**classifications (6)**
61:25;62:4,18;64:23,
24,25
**classified (3)**
10:19;17:10,16
**classify (1)**
17:13
**clean (1)**
173:18
**clear (6)**
20:7,7;82:18,19;
110:6;141:2
**cleared (1)**
83:16
**clearing (1)**
83:13
**clearly (1)**
9:22
**clerks (1)**
159:22
**click (18)**

40:19;158:22;
169:13,20,21;170:2,6,
6,8,11,12;171:18,20;
172:2,20,24;181:5,5
**clicking (3)**
171:10,24;172:18
**clip (5)**
40:21;41:11;43:4;
45:6,9
**clips (5)**
36:13,23;48:10;
50:13;58:23
**clock (2)**
159:25;160:6
**close (1)**
134:23
**closed (2)**
6:21;8:1
**closer (2)**
31:16;109:16
**closing (2)**
45:7;174:24
**clothing (1)**
18:9
**clue (1)**
80:4
**coffee (1)**
157:24
**collapse (1)**
89:25
**collapsed (2)**
90:1,3
**collect (2)**
36:6,9
**collected (1)**
50:19
**collects (1)**
133:1
**color (3)**
18:9,11;106:3
**color-coded (1)**
7:5
**colors (1)**
106:5
**combined (3)**
65:12;75:6;91:10
**coming (14)**
29:24;46:3;48:12;
62:10,12,22,23;83:13;
94:11;107:6;119:13;
150:3;167:23;180:21
**command (5)**
68:24;72:7;80:15,17;
84:18
**commands (1)**
50:3
**commences (1)**
155:12
**comment (1)**
122:18
**commingle (1)**
119:14
**Commissary (1)**

108:6
**committed (1)**
135:23
**common (3)**
69:24;81:7;92:1
**commonly (1)**
121:8;123:22
**communicate (7)**
10:24;11:2;82:5;
149:17;156:20,21;
179:18
**communicated (1)**
148:24
**communicating (1)**
187:6
**communication (4)**
22:16;83:19;136:18;
183:11
**communications (3)**
82:11;137:24;180:9
**Community (1)**
16:15
**COMPANY (45)**
5:2;6:10;10:19,23;
11:16,21;13:16;14:4,6,
17;17:25;18:5;50:23,
25;51:7;53:10;54:16;
55:22;56:13,20;57:13;
61:1,2,6;78:4,13,19,22;
85:8;90:9;92:24;93:3;
112:16;113:24;115:3,
10;121:20;125:12;
126:20,23;128:2;
129:21;135:17;140:21;
141:9
**Company's (2)**
13:19,22
**compare (4)**
181:23;182:14,18;
183:10
**compared (1)**
182:18
**comparison (1)**
83:3
**competent (2)**
111:15;133:12
**compiled (1)**
115:23
**complain (1)**
13:10
**complaints (2)**
135:13;152:19
**complete (2)**
143:22;154:7
**completed (8)**
26:5;84:3;92:3,4;
104:24;117:21;118:7;
143:22
**complicated (1)**
165:23
**complications (3)**
179:1,3;187:18
**complied (1)**

59:21
**complies (1)**
78:5
**component (3)**
22:22;23:1,4
**comprises (1)**
28:14
**computer (4)**
71:23;72:1,2;191:5
**concerned (2)**
38:21;103:12
**concluded (1)**
6:21
**concurred (1)**
128:7
**condition (1)**
102:24
**conduct (17)**
11:7,12,24;12:1,2,5,
23;36:1;69:3;101:11;
122:2,25;139:4;154:3;
155:16;156:7;167:8
**conducted (15)**
12:19;25:24,25;
51:18;69:10;89:11;
126:14;132:15,18,23;
135:9;139:9;145:2;
153:11;171:3
**conducting (4)**
29:9,21;138:23;
142:8
**confident (1)**
133:12
**confirm (3)**
25:16;66:25;141:4
**confirming (1)**
28:6
**conflicts (1)**
135:12
**confuse (1)**
64:24
**confusion (2)**
47:15;167:14
**connection (1)**
122:1
**consent (1)**
50:5
**consider (2)**
122:2;175:11
**considered (1)**
137:18
**considering (1)**
121:25
**consisted (2)**
29:6;119:7
**constant (7)**
148:4,4,4;150:4,10;
172:4;181:1
**constantly (3)**
13:3;179:9;181:4
**construction (2)**
63:25;118:6;119:7
**consult (1)**

174:18
**contact (4)**
32:16;34:5;69:22;
84:1
**contacted (1)**
85:21
**contain (1)**
51:12
**contains (2)**
10:14,14
**continue (3)**
14:1;39:6;125:21
**CONTINUED (1)**
4:1
**continues (1)**
45:16
**continuous (1)**
148:12
**continuously (3)**
13:14;177:19;178:1
**contract (2)**
143:15,20
**contractors (2)**
108:5;157:19
**contracts (1)**
16:24
**control (229)**
8:5,11;11:9,13,13;
12:1,3,6,6,9,20;13:1,
10;20:11,18,20,21,25;
21:2,13,17,17,23;
22:14,18;23:5;24:2,9;
25:2,3,11;26:20;27:22;
28:5,14;29:24;30:10,
18;31:13;32:1;35:17,
20;37:4,17;39:13,19,
22,23;40:12,13;41:15;
43:14;44:5,24;47:12,
13;49:6;56:5,15,22,24;
57:2,6,6;58:1,16,18;
65:2,3,17,23;66:2,3,6;
67:12;68:2,3,5,6,8,10,
19;69:14,19,23;70:1,
23;71:16;72:5,7,8,12;
73:10,13,14,15,16,17,
21,21;74:1,2;75:18,25;
76:8,11,14,18,22,23;
77:7,11,18,23;79:2;
80:18;81:3,4,14,16,21;
82:8,13,15,18;83:18,
25;84:1,2;87:24;88:22;
90:1,5,21;96:9;97:4;
99:25;103:5,20,23;
104:14,23;106:11;
107:2;108:9,18,21,23;
110:13;111:13;126:4,
6,8;128:18,22,22;
132:12;133:17,21;
134:2,5,12,15;139:16,
19;142:14,21;143:2;
144:18,23;145:3;
147:15,24;148:1,21;
149:6,10;150:12,18;

151:4,13,17,19,24;
152:4,6,22,25,25;
153:2,6,25;154:1,4,6,
14,15,24,24;156:18;
157:14;159:7;161:18;
162:9;163:10,11,13,15;
164:4,8,11;165:11,15;
168:7;169:12;170:13;
177:14,25;178:10,14;
179:5,9,17,24;180:22;
181:7,17;184:22;185:8
**controlled (9)**
8:5;20:11,12,14,14;
35:3;41:17;73:15;
150:18
**controlling (8)**
29:7;57:3;76:6;81:5;
84:6,10;105:3;151:20
**controls (1)**
73:18
**convalescent (2)**
176:18;177:3
**conversation (2)**
35:6;88:18
**coordinated (1)**
18:9
**copies (2)**
191:7,19
**copy (14)**
60:12,13,18,19,21;
90:10;108:11;131:13,
14;144:20;173:18;
190:24,25;191:6
**corner (1)**
169:25
**corporate (2)**
127:23,23
**correctional (2)**
16:12,15
**corrections (3)**
16:11,13,14
**correctly (4)**
19:23;27:20;129:11;
154:11
**correspondence (1)**
7:11
**corridor (14)**
7:23;20:15;30:8;
31:1,3;40:25;42:6;
43:1,3,15;45:11,24;
96:4;126:1
**corridors (1)**
59:4
**COUNSEL (5)**
2:1;106:3;112:18;
175:25;193:14
**count (131)**
12:12,15,20,23;
16:18;25:17,18,20,22,
24,25;26:1,2,3,4,5,12,
13,16,18,21,22,23;
27:4,5,7,8,9,18,19;
28:7,12,13,14;29:9,10,

14,21;59:7,9,22;74:15,
19;77:17;79:2,5;80:10;
82:24;83:5,6,6,8,17,20;
84:3,5,13,15,18,19,22;
95:12,16,18;104:10,11;
106:21;109:3,4;
126:14;132:15,17,22;
133:3,4,5,13,18,22;
135:5,8,15;153:11,12,
16;154:3,9,14;155:1,3,
4,8,11,11,17,21,23,25;
156:2,8,9,23,24;157:8,
8,10;158:7,11,12;
159:21;160:2;165:4;
171:3;181:19;182:2,8,
9,10,13,18,19,20,20,21,
22;183:1,4;186:8,9,12,
16
**counted (3)**
153:15;155:7,23
**counting (1)**
29:20
**counts (9)**
28:18;78:12;83:3;
153:9;158:9;164:18;
181:18;182:4,12
**COUNTY (1)**
193:2
**couple (14)**
10:16;13:2,6;33:21;
80:24;97:15;102:17;
105:25;119:9,10;
121:1;131:19;154:18;
179:22
**course (5)**
37:8;60:2;66:14;
89:21;96:21
**Court (12)**
2:;83:15;144:1;
146:24;149:14;150:2;
153:13;156:2;160:8,9;
162:11;190:5
**courts (2)**
109:8;159:19
**covering (1)**
151:22
**covers (2)**
91:13;128:11
**Cranberry (1)**
2:
**create (1)**
110:8
**created (2)**
9:20;11:8
**credibility (3)**
174:5;20;175:12
**criminal (2)**
18:22;176:23
**criteria (2)**
116:6;143:4
**critical (3)**
117:4,5;122:8
**cross (5)**

28:15;50:15;131:10;
163:23;188:16
**Cross-Examination (6)**
3:10,17;4:5;61:18;
132:4;164:1
**cross-examine (1)**
51:20
**CSR (2)**
1:22;193:
**cuff (1)**
50:3
**culinary (1)**
83:14
**curious (3)**
106:18,19;136:4
**current (5)**
19:12,12;64:14;
75:20;160:13
**currently (18)**
14:25;15:1,4,6;
16:18;17:21;18:24;
84:17;112:23;113:7;
118:20;132:18;134:7;
146:19,24;147:7;
152:13;188:3
**custody (2)**
19:10;67:19
**Customs (3)**
17:2,3;118:16
**cut (1)**
89:10
**cuts (2)**
82:25;83:2

## D

**daily (2)**
120:1;147:18
**dangerous (1)**
9:20
**dark (2)**
37:13;106:8
**Darmandzhyan (1)**
55:16
**date (17)**
8:12;89:6;91:15;
102:14;129:14,15;
152:17;154:19;169:3;
176:11,11,13;189:12;
190:8,15,17,18
**dated (4)**
53:4;54:13;55:7,15
**Davis (2)**
147:21;164:8
**day (63)**
7:1;12:15,25;16:18;
24:13;25:9;64:2;66:13,
14,15,16;80:22;81:12,
14;84:7;90:10;92:17;
93:21;100:14,16,19,22;
101:5;106:22;112:5;
118:23;119:6,6,11,16,
18,19,23,25;120:1,2,

20;138:9,10;140:13;
143:3;148:14,17,20;
149:25;160:7,10;
163:19;165:12;167:14,
22,25;168:1;179:19,20,
22;180:2,17,25;188:1,
1,18;193:18
**days (6)**
103:14;189:14,22;
190:6,10,16
**deal (2)**
11:21;30:1
**dealt (1)**
101:15
**decease (2)**
33:10,17
**decide (1)**
136:4
**decided (3)**
78:13,19;137:24
**decision (10)**
6:23;77:25;78:2,22;
116:10,20;123:4;
135:1,15;190:6
**decision-making (1)**
78:23
**defense (1)**
11:20
**definitely (3)**
64:5;75:8,8
**definitive (3)**
70:5;74:8,23
**degree (1)**
176:24
**delay (1)**
129:7
**delivery (1)**
177:2
**demonstrate (1)**
51:24
**demonstrating (1)**
102:6
**departing (1)**
99:4
**Department (6)**
16:25;17:1;68:22;
127:9,17,21
**Depending (5)**
62:22;71:20;81:25;
155:18;160:7
**depends (4)**
149:25;154:10;
158:25;160:10
**describe (8)**
22:2;25:20;36:24;
43:5;56:6;106:5;
132:20;148:5
**described (3)**
45:13;68:23;70:6
**DESCRIPTION (1)**
5:2
**designated (1)**
67:5

**designation (1)**
147:8
**desk (5)**
72:3,4;81:15;161:22;
180:20
**Desoto (1)**
54:23
**detail (5)**
12:13;54:3;87:13;
94:14;95:24
**detailed (2)**
10:9;54:9
**details (4)**
54:18;87:17;162:21;
167:22
**detainee (103)**
7:16;8:23;10:19;
11:5,16,24;12:5,11;
13:15,17;18:10,12,16;
19:7,13,24;14,15,18,
22;26:6,9,17;30:8;
31:2,5,10;32:9,16,19;
33:5;34:5;38:9,13;
39:3;42:4,4;43:20;45:22;
46:12;47:5,8;48:12;
49:3,14;50:1,8;54:14,
25;64:24;66:18;67:3,
14,18,22;76:7;85:4;
86:1;87:20;91:23;92:1;
94:18,21;95:1;96:6,16;
100:23;105:12,15;
114:6;117:4;121:14;
122:9;125:23,23;
136:5;137:3;142:5;
153:17;156:1;158:7,8,
11;159:5;160:22;
161:5,13,24;162:14;
163:4,20;165:15,21;
166:4,13,18,20;178:18,
18,18;182:25;184:23;
187:1,7,10
**detainees (54)**
7:8;12:15;17:4,6,10,
13,14,25;18:1,6;19:6;
25:22;29:11;37:7;
38:18;48:22;62:1,7,24;
63:1,3;67:12;69:23;
85:25;92:18;100:11,
15,24;101:1,8;106:5;
117:8;118:20,24;
119:5,5,12;120:9,22,
24;121:4;135:14;
138:4,16;153:12;
155:6;156:5,7;160:12,
21;165:6;178:20;
180:12;183:9
**detainees' (1)**
155:25
**detainee's (1)**
165:25
**Detention (11)**
5:;10:10;15:7;16:16;
64:25;112:24;118:18;

119:5;138:17;177:7,8

**detentional (1)**
128:10

**determination (7)**
6:21;18:17,20;
122:24;123:1,3;133:24

**determine (4)**
17:19;18:19;19:11;
124:5

**determined (3)**
93:7,12;125:19

**determining (1)**
17:18

**dictate (2)**
81:3;133:24

**difference (4)**
62:9,16,18;63:13

**differences (1)**
62:3

**different (36)**
8:23,24,24;9:14;
11:12;61:25;62:4;
64:22;65:2;68:4;73:4;
98:22;99:16;100:24,
24,25,25;101:4;106:3,
4;119:16;123:13;
128:11,15,16;132:24;
133:2;147:4,8;159:1,
18;174:19;179:10;
180:17;186:17,23

**differentiated (2)**
64:7;161:2

**digital (1)**
23:6

**dinner (2)**
135:9;177:12

**Direct (9)**
3:9,16;4:4,10;14:21;
73:23;112:21;146:12;
176:3

**directed (1)**
50:7

**directing (2)**
49:8;84:11

**direction (8)**
47:18,22,24;122:19;
137:16,17,20;193:11

**directions (2)**
56:19;83:10

**directive (9)**
35:10;49:11,13;
56:19;83:24;137:23;
154:22;167:18,23

**directives (3)**
32:11;49:16;83:10

**directly (2)**
15:18;37:11

**director (1)**
127:21

**discharge (3)**
6:5,6,8

**disciplinaries (1)**
122:11

**disciplinary (20)**
20:4;63:20;64:8,18;
65:7;67:10,16;94:21,
22;118:10,12;127:4,5,
8,10;128:5;140:5;
156:6;161:3;173:15

**discipline (10)**
13:23;43:11;91:7,10,
13;123:1;135:20;
138:24;142:1;173:19

**disciplined (1)**
162:25

**discovered (1)**
27:14

**discrepancy (7)**
12:18;26:24,25;
27:13,16;155:9;156:3

**discretion (2)**
49:9;79:8

**discuss (2)**
52:22;130:15

**discussed (1)**
119:4

**discussion (5)**
35:6,9;50:2;52:17;
70:17

**dismissal (3)**
116:7,12;123:4

**dismissed (1)**
9:23

**dispute (3)**
8:14,16;11:18

**disregard (1)**
9:19

**disruptions (1)**
101:15

**disruptive (1)**
101:14

**distinction (2)**
64:18;142:20

**distribution (1)**
11:11

**divided (2)**
101:1;118:8

**dividing (2)**
20:2;64:1

**division (1)**
20:8

**doctor (2)**
187:22,24

**document (17)**
52:7;55:24,25;57:19,
20,21,23;68:19;115:4;
127:1,8,12;133:3;
141:9;174:2,7,9

**documentation (3)**
28:20;115:25;116:9

**documented (2)**
68:17,21

**documents (11)**
5:;50:25;51:2,12;
66:22,24;115:5,7,9,11;
174:25

**done (10)**
42:11;79:3,18;83:11;
132:22;133:6;135:5,7;
144:9;157:9

**DONNA (3)**
1:22;193:,3

**door (206)**
7:16,18,20,25;8:24;
11:6;13:2,15,18;20:11;
21:14,15;22:10;23:22,
23,24;24:10;33:6,9,23,
23,24;34:3,4;37:21,23;
38:2,13;39:9,25;40:1,4,
7,10,17,18,20;41:1,2,3,
3,5,10,13,14,14,16,18,
18,21;42:5,5,8,9,12,14;
43:10,10,12,12,25;
44:2;45:7,12,14,23;
46:14,15,16;47:8,9,11,
12,22;48:2,8,9,12,17,
18;49:5,13,25;58:17;
70:15,23;71:3,6,13,13;
80:23;81:18;87:20,23;
88:2,3,9,11,13,19;
92:13,19;95:5,6,8;96:6,
11,13,16,17;97:3,9;
98:14,20,24,25,25;
99:3,3,5,5,24,25;100:8,
9;101:21,24;103:7;
104:5;105:16;106:11,
15;110:17;111:9;
123:12,14,18,21,23,25;
125:22,24;126:2,3,4;
136:8;149:22;150:7,9,
13,14;153:1;157:16,
20;158:2,4,19,22;
159:3,8,10,11,12;
161:13,24;162:9,12,16;
163:5;165:16,21,22;
166:4,10,12,18,22;
167:3;169:20,22;
170:2,6,12,14;171:1,
10,11,21,24;172:18,19,
20,23,24;180:24;
181:13;183:18,22;
184:23,25;185:1,6,6;
186:3,4,5

**doors (118)**
8:3,4,8,17,19,22,25;
9:3,15,17;11:19;12:12,
21;13:4,7;21:4,6,8,9,
11,12;23:12,14,15,17;
29:6;33:11,15;34:7,10,
11,14,23,24;35:2,3;
38:15,18;43:1,2,13,14,
16,21;47:19,21;49:9;
52:20;57:7;58:20;66:9,
10,14;70:21;72:11,14,
18;73:9,12;74:6,7,10,
15,21,24,25;75:16;
76:1,6,22;81:6;83:2;
96:24;97:1,2;107:23;
111:18;114:19,20;

**doorways (1)**
12:11

**dorms (1)**
177:11

**double (4)**
43:2,13;123:23;
182:25

**doubled (1)**
118:8

**doubt (1)**
125:7

**down (32)**
14:9;22:6;31:3;37:6;
42:22;43:20;45:16;
47:4;50:1;57:22;72:16;
81:15;82:25;83:2;
89:10;92:2;93:3;96:3;
101:21,25;102:3,12;
114:20;124:1;152:11;
154:1;159:6;167:13;
179:25;181:21;191:19;
193:9

**drastically (1)**
83:2

**dressed (1)**
7:6

**due (8)**
26:23;76:16;91:24,
25;104:24;130:7;
178:20;187:23

**Duran (1)**
122:14

**duration (1)**
27:9

**During (58)**
17:15,17;26:15,21;
28:23;29:10,14,23;
44:6;51:2;59:2,22;
63:24,25;64:5;66:13;
68:15;78:11,15;79:2,5;
80:7,22;82:21,24;83:6,
8,17,20;84:5,18,19,24;
103:5,6,18;104:15;
115:1;126:10;130:25;
131:6;138:1;147:3;
148:14,17;153:11,12;
156:2,9,22;157:7;
158:8;159:21;164:18;
182:18,21;183:1,4

**duties (11)**
11:10;12:1;80:17;
81:8;123:11;134:17;
143:6;151:4;157:13;

121:9;125:2,20;126:7,
11,16;136:12;137:8;
148:6;149:24;150:16,
18,22,23;151:14,20,24;
152:6,22;153:1,8;
154:2;156:25;158:20;
159:25;161:6;163:11,
12;169:25;170:3;
172:2;179:25;181:2,4,
25;183:15,16,25;187:2

**doorways (1)**
12:11

**door (206)** (continued above)

**167:7;179:10**

**duty (4)**
57:6;79:19;82:7;
116:6

**DVD (1)**
60:12

---

# E

**earlier (8)**
45:13;98:23;100:7;
113:24;118:9;121:4;
123:17;133:8

**easier (1)**
23:15

**East (6)**
2:5,11;19:24;147:22;
165:23;180:11

**effect (6)**
118:5;120:13,16;
122:19;134:22;135:10

**effective (1)**
14:2

**egregious (1)**
9:8

**eight (6)**
12:3;31:18,19;143:3;
178:23;181:8

**eighth (1)**
53:10

**eight-hour (2)**
68:16;79:25

**either (8)**
71:21;86:11,19;
128:20;138:17;140:18;
154:6;167:5

**electronically (2)**
21:6,9

**elements (1)**
128:11

**elicited (1)**
131:12

**Elimination (1)**
121:8

**Elizabeth (4)**
1:7;4:9;175:22;
176:7

**E-l-i-z-a-b-e-t-h (1)**
176:8

**else (14)**
25:3;93:22;134:5;
149:14;160:3;165:7;
167:24;172:1;174:22;
178:17;180:14;186:21;
191:15,24

**else's (1)**
149:4

**e-mail (1)**
190:16

**Emanuel (1)**
7:12

**emergency (40)**
12:12,19,23;26:23;

27:7,9;80:8,10;83:5,6,
6,8,17,20;84:18,19;
95:15;154:25;155:3,4,
11,16,21;156:2,9,23,
24;157:10;158:6,9,11,
12;164:18;182:4,8,9,
10,21;183:4;186:12
**employed (8)**
15:1,5,6;25:7;53:8;
112:23;146:19;176:9
**employee (2)**
114:6;127:6
**employment (1)**
6:22
**encompassed (1)**
72:17
**end (6)**
10:24;35:3;41:1;
97:2;133:5;166:23
**ended (2)**
107:6;114:20
**Enforcement (2)**
17:3;118:16
**enough (5)**
18:4;54:9,19;131:8;
164:24
**ensuing (2)**
45:15;48:13
**ensure (2)**
83:15;89:10
**ensuring (1)**
28:7
**entail (1)**
82:10
**entered (3)**
27:21;47:8;137:14
**entering (2)**
46:6;152:6
**entire (7)**
11:13;51:4;74:2;
75:2;113:5;144:15,16
**entirely (1)**
160:15
**entrance (3)**
42:5;49:24;90:5
**equipment (2)**
8:18;159:24
**error (5)**
13:19;98:11,12;
117:4,5
**Errors (2)**
13:16;95:7
**escape (7)**
7:1,13;24:24;30:4;
36:4;59:2;155:15
**escort (4)**
34:5;102:4;122:21;
138:15
**escorted (7)**
34:6;92:5;94:18;
114:21;122:17;125:25;
138:13
**escorting (1)**

120:21
**escorts (2)**
62:9,10
**especially (1)**
182:25
**ESQ (2)**
2:,10
**essentially (8)**
12:14;70:8;72:11;
76:14;80:19;124:16;
138:8;157:15
**establish (5)**
174:3,8,19;175:2;
189:12
**establishing (1)**
173:19
**estimate (1)**
73:8
**even (11)**
78:20;80:25;81:17;
83:7;103:10;114:14,
16;155:20;159:10;
160:2;164:9
**evening (1)**
91:21;114:13;
135:15,16
**event (7)**
35:14,16;76:9,13;
79:4;155:13;163:1
**events (3)**
6:18;116:8;122:3
**everybody (7)**
17:8;83:16;150:10;
153:15;159:23;182:12;
183:11
**everyone (4)**
12:16;108:12;
143:18;156:3
**everyone's (1)**
108:24
**Everywhere (2)**
147:14,15
**evidence (3)**
10:23;122:1;124:13
**exact (5)**
64:2,2;152:17;
154:19;169:3
**exactly (4)**
63:24;64:2;120:18;
162:20
**Examination (17)**
3:9,11,12,16;4:4,6,
10;14:21;98:6;105:9;
107:15;110:11;112:21;
146:12;170:23;172:15;
176:3
**example (4)**
150:11;155:19;
156:5;157:7
**Except (1)**
51:21
**excerpt (1)**
144:14

**exchange (1)**
7:11
**exclaimed (1)**
88:12
**excuse (4)**
9:18;15:1;54:21;
90:14
**excused (2)**
111:24;188:25
**Exhibit (25)**
50:23,25;51:4,7;
52:6,25;57:13;60:14;
61:2;78:4;85:8;93:3;
113:24;115:3,10;
121:20;126:20,23;
129:6,24;135:17;
143:1;144:3,7,8
**EXHIBITS (1)**
5:1
**existence (1)**
129:17
**exit (1)**
96:24
**exited (1)**
42:22
**exiting (4)**
7:18;9:18;99:4;
152:7
**exits (1)**
168:8
**expanded (4)**
118:12;120:10,11,14
**expect (1)**
13:11
**expectations (1)**
56:19
**expected (2)**
58:17;81:21
**experience (11)**
40:12;58:8,8;78:25;
103:14;105:12;110:25;
111:5;129:1;143:5;
165:14
**experienced (1)**
133:12
**explain (5)**
95:25;122:6;129:7;
151:2;160:16
**expressed (1)**
10:7
**extent (1)**
51:11
**exterior (2)**
57:7;72:20
**extra (4)**
77:18;135:2;153:4,5
**eyes (1)**
153:4

**F**

**face (3)**
26:5;96:12;155:24

**face-to-photo (5)**
26:3,5,15,18;182:13
**facilities (1)**
8:2;73:4;118:19
**facility (118)**
7:3,4,8,23;8:3,5,6,7,
18;9:6,10,18;10:11,13;
11:17;12:10;13:2;15:7;
16:5,15,21,24,25;
17:11,13;18:2,15;19:1,
5,5,19,20,22,24;20:10;
21:1,3,7;22:7,8,11;
26:15;28:15;29:7,17,
19;34:25;36:10;38:16;
56:11;57:4,8,18;58:17,
21;59:4,14,16;62:5,8;
70:12;72:15,19,20;
74:1,3;75:11;81:4,5;
82:6;83:2,14;100:12;
112:24;113:3,5,16;
114:6,14;115:22;
116:22;117:11,20,20;
118:7;119:3;121:12;
126:15;127:18;128:9;
137:8;146:25;147:5,
19,21,23;148:7,19;
149:3;150:4;151:5,7;
152:7;153:1,13;
156:25;157:12;158:1,
3;160:1;161:1;164:9,
13;165:24;166:1;
180:11;184:16,17
**facility's (1)**
26:14
**facing (1)**
149:7
**fact (6)**
13:9;51:18;67:22;
69:8;124:19;173:16
**factors (2)**
11:23;17:18
**facts (3)**
6:25;8:14,16
**failed (1)**
9:13
**failure (1)**
11:16
**failures (1)**
122:4
**Fair (8)**
18:4;67:14,17;80:25;
89:13;95:7;131:8;
164:24
**fairly (2)**
154:20;161:18
**faith (1)**
134:24
**familiar (14)**
16:3;18:25;24:15,23;
114:1,4,7,10;115:7,15;
117:7,7;128:16;160:13
**familiarization (1)**
114:5

**family (1)**
165:6
**far (8)**
31:14;38:21;82:10;
88:17;132:21;136:25;
142:16;159:20
**fast (4)**
152:9;153:19;
154:10;158:23
**February (2)**
135:11;178:4
**FedEx (2)**
176:18;177:2
**feed (7)**
21:21;23:8;71:7,11,
18;96:9;185:1
**feel (3)**
85:19;191:3,9
**feeling (2)**
178:24;179:2
**feet (2)**
31:18,19
**felt (3)**
79:6;116:10;141:22
**female (1)**
69:20
**few (8)**
61:22;95:11;98:1,22;
100:10;120:15;132:8;
163:24
**fifth (1)**
52:5
**figure (4)**
156:1,6;182:10;
183:9
**file (1)**
124:9
**final (1)**
188:17
**finally (2)**
7:22;57:12
**finding (1)**
137:10
**fine (3)**
60:5;189:18;191:13
**finger (1)**
158:21
**finish (2)**
45:6;97:20
**first (28)**
14:5;16:13,14;22:19;
40:3;41:11;43:10;
45:12,25;54:8,19;93:6;
109:6;115:4,9;117:17,
21;123:18,20;128:1;
145:22;147:19;163:5;
170:14;176:5,7;
177:10;187:9
**firsthand (1)**
50:11
**fit (1)**
66:16
**five (13)**

35:21;36:12;65:21;
72:17,17;74:9;97:19;
149:25;150:16;153:6;
156:5;164:17;181:2
**five-minute (2)**
111:25;112:3
**flash (3)**
158:20,21;169:13
**flashing (1)**
70:22
**flat (2)**
22:5;70:9
**flaw (1)**
89:19
**floor (5)**
65:17;66:1;91:23;
104:2;138:18
**FMCS (1)**
1:
**FMLA (4)**
129:12,17;187:14,17
**follow (2)**
118:16;172:10
**following (5)**
8:9;115:4;129:10;
135:9;137:12
**follows (6)**
14:17;61:16;112:16;
132:2;146:7;175:23
**follow-up (3)**
98:2;110:8,20
**food (2)**
11:11;108:7
**footage (7)**
37:3;44:4;46:1;
58:22;114:23;141:22;
162:20
**force (1)**
128:12
**foregoing (2)**
193:8,12
**forget (2)**
162:23;167:21
**forgot (2)**
154:13;163:3
**form (8)**
127:4,5,9,10;128:5;
140:6,21;173:15
**forth (2)**
104:6;157:12
**found (5)**
26:24;106:21;
114:19;136:23;178:2
**Foundation (1)**
59:8
**Four (29)**
8:23,24;9:14,14;
11:19;12:15;16:6;
17:21;26:2;29:18;
34:13;52:20;71:21,22,
22;72:5;73:12,16;74:9,
13;96:21;114:20;
115:4;119:8,23;130:2;

137:7;164:17;185:24
**fourth (6)**
7:25;45:9;126:2,25;
128:4;157:3
**frame (3)**
37:13;38:6;42:23
**frankly (1)**
174:2
**Frederick (1)**
2:
**free (4)**
100:15;119:14;
138:4,5
**Freehold (2)**
2:15;190:5
**frequent (1)**
81:1
**frequently (1)**
100:21
**fresh (1)**
98:10
**Friday (1)**
190:10
**front (5)**
81:14;85:8;180:20;
184:19,20
**full (2)**
71:23;193:13
**full-time (2)**
176:17,20
**function (3)**
8:7;9:19;121:5
**further (17)**
12:13;31:16;54:3,18;
61:16;105:24;107:12,
15;110:11,23;132:2;
145:9,12;172:15;
188:14;193:12,14
**future (1)**
7:14

---

## G

**gain (2)**
7:21;40:3
**gained (1)**
7:25
**gathered (1)**
124:9
**gave (5)**
61:23;94:3;122:19;
167:18;188:2
**general (10)**
114:5;117:12,13;
118:23;121:6;128:13;
132:13,13;182:6,7
**Generally (15)**
24:7;62:12;68:9;
69:20;79:23;82:24;
103:13;106:14;132:12;
149:19;151:4;154:11;
160:6;186:7,11
**generated (1)**

28:16
**Gentleman (1)**
189:6
**gentlemen (3)**
6:4;107:10;141:14
**GEO (19)**
1:4;2:3;15:7;16:23;
28:16;53:8;56:1;112:7;
115:20;145:2,17;
146:22,23;147:1;
174:7;176:9,16,17;
177:6
**GEO's (1)**
38:15
**gets (2)**
157:18;174:21
**given (6)**
18:9;47:22;106:13;
110:2;111:14;143:13
**gives (3)**
54:3,18;108:15
**giving (9)**
45:2;76:19;83:10;
88:23;89:21,24;118:3;
180:1;184:10
**glad (2)**
51:23;60:14
**God (1)**
72:24
**goes (12)**
18:17;79:17;95:15;
96:20;128:10;148:20;
150:8;159:20;172:20,
25;174:5;183:21
**good (11)**
6:12;14:23,24;60:23;
78:21;111:22;128:17;
134:23;164:17;179:2;
191:6
**GOVERNMENT (2)**
2:9;16:23
**grabbing (1)**
100:4
**gradually (1)**
120:14
**Grand (1)**
122:18
**great (5)**
11:21;30:1;41:24;
54:11;91:24
**grew (1)**
120:14
**grievance (6)**
9:22;13:25;130:11,
25;131:6;168:17
**Grievant (3)**
1:7;6:19;13:25
**grounds (1)**
9:5
**GROUP (3)**
1:4;2:3;15:7
**groups (3)**
119:13,14,17

**guard (1)**
7:10
**guess (1)**
110:8
**guide (1)**
118:18
**guys (1)**
84:2

---

## H

**half (10)**
117:24;119:16,18;
147:25;151:5,5,6;
154:12;155:20;160:18
**halfway (1)**
37:13
**hall (1)**
7:20
**hallway (31)**
11:25;30:8;31:3,5,
10;32:10;33:6;35:4;
42:10;45:16;46:8,12,
15;48:13,14;49:25;
85:4,25;86:1,1;88:1,7,
10;96:20;97:2,10;
107:3;123:15,25;
159:2,6
**hallways (1)**
100:11
**hand (8)**
14:10;50:22;104:1;
112:10;145:25;154:2;
172:3;175:16
**handcuffed (5)**
160:21,24,24,25;
161:1
**handcuffs (1)**
161:25
**handed (1)**
144:7
**hand-held (2)**
82:3,5
**handing (1)**
91:21
**handle (3)**
149:8;150:25;152:1
**handling (3)**
82:9;151:24;179:16
**handwritten (1)**
104:25
**hanging (2)**
106:24,25
**happen (6)**
92:20;111:5,8;166:7,
14,15
**happened (24)**
11:22;13:19;32:14;
33:8,19;85:21,23;
105:18;130:25;131:5;
153:21,22;159:13;
161:16;162:15,20;
166:16;167:25;168:1;

169:2,3;186:6,7,11
**happening (7)**
38:12;39:7;44:1;
47:13;49:6,21;161:5
**happens (19)**
10:11;13:5,17,18;
20:23;24:6;48:20;
69:24;70:25;71:10;
80:24;81:2;153:11;
155:21;158:23;167:6;
170:9;183:7;185:1
**happy (2)**
10:9;191:10
**hard (8)**
109:19,20;118:17;
190:24,25;191:4,6,19
**Harris (16)**
25:5,6,7;28:9,11;
30:14;33:14;49:9;84:6;
126:12,13;138:24;
139:2,13,16;168:1
**hazardous (1)**
9:11
**Head (2)**
127:17;162:10
**heading (2)**
42:25;43:1
**health (2)**
19:17;102:23
**hear (6)**
8:2;40:13,14;130:25;
131:3;161:9
**heard (4)**
17:9;136:17;139:21;
187:12
**hearing (2)**
6:5,6;60:15;83:8;
115:1
**hearsay (1)**
51:12
**heartbeat (1)**
20:21
**held (1)**
17:10
**hell (1)**
88:12
**help (2)**
103:13;104:15
**Helping (2)**
28:20,21
**hereby (1)**
193:4
**here's (1)**
156:15
**hereunto (1)**
193:17
**Hesperia (2)**
1:20;6:1
**Hey (4)**
47:17;84:2;162:14;
180:3
**high (24)**
17:23,24;18:12,12,

14,16,18;24:21,21;
62:1,1,8,13,17,18,25,
25;63:3,3,9,9;104:15;
106:6,8
**higher (1)**
180:13
**highest (1)**
7:7
**highly (1)**
144:23
**high-risk (4)**
7:2;8:23;9:15;10:20
**Highway (1)**
2:
**himself (2)**
11:5;157:20
**history (7)**
18:19,20,21,22;67:8;
117:17;118:4
**hit (14)**
23:24;38:10;40:5,8;
43:24,24;46:16;49:4;
71:2,4,10;169:19;
183:20;186:3
**hits (3)**
22:11;70:14;185:5
**Hm-hmm (23)**
49:12;70:7,13;72:10;
80:21;90:19;96:5,7;
98:21;101:6;118:1;
140:3;145:20;155:2;
170:7;171:2;176:21;
179:13;182:17;183:17;
184:11;187:13,16
**hold (4)**
58:3;135:1;146:23;
180:14
**home (4)**
79:17;176:18;177:2,
3
**Homeland (1)**
16:25
**honest (1)**
89:6
**hour (19)**
100:20,21,22,22,23,
24,25;101:4;119:16,16,
18,18;120:9;122:16;
154:12;155:12,20,21;
192:4
**hours (21)**
68:9,12,12,14,20,23;
79:10,24;80:11;
119:23;128:10,13;
135:8,12;143:3,3,14,
22;147:10;148:17;
181:8
**house (2)**
16:18;83:16
**housed (1)**
16:19
**houses (1)**
19:5

**housing (48)**
10:14;20:3,15;29:8;
34:6;37:4,5;40:25;
42:6;62:12;73:6,8,11,
14,15,16;74:10;75:1,2,
4,5,10,14,16,18,25;
76:18,22;82:17;83:18;
84:2;88:21;89:14;
134:12,16;147:16;
149:1,6,7,10;151:13,
14,16,19;152:2,21;
156:18;157:1
**HR (2)**
115:24;127:20
**hub (1)**
81:4
**Human (5)**
115:24,24;116:13;
127:24;128:12
**hundreds (7)**
72:14,14,17;75:8,9,
11;109:17
**Hurtado (1)**
162:19
**Hutchinson (9)**
32:7;50:7;54:12,18;
85:2,24;87:13;161:8;
187:11
**Hutchinson's (1)**
86:16

## I

**ICE (18)**
17:1,1;24:20;79:15,
16;80:3,4,4;94:12;
102:11;108:4;118:15;
119:2;157:19,20,21,23;
159:19
**icon (6)**
21:16;23:5,7;71:1,2,
7
**icons (4)**
22:13;70:20,21;
169:23
**ID (6)**
106:12,12;107:18;
110:2;158:15;184:3
**idea (3)**
79:16;107:5;148:2
**identification (13)**
5:4,6,11;8:10;24:8;
40:16;44:21;45:2;51:8;
61:3;110:18;124:20;
144:4
**identified (3)**
24:8,9;26:10
**identifies (2)**
157:20;173:16
**identify (13)**
24:2,3;26:6;40:9,14,
23;58:20;106:16;
125:18;127:3,14;

183:22,22
**identity (3)**
8:21;9:1;13:11
**ID's (1)**
184:9
**illness (1)**
121:7
**illuminate (1)**
70:21
**illustration (1)**
101:18
**image (12)**
44:23;169:11,18;
170:5,8;171:8,14,15,
16;172:18,19,24
**images (1)**
95:23
**imagine (3)**
9:2;12:14;13:2
**immediate (1)**
116:7
**immediately (5)**
35:22;63:6;129:10;
132:16;135:9
**Immigrants (1)**
17:6
**Immigration (3)**
17:2,3;118:16
**impact (2)**
29:13;122:2
**implemented (1)**
118:25
**important (1)**
85:19
**inadvertently (1)**
167:2
**inattention (5)**
9:7,9,9;116:5;123:11
**inaudible (1)**
108:19
**INC (2)**
1:4;2:3
**inches (3)**
71:25;185:18,19
**incident (53)**
6:15;8:12;10:16;
24:13,23;26:21;36:7;
39:15;44:6;50:18;53:5;
54:4,20;77:3;79:9;
84:5,24;87:19;91:3,17;
102:16;103:6,19;
105:14,18;109:19;
114:7,11,13,13,23;
117:7;121:12,13;
122:1;129:2,8,11;
130:7;132:14;151:18;
152:17,20;154:19;
161:12,14,17;166:12;
167:13;169:2;170:25;
177:16;187:20
**inclined (1)**
191:9
**include (6)**

19:13;74:7,18;85:16,
20;87:8
**included (5)**
74:24;81:9;85:6;
87:7;162:24
**includes (1)**
143:5
**including (6)**
9:6;24:20;56:9,10;
74:14;76:3
**inclusive (1)**
91:11
**incoming (2)**
20:24;81:24
**increase (1)**
148:15
**increases (1)**
148:16
**INDEX (2)**
4:1;5:1
**indicate (2)**
18:14;128:4
**indicating (1)**
7:7
**indirect (1)**
69:22
**individual (12)**
9:2;10:20;13:14;
18:10;24:2,9;32:13;
38:1;54:4;65:6;98:24;
120:8
**individuals (9)**
8:9;13:9,15;50:20;
62:16;91:3,9;111:15;
128:6
**individual's (1)**
17:18
**influx (1)**
104:22
**information (14)**
10:9;26:7;27:2;54:9,
20;84:16;139:5;
141:22,23;149:11;
156:19;174:22;179:25;
187:21
**informed (1)**
8:16
**infraction (6)**
115:22,23;116:2,11;
127:6,7
**initial (2)**
114:12,22
**initially (1)**
114:12
**initiate (2)**
27:7;116:22
**inmate (7)**
7:2,6;9:15,17;18:18;
30:25;114:8
**inmates (3)**
7:4;16:17;120:20
**inmate's (1)**
9:15

**inputted (1)**
105:1
**inside (4)**
38:1;73:11,14,15
**installed (1)**
20:6
**instance (5)**
62:7;65:1;101:18;
102:10;170:13
**instead (2)**
135:15;140:23
**institution (5)**
20:22;57:9;114:15;
123:16;128:16
**institutional (1)**
80:7
**instructed (1)**
33:24
**intake (22)**
17:15,15;48:13,15,
17,18,20,21;49:5,25;
73:2;75:12;84:15;
96:17,22;97:10;
102:12;104:22;150:3;
186:18,19,20
**interact (2)**
119:3;122:22
**interacted (1)**
102:18
**intercom (24)**
21:16,18;22:11,15,
19,23;23:24;24:1;
34:20;40:5,8;42:12;
43:24;44:14,15,25;
46:16;49:4;149:9;
152:2;156:17;170:1;
183:21;185:5
**interested (1)**
193:16
**interior (2)**
57:7;72:19
**intermix (1)**
62:25
**INTERNATIONAL (1)**
2:
**interview (1)**
142:3
**interviewed (5)**
138:25;139:2,14;
141:17;142:9
**interviews (1)**
139:9
**into (61)**
10:21;11:17;12:13,
18;18:17;20:12,15,16;
29:24;30:15;37:9,10,
16;38:22;41:4,15,22;
42:6,9;43:2,14;45:23;
48:13,18;49:5,24;68:2;
77:22;85:24;90:5;95:2,
15;96:20;97:3;104:14;
114:21;115:23;117:4;
119:11;120:14;122:9;

123:15,15,25;126:1;
131:13;134:5;136:23;
137:14;138:12,23;
148:6;150:11;158:1;
167:8;168:16;175:10;
177:13;180:22;186:6;
193:10
**introduce (1)**
173:17
**invariably (1)**
13:6
**investigation (17)**
6:20;36:3;50:19;
51:18,25;61:6;115:23;
126:9;129:17;130:7;
138:1,23;139:3,4,9;
142:8;167:8
**investigative (4)**
122:11;124:9;139:5;
141:20
**involved (4)**
11:10;36:3,7;50:19
**involves (3)**
6:15,16;12:14
**involving (4)**
24:13;114:8;121:13;
161:13
**I-r (1)**
66:22
**Irias (82)**
10:19;11:15;12:11;
24:14,17,18,24;30:5;
31:2;32:16,20,22;33:5;
34:5,7,23,24;35:5,10,
19;38:9,13;39:4;40:1;
42:4,11,22;43:20;
44:15;45:22;46:1,8;
48:12;49:3,15;50:1,8;
54:14;55:1;58:24,25;
66:19,19,19,20;67:3,5,
22;76:7;87:20;91:23;
95:2;96:6,16;98:12;
99:3;101:16;102:6;
105:12,15;106:21;
107:2;114:8,18,21;
122:9,15,20;123:23;
124:25;136:5;142:3,5;
159:6;161:5,13,24;
162:14;163:4;187:1,7,
10
**Irias' (3)**
36:10;42:17;101:11
**irrelevant (1)**
174:14
**issuance (1)**
129:8
**issue (9)**
6:7;89:16;101:20;
130:22;166:20;173:14;
174:20;175:1,10
**issued (2)**
136:11;140:6
**issues (5)**

6:24;11:4;89:13;
101:14;166:24

**J**

**JAMES (10)**
3:15;112:8,15;
116:15,16;127:19,22,
25;128:1;132:1
**JANECKA (12)**
3:15;16:2,3;35:14;
51:2;112:8,15;127:19;
132:1,6;144:7;180:13
**Jersey (3)**
2:15;190:5,6
**Jimmy (4)**
24:14,17;122:9,15
**job (7)**
9:19;15:10;16:13,14;
101:25;128:14;187:23
**jobs (1)**
177:4
**Johnson (5)**
15:20,21;127:16,16;
180:14
**joint (1)**
129:6
**Josh (1)**
127:16
**Joshua (1)**
127:16
**judge (1)**
185:18
**July (15)**
118:6,25;119:19;
120:20;138:20,22;
161:3;176:12,14;
190:10;191:11,14,17,
19;193:18
**June (3)**
1:16;6:1;193:6
**jurisdiction (1)**
14:1
**justice (1)**
176:23

**K**

**KAPITAN (121)**
2:10;3:4,10,12,17;
4:4,6,10;9:25;10:1,5;
36:18,20;50:9,16;
51:11,21;59:8;60:3,7,
13,17,18,21,24;61:12,
13,19;73:1;78:7;85:15;
86:5,9;90:12,16,19;
91:1;97:13,19,23;99:7,
9,14;105:7,10,23;
107:13,16;110:6,20,24;
111:3,4,19;124:2,4,7,
15,18;125:6,9;130:3,
20,22;131:11,17,22,23;
132:5;141:7,15;

143:24;144:2,6;145:6,
9,11,19,20;146:9,10,
13;152:8,11;163:21;
168:12,15;170:20,24;
171:5;172:10,13,16;
173:2,12,22;174:1,17;
175:1,6,13;176:1,4;
181:14;184:8;188:12;
189:1,2,5,10,11,17,18;
190:2,13,14,20,23;
191:2,13,16
**Keefe (5)**
108:5,6;157:24,24;
158:3
**keep (1)**
11:14
**Kelley (2)**
2:18;127:24
**key (1)**
8:7
**keys (2)**
150:14;159:24
**kind (14)**
10:17;26:21,22;
47:16,22;62:6;109:19;
136:10;148:24;149:2;
157:19;165:23;177:8;
191:4
**kinds (1)**
180:15
**kiosk (1)**
119:10
**kitchen (4)**
83:14;156:5;159:19;
182:24
**knew (4)**
92:24;137:16,17;
167:23
**Knock (1)**
181:13
**knowingly (2)**
9:2;10:20
**knowledge (17)**
17:8;50:9,11;59:10;
68:18;69:9,18;101:10;
121:11;124:8,12;
129:19;150:21;152:16;
161:12;162:25;166:5
**knowledgeable (1)**
58:5
**known (3)**
39:3;40:24;48:13

**L**

**labor (2)**
9:4;113:8
**lack (2)**
59:21;80:19
**Ladies (1)**
6:4
**laid (1)**
22:8

**laptop (2)**
36:13;185:16
**large (2)**
104:22;119:8
**largest (2)**
10:11,12
**last (26)**
7:11;16:18,18;26:18;
48:10;58:23;104:19;
106:14;107:20;108:21,
24;110:4;114:7;
124:19;132:17;146:14;
162:15;166:16,17;
173:13;175:14;176:5,
7;184:5,10,12
**lasted (1)**
27:13
**Lattimore (2)**
2:;190:5
**law (2)**
83:15;119:10
**layer (2)**
9:10,11
**layers (1)**
123:13
**laying (2)**
22:6;70:9
**layout (5)**
22:3,4,12,12;70:18
**lead (9)**
11:4,16,24;23:18;
33:6;37:16;41:14;43:2;
97:4
**leading (6)**
7:20;40:2;43:14;
95:8;98:14;99:9
**leads (14)**
37:21;39:9;41:1,3,
22;46:14;48:17,18;
96:20;97:3,10,10;
150:12;174:1
**least (6)**
8:15;28:3;32:3;63:6;
71:25;149:24
**leave (19)**
6:19,20;34:11;50:14;
92:2,10,18,19;111:20;
121:9;129:13,18;
174:16,24;175:8;
180:12,21;187:15,17
**leaves (3)**
79:22;148:20;160:9
**leaving (8)**
7:16;34:8,9;93:16;
98:12;117:8;120:24;
160:8
**led (2)**
95:7;137:8
**left (15)**
7:8,15;11:13,25;
12:20;30:18;37:6;38:6;
39:3;43:10;98:12;
121:14;162:1;165:10;

182:25
**left-hand (1)**
43:7
**legal (1)**
127:23
**Legrand (1)**
188:6
**leisurely (1)**
7:19
**LEONARD (2)**
1:2;2:14
**less (14)**
20:21;31:18,19;
35:21;36:14;56:18;
73:23;82:23,24,25;
83:7;103:15;164:21;
181:2
**lets (1)**
184:20
**letting (1)**
119:4
**level (18)**
7:5;17:19;18:10,12,
14,16,18;19:13,16;
24:21;58:11;59:3,17;
62:24;63:6;104:4;
115:22;116:22
**levels (2)**
17:20;106:8
**Lewis (1)**
127:20
**library (2)**
83:15;119:10
**Lieutenant (24)**
14:6,25;15:4,14;
36:23;37:2;38:12;
45:10;51:1;52:4;82:15;
94:12;106:17;114:16;
122:13,14,18;133:4;
152:3;162:19;163:17;
167:14;168:7;178:12
**lieutenant's (2)**
163:18;175:12
**likewise (1)**
123:7
**limited (1)**
153:2
**Lindino (1)**
127:23
**line (8)**
16:14;22:16;47:2;
65:3,24;66:1;83:19;
90:21
**list (6)**
108:9;158:14;
169:24,25;184:13,14
**lit (1)**
170:3
**litigating (2)**
173:18;175:4
**little (20)**
54:3;71:8;94:14;
102:1;117:17;119:14;

120:17;132:18;134:10;
151:2;152:11,12;
155:24;157:18;161:19;
169:24;181:3;185:15;
190:10;191:5
**LITTLER (1)**
   2:4
**live (3)**
   21:21;39:13;44:5
**lobby (2)**
   184:19,20
**LOCAL (3)**
   1:6;2:8;113:10
**located (1)**
   45:3
**location (5)**
   21:19,21;35:25;
   70:15;132:24
**locations (1)**
   133:3
**locked (2)**
   38:19;92:13
**log (1)**
   140:10
**logging (1)**
   104:24
**long (48)**
   15:8,12;16:5,7,11;
   19:18;26:18;27:6,13,
   24;28:1;35:17,19;
   38:20;69:25;70:1;
   95:18;96:3;100:18;
   102:16;108:15;117:15;
   118:4;119:18;120:13;
   121:11;134:9,21;
   147:1;152:16,18;
   154:9;155:16;159:2;
   169:18;171:9;172:18;
   177:24;178:6,21;
   181:7,11;185:25;
   186:1;188:8
**longer (5)**
   33:14;97:17;120:17;
   132:18;134:10
**look (17)**
   48:10;53:10;78:4;
   85:11;90:9;113:23;
   115:3;116:2,4;121:3;
   122:23;125:12;126:22;
   129:20;140:8;142:23;
   166:3
**looked (8)**
   30:6;31:2;116:8;
   122:10;123:12;137:5,
   5,19
**looking (29)**
   22:5;30:15;37:3,4,9,
   14,19,24;38:2;40:23,
   24,25;41:8,10;42:16;
   43:6,14;45:10,11;
   55:25;56:13;73:24;
   140:5,20;141:9;

149:23;158:25;171:11;
178:19
**looks (2)**
   41:5;43:23
**loosely (1)**
   64:23
**lot (5)**
   104:25;149:18,19;
   150:23;157:7
**loud (1)**
   47:17
**Love (3)**
   127:18;136:11;
   167:17
**low (19)**
   17:23,23;18:10,11;
   26:9;62:1,1,7,13,16,17,
   17,24,25;63:3,7,9;
   106:7,8
**lower (2)**
   101:2,2
**lucid (1)**
   103:3
**lunch (4)**
   93:16;112:4;135:3;
   181:10
**lunches (3)**
   89:11,12;93:14

---

## M

**machine (1)**
   131:16
**mad (1)**
   157:21
**mail (1)**
   159:22
**mailed (1)**
   190:24
**main (10)**
   7:23;30:8;31:3;
   32:10;43:1,2,15;45:11,
   24;126:1
**maintain (1)**
   57:8
**maintaining (2)**
   56:10;75:15
**majority (2)**
   21:10;133:2
**making (2)**
   28:21;39:8
**management (2)**
   11:7;113:4
**manager (1)**
   116:13
**managers (1)**
   11:3
**manning (1)**
   153:7
**many (35)**
   13:3;16:17,20;17:20;
   31:25;32:2;34:7,11,16,
   23,24;64:22;65:11,18;

72:11;73:9;74:6,12,21,
22;77:4;103:9,13;
109:2;111:1;113:6,13,
14,18;150:21;164:18,
20;172:2;180:24;
185:11
**March (1)**
   178:5
**Mariposa (1)**
   1:19
**mark (1)**
   61:1
**marked (9)**
   5:,,;50:23;51:7;61:2;
   113:24;144:3,8
**Marquez (51)**
   1:7;4:9;6:7;8:13,17,
   25;9:13;11:21,25;
   12:20;25:5;28:23,25;
   30:17;31:14;33:14,24;
   35:6;47:25;48:2;49:8,
   17;52:11,14;57:22,25;
   69:1;77:5;84:4;88:8,
   19;102:18;114:2,5;
   126:8,15;129:5,9,11,
   16;130:12;137:6;
   142:1;154:17;161:18;
   162:23;167:25;174:15;
   175:15,22;176:7
**Marquez' (4)**
   57:21;121:23;122:3;
   138:24
**M-a-r-q-u-e-z (1)**
   176:8
**Mary (1)**
   2:
**Massachussetts (1)**
   2:11
**master (6)**
   28:14;56:4,15;
   104:24;133:4;143:2
**matching (2)**
   27:2;186:22
**matter (3)**
   52:1;62:13;125:9
**may (10)**
   13:23;43:23;78:10,
   15,20;80:7;138:1,19;
   142:25;190:8
**maybe (6)**
   120:17;132:18;
   134:10;180:2;185:18,
   19
**McCusker (5)**
   15:18,19;35:15;
   55:12,13
**meal (10)**
   11:12,14;76:17;
   88:23;89:10;91:22;
   134:25;135:9,15,16
**mean (27)**
   29:4;35:21;40:7;
   63:2;68:12;74:9;79:18;

81:2;89:17,22;90:3;
93:11;94:10,15;
108:19,20;109:4,8;
111:7;133:14;136:8;
151:16;154:24;155:14;
160:16;169:21;180:19
**Meaning (5)**
   18:17;99:21,23;
   100:3,3
**meanings (1)**
   99:16
**means (5)**
   12:10;128:6;138:8;
   143:12;156:25
**meant (2)**
   99:12;100:6
**meantime (1)**
   181:24
**measures (1)**
   12:22
**mechanical (5)**
   41:2;43:13;50:4;
   62:11;94:23
**medical (20)**
   73:4;75:12;82:17;
   83:15;102:4;109:7;
   147:16;150:2;152:3;
   153:14;155:7;165:19,
   20,21;166:3,21;167:2;
   180:3;182:11,24
**medium (17)**
   17:23,23;18:11,12;
   62:1,1,13,17,17,17,25,
   25;63:7,9,9;106:7,8
**meet (2)**
   32:12;130:15
**member (9)**
   67:15;68:20;69:20;
   76:17;89:20,23;105:2;
   115:22;150:8
**members (9)**
   45:4;46:6;54:24;
   65:4,7;84:20;89:22,23;
   113:13
**memo (7)**
   52:10,14;115:15;
   128:1;136:10;167:16,
   22
**memorandum (11)**
   53:3,12,21;54:2,8,17,
   19;55:7,10,15;115:14
**memorize (1)**
   108:24
**memos (1)**
   169:7
**MENDELSON (1)**
   2:4
**mental (2)**
   19:17;121:7
**mention (2)**
   86:10,18
**mentioned (12)**
   22:2,25;82:1;87:1;

116:24;118:9;121:4;
123:17;125:20;160:3;
180:20;191:11
**merely (1)**
   173:19
**merit (1)**
   9:23
**message (1)**
   95:1
**messages (3)**
   94:7,11;180:12
**microwave (1)**
   119:10
**middle (2)**
   37:12;127:15
**might (8)**
   29:18;60:23;101:11;
   150:12;169:24;170:3
**mind (5)**
   97:15;98:10;142:20,
   23;164:25
**mine (3)**
   83:9;116:22;130:3
**MINER (90)**
   2:;3:3,9,11,16;4:5;
   6:12,15;10:7;14:6,19,
   22;36:12,22;50:13,17,
   22;51:23;52:3;57:11;
   59:12,24;60:8,11;61:1,
   7;72:24;78:6;85:11;
   86:4,7;90:11,13,15,18;
   96:23;97:15,22;98:1,4,
   7;99:13,20;105:4,24;
   107:12;110:8,12,19;
   111:21,25;112:7,19,22;
   124:24;125:11;130:4,
   9;131:1,4,8,16;141:4,
   12;145:11,14,16,17;
   163:24;164:2;168:21;
   170:17;173:3,5;
   174:12;175:4,7;
   188:17,22;189:7,14,25;
   190:8,19;191:7,11,21,
   23,25;192:2
**minimal (2)**
   29:18;143:12
**minimum (1)**
   63:6
**minus (1)**
   16:19
**minute (4)**
   97:13;150:15;170:5;
   188:12
**minutes (19)**
   26:19;27:7;28:3;
   35:21;36:15;60:6;
   80:24;95:13;97:16;
   120:10,15;131:14,19;
   154:12;155:20;173:9;
   180:2;181:12,12
**miscommunication (3)**
   136:25;137:1,13
**missing (4)**

130:2;155:15;156:1;
182:14
**mistake (2)**
122:8;123:20
**mistaken (1)**
117:22
**mistakes (1)**
166:15
**misunderstanding (3)**
93:7,12,18
**mitigating (1)**
11:23
**mix (1)**
95:1
**mixed (8)**
62:24;63:8,11;94:7,
11;136:21;137:13;
191:17
**mixing (1)**
63:13
**mode (1)**
12:19
**moment (5)**
24:18;38:21;60:9;
117:6;145:6
**Moments (1)**
35:21
**monitor (28)**
12:11,21;21:23,24;
23:9;30:9,19,22,23;
32:23,24;33:1;39:18;
45:1,3;71:15,19,20,23,
24;72:1;76:21;90:1;
96:8;158:24;162:3;
185:9,10
**monitoring (4)**
29:1;149:20;157:14;
183:15
**monitors (7)**
21:25;30:6,7,16;
71:12;185:11,14
**monthly (1)**
147:18
**months (7)**
12:4;102:17;104:19;
120:17;147:12;164:17;
178:23
**Mora (2)**
53:13,15
**more (26)**
10:9;20:21;29:25;
30:3;35:8;47:19,20,21;
54:9;56:18;73:23;
80:25;82:22;87:13;
93:14;94:14;95:11;
103:15;107:1;114:22;
120:10;126:13;152:1;
157:7,11;190:10
**Moreiko (3)**
90:22;140:12,18
**morning (6)**
6:13;14:23,24;115:1;
120:4;188:1

**most (7)**
21:20;22:25;23:8,10,
23;104:17;117:5
**mouse (7)**
158:22,22;169:13,
19;170:6;171:19,20
**move (11)**
20:16;26:11;58:21;
73:25;94:20,21;
135:15;141:14;150:2;
155:22;167:7
**moved (2)**
147:22;150:1
**movement (44)**
12:10;20:25;21:2;
26:15,17;29:11,14,16;
31:5;33:18;36:10;
47:21;58:24;59:3,17,
21;72:8;80:18;82:19;
83:1;86:24;94:23;
104:23,24,25;149:2,20;
150:3;153:5,16,16;
156:22;157:6,9,11,14;
158:7,8,13;160:1,20;
161:1;171:22;180:23
**movements (1)**
29:7
**moving (10)**
13:3;29:8,19;81:18;
82:17;148:6;157:9;
170:2;172:3;180:3
**much (21)**
13:11;29:16;31:19;
64:11;82:25;97:17,24;
118:21,22;130:10;
146:10;148:10;163:22;
167:14;177:12;181:6;
182:11;183:11;187:21;
188:15,24
**multiple (4)**
10:14;24:19;81:5,6
**myself (6)**
35:25;47:16;54:14;
55:8;127:18;165:19

# N

**name (29)**
24:14;81:3;106:14;
107:21;108:15,17,21,
24;110:4,14;111:10,
13;114:1,8;128:6;
133:15;146:14,14,17;
157:21,23;176:5,5,7;
184:5,10,12,15;193:18
**names (2)**
108:9;146:15
**nation (2)**
10:12,12
**National (2)**
5:10;118:18
**nature (1)**
10:8

**navy (1)**
106:8
**necessary (5)**
58:19;79:7;87:16;
94:20;108:17
**need (24)**
51:22;76:16;77:21,
24;79:6;83:1;89:9;
95:23,24,25,25;97:19;
103:22;104:6,9,14,20;
131:13;135:2;145:21;
149:4;153:23;168:22;
189:25
**needed (8)**
67:15;72:14;78:14,
20;79:5;81:25;103:20;
105:2
**needs (3)**
83:11;104:7;172:13
**neglect (1)**
9:19
**neither (1)**
193:14
**Nelson (1)**
127:22
**New (10)**
2:15;10:17,18;48:22;
118:19;128:9,10;
161:18;190:5,6
**next (35)**
14:7;24:6;32:14;
33:2,5,19;41:6,7;42:12,
17;43:12,12;45:14;
71:12;80:6;83:11;94:6;
112:1;167:13;169:20,
21;170:3,12;171:10,
24;172:4,6,18,20,24;
173:8;185:10;186:4,5;
188:1
**night (7)**
52:11;53:14;54:4,24;
55:8,17;114:13
**nine (1)**
120:17
**ninth (2)**
53:20;57:22
**nobody (3)**
182:23,24,24
**noise (1)**
31:20
**non (1)**
101:20
**noncontact (1)**
161:23
**noncontrolling (1)**
101:20
**nondisciplinary (1)**
19:6
**none (5)**
12:8;20:7;59:5,19;
131:6
**nor (2)**
193:15,15

**normal (12)**
12:25;29:25;30:3;
31:24;79:21;84:22;
133:20;154:9;157:13;
180:25;182:20;183:1
**normally (6)**
31:22;95:12;133:23;
144:20;151:11;163:13
**note (1)**
188:2
**noted (1)**
88:5
**notes (2)**
144:21;191:5
**notice (6)**
6:17;88:6;129:5,8,
16;178:11
**noticed (6)**
30:7,13;31:4;88:6;
152:12;187:9
**notification (3)**
24:7;46:7;130:5
**notified (2)**
6:22;130:6
**notify (1)**
35:12
**NOWICKI (4)**
4:3;146:6,17,19
**N-o-w-i-c-k-i (1)**
146:18
**number (18)**
12:15;26:13;29:23;
33:23;46:25;56:15;
62:23;64:20;72:16;
75:7;109:16,20;
127:11;143:2;150:17;
182:10;183:10;186:17
**numbered (2)**
52:5;56:1
**numbers (12)**
27:1,1;28:7,15;
83:23;84:3;155:4;
181:20,21;182:1;
186:15,22

# O

**object (1)**
124:18
**objection (18)**
36:18,20;50:9;59:8;
60:16,23,24;99:7,8,9;
124:5;125:6,8,16;
130:20,24;168:12,14
**objections (1)**
51:10
**objects (1)**
37:14
**observation (2)**
7:24;165:22
**observe (5)**
30:25;59:13,17;
102:23;104:6,9

**observed (3)**
45:25;58:24;102:6
**observing (1)**
42:3
**obvious (1)**
89:19
**Obviously (7)**
9:1,10;17:6;48:21;
78:22;92:17;102:14
**occasions (1)**
9:14
**occur (2)**
102:13;159:16
**occurred (15)**
6:16;8:15;9:9,20;
35:7;51:25;79:9;91:3,
17;98:12;104:18;
129:2;138:20;154:16;
167:9
**occurring (4)**
9:12;26:22;39:15;
59:3
**occurs (2)**
115:22,23
**o'clock (1)**
160:7
**off (14)**
61:9;73:22;89:25;
112:3;124:16;131:18;
177:23;182:23;186:2,
9,15,17;188:19,20
**offer (1)**
60:14
**offered (2)**
120:11,12
**offering (3)**
51:3,24,25
**office (38)**
8:5,6,11;20:20;25:3,
11;28:2,4,11;29:24;
31:20;32:15;15:17,20,
22,24,25;45:13,14;
46:3,6;58:12;115:24,
24;116:12,14;132:12,
19;133:7,8,19;134:6;
137:21;141:21;154:15,
23;163:18,20
**officer (145)**
9:6;11:12,13;13:1;
18:15;21:5,13,18;
22:14,20;24:1;25:5,5,6,
7;26:10;28:9,25;30:14;
39:23;40:11,12,13;
44:18,24;47:25;48:2;
49:17;52:11;53:3,12,
15;54:23;55:16;56:7,
20;57:22,25;58:18;
64:25,25;65:2,3;66:3;
68:10,14,15;69:1;
70:23;72:8;73:10,13;
76:11,16,23;77:4,10,
15,22;80:1,18;81:22;
82:8,14;84:1,4,6;88:8;

SANTIAGO 133

90:21;93:21;97:7;
104:23;106:10,11,15;
107:20;110:1;114:1;
121:14;126:12;128:9,
10;133:1,9,10,11,11,
15,20,21;134:2;
135:24;138:19,24;
139:2,13,16,22,24;
140:6,15;141:16;
142:18;143:4,13,19;
145:3;147:6;149:6,10,
24;151:4;154:1,2,5,7,
14;155:22;156:18,19;
157:14,20;159:7;
160:18;161:17,18,20;
162:2,10,11,22;163:11,
13,15,19;166:21;
167:16;168:8;173:16,
20;174:4;177:7,9;
181:19,22

**OFFICERS (74)**
2:9;8:10,12;11:3,8,9;
12:22;13:10;22:1;25:8,
13,14;29:19;30:11;
33:21,24;53:13;55:17;
64:20;65:8,11;66:6;
71:16;75:18,25;76:18;
77:7;83:9,18,19,19;
87:24;88:22;92:18;
93:13;107:23;108:4,9,
23;111:13;113:8,14;
117:8;118:14;122:21;
128:15,17,19,22,23;
133:15,16,17;134:13,
15,25;135:2,3;138:17;
140:11;143:4,12,17;
144:23;151:19,24;
153:7;154:10;155:23;
157:1,9;167:4,18;
182:22

**officer's (2)**
57:2,6

**offices (1)**
96:21

**official (2)**
127:10;133:4

**officials (1)**
119:3

**often (8)**
80:22;111:5;148:8;
149:16,21;150:7;
179:16,17

**OJT (1)**
128:14

**old (1)**
191:1

**Once (21)**
17:14;20:14;23:4,6;
24:7,7;26:11,12;40:15;
44:14,25;81:6;92:4;
127:6;153:16;157:9;
158:12;172:2;177:4;
182:9;186:3

**one (103)**
7:13;8:12;10:11;
11:9,13;12:24;25:7;
26:2;32:3;38:16;40:22;
41:13;53:11,13,22;
54:23;55:16,23;56:4,
13;60:23;62:23;65:17,
23,24;66:1,3;68:20;
70:5;21;71:12;72:6;
73:16,18;75:4;82:17;
83:24;85:18;89:23;
93:15;97:3,9,13;98:9;
100:20,21,22,22;107:1;
109:12;116:6;118:19;
122:22;123:14;125:13;
131:12;136:14;138:17,
18;140:15,24;141:11;
144:8,14;145:6;
150:16;151:3,5;
152:18;153:25;154:1;
155:7,7;157:8;163:3,3;
170:1,1,2,3,3,14,20;
171:6;172:3,4,6,6,23;
173:14;174:7;176:19;
179:8,11;182:7;
185:12,12,24;186:13,
15;188:12;189:2;
191:16

**ones (1)**
23:17

**ongoing (1)**
92:7

**only (20)**
8:8,9;11:13,23;12:9;
25:16;49:13;58:24;
83:21;84:14;105:15;
121:2;130:1,24;
140:15;144:20;147:12;
152:5;161:7;173:15

**onto (6)**
30:6;45:1;100:4;
105:1;133:3;183:21

**oOo- (2)**
6:3;192:6

**open (27)**
21:6,9,18;22:14;
33:24;40:7,20;43:4;
46:21;47:22;48:2,2;
49:9,13;66:15;71:3,6,
6;88:14;119:7,24;
121:9;158:22;162:10;
164:13;165:22;166:23

**opened (8)**
19:20,22,24;88:11;
100:1;106:11,16;
147:21

**OPENING (12)**
3:2;6:11,14;10:2,4;
22:16;47:19;96:23;
98:25;164:9;172:6;
181:25

**opens (1)**
171:21

**operate (2)**
16:24;94:17

**operates (1)**
68:3

**operating (4)**
19:19;28:25;29:2;
172:23

**operation (3)**
10:15;33:11;72:6

**operations (2)**
56:5;113:4

**opinion (1)**
137:6

**opportunity (2)**
51:20;189:8

**opposed (2)**
132:22;154:15

**orange (2)**
18:12;106:8

**order (24)**
12:7;34:11;39:24;
40:3,19;42:8,9;43:24;
46:16;56:16,18,23,25;
66:24;78:9;94:2,3;
98:9;99:25;124:5;
128:21;137:20;142:23;
184:19

**ordered (1)**
93:25

**orders (6)**
56:14;80:6;142:15,
17,22;143:9

**ordinary (1)**
31:21

**organization (1)**
113:9

**organize (1)**
28:21

**orientation (1)**
128:14

**original (1)**
95:12

**out (69)**
22:8;23:18;27:8;
31:21;32:15;37:21,21;
38:2;39:9;40:2;41:1;
45:23;46:3;48:23,24,
25;57:1;66:16;72:2;
80:4;91:21;94:22;95:8;
98:9,14;106:24,25;
114:14,18;119:2,13,13,
15;120:2;122:16,21;
123:14,19;129:11;
133:18;138:8,11,19;
144:15;147:22;150:14,
14;151:22;153:5;
155:7;156:1,6;159:19,
25;160:6;162:10;
163:4,12;166:4,20;
168:24;174:15;177:11;
178:2;182:10;183:9;
187:14,17;190:10

**outcome (2)**

19:11;193:16

**out-count (2)**
28:19;153:20

**outdoor (3)**
119:24;138:11,12

**outside (10)**
30:15;34:25;37:18;
97:5,11;101:5;138:16;
153:19;154:24;180:12

**over (26)**
12:11,21;17:7;33:15;
50:15;60:23;67:12;
74:2;82:12;90:4;95:15;
101:19,19,22,22;102:4;
110:16;134:6;135:1;
148:24;154:2;157:10;
159:3;180:10;185:12;
187:12

**overall (3)**
16:11;113:4;122:1

**overcome (1)**
89:19

**oversight (1)**
60:11

**own (2)**
10:24;64:10

---

**P**

**package (1)**
61:6

**packet (12)**
28:7,13,14;116:14;
124:16,17,21;135:18;
141:21;142:2;169:7,8

**packets (1)**
28:12

**PAGE (59)**
3:2,7,14;4:2,8;5:2;
52:4,5,24,24;53:10,20;
54:1,2,8,11,12,15,17,
19,21,23;55:6,7,14,15,
22;56:12;57:12,15,16;
78:8,10;85:9,9;86:15;
90:9,16;93:3,4;115:10;
116:5;125:12;126:23,
25;127:11,12,15;128:1,
5;129:20,22;140:11;
143:1,1;144:8,15;
191:5,5

**pages (3)**
86:2,4,5;115:4;130:2

**paperwork (12)**
25:17;28:6;84:7;
104:10;133:2;154:3,7,
22;155:5;162:23;
169:4,6

**part (8)**
8:7,18;78:2;122:23;
138:3;139:3,9;142:2

**participate (1)**
130:11

**participating (3)**

84:5,13,14

**participation (1)**
182:2

**particular (18)**
7:1,6;9:13;21:14;
39:25,25;56:4,6,16,18,
22;62:15;99:22,23;
103:6;121:13;128:18;
153:6

**parties (4)**
6:7;9:4;10:6;131:6

**party (2)**
10:8;193:15

**pass (5)**
34:3,7,11;59:25;
99:25

**passed (6)**
8:1;34:4,10;47:9;
91:5;163:20

**passing (2)**
48:8,9

**Pat (1)**
167:17

**Patricia (1)**
127:17

**pattern (1)**
111:17

**Patterson (7)**
90:22;139:25;140:2,
7,8,12,13,18,21,23;
141:10,17;174:4,7,9,
19;175:2

**pause (13)**
38:11;40:22;42:2,4;
43:5;45:9,20,21;46:12;
47:6;49:2;85:13;184:6

**pay (2)**
14:1;78:23

**payroll (1)**
113:20

**PBN (1)**
5:10

**PBNDS (2)**
144:10,12

**PBNS (1)**
118:16

**PC (1)**
2:4

**PDNX (1)**
143:14

**peak (2)**
78:11,16

**penalties (1)**
89:10

**people (15)**
13:3,3;109:2,5,10;
111:16,17;149:8,14;
150:1,2,3,6;157:24;
182:11

**per (2)**
22:9;27:6

**perceive (1)**
120:15

**Perez (16)**
90:23;91:16,18;
139:24,25;140:2,2,7,
12,12,18,23;141:9,17;
174:4,6
**Perfect (1)**
54:21
**Performance (1)**
118:17
**Performance-based (1)**
5:10
**perimeter (1)**
57:7
**period (9)**
10:25;12:17;29:23;
59:2;66:17;100:19;
119:25;126:10;143:20
**periods (5)**
78:11,16;100:14;
101:5;104:15
**permanent (1)**
6:24
**permissibly (1)**
10:20
**permitted (3)**
100:11,15;126:3
**person (17)**
12:2,24;67:1;93:15;
110:3;111:10;148:20;
150:16;151:5,6;153:5;
159:4,12;171:16;
172:19;185:12,13
**personal (4)**
59:10;101:10;102:8;
124:8
**personally (2)**
101:15;104:13
**personnel (1)**
127:9
**persons (1)**
158:14
**phase (2)**
117:21;118:6
**phases (1)**
117:21
**Phoenix (1)**
2:6
**phone (24)**
12:21;20:24;31:23;
35:13,13;58:19;81:9,
11,19,22,25;84:15;
104:5;148:9,11,14,20;
149:15;152:4;162:13;
166:25;180:10;181:25;
190:21
**phones (10)**
29:1;31:25;32:1;
81:15;84:10;148:5,8;
156:10;167:4;180:6
**photo (1)**
155:24
**physical (1)**
12:5

**pick (1)**
152:4
**picture (7)**
22:6;155:25;183:24;
185:6,7,20,25
**pictures (2)**
182:14;185:24
**place (10)**
26:13;53:5;64:15;
77:17;79:13;80:11;
94:1,24;119:19;135:11
**placed (12)**
18:11,13;19:6;20:2;
24:21,22;26:12;35:15;
62:11;63:5;67:12;
118:9
**placement (1)**
19:11
**plan (3)**
50:14;64:14;128:5
**play (3)**
38:10;41:24;46:2
**please (43)**
10:2,8;14:10;16:17;
25:21;33:3;52:4;53:10,
20;54:1,11,15,21;55:6,
14,22;56:12,13;57:1;
86:3;96:1;110:20;
112:1,9,17;117:18;
122:7;125:12;127:3;
129:20;142:24;145:25;
146:8;162:15;163:25;
166:21;168:23;170:20;
175:16,24;176:6;
188:13;189:11
**plus (3)**
16:19;153:6;155:9
**pm (7)**
112:4,5;131:20,20;
173:10,10;192:4
**pod (6)**
73:15;75:14,16,18;
76:23;84:2
**pods (6)**
73:16,18;75:25;77:4;
149:7;153:6
**point (19)**
31:8;35:11;49:13;
57:1;64:11;72:6;73:14,
20;78:20;110:1;
114:22;116:10,13;
141:1,8;148:11,14;
174:14;190:17
**pointed (2)**
23:24;174:15
**points (4)**
56:23,24;57:3;64:9
**policies (7)**
57:5;128:13;142:15;
143:9;168:3,3,4
**policy (18)**
27:6;38:15,20,25;
55:25;56:2,3;59:10,20;

101:7;116:9,25;
120:21,24;128:20;
137:18,19;142:25
**pop (2)**
45:1;181:3
**popped (4)**
162:9;166:10,12;
171:1
**popping (1)**
148:6
**pops (2)**
71:18;158:19
**population (4)**
117:12,13;118:24;
121:6
**pop-up (2)**
70:16;71:5
**port (13)**
7:18;20:13,13,15,16;
41:15,17,21;97:4,6,10;
123:22;150:11
**portion (5)**
19:5;22:11;45:1;
72:21;73:25
**portions (1)**
22:7
**position (6)**
30:19;112:25;
146:23;147:12;171:18;
177:6
**positions (1)**
147:4
**positive (3)**
8:9;40:16;110:17
**positively (9)**
24:3,8,9;25:22;26:6,
7,10;40:9;58:20
**possibility (1)**
78:24
**possible (1)**
69:22
**post (48)**
9:7;12:4;56:14,16,
18,21,23,24;57:17;
58:3,5,10;68:20;69:7,
15,21;70:2;72:7;78:9;
80:6;89:25;90:4;93:15,
16;128:21;131:4;
133:15;137:20;142:15,
17,21,23;143:5,9,20,
20,23;144:23;147:5,8,
9,11,11,16;148:7;
165:8,9;177:8
**posted (3)**
45:5;70:1;90:8
**post-marked (1)**
191:19
**post-order (1)**
57:16
**posts (2)**
128:15;147:17
**potentially (1)**
9:16

**practical (1)**
118:23
**practice (9)**
92:1,6,7,15,16,20;
160:14;168:6,11
**practices (2)**
160:11;168:3
**PREA (1)**
121:9
**preapproved (1)**
158:1
**pregnancy (5)**
69:19;178:6,13,22,
24
**pregnant (7)**
12:4;69:16,21;
102:21;129:10;178:2,
20
**premark (1)**
143:24
**PRESENT (2)**
2:17;139:16
**presented (1)**
101:12
**preservice (3)**
113:16;128:11;
143:21
**president (3)**
116:16;127:22;
167:12
**press (1)**
152:2
**pressed (1)**
124:20
**pressing (1)**
150:6
**pretty (10)**
64:11;158:23;
164:17;166:17;177:12;
181:1,6;182:11;
183:11;186:25
**prevent (1)**
9:11
**previous (6)**
43:8,8;147:20;
155:22;162:22;164:8
**previously (8)**
88:16;92:12;136:17;
139:23;144:12;150:17;
159:15;173:15
**prey (1)**
121:10
**primary (8)**
56:22,24;57:3;83:9;
93:4,6;126:10,15
**prior (35)**
10:16;46:2;58:8,8,
10;64:17;65:11,13,16;
69:11;70:2;87:20;88:1;
101:13;102:15,17;
117:7;122:16,16;
135:16;145:3;147:13;
150:25;151:2;153:25;

160:19;172:6;173:12,
13;176:16,17;177:15,
24;184:21;187:18
**Prison (1)**
121:8
**probably (12)**
51:15;80:24;102:17;
104:19;109:6,8;
120:16;132:17;134:23;
135:8;149:24;181:1
**problem (5)**
24:19;106:21;131:1;
155:18;174:1
**procedural (1)**
6:24
**procedure (7)**
33:3;56:1;84:17;
130:11;133:20;157:17;
183:15
**Procedures (8)**
10:17,25;11:2;20:5;
118:13,15;128:13;
132:11
**proceed (12)**
36:16;41:24;42:20;
43:17;45:9,18;46:23;
49:1,19;82:20;83:10;
145:23
**proceeded (2)**
124:1;126:1
**proceeding (1)**
193:13
**PROCEEDINGS (8)**
1:1,13;85:13;184:6;
192:5;193:7,8,9
**process (14)**
7:24;17:15,15,17;
48:23;81:23,24;
104:10;127:10;130:25;
131:6;181:18;183:19;
190:23
**processes (1)**
169:1
**processing (2)**
48:22;168:17
**produce (1)**
144:16
**programs (1)**
118:22
**progression (2)**
42:18;158:5
**projector (1)**
36:14
**promotion (1)**
16:9
**proof (1)**
51:17
**properly (1)**
57:25
**propose (2)**
189:14;190:8
**protective (3)**
19:10;67:19;121:5

June 14, 2017

protocol (2)
26:14;58:15
protocols (1)
118:14
proven (2)
58:9,9
provide (10)
10:9;18:5;52:14;
53:15;55:18;56:3,17;
87:13,16;135:2
provided (13)
6:17;7:4;60:13;
77:18;114:24;124:13;
129:16;136:14;137:21;
139:5;141:23;162:21;
169:8
provides (3)
9:5;56:18;115:25
providing (2)
9:14;49:16
provisions (1)
143:6
public's (1)
9:17
pulled (1)
166:22
purpose (5)
19:7;115:19,21;
173:18;174:3
purposes (3)
51:6;68:21;70:17
pursuing (1)
58:23
push (8)
149:9;150:9;156:17;
159:9;165:22,22;
166:2,18
pushed (2)
123:24;162:8
pushes (2)
44:15;184:25
put (10)
38:22;63:20;64:1;
67:15;69:21;87:6;
147:20;157:7;168:1,7
putting (2)
28:6,11

**Q**

qualifications (1)
12:7
qualified (1)
58:3
queue (3)
39:16,24;96:1
queued (2)
36:13;39:21
quick (5)
158:4,20,21;190:15;
191:16
quickly (3)
13:14;95:11;154:20

quiet (1)
47:16
quite (3)
18:3;111:19;118:3

**R**

radio (56)
12:22;29:1;30:1;
31:9,11;32:4;33:15,16;
47:20;82:1,3,4,8,12,23,
25;83:7;84:11;85:23;
86:10,18,23;104:5;
110:16;148:6,22,25;
149:4,8,12,15,16,17,
18;150:4,5,13;152:1,5;
156:13,20;161:8,9;
162:9;167:1,5;179:12,
18;181:25;182:16,20;
183:13;186:18,20;
187:11,12
radios (1)
82:5
raise (6)
14:9;98:1;112:9;
145:25;173:14;175:16
Rancho (1)
188:7
range (1)
37:18
Rape (1)
121:8
rarely (2)
111:6,6
rate (1)
78:23
rather (3)
7:19;47:16;85:19
Re (1)
1:7
reach (1)
174:10
reached (1)
49:4
read (2)
56:25;78:17
ready (1)
145:22
real (3)
85:18;190:15;191:16
really (13)
23:21;27:25;35:8;
64:13;70:4;78:21;89:9;
92:16;103:12;106:19;
130:24;131:3;157:21
realm (1)
168:16
reason (11)
25:16;67:20,25;
87:10;95:25;126:2;
140:22,24;142:10;
143:16;156:16
reasonable (3)

12:1,24;74:25
reasons (4)
19:9,10;121:1,5
rebuttal (1)
145:18
rec (2)
41:1;160:25
recall (31)
27:16,25;28:1;29:23;
30:1;69:25;95:20;
101:23;104:17;105:18;
114:15;116:4;129:11,
13;130:17;132:16;
136:14,16;138:2;
139:15;141:20;150:19;
152:17;161:4,7;163:7;
168:10;179:14;180:7;
186:7,11
receipt (3)
189:14,23;190:11
receive (4)
26:11,12;100:23;
129:5
received (4)
35:13;69:1;141:20;
191:20
Receives (2)
44:21;133:1
receiving (3)
84:15;120:9,10
recent (2)
98:9;104:17
recently (1)
119:1
Recess (4)
61:10;112:4;131:20;
173:10
reclassification (1)
19:16
reclassified (1)
63:6
recognizable (1)
108:17
recognize (7)
52:7,25;108:21;
110:4,14;111:10,13
recognizing (1)
111:17
recommendation (2)
128:7;135:20
recommended (1)
123:7
reconcile (3)
155:5,25;157:12
reconciled (1)
155:12
record (15)
60:9,10;61:9,11;
112:3,6;131:18,21;
141:2;146:15;173:11;
176:6;184:8;188:19,20
records (1)
139:20

recount (1)
186:21
recounting (1)
157:3
recreation (3)
118:22;119:24;
138:11
recreational (1)
138:19
Recross (4)
3:12;105:6,9;107:15
RECROSS-EXAMINATION (1)
110:23
rectangular (1)
37:14
red (9)
7:6;18:13,14;106:6;
159:10;181:3,4,4,5
Redirect (10)
3:11;4:6;69:4;97:25;
98:6;110:11;145:10;
170:19,23;172:15
redirection (1)
68:20
reds (1)
181:3
reduce (1)
149:12
reduces (1)
152:5
refer (2)
123:22;143:17
reference (4)
54:25;127:25;
143:11;173:16
referenced (2)
115:9;128:20
references (1)
140:6
referencing (1)
184:12
referred (3)
20:18;121:8;133:8
referring (3)
34:20;132:17;143:18
regard (5)
6:5,6;51:19;54:20;
175:12
regarding (19)
10:8;50:9;61:22;
101:10;120:21;132:8;
135:20;136:11;137:13,
14;159:15;160:11,12;
168:11,17;180:6;
181:18;182:7;183:14
Regardless (1)
109:24
regards (6)
53:5;54:14;55:8;
62:6,10;159:20
Regina (1)
122:14
regional (6)

116:12,14,16;
127:20,21,22
regular (6)
72:1;92:22;155:11;
157:8;164:17;179:17,
19
rehabilitate (1)
99:10
reinstatement (1)
14:1
relate (2)
6:25;157:5
related (4)
73:2;178:13,16;
193:15
relating (1)
104:11
relationship (2)
10:6;172:5
relativity (1)
171:24
relax (1)
102:1
relay (4)
149:11,12;152:5;
156:18
release (2)
48:23,24
Relevance (2)
130:20;172:21
relevant (2)
168:18;173:25
relief (1)
134:17
relieve (3)
76:17;93:13,22
relieved (2)
133:18;134:3
relieves (1)
154:6
relieving (1)
93:15
rely (1)
149:15
remain (4)
35:20;119:19;
167:19;169:18
remainder (1)
51:1
remained (2)
95:5,6
remedy (2)
6:9;14:2
remember (18)
19:23;27:19;33:21;
63:24;64:2,15;89:6;
98:16;102:14;114:17;
122:10;176:12;178:4;
179:2;182:4;187:1,3,6
remembrance (1)
129:9
rep (1)
167:20

**Repeat (1)**
118:2
**repetitiveness (1)**
111:17
**replay (1)**
95:24
**reply (3)**
189:24,25;190:4
**report (7)**
15:17,18,19,21;16:1;
19:12;193:7
**REPORTER (2)**
189:21;193:3
**reports (2)**
54:10;122:12
**represent (1)**
72:18
**represented (1)**
113:8
**Request (37)**
5:3;22:20;23:6,7;
34:20;42:14;44:19;
52:14;53:16,23;54:5;
55:2,18;58:16;71:5;
83:21,22;103:19;
115:18,19,21;116:12,
17,20,23;139:6,8,13;
141:16,18,21,24;142:9,
10;149:21;168:2;189:7
**requested (6)**
8:24;55:3;70:24;
71:14;168:6,10
**requesting (2)**
58:21;106:15
**requests (5)**
44:15;81:6;103:7,15;
104:5
**require (2)**
142:17;175:4
**required (10)**
12:10;68:7;89:12;
108:23;109:25;120:12;
142:16;143:14,20;
179:11
**requirements (3)**
118:19;128:8,19
**requires (2)**
12:7;143:9
**re-re-recross (1)**
111:3
**re's (1)**
111:1
**resources (6)**
8:20;115:24,25;
116:13;127:24;128:12
**respect (31)**
8:15;26:14;36:9;
38:15;42:13;56:22;
57:3;59:21;82:7;88:21;
95:21;100:6;101:7;
122:25;128:17;130:12,
18;132:15;137:10;
148:1,8;149:20;

152:22;156:10;157:13;
158:18;161:5;172:17;
174:21;182:16;186:8
**respond (4)**
49:17;82:15;110:17;
111:9
**responding (11)**
33:20,25;47:11;
49:14,23;53:13,22;
54:13,24;55:16;104:3
**response (4)**
51:16;99:22;100:7;
106:16
**responses (2)**
131:2;184:4
**responsibilities (4)**
56:7;76:21;113:2;
134:6
**responsibility (13)**
11:3,22;13:16,22;
29:22;57:2;72:12;73:9,
25;75:15;77:4;126:15;
138:15
**responsible (11)**
8:17;11:10;25:23;
72:8,9;73:13;76:1,6,
19;126:7;144:23
**responsive (1)**
103:1
**restate (1)**
168:22
**restrained (3)**
62:8;94:20;95:3
**restraints (4)**
50:4;62:11,14;94:23
**restricted (2)**
34:6;37:5
**rests (2)**
145:18;189:5
**result (4)**
7:11;11:7;94:6;
116:6
**resulted (4)**
7:9;98:13;99:3;
122:3
**resulting (1)**
123:4
**resumed (2)**
61:16;132:2
**Retained (6)**
5:,,11;51:9;61:4;
144:5
**retirement (1)**
177:3
**retracing (1)**
157:1
**return (3)**
6:19;40:15;156:7
**returned (4)**
83:16;129:13;156:3;
164:7
**review (11)**
52:12;53:18,24;55:4;

66:24;85:7;114:23,25;
116:1,3;144:9
**reviewed (7)**
55:20;114:25;
122:13;126:17;135:17;
139:4;169:8
**reviewing (5)**
30:7;50:24;51:1;
122:11;124:13
**right (75)**
14:9;23:16;30:14;
33:2,3;37:12;41:2,19;
45:12;46:8,9;49:3,23;
51:6;63:23;64:17;
65:11,18;66:18;67:6;
71:10;72:8;74:13;
76:10,18;83:18;84:4,8;
86:15;87:1,10;90:6;
91:2;96:4,11,14,19,23;
99:18;109:23;112:9;
118:3;122:20;131:23;
132:14;139:8;141:10;
145:20,23,25;148:8;
150:14;151:8;152:20,
21;159:3,14;163:6;
165:1;166:6;167:21;
169:14;172:7;175:16;
177:24;178:3;179:24;
180:5,9;182:6;183:1,
25;184:9,18;185:15
**right-hand (1)**
48:16
**ring (1)**
148:9
**ringing (6)**
31:23;32:2;58:16;
148:5;166:25;170:1
**risk (16)**
7:5,7;9:15,16,16;
12:5;19:13,16;24:21;
62:7,8,16,17;63:3,3;
101:11
**risky (2)**
9:9,11
**Road (2)**
1:19;2:5
**roaming (1)**
123:15
**Rob (4)**
50:14;86:4;90:18;
188:17
**ROBERT (1)**
2:10
**role (2)**
7:13;35:11
**rolled (1)**
162:19
**RONALD (3)**
3:8;14:16;61:15
**room (26)**
12:1;13:10;20:14;
41:2,15;43:13;66:14,
15,16;97:4;100:14,16,

19;101:5;107:2;119:6,
7,11,19,23,25;120:1,2,
20;138:9,10
**rooms (1)**
118:23
**roster (3)**
90:10;108:11;140:11
**rosters (1)**
140:1
**rotated (1)**
128:15
**rotation (1)**
143:6
**rote (1)**
13:8
**roughly (5)**
16:19,20;28:1;103:9;
120:5
**routed (2)**
81:15;148:19
**routinely (1)**
119:3
**rule (2)**
127:7,8
**rummage (1)**
191:4
**run (3)**
27:5;36:13;58:9
**runs (2)**
120:5,6

**S**

**safety (3)**
9:16,16,17
**Sally (5)**
7:18;20:12,13,15,16;
41:15,17,21;97:3,6,10;
123:22;150:11
**same (20)**
7:19;12:23;17:10;
33:1;54:15;67:1;83:4;
86:17;96:10;100:23;
103:16,17;112:5;
119:21,22;128:1;
132:23;150:14;164:10;
168:17
**SAN (1)**
193:2
**Santiago (31)**
7:12;11:9;53:4,7;
90:24;91:16,20,21;
93:22;117:3,3;121:14;
122:8,13,19,23;135:24;
137:11,15;140:2,6,12,
14;141:5,12,25;173:15,
17,24;175:5,10
**Santiago's (5)**
121:21;122:2,25;
173:19,24
**sat (1)**
26:9
**saw (16)**

19;101:5;107:2;119:6,
7,11,19,23,25;120:1,2,
20;138:9,10
**rooms (1)**
118:23
**roster (3)**
90:10;108:11;140:11
**rosters (1)**
140:1
**rotated (1)**
128:15
**rotation (1)**
143:6
**rote (1)**
13:8
**roughly (5)**
16:19,20;28:1;103:9;
120:5
**routed (2)**
81:15;148:19
**routinely (1)**
119:3
**rule (2)**
127:7,8
**rummage (1)**
191:4
**run (3)**
27:5;36:13;58:9
**runs (2)**
120:5,6
30:25;31:2;41:11;
44:4;58:22;87:20;
88:10;95:21,23;96:6;
107:2;137:16;159:3,5,
5,9
**saying (5)**
71:15;75:24;78:13;
97:9;109:18;140:20;
181:22
**scenario (1)**
9:20
**scheduled (2)**
27:4,5
**school (1)**
191:1
**screaming (1)**
101:24
**screen (18)**
22:6;43:7;70:8;
71:11,23;107:6;
144:22;169:18,23;
181:3;183:20,23;
185:8,15,21,22,23;
186:2
**screened (1)**
145:4
**screening (2)**
17:16;145:2
**se (1)**
22:9
**seat (3)**
112:17;146:8;175:24
**second (9)**
40:21;41:21;109:6;
115:10;123:21;127:12;
154:2;157:3;189:2
**secondary (2)**
41:14;84:1
**seconds (7)**
13:2,6;97:19;149:25;
179:22;181:2;186:1
**secretaries (1)**
160:5
**secretary (1)**
148:18
**section (3)**
10:13;67:20;127:19
**secure (6)**
8:19;38:15;58:17;
117:4;123:22;166:21
**secured (2)**
7:16,17,25;8:4,8;
9:15;21:11,12;34:14;
42:5;43:21;46:15;
56:10;57:7;73:9;75:1;
76:22;105:16;120:25;
121:1;123:23;165:16
**securing (3)**
122:9;136:12;137:3
**SECURITY (19)**
2:9;9:11;12:22;56:4;
57:8;80:23;97:6;109:6;
110:17;123:13;127:16;

144:19,22;147:6;
159:18,20;183:15,18;
188:10
seeking (4)
    8:21;24:2;165:15;
    168:24
seem (1)
    103:3
segregated (2)
    67:15,18
segregation (118)
    7:2,17;10:15;11:1,
    14;19:1,4,18;20:1,9,16;
    22:9,10;23:18;24:22;
    34:8,9;37:5,16,22;
    38:14,18,22;39:9;40:2,
    25;41:4,22;43:11;
    45:17,23;50:8;53:6;
    62:11;63:2,4,5,8,12,15,
    16,21;64:9,19,19,22;
    65:1,8,12;66:4,7,8,9;
    67:6,10,16,23,25;
    74:13;76:3,5;89:14,15;
    90:7,21,22,23,23;91:4,
    6,10,14,25;93:13,22;
    94:12,19;95:9;98:15;
    99:4;100:18;114:19,
    21;117:9,15,19,24;
    118:4,8,12,13,21;
    121:3,16,17;122:14;
    123:14,19;124:1;
    134:16;136:19;138:3,
    16;139:22;140:15,16;
    147:16,25;153:7;
    160:12,17,18,21,23;
    161:2,3;163:12;167:13
select (1)
    183:20
selected (1)
    143:4
selects (1)
    183:21
self-identification (1)
    125:17
self-identify (1)
    125:1
send (2)
    182:12;183:11
seniority (1)
    147:9
sentence (4)
    80:6;93:6;94:6,8
separate (4)
    20:3;63:2;96:11;
    120:19
separated (3)
    65:9;76:11;118:12
separating (1)
    118:9
September (3)
    130:6;164:12,15
sequence (1)
    122:3

Sergeant (17)
    32:6;50:7;53:21;
    54:2,12,13,17;84:25;
    85:24,24;86:2,16;
    87:12,12;161:7;
    162:18;187:11
sergeants (12)
    31:9;32:4,15,22;
    33:21;36:1;46:3,11;
    47:1,1;53:22;87:23
series (3)
    40:19;115:5,10
serious (2)
    121:6;155:13
seriously (1)
    125:7
SESSION (3)
    3:5;120:4,6
set (11)
    9:10;13:13;21:4,4,5;
    43:2;71:21;151:3;
    153:4;161:21;173:13
setup (1)
    161:19
seven (1)
    74:14
seventh (1)
    52:24
several (6)
    57:20;58:10;109:8;
    117:1;121:6;159:1
severeness (1)
    116:11
severity (2)
    116:2;123:11
shadowed (1)
    68:15
shall (2)
    6:9;144:22
SHAPIRO (6)
    1:2;2:14;10:5;124:2;
    131:11;168:12
Sharon (2)
    2:18;127:24
SHAWNA (3)
    4:3;146:6,17
S-h-a-w-n-a (1)
    146:17
sheet (6)
    28:15;57:16;104:24;
    105:1;133:4;153:19
sheets (1)
    133:3
Shelton (1)
    167:16
shift (38)
    15:11,12;16:7,9;
    25:8;31:9;32:4,6,15;
    33:20;36:1,1,1;45:14;
    46:11;47:1;68:16;
    78:11;79:12,15,25;
    80:1;109:25;133:7,19,
    23;135:2;140:10,11;

148:2;159:15,16,18,20,
    21;160:3;181:7,15
shifted (2)
    75:16;76:11,14,22;
    77:4
shifts (1)
    143:3
short (2)
    36:12,16
shorter (1)
    40:22
Shorthand (1)
    193:3
shortly (1)
    105:19
shot (3)
    21:21;46:20;159:14
show (12)
    21:16;23:8,23;36:21,
    23;50:14;71:11;96:3;
    109:21;181:4;183:24;
    185:7
shower (24)
    7:9,15;10:21;11:5;
    13:21;38:16;39:4;92:2,
    3,10,13;95:2;98:13;
    99:3,5;117:5;121:9,15;
    122:17,17;136:6;
    137:3;160:24;163:4
showers (7)
    37:7;92:19;117:8;
    120:22,25;122:10;
    167:19
showing (1)
    37:3
shown (2)
    36:19;39:18
shows (7)
    22:11;42:17;90:21,
    22,23;183:23;185:5
shut (6)
    33:9;47:9;81:15;
    154:1;162:12;166:23
shut-down (1)
    12:19
side (25)
    7:18;20:4,4;30:18;
    43:11;48:16;64:10;
    65:7,8,20,23;66:1;
    84:9;94:19,21,22,24;
    118:10,10;159:23;
    161:23;162:3;167:5;
    185:13;186:14
sides (1)
    66:3
signal (1)
    136:21
signals (1)
    137:14
signature (3)
    57:16,21,22
signatures (4)
    57:19,20;127:11;

128:4
significant (1)
    164:25
similar (2)
    118:21,22
simple (2)
    166:17;171:22
simultaneous (2)
    190:3,4
single (2)
    153:1;157:3
sit (3)
    14:7,9;162:2
sitting (5)
    40:11;72:3,4;82:13;
    163:12
situation (7)
    10:18;11:4,8;13:13;
    19:12;104:1;151:23
situations (2)
    77:16;79:5
six (8)
    29:19;104:19;
    119:23;147:2,3;153:7;
    158:9;161:17
sixth (1)
    52:24
size (2)
    117:24;118:8
slip (1)
    26:13
slips (3)
    28:18,19;133:5
slow (3)
    152:11;156:16;180:1
slowly (4)
    118:17;119:1,2;
    138:22
small (3)
    71:8;119:13,14
smaller (1)
    185:23
sole (1)
    174:3
solely (1)
    51:24
Soliz (10)
    32:6;53:21;54:3;
    84:25,25;85:1,2,22,24;
    87:12
Soliz' (1)
    86:2
S-o-l-i-z (1)
    85:1
somebody (12)
    22:10;79:5,7;111:9;
    149:4;155:14;180:2,
    14;185:5;186:16,21,22
someone (25)
    13:6,8,11;44:15;
    70:14;80:23;81:18;
    89:21,24;93:22;
    108:15;121:10;134:5;

143:21;149:16,21;
    157:15;158:18;179:17,
    23;180:24;183:18;
    184:10,15,25
someone's (1)
    96:12
sometime (2)
    64:3;120:6
sometimes (5)
    106:19;159:1,2;
    180:13;183:23
somewhat (1)
    12:19
somewhere (1)
    155:10
Sony (1)
    127:20
soon (4)
    148:19;172:7,20,24
sorry (23)
    60:8;62:17;77:17;
    78:6;80:17;82:22;86:4;
    90:6;118:2;124:12;
    137:9;139:1;145:11;
    149:5;152:10;153:18,
    21;156:16;163:18;
    168:3;178:5,7;191:17
sort (5)
    8:6;18:8,21;26:25;
    158:14
sounds (1)
    141:5
spaces (1)
    83:14
speak (3)
    114:15;142:15;
    156:16
speaking (3)
    137:6;152:8;154:11
speaks (2)
    55:11;57:5
special (2)
    145:2;147:7
specialized (5)
    68:7;128:23;142:21;
    143:9;147:11
specific (9)
    12:7;68:24;70:15;
    81:17;82:21;120:2;
    129:14,15;174:13
specifically (10)
    70:2;89:4;106:12;
    110:2;116:5;137:9;
    138:2;147:10;150:6;
    182:6
specify (1)
    128:23
speeding (1)
    152:12
spell (3)
    146:14,15;176:5
spelled (1)
    66:22

**spelling (1)**
  66:21
**spend (2)**
  120:20;165:11
**spent (1)**
  164:3
**split (1)**
  151:5
**spoke (1)**
  103:1
**spot (2)**
  20:13;95:24
**spotting (1)**
  187:22
**square (2)**
  71:21,22
**ss (1)**
  193:
**staff (68)**
  7:24;9:16;16:14,20;
  20:25;24:20;29:8,14,
  17;30:2;45:4;46:6,25;
  47:2,10,10,11;49:14,
  23;53:22;54:13,24;
  58:23;65:4,7;67:15;
  68:20;69:20;76:17;
  77:14,18;78:10,14;
  79:1,17,19,22;80:7,14;
  84:20;89:3,11,20,22,
  23,23;102:11;103:19,
  22;104:2,14,21;105:2;
  108:18;109:5,6,7;
  110:17;113:6;114:20;
  115:22;142:12;150:8;
  151:14,17;160:6,8,9
**staffed (7)**
  8:11;64:19;77:7,13;
  97:6;134:12;143:2
**staffers (2)**
  93:4,6
**staffing (15)**
  11:4;25:10;64:12,13,
  14;78:9;84:18;88:21;
  89:14;90:10;95:7;
  104:6,9;142:25;143:1
**stainless (1)**
  119:8
**stand (3)**
  61:16;132:2;153:14
**standard (10)**
  68:16;71:23;72:1,6;
  73:11;79:25;118:18;
  119:21;144:11,15
**Standards (4)**
  5:;118:19;119:22;
  144:10
**standing (12)**
  30:8,12,13,14;33:5;
  38:14;46:14;56:20;
  159:9,11,12;185:6
**start (11)**
  6:10;70:22;98:8;
  119:4,5,12;138:10;

164:6,11;177:14;
  180:21
**started (11)**
  16:12;27:8;30:6;
  32:18;117:3;119:1,2,
  15;147:22;177:10;
  187:22
**starting (2)**
  11:1;79:24
**starts (3)**
  40:22;153:16;158:12
**state (7)**
  78:15;86:17;88:15;
  90:1;146:14;193:1,4
**stated (5)**
  18:4;56:1;66:11;
  88:17;109:19
**statement (22)**
  6:11,14;10:2,4;54:5;
  55:2,3,18;85:6,7,17,18,
  20;86:3;87:8,9,13;
  96:23;122:12;137:12;
  141:25;162:21
**STATEMENTS (16)**
  3:2;36:6;50:20;
  51:12,14,24;86:16;
  87:2,14;114:24;115:5;
  121:25;126:18;142:11;
  168:11,25
**states (3)**
  116:5;128:21,25
**stationed (11)**
  8:10;21:24,25;30:9;
  37:20,23;69:13;91:4,9;
  178:10,14
**status (6)**
  18:1;19:6,17;75:20,
  22;83:23
**stay (6)**
  170:10;171:9,10;
  172:22;185:25;186:1
**stays (4)**
  153:15;170:11;
  171:9;172:18
**steel (1)**
  119:8
**stenographic (1)**
  193:10
**step (1)**
  40:3
**steps (1)**
  157:2
**still (14)**
  29:16;53:7;58:20;
  75:12;84:19,22,23;
  120:9;125:18;132:23;
  133:1;135:5;159:14;
  179:25
**stipulate (1)**
  51:23
**stipulation (2)**
  174:10,11
**stood (1)**

34:24
**stop (12)**
  32:21;33:12;47:23;
  62:14;86:24;88:8;
  90:11;114:20;117:6;
  125:15;162:4;166:6
**stops (1)**
  157:9
**straight (2)**
  41:1;72:2
**street (1)**
  48:24
**stress (2)**
  187:20,23
**stressful (1)**
  179:7
**strike (3)**
  30:22;35:18;41:9
**stroll (1)**
  43:23
**stuck (1)**
  162:10
**student (2)**
  176:17,20
**studying (1)**
  176:22
**stuff (2)**
  179:9;191:6
**subject (2)**
  47:4;145:18
**submission (2)**
  190:9,17
**submit (5)**
  50:4;94:23;169:6;
  190:2;191:18
**submitted (10)**
  52:10;53:12,23;55:4,
  12,13;87:14;116:13,14,
  17
**subscribed (1)**
  193:18
**Subsequent (2)**
  6:18;7:15
**substantial (1)**
  11:23
**substantiate (2)**
  137:22;141:24
**successfully (1)**
  143:22
**sufficient (1)**
  141:23
**suicide (1)**
  165:19
**suitability (2)**
  129:1;143:5
**Suite (1)**
  2:
**summer (5)**
  20:1;64:4,5;177:17,
  20
**superior (1)**
  35:12
**supervising (1)**

69:11
**supervision (1)**
  69:22
**supervisor (12)**
  15:11,12;16:8,9;
  25:15;79:6,8;127:17;
  133:23;149:2;154:21;
  188:6
**supervisors (4)**
  36:1;104:2;168:2,25
**supervisor's (3)**
  132:19;133:7,19
**Supplementary (3)**
  78:10,14;79:1
**support (1)**
  141:25
**supporting (1)**
  115:11
**supposed (7)**
  26:8;65:25;81:22;
  101:8;109:24;155:6;
  163:11
**sure (33)**
  12:16;23:21;28:21;
  47:17,18,18;67:11;
  70:4;74:22;81:2,20;
  85:21;89:9;97:14,22;
  109:12,18;122:21;
  124:6,7;141:2,10;
  145:5,8;154:19;
  162:15;165:1;169:3;
  170:15;172:12;182:23;
  189:4;191:18
**sustain (2)**
  13:25;130:24
**Sustained (5)**
  50:12;59:11;124:22;
  125:8,17
**swear (2)**
  14:11;112:10;146:1;
  175:17

**T**

**tab (1)**
  28:15
**tables (1)**
  119:8
**tabs (1)**
  11:15
**talk (3)**
  11:2;86:13,21
**talked (6)**
  106:2;135:23;149:7;
  162:18;167:25;168:1
**talking (14)**
  10:10,13;12:22;17:5;
  63:4;82:21;83:9;84:25;
  150:24;153:21;156:14,
  15;158:6;184:9
**tank (2)**
  165:20;166:3
**tanks (3)**

165:19,20,24
**task (1)**
  89:4
**team (2)**
  33:20,25
**telephone (6)**
  29:24;180:16;183:2,
  5,11,12
**telephones (1)**
  58:15
**televisions (1)**
  119:9
**ten (4)**
  36:15;60:5;164:21;
  173:8
**ten-minute (3)**
  61:8;134:25;135:3
**tenth (2)**
  54:1,2
**term (3)**
  80:20;98:20;99:21
**terminate (1)**
  6:21
**terminated (2)**
  123:5;154:17
**Termination (30)**
  5:3;6:17,17;7:10,12;
  9:5,21,22;13:24;51:13,
  19;115:18,19,21;116:3,
  17,20;123:4,8;125:19;
  128:7;129:6;130:12,
  16,19;133:25;141:24;
  162:22;174:15;176:13
**terms (4)**
  98:11,24;103:14;
  104:4
**testified (34)**
  14:17;29:10;32:5;
  50:18;59:9;61:16,25;
  63:15;66:18;67:8;
  75:14;81:8;84:24;
  86:23;87:19;98:23;
  100:14;112:16;124:19;
  132:2,11;137:10,11;
  142:13,15;144:11;
  146:7;148:22;164:3;
  169:11,14;174:6,13;
  175:23
**testify (1)**
  13:9
**testifying (1)**
  59:10
**testimony (34)**
  8:3;13:5;14:11;51:2,
  19;61:23;83:4;84:12;
  88:15;92:12;99:10;
  112:10;124:8,16,21;
  132:9;136:17;139:21,
  23;141:8;146:1;
  150:17,19;153:9;
  154:25;159:15;160:11;
  174:6,21;175:17;
  179:10;180:6;187:14;

193:7
**Thanks (1)**
90:18
**thereafter (1)**
193:10
**Therefore (3)**
24:21;27:6;105:1
**thereof (1)**
193:16
**thinking (1)**
137:14
**third (12)**
7:20;41:3,18;43:4;
77:10,15,22;105:2;
125:12,22;126:22;
157:3
**though (4)**
42:13;78:20;85:19;
93:21
**thought (2)**
76:10;139:24
**three (11)**
16:6;26:2;45:15;
47:2;65:17;114:19;
143:3;147:12;150:13;
181:2;186:14
**throughout (13)**
20:25;21:2,6;29:7,
17;56:11;57:7,17;
58:21;70:20;72:15;
82:5;83:1
**tier (4)**
101:2,2,2,3
**tiers (1)**
101:1
**times (14)**
8:23,25;12:15;58:10;
66:13;76:23;77:10;
79:4;120:2;133:16,17;
150:13;180:17,24
**tiny (1)**
169:24
**title (1)**
15:10
**today (11)**
7:10;8:3;16:17;
60:15;117:24;118:20;
119:20;120:16;122:20;
136:1;141:5
**together (4)**
28:7,11;75:5;115:1
**told (8)**
32:9;33:14;35:14;
84:25;108:20;162:11;
167:16;187:11
**took (4)**
6:19;53:5;95:18;
135:11
**total (10)**
9:18;34:7;65:13,16,
20;75:3;109:10;
113:14;123:11;155:6
**totality (2)**

116:8;122:10
**touch (1)**
191:3
**toward (1)**
78:9
**towards (7)**
43:1,20;45:17;47:4,
10;50:1;163:5
**track (3)**
18:1;28:16;184:7
**tracking (1)**
180:23
**traffic (27)**
82:10,23,24,25,25;
83:7,7,12;84:11;148:6,
15,20;149:8,12,19;
152:1,5;156:9,12,13;
157:5;179:23,23;
182:16,21;183:2,5
**trained (6)**
128:23;142:18;
143:4,11,19;164:7
**training (22)**
12:7;68:7,14,17,19,
21,22,23;69:2,10;
128:8,11,14,19,24;
142:13,16,21;143:10,
12,14,21
**transcribed (1)**
193:10
**TRANSCRIPT (8)**
1:13;185:18;189:15,
20,23;190:11,16;
193:13
**transfer (2)**
81:23,24
**trays (3)**
11:11,14;91:22
**treated (3)**
62:4,16,19
**treatment (1)**
62:6
**tricky (1)**
157:18
**tried (6)**
12:12;13:15,18;
105:15;188:10,11
**tries (3)**
157:15;158:18;
183:18
**trouble (1)**
106:20
**true (5)**
79:12;80:10;84:4;
105:14;193:13
**truth (13)**
14:12,12,13;52:1;
112:11,11,12;146:2,2,
3;175:18,18,19
**try (9)**
15:3;80:23;99:9;
101:25,25;180:24;
182:21,23;184:23

**trying (18)**
12:23;13:4;47:17;
87:24;96:16;104:23;
134:24;141:1;156:16;
157:11;171:15,25;
172:19;180:12,14;
181:25;186:20;187:1
**turn (8)**
52:4;55:22;56:12;
57:12;78:8;86:3,15;
159:23
**turned (1)**
90:4
**turning (1)**
190:20
**TV (1)**
22:6
**two (65)**
8:11;9:17;11:8;
19:23;20:3,3,8,14;22:1,
15;25:12,13,14,25;
26:2;31:8;32:1,4;
34:10,17;35:1;43:13,
15;45:4;46:6;47:1,1;
58:23;64:1;65:3,7,8,17,
20,22,25;66:6;71:16;
77:7;84:19,20,22,23;
89:22,22;96:24;97:1,2;
99:16;104:2;114:7;
117:21;122:21;125:20;
131:14;151:3;153:24;
155:23;157:8;167:4,4;
177:4;178:13;185:12;
189:20
**two-page (1)**
127:1
**type (4)**
17:4;67:19;94:16;
180:9
**types (2)**
184:3
**typewriting (1)**
193:11
**typical (8)**
25:10;51:16;80:22;
81:11;82:8,11;133:25;
148:2

U

**UGSOA (2)**
1:6;2:8
**ultimately (1)**
15:25
**unaccompanied (1)**
7:20
**unattended (1)**
93:17
**unauthorized (3)**
31:4,10;32:9
**unclear (2)**
44:11;68:1
**uncommon (1)**

76:25
**uncuffed (1)**
161:25
**under (9)**
9:21;72:11;78:9;
130:7;142:21,25;
144:18;147:20;193:11
**underlined (1)**
144:19
**undetermined (1)**
72:13
**unescorted (12)**
10:21;11:17,24;
13:20;31:6;86:1;95:2;
100:12;126:1;136:6;
158:4;160:13
**unfortunately (1)**
23:17
**uniform (2)**
7:6;18:14
**uniforms (4)**
7:4;18:5,8;106:4
**UNION (21)**
2::5;9:11;18:13;23;
113:10,11;130:15,18;
134:24;136:15;144:1,
3,8;145:22;146:7;
167:12,20;174:18;
175:14,23;189:5
**Union's (1)**
173:13
**unit (113)**
7:2,17,19;10:15,22;
11:1,5,14;12:3,20;19:1,
4,8,18;20:9,17;23:18;
24:22,24;26:2,11;34:6,
8,12;37:5,5,6,9,10,17;
38:14,18;43:11;45:23;
63:3,16,16;65:1,6,12;
66:7,8;67:6;69:23;
73:11,14,17,21;74:1,6,
10,11,14,16;75:1,2,4;
76:3,5;82:17;84:2;
88:21;89:15,15;90:1,5,
7;91:21;95:9;99:4;
24:118:4,8;136:19;
138:4;139:23;140:15,
16;149:1,8,9;151:14,
19,19,25;152:2;
153:19;154:24;155:7,
22,23;156:4,7,18;
157:1,3,8;158:12;
160:12,17,17,19,23;
163:12;167:13,17;
180:4;186:21
**UNITED (1)**
2:9
**units (28)**
10:14;20:3,8;29:8,
20;62:12;65:4;73:16;
74:12,13;75:6;76:19;
83:25;84:16;134:16,

16;147:16;151:15;
152:21;153:6;177:10;
181:21,22;182:1,13;
183:12;186:13,15
**unless (1)**
110:4
**unlock (1)**
183:22
**unlocked (7)**
11:6;66:10;92:15,19;
95:5,6;167:19
**unreasonable (2)**
58:11,14
**unrestrained (4)**
10:21;11:17,25;
13:20
**unsecure (1)**
8:19
**unsecured (10)**
7:9,15;39:4;98:13;
99:2,6;117:8;121:15;
136:7,8
**unsupervised (1)**
38:14
**unsure (2)**
69:12;92:25
**unusual (4)**
31:21;58:11;79:20;
102:23
**up (83)**
9:10;11:1;13:13;
14:7;19:22;21:5,16,18,
20;22:11,14,16;23:6,8;
27:2;30:6;31:2;36:13;
37:13;39:16,22,24;
43:12;45:1;49:4;50:4;
64:6,17;65:14,16,18,
22;70:11,15;71:11,18,
21;75:7,8;81:6;95:11;
96:1,1,8;97:20;107:6,
6;109:21;110:6;111:2;
114:20;116:14;118:9;
122:15;131:4;137:12;
145:7;148:6;151:3;
152:4,12;155:8,20;
158:19;160:18,19,20;
161:21;170:1,3;
172:10,18,24;174:24;
175:1;181:3,4;185:7,
20,25;186:1;187:10;
191:17
**Upon (5)**
6:19;9:10;51:19;
83:21;123:10
**upper (2)**
101:2,3
**ups (1)**
180:13
**upset (5)**
101:19,19,22,22,23
**use (5)**
8:21;22:8;37:7;
64:23;100:16;128:12;

183:13
**used (5)**
8:19;38:17;70:12;
82:4;98:20
**using (4)**
32:4;81:11;180:6;
181:24
**usually (2)**
154:12;160:9
**utilities (2)**
83:9,13
**utility (4)**
133:16,22;138:18;
177:11
**utmost (1)**
117:5

**V**

**vacated (1)**
90:4
**Vantel (1)**
15:22
**varies (2)**
19:9,9
**various (4)**
5:3;17:7;19:9;50:20
**verbal (14)**
40:9;50:3;106:12,12;
107:18;110:2;125:16;
157:16;158:15;167:18,
23;184:3,4,9
**Verbally (2)**
24:5;167:16
**verification (1)**
123:24
**verified (1)**
166:19
**verifies (2)**
133:5,5
**verify (4)**
8:21;13:11;158:21;
183:8
**verifying (2)**
9:1;162:16
**versus (3)**
26:6;62:16;63:3
**vestibule (1)**
123:23
**via (3)**
31:9;47:20;156:20
**vice (3)**
116:16;127:22;
167:12
**video (96)**
8:20;21:20,21,21,22;
23:1,4,8,12,14,19,22,
25;34:16;36:9,13,15,
18,21,23;37:3,11,23;
38:11;39:6,10,12,16,
21;40:21;41:8,10,11,
25;42:13,16,17,23;
43:4,8;44:4,5,23,25;

45:1,1,6;46:1,2,10;
48:10;49:1,19;50:10,
13;51:22;53:23;58:22;
59:13,15;60:12,20;
71:7,8,11,18;87:22;
95:21,25;96:3,8,9,11;
102:8,9;107:2,6;
114:23,25;122:12;
123:18;124:13,17;
141:22;142:11;158:18,
19;159:3,5;169:11;
171:12;172:19,24;
183:19;184:1;185:1
**Video/DVD (1)**
5:
**videos (1)**
163:3
**view (7)**
36:15;37:6;39:25,25;
44:12;60:15;159:13
**viewable (1)**
39:12,17;44:5
**viewed (1)**
44:8
**viewer (1)**
48:16
**viewing (3)**
36:24;43:19;49:22
**violated (2)**
127:7,7
**violation (7)**
123:10;127:8;
135:23;136:5,24;
137:10,15
**violations (3)**
116:25;123:12;
125:18
**violent (2)**
67:23;102:7
**vis-a-vis (1)**
32:22
**visible (5)**
30:20,22,23;39:12;
42:23
**visit (6)**
149:14;155:8;
158:10;162:1,2;165:6
**visitation (8)**
83:15;135:12;
153:13;161:20,21;
165:3;182:11,24
**visits (1)**
150:1
**visual (3)**
32:16;45:2;103:11
**volume (1)**
180:16
**vulnerable (1)**
121:7

**W**

**wait (2)**

40:9;170:5
**waited (1)**
40:7
**waiting (4)**
17:8;19:11;47:11;
49:23
**walk (4)**
7:19,22;100:11;
158:3
**walked (2)**
33:7;154:10
**walking (13)**
31:2;32:19;43:20;
44:2;49:25;62:8;98:24,
25;150:15;159:6;
162:11;163:4,5
**wall (18)**
20:2,6;30:15;48:15;
63:20;64:1,6,17;65:14,
16,18,22;118:8;160:17,
19,20;161:23;162:3
**warden (21)**
15:23,25;16:2,3;
35:14;51:2;112:23;
113:1,2;127:17;131:2;
136:11;145:14;154:5;
160:5;162:22;167:17;
169:6,9;174:12;180:13
**Warden's (1)**
154:22
**Wareham (1)**
2:11
**Warehouse (1)**
188:6
**warranted (1)**
116:11
**warranting (1)**
125:19
**warrants (1)**
116:3
**watch (11)**
32:15;35:22,24,25;
45:12;46:6;109:6;
133:8;154:15,23;
165:19
**watching (2)**
32:24;165:6
**way (17)**
17:11;26:3;35:22;
49:17;62:21;71:20;
84:13,14;132:23;
140:24;150:9;152:8;
154:13;156:21;161:21;
174:8,19
**ways (2)**
25:25;98:22
**Wednesday (3)**
1:16;6:1;193:6
**week (3)**
7:11;10:16;167:18
**weekly (1)**
157:25
**weeks (4)**

10:16;154:18;
161:17;189:20
**weren't (2)**
27:1,2
**west (11)**
10:13;19:20,22;
117:20;118:7;146:24;
147:21,22,23;164:13;
166:1
**whatnot (1)**
105:3
**what's (9)**
39:6;41:16;47:13;
83:23,23;88:12;
119:25;140:1;167:15
**whatsoever (4)**
69:9,18;126:3;158:7
**whenever (3)**
79:18;109:14;153:23
**whereas (1)**
174:6
**whereof (1)**
193:17
**Whereupon (1)**
192:4
**wherever (1)**
182:23
**whole (7)**
13:25;14:12;112:11;
146:2;149:18;175:18;
187:19
**Whoops (1)**
167:2
**Who's (5)**
81:11;156:1;159:14;
182:14;185:6
**whose (4)**
77:24;116:20;
138:15;171:16
**window (12)**
41:6,7;43:8,12,15;
45:12;70:16;71:5,6;
163:5,9,10
**windows (4)**
37:16;45:11,15;
161:22
**Wise-McCormick (1)**
2:
**wish (1)**
60:14
**within (28)**
17:18;18:1;26:15;
36:10;62:4;64:22;65:4,
5;73:8;74:10,10;75:4;
84:20,21;100:15;
104:19;118:15;150:3;
151:14,24;152:21;
153:1;155:12;156:18;
160:1,20;161:1;179:5
**without (3)**
9:1;162:16;166:5
**WITNESS (67)**
3:7,14;4:2,8;14:5,14,

17,18;50:19;57:5;
59:25;60:1;61:12;78:5;
85:12,14;86:6,8;90:14,
17,20;97:21;99:10;
106:1,7,14,23;107:4,7,
9;111:23;112:1,13,16,
18;115:5;124:12,17,
23;125:7,9;126:18;
130:5;145:15,22;
146:4,7,9;152:10;
168:13;171:7,13,18,21;
172:1,7;173:7,8,13;
175:14,20,23,25;
188:14,17,22;193:17
**witnessed (1)**
162:4
**witnesses (4)**
36:6;51:20,22;
145:16
**word (5)**
70:12;73:24;99:17;
143:11;178:19
**words (2)**
143:17;155:5
**work (17)**
12:4,8;23:3;69:7;
79:18;80:1;108:5;
147:18;152:21,23;
164:16;176:16;177:8,
19;178:17,19;188:10
**worked (10)**
15:8;147:1,5,14,15;
160:16;165:14;176:18;
177:22;188:8
**working (32)**
12:6;24:11;31:15;
66:6;70:2;80:19;
118:14;134:23;147:13;
148:3;157:15;164:3,
11;165:1;173:17;
174:4;176:16,17;
177:1,2,4,10,14,25;
179:6,11;181:7,16,17;
184:22;188:3,5
**works (3)**
152:13;171:13;
183:15
**world (1)**
17:7
**wrap (2)**
95:11;145:7
**write (4)**
167:21,22;179:25;
181:21
**writing (4)**
137:17,21;168:7;
193:10
**written (4)**
48:15;55:8;85:19;
137:20
**wrong (2)**
174:22,22
**wrote (1)**

93:9

## Y

**yard (3)**
41:1;119:24;160:25
**year (9)**
120:17;132:18;
134:10,23;147:25;
160:18;176:14;177:15;
188:9
**years (6)**
16:6;19:24;147:2,3;
158:9;176:14
**yelling (1)**
101:24

## 0

**02538 (1)**
2:11
**07728 (2)**
2:15;190:6

## 1

**1 (25)**
5:3,10;26:8;50:23;
51:7;54:16;57:13;61:6;
78:4;85:8;90:9;93:3;
113:24;115:4,10;
121:20;126:20;128:2;
129:21,24;135:17;
143:1;144:1,3,8
**1,500 (1)**
16:19
**1:00 (3)**
101:3;120:7;187:25
**1:39 (1)**
112:5
**10 (5)**
3:4;86:2,5,6;109:7
**10.2.27 (1)**
56:1
**10.3.11 (1)**
56:15
**10:00 (1)**
120:5
**10:04 (2)**
1:17;6:2
**101 (1)**
26:8
**105 (1)**
3:12
**107 (1)**
3:12
**11 (2)**
54:19;86:15
**11:20 (1)**
61:10
**11:30 (1)**
165:10
**11:37 (1)**

61:10
**110 (2)**
3:11,12
**11191 (3)**
1:22;193:,4
**112 (2)**
3:5,16
**11th (2)**
54:11,12
**12 (6)**
71:25;74:10;85:9,10;
86:15;185:19
**12:00 (1)**
101:3
**12:45 (1)**
112:4
**12th (2)**
54:15,17
**13 (1)**
117:22
**132 (1)**
3:17
**13th (2)**
54:21,23
**14 (9)**
1:16:3:9;6:1;71:25;
82:22;85:11,12;93:3;
193:6
**14.3 (2)**
9:4,21
**1400 (1)**
181:16
**141 (1)**
5:
**1430 (1)**
80:11
**144 (1)**
5:10
**146 (1)**
4:4
**14th (2)**
55:6,7
**15 (6)**
53:4;109:7;117:25;
138:22;164:14;178:5
**1500 (3)**
79:17,24;80:11
**15th (3)**
55:14,15;76:5
**16 (1)**
129:15
**1630 (7)**
12:17;27:19;79:10;
82:22;135:5;159:21;
186:7
**164 (1)**
4:5
**1640 (1)**
27:23
**1645 (1)**
27:23
**1655686 (1)**
1:

170 (1)
4:6
**1700 (2)**
79:10;82:22
**172 (1)**
4:6
**1730 (1)**
79:24
**176 (5)**
4:10;128:10,13;
143:14,22
**18 (1)**
90:9
**1800 (1)**
135:8
**1st (1)**
118:6

## 2

**2 (11)**
5:;42:14;61:1,2;
82:17;90:22;118:6;
123:21,23;129:6;155:9
**2:00 (1)**
187:25
**2:06 (1)**
131:20
**2:08 (1)**
131:20
**20 (2)**
149:24;158:20
**200 (1)**
16:22
**2000- (1)**
164:13
**2001 (1)**
16:12
**2011 (1)**
15:9
**2012 (2)**
117:22;176:15
**2013 (4)**
16:10;19:22;38:24;
63:16
**2014 (4)**
15:13;177:17,20;
178:5
**2015 (42)**
6:16,25;10:17;20:1;
24:11;63:19,23;64:4;
65:9;69:14;70:1;75:22,
24;76:5;79:9;80:12;
88:22;89:14;90:7;91:2;
95:19;113:18;118:6,
25;119:19;120:20;
130:8;134:11,15;
138:21;151:1;152:20,
24;161:4;164:15;
165:2;176:15;177:20,
24;178:8,21;184:21
**2016 (4)**
6:18,20;129:7;

135:11
**2017 (4)**
1:16;6:1;193:6,18
**21 (2)**
90:16;140:11
**2230 (1)**
181:16
**23 (1)**
78:8
**23rd (1)**
55:22
**24 (1)**
143:2
**24/7 (1)**
80:5
**2425 (1)**
2:5
**26 (2)**
90:21;143:1
**260 (1)**
113:21
**27 (1)**
90:22
**270 (1)**
113:21
**28 (1)**
90:22
**2879 (1)**
2:
**28th (5)**
190:10;191:11,14,
17,19
**29 (1)**
90:23
**29th (2)**
6:18;56:12
**2nd (1)**
130:6

## 3

**3 (4)**
90:23;124:1;126:23;
143:2
**3:07 (1)**
173:10
**3:17 (1)**
173:10
**3:30 (1)**
120:7
**3:41 (1)**
192:4
**30 (7)**
95:13;181:12;
189:14,22;190:6,10,16
**300 (3)**
12:11,21;113:16
**307 (1)**
113:15
**31 (1)**
181:12
**35 (2)**
26:19;130:1

**35th (3)**
57:12,15,16
**360 (1)**
74:25
**37 (1)**
129:23
**37th (1)**
129:20
**3rd (2)**
90:12,13

## 4

**4 (2)**
90:23;127:12
**4:00 (4)**
79:25;148:18;160:9;
180:21
**4:30 (2)**
12:17;148:16
**40 (8)**
68:9,12,12,14,19,23;
109:5;128:14
**405 (1)**
113:7
**40-hour (1)**
69:2
**40-inch (3)**
22:5,5;70:8
**431 (1)**
113:7
**45 (6)**
26:19;27:6;28:3;
95:13;154:12;155:20
**45442 (1)**
46:20
**474-3600 (1)**
2:

## 5

**5 (3)**
2:;52:4;190:5
**5:00 (2)**
79:25;160:7
**50 (1)**
109:9
**500 (1)**
170:3
**51 (1)**
5:3
**5th (41)**
6:16,18,25;10:18;
24:11;26:21;52:11;
53:4,14;54:4,14,25;
55:9;58:1,12;70:3;
75:24;79:9;80:11;
82:22;90:7;91:2;95:19;
102:18;117:25;126:7;
129:2,11;130:8;
134:11;140:9;153:25;
161:4;165:2;167:9;
169:3;177:24;178:21;

182:7;184:21;186:6

**6**

**6 (1)**
 3:3
**6:00 (1)**
 160:9
**60 (1)**
 27:6
**602 (1)**
 2:
**61 (1)**
 3:10
**640 (1)**
 117:23
**678-0936 (1)**
 2:
**6th (3)**
 55:7,15;188:2

**7**

**7:00 (2)**
 120:5;148:18
**707 (11)**
 33:23;46:14;48:3,12;
 49:14,25;87:20;88:3,
 11,13,19
**732 (1)**
 2:
**76 (2)**
 155:9,9
**761-9847 (1)**
 2:
**774 (1)**
 2:
**7th (1)**
 193:18

**8**

**8 (1)**
 143:1
**8:00 (1)**
 79:25
**8:30 (1)**
 165:10
**80 (2)**
 155:6,9
**85016 (1)**
 2:6
**880 (2)**
 1:6;2:8

**9**

**9 (5)**
 54:8;74:10;86:2,5,6
**9:00 (1)**
 79:24
**90 (1)**
 120:9

**900 (1)**
 2:
**9619 (1)**
 1:19
**98 (1)**
 3:11
**9th (2)**
 176:12,14

# EXHIBIT 36

Arbitration Ruling Re: Marquez

FEDERAL MEDIATION AND CONCILIATION SERVICE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of the Arbitration

      -between-

UNITED GOVERNMENT SECURITY OFFICERS
OF AMERICA LOCAL 880
              Re: Elizabeth Marquez

     -and-                                 FMCS No.
                                              1655686

GEO GROUP, INC.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BEFORE:  LEONARD M. SHAPIRO
            ARBITRATOR


Appearances
        For the Union:
                Robert Kapitan, Esq.
        General Counsel
        UGSOA, Local 880
        For the Employer:
                Frederick C. Miner, Esq.
        Littler Mendelson, P.C.



\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*


<u>OPINION</u>


In compliance with the procedures of the Federal Mediation and Conciliation Service I have been designated as Arbitrator in the above matter.  A hearing was held on June 14, 2017 at which time both parties had full opportunity to produce evidence, witnesses and argument in support of their respective positions.  They did so.  The parties agreed to submit closing briefs which were due and received by August 5, 2017.  At which time the record was closed.

SANTIAGO 185

## The ISSUE:

Did the Company have just cause to discharge the Grievant, Elizabeth Marquez; and if not, what is the appropriate remedy?

## RELEVANT PROVISIONS

### PARTIES COLLECTIVE BARGAINING AGREEMENT
### ARTICLE 14
### JUST CAUSE

14.2.        No Officer shall be disciplined or discharged without Just Cause....

14.3.        The following violations are representative only of the reasons that constitute Just Cause for immediate dismissal.  The list of violations below is not an all-inclusive list....

- Inattention to post (sleeping, etc.)

### POLICY AND PROCEDURE MANUAL
### Title:  Master Control Center Operations
### Number:  10.2.27-ADJ

II.    Procedures

....Major responsibilities of the control center officer include the following:

- Controlling such doors and gates as are actuated from this post....

C.    MOVEMENT CONTROL

The control center officer controls movement through critical doors and ensures that all gates and doors are closed at all times when intended.  Television and audio communications devices used in connection with gate functions will enable positive identification of all persons passing through key traffic points.

### POLICY AND PRUCEDURE MANUAL
### Title:  Master Control Center Officer
### Number:  10.3.11 – ADF

C.    Entrances / Exits

2

SANTIAGO 186

Control Property access points

 All perimeter security entrances, Control Center door, housing unit doors and any door opening into a corridor are to be kept locked except when used for entry or exit of employees, detainees, visitors, or for emergencies.

1.      ....When opening or closing doors, the Master Control Center Officer will exercise caution to allow only authorized persons and equipment in and out without compromising the safety and security of the facility.  The Master Control Center Officer will open and close one door at a time for high security areas as well as primary access points.

## **BACKGROUND**

On the entire record produced, including my assessment of credibility, I find the following relevant facts:

At the time of her discharge the Grievant was employed as a Detention Officer at a GEO detention facility in Adelanto, California.  She was employed there from July 2012 until her discharge in April of 2016.  The Grievant requested and was granted FMLA leave just after the date of the incident that led to her discharge (August 5, 2015) and was notified of her termination just after the leave period ended.  She performed numerous Detention Officer functions during her employment and on the day in question was functioning as a Central Control Officer.  A post which she held numerous times before and one in which her supervisors deemed her qualified.

As a Central Control Officer her main duty was to control the flow of authorized personnel through the facility.  The facility has numerous doors that lead to numerous corridors separating the various departments and functions.  Detainees are not permitted movement through the facility unless accompanied by an Officer.  The Central Control Office is staffed by two officers stationed at an electronic board that allows them to verbally or visually identify individuals

3

**SANTIAGO 187**

requesting access to a particular corridor through a door. Each officer is responsible for half of the board. Once the officer identifies an individual as authorized the officer presses a button that unlocks the door. The door then relocks after the individual has passed through.

The Central Control Officer also has other duties. The officer is required to communicate by radio with detention officers to document their activities. They are also responsible for answering phones and taking messages for parties within the facility. After 4:00PM when the main switchboard is closed all incoming calls are routed through the Central Control Room. Central Control officers also play a role in scheduled and emergency counts of Detainees. At the time of the incident during counts, sections called their counts into Central Control where officers tallied them.[1]

## THE AUGUST 5, 2015 INCIDENT

In the early evening of August 5, 2015 a number of events occurred simultaneously, which impacted the typical responsibilities of the Grievant as a Central Control Room Officer. A high-risk Detainee[2] was left unsupervised in a shower room and was now walking through the facility in an attempt to escape. The front desk was closed and the Grievant was handling incoming calls to the facility. The evening count[3] was off and an emergency count was instituted. A supervisor

---

[1] This was changed by management a short time after the August 5th incident.
[2] Detainees are categorized into security risk levels and wear different color jumpers depending on that level. High-risk detainees wear bright red jumpers. The Detainee involved in the incident was wearing a bright red jumper.
[3] A head count of detainees is made on a regular basis throughout the day. If that count cannot be reconciled with the number of detainees on the rolls, an emergency

SANTIAGO 188

entered the control room and was coordinating the count with the second Control Room Officer.  The Grievant was now in charge of the entire board.  At some point the supervisor looked up at one of the monitors and noticed that a detainee in a red jumpsuit was walking through a corridor where he was not permitted.  Other officers were alerted.  They followed the Detainee, stopped him, and after a heated conversation persuaded him to return with them to his appropriate area within the facility.  The Company's investigation revealed that the Detainee had been buzzed through four different security doors by the Grievant and was two doors away from the exterior of the facility.

## POSITION OF THE PARTIES

The Company contends that there was just cause for the discharge of the Grievant.  The Company argues that the Grievant's actions (allowing the Detainee to pass through four different doors without first checking on the identity of the person requesting access) are a clear violation of her post orders.  Furthermore, they argue, her inattention to her post is just cause for immediate dismissal as described in Article 14.3 of the parties collective bargaining agreement.

The Company asserts that, "Officers are charged with authority to monitor and secure detainees in a safe environment.  Their performance of their duties is essential to safety in and outside the facility.  Ms. Marquez failed to do so, and her casual inattention to the requirements of her post warranted her termination under

---

count is instituted whereby detainees are identified individually by comparing them to their pictures.

the cleat terms of the parties' agreement.  The grievance has no merit; it should be denied."[4]

The Union contends that there was not just cause for the Grievant's discharge.  The Union argues that while the facts relating to the August 5th incident are not in dispute there were systemic errors and Company shortcuts that caused increased stress on Control Room Officers and led to the Detainee being able to gain access to various corridors and doors.  Specifically, the creation of a segregation unit that allowed detainees to move through the facility without restraints or an escort. The Union argues that its position is substantiated by the fact that after the incident a number of policies, procedures, and staffing assignments were changed to correct the problems that led to the August 5th situation.  Specifically the Union points to the following:

Housing Officers no longer giving breaks to other officers and are now responsible for access through security doors in their own housing units.

A third Officer now assists Central Control with detainee counts.

The Union argues that these conditions in addition to the other responsibilities of the Grievant on that afternoon created a situation where she was under tremendous stress and that they should be considered mitigating circumstances when applying discipline.   The Union also argues that the Grievant is not being treated consistent with another officer who allowed the same Detainee to access a door to which he was not authorized. The Union asserts that, "Officer Marquez did not choose to let a detainee

---

[4] Company's brief pg. 21

6

SANTIAGO 190

through secure doors, it was an unintentional mistake, one that she could

learn from.  It is simply unfair to impose the stain of termination on Officer

Marquez's record so early in her career when we consider that GEO created

the situation that set her up to fail.  The Union asks the Arbitrator to take

these factors into account and order GEO to apply progressive discipline, as it

is required to do under the COLLECTIVE BARGAINING AGREEMENT. [5]"

DISCUSSION

On the basis of the entire record before me including my assessment of

testimony, exhibits and argument I find that the Company did have just cause to

discharge Ms. Marquez.  I have come to this finding for the following reasons:

The Post Orders (Company Exhibit 1) require that she keep doors secured

absent positive identification via audio or video images of those seeking access.  She

did not do that.  In her report of the incident that she prepared the same day as the

incident she stated, "I do not recall seeing any detainee at the camera call-up while

accessing multiple doors."  In her testimony at the hearing she stated that she did

not remember the Detainee trying to access any doors.  It is clear from her

testimony that she was very busy at the time, but the facts clearly indicate that she

gave the Detainee unauthorized access to doors on four separate occasions in a very

_____

[5] Union brief pg. 21-22

SANTIAGO 191

short period of time.  If she had looked at the screen she would have seen a person in a red jump suit and known that he should <u>not</u> have been granted access.  Security was her prime responsibility and her inattention to that responsibility is inexcusable.  The parties codified the importance of that responsibility in their collective bargaining agreement when they listed "Inattention to post "as one of the infractions that constitute just cause for immediate dismissal.  Evidence and testimony clearly support the determination that the Grievant was inattentive to her post.  Therefore, there was just cause for her dismissal.

The Union's argument that the Company's poor policies and procedures placed Central Control Room Officers under such stress that it precipitated the incident on August 5th is not supported by the facts.

While a credible Union witness described the complexity and stress of the Central Control Room Officer post, she was not on duty in the Control Room at the time of the incident and could not know what was happening.   If the Grievant felt that she could not perform all of her functions in a satisfactory manner because there was too much going on and she was too stressed, she had the obligation to say so to her supervisor, who happened to be in the room at the time.   However, her testimony shows that that is not the case.  In response to the question by the Unions attorney, "How busy was it at the time?" She replied, "It was pretty busy."  She didn't say "very busy" or "extremely busy" or "I was under a lot of stress."  Clearly she did not feel that she was under extreme stress.

The Union also argued that Ms. Marquez has been treated differently than another officer who mistakenly permitted unauthorized access to this same

SANTIAGO 192

Detainee.  I have carefully reviewed the details of that incident and do not find it comparable in either scope or severity. I find no disparate treatment.

Finally, the Union asserts that because the Company changed a number of its procedures regarding staffing and conducting of counts as the result of the incident which led to the Grievant's dismissal, it should be a mitigating factor in determining the severity of the discipline Ms. Marquez should receive.   The Union's argument in this regard is not without merit. However, while I may be somewhat sympathetic to this position, I cannot rule against the clear and specific language of the collective bargaining agreement, the Post Orders, and the undeniable fact that the Grievant having a responsibility for safety within and outside the facility, was inattentive to her post.

SANTIAGO 193

## AWARD

**The Company did have just to discharge the Grievant, Elizabeth Marquez.  The grievance is denied.**

Dated: <u>September 1, 2017</u>

LEONARD M. SHAPIRO

ARBITRATOR

10

**SANTIAGO 194**

AFFIRMATION

I Leonard M. Shapiro, do hereby affirm, upon my oath as Arbitrator, that I am the

individual described in and who executed this instrument, which is my Opinion and

Award.

Dated: September 1, 2017

LEONARD M. SHAPIRO

ARBITRATOR

SANTIAGO 195