# EXHIBIT B

Declaration of Emanuel Santiago

AMIR MOSTAFAVI, ESQ. (SBN: 282372)
**MOSTAFAVI LAW GROUP, APC**
11835 W Olympic Blvd., STE 1055
Los Angeles, California 90064
Telephone: (310) 473-1111
Facsimile: (310) 473-2222
amir@mostafavilaw.com

Attorneys for Plaintiff EMANUEL SANTIAGO

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMANUEL SANTIAGO, an individual, <br><br> PLAINTIFF, <br><br> vs. <br><br> THE GEO GROUP, INC., a Florida Corporation dba GEO CALIFORNIA, INC.; GEO Corrections and Detention, LLC; DOES 1-10, individuals, and DOES, 11-20, business entities inclusive, <br><br> DEFENDANTS. | Case No. 5:16-cv-02263-DOC-KK <br><br> **DECLARATION OF PLAINTIFF EMANUEL SANTIAGO IN SUPPORT OF OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** <br><br> *[Filed concurrently: Memorandum of Points and Authorities; Statement of Uncontroverted Facts and Conclusions of Law; Statement of Genuine Disputes; Evidentiary Objections; Appendix of Evidence; Proposed Order]* <br><br> Assigned to: Hon. David O. Carter <br> Date: December 18, 2017 <br> Time: 8:30 a.m. <br> Courtroom: 9D – 9th Floor <br> Action Filed: July 18, 2016 <br> Trial: January 23, 2017 |

MOSTAFAVI LAW GROUP, APC
PRACTICE LIMITED IN EMPLOYMENT LAW
11835 W OLYMPIC BLVD. STE 1055, LOS ANGELES, CA 90064

# **DECLARATION OF EMANUEL SANTIAGO**

I, Emanuel Santiago, declare as follows:

1.  I am the plaintiff in this action. I submit this declaration in support of the Opposition to Defendant THE GEO GROUP, INC., dba GEO CALIFORNIA, INC., GEO Correction and Detention, LLC's Motion For Summary Judgment Or, In the Alternative, Partial Summary Judgment.  I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.  I worked for GEO as a Detention Officer at Adelanto Detention Facility from 2013 to 2015. GEO terminated me on August 15, 2015, following an incident at the facility on August 5, 2015.

3.  On August 5, 2015, my supervisors assigned me to be on watch in the Administrative Segregation Unit. Even though I had been assigned to the Segregation Unit before during different shifts, this time my assignment was different because of the literal changes that the Segregation Unit had undergone.

4.  Before July 2015, there was only one Segregation Unit. This Segregation Unit housed detainees who were not allowed to be part of the general population for various reasons. The reasons varied from the detainees' propensity for danger or administrative.

5.  After July 2015, the Segregation Unit was further separated into two segregation units with a wall. After the wall was constructed, the old Segregation Unit became two segregation units: Administrative Segregation Unit and Disciplinary Segregation Unit. The Administrative Segregation Unit now held detainees who were under protective custody, or for any administrative reason, while the Disciplinary Segregation Unit held only detainees who were on disciplinary status. Detainees would be placed on disciplinary status for various reasons, usually after being involved in an altercation. In other words, GEO further segregated detainees who were already housed in Segregation by

MOSTAFAVI LAW GROUP, APC
PRACTICE LIMITED IN EMPLOYMENT LAW
1855 W OLYMPIC BLVD, STE 1055, LOS ANGELES, CA 90064

separating those on disciplinary status from those who were not on disciplinary status.

6.   With this development, GEO needed to ensure that they had enough detention officers monitoring two different segregation units, 24 hours a day. GEO began hiring new detention officers. After hiring new detention officers, GEO placed these new hires on night shift duty and removed officers with seniority to day shift duty. I was one of these officers who were removed to day shift, or 2nd Watch.

7.   Until August 3, 2015, two days prior the incident that lead to my termination, I was a night shift detention officer. Even though I still worked at the segregation unit before summer of 2015, my training and familiarity was minimal. I was unfamiliar with these activities because there were no dayroom activities on night shift, or 3rd shift. All detainees remained locked in their cells on 3rd shift and there was no detainee activities to complete.

8.   Due to the high-risk nature of the segregation unit, even before the further separation into two segregation units, a Lieutenant responsible for the segregation unit must specifically authorize officers to work at this post. The reason for this is simple: during the day shift, the detention officer's responsibilities are monumental in addition to keeping a close eye on detainees and their activities. During the day shift, detention officers were responsible for keeping everyone inside the facility and outside the facility safe, and also were required to count detainees every 2 hours, PIPE (security checks) every 30 minutes, escort detainees to requested areas of the facility, distribute dinner on time by themselves and keep a log of all that is completed.

9.   Prior to its division, the segregation unit required 2 Officers at all times per GEO's policies. All detainees had to be cuffed and escorted by 2 Officers anytime they were outside of their cell. After the further separation of the segregation unit, the Disciplinary Segregation Unit remained a high-threat, and so no policies were

changed. But, the risk level was considered to be minimal in the Administrative Segregation Unit, where I was assigned.

10. The new policy for the Administrative Segregation Unit no longer required officers to handcuff or escort detainees outside of their cells. Detainees were allowed to move freely in and out of their cells for access to the showers, television, social interaction, telephones, and law library terminals, which were all in a shared living area (dayroom). Due to these changes in policy, 2 officers were no longer required in Administrative Segregation, so management reduced staffing requirements to only 1 officer, allowing the 2nd officer to leave the unit to complete other tasks. As Officers, we were instructed to treat the detainees in this Unit like we would treat detainees in the general population. However, the amount of responsibility and the number of tasks to be completed by the officer on post remained the same.

11. When my Lieutenant changed my shift two days prior the incident, I was not familiar with the daytime operations or movement of detainees in the Administrative Segregation Unit, and I was yet to receive the specialized training. However, the authorization to work the day shift in Administrative Segregation Unit did not change.

12. On August 5, 2015, my shift supervisor assigned me to Administrative Segregation Unit, along with Officer Patterson. Because I was not familiar with the day shift operation of the unit, I was simply following officer Patterson's lead and learning along the way.

13. Although, the Policy requires two officer work during each shift including the 2:00 pm-10:30 pm day shift on August 5, 2015, I was the only segregation officer in the Administrative Unit most of the time on that day. Officer Paterson was going in and out to handle other duties in other units due to absence of officers.

14. During my short time in the day shift, they told me that I must strictly

MOSTAFAVI LAW GROUP, APC
PRACTICE LIMITED IN EMPLOYMENT LAW
1875 W OLYMPIC BLVD, STE 1055, LOS ANGELES, CA 90064

follow GEO's procedures for distributing food to the detainees. I was told they needed to be distributed in a timely manner once received from kitchen staff. GEO's policy specified that staff would ensure that food delivered to detainees be at the proper temperature.

15. Although there were 2 officers assigned to work at the Administrative Segregation Unit during 2nd shift, I was the only one on watch on August 5, 2015 as the 2nd officer was deployed to carry out other duties. During my shift on August 5th, Lieutenant Duran commanded me to watch a detainee named Irias. Lieutenant Duran's instructions were vague and she did not give specific directions requiring extra precaution or higher security when dealing with D/T Irias.

16. I knew that detainees who were violent or demonstrated unusual or bizarre behavior required more frequent observation. D/T Irias had not demonstrated any violence, or that he was mentally disordered or had unusual or bizarre behavior. Because of this I treated D/T Irias in the same manner as other detainees in the Administrative Segregation Unit.

17. Special categories of detainees may require a locked status in Administrative Segregation Unit based on safety and security concerns of the facility, and will be handled in on a case-by-case basis. D/T Irias was not among those detainees classified under special categories. I was never notified of such status even if applicable to D/T Irias.

18. From inside his cell, D/T Irias requested to use the shower, and given the new policy I allowed him to do so.  I unlocked his cell door allowing him to proceed to the shower, which was no more than 15 feet from his cell. I did not secure him in the shower by locking it because he did not request a shaving razor.

19. At no time on August 5, 2015, was D/T Irias considered to require a dedicated escort, or require to be locked inside the shower as he had not requested a razor.

MOSTAFAVI LAW GROUP, APC
PRACTICE LIMITED IN EMPLOYMENT LAW
1875 W OLYMPIC BLVD. STE 1055, LOS ANGELES, CA 90064

20. At this time I was operating the Unit by myself as Officer Patterson had taken a group of detainees outside for required recreation time. Shortly after I placed D/T Irias in the shower, Officer Patterson entered the unit to return the group of detainees to their cells in preparation for the 4:30 pm facility count. I assisted him in returning these detainees to their cells and securing their cell doors.

21. D/T Irias had not finished showering when the facility count commenced so he was counted in the shower with no issue. Once the count commenced, the dinner trays were delivered to the Unit by kitchen staff.

22. Once Officer Patterson and me completed counting the unit, Officer Patterson left Administrative Segregation once again to deliver the count paperwork to the Central Control. Officer Patterson did not return to the Unit as he was required to cover for another officer at a different post during that officer's meal break. I was left alone.

23.   Since dinner had arrived, I needed to start distributing it to the detainees per GEO's policy. D/T Irias was still in the shower when I began distributing the dinner. With the help of two detainees (porters), who were authorized to help me with the distribution of dinner, we distributed dinner to the entire lower level of the Administrative Unit. Once done, I checked on D/T Irias again and saw that he was still showering.

24. I proceeded to the upper level of the Unit with the porters to finish distributing the dinner. I finished distributing the dinner trays to the upper level and once completed I headed back down to the lower level. As I was going down the stairs I saw multiple officers entering the Unit with D/T Irias. They escorted him into his cell and we secured the cell door.

25. Sergeant Hutchinson told me that they had found D/T Irias outside of the Unit and asked me what had happened. I told them that detainee Irias was in the shower while I was busy distributing dinner trays. I believed that detainee Irias had exited the shower and the housing Unit when I was distributing trays to the

MOSTAFAVI LAW GROUP, APC
PRACTICE LIMITED IN EMPLOYMENT LAW
1875 W OLYMPIC BLVD, STE 1055, LOS ANGELES, CA 90064

DECLARATION OF PLAINTIFF EMANUEL SANTIAGO

upper level, as I did not see him leave.

26. Two officers from the Central Control office usually operate facility doors. There is a button by each security door, which has a speaker and microphone. To access a door, an officer presses this button, which relays to Central Control that someone is trying to access the door. Most doors have cameras on both sides of the door so control officers can see who is trying to access the door before remotely unlocking it.

27. Doors, which do not have cameras to show the person or those that have a bad view or angle preventing control from identifying the person, require audio identification. When D/T Irias exited the shower he had to gain access to two doors in order to exit the Administrative Segregation housing unit. The only way he was able to access the doors is if an office in the Central Control gave him the access.

28. Once D/T Irias was out of the housing unit he continued walking through the facility and was able to get through another 2 doors as Central Control continued unlocking doors for him.

29. Officer Marquez was the one operating the doors that day and she was the one who allowed D/T Irias to access total of 4 doors before he was caught. Officer Marquez and myself were instructed to write memos describing what had happened.

30. On August 6th, the day following the incident, officer Marquez did not report to work. She was pregnant and was granted leave of absence. She requested her maternity leave on the night following the incident. That same day I was called to Human Resources and was informed in writing that I was being placed on unpaid administrative leave pending an investigation, effective immediately.

31. GEO, as usual, treated me and Marquez rather differently even though they held us both responsible for the same incident. I was terminated not even after a month, while Marquez was terminated after a year. GEO has always treated men

MOSTAFAVI LAW GROUP, APC
PRACTICE LIMITED IN EMPLOYMENT LAW
1875 W OLYMPIC BLVD, STE 1055, LOS ANGELES, CA 90064

7

employees different than women employees. GEO always accommodates for women, but not for men.

32. About a year before I was terminated, I broke my leg and I was out of work for 5 months. I had asked HR multiple times to place me on light duty (clerical or central control room), but HR repeatedly told me that they do not have a light duty work for me. However, every time a female officer requests a light duty, for either physical injury or pregnancy, GEO always grants women light duty—just as they had placed Marquez in light duty in the Central Control because she was pregnant at the time of the incident.

33. GEO's carelessness, negligence and total disregard for its employees does not end here. As a detention officer, I was rarely able to take my rest and meal breaks. Because of the constant short staffing, officers on duty had no choice but to skip meal and rest breaks because we could not leave our posts unattended.

34. When I was notified that I was being placed on an administrative leave on the following date of the incident, Aida Aldape, the HR representative, assured me it was not a form of discipline but only a formality, and that the outcome would be determined upon completion of the investigation. I took my leave as instructed with the peace of mind that once the investigation is completed and GEO finds out that I was not at fault and the situation was out of my control, I would be back to my job.

35. During my leave I stayed in touch with my union representatives. First, they advised me that GEO in the corporate level was going to complete the investigation. Then, they told me that the corporate was going to send back the paperwork and the investigation was going to be done at the facility. By this time, over a month had passed and my union was trying to get the corporate office to allow me to return to work while the investigation was pending.

36. On September 15, 2015, I was called by HR and told they wanted me to go in the following day for a meeting. The next day I arrived at the facility and was

MOSTAFAVI LAW GROUP, APC
PRACTICE LIMITED IN EMPLOYMENT LAW
1855 W OLYMPIC BLVD, STE 1055, LOS ANGELES, CA 90064

met by my union representatives. At the meeting, the HR representative, Aldape, gave me a written notice stating that I failed to follow policy and procedures which lead to the almost escape of a detainee. The notice also stated that my employment was terminated.

37. This written notice continues in detail stating that I failed to secure the detainee in the shower by locking it and also failed to conduct a 2-officer escort of this detainee to the shower.

38. I was not only shocked but also confused because these policies that they were telling me I failed to follow were not in effect in the Administrative Segregation Unit. They were holding me responsible for their failure to implement clear guidelines for officers to follow. Not only this, but they were also holding me responsible for their failure to keep everyone safe. I became the scapegoat for all of the supervisors, Lieutenants and all the higher-ups that make the decisions for us on the ground to follow. I was the little guy that they got to push out and cause me to lose my job that paid for my family.

39. I followed all of the policies and procedures that I was told at the time to follow. Yet, I was fired and officer Marquez was allowed to take her maternity leave because GEO treats women more favorably than men.

40. As a detention officer at the Administrative Segregation Unit, I was responsible only for areas within range of my vision, areas within sight and sound including windows, emergency fire doors, corridors, the adjacent entrances to the main corridor and observation of the exterior of the facility grounds area, but my responsibility did not extend to different floors at the segregation unit where I could not have vision.

41. When D/T Irias requested to take a shower, I was required to allow him access to the showers. When I did not secure and lock D/T Irias in the shower, I was not required to secure him in the shower since he had not requested a razor. Attached hereto as **Exhibit 1** is a true and correct copy of GEO's razor-log sheet

MOSTAFAVI LAW GROUP, APC
PRACTICE LIMITED IN EMPLOYMENT LAW
1835 W OLYMPIC BLVD, STE 1055, LOS ANGELES, CA 90064

that shows that on August 5, 2015, D/T Irias did not request a razor or was given one.

42. When D/T Irias existed the shower on August 5, 2015, I was delivering food trays to detainees on the second floor of the unit per GEO's policies, and I could not have seen him maneuver on the first floor.  When D/T Irias left the shower and the unit, had there been a local control officer, D/T Irias would have been seen and prevented from leaving the area. Had GEO provided more officers and assigned fewer tasks per officer, Officer Marquez would not have been occupied with other pressing duties and would have prevented D/T Irias' access to 4 doors.

43. Had GEO, its supervisors, agents and decision makers made sure that there was a 2nd officer with me per their own policy and procedure, the escape attempt would have never happened.  Had GEO, its supervisors, agents and decision makers made sure that officers alone on duty should not be responsible carrying out other mandatory tasks other than monitor and guard, the escape attempt would have never happened. Had GEO cared more about its employees and had less corporate greed, my terminations, which lead to me losing a child and a house, would have never happened.

44. In or around January 2016, I received a claim form for the class action that had been filed against GEO for violation of various labor code sections. Attached hereto as **Exhibit 2** is a true and correct copy of the claim form that I had received in January 2016.

45. On or about February 3, 2016, I sent my opt-out to my attorneys asking them to submit it on my behalf. I received the Certified Mail Transmission from my attorneys' office that the opt-out form was properly and timely submitted to the claim administrator. Attached hereto as **Exhibit 3** is a true and correct copy of the opt-out form.

46. After Geo separated the segregation unit into administrative and

DECLARATION OF PLAINTIFF EMANUEL SANTIAGO

MOSTAFAVI LAW GROUP, APC
PRACTICE LIMITED IN EMPLOYMENT LAW
1855 W OLYMPIC BLVD. STE 1055, LOS ANGELES, CA 90064

disciplinary units in July 2015, I realized that some of the practices at the Adelanto facility deemed to be in contrary to what I have been trained at the Correctional Officer Training Academy in Tucson, AZ and the California Correctional Officer Training Academy in Victorville, California. I noticed that administrative unit was always understaffed, we could not take our breaks, and counts were conducted while detainees were not in their cell. I also noticed that we did not have enough detention officers on the unit for each post. Since Adelanto was operated under the ICE Detention Standard, I went to the ICE website at https://www.ice.gov/factsheets/facilities-pbnds to see if my observation were justified under the guidance required by ICE. I printed a couple of pages from the website to discuss with my shift supervisor about my findings. When I drafted the memo on August 5, 2015, I included some of issues that I had observed at work in contrast with the ICE detention standard. Attached hereto as **Exhibit 4** is a true and correct copy of the print out from the ICE website.

I declare under penalty of perjury under the laws of the state of California and the United Stated of America that the foregoing is true and correct. Executed on November 27, 2017 at Los Angeles, California.

Emanuel Santiago

DECLARATION OF PLAINTIFF EMANUEL SANTIAGO

Declaration of Emanuel Santiago

EXHIBIT 1

The Razor Log

SANTIAGO071

# Razor Log

5

| TE | NAME | A # | BUNK | OUT | IN | OFFICER |
|---|---|---|---|---|---|---|
| 7/30/15 | IRIAS | 739US866 | W1A.116·16 | 1823. | 1900 | MARTINEZ |
| 8/1/15 | Cardenas | 90079291 | 11A-110-1L | 0840 | 0905 | Alberan |
| 8/1/15 | Irias | 73 945866 | W1A 116-1L | 1832 | 1920 | Williams |
| 15 | Jaramillo | 27162048 | W1A 107·1L | 0845 | 0907 | U Ramirez |
| 1/ | Tiffado | 90079291 | W1A 14·1L | 0840 | 1017 | U Ramirez |
| 7-15 | Gutierrez | 71602035 | W1A-105-1L | 0840 | 0850 | Sanchez |
| 8/5/15  LT TIDWELL POD CHECK | | | | | | RD |
| 10-15 | Gutierrez | 75602035 | 105·1L | 1530 to | 1601 | E Flores |
| 8/7/15  LT TIDWELL POD CHECK | | | | | | RD |
| 7-15 | Torres | 24259382 | 205·1L | 1521 | 1530 | Hernandez |
| 7·15 | Icingkham | 46440029 | 213·1L | 1521 | 1530 | Hernandez |
| 7-15 | Flores | 20640971 | 212·1L | 1533 | 1536 | PATTERSON |
| 7-15 | PULIDO | 99892817 | 107-1L | 1639 | 1747 | PATTERSON |
| 8-10-15 | GUTIERREZ / SANCHEZ | 75602035 | 105·1L | 0732 | 1001 | H. JAUCING |
| 8/12/15 | GUTIERREZ-LOPEZ | 27149548 | 112-1L | 1815 | 1832 | MOREIKO |
| 8/12/15 | LAZARO | 200977225 | 115-1L | 1815 | 1830 | MOREIKO |
| 8/12/15 | PULIDO | 99892817 | 107-1L | 1845 | 1922 | MOREIKO |
| 8/12/15 | RAMIREZ | 90819128 | 113-1L | 1915 | 1936 | MOREIKO |
| | ALL RAZORS | ACCOUNTED | 2ND | WATCH | 8/12/15 | |
| 8/15 | Lazaro | 200977225 | 115-1U | 0910 | 0925 | S. Avila |
| 8/15 | pulido | 99892817 | 107-1L | 0915 | 1030 | Bonsoff |
| 8/15 | MALDONADO | 74431354 | 109·1L | 0930 | 0958 | H. JAUCING |
| 8/15 | Acever | 76342632 | 118·1L | 1010 | 1017 | Bonsoff |
| 8/15 | CORONADO | 70711570 | 210·1L | 0928 | 0954 | C Rojay |
| 8/16/15 | O RAZORS ISSUED 1ST WATCH | | | | | RD |
| 8/17/15  Lt. Duran Pod Check  RD | | | | | | |
| 8/15 | Torres | 24259382 | 1A-205·1L | 1800 | 1815 | J Hernd |
| 8/17·18 | Castillo | 44028637 | 208·1L | 1914 | 2015 | L PEREZ |
| 8/7/15 | Capt. McCusan | | Pod Check | | | |

# Declaration of Emanuel Santiago

# EXHIBIT 2

## The Class Action Claim Form

**CLAIM FORM**

United States District Court for the Central District of California

*Victor Lopez v. The GEO Group, Inc. Case No.* 2:14-CV-06639-PSG (PLAx)

This Claim Form includes information based on GEO's records. It is important that you carefully check the information provided and correct any inaccuracies. This Claim Form MUST be postmarked no later than February 8, 2016 and received by the Claims Administrator. **You MUST complete, sign, and return this Claim Form if you wish to receive money from this settlement.**

## I.   CLAIMANT INFORMATION

This is the information that we have for you and where your settlement check will be mailed:

AA230951BB44842CC5696202DD7879609
SIMID 1516
Emanuel Santiago
7659 Alder Ave
Fontana CA  92336-2305

Name/Address Changes:

_____

_____

_____

Tel: _____

If your name or address is incorrect or has changed, please legibly print the correct or new information on the corresponding lines above.

## II.   EMPLOYMENT INFORMATION

Defendants' personnel records state that the exact dates of your employment for Defendants' in California during the Class Period were **3/18/2013 through 9/16/2015**.

Defendants' records reflect that during your employment you worked 130.43 weeks as a nonexempt employee.

Based on the stated information your estimated settlement share is $370.93.

If you agree with the information stated above, please sign, date where indicated on the reverse, and return this Claim Form postmarked on or before February 8, 2016, to receive your monetary recovery.

☐    I disagree with the information stated above. I believe that my actual dates of employment during the Class Period were ___ / ___ / ___ to ___ / ___ / ___. I have attached tax and/or other documentation that supports this belief.

## III.   RELEASE OF CLAIMS

By completing this Claim Form and accepting the benefits under this settlement, I hereby agree that: I, and all persons purporting to act on my behalf or purporting to assert a claim under or through me, including, but not limited to, my dependents, heirs and assigns, beneficiaries, devisees, legatees, executors, administrators, trustees, conservators, guardians, personal representatives, and successors-in-interest, whether individual, class, representative, legal, equitable, direct or indirect, or any other type or in any other capacity hereby forever completely and irrevocably release and discharge The GEO Group, Inc. d/b/a GEO California, Inc., GEO Corrections Holdings, Inc., and GEO Corrections and Detention, LLC, their present and former parent companies, present owners, former owners, subsidiaries, shareholders, officers, directors, employees, agents, attorneys, insurers, successors, and assigns and any individual or entity which could be jointly liable with GEO, or any of them (hereinafter "GEO," "Defendants," or "Released Parties") of all claims against the Released Parties for work performed

AA230951BB44842CC5696202DD7879609

SIMID 1516

a.   Any claims for unpaid wages (including but not limited to overtime pay, minimum wage, regular wages, salary, bonuses, commissions, missed meal period pay, missed rest period pay, paid time off or other benefits), and claims for interest, penalties (including but not limited to wait time penalties), or premiums in connection therewith, as well as any claims under the California Labor Code, or California Wage Orders alleged or which could have been alleged under the facts pleaded in the complaints filed as part of the Litigation;

b.   Any claims for injunctive relief, declaratory relief, restitution, fraudulent business practices or punitive damages alleged or which could have been alleged under the facts pleaded in the complaints filed as part of the Litigation;

c.   Any claims under PAGA arising out of the wage, hour and payroll practices alleged or could have been alleged under the facts pleaded in the complaints filed as part of the Litigation;

d.   Any and all other claims under California common law, the California Labor Code, California Wage Orders, and the California Business and Professions Code asserted in or that could have been asserted in the complaints filed as part of the Litigation; and

e.   Any and all claims for unpaid wages, penalties, interest and attorneys' fees that could have been alleged under the Fair Labor Standards Act based upon the facts alleged in the complaint.

## IV.   MAILING INFORMATION

Please mail this completed Claim Form to the Claims Administrator at the address listed below.  Your completed Claim Form must be postmarked on or before February 8, 2016 or else you will forfeit your benefits under this Settlement.

*Lopez v. The GEO Group, Inc. et al.*
c/o Simpluris, Inc.
P.O. Box 26170
Santa Ana, CA 92799
Telephone: (888) 427-9230

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: _____                                   _____
                                                                              Signature

                                                                              _____
                                                                              Print Name

Page 2 of 2
Claim Form



AA230951BB44842CC5696202DD7879609                                                                          SIMID 1516

# NOTICE OF PENDENCY OF CLASS ACTION AND PROPOSED SETTLEMENT

*Victor Lopez v. The GEO Group, Inc. Case No.* 2:14-CV-06639-PSG (PLAx)

**To: All persons who worked as non-exempt, hourly employees for The GEO Group, Inc., dba GEO California, Inc.; GEO Corrections Holdings, Inc.; and/or GEO Corrections and Detention, LLC (collectively, "GEO") between July 22, 2010 and December 21, 2015 in California.**

**PLEASE READ THIS NOTICE CAREFULLY. TO RECEIVE YOUR SHARE OF THE SETTLEMENT PROCEEDS YOU NEED TO RETURN THE ENCLOSED CLAIM FORM BY MAIL BY FEBRUARY 8, 2016.**

Pursuant to the settlement of the parties and order of the United States District Court of the Central District of California, entered December 21, 2015, YOU ARE HEREBY NOTIFIED AS FOLLOWS:  A settlement has been reached between the parties in the lawsuit pending in the United States District Court for the Central District of California on behalf of the following class, which has been provisionally certified for purposes of this settlement:

All persons who, at any time from July 22, 2010, to December 21, 2015 of this Settlement (the "Class Period"), were employed by GEO as a non-exempt employee at any of the following facilities: (1) Adelanto Detention Facility (East and West); (2) Alhambra Jail; (3) Baldwin Park Jail; (4) Bell Gardens City Jail; (5) Central Valley Modified Community Correctional Facility; (6) Desert View Modified Community Correctional Facility; (7) Downey Jail; (8) Fontana City Jail; (9) Garden Grove City Jail; (10) Golden State Medium Community Correctional Facility; (11) Leo Chesney Community Correctional Facility; (12) McFarland Community Correctional Facility; (13) Mesa Verde Community Correctional Facility; (14) Montebello City Jail; (15) Ontario City Jail; (16) Western Region Detention Facility at San Diego.

This document describes your rights with respect to this class action settlement.  Please read it carefully.  The details of the action and settlement are described below, but the relevant points are as follows:

- GEO has agreed to settle a class action lawsuit for $1,375,000.00 to pay claims by current and former hourly employees of GEO who worked at any time between July 22, 2010 and December 21, 2015 in certain California facilities;
- **If you want to receive a payout from this settlement you MUST complete, sign, and mail the enclosed Claim Form by February 8, 2016;**
- The settlement resolves a lawsuit in which an hourly worker claimed that GEO failed to pay all wages owed, failed to offer legally-compliant 30-minute meal periods, and failed to comply with other related state labor laws;
- GEO has denied all liability and vigorously defended its payroll practices as lawful;
- The parties agreed that the settlement was reasonable to avoid the costs and risks associated with continuing the lawsuit;
- The settlement releases GEO from liability of certain claims related to the claims set forth in this lawsuit;
- GEO has agreed that the Court-approved lawyers may petition the Court for up to 33⅓% of the total settlement amount from the settlement as fees and up to $75,000.00 as expenses for investigating the facts, litigating the case and negotiating the settlement. At this juncture the Court has not yet determined the amount to be awarded to class counsel for fees and expenses;
- The Court in charge of this case still has to decide whether the settlement is fair and whether to approve the settlement. Payments will be made if the Court approves the settlement and after any appeals are resolved.  Please be patient.

- Your legal rights are affected whether you act, or do not act. These rights and options—**and the deadlines to exercise them**—are explained in this notice.
- Class Counsel support this settlement. Among the reasons for Class Counsel support of the settlement are the complete defenses to liability available to GEO on whether their payroll practices were lawful.

## OVERVIEW OF THE CASE

A putative class action lawsuit entitled *Lopez v. The GEO Group, Inc. et al.* was filed on July 22, 2014 in the Superior Court of Los Angeles County and then removed to the United States District Court for the Central District of California. On October 14, 2015, Plaintiff filed an Amended Complaint (the "Action"), seeking damages for Plaintiff and putative Class Members for unpaid wages, unpaid overtime, denied meal and rest periods, and waiting time penalties, penalties under the Labor Code and California Industrial Welfare Commission ("IWC") wage orders, for violation of the Unfair Business Practices Act ("UCL"), Business and Professions Code §17200, et seq., and for penalties under the Private Attorney General Act ("PAGA").

GEO contends that Plaintiff and the putative class members were properly paid all wages and compensation owed and deny all alleged wrongdoing associated with these and all other claims. GEO further contend that since the putative class members were properly compensated, the remainder of the claims are also without merit. GEO, therefore, disputes all claims for damages and other relief made by and also dispute that the lawsuit is appropriate for class action treatment. Further, the Court has not stated or determined that GEO did anything wrong.

GEO has agreed to settle this class action lawsuit for $1,375,000.00 to pay claims by current and former hourly employees of GEO who worked at any time between July 22, 2010 and December 21, 2015 in certain California facilities. Also, as part of the settlement GEO will pay its employer's share of the payroll taxes.

## PARTIES TO THE ACTION

Victor Lopez is the Plaintiff in this class action lawsuit, acting on behalf of himself and on behalf of other current and former non-exempt hourly employees in California. The Defendants are: The GEO Group, Inc. D/B/A GEO California, Inc.; GEO Corrections Holdings, Inc.; and GEO Corrections and Detention, LLC. (GEO").

## OVERVIEW OF THIS NOTICE

You have received this notice because records indicate that you are a class member in this lawsuit. The settlement will resolve claims described below during the class period of July 22, 2010 until December 21, 2015.

You may be entitled to receive money from a settlement that has been reached in the lawsuit. The Court must finally approve the terms of the settlement described below as fair and reasonable to the class. The settlement will affect all members of the class, including you. You may receive money from the class action settlement if you submit a valid and timely claim form as instructed below. This notice will explain the terms of the settlement and the amount of money you may get.

The Court will hold a Final Fairness Hearing concerning the proposed settlement on April 25, 2016 at 1:30PM in Courtroom 880 -Roybal at the United States District Court for the Central District of California located at:

Edward R. Roybal Federal Building and United States Courthouse
255 East Temple Street
Los Angeles, CA 90012-3332

**The hearing may be continued without further notice to the settlement class. It is not necessary for you to appear at this hearing unless you have timely filed an objection.**

## SUMMARY OF THE PROPOSED SETTLEMENT

The Plaintiff and Class Counsel support this settlement. Among the reasons given for support includes the inherent risk of trial on the merits and the delays associated with litigation. The settlement provides for the following:

### A.    Settlement Formula

Simpluris, the Claims Administrator, will pay to each Settlement Class Member who returns a valid and timely Claim Form ("Qualified Claimant") a pro-rata share of the Net Settlement Amount ("NSA") based upon the number of weeks worked during the class period. The NSA is $1,375,000.00 minus attorneys' fees, costs, actual enhancement awards to Lopez, the PAGA Payment, and actual claims administration expenses. As part of the settlement of the PAGA claim, $15,000.00 from the NSA will be paid to the California Labor & Workforce Development Agency. Simpluris estimates that the claims expenses will be about $22,000.00. It is your responsibility to ensure the Claims Administrator has timely received your Claim Form. You may contact the Claims Administrator at the toll-free number listed at the bottom of each page to ensure it has been received. It is also your responsibility to keep a current address on file with the Claims Administrator to ensure receipt of your Settlement Claim Payment.

### B.    Calculations

Defendants' records will be determinative with respect to the number of shifts you worked in each position unless you dispute those records as provided below.

### C.    Release

The settlement is intended to settle and fully release and discharge any and all claims against Defendants, their present and former parent companies, present owners, former owners, subsidiaries, related or affiliated companies, shareholders, officers, directors, employees, agents, attorneys, insurers, successors, and assigns. and any individual or entity which could be jointly liable with Defendants, or any of them (the "Releasees"), for any and all claims that were or otherwise could have been brought under the facts pleaded in the Action arising out of or relating to work performed during the Class Period, including the following:

- Any claims for unpaid wages (including but not limited to overtime pay, minimum wage, regular wages, salary, bonuses, commissions, missed meal period pay, missed rest period pay, paid time off or other benefits), and claims for interest, penalties (including but not limited to wait time penalties), or premiums in connection therewith, as well as any claims under the California Labor Code, or California Wage Orders alleged or which could have been alleged under the facts pleaded in the complaints filed as part of the Action;

- Any claims for injunctive relief, declaratory relief, restitution, fraudulent business practices or punitive damages alleged or which could have been alleged under the facts pleaded in the complaints filed as part of the Action;

- Any claims under PAGA arising out of the wage, hour and payroll practices alleged or that could have been alleged under the facts pleaded in the complaints filed as part of the Action;

- Any and all other claims under California common law, the California Labor Code, California Wage Orders, and the California Business and Professions Code asserted in or that could have been asserted in the complaints filed as part of the Action; and

- Upon the Effective Date, any and all claims for unpaid wages, penalties, interest and attorneys' fees that could have been alleged under the Fair Labor Standards Act based upon the facts alleged in the complaint against the Released Parties for work performed during the Class Period will be released by the Class Members who submit a Claim Form.

If the Settlement is approved and you submit a timely and valid Claim Form, you will receive compensation and will be forever barred from asserting the above claims against the Released Parties. If the settlement is approved and you have not submitted a timely and valid Claim Form and have not submitted a timely Request for Exclusion Form, you will not receive any money from the settlement and you will also be forever barred from asserting the above claims (excluding FLSA) against the Released Parties.

## THE ATTORNEYS REPRESENTING THE PARTIES

### Attorneys for Plaintiff & the Class are:

Law Offices of Robert W. Sink
Robert Sink
1800 JFK Blvd., 14th Floor
Philadelphia, PA 19103
Telephone: (215) 995-1000
Facsimile: (215) 475-4600

The Downey Law Firm, LLC
Philip A. Downey
Cory Lee
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Tel: (213) 291-3333
Fax: (610) 813-4579

### Attorneys for Defendants are:

Littler Mendelson, PC
Elizabeth Staggs-Wilson
Michelle Rapoport
633 West Fifth Street, 63rd Floor
Los Angeles, California 90071
Telephone: (213) 443-4300
Facsimile: (213) 443-4299

## YOUR RIGHTS AS A CLASS MEMBER

Your interests as a Settlement Class Member are represented by the Plaintiff and Class Counsel. Unless

you opt out of the Class, you are a part of the Settlement Class, you will be bound by the terms of the settlement and any final judgment that may be entered by the Court, and will be deemed to have released certain claims against Defendants as described above.  As a member of the Class you will not be responsible for the payment of attorneys' fees or reimbursement of litigation expenses unless you retain your own counsel, in which event you will be responsible for your own attorneys' fees and costs.

### A.     Submit a Claim

In order to receive your share of the settlement you must complete and sign the Claim Form and return it, no later than February 8, 2016 via regular mail to Simpluris, Inc. at the following address:

*Lopez v. The GEO Group, Inc. et al.*
c/o Simpluris, Inc.
P.O. Box 26170
Santa Ana, CA 92799
Telephone: (888) 427-9230

The Claim Form must be postmarked no later than February 8, 2016. If the Claim Form is sent from within the United States it must be sent through the United States Postal Service via regular mail.  If you lost, misplaced, or need another Claim Form, in addition to contacting any of the class counsel at the addresses identified in Section V of this Notice, you may also contact the Claims Administrator toll-free at (888) 427-9230.

### B.     Object to Settlement

You can object to the settlement before final approval.  However, if the Court rejects your objection you will still be bound by the terms of the settlement.  To object, you must mail a written objection to the Law Offices of Robert W. Sink, 1800 J.F.K. Blvd., 14th Floor, Philadelphia, PA 19103 by February 8, 2016.

Any written objection must contain your full name, current address, and include all objections and the reasons therefore, and include any and all supporting papers (including, without limitation, all briefs, written evidence, and declarations).  If you fail to comply with the objection procedure set forth herein you will be deemed to have not objected.

If you wish to appear at the Final Approval Hearing and present your objection to the Court orally, your written statement must include a statement of intent to appear at the Final Approval Hearing. Failure to do so will bar you from appearing at the Final Approval Hearing and presenting your objections to the court. If you fail to timely mail written objections you will not be permitted to present your objections at the Final Approval Hearing. If you choose to mail an objection to the terms of this settlement, you may enter an appearance in propria persona (meaning you choose to represent yourself) or through your own attorney. The Final Approval Hearing at which the Court will adjudicate any Objections, and be asked to approve the settlement will be held at the United States District Court Central District of California, on April 25, 2016 at 1:30PM in Courtroom 880-Roybal or such other, later date as the Court may authorize.

If you mail an objection you remain eligible to submit a Claim Form and receive monetary compensation from the settlement.

**IF YOU INTEND TO OBJECT TO THE SETTLEMENT, BUT WISH TO RECEIVE YOUR SHARE OF APPROVED SETTLEMENT FUNDS, YOU MUST TIMELY FILE YOUR CLAIM AS STATED ABOVE.  IF THE COURT APPROVES THE SETTLEMENT DESPITE ANY OBJECTIONS, AND YOU DO NOT HAVE A CLAIM ON FILE, YOU WILL NOT RECEIVE ANY SETTLEMENT FUNDS.**

### C.     Exclude Yourself from the Settlement

In order for you to validly and effectively request exclusion from, and opt out of, this Settlement, you must submit a written, signed, and dated request to the Claims Administrator. The Exclusion request must include the last four digits of your social security number to be valid or applicable work permit number if you have no social security number. The request for exclusion must be postmarked no later than February 8, 2016.

If you desire to be excluded from, and opt out of, this Settlement but fail to comply with the Exclusion procedure set forth herein, you shall be deemed to have not been excluded or opted out. Any person who files a complete and timely request for Exclusion shall, upon receipt, no longer be a member of the settlement class, shall be barred from participating in any portion of the settlement, may not object to the settlement, and shall receive no benefits from the settlement. Any such person will not release any claims he/she may have against Defendants. You may choose to proceed against the Defendants at your expense and costs.

If you first request exclusion from, and opt out of, the settlement and then object, the objections will not be considered valid. If you object and then request exclusion from, and opt out of the settlement, you will be deemed to have waived your objection. If you submit both a Claim Form and a request for exclusion, only the Claim Form will be valid.

### D.     Do Nothing

You are not required to take any action by reason of receipt of this Notice. If you do nothing, then, you will not receive any portion of the settlement, but will remain a member of the Settlement Class and will be bound by the terms of the settlement and have released your claims as described above.

## PAYMENT TO CLASS COUNSEL

The attorneys for the plaintiffs will be paid from the total settlement amount. The attorneys may ask for an award of up to 33 ⅓% of the Gross Settlement in fees and up to $75,000.00 in costs, and will receive that award if their request is approved by the Court. If approved by the Court, an Enhancement Award not exceeding $5,000.00 total for Plaintiff will be paid from the settlement proceeds for his service.

## ADDITIONAL INFORMATION IS AVAILABLE

The above is a summary of the basic terms of the settlement. For the precise terms and conditions of the settlement, you are referred to the detailed Stipulated Settlement Agreement ("Stipulation") and Order thereon, which will be on file with the Clerk of the Court. The pleadings and other records in this litigation including the Stipulation may be examined at any time during regular business hours at United States District Court, Central District of California, Edward R. Roybal Federal Building and United States Courthouse, 255 East Temple Street, Los Angeles, CA 90012-3332.

Please do not call the Court for information about this Settlement or the claims process.

OPT OUT/ REQUEST FOR EXCLUSION

## UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICTOR LOPEZ, on behalf of himself and on behalf of all others similarly situated, <br><br> Plaintiff <br><br> v. <br><br> THE GEO GROUP, INC. D/B/A GEO CALIFORNIA, INC.; GEO CORRECTIONS HOLDINGS, INC.; AND GEO CORRECTIONS AND DETENTION, LLC, <br><br> Defendants. | Case No. 2:14-CV-06639-PSG (PLAx) <br><br> **CLASS ACTION** |

**ONLY SUBMIT THIS FORM IF YOU <u>DO NOT</u> WISH TO BE PART OF THE PROPOSED CLASS ACTION SETTLEMENT.**

**IF YOU SUBMIT THIS FORM, YOU WILL BE EXCLUDED FROM THE PROPOSED CLASS ACTION SETTLEMENT AND YOU WILL NOT RECEIVE ANY PAYMENT FROM THIS SETTLEMENT**

I, _____, wish to opt-out of the proposed class action settlement.  Please print the following information (this information is necessary to ensure that the correct person is deleted from the list of Class Members):

_____

Full Name and Address

_____

Last Four Digits of Social Security Number

_____

SIGNATURE                                    DATE

**IF YOU WISH TO BE EXCLUDED FROM THIS SETTLEMENT, RETURN THIS FORM IN THE ENVELOPE PROVIDED POSTMARKED NO LATER THAN FEBRUARY 8, 2016 UNTIMELY OPT-OUT FORMS WILL NOT BE ACCEPTED.**

*Lopez v. The GEO Group, Inc. et al.*
c/o Simpluris, Inc.
P.O. Box 26170
Santa Ana, CA 92799
Telephone: (888) 427-9230

Page 1 of 1
Opt Out/Request for Exclusion



AA230951BB44842CC5696202DD7879609                                    SIMID 1516

# Declaration of Emanuel Santiago

# EXHIBIT 3

The Class Action Opt-out Form

## OPT OUT/ REQUEST FOR EXCLUSION

### UNITED STATES DISTRICT COURT FOR THE
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICTOR LOPEZ, on behalf of himself and on behalf of all others similarly situated,<br><br>Plaintiff<br><br>v.<br><br>THE GEO GROUP, INC. D/B/A GEO CALIFORNIA, INC.; GEO CORRECTIONS HOLDINGS, INC.; AND GEO CORRECTIONS AND DETENTION, LLC,<br><br>Defendants. | Case No. 2:14-CV-06639-PSG (PLAx)<br><br>**CLASS ACTION** |

**ONLY SUBMIT THIS FORM IF YOU <u>DO NOT</u> WISH TO BE PART OF THE PROPOSED CLASS ACTION SETTLEMENT.**

**IF YOU SUBMIT THIS FORM, YOU WILL BE EXCLUDED FROM THE PROPOSED CLASS ACTION SETTLEMENT AND YOU WILL NOT RECEIVE ANY PAYMENT FROM THIS SETTLEMENT**

I, _Emanuel Santiago_, wish to opt-out of the proposed class action settlement. Please print the following information (this information is necessary to ensure that the correct person is deleted from the list of Class Members):

_Emanuel Santiago, 7659 Alder Ave, Fontana CA 92336_
Full Name and Address

_9835_
Last Four Digits of Social Security Number

_[signature]_ 　　　 _2-3-16_
SIGNATURE 　　　　　 DATE

**IF YOU WISH TO BE EXCLUDED FROM THIS SETTLEMENT, RETURN THIS FORM IN THE ENVELOPE PROVIDED POSTMARKED NO LATER THAN FEBRUARY 8, 2016 UNTIMELY OPT-OUT FORMS WILL NOT BE ACCEPTED.**

*Lopez v. The GEO Group, Inc. et al.*
c/o Simpluris, Inc.
P.O. Box 26170
Santa Ana, CA 92799
Telephone: (888) 427-9230

Page 1 of 1
Opt Out/Request for Exclusion


AA230951BB44842CC5698202DD7879609

SIMID 1516

Amir Mostafavi, Esq.
Mostafavi Law Group, APC
11835 W Olympic Blvd., STE 1055
Los Angeles CA 90064





$3.935
US POSTAGE
FIRST-CLASS
FROM 90064
02/03/2016
stamps.com

7012 3050 0001 5008 3700

Lopez v. The GEO Group, Inc., et al.
c/o Simpluris, Inc.
P.O Box 26170
Santa Ana CA 92799-6170

Declaration of Emanuel Santiago

EXHIBIT 4

The ICE Detention Standard

2C-02, 7F-06

ICE/ERO *Performance-based National Detention Standards 2011:*

- "2.3 Contraband";
- "2.5 Funds and Personal Property";
- "2.7 Key and Lock Control";
- "2.8 Population Counts";
- "2.9 Post Orders";
- "2.12 Special Management Units";
- "2.15 Use of Force and Restraints";
- "2.14 Tool Control";
- "5.1 Correspondence and Other Mail";
- "5.7 Visitation"; and
- "6.2 Grievance System."

# V. Expected Practices

## A. Security Staffing

Security staffing shall be sufficient to maintain facility security and prevent or minimize events that pose a risk of harm to persons and property. The facility administrator shall determine security needs based on a comprehensive staffing analysis and a staffing plan that is reviewed and updated at least annually. Essential posts and positions shall be filled with qualified personnel.

At least one male and one female staff member shall be on duty at all times in a facility housing both male and female ~~detainees~~ainees.

All security posts shall be guided by standard "2.9 Post Orders."

## B. Control Centers

Each facility shall have a secure control center that is staffed continuously, 24/7. Control center staff shall monitor and coordinate facility security, life-safety and communication systems.

*The Chief of Security shall carefully screen officers for the highly responsible control center post assignment(s). The Control officer's responsibilities include (but are not limited to) key control, count procedures and public-address-system operations. The standards on "Key and Lock Control" and "Population Counts" detail requirements for key control and counts.*

*The facility administrator shall establish procedures to implement the following control center requirements:*

1. *round-the-clock staffing;*

2. *limited staff access;*

3. *no detainee access (in a control center, staff must perform cleaning duties that elsewhere in the facility may ordinarily be assigned to detainees);*

4. *round-the-clock communications;*

5. *maintenance of a list of the current home and cell phone numbers of every staff member assigned to the facility, including administrative/support services staff members, all situation response team members (SRTs), hostage negotiation team member (HNTs) and applicable law enforcement agencies.   If any staff member is inaccessible by phone, other means of off-duty contact approved by the facility administrator, such as a pager*

# EXHIBIT C

Declaration of James Henry Hutchinson III

# JAMES HENRY HUTCHINSON III DECLARATION

I, James Henry Hutchinson III, hereby declare the following:

1.     I am over the age of eighteen and am a resident of California. The following facts are based upon my personal knowledge, and if I am called as a witness, I would, and could competently and completely testify to the truth of the facts stated herein.

2.     This declaration is in support of claims asserted by Emanuel Santiago against The Geo Group, Inc.

3.     I began working for GEO in 2009 at the Desert View Modified Community Correctional Facility. However, a few years in the facility closed down. In 2012, I continued working for GEO, however, it was at the Adelanto Detention Facility, located at 10250 Rancho Road, Adelanto, California 92301.

4.     I began working for GEO as a Correctional Officer. I then became a Detention Officer and eventually promoted to Sergeant. Currently, I still work at GEO as a Transportation Officer.

5.     I have extensive background as a Correctional and Detention Officer since 2007. I have received certificates of completion from two correctional academy, the Department of Justice Federal Bureau of Prisons and Victor Valley Community College. I have also received a gun permit, guard card, and firearm permit from the Bureau of Security and Investigative Services. I am also certified to teach transportation at GEO.

6.     As a correctional officer at GEO I didn't need any training since I was certified at the correctional academy. As a detention officer I received vague training on their policies. As a Sergeant I received supervisor training for a week. And as a transportation officer I also received supervisor training for a week and was required to be certified for every vehicle in which I drive.

7.     Since working at GEO, I have never received any write-ups or reprimands. However, on November 1, 2017 I was terminated.

8.     During the time of the incident I was a Sergeant in Segregation and Lieutenant Anderson was my supervisor.

9.     Segregation is different from other units at the facility because it is divided into two distinct sides. One side is disciplinary and one side is administration. In the disciplinary side detainees are locked down for 23 hours. Detainees in the disciplinary side are always handcuffed. But on the administration side detainees are allowed out of their cells. The amount of time allowed outside of their cells varies on the tier the detainee is placed in. Sometimes a specific tier could be let out for up to six hours. Detainees in the administration side are not handcuffed. Due to administration detainees being allowed to roam the area without handcuffs, Assistant Warden Patricia Siebert-Love (AW Love) gave the order that detainees need not be secured in the showers.

10.     Segregation is manned by four officers. Each side of segregation will be manned by two officers. One officer is by himself on the floor while the other officer is a relief officer. The relief

officer leaves the post to relieve other officers for breaks and lunches.

11.     Changes in policies at Adelanto are communicated to employees orally. However, as a Sergeant I also received these changes by email. I was notified by email from AW Love that detainees from administration do not need to be secured in the showers. However, after the incident this policy changed, all detainees had to be locked in the shower

12.     I knew Officer Santiago as I was his supervisor. I don't believe that Officer Santiago's termination was justified. He was not the one who let the detainee access four different doors. But I believe that he was fired in order to show that action had been taken even though he was not at fault.

13.     On August 5, 2015, I was in the watch office with Sergeant Soliz when Officer Mora and Officer Dermazgyian came in and notified us what happened. I never received any direction or radio call from Lieutenant Anderson. They told me and Sergeant Soliz that detainee Irias from administration was walking around the facility unguarded. After being advised of this I got out of my seat and went to the main hallway. Upon opening the door I see detainee Irias in red getting ready to open another door. I did not want to be confrontational, due to his history of assaults, I did not want him to run. I tried to speak to him by saying "Jimmy let me talk to you" and he replied "You guys opened the door for me." He then proceeded to go through another door.

14.     Myself, Sergeant Soliz, Officer Mora, and Officer Dermazgyian then ran to the door whereby I radioed to central control to not access any more doors until I say so. We all proceed towards detainee Irias where I began talking to him and told him he needs to go back to Segregation or I will spray him with a chemical agent. He did not want to be cuffed so I told him he can walk back but if he makes a move I will spray him. We were able to get him back to segregation without using any force or chemical agent.

15.     After the incident I wrote a report that was short and sweet as directed. However, Lieutenant Anderson approached me and said that my report did not show a sense of urgency in the matter and that we are going to be written up. Indicating that our report shows we took our time in detaining detainee Irias. Thereafter, I wrote another report so that I would not be written up.

16.     Officer Santiago was terminated immediately however Elizabeth Marquez, the officer who allowed the detainee access of the secured doors were not. Since Officer Marquez was pregnant she went on maternity leave. She was not terminated until after she had returned from maternity leave. I believe that Officer Santiago was discriminated for his gender due to this reason.

17.     After Officer Santiago and Offer Marquez was terminated, Geo simply pulled another officer off the floor to fill their spots. They would fill their spots with any officer and train them. There were all kinds of officers at who were working in Central Control when Ms. Marquez was on maternity leave.

18.     As a Sergeant I am prone to more knowledge of inside information than the officers. I knew detainee Irias was dangerous and had fought an ICE agent and therefore I knew I had to approach him carefully. However, this information about the dangerous propensities of detainee Irias is not known to all. Outside of his record there is no way of knowing that he needs special attention.

Furthermore, no indications are made to officers that detainee Irias did need special attention.

19.     As a Sergeant and as someone who has worked at GEO for over 8 years, I have seen the ins and outs of the facility. I have seen all the politics in play. There is a lot of favoritism towards employees who are friends with supervisors.

20.     I work more than 9 hours per day. I rarely if at all took my meal and rest breaks. When I am able to take my breaks, I was not relieved of my duties. I was forced to sign the break log without taking any breaks. If I did not do what my supervisor said I would get an undesirable post or even mandated to stay for overtime. Sometimes my supervisor would also forge my signature on the break log so that they would not get into trouble.

21.     The breaks are not scheduled but there is a cut off time for meals to be done every shift. Not everyone takes their meal and rest breaks at the same time because there are not enough officers to cover each post. Detainees typically would take lunch, breakfast, and dinner with the officers if the officer is on break during that time.

22.     Officer K. Johnson, was an employee who refused to sign the break log since she did not receive her breaks. Due to her being "difficult" she was assigned to a post she did not desire, the recreational yard. She filed suit against GEO and I believe that she won.

23.     I believe that GEO treats females differently than they treat males. There are a few instances of gender discrimination. Many of those instances are of female employees who have failed to conduct their jobs properly and were not fired.

24.     In 2013, between 10:00pm to 6:30 am Officer Robertson fell asleep at her desk while on watch in Segregation (the unit that houses the most dangerous detainees in the entire facility). Lieutenant Cheney or Lieutenant Salgado saw her sleeping and did not reprimand her.

25.     On August 8, 2017, Officer A.A. Maciel was in charge of watching detainee Hovhannisyan while he was in the care of Victor Vally Hospital. She started falling sleep at around 11:30 pm. A nurse came in around 1:30 am to take the detainee's vital signs and Officer Maciel never moved. The nurse noticed Officer Maciel sleeping and made visual contact. An hour later, a nurse walked in and woke up Officer Maciel. Officer Cleveland made a gesture at Maciel to make her aware of the nurse but she nodded and went back to sleep. Officer Cleveland notified his supervisors but she was never reprimanded nor terminated.

26.     In 2015, between 6:00 am to 2:30 pm Officer W. Luis was on watch at the perimeter of the facility near the open gate. He had a condition that made him fall asleep at random places, I believe narcolepsy. The Deputy Warden at the time saw him sleeping and got Lieutenant Jameson to wake him up. After that incident Officer Luis was terminated.

27.     On September 25, 2017, I was working as a Transportation Officer. A complaint was made by three employees who did not like that I was sleeping in the car. My supervisor House was not on the premises at the time but made a written statement that he saw me sleeping as well. After this incident I was terminated.

28.     The unfair treatment between males and females at Adelanto Facility is very common. These types of mistreatment occur all the time.

**DECLARATION OF JAMES HENRY HUTCHINSON III**

29.    Around August 2014, Elizabeth Walker, another employee at GEO began stalking and harassing me. She would wait outside my home and find out where I am during lunch the few instances among many others. I made several formal complaints to Assistant Warden Love showing her pictures, tests, and voicemail messages as proof. Assistant Warden Love did nothing.

30.    In August 2015, I was partnered up with Officer Maciel. When escorting a female detainee there must be a female employee there at all times. I was driving the bus to the Los Angeles Federal Building off of Alameda, next to the twin towers. After that run, Maciel started spreading rumors that we were together even though it was not true. Since she worked in Central Control she was able to obtain my personal information such as cell phone number. She began sending me constant texts messages and waiting outside my house in her car. I made a complaint in September 2015. She was put on leave and continued to harass me. GEO allowed her to come back to work in December of 2016 and she is still with them.

31.    In 2013, Officer P. Gutierrez was having an affair with Lieutenant Rogokos. He decided he did not want to mess around with her anymore and broke it off. Afterwards, she filed a sexual harassment complaint against him and he was terminated.

32.    However, the unequal treatment received by females compared to males does not end there.

33.    Under GEO policies, anyone who gets into a car accident will not be able to continue to drive for the company until after they have passed the drug test and completed their remedial training.

34.    Officer D. Baltazar got into a car accident in September of 2017 on a Friday. She was driving a detainee to the UCLA hospital with Officer Juarez in order for the detainee to get some dental work done. The accident occurred while they were on the freeway when they were merging. It happened early rmoning between 4:00 am and 6:00 am. Yet, the following Monday she went with J. Lugo, another GEO employee, (her boyfriend) in the company car to the DMV in Fontana without a license during company time to get a license for class B. She was not supposed to drive until after her drug test came back and after her remedial training but she did anyway. She never got reprimanded not terminated.

35.    There was another incident involving a female Officer that I do not remember her name. She crashed one of the cars under the property of GEO. However, she was never terminated nor reprimanded.

36.    In 2016, Officer J. Rocha had an accident. He was driving the company bus and hit the passenger side mirror of a U.S. Marshall bus while still on company property. He was not able to drive for awhile. The drug test he needed to past typically takes 3 days. He must then attend the remedial training in order to get re-trained and re-certified, which typically takes 4 weeks.

37.    It is pretty clear and I believe that GEO has been mistreating people based on gender before I began working for them in 2009.

I declare under penalty of perjury under the laws of the state of California that the foregoing

4

is true and correct.

Executed on November __22__, 2017 at Los Angeles, California.

_____
James Henry Hutchinson III, Declarant

---

**DECLARATION OF JAMES HENRY HUTCHINSON III**

# EXHIBIT D

Declaration of Shawna Danielle Nowicki

# SHAWNA DANIELLE NOWICKI DECLARATION

I, Shawna Danielle Nowicki, hereby declare the following:

1.     I am over the age of eighteen and am a resident of California. The following facts are based upon my personal knowledge, and if called as a witness, I would, and could competently and completely testify to the truth of the facts stated herein.

2.     This declaration is in support of claims asserted by Emanuel Santiago against The GEO Group.

3.     I have worked for The GEO Group at the Adelanto Detention Facility, located at 10250 Rancho Road, Adelanto, California 92301 since August 10, 2011.

4.     I continue to work at the Adelanto Detention Facility as a Detention Officer, and also as the Vice President of the Union.

5.     I have worked as a Segregation Officer for a year and half after the West Facility had opened in 2012.   I currently work as an intake officer.

6.     Since August 10, 2011, when I was first hired by GEO, I have always worked the Second Watch.

7.     Adelanto Detention Facility Second Watch shift hours are from 2:00 p.m. to 10:30 p.m. Monday through Friday.

8.     The Segregation Housing Unit at the Adelanto Detention Facility is a higher level of security than other Units at the Facility.   Therefore, in order to work in Segregation, Officers are required special clearance to work the Segregation Unit.

9.     In order to gain the clearance to work in the Segregation Unit, Officers must be granted authorization by a Shift Lieutenant to work as Segregation Officer.

10.     While Santiago had been employed by GEO, GEO policy and procedure with respect to Officer authorization to work Segregation provided that Officers were required to undergo Specialized Training.

11.     I had never received Specialized Training to work in Segregation Housing Unit.   Nor do I believe that Santiago, nor any other Detention Officer had received Specialized Training to work the Segregation Unit while Santiago had been employed by GEO.

12.     The Specialized Training Program is a program GEO had implemented and enforced only after Santiago had been terminated.

---

1

**DECLARATION OF SHANNA DANIEL NOWICKI**

1  ...  Today an officer has to complete 40 hours of on the job training with an experienced officer
2  and a review of all policies and procedures that apply to segregation.

3  14.  Undergoing Specialized Training to work in Segregation is crucial because since the revised
   June 2015 post orders reduced the level of security for detainees in many ways.  Detainees were
4  granted more freedoms and GEO reduced staffing requirements from two officers to one officer as
5  ordered by the shift supervisor.  Thus, expanded detainee freedoms, in turn, translated to increased
6  Officer responsibilities.

7  15.  I personally know Emanuel Santiago because he and I were both Detention Officers with
   GEO at the Adelanto Detention Facility.  Santiago was a very committed officer.  When Santiago
8  was assigned to Segregation as a full time Segregation Officer, he had just moved to Second Watch,
9  but I knew of him because he often came in early on Third Watch.

10  16.  Santiago was very helpful and was he very passionate about his work.  Since all the
11  Detention Officer work together in the facility all Officers are fully aware of what went on in the
12  department.  Santiago constantly worked twelve-hour shifts.  Santiago generally worked half of
   Second Watch and all the way into the Third Watch.
13
   17.  The Count Procedures in the Adelanto Detention Facility have completely changed since
14  Santiago's termination.

15  18.  Prior to Santiago's termination, two Officers were stationed at the Central Control
16  Command.  One Officer was entrusted to control the security doors for the entire facility, which
17  amounted to approximately five hundred doors in total.  At time when Santiago and Officer Marquez
   were working at GEO, the Housing Control Units were not manned.   Also, prior to Santiago's
18  termination, one Officer in the Central Control Command was responsible for completing the count
19  paperwork and reconciling the facility totals after Facility Count had been conducted.

20  19.  After the incident that had happened with detainee Irias, GEO changed the count procedure
21  in many ways.

22  20.  As of the date of when this declaration was provided, the Central Control Officer who
23  conducts the facility count, when relieved exits the Central Control Center and goes to the
   Supervisor at the Watch Office to conduct their count procedure away from any other work and they
24  have so the Center Control Center is not simultaneously completing count paperwork and operating
25  facility doors.

26  21.  Also, after the incident that had happened with detainee Irias, the Adelanto Facility now has
27  three different Housing Control Units that act as a mini Central Control.  The Facility now staffs all
28  housing control units, which relieves about twenty doors off from each pod.  So, rather than being

2

**DECLARATION OF SHANNA DANIEL NOWICKI**

1  responsible for manning five hundred doors, the Central Control is now only responsible for perhaps
2  two hundred and fifty doors during count time.
3  22.    Segregation Unit Count is conducted by two Officers, and is designed to ensure that
   detainees are safe and provided for inside their assigned unit.
4  23.    Officers conduct a Unit count 1 times during the Second Watch in the Segregation Unit.
5  24.    Facility Count during the Second Watch use to occur at 1630 now it occurs at 1830 so as not
6  to interfere with the meal time and may take up to one hour from commencement to completion.
7  25.    When Count commences, one Officer is tasked with going through the Housing Unit and
8  conducting an independent count while the second Officer is responsible for monitoring detainee
   movement within his or her post.  When the first Officer has completed accounting for the detainees,
9  that Officer would record his findings in a daily count log book, and the second Officer would
10 commence his or her own independent count, record his or her findings in his or her count log book,
11 while the first Officer monitors the detainee movement within the post.
12 26.    After the Officers conduct their independent counts, the two reconcile their count numbers to
13 ensure they have arrived at the same figure.
   27.    Officers shall account for every detainee housed within their assigned Unit during count.  If a
14 detainee is not present within their appropriate housing unit during count, the Officers would out-
15 count that detainee.   An Officer would not out count a detainee to the unit the detainee is in fact
16 housing in.
17 28.    An "out-count" can arise if a detainee is at visitation during count, or is being tending to by a
18 nurse during count, or if they are in any area that is not their assigned housing unit, for example.
   29.    If there is a situation requiring an out count, the officer would record the detainee's
19 identification on a list, and the list would go to the Central Officer.  Central would reconcile the
20 Detention Officers'' Count numbers following Unit Count.
21 30.    The showers are within a cage that is contained within the unit, so the showers are within the
22 housing unit. This means that if the detainee is in the shower, and the shower is within the housing
23 unit, the officer in that housing unit would retain custody over the detainee and account for that
   detainee in an ordinary manner during count.
24 31.    There are many instances, where facility count can commence even though a detainee is not
25 secured within his cell.  For example, if detainees require medication during the count, nurses only
26 have a small window to tend to the detainees.  If the detainee's medication requirements were to fall
27 within the count, Officers have to use their discretion to get the job done—this is particularly so
28 since Adelanto was short staffed at the time the incident with detainee Irias occurred.

3

32.   Another example where facility count can commence even though a detainee is not secured within their assigned cell is where an Immigration and Customs Enforcement ("ICE") officer serves detainees with paper work. Oftentimes, ICE arrives during count time and they pull a detainee from the cell. Although GEO policy is silent with respect to commencing count in such stance, it is understood by Detention Officers that the detainee shall go with ICE, and count is to resume.

33.   Although GEO provides certain procedures for Detention Officers to observe, many issues, such as whether to commence count even through a detainee is not secured within his cell, as left to the Officer's discretion.

34.   I have personally experienced the situation where a detainee is in the shower during count. Officers often allow detainees to shower during the count, and supervisors have not taken adverse action against Officers for so acting because these supervisors realize that there are only so many hours in a day for Officers to complete all their given tasks. All detainees must be given the opportunity to shower.

35.   Each Unit Supervisor is different and expects something different from his or her Detention Officers. Detention Officers are expected as Officers to adjust to their Unit Supervisor.

36.   Counts take an hour to complete, Officers have to conduct security checks at random thirty-minute intervals, Officers also have to find time to grant detainee requests to shower, service meals, and provide recreation for the detainees. So if an Officer has to control fifty detainees during his or her watch, the Officer would have only have so many hours in the day to shower the detainees; it is very common for Officers to conduct the count while conducting other matters.

37.   Supervisors do not always follow GEO policy because Supervisors understand and accept that there was short staffing the Facility, and that there is too much to do in a day for Detention Officers working Segregation.

38.   I have also witnessed meal service procedures to commence during count. Once the kitchen staff delivers the detainee meals to the Officers, Detention Officers are required to serve the food to the detainees while the food is hot. It doesn't matter what else is going on; if both Officers finish counting their Unit, they are required to serve the detainees their meal trays.

39.   GEO policy states, and common GEO practice and experience dictates that Detention Officers must stop whatever they are doing and ensure that detainees receive their food while its warm.

40.   It is common practice for Detention Officers to release detainee porters to assist an Officer in servicing the meal trays to detainees.

41.   Detainee porters are invaluable to Detention Officers for servicing meals. Each meal tray has to be carried up two tiers of stairs. Given how populated the Segregation Housing Unit was at the

4

**DECLARATION OF SHANNA DANIEL NOWICKI**

1   time Santiago had been working at Adelanto, and considering the fact that GEO was extremely short

2   staffed at that time, it is simply too much to ask for a single Detention Officer to conduct meal

    service by him or her self.

3   42.     I have witnessed Detention Officers release detainee porters for servicing meal trays during

4   facility count with no adverse action taken against the Detention Officer. Detention Officers

5   regularly conduct such practice because these detainee porters are still within the unit, so there

6   would be no need for Officers to out-count the detainees.

7   43.     Segregation is different from the regular unit because Officers in Segregation may always

8   conduct an emergency count to reconcile the count numbers.  In instances where detainee porters are

    released during count and a miscount ensues, the Officer would simply take the porters walk them

9   back to their cell, secure them, and conduct their emergency count.

10  44.     It is important to stress here that at the time Santiago had started working Segregation,

11  Segregation was new a Unit—it had only been open in the PC ( PROTECTIVE CUSTODY)side for

12  about two weeks. Many of GEO's policies for Segregation were new, and Officers and Supervisors

13  alike were uncertain about proper procedure.  While GEO was adapting their policies for the

    changing circumstances, Detention Offiters were left in dark and were encouraged to follow their

14  discretion with respect to many procedures.

15  45.     A great example of the uncertainty surrounding the Segregation procedures is with respect to

16  GEO's policy of securing a detainee in the shower if the detainee does not request a shaving razor.

17  46.     When Santiago was working in Segregation, GEO had no procedure in place with respect to

18  providing shaving razors and securing a detainee in the shower.   Detention Officers were to secure

    the shower by locking it if a detainee were to request for a shaving razor.   GEO policy was silent

19  about whether the detainee shall be secured if the detainee did not request a razor while taking a

20  shower.

21  47.     GEO policy has changed since the incident with detainee Irias. Officers at Segregation are

22  now required to secure a detainee in the shower at all times, whether or not the detainee requests a

23  shaving razor.

    48.     With respect to GEO procedure regarding breaks, it is common practice for Detention

24  Officers to work without receiving breaks.

25  49.     By June (2016) all officers were receiving an unpaid lunch but Officers were not receiving

26  any of their state sanctioned ten minute breaks.  GEO's practice of not providing Officers with their

27  lunches and ten minute breaks have been a common occurrence for the six years that I have been

28  employed with GEO.

5

**DECLARATION OF SHANNA DANIEL NOWICKI**

50.     I have personally experienced and have witnessed Officers working twelve to sixteen hour work shifts without being granted a restroom break.

51.     There have been many times where officers had not received a ten minute break because the company does not want to pay them a meal penalty.

52.     On more than one occasion, Supervisors would have the Detention Officer sign the break log indicting that the Officer had received a break, when in fact, the Officer had not received such break.

53.     The Supervising Lieutenant has discretion to assign an Officer to any post.  If an Officer noes not sign the roster indicating that he or she had received the sanctioned break, it is common knowledge amongst the Detention Officers in the Adelanto Facility, that the Lieutenant will assign that objecting Officer to an undesirable post.

54.     Out of fear of retaliation, if there is a more desirable post available in the facility, and an Officer wants a different post, the Officer would not make a big deal out of not receiving a break by refusing sign the break roster.

55.     Santiago was one of the best officers at Adelanto,  I know personally that during his years working with the company he never received any disciplinary action.  The supervisor should have been held accountable for the situation because he was the one that ordered the second officer off the post that day.  Officer Santiago was following the supervisors directive and we are not allowed to question orders.

56.     Per the ICE- GEO contract, Segregation is a two-man post.  On August 5, 2015, the day of the incident with detainee Irias, an Adelanto Supervisor ordered Officer Patterson off post, thereby leaving Officer Santiago to man the post by himself.

57.     In my opinion if there had been two Officers posted in Segregation as the policy had called for, the incident with detainee Irias never would have happened.

58.     As of the date where this declaration has been executed, new Segregation practices provide for proper Officer relief such that there are always two Officers present in the post at all times.

59.     Also, I have knowledge of an incident which occurred one week after Santiago was terminated (I am not sure of the exact date) where a new Central Control Officer unlocked an interior door, thereby allowing detainee Jimmy Irias access outside the Unit.  As a Union representative I reviewed the  video However, unlike the August 5, 2015 incident involving Santiago and Irias, no Officer or staff involved in this incident were disciplined.

60.     Officer Marquez the central control officer was pregnant at the time was placed off work the day after the incident occurred by her doctor.  When she returned from family leave she was terminated.

I declare under penalty of perjury under the laws of the state of California that the foregoing

6

**DECLARATION OF SHANNA DANIEL NOWICKI**

is true and correct.

Executed on January   20, 2017 at Los Angeles, California.

Shawna Nowicki, Declarant

**DECLARATION OF SHANNA DANIEL NOWICKI**

# EXHIBIT E

Declaration of Joseph Lee Harris

# JOSEPH LEE HARRIS DECLARATION

I, Joseph Lee Harris, hereby declare the following:

1.     I am over the age of eighteen and am a resident of California. The following facts are based upon my personal knowledge, and if I am called as a witness, I would, and could competently and completely testify to the truth of the facts stated herein.

2.     This declaration is in support of claims asserted by Emanuel Santiago against The Geo Group, Inc.

3.     I have had a long history as a Security or Detention Officer. Since the age of eighteen, I have been working in some capacity as a security officer for various private contract companies. I began working for GEO at the Adelanto Detention Facility, located at 10250 Rancho Road, Adelanto, California 92301, in 2011.

4.     In October 2016, I left GEO by my own volition and I started working for a different Detention contract company.

5.     Since 2011, I worked for GEO as a Detention Officer. In 2014, I also served as Vice President of the Union. In 2015, I was promoted from Vice President of the Union to President of the Union.

6.     For all five years that I was employed by GEO, I have worked on Second Shift. The Second Shift commences at 1400 hours (2:00 pm), and ends at 2230 hours (10:30 pm).

7.     I have worked extensively during the Second Shift at the Segregation Housing Unit. During my five years of my employment with Geo, I spent approximately two-and-a-half to three years working on Second Shift in Segregation Unit.

8.     Second Shift is more demanding than First Shift and Third Shift because Second Shift is the most active shift. The Second Shift is unlike the First Shift, and the Third Shift, in that there is extensive detainee movement occurring during those hours. While detainees are likely sleeping or on lockdown during the other shifts, detainees are awake, and active during Second Shift therefore demand more Officer attention. Accordingly the Segregation Unit is supposed to be a two-manned officer post at all times.

9.     Detention Officers working the Second Shift in the Segregation Unit are responsible for many duties. Detention Officers working during the Second Shift in the Segregation Unit are responsible for conducting detainee "checks" at random thirty-minute intervals, conducting facility "counts" at least one time during the shift, conducting meal service for the detainees, providing detainees access to showers, providing detainees access to recreational facilities, providing detainees

1

**DECLARATION OF JOSEPH LEE HARRIS**

1    access to the law library, and providing detainees access to the yard.

2    10.    A demanding aspect for Detention Officers who are working in the Segregation Unit during

3   the Second Shift is conducting security checks. At the time Officer Santiago was working for GEO,

the Adelanto Facility had an automated system that was operated by scanning an instrument

4   (commonly referred to as a "Pipe", due to its similarity in shape) to a magnet affixed to the

5   detainee's cell door. At least every thirty minutes, and at random intervals, the Officer was required

6   to check on the detainees to insure the detainees was present, and safe, and document that finding by

7   scanning the pipe to the magnet. When scanned, the magnet reads the time when the Officer had

conducted the security check on a given door.

8

9   11.    Second Shift Officers may experience additional burdens if and when things do not operate

smoothly during the First Shift. For example, if there was a disturbance during First Shift, which

10   detracted the Officers from conducting their work, Second Shift Officer duties (showers, recreation,

11   yard, law library access) will consequently be increased to make-up for lost time.

12   12.    During Second Shift at Segregation, facility-wide counts were generally conducted around

13   1600 hours (4:00 pm), and oftentimes, once again around 2100 hours (9:00 pm). Facility counts

generally take about two hours to complete. A facility count is a process used where Detention

14   Officers must account for every detainee housed within their assigned post or Unit.

15   13.    Aside from the active nature of Second Shift, the increased need for Officer attention in

16   Segregation, and the sheer magnitude of duties Officers were responsible for undertaking, GEO

17   suffered from chronic short-staffing problems.

18   14.    During the five years I have worked for GEO, the Adelanto Facility I had experienced and

encountered problems due to short-staffing every single year. Detention Officers felt the weight of

19   short staffing in multiple ways, specifically, there was the constant need for mandatory overtime for

20   officers. Essentially, GEO mandated that Officers work overtime. In the event there were

21   insufficient Officers on the Voluntary Overtime List and the assignment of mandatory overtime was

22   necessary, Officers were mandated in reverse seniority order. Also, mandatory overtime may be 4 or

23   8 hour assignments at GEO's discretion. Moreover, the failure to work mandated overtime will

result in appropriate discipline. Often times, Detention Officers, including Officer Santiago would

24   voluntarily work overtime shifts to help alleviate some of the burdens placed on other officers by

25   virtue of the short staffing at GEO.

26   15.    Short staffing was constantly a problem at the Adelanto Detention Facility. Short-staffing

27   issues at the Adelanto Facility created significant safety risks for GEO staff, and inmates, alike.

GEO administrative staff and lieutenants often ordered Detention Officers to cover multiple posts at

28   one time, thereby requiring Officers to leave their assigned posts to assist officers in other posts.

2

**DECLARATION OF JOSEPH LEE HARRIS**

Also, due to short staffing at GEO, GEO would collapse or close certain posts because there was not a sufficient number of officers to cover or control every post.

16.     On August 5, 2015, the day of the incident, which involved detainee Jimmy Irias, I was manning Central Control with Officer Marquez. On the day of the incident involving detainee Jimmy Irias, a Lieutenant ordered Officer Patterson to leave his assigned post in Segregation, serve Central Command with the Facility Count paperwork, and then go relieve other officers for break so GEO would not incur meal penalties. By ordering Officer Patterson to leave Segregation, which was a two-man post, Officer Santiago was left alone. Santiago was performing the workload of two officers.

17.     With respect to whether Detention Officers received specialized training to work in the Segregation Unit, there was never ever a formalized training to undergo in order to be qualified – just paperwork training.

18.     Just prior to Mr. Santiago being terminated by GEO, Adelanto circulated paperwork that provided that detainees under protective custody should not be locked in the shower unless they were given a razor. I know that on the day of the incident with detainee Irias, detainee Irias was not given a razor, so there was no need for the detainee to be locked in the shower. Nor, on the day of the incident with detainee Irias, were there any precautions placed on detainee Irias' cell door indicating that special precautions needed to be taken when handling that detainee.

19.     In no way shape or form was Officer Santiago justifiably terminated. In all regards the detainee never escaped. The detainee was still within the facility in a secured area that general population goes through all the time. The detainee was never at risk of escaping the facility in any way. Officer Santiago was manning the Segregation Unit by himself at the time when there should have been two men in there due to the second officer being collapsed to go cover lunches on the other side. Officer Santiago was upstairs either distributing meal to the detainee inmates or conducting a pipe check. The incident occurred due to a culmination of Officer Santiago having to do his job duties in concert with the duties of another officer at the same time. I firmly believe that Officer Santiago did not do anything wrong. He was told not to lock showers unless they had a razor – the detainee did not have a razor, and inmate Jimmy Irias was a Protective Custody detainee so there was no reason to lock him in the showers at the time Officer Santiago was terminated from GEO.

20.     GEO management often told us that Segregation runs itself. Segregation was its own unit; it was to run the way it needed to be run—separate and distinct from all other units. There was never a practice put in place where detainees would not be allowed to come out during facility counts because the Segregation Unit was unlike General Population and such a practice would place

3

1   restraints on officers in trying to complete their duties.  Conducting count while detainees were in
2   the showers was not uncommon at the time Officer Santiago worked at GEO, and it was never an
3   issue prior to Officer Santiago's termination.  It was common practice for detainees to be unsecured
    outside their cells even though facility count had commenced in the Segregation Unit before the
4   August 2015 with detainee Irias.  I have personally witnessed detainees be unsecured in the unit
5   while Facility Count has commenced, and in those circumstances no officers were written-up or
6   reprimanded in any way.  Officer Santiago did what he was instructed to by administration.  He was
7   doing his regular work duties and detainee Jimmy Irias was not required to be secured in the shower.

8   21.     If a detainee was one who posed an escape risk or exhibited violent behavior towards staff,
    GEO was required to notify the Officers in writing indicating that extra precautions should be taken
9   with that detainee such as the detainee requiring multiple officer escorts.  I distinctly remember that
10  there were no such written notifications that detainee Jimmy Irias posed any such risk to anybody at
11  the Adelanto Facility.  If GEO did not log that the detainee required a special precaution or
12  restraints, or if the need for restraints were not documented, GEO Detention Officers would not be
13  responsible for taking additional precautions.

    22.     Similar to GEO's policy vis-a-vis facility count, GEO allowed for Officers to conduct meal
14  service during count.  In fact, GEO instructed Detention Officers in the Segregation Unit that meals
15  shall be served at the proper temperature.  This means that as soon as the Kitchen Staff delivers the
16  meal trays to the Unit, Officers should assume that the meals are at the proper temperature.
17  Accordingly, Officers working the Segregation Unit are encouraged to serve the meals to the
18  detainees immediately upon receiving the trays.  This proved to be difficult for Officers because
    Officers are also required to conduct their thirty-minute security checks throughout the shift.
19  23.     If a meal arrives from the Kitchen Staff during facility count, Officers generally serve the
20  meal as soon as they finish counting their unit.  An officer's unit count could be completed while
21  facility count could still be in process.  Facility count generally takes up to two hours to complete.
22  And between you and your partner manning the same Unit, Segregation count generally takes about
23  ten minutes to complete.  Therefore, it was common practice, and well within GEO's policies at the
    time Office Santiago was terminated at GEO, for an Officer to distribute meals, and/or to allow a
24  detainee to enter the showers, even through facility count is still in process.

25  24.     The procedures for conducting a facility count is straightforward.  If a detainee is housed in
26  Unit, the Officer shall account for that detainee at all times.  If a detainee is not present in an
27  Officers Unit while a count has commenced, that officer would indicate so on the unit Count Slip
28  form and the officer directly supervising the detainee outside of the unit would complete an out-
    count form indicating that they are in possession of said detainee.  For example, if a detainee is in

4

**DECLARATION OF JOSEPH LEE HARRIS**

the law library, kitchen, or at the visiting room, the supervising Officer should indicate that they are in custody of that detainee and indicate so on an out-count form. If the detainee is confined within the Unit, however, the housing unit officer would maintain custody of that detainee so there would be no need for an out-count form. The out-count form is only meant to track a detainee who is not present within their assigned unit during count.

25.     The biggest issue which I believe contributed to the incident with detainee Irias on August 2015, was that there was supposed to be two officers manning the unit that day. There is a control bubble within the Segregation Unit. On the day of the incident, this control bubble was not manned. If there were an officer manning that station, that officer would have seen the detainee exit the shower and enter the sally port and try to get out. If there were somebody in the control bubble this would have never happened. The control bubble is a post, there needed to be an officer manning that station. GEO labeled this post as "control officer" on the shift roster, but there was never any body there. Instead, Adelanto facility used the person that was supposed to be stationed at that post to cover another person in segregation. This was a staffing plan that GEO kept getting away with. On the day that this Declaration was submitted, First Shift has that bubble fully manned where there is one officer in the bubble, and there are two additional officers on each side of the unit. In regards to Second shift, there are two people on the Protective Custody side while the detainees are unsecured in the unit. If the detainees are secured, one officer remains on the floor while the other officer would man the control bubble in the segregation unit. Likewise, if there were two officers in that unit where Officer Santiago was, this wouldn't have happened

26.     With respect to meal and rest breaks, California Labor standards require that for every eight hours of work, an Officer is supposed to get one thirty-minute lunch break, and two ten-minute breaks. GEO simply did not provide Officers with their ten-minute breaks. From the moment we started to about the year of 2014, Detention Officers were simply not awarded their ten-minute breaks or lunches. There were instances where Detention Officers would outright not receive their lunch breaks. On the day that this declaration was submitted, GEO has a lieutenant track who received their breaks.

27.     On the day of the incident in August 2015, Officer Marquez was in the Central Control post. Officer Marquez's duties were very difficult because she had to regulate the entire facility on one switch board. Central was supposed to have three officers in the control center—one for each board, and one for the radio, telephone, and opening doors. Marquez was by herself on the day of the incident with detainee Irias.

28.     On the day that this declaration was submitted, the procedure for Central Control changed to relieve the Central Control officer from much stress. After the incident with Officer Santiago,

1   during count they began taking the officer who is conducting paperwork outside of central to the
2   watch office while another officer enters and covers that post while the other officer is conducting
3   count. Because at that time the other officer would transfer all the boards to the other side and that
    officer would conduct all the paperwork for the count in central while still dealing with all the
4   radios, doors, and telephone. This relieves the number of doors central has to control. Because there
5   are two boards and you could transfer back and forth (meaning that the officers could separate the
6   facility into halves). But when the facility is on one board there are six access ports that go from
7   inside the facility to the perimeter that would let one go outside, plus there are numerous inside
    doors, and at that time they had control bubbles that would watch over all the pods—actual units for
8   the general population – those were unmanned at the time because they would have those officers as
9   roamers who would go to other units and do breaks and lunches in that unit so they would have all
10  the unit doors also.

11  29.     Officer Marquez was terminated due to the August 2015 incident with detainee Irias. Geo
12  terminated her at a different time than Officer Santiago because at the time of the incident, Officer
13  Marquez was pregnant, and she went out on maternity leave the following day. After having her
    baby, she returned to work and was terminated the same day.

14

15       I declare under penalty of perjury under the laws of the state of California that the foregoing
16  is true and correct.

17

18       Executed on September   1 , 2017 at Los Angeles, California.

19

20

21                                              _____
22                                                   Joseph Lee Harris, Declarant
23

24

25

26

27

28

                                             6
                          **DECLARATION OF JOSEPH LEE HARRIS**

# EXHIBIT F

Declaration of Daniel Moreiko

# DANIEL MOREIKO DECLARATION

I, Daniel Moreiko, hereby declare the following:

1.      I am over the age of eighteen and am a resident of California.  The following facts are based upon my personal knowledge, and if called as a witness, I would, and could competently and completely testify to the truth of the facts stated herein.

2.      This declaration is in support of claims asserted by Emanuel Santiago against The GEO Group.

3.      I have had a long history as a Detention Officer with GEO Corrections and Detention Facility.  GEO Corrections and Detention Facility hired me on March 18, 2013 as a Detention Officer at Facility Number 196, the Adelanto Detention Facility, located at 10250 Rancho Road, Adelanto, California 92301.

4.      My official last day of employment with Geo was December 30, 2016.

5.      I am familiar with Segregation procedures because upon being hired, I worked as a Second Watch Detention Officer, and for the past two years. I have worked Second Shift Detention Officer in the Segregation Housing Unit.

6.      I believe Emanuel Santiago is a hardworking and capable individual.  Emanuel is passionate about his work and loves what he does.  Emanuel is constantly seeking to learn and for this reason proved to be an effective Detention Officer while employed with GEO Corrections and Detention Facility.

7.      I know Emanuel Santiago as he and I were in the same pre-service training program when GEO Corrections and Detention Facility first hired us as Detention Officers in March 2013. Emanuel and I had have worked together for many months.  As Officer Santiago was quite new to working Second Watch Segregation, I have worked with him only on a handful of occasions during the Second Watch in the Segregation Housing Unit.

8.      The Segregation Unit is more demanding than other Units in the Adelanto Detention Facility. This unit houses detainees who require a higher level of security, and because of this higher level of security, the unit requires two officers at all ties as all detainee movement was controlled.

9.      A supervising Lieutenant must grant every Detention Officer authorization to work in the Segregation Unit.  The authorization process includes for Officers to undergo "Specialized Training" in the operations of the segregated housing unit.  Also, a necessary component to satisfying this Specialized Training is a forty-hour on the job training ("OJT") to be accomplished in one-weeks

1

1    time.  Officers going through OJT are trained by already trained, and approved segregation officers.

2    I am not certain whether Emanuel had received this Specialized Training prior to being authorized to

3    work the Segregation Unit.

4    10.    With respect to the count procedures implemented by GEO at the time Santiago had been

5    working as Detention Officer there, GEO policy required that two officers shall be present in

6    Segregation at all times.  GEO policy dictates that once Facility Count commences each officer shall

7    individually proceed to count each detainee in the given Unit that they are working in.  While one

8    Officer conducts the count, the other officer stationed in the Unit is required to monitor detainee

9    movement to ensure that detainees stay within their space. Once both Officers have conducting their

10   individual counts, they confirm that they had reached the same detainee count number.  This

11   reconciliation step for the count process is crucial in that it helps to determine whether all detainees

12   are present and accounted for in the unit at the time.  Next, the Officers would complete the count

13   slip together and one Officer would take responsibility for submitting the completed form to the

14   Central Control for count confirmation.

15   11.    If a detainee is confined within the unit, the Officers will account for that detainee.  If the

16   detainee is not within the unit during count, and is in the visitation room—outside of the unit-- for

17   example, that detainee will be "out-counted."  It follows that if a detainee is taking a shower within

18   the unit during count, the Officers will not "out-count" the detainee because the detainee is still

19   within the housing unit.

20   12.    At the time Emanuel was working at GEO, Detention Officers working in the Segregation

21   Unit were responsible for conducting many tasks throughout the workday.  For example, Detention

22   Officers working in Segregation were responsible for conducting hourly detainee "checks" to ensure

23   that every detainee within their assigned Unit is safe, and present. Post orders state security checks

24   must be completed before every 30 minutes to check for living breathing flesh. Additionally,

25   Officers working in Segregation Unit and particularly during the Second Shift, were required to

26   monitor detainee movement more closely because Detainees frequently requested going to

27   restrooms, bathrooms, recreational areas, and dormitory areas, especially during this shift period.

28   13.    Segregation officer duties include security checks, conducting formal counts, allowing

     detainees the opportunity for dayroom activities, outside recreation time (2 hours daily on 2nd

     watch), allowing detainees to shower upon request, maintaining a post log book which details

     everything that occurs on post, daily segregation paperwork such as arrivals and releases from

     segregation.

     14.    There is also an additional pressure on Detention Officers because the Facility is extremely

     short-staffed; posts are constantly being collapsed or terminated because there simply are not enough

**DECLARATION OF DANIEL MOREIKO**

Officers to operate the stations.   Given the number of tasks to be completed, and that detainee movement is more frequent during Second Watch, and coupled with the fact that Segregation Unit is short-staffed, Officers are given a lot of discretion to accomplish their daily and weekly tasks.

15.     I have personally witnessed facility counts commence when a detainee is not secured in their cell. This is common practice. An Officer may determine, due to short staffing and time constraints of the job, that the detainee continues his shower while count is in process.  Officers have this discretion if the Officer can account for the showering detainee.  An Officer can easily walk by the shower area during the count, observe the detainees presence, and confirm that the detainee is still within the Unit.

16.     At the time when Emanuel was working in Segregation there was really no procedure in place with respect to providing shaving razors and securing a detainee in the shower.   In fact, Detention Officers were told that Detention Officers shall secure the shower by locking it only if a detainee were to request for a razor.   If a detainee did not request a razor while taking a shower, Officers should not lock the showers. Following the incident with Officer Santiago and detainee Irias, GEO policy had changed; we were told to lock the detainee in the shower at all times.

17.     With respect to meal service, at the time Emanuel was working at Adelanto Corrections and Detention Facility, two officers would go cell to cell, open each detainee's food port, which is affixed to the detainees' cell doors, and manually hand each detainee their food trays and fill up their drinks.

18.     The Meal Service procedure may take place, and often did take place during facility count. Once Officers reconcile their count numbers they would immediately initiate the meal service procedure or "chow."  It is definitely not out of the question for meal service to proceed while count had commenced.

19.     It is also common practice, and up to Detention Office discretion whether to release detainee porters from their cells to assist the officer in distributing meal service while count has commenced. If the porters are within the Segregation unit it is not uncommon for Officers to release porters while Facility Count is not yet completed because meal service is to be served while it is still warm.

20.     Following Emanuel's termination, GEO procedure with respect to meal service has changed as well.  Now, one officer sets-up a food cart in the middle of the dorm at the day room, and one officer would observe as detainees would come from their cells and receive their food trays.  Upon receiving their meals, the detainees would return to their respective cells

21.     With resect to our state required meal and rest breaks, Officers are permitted two ten-minute rest breaks and one thirty-minute lunch break within an eight-hour working shift. However, Officers rarely receive their minute breaks in Segregation.   Officers are lucky if they even receive even one

3

ten-minute break rest break during their eight-hour working shift.  Officer's not receiving their state sanctioned meal and rest breaks happened regularly.  I have witnessed "Utilities" – who are responsible for ensuring breaks and counts are completed—sign the Break- Log on behalf of Officer's to indicate that an Officer had received their required break even though the Officer had not received a break.

22.      Santiago was an exception Detention Officer.  Second Watch Segregation is the only Watch that is not assigned a Segregation Control Room Officer.  We have asked many times why Second Watch is not assigned a Control Officer and we were told that post does not meet the staffing requirements for Second Watch.

23.      This whole situation with Santiago would have been prevented if there was a Segregation Control Room Officer because the Control Room is right next to the exit doors of Segregation.

**DECLARATION OF DANIEL MOREIKO**

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct.

Executed on January 2<u>ᴼ</u> 2017 at Los Angeles, California.

Daniel Moreiko, Declarant

**DECLARATION OF DANIEL MOREIKO**

# EXHIBIT G

Declaration of Eduardo Macias

# EDUARDO MACIAS DECLARATION

I, Eduardo Macias, hereby declare the following:

1.       I am over the age of eighteen and am a resident of California. The following facts are based upon my personal knowledge, and if I am called as a witness, I would, and could competently and completely testify to the truth of the facts stated herein.

2.       This declaration is in support of claims asserted by Emanuel Santiago against The Geo Group, Inc.

3.       I began working for GEO on October 1, 2012 at the Adelanto Detention Facility, located at 10250 Rancho Road, Adelanto, California 92301. And I continued to work three for 3 years and 8 months. Prior to working at GEO I was working for a private sector security company from February 2012 to October 2012.

4.       On June 8, 2016 I resigned and left GEO for a career advancement with the Federal Bureau of Prisons in Victorville, CA.

5.       I have extensive background in criminal justice. I have a Bachelors degree in Criminal Justice. I am CPR certified, trained in tear gas and O.C. spray by the Public Safety Training Association, Inc. I have a guard card. I am permitted for exposed fire arms for 9mm caliber from the State of California. I also have specialized training at the Federal Law Enforcement Training Center in Brunswick, Georgia.

6.       When I began working at GEO I received 40 hours of on the job training.

7.       Since working at GEO, I have never received any write-ups or reprimands.

8.       During the time of the incident I was an Officer in Segregation and Lieutenant Anderson was my supervisor.

9.       I began working in Segregation six months after I was hired at GEO. Segregation is different from all other units in the facility because it had lock down status. Meaning that all detainees in segregation were locked down except for daily showers and recreational time. Whereas, general population has day room access as well as access to other amenities.

10.       Segregation is divided into two sections, disciplinary and administrative. Detainees who are housed in disciplinary are dangerous. Whereas detainees in administration are not. Originally there were only two officers assigned to Segregation. Now there are four officers, two for administration and two for disciplinary. On each side, one officer is the primary officer and would be in charge of the entire unit. The second officer would be a relief officer, meaning he would be consistently leaving the post to relieve other officers or perform paperwork.

11.       Employees are determined to work in Segregation based on the time that you have worked at the Adelanto facility and the experience you may have. You need to have worked there for a minimum of one year to be authorized to work in Segregation. However, due to the short staffing issues, officers would get placed in Segregation if supervisors believed they would be suitable or if the officer knew how Segregation was operated. There are no specific skills or training you would

1

1   need in order to work in Segregation.

2   12.    As an officer at GEO I have expressed disappointment with the policies at GEO to other

3   officers and employees who worked there.  Mainly for the reason that some policies contradict one another.

4   13.    I worked at Adelanto facility from 8 to 16 hours a day.  I am only able to make meal or rest

5   breaks when there is sufficient coverage.  I have encountered several occasions where there was no available post coverage and was not able to take my breaks.  Not everyone receives their meals and

6   rest breaks at the same time, it depends on the availability to cover.  Sometimes multiple officers

7   would be on break.  Officers would be on lunch during the same time that detainees are being fed.

8   14.    I knew Officer Santiago as I worked with him as a fellow officer.  I also helped train Mr. Santiago by showing him how segregation was operated on a shift basis.  It was not a formal training

9   nor was it indicated in a record.  The training I provided Mr. Santiago was during the 8-hour work

10  shift.

11  15.    On August 5, 2015, I was posted as a perimeter officer outside circulating the facilities perimeter in a company vehicle.

12  16.    Detainee Irias an administrative segregation detainee had a known history of being a

13  combative detainee and he served disciplinary segregation time for those incidents in the past.  There were never any indications made on detainee's prison cell of his propensity to be dangerous or

14  escape after the incident.  There were never any signs advising staff of detainee Irias being an escape

15  risk, dangerous and/or anything in that manner.

16  17.    After this incident only verbal indications were made to officers that detainee Irias had to be watched more carefully.

17  18.    Changes in policies were typically communicated orally.  During briefings, the Lieutenant would announce a policy change and would notify us to read post orders.

18  19.    As an officer at GEO I have heard of instances where employees were not fired for not

19  following policies.  There are also instances of employees not being fired due to being pregnant or

20  female.  Usually these employees are given only verbal warnings.

21  20.    GEO has had many issues regarding short staffing and it is the biggest issue there.  There are

22  also issues with break times as well as overtime pay.  We were required to make sure the correct times were inputted.

23  21.    There are huge issues regarding our safety.  Safety equipment was not always provided and

24  no notifications would be made to employees of detainees who may have a dangerous record.

25          I declare under penalty of perjury under the laws of the state of California that the foregoing

26  is true and correct.

27

28

**DECLARATION OF EDUARDO MACIAS**

Executed on November __8__, 2017 at Los Angeles, California.

Eduardo Macias, Declarant

3
**DECLARATION OF EDUARDO MACIAS**